# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---------------------------------------------------------------- X

MEIDU ENERGY CORPORATION and : Index No.: _____/2020
MEIDU AMERICA, INC. :
 :
            Plaintiffs, :          **VERIFIED COMPLAINT**
 :
    -against- :
 :
MC CREDIT FUND I LP, MC CREDIT I A LP, :
MC CREDIT II FUND LP, MC CREDIT FUND III, :
MC CREDIT FUND III-U, MC CREDIT FUND III, :
TAO TALENTS LLC, TPG SPECIALTY LENDING :
INC., ARENA LIMITED SPV LLC, PRUDENTIAL :
LEGACY, INSURANCE COMPANY OF NEW :
JERSEY, THE PRUDENTIAL INSURANCE :
COMPANY OF AMERICA, ROBERT :
WARSHAUER, AND DONALD RITTER, :
 :
            Defendants, :
 :
MD AMERICA ENERGY HOLDINGS, INC., MD :
AMERICA INTERMEDIATE HOLDINGS, LLC, :
MD AMERICA HOLDINGS, LLC, MD AMERICA :
ENERGY, LLC, MD AMERICA PIPELINE, LLC, :
and MD AMERICA FINANCE CORPORATION, :
 :
            Nominal Defendants. :

---------------------------------------------------------------- X

Plaintiffs MeiDu Energy Corporation ("MeiDu") and MeiDu America, Inc ("MeiDu

America" collectively, "Plaintiffs") by way of complaint against defendants MC Credit Fund I LP,

MC Credit I A (Cayman Master) LP, MC Credit Fund II LP, MC Credit Fund III (Delaware) LP,

MC Credit Fund III-U (Delaware) LP, MC Credit Fund III (Cayman Islands) LP, Tao Talents

LLC, TPG Specialty Lending Inc., Arena Limited SPV LLC, Prudential Legacy Insurance

Company of New Jersey, The Prudential Insurance Company of America, Robert Warshauer and

Donald Ritter  (collectively "Defendants"), and MD America Energy Holdings, Inc., MD America

Intermediate Holdings, LLC, MD America Holdings, LLC, MD America Energy, LLC, MD America

Pipeline, LLC, and MD America Finance Corporation (collectively, "MeiDu Subs" and "Nominal Defendants") hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.  MeiDu Energy Corporation is a corporation organized and existing in China and is engaged in business of developing oil and gas resources.

2.  MeiDu America is a corporation organized and existing under the laws of the State of Delaware.

3.  The sole member of MeiDu America, Inc. is MeiDu Energy Corporation.

4.  Defendant MC Credit Fund I LP is a limited partnership, under information and belief, organized and existing under the laws of the State of Connecticut

5.  Defendant MC Credit I A LP is a limited partnership, which on information and belief, is duly organized and existing under the laws of the State of Connecticut.

6.  Defendant MC Credit Fund II LP is a limited partnership, which on information and belief, is organized and existing under the laws of the State of Connecticut

7.  Defendant MC Credit Fund III LP is a limited partnership, which on information and belief, is organized and existing under the laws of the State of Connecticut.

8.  Defendant MC Credit Fund III LP is a limited partnership, which on information and belief, is organized and existing under the laws of the State of Connecticut.

9.  Defendant Tao Talents, LLC, is a limited liability company organized and existing under the laws of Delaware.

10.  Defendant TPG Specialty Lending, Inc. is a corporation organized and existing under the laws of Delaware.

11.  Defendant Prudential Legacy Insurance Company of New Jersey is a corporation

{N0271565 }

organized and existing under the laws of the State of New Jersey.

12.     Defendant The Prudential Insurance Company of America is a corporation organized and existing under the laws of the State of New Jersey.

13.     Defendant Arena Limited SPV, LLC is a limited liability company organized and existing in under the laws of the State of Connecticut.

14.     Defendant Robert Warshauer, on information and belief, is a Texas resident.

15.     Defendant Donald Ritter, on information and belief, is a Texas resident.

16.     Nominal Defendant MD America Energy Holdings, Inc. is a corporation organized and existing under the laws of the State of Delaware.

17.     The sole member of MD America Energy Holdings, Inc. is MeiDu America, Inc.

18.     Nominal Defendant MD America Intermediate Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

19.     The sole member of MD America Intermediate Holdings, LLC is MD America Energy Holdings, Inc.

20.     Nominal Defendant MD America Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

21.     The sole member of MD America Holdings, LLC is MD America Intermediate Holdings, LLC.

22.     Nominal Defendant MD America Energy, LLC is a limited liability company organized and existing under the laws of the State of Delaware.

23.     The sole member of MD America Energy, LLC is MD America Holdings, Inc.

24.     Nominal Defendant  MD America Pipeline, LLC is a limited liability company organized and existing under the laws of the State of Texas.

{N0271565 }

25.     The sole member of MD America Pipeline, LLC is MD America Energy, LLC.

26.     Nominal Defendant MD America Finance Corporation is a corporation organized and existing under the laws of the State of Delaware.

27.     The sole member of MD America Finance Corporation is MD America Energy, LLC.

28.     This Court has jurisdiction over this matter pursuant to CPLR §§ 301 and 302, *et seq*., because Defendants transact business in the State of New York, and/or committed tortious acts within the State of New York.

29.     Additionally, pursuant to the Credit Agreement, Plaintiffs, Defendants and Nominal Defendants have agreed to submit to the jurisdiction of any federal or state court in the City of New York, County of New York.

30.     Venue is proper in this Court pursuant to CPLR § 501 because there is a written agreement between Plaintiffs and Defendants fixing New York County as the place of trial.

31.     All conditions precedent to this suit have been met, performed, or waived.

## STATEMENT OF FACTS

32.      On November 14, 2018, MD America Energy Holdings, Inc., MD America Intermediate Holdings, Inc., MD America Holdings, LLC (collectively "Holding Companies"), MD America Energy, LLC ("Borrower"), Loan Admin. Co., LLC and Guggenheim Securities, LLC entered into a Credit Agreement to borrow $100 million in connection with their oil and gas business. (collectively, "Credit Agreement Parties"). A true and correct copy of the Credit Agreement is attached hereto as **Exhibit A**.

33.     Pursuant to the Credit Agreement, the Defendants and Nominal Defendants have agreed to submit to the jurisdiction of any federal or state court in the City of New York, County

of New York. See Exhibit A at p. 136.

34.     On November 14, 2018, the Credit Agreement Parties entered into a Pledge Agreement. The Pledge Agreement provided for various remedies in the event of default in according with Article 9 of the UCC such as: (i) receive all amounts payable, (ii) transfer collateral; (iii) accelerate the Pledged Notes; (iv) appoint a receiver or agent, (v) institute court proceedings for the appointment of a receiver, (vi) act with respect to the collateral as the outright owner, (vii) sell, assign, deliver or grant options to purchase all or part of the Collateral at any public or private sale. In effect, the Pledge Agreement resulted in the pledge of all of membership interests in the MeiDu Subs. A true and accurate copy of the Pledge Agreement is attached hereto as **Exhibit B**.

35.     On November 14, 2018, MD America Energy, LLC executed a $20,000,000 note in favor of Arena Limited SPV, LLC.  See **Exhibit C** hereto.

36.     On November 14, 2018, MD America Energy, LLC executed a $29,500,000 note in favor of Prudential Legacy Insurance Company of New Jersey**.** See **Exhibit D** hereto.

37.     On November 14, 2018, MD America Energy, LLC executed a $5,500,000 note in favor of The Prudential Insurance Company of America. See **Exhibit E** hereto.

38.     MD America Energy, LLC also executed notes for a total of $130 million.

39.     On December 20, 2019, the Defendants forced the Credit Agreement Parties to execute an amendment to the Credit Agreement, which provided that the MD America Energy, LLC had to "cause an aggregate amount of not less than $30 million of cash common equity proceeds to be distributed to Holdings." Moreover, failure to provide the $30 million before March 31,2020 would result in a default. A copy of the First Amendment is attached hereto as **Exhibit F**. Moreover, the Defendants altered the calculations of reserves to go from a 12-month

{N0271565 }

rolling average to a 30-90-day average, which is considered to be "suicide" in the commodities market.

40.     Upon information and belief, this was an attempt by the Defendants to induce a default by utilizing their economic power to force MeiDu America to enter into the amendment.

41.     MeiDu America, upon information and belief, was current on all payments up and until March 31, 2020, when it was required to make a payment of $30,000,000.

42.     Due to the global pandemic of COVID-19, China was on lockdown until April 2020 and therefore MeiDu America was unable to complete this financial obligation.

43.     Upon information and belief, MeiDu Energy Corporation's location in China was the second hardest hit COVID-19 province in China after Wuhan.

44.     On April 1, 2020, Defendants issued a Notice of Default to Plaintiffs stating that they were intending to take over the business. See **Exhibit G**.

45.     On April 1, 2020, the MeiDu Subs purported to appoint a new captive board consisting of defendants Warshauer and Ritter to take control of the company ("Lenders' Board"). True and accurate copies of the purported appointments are attached as **Exhibit H**.

46.     On April 2, 2020, the MeiDu Subs abruptly terminated the computer access of Haixiao Shao ("Jimmy") so that he would no longer be able to communicate with the them. Jimmy Shao was also instructed not to communicate with anyone and if he was contacted to direct the third party directly to the Lenders' Board.

47.     On April 11, 2020, Jimmy Shao reached out to the Lenders' Board and Ashok Nayyar and John Tunis of MC Credit Fund to let them know that Plaintiffs and its financial officers needed certain financial information so that they could complete the 2019 annual report and the 2020 first quarter report. This email went unanswered. See **Exhibit I**.

48.    Plaintiffs learned that this failure was intentional. Defendants withheld this information in order to drive down the market value of MeiDu Energy Corporation's shares in order to put further financial pressure on Plaintiffs.

49.    As a result of these actions, including but not limited to the Lenders' Boards failure to provide the information requested for the financials, MeiDu Energy Corporation's auditor had to issue a qualified opinion on April 29 ,2020.

50.    On April 14, 2020, due to the takeover by the Lenders' Board, press releases were issued in China. See **Exhibit J**.

51.    Upon information and belief, the press releases caused a precipitous decline in MeiDu Energy Corporation's stock value.

52.    On May 27, 2020, according to their regulations, the Shanghai Exchange suspended MeiDu Energy Corporation and began their de-listing process. See **Exhibit K**.

53.    As a direct and proximate result of Defendants' failure to provide this vital financial information, MeiDu Energy Corporation has been damaged in an amount yet to be determined, but believed to be in excess of $400 million due to Defendants' deliberate failure to provide this information to its auditors.

54.    In addition, MeiDu America's efforts to address the loan payments that came due (for which the collateral served as security) has been stymied by Defendants' improper conduct.

55.    By way of example, MeiDu America received an offer and term sheet from a third party, Zhongzhi Enterprise Group ("ZG Group"), which is a Chinese private financial group.

56.    ZG group was summarily rebuffed by Defendants.

57.    Notwithstanding Defendants' failure to properly manage the collateral for the benefit of MeiDu, including reviewing in good faith offers of sale, Defendants have also begun

{N0271565 }

to affirmatively and systematically dismantle MeiDu's operations.

58.     On March 23, 2020, Defendants forced MeiDu to reduce their workforce by 40% and the employees who remained employed were paid substantially less than owed.

59.     Based on information and belief, a second reduction in the workforce is imminent.

60.     This unilateral decision by the captive directors, effected for the sole benefit of the Defendants will necessarily cause a substantial hardship to Plaintiffs when Plaintiffs begin to fully operate following the COVID-19 pandemic due to the loss of invaluable human capital and critical operational components of MeiDu's workforce.

61.     The aforementioned activities resulted in enormous damage to the Plaintiffs, were violative of Defendants' obligations pursuant to Article 9 of the Uniform Commercial Code, and violated Defendants' fiduciary obligations.

62.     By reason thereof, defendants suffered damages in an amount yet to be determined but in excess of $130 million.

## COUNT I
### (Declaratory Relief)

63.     Plaintiffs repeat and reallege the allegations heretofore stated.

64.     Defendants' exercise of complete dominion and control over MeiDu America's ownership interest in the MeiDu Subs was a direct violation of applicable provisions of Article 9 of the Uniform Commercial Code.

65.     To the extent that the Pledge Agreement purports to give defendants the right to ownership of the pledged corporate interests of MeiDu America's subsidiaries, the Pledge Agreement is unenforceable under U.C.C. § 9-602.

66.     By reason thereof, plaintiff MeiDu America seeks an order determining that all such ownership interests in the MeiDu Subs remain assets of Plaintiffs, and the actions taken by

the Defendants purporting to rest total ownership and control from MeiDu America is unenforceable as a matter of law.

## COUNT II
### (Conversion)

67.     Plaintiffs repeat and reallege the allegations heretofore stated.

68.     Defendants' exercise of complete dominion and control and the assertion of ownership of the assets of MeiDu America Inc. was unlawful.

69.     In furtherance thereof, Defendants unlawfully removed the board members and the board of directors of the MeiDu Subs owned by plaintiff MeiDu America and replaced these duly elected members with a captive board, for the benefit not of MeiDu America, but rather that of the Defendants.

70.     This conduct constitutes an unlawful conversion of MeiDu America's property.

71.     By reason of the foregoing, plaintiff MeiDu America is due and owed an amount yet to be determined, but in excess of $130 million.

## COUNT III
### (Injunctive Relief)

72.     Plaintiffs repeat and reallege the allegations heretofore stated.

73.     Pursuant to U.C.C. § 9-625(a), Plaintiffs' rights to corporate governance were violated when Defendants removed the directors and managers of the MeiDu Subs.

74.     In addition, defendants Warshauer and Ritter, the captive board members of the MeiDu Subs have been placed in these positions unlawfully.

75.     By reason of the foregoing, this Court should order these Defendants be removed as directors forth with and replaced with the board of directors and board of managers in place prior to April 1, 2020.

{N0271565 }

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 11 of 300

## COUNT IV
### (Injunctive Relief)

76.     Plaintiffs repeat and reallege the allegations heretofore stated.

77.     Defendants, by exercising complete dominion and control over the MeiDu Subs, have exceeded their authority under applicable provisions of Article 9 of the Uniform Commercial Code.

78.     By reason of the foregoing, this Court should order all such activity to cease immediately pursuant to U.C.C. § 9-625(a).

## COUNT V
### (Breach of Fiduciary Duty)

79.     Plaintiffs repeat and reallege the allegations heretofore stated.

80.     MeiDu Energy Corporation is a "person" as defined by U.C.C. § 9-625(b).

81.     By deliberately withholding information requested by Plaintiffs, MeiDu Energy Corporation has suffered damages. These damages not only violated applicable provisions of Article 9 of the Uniform Commercial Code, but also violated the obligation of good faith and fair dealing memorialized both by the Uniform Commercial Code and by the common law of the State of New York.

82.     By reason of the foregoing, MeiDu Energy Corporation has suffered damages in an amount yet to be determined but in excess of $440 million USD.

## COUNT VI
### (Discharge of Debt)

83.     Plaintiffs repeat and reallege the allegations heretofore stated.

84.     By reason of the foregoing, Plaintiffs' obligations to the Defendants should be deemed satisfied.

{N0271565 }

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 12 of 300

## COUNT VII
### (Set-Off of Debt)

85.     Plaintiffs repeat and reallege the allegations heretofore stated.

86.     Alternatively, Plaintiffs' are entitled to a right of set off, in an amount up to and including any debt allegedly owed by Plaintiffs' to Defendants.

87.     By reason of the foregoing, Plaintiffs' obligations to the Defendants should be deemed satisfied.


## DEMAND FOR RELIEF

**WHEREFORE,** Plaintiffs MeiDu Energy Corporation and  MeiDu America, Inc., demand judgment against Defendants MC Credit Fund I LP, MC Credit I A (Cayman Master) LP, MC Credit Fund II LP, MC Credit Fund III (Delaware) LP, MC Credit Fund III-U (Delaware) LP, MC Credit Fund III (Cayman Islands) LP, Tao Talents LLC, TPG Specialty Lending Inc., Arena Limited SPV LLC, Prudential Legacy Insurance Company of New Jersey, The Prudential Insurance Company of America, Robert Warshauer and Donald Ritter and Nominal Defendants MD America Energy Holdings, Inc., MD America Intermediate Holdings, LLC, MD America Holdings, LLC, MD America Energy, LLC, MD America Pipeline, LLC, and MD America Finance Corporation for the following:

i)     Declaratory Judgment that all such ownership interests in the MeiDu Subs remain assets of the Plaintiffs, and the actions taken by the Defendants purporting to rest total ownership and control in MeiDu America is unenforceable as a matter of law.

ii)     Conversion finding that MeiDu America is owed an amount yet to be determined, but in excess of $130 million USD.

{N0271565 }

iii)     An injunction removing as directors forth with and replaced with the board of directors and board of managers in place prior to April 1, 2020.

iv)     Injunctive Relief pursuant to U.C.C. § 9-625(a);

v)     Damages for the Defendants' breach of fiduciary duty under both the Uniform Commercial Code and the common law of the State of New York to MeiDu Energy Corporation in an amount yet to be determined but believed to be in excess of at least $440 million USD;

vi)     Discharge of Debt against all Plaintiffs;

vii)     Set-Off of Debt against all Plaintiffs;

viii)     Return of any compensation paid to the captive directors, Warshauer and Ritter;

ix)     Punitive Damages against all Defendants on the Conversion claim in the amount of $300 million USD;

x)     for such other and further relief as may be awarded by the Court.


Dated:  June 16, 2020                    **BECKER & POLIAKOFF, LLP**
                                         *Attorneys for Plaintiff*

                                         */s/ James J. Mahon*
                                         James J. Mahon
                                         Vincenzo Mogavero
                                         Paul H. Shur
                                         Oliver Edwards VII
                                         Samantha A. Lesser
                                         45 Broadway, 17th Floor
                                         New York, NY 10006
                                         (212) 599 - 3322

## VERIFICATION

STATE OF TEXAS       )
                              ) ss.:
COUNTY OF TARRANT    )

      **HAIXIAO (JIMMY) SHAO**, being duly sworn, deposes and says:

      I am an officer and director of MeiDu America, Inc., one of the plaintiffs in this action. I have read the foregoing Verified Complaint, and I know the contents thereof to be true based upon my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true. The grounds of my belief as to all matters not stated upon my personal knowledge are my personal involvement in the dispute giving rise to this action.



                                                Haixiao Shao

Subscribed and sworn to before me this
_16th_ day of June, 2020

_Loretta Hunter_
Notary Public

LORETTA HUNTER
Notary Public, State of Texas
Comm. Expires 05-16-2023
Notary ID 132010090

{N0271321 }

# EXHIBIT A

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 16 of 300

EXECUTION VERSION

CREDIT AGREEMENT

AMONG

MD AMERICA ENERGY HOLDINGS, INC.,
AS HOLDINGS AND A HOLDING COMPANY,

MD AMERICA ENERGY, LLC,
AS THE BORROWER,

MD AMERICA INTERMEDIATE HOLDINGS, LLC AND
MD AMERICA HOLDINGS, LLC,
EACH AS A HOLDING COMPANY,

THE LENDERS FROM TIME TO TIME PARTY HERETO

AND

LOAN ADMIN CO LLC,
AS ADMINISTRATIVE AGENT

_____

DATED AS OF NOVEMBER 14, 2018

_____

LOAN ADMIN CO LLC,
AS JOINT LEAD ARRANGER AND SOLE BOOK RUNNER

GUGGENHEIM SECURITIES, LLC,
AS JOINT LEAD ARRANGER

## Table of Contents

Page

SECTION 1. Definitions and Accounting Terms. ........................................................ 1

1.01. Defined Terms. ...................................................................................... 1

1.02. Divisions. ............................................................................................. 40

SECTION 2. Amount and Terms of Loans. ............................................................. 40

2.01. The Loans. .......................................................................................... 40

2.02. Minimum Amounts for Delayed Draw Term Loans; Limitations on Number of Borrowings. .............................................................. 41

2.03. Notice of Borrowing. ........................................................................... 41

2.04. Disbursement of Funds. ...................................................................... 41

2.05. Notes. .................................................................................................. 42

2.06. Conversions. ........................................................................................ 43

2.07. Pro Rata Borrowings. ......................................................................... 43

2.08. Interest. ............................................................................................... 43

2.09. Interest Periods. .................................................................................. 44

2.10. Increased Costs, Illegality, etc. .......................................................... 45

2.11. Compensation. ..................................................................................... 47

2.12. Change of Lending Office. ................................................................... 48

2.13. Replacement of Lenders. ..................................................................... 48

2.14. Alternate Rate of Interest. ................................................................... 49

SECTION 3. Intentionally Omitted. ....................................................................... 51

SECTION 4. Commitment Commission; Fees; Reductions of Commitment. .................... 51

4.01. Fees. ................................................................................................... 51

4.02. Mandatory Reduction of Commitments ............................................... 51

SECTION 5. Prepayment Premiums. ...................................................................... 52

5.01. Prepayment Premiums. ........................................................................ 52

SECTION 6. Prepayments; Payments; Taxes. .......................................................... 53

6.01. Voluntary Prepayments. ...................................................................... 53

6.02. Mandatory Repayments. ...................................................................... 53

6.03. Method and Place of Payment. ............................................................ 56

6.04. Net Payments. ..................................................................................... 57

SECTION 7. Conditions Precedent to Credit Events on the Closing Date. ..................... 60

7.01. Credit Agreement; Notes. .................................................................... 60

i

## Table of Contents
### (continued)

Page

7.02. Officer's Certificate. ......................................................................... 61

7.03. Opinions of Counsel. ......................................................................... 61

7.04. Company Documents; Proceedings; etc. ............................................ 61

7.05. Material Agreements. ......................................................................... 61

7.06. Adverse Change, Approvals. .............................................................. 62

7.07. Litigation. .......................................................................................... 63

7.08. Subsidiaries Guaranty; Intercompany Subordination Agreement. ...... 63

7.09. Pledge Agreement and Meidu Pledge Agreement. ............................. 63

7.10. Mortgage. ........................................................................................... 64

7.11. Security Documents. ........................................................................... 64

7.12. Initial Reserve Report; Title. .............................................................. 64

7.13. Capitalization Information. ................................................................. 65

7.14. Organization Chart. ............................................................................ 65

7.15. Financial Statements; Pro Forma Balance Sheet; Projections. ........... 65

7.16. Solvency Certificate; Insurance Certificates, etc. .............................. 65

7.17. Fees, etc. ............................................................................................ 65

7.18. AML, KYC. ........................................................................................ 66

7.19. Lien Searches. .................................................................................... 66

7.20. Closing Checklist. .............................................................................. 66

SECTION 8.    Conditions Precedent to All Credit Events. ............................. 66

8.01. No Default; Representations and Warranties. ..................................... 66

8.02. Notice of Borrowing. ......................................................................... 66

8.03. Conditions Precedent to Borrowings of Delayed Draw Term Loans. ... 67

SECTION 9.    Representations, Warranties and Agreements. ......................... 67

9.01. Company Status. ................................................................................ 68

9.02. Power and Authority. ......................................................................... 68

9.03. No Violation. ...................................................................................... 68

9.04. Approvals. .......................................................................................... 69

9.05. Financial Condition; Projections. ....................................................... 69

9.06. Litigation. ........................................................................................... 70

9.07. True and Complete Disclosure. .......................................................... 70

9.08. Use of Proceeds; Margin Regulations. ............................................... 70

ii

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM INDEX NO. 652519/2020
NYSCEF DOC. NO. 3 RECEIVED NYSCEF: 06/16/2020

Table of Contents
(continued)

Page

9.09.  Tax Returns and Payments .................................................................. 71

9.10.  Compliance with ERISA ...................................................................... 71

9.11.  Security Documents ............................................................................. 72

9.12.  Properties; Title ................................................................................... 73

9.13.  Capitalization ...................................................................................... 75

9.14.  [Reserved] ........................................................................................... 75

9.15.  Compliance with Statutes, etc ............................................................ 75

9.16.  Investment Company Act .................................................................... 75

9.17.  Insurance ............................................................................................. 76

9.18.  Environmental Matters ....................................................................... 76

9.19.  Employment and Labor Relations ...................................................... 76

9.20.  Intellectual Property ........................................................................... 77

9.21.  EEA Financial Institution ................................................................... 77

9.22.  Indebtedness ........................................................................................ 77

9.23.  Representations and Warranties in Other Documents ......................... 77

9.24.  Necessary Authorizations ................................................................... 77

9.25.  Sanctions; Anti-Corruption ................................................................ 78

9.26.  No Default ........................................................................................... 78

9.27.  Solvency .............................................................................................. 79

9.28.  Maintenance of Properties .................................................................. 79

9.29.  Gas Imbalances, Prepayments ............................................................ 80

9.30.  Marketing of Production ...................................................................... 80

9.31.  Hedge Agreements .............................................................................. 80

SECTION 10.      Affirmative Covenants .......................................................... 80

10.01.  Information Covenants ....................................................................... 80

10.02.  Books, Records and Inspections ........................................................ 84

10.03.  Maintenance of Property; Insurance .................................................. 84

10.04.  Existence; Franchises ......................................................................... 86

10.05.  Compliance with Statutes, etc ........................................................... 86

10.06.  Compliance with Environmental Laws .............................................. 86

10.07.  ERISA ................................................................................................ 87

10.08.  End of Fiscal Years; Fiscal Quarters ................................................. 88

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 20 of 300

Table of Contents
(continued)

Page

10.09.   Performance of Obligations. ........................................................ 88

10.10.   Payment of Taxes. ...................................................................... 88

10.11.   Use of Proceeds. ......................................................................... 89

10.12.   Additional Security; Further Assurances; etc. ............................ 89

10.13.   Ownership of Subsidiaries; etc. .................................................. 91

10.14.   Contributions. ............................................................................. 91

10.15.   Minimum Cash and Cash Equivalents. ....................................... 91

10.16.   Sanctions; Anti-Corruption Laws. .............................................. 91

10.17.   Permitted Acquisitions. ............................................................... 91

10.18.   Maintenance of Company Separateness. ...................................... 93

10.19.   Board Information Packages. ...................................................... 93

10.20.   Keepwell. .................................................................................... 93

10.21.   Reserve Reports. ......................................................................... 94

10.22.   Title Information. ........................................................................ 95

10.23.   Hedge Agreements. ..................................................................... 96

10.24.   Volume of Production, Etc. ......................................................... 96

SECTION 11.      Negative Covenants. .......................................................... 97

11.01.   Liens. .......................................................................................... 97

11.02.   Consolidation, Merger, Purchase or Sale of Assets, etc. ........... 100

11.03.   Dividends. ................................................................................. 102

11.04.   Indebtedness. ............................................................................. 104

11.05.   Advances, Investments and Loans. ............................................ 105

11.06.   Transactions with Affiliates. ..................................................... 108

11.07.   Capital Expenditures. ................................................................ 108

11.08.   Fixed Charge Coverage Ratio. ................................................... 110

11.09.   Total Leverage Ratio. ................................................................ 110

11.10.   Adjusted Coverage Ratio. .......................................................... 111

11.11.   Drilling and Exploration Expenses; Capitalized Drilling and Exploration
         Expenses. ................................................................................... 111

11.12.   Modifications of Certificate of Incorporation, By-Laws and Certain Other
         Agreements; Limitations on Voluntary Payments, etc. .............. 112

11.13.   Limitation on Certain Restrictions on Subsidiaries. .................. 112

iv

Table of Contents
(continued)

Page

11.14. Limitation on Issuance of Equity Interests. ................................................... 113

11.15. Business; etc. ................................................................................................ 113

11.16. Holding Companies. ...................................................................................... 114

11.17. Certain Deposit Accounts. ............................................................................ 114

11.18. Sanctions; Anti-Corruption Use of Proceeds. .............................................. 115

11.19. Restrictions on Hedge Agreements. .............................................................. 115

11.20. Gas Imbalances, Take-or-Pay or Other Prepayments. ................................. 116

11.21. General and Administrative Expenses. ......................................................... 116

SECTION 12.    Events of Default. ................................................................................. 116

12.01. Payments. ...................................................................................................... 116

12.02. Representations, etc. ..................................................................................... 116

12.03. Covenants. ..................................................................................................... 117

12.04. Default Under Other Agreements. ................................................................ 117

12.05. Bankruptcy, etc. ............................................................................................ 117

12.06. ERISA. ........................................................................................................... 118

12.07. Security Documents. ..................................................................................... 118

12.08. Guaranties. .................................................................................................... 118

12.09. Judgments. ..................................................................................................... 119

12.10. Change of Control. ........................................................................................ 119

12.11. No Waiver of Affiliate Operator's Liens. ..................................................... 119

12.12. Subordination. ............................................................................................... 119

12.13. Hedge Agreements. ....................................................................................... 119

SECTION 13.    The Administrative Agent. .................................................................... 121

13.01. Appointment. ................................................................................................. 121

13.02. Nature of Duties. ........................................................................................... 121

13.03. Lack of Reliance on the Administrative Agent. ............................................ 122

13.04. Certain Rights of the Administrative Agent. ................................................. 123

13.05. Reliance. ........................................................................................................ 124

13.06. Indemnification. ............................................................................................ 124

13.07. The Administrative Agent in its Individual Capacity. .................................. 125

13.08. Holders. ......................................................................................................... 125

13.09. Resignation by the Administrative Agent. .................................................... 125

v

## Table of Contents
### (continued)

Page

13.10. Collateral Matters. .................................................................................... 126

13.11. Delivery of Information. ............................................................................. 127

13.12. Delegation of Duties. ................................................................................. 127

13.13. No Reliance on the Administrative Agent's Customer Identification
Program: Certifications From Banks and Participants: Patriot Act. ................ 128

SECTION 14.       Miscellaneous. ................................................................ 128

14.01. Payment of Expenses, etc. ......................................................................... 128

14.02. Right of Setoff. .......................................................................................... 130

14.03. Notices. ...................................................................................................... 130

14.04. Benefit of Agreement; Assignments; Participations. ......................... 131

14.05. No Waiver; Remedies Cumulative. ....................................................... 134

14.06. Payments Pro Rata. .................................................................................. 134

14.07. Calculations; Computations. ................................................................... 135

14.08. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
WAIVER OF JURY TRIAL. ...................................................................... 136

14.09. Counterparts. ............................................................................................ 137

14.10. Effectiveness. ............................................................................................ 137

14.11. Headings Descriptive. .............................................................................. 137

14.12. Amendment or Waiver; etc. ..................................................................... 138

14.13. Survival. .................................................................................................... 139

14.14. Domicile of Loans. .................................................................................... 140

14.15. Register. ..................................................................................................... 140

14.16. Confidentiality. ......................................................................................... 140

14.17. Special Provisions Regarding Pledges of Equity Interests in, and
Promissory Notes Owed by, Persons Not Organized in the United States or
Pledges over Assets Not Located in the United States. ...................................... 142

14.18. Patriot Act. ................................................................................................ 143

14.19. Post-Closing Actions. ............................................................................... 143

14.20. Interest Rate Limitation. ........................................................................... 143

14.21. Entire Agreement. ..................................................................................... 144

14.22. Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ....... 144

14.23. Hedge Intercreditor Agreement. .............................................................. 144

SECTION 15.       Holding Companies Guaranty ........................................ 144

vi

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 23 of 300

Table of Contents
(continued)

Page

15.01.  Guaranty............................................................................................... 144

15.02.  Bankruptcy............................................................................................ 145

15.03.  Nature of Liability................................................................................ 145

15.04.  Independent Obligation....................................................................... 146

15.05.  Authorization........................................................................................ 146

15.06.  Reliance................................................................................................. 147

15.07.  Subordination....................................................................................... 147

15.08.  Waiver.................................................................................................... 147

15.09.  Payments................................................................................................ 148

15.10.  Maximum Liability............................................................................... 149

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 24 of 300

## SCHEDULES

SCHEDULE I            Total Commitments as of Closing Date

SCHEDULE II           Credit Party Addresses

SCHEDULE III          Real Property

SCHEDULE IV           Plans

SCHEDULE V            Subsidiaries

SCHEDULE VI           Existing Indebtedness

SCHEDULE VII          Insurance

SCHEDULE VIII         Existing Liens

SCHEDULE IX           Existing Investments

SCHEDULE X            Gas Imbalances

SCHEDULE XI           Capitalization

SCHEDULE XII          Post-Closing Matters

SCHEDULE XIII         Necessary Authorizations

SCHEDULE XIV          Capitalized Labor Expense

SCHEDULE XV           Marketing Agreements

SCHEDULE XVI          Hedge Agreements

SCHEDULE XVII         Preferential Rights and Consents

SCHEDULE XVIII        Senior Management Restricted Unit Agreements

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 25 of 300

## EXHIBITS

EXHIBIT A-1        Form of Notice of Borrowing

EXHIBIT A-2        Form of Notice of Conversion/Continuation

EXHIBIT B          Form of Note

EXHIBIT C          Form of Section 6.04(b)(ii) Certificate

EXHIBIT D          Form of Officers' Certificate

EXHIBIT E          Form of Subsidiaries Guaranty

EXHIBIT F-1        Form of Pledge Agreement

EXHIBIT F-2        Form of Meidu Pledge Agreement

EXHIBIT G          Form of Security Agreement

EXHIBIT H          Form of Solvency Certificate

EXHIBIT I-1        Form of Compliance Certificate

EXHIBIT I-2        Form of Adjusted Coverage Ratio Compliance Certificate

EXHIBIT J          Form of Assignment and Assumption Agreement

EXHIBIT K          Form of Intercompany Note

EXHIBIT L          Closing Checklist

EXHIBIT M          Form of Reserve Report Certificate

EXHIBIT N          Form of Capital Expenditures Certificate

EXHIBIT O          Form of Hedging Report

EXHIBIT P          Form of Hedge Intercreditor Agreement

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 26 of 300

CREDIT AGREEMENT, dated as of November 14, 2018 among MD AMERICA ENERGY HOLDINGS, INC., a Delaware corporation ("**Holdings**"), MD AMERICA INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company ("**MDA Intermediate Holdco**"), MD AMERICA HOLDINGS, LLC, a Delaware limited liability company ("**MDA Holdco**" and, together with Holdings and MDA Intermediate Holdco, collectively, the "**Holding Companies**," each of which is a "**Holding Company**"), MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the Lenders party hereto from time to time, LOAN ADMIN CO LLC, as Administrative Agent, LOAN ADMIN CO LLC, as Lead Arranger and GUGGENHEIM SECURITIES, LLC, as Lead Arranger.  All capitalized terms used herein and defined in <u>Section 1.01</u> are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the respective credit facilities provided for herein;

NOW, THEREFORE, IT IS AGREED:

SECTION 1.   <u>Definitions and Accounting Terms</u>.

1.01.   <u>Defined Terms</u>.

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Acquired EBITDAX**" shall mean, for any Acquired Entity or Business acquired pursuant to a Permitted Acquisition and for any period, the Consolidated EBITDAX as determined for such Acquired Entity or Business, for such period on a basis substantially the same (with necessary reference changes) as provided in the definition of Consolidated EBITDAX contained herein, except that (i) all references therein and in the component definitions used in determining Consolidated EBITDAX to "Holdings and its Subsidiaries" shall be deemed to be references to the respective Acquired Entity or Business and (ii) the adjustments contained in clause (iv) of the first sentence of the definition of Consolidated EBITDAX shall not be made.

"**Acquired Entity or Business**" shall mean either (x) the assets constituting a business, division or product line of any Person not already a Subsidiary of the Borrower or (y) 100% of the Equity Interests of any such Person.

"**Additional Security Documents**" shall have the meaning provided in <u>Section 10.12</u>.

"**Adjusted Consolidated Net Income**" shall mean, for any period, the result of (a) Consolidated Net Income for such period <u>plus</u> (b) the sum of the amount of all net non-cash charges (including, without limitation, depreciation, amortization, deferred tax expense, accretion of asset retirement obligations and non-cash interest expense) and net non-cash losses which were included in arriving at Consolidated Net Income for such period, <u>less</u> (c) the amount

of all net non-cash gains and non-cash credits which were included in arriving at Consolidated Net Income for such period.

"**Adjusted Consolidated Working Capital**" shall mean, at any time, the result of (a) Consolidated Current Assets (but excluding therefrom all cash and Cash Equivalents) <u>less</u> (b) Consolidated Current Liabilities at such time.

"**Adjusted Coverage Ratio**" shall mean, on any date of determination, the ratio of (a) the PV-10 Value of PDP Reserves *plus* PV-10 Value of Workover PDNP Reserves in an aggregate amount not to exceed $5,000,000 *plus* all cash and Cash Equivalents in accounts subject to a "control agreement" referred to in Section 3.9 of the Security Agreement *minus* Drilling and Completion Related Payables and Accruals, to (b) Consolidated Indebtedness. For purposes of calculating the Adjusted Coverage Ratio, (i) PV-10 Value of PDP Reserves at any time shall be calculated to account for Dispositions and acquisitions of Oil and Gas Properties consummated by the Borrower or any of its Subsidiaries (provided that, in the case of any such acquisition, the Administrative Agent shall have received a Reserve Report evaluating the PDP Reserves and Workover PDNP Reserves subject thereto) and any Liquidation of any Hedge Agreement, in each case occurring since the date of the Reserve Report most recently delivered pursuant hereto, (ii) the amount of cash and Cash Equivalents shall be calculated to (A) deduct any amount of cash used for acquisitions of Oil and Gas Properties since the most recent balance sheet and (B) add any cash received from Dispositions of Oil and Gas Properties (other than cash used to repay Consolidated Indebtedness) and (iii) Consolidated Indebtedness shall be calculated to (A) add any Consolidated Indebtedness incurred in connection with any acquisition of Oil and Gas Properties since the most recent balance sheet and (B) deduct any Consolidated Indebtedness repaid with proceeds of the Disposition of Oil and Gas Properties; provided that all such adjustments pursuant to the foregoing clauses (i), (ii) and (iii) shall be reasonably acceptable to the Administrative Agent.

"**Administrative Agent**" shall mean Loan Admin Co LLC, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to <u>Section 13.09</u>.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and senior executive officers of such Person), controlled by, or under direct or indirect common control with, such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (ii) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; <u>provided</u>, <u>however</u>, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof.

"**Agreement**" shall mean this Credit Agreement, as it may be modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"**Applicable Margin**" shall mean (i) with respect to any Eurodollar Loan, a percentage per annum equal to 7.75% and (ii) with respect to any Base Rate Loan, a percentage per annum equal to 6.75%.

"**Applicable Percentage**" shall mean, at any time, a fraction (expressed as a percentage) the numerator of which is equal to the aggregate principal amount of all Loans outstanding at such time held by the applicable Lender and the denominator of which is equal to the aggregate principal amount of all Loans outstanding at such time.

"**Approved Counterparty**" shall mean (a) the Administrative Agent, any Lead Arranger, any Lender or any Affiliate of the foregoing, (b) BP Energy Company, (c) Shell Trading Risk Management, LLC, (d) Koch Supply & Trading, LP, (e) J. Aron & Company LLC, (f) Cargill Incorporated and (g) any other Person approved by the Administrative Agent.

"**Approved Petroleum Engineers**" shall mean (a) Cawley, Gillespie & Associates, Inc., Netherland, Sewell and Associates, Inc., WD Von Gonten and Co., Ryder Scott Company and (b) any other independent petroleum engineers reasonably acceptable to both the Administrative Agent and the Borrower.

"**Asset Sale**" shall mean any Disposition other than to Holdings or a Wholly-Owned Subsidiary of Holdings but excluding (x) Dispositions pursuant to <u>Sections 11.02(b)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(i)</u>, and (y) other Dispositions that generate Net Sale Proceeds of less than $1,000,000 individually (or with respect to a series of related Dispositions) or $2,500,000 in the aggregate in any fiscal year of Holdings.

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form of <u>Exhibit J</u> (appropriately completed).

"**Authorized Officer**" shall mean, with respect to (i) delivering the Notice of Borrowing and similar notices, any person or persons that has or have been authorized by the board of directors of Holdings or the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards or incumbency certificates on file with the Administrative Agent, (ii) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of Holdings or the Borrower, or any other person or persons that has or have been authorized by the board of directors of Holdings or the Borrower to deliver such information and certificates, <u>provided</u> that Holdings or the Borrower shall have notified the Administrative Agent in writing of such authorization and that such person or persons shall have appropriate signature cards or incumbency certificates on file with the Administrative Agent, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of Holdings or the Borrower.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council

3

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 29 of 300

of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" shall have the meaning provided in Section 12.05.

"**Base Rate**" shall mean, for any day, a rate per annum equal to the highest of (a) the Prime Rate, (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate and (c) the daily one month Eurodollar Rate (the "LIBOR" rate as published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, as published in another publication selected by the Administrative Agent)) divided by a number equal to 1.00 minus the Reserve Percentage plus 100 basis points (1.00%), in each instance, as of such day.  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate for an Interest Period of one (1) month.

"**Base Rate Loan**" shall mean each Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Borrower**" shall have the meaning provided in the first paragraph of this Agreement.

"**Borrowing**" shall mean the borrowing of one Type of Loan of a single Tranche from all the Lenders having Commitments of the respective Tranche on a given date (or resulting from a conversion or conversions on such date) having in the case of Eurodollar Loans the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans.

"**Business Day**" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York or Houston, Texas, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in U.S. dollar deposits in the interbank Eurodollar market.

"**Calculation Period**" shall mean, with respect to any Permitted Acquisition or any other event expressly required to be calculated on a Pro Forma Basis pursuant to the terms of this Agreement, the Test Period most recently ended prior to the date of such Permitted Acquisition or other event for which financial statements have been delivered to the Lenders pursuant to Section 10.01(b) or (c), as applicable.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person, but shall in any event (a) include all expenditures for acquisitions of direct interests in Oil and Gas Properties (including acquisitions of oil and gas leases and unproven acreage, but excluding Permitted Acquisitions) and (b) exclude all expenditures by such person that constitute Permitted Acquisitions effected in accordance with the requirements of Section 10.17.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 30 of 300

"**Capitalized Drilling and Exploration Expenses**" shall mean any costs or expenses that are required to be capitalized and recorded on the balance sheet as part of long-term assets under the Successful Efforts method of accounting under Statement of Financial Accounting Standards 19.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"**Cash Collateralized**" shall mean to be pledged and deposited with or delivered to the issuer of a letter of credit, cash or deposit account balances. "**Cash Collateral**" shall have a meaning analogous to the foregoing and shall include the proceeds of such cash or deposit account balances.

"**Cash Equivalents**" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (<u>provided</u> that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, (vi) Investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"**CEA**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"**CFTC**" shall mean the Commodity Futures Trading Commission.

"**Change of Control**" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) shall become the beneficial owner, directly or indirectly, of 50% or more on a fully diluted basis of the economic or voting interests in Parent,

(ii) Holdings shall at any time cease to own, directly or indirectly, 100% of the Equity Interests of each of the Borrower, MDA Holdco and MDA Intermediate Holdco, except as expressly provided in the Senior Management Restricted Unit Agreements; (iii) Meidu America shall at any time cease to own directly 100% of the Equity Interests of Holdings; (iv) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than Parent is or shall become the beneficial owner, directly or indirectly, of 50% or more on a fully diluted basis of the economic or voting interests in Holdings; (v) Parent shall at any time and for any reason fail to (A) be the beneficial owner, directly or indirectly, of more than 50% on a fully diluted basis of the economic or voting interests in Meidu America or (B) have the right to appoint at least a majority of the members of the Board of Directors of Meidu America; (vi) the Board of Directors of Holdings shall cease to consist of a majority of Continuing Directors or (vii) any "Exit Event" (as defined in any Senior Management Restricted Unit Agreement) shall occur. For purposes of this definition, "beneficial owner" is used as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act.

"**CIP Regulations**" shall have the meaning provided in Section 13.13.

"**Claims**" shall have the meaning provided in the definition of "Environmental Claims".

"**Closing Checklist**" shall mean the closing checklist attached as Exhibit L.

"**Closing Date**" shall have the meaning provided in Section 14.10.

"**Closing Date Distribution**" shall mean a special distribution and/or loan to Meidu America or Parent, which distribution and/or loan may be made in two installments; provided that (i) such distribution and/or loan is made on or prior to the date which is ten (10) Business Days following the Closing Date and (ii) the aggregate amount of such distribution plus the aggregate amount of cash advanced as a loan, in each case, made and/or advanced by the Credit Parties on an aggregate basis shall not exceed $20,000,000.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Collateral**" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties, and all cash and Cash Equivalents delivered as collateral pursuant to Section 6.02 or 11. Notwithstanding any provision in this Agreement, any Security Document or other Credit Document to the contrary, in no event is any Excluded Asset (as defined in the Security Agreement) or any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) included in the definition of "Collateral," and no Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) shall be subject to a Lien under any Security Document.

"**Collateral Agent**" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"**Collective Bargaining Agreements**" shall have the meaning provided in Section 7.05(f).

"**Commitment**" shall mean, for each Lender, such Lender's "Commitment", i.e. an Initial Term Loan Commitment or a Delayed Draw Term Loan Commitment, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15. As of the Closing Date, the name of each Lender with an Initial Term Loan Commitment and the name of each Lender with a Delayed Draw Term Loan Commitment are set forth on Schedule I.

"**Commitment Commission**" shall have the meaning provided in Section 4.01(a).

"**Company**" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"**Consolidated Current Assets**" shall mean, at any time, the consolidated current assets of Holdings and its Subsidiaries at such time, but excluding current assets from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business (other than accounts receivable with respect to any non-contingent periodic settlement payments due thereunder).

"**Consolidated Current Liabilities**" shall mean, at any time, the consolidated current liabilities of Holdings and its Subsidiaries at such time, but excluding (i) the current portion of any Indebtedness under this Agreement, (ii) the current portion of any other long-term Indebtedness which would otherwise be included therein, (iii) deferred tax liabilities, (iv) the current portion of interest payable and (v) current liabilities (A) associated with asset retirement obligations relating to Oil and Gas Properties or (B) from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business (other than accounts payable with respect to any non-contingent periodic settlement payments due thereunder).

"**Consolidated EBITDAX**" shall mean, for any period, Consolidated Net Income for such period adjusted by adding thereto (in each case to the extent deducted in determining Consolidated Net Income for such period), without duplication, the amount of:

(i) total interest expense (inclusive of amortization of deferred financing fees and other original issue discount and banking fees, charges and commissions) of Holdings and its Subsidiaries determined on a consolidated basis for such period;

(ii) provision for taxes based on income and foreign withholding taxes for Holdings and its Subsidiaries determined on a consolidated basis for such period;

(iii) all depreciation, depletion, amortization expense and accretion of asset retirement obligations of Holdings and its Subsidiaries determined on a consolidated basis for such period;

(iv) any fees, expenses or charges (other than depreciation, depletion or amortization expense as described in the preceding clause (iii)) actually incurred and related to (A) any Permitted Acquisition or Disposition (whether or not successful) or any other Investment not in the Ordinary Course of Business permitted under Section 11.02 or

7

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 33 of 300

11.05, (B) any issuance of any Equity Interests permitted under Section 11.06(e) or (C) any Indebtedness issuance permitted under Section 11.04 (such fees and expenses described in this clause (iv), collectively, "Transaction Fees"); provided, that the aggregate amount of Transaction Fees added back to Consolidated EBITDAX pursuant to this clause (iv) and Closing Date Transaction Fees pursuant to clause (v) below shall not exceed 15% of Consolidated EBITDAX in any four-quarter period (calculated without giving effect to such add-backs);

(v) the amount of all fees and expenses (such fees and expenses described in this clause (v), the "Closing Date Transaction Fees") incurred in connection with the Transactions as reflected in a funds flow memorandum or otherwise disclosed to the Administrative Agent; provided, that the aggregate amount of Closing Date Transaction Fees added back to Consolidated EBITDAX pursuant to this clause (v) and Transaction Fees pursuant to clause (iv) above shall not exceed 15% of Consolidated EBITDAX in any four-quarter period (calculated without giving effect to such add-backs);

(vi) non-cash stock-based employee compensation;

(vii) if Holdings and its Subsidiaries account for their oil and gas operations using successful efforts or a similar method of accounting, consolidated exploration and abandonment expenses of Holdings and its Subsidiaries;

(viii) any non-recurring or extraordinary losses or expenses (less any non-recurring or extraordinary gains or income);

(ix) any non-cash losses (less any non-cash gains);

(x) any losses from sales of assets other than Hydrocarbons sold in the Ordinary Course of Business (less any gains from sales of assets other than any Hydrocarbons sold in the Ordinary Course of Business); and

(xi) other unusual out-of-pocket expenses, including restructuring charges, that are reasonably acceptable to the Administrative Agent.

For the avoidance of doubt, it is understood and agreed that, to the extent any amounts are excluded from Consolidated Net Income by virtue of the proviso to the definition thereof contained herein, any add backs to Consolidated Net Income in determining Consolidated EBITDAX as provided above shall be limited (or denied) in a fashion consistent with the proviso to the definition of "Consolidated Net Income" contained herein. Notwithstanding anything to the contrary contained above, for purposes of determining Consolidated EBITDAX for any Test Period which ends on or prior to June 30, 2019, Consolidated EBITDAX for all portions of such period occurring prior to the Closing Date shall be calculated in accordance with the definition of "Test Period" contained herein.

"Consolidated Indebtedness" shall mean, at any time, the sum of (without duplication) (i) all Indebtedness of Holdings and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capitalized Lease Obligations on the liability side of a consolidated balance sheet of Holdings and its Subsidiaries in accordance with GAAP, (ii) all

Indebtedness of Holdings and its Subsidiaries of the type described in clauses (ii) (except to the extent Cash Collateralized with cash from the balance sheet), (viii) and (x) of the definition of Indebtedness, and (iii) all Contingent Obligations of Holdings and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the amount of Indebtedness in respect of Hedge Agreements shall not include any unrealized net loss position of Holdings and/or its Subsidiaries thereunder on a marked-to-market basis.

"**Consolidated Interest Expense**" shall mean, for any period, (i) the total consolidated cash interest expense and payment-in-kind interest expense of Holdings and its Subsidiaries (including, without limitation, all commissions, discounts and other commitment and banking fees and charges (e.g., fees with respect to letters of credit and Interest Rate Protection Agreements)) for such period, adjusted to exclude (to the extent same would otherwise be included in the calculation above in this clause (i)) the amortization of any deferred financing costs for such period, plus (ii) without duplication, (x) that portion of Capitalized Lease Obligations of Holdings and its Subsidiaries on a consolidated basis representing the interest factor for such period and (y) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Indebtedness of Holdings and its Subsidiaries of the type described in clause (viii) of the definition of Indebtedness contained herein (to the extent same does not arise from a financing arrangement constituting an operating lease) for such period. Notwithstanding anything to the contrary contained above, for purposes of determining the Fixed Charge Coverage Ratio, to the extent Consolidated Interest Expense is to be determined for any Test Period which ends on or prior to September 30, 2019, Consolidated Interest Expense for all portions of such period occurring prior to the Closing Date shall be calculated in accordance with the definition of Test Period contained herein.

"**Consolidated Net Income**" shall mean, for any period, the net income (or loss) of Holdings and its Subsidiaries determined on a consolidated basis for such period (taken as a single accounting period) in accordance with GAAP, provided that the underlying mathematical drivers, policies and procedures used to calculate capitalization of labor expense remain constant with those used in preparation of the fiscal year ended December 31, 2017 financial statements as set forth in Schedule XIV and provided, further, that the following items shall be excluded in computing Consolidated Net Income (without duplication): (i) the net income (or loss) of any Person in which a Person or Persons other than Holdings and its Wholly-Owned Subsidiaries has an Equity Interest or Equity Interests to the extent of such Equity Interests held by Persons other than Holdings and its Wholly-Owned Subsidiaries in such Person, (ii) except for determinations expressly required to be made on a Pro Forma Basis, the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or all or substantially all of the Property or assets of such Person are acquired by a Subsidiary, (iii) the net income of any Subsidiary to the extent that the declaration or payment of cash Dividends by such Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (iv) unrealized losses and gains under derivative instruments included in the determination of Consolidated Net Income, including, without limitation those resulting from the application of Financial Accounting Standards Board Accounting Standards Codification 815 ("FASB ASC 815"), and any asset impairment writedowns on Oil and Gas Properties under GAAP or SEC guidelines.

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, Dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) to pay contingent cash purchase price, earn-out, and other similar obligations incurred in connection with an acquisition or (v) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Continuing Directors**" shall mean the directors of Holdings on the Closing Date and each other director of Holdings if such director's nomination for election to the Board of Directors of Holdings is recommended or approved by (x) Meidu America or (y) a majority of the then Continuing Directors.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"**Covered Properties**" shall mean the Oil and Gas Properties of the Credit Parties covered by the most recently delivered Reserve Report (which shall mean on the Closing Date, the Initial Reserve Report), other than (a) those Oil and Gas Properties disposed of since the date of such Reserve Report in accordance with and to the extent permitted by the terms of this Agreement and (b) leases that have expired in accordance with their terms.

"**Credit Documents**" shall mean, collectively, the following (as the same may be amended, modified, supplemented, renewed, restated or replaced from time to time): this Agreement, the Fee Letter, the Subsidiaries Guaranty, each Security Document, the Intercompany Notes, each other subordination agreement relating to the Obligations and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and each other Security Document and all other agreements, documents, certificates and instruments executed and delivered to the Administrative Agent, the Collateral Agent or any Lender in their capacity as such by any Credit Party in connection therewith, including, without limitation, all letters for the payments of fees, guaranties and collateral documents.

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 36 of 300

"**Credit Event**" shall mean the making of any Loan.

"**Credit Party**" shall mean each Holding Company, the Borrower and each Subsidiary Guarantor, and the "**Credit Parties**" shall mean all of them, collectively.

"**Cure Amount**" shall have the meaning provided in <u>Section 12</u>.

"**Cure Right**" shall have the meaning provided in <u>Section 12</u>.

"**DDTL Commitment Expiration Date**" shall mean the earliest to occur of (i) the date on which the Delayed Draw Term Loans have been funded fully, (ii) the date on which the Delayed Draw Term Loan Commitments are otherwise terminated (including upon any acceleration in the repayment of the Loans) and (iii) the date that is one year after the Closing Date.

"**Default**" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"**Defensible Title**" shall mean, with respect to any Covered Property of any Credit Party, title of such Credit Party to such Covered Property that, although not constituting perfect, merchantable or marketable title, (a) is evidenced by instruments filed of record or other documentation so as to be sufficient to successfully defend against claims of bona fide purchasers for value or other Persons entitled to protection of applicable recording laws that such Credit Party does not have title to such Covered Property (<u>provided</u>, <u>however</u>, that this clause (a) shall not impose a standard for "defensible title" that is broader or more difficult to satisfy than the meaning of "defensible title" under applicable law (if any) of the State in which such Covered Property is located, and if such applicable law exists, clause (a) shall be deemed replaced by the legal standard of "defensible title" in effect in such State), and (b) is free and clear of all Liens other than Permitted Liens.

"**Delayed Draw Term Loan Commitment**" shall mean, for each Lender, the amount of Delayed Draw Term Loans such Lender is committed to make, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u>, as the same may be (x) terminated pursuant to <u>Section 4.02</u>, or (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to <u>Section 2.13</u> or <u>14.04</u>.

"**Deposit Account**" shall have the meaning provided in the Security Agreement.

"**Disposition**" shall mean any sale, transfer or other disposition of any asset (including, without limitation, any Equity Interests or other securities of another Person) by Holdings or any of its Subsidiaries to any Person (including by way of redemption by such Person or by way of a sale and leaseback transaction).

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend or distribution, or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests or Qualified Preferred Stock of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or

otherwise acquired, directly or indirectly, for consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests) or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests). Without limiting the foregoing, (i) "Dividends" shall include all of the foregoing actions effected by division of any Person and (ii) "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" and the sign "**$**" shall each mean freely transferable lawful money of the United States.

"**Domestic**" shall mean incorporated or organized in the United States or any State or territory thereof or the District of Columbia.

"**Drilling and Completion Related Payables and Accruals**" shall mean, as of any date a determination thereof is to be made, Borrower's estimate (prepared in good faith and based on assumptions believed by the Borrower to be reasonable when made) of any accrued or invoiced but unpaid drilling and completion costs associated with assets that are included in the calculation of PV-10 Value of PDP Reserves; provided that Drilling and Completion Related Payables and Accruals as of the Closing Date shall be deemed to be $19,022.

"**Drilling and Exploration Expenses**" shall mean any costs and expenses that are required to be charged to the income statement as part of that period's expenses under the Successful Efforts method of accounting under Statement of Financial Accounting Standards 19.

"**EEA Financial Institution**" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligibility Date**" shall mean, with respect to each Credit Party and each Hedge Agreement, the date on which this Agreement or any Credit Document becomes effective with respect to such Hedge Agreement (for the avoidance of doubt, the Eligibility Date shall be the effective date of such Hedge Agreement if this Agreement or any Credit Document is then in

12

effect with respect to such Credit Party, and otherwise it shall be the effective date of this Agreement and/or such Credit Document(s) to which such Credit Party is a party).

"**Eligible Contract Participant**" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"**Eligible Transferee**" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding Holdings and its Subsidiaries and Affiliates; provided, that "Eligible Transferee" shall not include any natural Person.

"**Employee Benefit Plans**" shall have the meaning provided in Section 7.05(c).

"**Employment Agreements**" shall have the meaning provided in Section 7.05(d).

"**Environmental Claims**" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of non-compliance or violation, investigations or proceedings (hereafter, "**Claims**") relating in any way to any Hazardous Materials, Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence, release of or exposure to Hazardous Materials.

"**Environmental Law**" shall mean any Law, relating in any way to the environment, health and safety, Hazardous Materials or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which any Credit Party or any Subsidiary is conducting or at any time has conducted business, or where any Property of any Credit Party or any Subsidiary is located, including, without limitation: CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) which together with Holdings or a Subsidiary of Holdings would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) or (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code or Section 302 of ERISA).

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eurodollar Loan**" shall mean each Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Eurodollar Rate**" shall mean, for any Interest Period with respect to a Loan, the rate per annum determined by the Administrative Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (a) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by the Administrative Agent which has been approved by the Intercontinental Exchange Benchmark Administration as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "**LIBOR Alternate Source**"), at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by the Administrative Agent at such time (which determination shall be conclusive absent manifest error), provided that if the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page) or the rate that appears on a LIBOR Alternate Source, as applicable, shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement), by (b) a number equal 1.00 minus the Reserve Percentage.  The Eurodollar Rate may also be expressed by the following formula:

Average of London interbank offered rates quoted by Bloomberg or appropriate successor as shown on

| Bloomberg | Page | BBAM1 |
|---|---|---|
| Eurodollar Rate = | 1.00 – Reserve Percentage | |

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date.  The Administrative Agent shall give reasonably prompt notice to the Borrower of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 40 of 300

"**Event of Default**" shall have the meaning provided in <u>Section 12</u>.

"**Excess Cash Flow**" shall mean, for any Excess Cash Payment Period, the remainder of (a) the sum of, without duplication, (i) Adjusted Consolidated Net Income for such period and (ii) the decrease, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period, minus (b) the sum of, without duplication, (i) the aggregate amount of all Capital Expenditures made by Holdings and its Subsidiaries during such period (other than Capital Expenditures to the extent financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness), (ii) the amount of any Capital Expenditures that Holdings and its Subsidiaries are committed to make during the subsequent Excess Cash Payment Period; *provided* that (x) if any Capital Expenditures are deducted from Excess Cash Flow pursuant to this <u>clause (b)(ii)</u>, such amount shall be added to Excess Cash Flow for the immediately succeeding Excess Cash Payment Period if such Capital Expenditure is not actually made within such Excess Cash Payment Period or if such Capital Expenditure is financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness  and (y) no deduction shall be taken in the immediately succeeding Excess Cash Payment Period when such amounts (other than amounts added to Excess Cash Flow pursuant to clause (x) of this proviso) deducted pursuant to this <u>clause (b)(ii)</u> are actually spent,  (iii) the aggregate amount of all Investments made by Holdings and its Subsidiaries pursuant to <u>Section 11.05(e)</u>, <u>(n)</u> and <u>(o)</u> during such period (other than Investments to the extent financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness), (iv) the aggregate amount of permanent principal payments of Indebtedness for borrowed money of Holdings and its Subsidiaries and the permanent repayment of the principal component of Capitalized Lease Obligations of Holdings and its Subsidiaries during such period (other than repayments made with the proceeds of Asset Sales, sales or issuances of Equity Interests, insurance or Indebtedness), (v) the increase, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period and (vi) the aggregate amount of all cash payments made in respect of all Permitted Acquisitions consummated by Holdings and its Subsidiaries during such period (other than any such payments to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness). No payment of Excess Cash Flow under <u>Section 6.02(f)</u> shall be subject to the Prepayment Premium under <u>Section 5.01</u>, unless such payment is in connection with an acceleration of the Loans pursuant to <u>Section 12</u> (or solely to the extent the action giving rise to such payment constitutes a Default hereunder).

"**Excess Cash Payment Date**" shall mean the date occurring 120 days after the last day of each fiscal year of Holdings (commencing with the fiscal year of Holdings ended December 31, 2019).

"**Excess Cash Payment Period**" shall mean (i) with respect to the repayment required on the first Excess Cash Payment Date, the fiscal year of Holdings ending December 31, 2019, and (ii) with respect to the repayment required on each successive Excess Cash Payment Date, the immediately preceding fiscal year of Holdings.

"**Excess Cash Percentage**" shall mean, at any time with respect to an Excess Cash Payment Period, 50%; <u>provided</u> that if the Total Leverage Ratio at the end of the applicable Excess Cash Payment Period is (x) less than or equal to 2.50:1.00 but greater than 2.00:1.00 (as set forth in the officer's certificate delivered pursuant to <u>Section 10.01(g)</u> for the fiscal quarter or

fiscal year, as the case may be, of Holdings then last ended for which financial statements are available), such percentage shall be 25% or (y) less than or equal to 2.00:1.00 (as set forth in the officer's certificate delivered pursuant to Section 10.01(g) for the fiscal quarter or fiscal year, as the case may be, of Holdings then last ended for which financial statements are available), such percentage shall be 0%.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, and regulations promulgated thereunder, as amended.

"**Excluded Account**" shall mean (a) accounts which are used solely as an escrow account or as a fiduciary or trust account, (b) any other account that is contractually obligated to be segregated from the other assets of the Credit Parties, in each case, for the benefit of unaffiliated third parties, (c) any disbursement or payroll accounts used solely for such purposes, (d) any accounts solely holding withheld income taxes, payroll taxes or other employment-related taxes or amounts to be paid over to employee health or benefits plans, (e) cash collateral accounts subject to Permitted Liens under clause (l) or (r) of the definition thereof), (f) suspense accounts and other accounts all of the deposits in which consist of monies of third parties, including working interest owners, royalty owners and the like, and (g) any other accounts with a balance of less than $500,000 individually or $1,500,000 in the aggregate at all times.

"**Excluded Hedge Liability**" or "**Excluded Hedge Liabilities**" shall mean, with respect to each Credit Party, each of its Hedge Obligations if, and only to the extent that, all or any portion of this Agreement or any Credit Document that relates to such Hedge Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Credit Party's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Hedge Agreement.  Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Credit Document, the foregoing is subject to the following provisos: (a) if a Hedge Obligation arises under a master agreement governing more than one Hedge Agreement, this definition shall apply only to the portion of such Hedge Obligation that is attributable to Hedge Agreements for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Credit Party for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Hedge Agreement; (b) if a guarantee of a Hedge Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Hedge Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Credit Party executing this Agreement or the Credit Documents and a Hedge Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of "Excluded Hedge Liability or Liabilities" with respect to each such Person shall only be deemed applicable to (i) the particular Hedge Obligations that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Hedge Obligations constitute Excluded Hedge Liabilities.

"**Excluded Taxes**" shall have the meaning in Section 6.04(a).

"**Existing Indebtedness**" shall have the meaning provided in Section 11.04(b).

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 42 of 300

"**Existing Indebtedness Agreements**" shall have the meaning provided in Section 7.05(b).

"**Extraordinary Receipts**" means any cash received by any Credit Party not in the ordinary course of business (and not consisting of proceeds relating to an event described in Section 6.02(c), Section 6.02(d), Section 6.02(e), Section 6.02(f) or Section 6.02(g) of this Agreement) consisting of (a) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, (b) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries), (c) any tax refunds or (d) any business interruption insurance proceeds; provided that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of Holdings, or the Subsidiary of Holdings selling such asset.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations, published guidance or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements (and any foreign legislation, regulations or published guidance implemented to give effect to such intergovernmental agreements) entered into to implement the foregoing.

"**FCPA**" shall have the meaning provided in Section 9.25(b)

"**Federal Funds Rate**" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Administrative Agent (an "**Alternate Source**") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Administrative Agent at such time (which determination shall be conclusive absent manifest error)); provided however, that if such day is not a Business Day, the Federal Funds Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Rate changes, the rate of interest with respect to

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 43 of 300

any advance to which the Federal Funds Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

"**Fee Letter**" shall mean that certain Credit Facility Fee Letter, dated as of the Closing Date, by and among the Borrower, each Holding Company and the Administrative Agent.

"**Fees**" shall mean all amounts payable pursuant to or referred to in the Credit Documents.

"**Financial Performance Covenants**" shall have the meaning provided in Section 12.

"**Fixed Charge Coverage Ratio**" shall mean, for any period, the ratio of (a) Consolidated EBITDAX for such period minus the sum of, without duplication (i) the aggregate amount of all Maintenance Capital Expenditures made by Holdings and its Subsidiaries in cash during such period (other than Capital Expenditures, to the extent financed with cash equity proceeds, reimbursed from landlords, Disposition proceeds, insurance proceeds or Indebtedness), (ii) the amount of all cash payments made by Holdings and its Subsidiaries in respect of income taxes or income tax liabilities during such period (excluding taxes related to Dispositions not in the Ordinary Course of Business), and (iii) the aggregate amount of all cash Dividends (including stock repurchases and redemptions) paid by Holdings during such period, other than Dividends paid with the proceeds of any issuance of Equity Interests and the Closing Date Distribution, to (b) Fixed Charges for such period.

"**Fixed Charges**" shall mean, for any period, the sum, without duplication, of (i) Consolidated Interest Expense paid in cash during such period, and (ii) the scheduled principal amount of all amortization payments on all Indebtedness of Holdings and its Subsidiaries for such period (including the principal component of all Capitalized Lease Obligations) as determined on the first day of such period (or, with respect to a given issue of Indebtedness incurred thereafter, on the date of the incurrence thereof but after giving effect to all prior payments thereof). Notwithstanding anything to the contrary contained above, for purposes of determining the Fixed Charge Coverage Ratio, to the extent Fixed Charges are to be determined for any Test Period which ends prior to the first anniversary of the Closing Date, Fixed Charges for all portions of such period occurring prior to the Closing Date shall be calculated in accordance with the definition of "Test Period" contained herein.

"**Flood Laws**" shall mean all applicable laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other applicable laws related thereto.

"**GAAP**" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes of Sections 6.02, 10.17 and 11, including defined terms as used therein, and for all purposes of determining the Financial Performance Covenants, are subject (to the extent provided therein) to Section 14.07(a).

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision of the foregoing, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity

18

exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guaranteed Creditors**" shall mean and include each of the Administrative Agent, the Collateral Agent, the Lenders and each party (other than any Credit Party) party to an Interest Rate Protection Agreement or a Secured Hedge Agreement to the extent such party constitutes a Secured Creditor under the Security Documents.

"**Guaranteed Obligations**" shall mean (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest on each Note issued by, and all Loans made to, the Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) thereon) of the Borrower to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document to which the Borrower is a party and the due performance and compliance by the Borrower with all the terms, conditions and agreements contained in the Credit Agreement and in each such other Credit Document and (ii) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) of the Borrower owing under any Secured Hedge Agreement or any Interest Rate Protection Agreement entered into by the Borrower with (x) any Lender or any affiliate thereof (even if such Lender subsequently ceases to be a Lender under this Agreement for any reason) so long as such Lender or affiliate participates in such Interest Rate Protection Agreement and their subsequent assigns, if any, (y) any Approved Counterparty or (z) any other Person approved by the Administrative Agent, in each case whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

"**Guarantor**" shall mean each Holding Company and each Subsidiary Guarantor.

"**Guaranty**" shall mean each of the Holdings Guaranty and the Subsidiaries Guaranty.

"**Hazardous Materials**" shall mean (a) any petroleum, petroleum hydrocarbons, petroleum products, petroleum by-products, petroleum breakdown products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives of any of the foregoing, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any

19

applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any Governmental Authority under any applicable Environmental Law.

"**Hedge Agreement**" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Credit Party or any Subsidiary shall be a Hedge Agreement.

"**Hedge Intercreditor Agreement**" shall mean an Intercreditor Agreement in the form of Exhibit P, as amended, modified, restated and/or supplemented from time to time pursuant to the terms thereof.

"**Hedge Obligation**" shall mean any obligation to pay or perform under any agreement, contract or transaction that constitutes a Hedge Agreement.

"**Hedge Termination Value**" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined by the counterparties to such Hedge Agreements so long as written evidence thereof from such counterparty is provided to Administrative Agent on or prior to such date and if no such evidence is provided, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender) acceptable to Administrative Agent in its reasonable discretion.

"**Holding Companies**" and "**Holding Company**" shall have the meanings provided in the first paragraph of this Agreement.

"**Holdings**" shall have the meaning provided in the first paragraph of this Agreement.

"**Holdings Guaranty**" shall have the meaning provided in Section 15.01.

"**Hydrocarbon Interests**" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests relating to oil, gas or other hydrocarbons, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"**Indebtedness**" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (ii) (x) the maximum amount available to be drawn or paid under all letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and (y) all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi), (vii) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, or to pay for the delivery of a specified quantity of goods, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person in respect of Indebtedness of any third Person of the types described in clause (i), (ii), (iii) (iv), (v), (vii) or (viii) of this definition, (vii) all obligations under any Hedge Agreement or under any similar type of agreement, (viii) all Off-Balance Sheet Liabilities of such Person, (ix) any obligation of a Person in respect of a farm-in agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an Oil and Gas Property, (x) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services, in each case, that are more than 60 days past the date such amounts were due to be paid and (xi) in-kind obligations relating to net oil or natural gas balancing positions arising in the Ordinary Course of Business. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include (x) deferred tax and other credits incurred by any Person in accordance with customary practices and in the Ordinary Course of Business of such Person or (y) purchase price adjustments, earn-outs, and other similar obligations incurred by any Person in connection with acquisitions, in each case except to the extent such items are reflected or are required to be reflected on the balance sheet of such Person as indebtedness pursuant to GAAP.

"**Indemnified Person**" shall have the meaning provided in Section 14.01(a).

"**Indemnified Taxes**" shall have the meaning in Section 6.04(a).

"**Initial Reserve Report**" shall mean the reserve audit dated July 17, 2018 and prepared by Cawley, Gillespie & Associates, Inc., as modified by the reserve review dated October 29, 2018 and prepared by VSO Petroleum Consultants, Inc.

"**Initial Term Loan**" and "**Initial Term Loans**" shall have the meaning provided in Section 2.01(a).

"**Initial Term Loan Commitment**" shall mean, for each Lender, the amount of Initial Term Loans such Lender is committed to make, as shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15, as the same may be (x) terminated pursuant to Section 4.02, or (y) adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 2.13 or 14.04.

"**Insolvency Event**" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under the Bankruptcy Code), or regulatory restrictions, (b) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due, (d) with respect to a Lender, such Lender is unable to perform hereunder to the application of applicable law or (e) in the good faith determination of the Administrative Agent or the Collateral Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"**Intellectual Property**" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, or design right.

"**Intercompany Debt**" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by Holdings or any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings.

"**Intercompany Loans**" shall have the meaning provided in Section 11.05(h).

"**Intercompany Note**" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered substantially in the form of Exhibit K (or such other form as shall be satisfactory to the Administrative Agent in its sole discretion), with blanks completed in conformity herewith.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 48 of 300

"**Interest Determination Date**" shall mean, with respect to any Loan, the second Business Day prior to the commencement of any Interest Period relating to such Loan.

"**Interest Period**" shall have the meaning provided in <u>Section 2.09</u>.

"**Interest Rate Protection Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"**Investments**" shall have the meaning provided in <u>Section 11.05</u>.

"**Law**" shall mean laws, common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders, and enforceable policies, guidelines or similar requirements of all Governmental Authorities.

"**Lead Arranger**" shall mean each of (i) Loan Admin Co LLC in its capacity as Joint Lead Arranger and Sole Book Runner and (ii) Guggenheim Securities, LLC in its capacity as Joint Lead Arranger, and, in each case, any successor thereto.

"**Leaseholds**" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"**Lender**" shall mean each Person that becomes a "Lender" hereunder on the Closing Date or pursuant to <u>Section 2.13</u> or <u>14.04</u> in each case as evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u>. For the purpose of any Credit Document which provides for the granting of a security interest or other Lien to the Collateral Agent for the benefit of Lenders as security for the Obligations, "**Lenders**" shall include any Affiliate of a Lender to which such Obligation is owed.

"**LIBOR Termination Date**" shall have the meaning provided in <u>Section 2.14(b)</u>.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"**Liquidate**" shall mean, with respect to any Hedge Agreement, (a) the sale, assignment, novation, unwind or termination of all or any part of such Hedge Agreement or (b) the creation of an offsetting position against all or any part of such Hedge Agreement.  The terms "**Liquidated**" and "**Liquidation**" have correlative meanings thereto.

"**Loan**" shall mean each Initial Term Loan and each Delayed Draw Term Loan.

"**Loan Admin**" shall mean Loan Admin Co LLC, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

23

"**Maintenance Capital Expenditures**" shall mean Capital Expenditures with respect to the replacement, repair, maintenance and upkeep of any fixed or capital asset (to the extent capitalized on the financial statements of Holdings and its Subsidiaries) and, for the avoidance of doubt, shall include items of the type described in rows 200 and 203 in the "Operating Assumptions" tab for "Capital Projects – Leasing" and "Capital Projects - Op Proj" in the financial model titled "MDAE Company Model (3 Statement) v38..11052018" delivered to the Administrative Agent on November 5, 2018.

"**Majority Lenders**" shall mean, at any time, one or more Lenders (and if there are two or more non-affiliated Lenders, at least two non-affiliated Lenders) the sum of whose outstanding Loans and Commitments at such time represents at least 50.1% of the sum of all outstanding Loans and Commitments at such time.

"**Margin Stock**" shall have the meaning provided in Regulation U.

"**Material Adverse Effect**" shall mean (i) a material adverse effect on the business, operations, property, assets, liabilities, financial condition or prospects of the Borrower or of Holdings and its Subsidiaries, taken as a whole, or (ii) a material adverse effect (x) on the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent under the Credit Documents, taken as a whole, or (y) on the ability of the Credit Parties, taken as a whole, to perform their obligations hereunder or under any other Credit Document.

"**Material Agreement**" shall mean any agreement or series of related agreements to which any Credit Party is a party, the termination or breach of which, individually or in the aggregate, would be reasonably expected to be materially adverse to the business of the Credit Parties taken as a whole.

"**Maturity Date**" shall mean November 14, 2023.

"**Maximum Rate**" shall have the meaning provided in Section 14.20.

"**MDA Consolidated Group**" shall mean the consolidated group for U.S. federal income tax purposes that includes the Credit Parties.

"**MDA Holdco**" shall have the meaning provided in the first paragraph of this Agreement.

"**MDA Intermediate Holdco**" shall have the meaning provided in the first paragraph of this Agreement.

"**Meidu America**" shall mean MeiDu America, Inc., a Delaware corporation.

"**Meidu Pledge Agreement**" shall have the meaning provided in Section 7.09(b).

"**Meidu Pledge Agreement Collateral**" shall mean all "Collateral" as defined in the Meidu Pledge Agreement.

"**Midstream Assets**" shall mean all property used in gathering systems and pipeline systems and all equipment, processing, compressor, treatment, storage, transportation, extraction, exchange or manufacturing facilities or other similar facilities, natural gas, liquid product and other storage tanks, liquid product truck loading terminals and any other assets used in connection with, and contracts, recorded fee deeds, leases, easements, rights of way, servitudes, permits, licenses, instruments and other rights in respect of, the gathering, compressing, treating, transporting or processing of Hydrocarbons and the water distribution, supply, treatment and disposal services thereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean a mortgage, deed of trust, leasehold mortgage, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument, pursuant to which such Credit Party grants a Lien on certain of their Oil and Gas Properties, Midstream Assets and Real Property, in a forma and substance reasonably satisfactory to the Administrative Agent, as it may be amended, supplemented or otherwise modified from time to time.

"**Mortgaged Property**" shall mean any Oil and Gas Properties, Midstream Assets and Real Property owned or leased by Holdings or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"**Multiemployer Plan**" shall mean any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which a Credit Party makes, is making or is obligated to make contributions or has made or been obligated to make contributions during the preceding five years if a Credit Party has liability thereunder or to which the Credit Party has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**NAIC**" shall mean the National Association of Insurance Commissioners.

"**Necessary Authorizations**" shall mean all material authorizations, consents, permits, approvals, waivers, licenses, and exemptions from, and all filings and registrations with, and all reports to, any Governmental Authority whether federal, state, local, and all agencies thereof, which are required for the transactions contemplated by the Credit Documents and necessary to the conduct of the businesses and the ownership (or licensure or lease) of the properties and assets of the Credit Parties.

"**Net Cash Proceeds**" shall mean for any event requiring a repayment of Loans pursuant to Section 6.02, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith).

"**Net Sale Proceeds**" shall mean for any Disposition, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such Disposition, net of (i) reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 51 of 300

selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such Disposition, (iii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness of the Lenders pursuant to this Agreement) which is secured by the respective assets which were sold or otherwise disposed of, and (iv) the estimated net marginal increase in income taxes which will be payable by Holdings' consolidated group or any Subsidiary of Holdings with respect to the fiscal year of Holdings in which the Disposition occurs as a result of such Disposition; provided, however, that such gross proceeds shall not include any portion of such gross cash proceeds which Holdings determines in good faith should be reserved for post-closing adjustments (to the extent Holdings delivers to the Lenders a certificate signed by an Authorized Officer as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than twelve months following the date of the respective Disposition), the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the actual post-closing adjustments payable by Holdings or any of its Subsidiaries shall constitute Net Sale Proceeds on such date received by Holdings and/or any of its Subsidiaries from such Disposition.

"**Non-Compete Agreements**" shall have the meaning provided in Section 7.05(e).

"**Non-Qualifying Party**" shall mean any Credit Party that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"**Non-Wholly Owned Subsidiary**" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"**Note**" shall have the meaning provided in Section 2.05(a).

"**Notice of Borrowing**" shall have the meaning provided in Section 2.03.

"**Notice of Conversion/Continuation**" shall have the meaning provided in Section 2.06.

"**Notice Office**" shall mean the office of the Administrative Agent located at 2200 Atlantic Street, 5th Floor, Stamford CT 06902, Attention: Sean Chao and Purvang Desai or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" shall mean all amounts owing to the Administrative Agent, the Collateral Agent, any Lender or Affiliate of a Lender pursuant to the terms of an Interest Rate Protection Agreement, or any Lender pursuant to the terms of this Agreement or any other Credit Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of Holdings or any of its Subsidiaries, whether or not allowed in such case or proceeding).

"**OFAC**" shall have the meaning provided in Section 9.25(a).

"**Off-Balance Sheet Liabilities**" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Oil and Gas Business**" shall mean:

(1)     the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(2)     the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(3)     any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Credit Parties or their Subsidiaries, directly or indirectly, participate;

(4)     any business relating to oil field sales and service; and

(5)     any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (4) of this definition.

"**Oil and Gas Properties**" shall mean all Hydrocarbon Interests and related property owned by a Person.

"**Ordinary Course of Business**" shall mean, with respect to each Credit Party, the ordinary course of such Credit Party's business as conducted on the Closing Date or any business that is reasonably related, similar, complementary, incidental, corollary, ancillary to or a reasonable extension, development or expansion of its business.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document.

"**Parent**" shall mean MeiDu Energy Corporation, a company organized under the laws of the People's Republic of China.

"**Participant**" shall have the meaning provided in <u>Section 14.04(e)</u>.

"**Patriot Act**" shall have the meaning provided in <u>Section 14.18</u>.

27

"**Payment Office**" shall mean the office of the Administrative Agent located at 2200 Atlantic Street, 5th Floor, Stamford CT 06902 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**PDP Reserves**" shall mean "proved developed producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines.

"**Permitted Acquisition**" shall mean the acquisition by the Borrower (or a Wholly-Owned Subsidiary of the Borrower which is a Credit Party) of an Acquired Entity or Business (including by way of merger of such Acquired Entity or Business with and into such Credit Party (so long as the Credit Party is the surviving corporation)), provided that (in each case) (A) the consideration paid or to be paid by such Credit Party consists solely of cash, Holdings common Equity Interests, Qualified Preferred Stock, the issuance or incurrence of Indebtedness otherwise permitted by Section 11.04 and the assumption/acquisition of any Indebtedness (calculated at face value) which is permitted to remain outstanding in accordance with the requirements of Section 11.04, (B) in the case of the acquisition of 100% of the Equity Interests of any Acquired Entity or Business (including by way of merger), such Acquired Entity or Business shall own no Equity Interests of any other Person unless (w) such Acquired Entity or Business owns 100% of the Equity Interests of such other Person, (x) if such Acquired Entity or Business owns Equity Interests in any other Person which is a Non-Wholly Owned Subsidiary of such Acquired Entity or Business, (1) such Acquired Entity or Business shall not have been created or established in contemplation of, or for purposes of, the respective Permitted Acquisition and (2) any such Non-Wholly Owned Subsidiary of the Acquired Entity or Business shall have been a Non-Wholly Owned Subsidiary of such Acquired Entity or Business prior to the date of the respective Permitted Acquisition and shall not have been created or established in contemplation thereof (y) such Equity Interests have a Fair Market Value of less than $1,000,000 or (z) the acquisition of such Equity Interests would be separately permitted pursuant to Section 11.05 (in which case any applicable basket will be charged for the Fair Market Value thereof), (C) other than businesses, divisions and product lines with a Fair Market Value of up to $2,000,000 in the aggregate for all Permitted Acquisitions (measured at the time thereof), the business, division or product line acquired pursuant to the respective Permitted Acquisition, or the business of the Person acquired pursuant to the respective Permitted Acquisition and its Subsidiaries taken as a whole, is in the United States, (D) the Acquired Entity or Business acquired pursuant to the respective Permitted Acquisition is in a business permitted by Section 11.15 and (E) all requirements of Sections 10.17, 11.02 and 11.15 applicable to Permitted Acquisitions are satisfied. Notwithstanding anything to the contrary contained in the immediately preceding sentence, an acquisition which does not otherwise meet the requirements set forth above in the definition of "Permitted Acquisition" shall constitute a Permitted Acquisition if, and to the extent, the Required Lenders agree in writing, prior to the consummation thereof, that such acquisition shall constitute a Permitted Acquisition for purposes of this Agreement.

"**Permitted Business Investment**" shall mean any Investment made in the ordinary course of, and of a nature that is or shall have become customary in, the business of the Credit Parties and the Subsidiaries (as permitted by Section 11.15), including investments or

expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing or transporting oil, natural gas or other Hydrocarbons and minerals through agreements, transactions, interests or arrangements which permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including:

(1)	ownership interests in oil, natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests; and

(2)	Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, farm-in agreements, farm-out agreements, contracts for the sale, transportation or exchange of oil, natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies, but provided, in each case of an Investment in any joint venture, partnership, limited liability company or other Person, that (i) the Equity Interest in such Person is pledged to secure the Secured Obligations and (ii) the aggregate amount of all such Investments made during the term of this Agreement (net of any dividend, distribution or other return on such Investments) shall not exceed 15% of PV-10 Value of PDP Reserves at the time made and (iii) the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant (which, for purposes of Section 11.10, shall mean that the Adjusted Coverage Ratio is greater than 1.50:1.00)) with third parties whose principal lines of business include the Oil and Gas Business (other than Investments in any master limited partnerships or other publicly traded Person).

"**Permitted Cure Securities**" shall mean any Holdings common Equity Interests or Qualified Preferred Stock issued pursuant to the Cure Right.

"**Permitted Liens**" shall have the meaning provided in Section 11.01.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Plan**" shall mean any "plan" defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is subject to Title IV of ERISA, and which is contributed to by a Credit Party or any such plan to which a Credit Party is required to contribute or has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**Pledge Agreement**" shall have the meaning provided in Section 7.09(a).

"**Pledge Agreement Collateral**" shall mean all "Collateral" as defined in the Pledge Agreement.

"**Pledgee**" shall have the meaning provided in the Pledge Agreement or the Meidu Pledge Agreement, as applicable.

"**Preferred Equity**", as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common Equity Interests of such Person) of any class or classes (however designed) that ranks prior, as to the payment of Dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to shares of Equity Interests of any other class of such Person, and shall include any Qualified Preferred Stock.

"**Preferred Equity Documents**" shall have the meaning provided in <u>Section 7.05(h)</u>.

"**Prepayment Premium**" shall have the meaning provided in <u>Section 5.01(a)</u>.

"**Prime Rate**" shall mean a variable per annum rate, as of any date of determination, equal to the rate as of such date published in the "Money Rates" section of *The Wall Street Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in *The Wall Street Journal* of a Prime Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the Prime Rate, the Administrative Agent shall choose a reasonably comparable index or source to use as the basis for the Prime Rate.

"**Pro Forma Basis**" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a <u>pro forma</u> basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness) after the first day of the relevant Calculation Period or Test Period, as the case may be, as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Test Period or Calculation Period, as the case may be, as if such Indebtedness had been retired or repaid on the first day of such Test Period or Calculation Period, as the case may be, and (z) any Permitted Acquisition then being consummated as well as any other Permitted Acquisition if consummated after the first day of the relevant Test Period or Calculation Period, as the case may be, as if such Permitted Acquisition was consummated on the first day of such Test Period or Calculation Period, as the case may be, with the following rules to apply in connection therewith:

(i)    all Indebtedness (x) (other than revolving Indebtedness) incurred or issued after the first day of the relevant Test Period or Calculation Period (whether incurred to finance a Permitted Acquisition, to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, and remain outstanding through the date of determination (and thereafter, in the case of projections pursuant to <u>Section 10.17(a)</u>) and (y) (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or

30

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 56 of 300

redeemed after the first day of the relevant Test Period or Calculation Period, as the case may be, shall be deemed to have been retired or redeemed on the first day of such Test Period or Calculation Period, as the case may be, and remain retired through the date of determination (and thereafter, in the case of projections pursuant to Section 10.17(a));

(ii)     all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) the rates which would have been applicable thereto during the respective period when same was deemed outstanding, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); provided that all Indebtedness (whether actually outstanding or deemed outstanding) bearing interest at a floating rate of interest shall be tested on the basis of the rates applicable at the time the determination is made pursuant to said provisions; and

(iii)     in making any determination of Consolidated EBITDAX on a Pro Forma Basis, pro forma effect shall be given to any Permitted Acquisition and any Asset Sale if effected during the respective Calculation Period or Test Period (or thereafter, for purposes of determinations pursuant to Section 10.17(a) only) as if same had occurred on the first day of the respective Calculation Period or Test Period, as the case may be, taking into account, in the case of any Permitted Acquisition, factually supported and identifiable expected pro forma "run rate" cost savings, expense reductions, other operational initiatives, improvements and changes and synergies related to such Permitted Acquisition that, in each case, have resulted from, or are projected by Holdings in good faith to result from actions which have been taken or are expected to be taken no later than three months after the date of such pro forma event, as if such cost savings, improvements, changes, expense reductions or synergies were realized on the first day of the respective period in an amount not to exceed 10% of Consolidated EBITDAX of the prospective acquired business or Collateral; provided that any such adjustments to Consolidated EBITDAX pursuant to this clause (iii) shall be reasonably acceptable to the Administrative Agent.

"**Projected Oil and Gas Production**" shall mean the projected production of crude oil, natural gas or natural gas liquids (measured by volume unit or BTU equivalent, not sales price) from Oil and Gas Properties and interests owned by the Borrower and its Subsidiaries which have attributable to them proved developed producing reserves, as such production is projected in the most recent Reserve Report, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation and otherwise delivered pursuant to this Agreement, (a) for purposes of Section 10.23(a), after deducting projected production from any Oil and Gas Properties or Hydrocarbon Interests sold or under contract for sale that had been included in such Reserve Report and after adding reasonable projected production from any Oil and Gas Properties or Hydrocarbon

Interests that had not been reflected in such Reserve Report but that are reflected in a separate or supplemental report meeting the requirements of Section 10.21 (including the Reserve Report as of September 30, 2018 required to be delivered pursuant to Section 10.21) and (b) for purposes of Section 10.23(b) and Section 11.19, making adjustments to account for Dispositions of Oil and Gas Properties included in such report and acquisitions of Oil and Gas Properties not included in such report, in each case consummated by the Borrower or any of its Subsidiaries and, in the case of acquisitions, to the extent such acquired Oil and Gas Properties are reflected in a separate or supplemental report meeting the requirements of Section 10.21 (and the Borrower hereby agrees to deliver to the Lenders such separate or supplemental report with the applicable compliance certificate delivered pursuant to Section 10.01(d)).  For purposes of this definition, the Strip Price shall be determined ten (10) Business Days prior to the delivery of the applicable certificate under Section 10.01(g)(iii) or the last sentence of Section 10.23.

"**Projections**" shall mean the projections that were prepared by or on behalf of the Borrower in connection with the Transaction and delivered to the Administrative Agent and the Lenders on November 5, 2018.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Proved Reserves**" shall mean those Oil and Gas Properties designated as "proved" (in accordance with SPE definitions and regulations) in the Reserve Report most recently delivered to the Administrative Agent pursuant to this Agreement.

"**PV-10 Value**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses , and capital expenditures of the Credit Parties' Proved Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; provided that (a) such value should be adjusted to give effect to the Hedge Agreements with Approved Counterparties then in effect and (b) such calculations of the PV-10 Value shall be reasonably acceptable to the Administrative Agent.  For purposes of this definition, the Strip Price shall be determined ten (10) Business Days prior to the delivery of the applicable certificate under Section 10.01(g)(iii).

"**PV-10 Value of PDP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses and capital expenditures of the Credit Parties' PDP Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense

and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; provided that (a) such value should be adjusted to give effect to the Hedge Agreements with Approved Counterparties then in effect, (b) such calculations of the PV-10 Value of PDP Reserves shall be reasonably acceptable to the Administrative Agent and (c) PV-10 Value of PDP Reserves as of the Closing Date shall be deemed to be $122,915,440.  For purposes of this definition, the Strip Price shall be determined ten (10) Business Days prior to the delivery of the applicable certificate under Section 10.01(g)(iii).

"**PV-10 Value of Workover PDNP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses and capital expenditures of the Credit Parties' Workover PDNP Reserves as set forth in the most recent certificate delivered pursuant to Section 10.01(g)(iii), using information prepared by the chief engineer of the Borrower from the most recent Reserve Report delivered pursuant hereto (identified separately by from PDNP Reserves), calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; provided that (a) such calculations of the PV-10 Value of Workover PDNP Reserves and calculations of Workover PDNP Reserves shall be reasonably acceptable to the Administrative Agent and (b) PV-10 Value of Workover PDNP Reserves as of the Closing Date shall be deemed to be $0.  For purposes of this definition, the Strip Price shall be determined ten (10) Business Days prior to the delivery of the applicable certificate under Section 10.01(g)(iii).

"**Qualified ECP Loan Party**" shall mean each Credit Party that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"**Qualified Preferred Stock**" shall mean any Preferred Equity of Holdings so long as the terms of any such Preferred Equity (x) do not contain any mandatory put, redemption (other than solely for other Qualified Preferred Stock), repayment, sinking fund or other similar provision prior to the date that is six months after the Maturity Date (as the same may be amended or extended hereunder), (y) do not require the cash payment of Dividends that would otherwise be prohibited by the terms of this Agreement or any other agreement or contract of Holdings or any of its Subsidiaries and (z) in the case of Preferred Equity of Holdings that was not issued prior to the Closing Date, (1) do not contain any covenants (other than periodic reporting requirements), (2) do not grant the holders thereof any voting rights except for (I) voting rights required to be granted to such holders under applicable law and (II) limited customary voting rights on fundamental matters such as mergers, consolidations, sales of all or substantially all of the assets of Holdings, or liquidations involving Holdings, and (3) are otherwise reasonably satisfactory to the Administrative Agent.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 59 of 300

"**Quarterly Payment Date**" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"**Real Property**" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"**Recipient**" shall mean (a) the Administrative Agent and (b) any Lender, as applicable.

"**Recovery Event**" shall mean the receipt by Holdings or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of Holdings or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 10.03.

"**Register**" shall have the meaning provided in Section 14.15.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Released Claims**" shall have the meaning provided in Section 13.02(c).

"**Releasees**" shall have the meaning provided in Section 13.02(c).

"**Replaced Lender**" shall have the meaning provided in Section 2.13.

"**Replacement Lender**" shall have the meaning provided in Section 2.13.

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan other than those events as to which the 30-day notice period has been waived.

"**Required Lenders**" shall mean, at any time, one or more Lenders (and if there are two or more non-affiliated Lenders, at least two non-affiliated Lenders) the sum of whose outstanding Loans and Commitments at such time represents at least 66 2/3% of the sum of all outstanding Loans and Commitments at such time.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 60 of 300

"**Required Prepayment Date**" shall have the meaning provided in <u>Section 6.02(k)</u>.

"**Reserve Percentage**" shall mean, as of any day, the maximum percentage (expressed as a decimal) in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

"**Reserve Report**" shall mean the Initial Reserve Report or the most recently delivered report delivered pursuant to <u>Section 10.21</u> which report shall, as of its date, set forth the oil and gas reserves attributable to the Oil and Gas Properties of the Credit Parties and which report shall be in form and substance reasonably satisfactory to the Administrative Agent, and shall, at a minimum, set forth each Credit Party's royalty interests, oil and gas reserves (including proved developed producing, proved developed non-producing, proved undeveloped and probable reserves) and a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date.

"**Reserve Report Certificate**" shall have the meaning set forth in <u>Section 10.21(b)</u>.

"**Restricted**" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of Holdings or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors (other than Permitted Liens) or (iii) are not otherwise generally available for use by Holdings or such Subsidiary.

"**Returns**" shall have the meaning provided in <u>Section 9.09</u>.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Sanctions**" shall have the meaning provided in <u>Section 9.25(a)</u>.

"**Scheduled Repayment**" shall have the meaning provided in <u>Section 6.02(b)</u>.

"**SEC**" shall have the meaning provided in <u>Section 10.01(i)</u>.

"**Section 6.04(b)(ii) Certificate**" shall have the meaning provided in <u>Section 6.04(b)(ii)</u>.

"**Secured Creditors**" shall have the meaning assigned that term in the respective Security Documents.

"**Secured Hedge Agreement**" shall mean any Hedge Agreement (a) entered into pursuant to in compliance with this Agreement and by or among any Credit Parties and any Approved Counterparty, (b) with respect to which the Approved Counterparty executes the Hedge Intercreditor Agreement or a joinder thereto and (c) which contains no requirement, agreement or covenant for Holdings or any Subsidiary to post collateral or margin to secure their

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 61 of 300

obligations under such Hedge Agreement or to cover market exposures, other than a requirement that such obligations be secured by the Security Documents.

"**Secured Obligations**" shall have the meaning assigned that term in the respective Security Documents.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Agreement**" shall have the meaning provided in Section 7.11.

"**Security Agreement Collateral**" shall mean all "Collateral" as defined in the Security Agreement.

"**Security Document**" shall mean and include each of the Security Agreement, the Pledge Agreement, the Meidu Pledge Agreement, each Mortgage, each landlord waiver, each control agreement and, after the execution and delivery thereof, each Additional Security Document.

"**Senior Management Restricted Unit Agreements**" shall mean, collectively, (i) that certain Restricted Unit Agreement, dated as of March 20, 2017, by and among the Borrower, MDA Holdco and C. Eric Waller, (ii) those certain other Restricted Unit Agreements listed on Schedule XVIII and (iii) those certain other Restricted Unit Agreements entered into after the Closing Date and which have been described in a supplement to Schedule XVIII delivered to Administrative Agent by Borrower from time to time.

"**SPE**" shall mean the Society of Petroleum Engineers.

"**Special Distribution**" shall mean a one-time special distribution, loan and/or any combination thereof, to Meidu America or Parent; provided that the aggregate amount of such distribution plus the aggregate amount of cash advanced as a loan, in each case, made and/or advanced by the Credit Parties on an aggregate basis shall not exceed an amount equal to (x) $50,000,000 minus (y) the Closing Date Distribution minus (z) without duplication, the sum of all distributions and/or loans made to Parent or Meidu America by Holdings and its Subsidiaries from and after September 10, 2018 to the Closing Date; provided that, (A) no Default or Event of Default shall then exist or result therefrom, (B) before and after giving effect to the Special Distribution, the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant (which, for purposes of Section 11.10, shall mean that the Adjusted Coverage Ratio is equal to or greater than 1.65:1.00), (C) at the time such Special Distribution is made, the West Texas Intermediate Crude price at the Cushing hub shall have been greater than or equal to $60 for the immediately preceding fifteen (15) consecutive days, (D) after giving effect to any such Special Distribution, Unrestricted cash and Cash Equivalents of Holdings and its Subsidiaries (in each case deposited to an account subject to a "control agreement" referred to in Section 3.9 of the Security Agreement) shall not be less than $25,000,000, and (E) the final Reserve Report as of December 31, 2018 shall have been delivered pursuant to Section 10.21, together with the certificates required pursuant to Sections 10.01(d) and 10.01(g).

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 62 of 300

"**Strip Price**" shall mean, as of any date of the determination thereof, the five-year (60 month) strip price for crude oil (WTI Cushing) and natural gas (Henry Hub), with such price held flat for each subsequent year, quoted on the New York Mercantile Exchange (or its successor) and published in a nationally recognized publication for such pricing as selected by Administrative Agent; provided, however, in the event that the New York Mercantile Exchange no longer provides futures contract price quotes for five- year (60 month) periods or if the New York Mercantile Exchange no longer provides such futures contract quotes or has ceased to operate, Administrative Agent shall designate another period and/or nationally recognized commodities exchange to replace the period and/or New York Mercantile Exchange for purposes of the references to the period and/or New York Mercantile Exchange, which in the Administrative Agent's opinion is the most comparable to obtain the appropriate Strip Price for the purposes of this Agreement.

"**Subordinated Debt**" shall mean any unsecured Indebtedness of a Credit Party incurred from time to time that is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to the Administrative Agent.

"**Subordinated Provisions**" shall have the meaning provided in Section 12.11.

"**Subsidiaries Guaranty**" shall have the meaning provided in Section 7.08.

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of Holdings.

"**Subsidiary Guarantor**" shall mean each Subsidiary.

"**Synthetic Lease**" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"**Taxes**" (or "**Tax**" as the context may require) shall mean any taxes, charges, fees, levies, penalties or other assessments imposed by any Taxing Authority, including, income, premium, excise, property, sales, use, value added, goods and services, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions to tax attributable thereto.

"**Taxing Authority**" shall mean any Governmental Authority with the authority to impose Tax.

"**Test Period**" shall mean each period of four consecutive fiscal quarters of Holdings then last ended, in each case taken as one accounting period; provided that in the case of any Test Period which includes any fiscal quarter ended on or prior to the Closing Date, the rules set forth in the immediately succeeding sentence shall apply; provided further, that in the case of determinations of each of the Total Leverage Ratio and the Fixed Charge Coverage Ratio pursuant to this Agreement, such further adjustments (if any) as described in the proviso to the definition of each of "Total Leverage Ratio" and "Fixed Charge Coverage Ratio", as the case may be, contained herein shall be made to the extent applicable. If the respective Test Period: (i) includes the fiscal quarter of Holdings ended December 31, 2017, Consolidated EBITDAX for such fiscal quarter shall be deemed to be $9,774,000; (ii) includes the fiscal quarter of Holdings ended March 31, 2018, (A) Consolidated EBITDAX for such fiscal quarter shall be deemed to be $8,014,000, (B) Maintenance Capital Expenditures for such fiscal quarter shall be deemed to be $1,429,000, and (C) Capitalized Drilling and Exploration Expenditures for such fiscal quarter shall be deemed to be $4,111,000; (iii) includes the fiscal quarter of Holdings ended June 30, 2018, (A) Consolidated EBITDAX for such fiscal quarter shall be deemed to be $9,568,000, (B) Maintenance Capital Expenditures for such fiscal quarter shall be deemed to be $417,000, and (C) Capitalized Drilling and Exploration Expenditures for such fiscal quarter shall be deemed to be $16,924,000; and (iv) includes the fiscal quarter of Holdings ended September 30, 2018, (A) Consolidated EBITDAX for such fiscal quarter shall be deemed to be $12,355,000, (B) Maintenance Capital Expenditures for such fiscal quarter shall be deemed to be $698,000 and (C) Capitalized Drilling and Exploration Expenditures for such fiscal quarter shall be deemed to be $33,424,000.  For the Test Period ending December 31, 2018, Consolidated Interest Expense shall be deemed to be the actual Consolidated Interest Expense (calculated on a Pro Forma Basis to the extent applicable) for the period from and including the Closing Date through and including December 31, 2018 multiplied by a factor equal to 365 divided by the number of days included in such period.  For the Test Period ending March 31, 2019, Consolidated Interest Expense shall be deemed to be the actual Consolidated Interest Expense (calculated on a Pro Forma Basis to the extent applicable) for the period commencing January 1, 2019 and ending on such date multiplied by 4.  For the Test Period ending June 30, 2019, Consolidated Interest Expense shall be deemed to be the actual Consolidated Interest Expense (calculated on a Pro Forma Basis to the extent applicable) for the period commencing January 1, 2019 and ending on such date multiplied by 2.  For the Test Period ending September 30, 2019, Consolidated Interest Expense shall be deemed to be the actual Consolidated Interest Expense (calculated on a Pro Forma Basis to the extent applicable) for the period commencing January 1, 2019 and ending on such date multiplied by 4/3.  For any calculation of Consolidated Interest Expense prior to the date that financial statements are delivered for the fiscal quarter ending December 31, 2018, Consolidated Interest Expense for the applicable Test Period shall be deemed to be $10,351,000.

"**Total Commitment**" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"**Total Delayed Draw Term Loan Commitment**" shall mean, at any time, the sum of the Delayed Draw Term Loan Commitments at such time, which such amount as of the Closing Date is set forth on Schedule I.

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 64 of 300

"**Total Initial Term Loan Commitment**" shall mean, at any time, the sum of the Initial Term Loan Commitments at such time which such amount as of the Closing Date is set forth on Schedule I.

"**Total Leverage Ratio**" shall mean, on any date of determination, the ratio of (x) Consolidated Indebtedness  on such date to (y) Consolidated EBITDAX for the Test Period most recently ended on or prior to such date; provided that (i) for purposes of any calculation of the Total Leverage Ratio pursuant to this Agreement, Consolidated EBITDAX shall be determined on a Pro Forma Basis in accordance with clause (iii) of the definition of "Pro Forma Basis" contained herein and (ii) for purposes of any calculation of the Total Leverage Ratio pursuant to Section 10.17(a) only, Consolidated Indebtedness shall be determined on a Pro Forma Basis in accordance with the requirements of the definition of "Pro Forma Basis" contained herein.

"**Tranche**" shall mean the respective facility and commitments utilized in making Loans hereunder, with there being two separate Tranches, i.e., Initial Term Loans and Delayed Draw Term Loans.

"**Transaction**" shall mean, collectively, (i) the incurrence of Loans on the Closing Date and the use of proceeds thereof, (ii) the making of the Closing Date Distribution, and (iii) the payment of all fees and expenses in connection with the foregoing.

"**Type**" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Eurodollar Loan.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"**United States**" and "**U.S.**" shall each mean the United States of America.

"**Unrestricted**" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"**Unutilized DDTL Commitment**" shall mean, with respect to any Lender at any time, such Lender's Delayed Draw Term Loan Commitment at such time less the aggregate outstanding principal amount of all Delayed Draw Term Loans made by such Lender at such time.

"**Waivable Payment**" shall have the meaning provided in Section 6.02(k).

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (i) any corporation 100% of whose Equity Interests are at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

"**Workover PDNP Reserves**" shall mean "proved developed non-producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines, but limited to only those "proved developed non-producing oil and gas reserves" associated with expected workovers of currently producing and/or previously producing wells. For the avoidance of doubt Workover PDNP Reserves shall not include drilled but uncompleted wells.

"**Write-Down and Conversion Powers**" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.02.    Divisions.

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 2.    Amount and Terms of Loans.

2.01.    The Loans.

(a)    Initial Term Loans. Subject to and upon the terms and conditions set forth herein, each Lender with an Initial Term Loan Commitment severally agrees to make a term loan (an "**Initial Term Loan**" and, collectively, the "**Initial Term Loans**") to the Borrower, which Initial Term Loans (i) shall be incurred pursuant to a single drawing on the Closing Date, (ii) shall be denominated in Dollars, (iii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into Base Rate Loans or Eurodollar Loans and (iv) shall be made by each such Lender in that aggregate principal amount which does not exceed the Initial Term Loan Commitment of such Lender on the Closing Date. Once repaid, Initial Term Loans incurred hereunder may not be reborrowed. All references herein to an "Initial Term Loan" or "Initial Term Loans", to "principal" or the "principal amount" of any Initial Term Loan or Initial Term Loans and other terms of like import shall mean Initial Term Loans incurred by the Borrower, minus repayments and prepayments of Initial Term Loans pursuant to this Agreement.

(b)    Delayed Draw Term Loans. Subject to and upon the terms and conditions set forth herein, each Lender with a Delayed Draw Term Loan Commitment severally agrees to make additional term loans (each, a "**Delayed Draw Term Loan**" and, collectively, the "**Delayed Draw Term Loans**") to the Borrower, which Delayed Draw Term Loans (i) may be

40

Case 20-34966    Document 136-1    Filed in TXSB on 11/03/20    Page 66 of 300

requested by the Borrower after the Closing Date and prior to the DDTL Commitment Expiration Date, (ii) shall be denominated in Dollars, (iii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into Base Rate Loans or Eurodollar Loans and (iv) shall be made by each such Lender in that aggregate principal amount which does not exceed the Delayed Draw Term Loan Commitment of such Lender at such time. Once repaid, Delayed Draw Term Loans incurred hereunder may not be reborrowed. All references herein to an "Delayed Draw Term Loan" or "Delayed Draw Term Loans", to "principal" or the "principal amount" of any Delayed Draw Term Loan or Delayed Draw Term Loans and other terms of like import shall mean Delayed Draw Term Loans incurred by the Borrower, minus repayments and prepayments of Delayed Draw Term Loans pursuant to this Agreement.

2.02. <u>Minimum Amounts for Delayed Draw Term Loans; Limitations on Number of Borrowings</u>.

Each Delayed Draw Term Loan shall be in an amount that is an integral multiple of $5,000,000 and not less than $15,000,000; <u>provided</u> that, if the Delayed Draw Term Loan Commitments at any time are less than $15,000,000, the Borrower may request a Delayed Draw Term Loan in an amount equal to the remaining amount of the Delayed Draw Term Loan Commitments at such time. The Borrower shall not request more than four Borrowings of Delayed Draw Term Loans. At no time shall there be more than eight Borrowings of Eurodollar Loans in the aggregate.

2.03. <u>Notice of Borrowing</u>.

Whenever the Borrower desires to incur (x) Eurodollar Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least eight Business Days' prior notice of each Eurodollar Loan to be incurred hereunder, and (y) Base Rate Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least one Business Day's prior notice for the Initial Term Loans and eight Business Days' prior notice of each subsequent Base Rate Loan to be incurred hereunder; provided that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time) on such day. Each such notice (each, a "**Notice of Borrowing**"), except as otherwise expressly provided in <u>Section 2.10</u>, shall be irrevocable and shall be in writing, in the form of <u>Exhibit A-1</u>, appropriately completed to specify: (i) the aggregate principal amount of the Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day) and (iii) whether the Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or, to the extent permitted hereunder, Eurodollar Loans and, if Eurodollar Loans, the initial Interest Period to be applicable thereto. The Administrative Agent shall promptly give each Lender which is required to make Loans of the Tranche specified in the respective Notice of Borrowing, notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

2.04. <u>Disbursement of Funds</u>.

No later than 3:00 P.M. (New York City time) on the date specified in each Notice of Borrowing, each Lender with a Commitment of the respective Tranche will make available its

pro rata portion (determined in accordance with <u>Section 2.07</u>) of each such Borrowing requested to be made on such date. All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower at the Payment Office the aggregate of the amounts so made available by the Lenders. Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to <u>Section 2.08</u>. Nothing in this <u>Section 2.04</u> shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

2.05.   <u>Notes</u>.

(a)       The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to <u>Section 14.15</u> and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of <u>Exhibit B</u>, with blanks appropriately completed in conformity herewith (each, a "**Note**" and, collectively, the "**Notes**").

(b)       Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will record on the reverse side thereof the outstanding principal amount of Loans evidenced thereby. Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)       Notwithstanding anything to the contrary contained above in this <u>Section 2.05</u> or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes. No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which

would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (b).  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans.

2.06.   <u>Conversions</u>.

The Borrower shall have the option to convert, on any Business Day, all or a portion of the outstanding principal amount of Loans made pursuant to one or more Borrowings (so long as of the same Tranche) of one or more Types of Loans into a Borrowing (of the same Tranche) of another Type of Loan, <u>provided</u> that, (i) except as otherwise provided in <u>Section 2.10(b)</u>, Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted, (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into Eurodollar Loans if no Event of Default is in existence on the date of the conversion and (iii) no conversion pursuant to this <u>Section 2.06</u> shall result in a greater number of Borrowings of Eurodollar Loans than is permitted under <u>Section 2.02</u>.  Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 2:00 P.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans into Eurodollar Loans, three Business Days' prior notice and (y) in the case of conversions of Eurodollar Loans into Base Rate Loans, one Business Day's prior notice (each, a "**Notice of Conversion/Continuation**"), in each case in the form of <u>Exhibit A-2</u>, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07.   <u>Pro Rata Borrowings</u>.

All Borrowings of Initial Term Loans and Delayed Draw Term Loans under this Agreement shall be incurred from the Lenders <u>pro rata</u> on the basis of their Initial Term Loan Commitments or Delayed Draw Term Loan Commitments, as the case may be.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08.   <u>Interest</u>.

(a)      The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from and including the date of Borrowing thereof until and including the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin <u>plus</u> the Base Rate.

(b)      The Borrower agrees to pay interest in respect of the unpaid principal amount of each Eurodollar Loan from the date of Borrowing thereof until and including the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin <u>plus</u> the Eurodollar Rate for such Interest Period.

(c)      While any Event of Default exists, upon the election of the Administrative Agent or the request of the Required Lenders (or automatically upon the occurrence of any Event of Default set forth in <u>Sections 12.01</u> or <u>12.05</u>), (A) the Borrower shall pay interest on the outstanding principal balance of the Loans and, to the extent permitted by law, interest thereon, at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by the applicable Loans and (B) all other Obligations shall bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate applicable to Base Rate Loans from time to time. Interest that accrues under this <u>Section 2.08(b)</u> shall be payable in cash on demand.

(d)      Accrued (and theretofore unpaid) interest shall be payable in respect of each Loan (x) quarterly in arrears on the applicable Quarterly Payment Date (it being understood and agreed that such amount shall be calculated through, and payable in respect of, the end of such calendar quarter even if such Quarterly Payment Date is prior to the end of such calendar quarter), (y) on the date of any repayment or prepayment in full of all outstanding Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)      Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Eurodollar Loans and shall promptly notify the Borrower and the applicable Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09.   <u>Interest Periods</u>.

At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any Eurodollar Loan (in the case of the initial Interest Period applicable thereto) or prior to 2:00 P.M. (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loan (in the case of any subsequent Interest Period), the Borrower shall have the right to elect the interest period (each, an "**Interest Period**") applicable to such Eurodollar Loan, which Interest Period shall, at the option of the Borrower, be a one, two, three or six month period, <u>provided</u> that (in each case):

(a)      all Eurodollar Loans comprising a Borrowing shall at all times have the same Interest Period;

(b)      the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 70 of 300

(c)     each Interest Period shall end on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as applicable; provided that if any Interest Period for a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(d)     if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)     no Interest Period may be selected at any time when an Event of Default is then in existence;

(f)     no Interest Period in respect of any Borrowing shall be selected which extends beyond the Maturity Date; and

(g)     no Interest Period in respect of any Borrowing of Loans shall be selected which extends beyond any date upon which a mandatory repayment of such Loans, as the case may be, will be required to be made under Section 6.02(b), as the case may be, if the aggregate principal amount of such Loans, as the case may be, which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount of such Loans, as the case may be, then outstanding less the aggregate amount of such required repayment.

If by 2:00 P.M. (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Eurodollar Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Eurodollar Loans as provided above, the Borrower shall be deemed to have elected to convert such Eurodollar Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

2.10.   Increased Costs, Illegality, etc.

(a)     In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)     on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Eurodollar Rate"; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule,

45

regulation, order, guideline or request, such as, but not limited to: (A) a change in law which subjects any Lender to any Taxes (other than Indemnified Taxes) in respect of payments of the principal of or interest on the Loans or the Notes or any other amounts payable hereunder or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Closing Date affecting such Lender, the interbank Eurodollar market or the position of such Lender in such market (including that the Eurodollar Rate with respect to such Eurodollar Loan does not adequately and fairly reflect the cost to such Lender of funding such Eurodollar Loan); or

       (iii)    at any time, that the making or continuance of any Eurodollar Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, Eurodollar Loans shall automatically convert into Loans that accrue interest at the Base Rate and no Loans that accrue interest at the Eurodollar Rate shall be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, (y) in the case of clause (ii) above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by law.

       (b)    At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.10(a)(ii), the Borrower may, and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.10(a)(iii), the Borrower shall, either (x) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent written notice on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to Section 2.10(a)(ii) or (iii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan, provided that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.10(b).

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 72 of 300

(c)     If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, <u>provided</u> that such Lender's determination of compensation owing under this <u>Section 2.10(c)</u> shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this <u>Section 2.10(c)</u>, will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish the Borrower's obligation to pay additional amounts pursuant to this <u>Section 2.10(c)</u> upon the subsequent receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.10</u> shall not constitute a waiver of such Lender's right to demand such compensation.

2.11.   <u>Compensation</u>.

The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of, or conversion from or into, Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to <u>Section 2.10(a)</u>); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to <u>Section 6.01</u>, <u>Section 6.02</u> or as a result of an acceleration of the Loans pursuant to <u>Section 12</u>) or a conversion of any of its Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to <u>Section 2.10(b)</u>.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 73 of 300

2.12.    Change of Lending Office.

Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10 and 6.04.

2.13.    Replacement of Lenders.

(x) Upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders or (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 14.12(b), then the  Borrower may, with the consent of the Administrative Agent (in its sole discretion) and in accordance with Section 14.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, replace such Lender (the "**Replaced Lender**") with one or more other Eligible Transferees (collectively, the "**Replacement Lender**") or, in the case of a replacement as provided in Section 14.12(b) where the consent of the respective Lender is required with respect to less than all Tranches of its Loans or Commitments, to replace the Commitments and/or outstanding Loans of such Lender in respect of each Tranche where the consent of such Lender would otherwise be individually required, with identical Commitments and/or Loans of the respective Tranche provided by the Replacement Lender; provided that:

(a)    at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 14.04(b) (and with all fees payable pursuant to said Section 14.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans (or, in the case of the replacement of only the outstanding Loans of any Tranche, the outstanding Loans of the respective Tranche or Tranches with respect to which such Lender is being replaced) of, the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender under each Tranche with respect to which such Replaced Lender is being replaced and (B) an amount equal to all accrued, but theretofore unpaid, fees owing to the Replaced Lender pursuant to the Credit Documents (but only with respect to the relevant Tranche, in the case of the replacement of less than all Tranches of Loans then held by the respective Replaced Lender) pursuant to Sections 4.01 and 5.01; and

(b)    all obligations of the Borrower then owing to the Replaced Lender (other than those (a) specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11 or (b) relating to any Tranche of Loans and/or Commitments of the respective Replaced Lender which will remain outstanding after giving effect to the respective replacement) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 14.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 14.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Loans hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 6.04, 13.06, 14.01 and 14.06), which shall survive as to such Replaced Lender.

2.14.    Alternate Rate of Interest.

(a)    Interest Rate Inadequate or Unfair.  In the event that the Administrative Agent or any Lender shall have determined that:

(i)    reasonable means do not exist for ascertaining the Eurodollar Rate for any Interest Period;

(ii)    Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank LIBOR market, with respect to any outstanding Eurodollar Loan, proposed Eurodollar Loan, or proposed conversion of a Base Rate Loan into a Eurodollar Loan;

(iii)    the making, maintenance or funding of any Eurodollar Loan has been made impracticable or unlawful by compliance by the Administrative Agent or any Lender in good faith with any applicable law or any interpretation or application thereof by any Governmental Authority or with any request or directive of any such Governmental Authority (whether or not having the force of law), or

(iv)    the Eurodollar Rate will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any Eurodollar Loan,

then the Administrative Agent shall give the Borrower prompt written or telephonic notice of such determination.  If such notice is given prior to a LIBOR Termination Date (as defined below) or prior to the date on which Section 2.14(b) applies, (x) any such requested Eurodollar Loan shall

49

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 75 of 300

be made as a Base Rate Loan, unless the Borrower shall notify the Administrative Agent no later than 1:00 p.m. two (2) Business Days prior to the date of such proposed Borrowing, that its request for such Borrowing shall be canceled or made as an unaffected type of Eurodollar Loan, (y) any Base Rate Loan or Eurodollar Loan which was to have been converted to an affected type of Eurodollar Loan shall be continued as or converted into a Base Rate Loan, or, if the Borrower shall notify the Administrative Agent, no later than 1:00 p.m. two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Loan, and (z) any outstanding affected Eurodollar Loans shall be converted into a Base Rate Loan, or, if the Borrower shall notify the Administrative Agent, no later than 1:00 p.m. two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Loan, shall be converted into an unaffected type of Eurodollar Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Loans (or sooner, if any Lender cannot continue to lawfully maintain such affected Eurodollar Loan).  Until such notice has been withdrawn, the Lenders shall have no obligation to make an affected type of Eurodollar Loan or maintain outstanding affected Eurodollar Loans and the Borrower shall not have the right to convert a Base Rate Loan or an unaffected type of Eurodollar Loan into an affected type of Eurodollar Loan.

(b)     Successor Eurodollar Rate Index.

(i)     If the Administrative Agent determines (which determination shall be final and conclusive, absent manifest error) that either (x) (A) the circumstances set forth in Section 2.14(a) have arisen and are unlikely to be temporary, or (B) the circumstances set forth in Section 2.14(a) have not arisen but the applicable supervisor or administrator (if any) of the Eurodollar Rate or a Governmental Authority having jurisdiction over the Administrative Agent or any Lender has made a public statement identifying the specific date after which the Eurodollar Rate shall no longer be used for determining interest rates for loans (either such date, a "**LIBOR Termination Date**"), or (y) a rate other than the Eurodollar Rate has become a widely recognized benchmark rate for newly originated loans in Dollars in the U.S. market, then the Administrative Agent may (with the consent of the Borrower) choose a replacement index for the Eurodollar Rate and make adjustments to applicable margins and related amendments to this Agreement as referred to below such that, to the extent practicable, the all-in interest rate based on the replacement index will be substantially equivalent to the all-in Eurodollar Rate-based interest rate in effect prior to its replacement, and the Administrative Agent, the Required Lenders and the Borrower shall enter into an amendment to this Agreement to reflect such replacement index, the adjusted margins and such other related amendments as may be appropriate, for the implementation and administration of such replacement index-based rate.

(ii)     Selection of the replacement index, adjustments to the applicable margins, and amendments to this Agreement (i) will be determined with due consideration to the then-current market practices for determining and implementing a rate of interest for newly originated loans in the United States and loans converted from a Eurodollar Rate-based rate to a replacement index-based rate, and (ii) may also reflect adjustments to account for (x) the effects of the

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 76 of 300

transition from the Eurodollar Rate to the replacement index and (y) yield- or risk-based differences between the Eurodollar Rate and the replacement index.

(iii) Until an amendment reflecting a new replacement index in accordance with this Section 2.14(b) is effective, each Loan and each conversion and renewal of a Eurodollar Loan will continue to bear interest with reference to the Eurodollar Rate; provided however, that if the Administrative Agent determines (which determination shall be final and conclusive, absent manifest error) that a LIBOR Termination Date has occurred, then following the LIBOR Termination Date, no Loans shall be made, converted or continued as Eurodollar Loans and all then outstanding Eurodollar Loans shall automatically be converted to Base Rate Loans until such time as an amendment reflecting a replacement index and related matters as described above is implemented.

(iv) Notwithstanding anything to the contrary contained herein, if at any time the replacement index is less than zero, at such times, such index shall be deemed to be zero for purposes of this Agreement.

SECTION 3.    Intentionally Omitted.

SECTION 4.    Commitment Commission; Fees; Reductions of Commitment.

4.01.    Fees.

(a)    The Borrower agrees to pay to the Administrative Agent for distribution to each Lender with a Delayed Draw Term Loan Commitment, a commitment commission (the "**Commitment Commission**") for the period from and including the Closing Date to and including the DDTL Commitment Expiration Date (or such earlier date on which the Delayed Draw Term Loan Commitment has been terminated) computed at a rate per annum equal to 2.30% on the Unutilized DDTL Commitment of such Lender as in effect from time to time. Accrued Commitment Commission shall be due and payable quarterly in arrears on each Quarterly Payment Date and on the DDTL Commitment Expiration Date (or such earlier date on which the Delayed Draw Term Loan Commitment has been terminated).

(b)    The Borrower agrees to pay to the Administrative Agent and the Collateral Agent such fees as may be agreed to in the Fee Letter or otherwise in writing from time to time by Holdings or any of its Subsidiaries and the Administrative Agent and/or the Collateral Agent.

4.02.    Mandatory Reduction of Commitments.

(a)    In addition to any other mandatory commitment reductions pursuant to this Agreement, the Total Initial Term Loan Commitment (and the Initial Term Loan Commitment of each Lender) shall terminate in its entirety on the Closing Date (after giving effect to the making of the Initial Term Loans on such date).

(b)    In addition to any other mandatory commitment reductions pursuant to this Agreement, the Total Delayed Draw Term Loan Commitment shall terminate in its entirety upon the DDTL Commitment Expiration Date.

51

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 77 of 300

SECTION 5.  Prepayment Premiums.

5.01.  Prepayment Premiums.

(a)     Upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Sections 6.01 or, in the case of any Asset Sale consummated pursuant to Section 11.02(d), Section 6.02(e) (in each case, whether or not a Default exists) or as a result of and immediately upon an acceleration of the Loans pursuant to Section 12 (or upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Section 6.02, but solely to the extent that the action giving rise to such prepayment or repayment constitutes a Default hereunder, it being understood and agreed that the Prepayment Premium shall be payable in connection with any prepayment under Section 6.02(c) or Section 11.10), then, in addition to the payment of the principal amount of the Loans, accrued and unpaid interest, and Fees, the Borrower shall pay the following prepayment or repayment premium (each a "**Prepayment Premium**") to the Lenders:

(i)     if any such prepayment or repayment occurs after the Closing Date but on or prior to the first anniversary of the Closing Date, the Borrower shall pay the Lenders a prepayment premium equal to 5.00% of the principal amount of the Loans prepaid or repaid at such time;

(ii)    if any such prepayment or repayment occurs after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, the Borrower shall pay the Lenders a prepayment premium equal to 3.00% of the principal amount of the Loans prepaid or repaid at such time;

(iii)   if any such prepayment or repayment occurs after the second anniversary of the Closing Date but on or prior to the third anniversary of the Closing Date, the Borrower shall pay the Lenders a prepayment premium equal to 2.00% of the principal amount of the Loans prepaid or repaid at such time; and

(iv)    if any such prepayment or repayment occurs after the third anniversary of the Closing Date, the Borrower shall not be obligated to pay any prepayment premium.

(b)     The Borrower agrees that the prepayment premiums required under Section 5.01(a) are a reasonable calculation of the Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from a prepayment of the Loan.  All prepayment premiums under this Section 5.01 shall be in addition to all other amounts which may be due to the Lenders from time to time pursuant to the terms of this Agreement and the other Credit Documents.  All of the Loans shall be subject to the prepayment premiums set forth in this Section 5.01 and the payment of one prepayment premium on a portion of the Loans shall not excuse or reduce the payment of a premium on any subsequent prepayment or repayment of the Loans. For all purposes of this Section 5, upon any acceleration of any Loans, the Prepayment Premium shall be due and payable upon such date of acceleration as if such Loans were repaid on such date, regardless of whether the Loans are actually repaid on such date.

(c)     THE CREDIT PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW.  The Credit Parties expressly agree that (i) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium, (iv) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 5.01(c), (v) their agreement to pay the Prepayment Premium is a material inducement to the Lenders to make the Loans, and (vi) the Prepayment Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such event.

SECTION 6.   Prepayments; Payments; Taxes.

6.01.   Voluntary Prepayments.

The Borrower shall have the right to prepay the Loans subject to the Prepayment Premium, if applicable, in whole or in part at any time and from time to time on the following terms and conditions: (i) the Borrower shall give the Administrative Agent prior to 2:00 P.M. (New York City time) at the Notice Office (x) at least seven Business Days' prior written notice of its intent to prepay Base Rate Loans and (y) at least seven Business Days' prior written notice of its intent to prepay Eurodollar Loans, which notice (in each case) may be conditioned on the occurrence of a specified transaction and revoked if such transaction does not occur and shall specify the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) each partial prepayment of Loans pursuant to this Section 6.01 shall be in an aggregate principal amount of at least $10,000,000 or such lesser amount approved by the Administrative Agent; (iii) each voluntary prepayment of Loans pursuant to this Section 6.01 shall be applied to the Loans on a pro rata basis (with the Applicable Percentage of the aggregate amount of such prepayment to be applied as a prepayment of the Loans); and (iv) each prepayment of Loans pursuant to this Section 6.01 shall reduce the then remaining Scheduled Repayments thereof on a pro rata basis (based upon the then remaining principal amount of each such Scheduled Repayment after giving effect to all prior reductions thereto).

6.02.   Mandatory Repayments.

(a)     [Reserved.]

(b)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 6.02, on each Quarterly Payment Date commencing on the Quarterly Payment Date for the quarter ending March 31, 2019, the Borrower shall be required to repay an

amount equal to 0.625% of the sum of (i) the aggregate original principal amount of all outstanding Initial Term Loans <u>and</u> (ii) the aggregate original principal amount of all outstanding Delayed Draw Term Loans that were Borrowed on or before the first day of the fiscal quarter ending on or about such Quarterly Payment Date (each such repayment, as the same may be reduced as provided in <u>Section 6.01</u> or <u>6.02(h)</u>, a "**Scheduled Repayment**").

(c) In addition to any other mandatory repayments or commitment reductions pursuant to this <u>Section 6.02</u>, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from the issuance of any Permitted Cure Securities or any other cash Cure Amount, an amount equal to 100% of the Net Cash Proceeds of the issuance of Permitted Cure Securities or such cash Cure Amount shall be applied on such date as a mandatory repayment in accordance with the requirements of <u>Sections 6.02(h)</u>.

(d) In addition to any other mandatory repayments or commitment reductions pursuant to this <u>Section 6.02</u>, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by Holdings or any of its Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to <u>Section 11.04</u>), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of <u>Section 6.02(i)</u>.

(e) In addition to any other mandatory repayments or commitment reductions pursuant to this <u>Section 6.02</u>, subject to the Prepayment Premium in the case of any Asset Sale consummated pursuant to <u>Section 11.02(d)</u>, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment and/or commitment reduction in accordance with the requirements of <u>Sections 6.02(i)</u>; <u>provided</u>, <u>however</u>, that such Net Sale Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and such Net Sale Proceeds shall be used to purchase assets (other than inventory and working capital) used or to be used in the businesses permitted pursuant to <u>Section 11.15</u> within 360 days following the date of such Asset Sale or the purchase of such assets shall have been committed to pursuant to a definitive agreement within such 360-day period (provided that such purchase is then consummated within 90 days thereafter), and <u>provided further</u>, that if all or any portion of such Net Sale Proceeds not required to be so applied as provided above in this <u>Section 6.02(e)</u> are not so reinvested within such applicable period (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Sale Proceeds from such Asset Sale, such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this <u>Section 6.02(e)</u> without regard to the preceding proviso.

(f) In addition to any other mandatory repayments or commitment reductions pursuant to this <u>Section 6.02</u>, on each Excess Cash Payment Date, an amount equal to the Excess Cash Percentage of the Excess Cash Flow for the related Excess Cash Payment Period.

(g) In addition to any other mandatory repayments or commitment reductions pursuant to this <u>Section 6.02</u>, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Recovery Event (other than

Recovery Events where the Net Cash Proceeds therefrom do not exceed $1,000,000), an amount equal to 100% of the Net Cash Proceeds from such Recovery Event shall be applied on such date as a mandatory repayment and/or commitment reduction in accordance with the requirements of Section 6.02(i); provided, however, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and Holdings has delivered a certificate to the Administrative Agent on such date stating that such Net Cash Proceeds shall be used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of the receipt of such Net Cash Proceeds or the replacement or restoration of such assets shall have been committed to pursuant to a definitive agreement within such 360-day period (provided that such replacement or restoration is then consummated within 90 days thereafter) (which certificate shall set forth the estimates of the Net Cash Proceeds to be so expended), and provided further, that if all or any portion of such Net Cash Proceeds not required to be so applied pursuant to the preceding proviso are not so used within 360 days after the date of the receipt of such Net Cash Proceeds (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(g) without regard to the immediately preceding proviso.

(h)     In addition to any other mandatory repayments or commitment reductions pursuant to this Section 6.02, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives Extraordinary Receipts, an amount equal to 100% of the Net Cash Proceeds of such Extraordinary Receipts shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(i); provided, however, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and such Net Cash Proceeds shall be used to purchase assets (other than inventory and working capital) used or to be used in the businesses permitted pursuant to Section 11.15 within 360 days following the date of receipt of such Extraordinary Receipts or the purchase of such assets shall have been committed to pursuant to a definitive agreement within such 360-day period (provided that such purchase is then consummated within 90 days thereafter), and provided further, that if all or any portion of such Net Cash Proceeds not required to be so applied as provided above in this Section 6.02(h) are not so reinvested within such applicable period (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds from such Extraordinary Receipts, such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(h) without regard to the preceding proviso. Notwithstanding anything to the contrary in this Agreement, any amount of Net Cash Proceeds used to purchase assets as provided herein shall be in addition to, and not considered or deemed to be a part of, any Capital Expenditures described in and limited by Sections 11.07 and 11.11.

(i)     Each amount required to be repaid pursuant to Sections 6.02(c), (d), (e), (f), (g) and (h) and applied in accordance with this Section 6.02(i) shall be applied to reduce the then remaining Scheduled Repayments of the Loans on a pro rata basis (based upon the then remaining principal amounts of the Scheduled Repayments of such Loans after giving effect to all prior reductions thereto).

(j)      In addition to any other mandatory repayments pursuant to this Section 6.02, (i) all then outstanding Loans of a respective Tranche shall be repaid in full on the Maturity Date, and (ii) unless the Required Lenders otherwise agree in writing, all then outstanding Loans shall be repaid in full on the date on which a Change of Control occurs.

(k)      Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "**Waivable Payment**") of the Loans in accordance with clauses (c) through (h) above, not later than 2:00 p.m., New York City time, three (3) Business Days prior to the date (the "**Required Prepayment Date**") on which the Borrower elects (or is otherwise required) to make such Waivable Payment, the Borrower shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's pro rata share of such Waivable Payment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to the Administrative Agent of its election to do so not later than 2:00 p.m., New York City time, the second Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option); provided, however, that (A) in the event that the Required Lenders elect to refuse a Waivable Payment, the Waivable Payment shall be deemed to have been refused by all Lenders and (B) in the event that the Required Lenders do not elect to refuse a Waivable Payment, the Waivable Payment shall be deemed to have been accepted by all Lenders.  On the Required Prepayment Date, if the Waivable Payment has not been declined pursuant to the proviso in the immediately preceding sentence, the Borrower shall pay to the Administrative Agent the amount of the Waivable Payment, which amount shall be applied by the Administrative Agent to prepay the Loans of all Lenders (which prepayment shall be applied to the scheduled installments of principal of the Loans in accordance with Section 6.02(i)).  Any Waivable Payment declined pursuant to this clause may be retained by the Borrower and used for any purpose not prohibited by this Agreement.

(l)      With respect to each repayment of Loans required by this Section 6.02, the Borrower may designate the Types of Loans of the respective Tranche which are to be repaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings of the respective Tranche pursuant to which such Eurodollar Loans were made, provided that:  (i) repayments of Eurodollar Loans pursuant to this Section 6.02 may only be made on the last day of an Interest Period applicable thereto unless all Eurodollar Loans of the respective Tranche have been paid in full; and (ii) each repayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion.

6.03.    Method and Place of Payment.

Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 P.M. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Any payments

EAST\159464702.32

received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day and any applicable interest or fee shall continue to accrue. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

6.04.   Net Payments.

(a)    All payments made by any Credit Party hereunder and under any Credit Document will be made without setoff, counterclaim or other defense. Except as provided in Section 6.04(b), all such payments will be made free and clear of, and without deduction or withholding for, any Taxes now or hereafter imposed by any Taxing Authority with respect to such payments (other than (i) any Tax imposed on or measured by the net income (however denominated), franchise Taxes and branch profits Taxes imposed on a Recipient pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Recipient is located or any subdivision thereof or therein or as the result of any present or former connection with such jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement or any other Credit Document, or sold or assigned an interest in any Loan or Credit Document), (ii) U.S. federal income withholding Taxes imposed on amounts payable to or for the account of a Recipient pursuant to a law in effect on the date on which such Recipient becomes a party hereto (other than pursuant to an assignment request by the Borrower under Section 2.13) or such Recipient changes its lending office, except that this clause (ii) shall not apply to the extent that, pursuant to this Section 6.4(a), amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or to such Recipient immediately before it changed its lending office, (iii) Taxes attributable to such recipient's failure to comply with Section 6.04(b) and (iv) any withholding Taxes imposed under FATCA (all such Taxes referred to collectively as "**Excluded Taxes**")) and all interest, penalties, Other Taxes, or similar liabilities with respect to such non-Excluded Taxes, levies, imposts, duties, fees, assessments or other charges (all such non-Excluded Taxes, levies, Other Taxes, imposts, duties, fees, assessments or other charges being referred to collectively as "**Indemnified Taxes**"). If any Indemnified Taxes are so levied or imposed, the relevant Credit Party shall pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that the payment of such amounts due under this Agreement or under any Credit Document, after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein or in such Credit Document had no such withholding or deduction been made. If any amounts are payable or paid or required to be withheld in respect of Indemnified Taxes pursuant to the preceding sentence, the relevant Credit Party will furnish to the Administrative Agent as soon as reasonably practicable after the date the payment of any Indemnified Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Credit Party. Each of the Credit Parties agrees to indemnify and hold harmless each Recipient, and reimburse such Recipient upon its written request, for the amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to

57

additional amounts payable under this Section 6.04) so levied or imposed and paid by (or withheld upon payment made to) such Recipient.

(b)     Each Recipient that is a United States Person (as such term is defined in Section 7701(a)(30) of the Code), shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Recipient becomes a Recipient under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), a copy of an executed Internal Revenue Service Form W-9 certifying that such Recipient is exempt from U.S. federal backup withholding tax.  Each Recipient that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes agrees, to the extent it is legally entitled to do so, to deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Recipient that is an assignee or transferee of an interest under this Agreement pursuant to Section 2.13 or 14.04(b) (unless the respective Recipient was already a Recipient hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Recipient, (i) two accurate and complete signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to a complete exemption or a reduced rate under an income tax treaty) (or successor forms) certifying to such Recipient's entitlement as of such date to a complete exemption from (or a reduced rate of) United States withholding tax with respect to payments to be made under this Agreement and under any Credit Document, or (ii) if the Recipient is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of Exhibit C (any such certificate, a "**Section 6.04(b)(ii) Certificate**") and (y) two accurate and complete signed copies of Internal Revenue Service Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Recipient's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Credit Document. If a payment made to a Recipient under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of the previous sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement. In addition, each Recipient agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Recipient will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 84 of 300

exemption) and a Section 6.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Recipient to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Credit Document, or such Recipient shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Recipient shall not be required to deliver any such Form or Certificate pursuant to this Section 6.04(b). Notwithstanding anything to the contrary contained in Section 6.04(a), but subject to Section 14.04(b) and the immediately succeeding sentence, (x) the Borrower shall be entitled, to the extent they are required to do so by law, to deduct or withhold income or similar Taxes imposed by the United States (or any political subdivision or Taxing Authority thereof or therein) from any amounts payable hereunder for the account of any Recipient for U.S. federal income tax purposes to the extent that such Recipient has not provided to the Borrower such Internal Revenue Service Forms and other documentation required to be provided to the Borrower pursuant to this Section 6.04(b) that establish a complete exemption from such deduction or withholding and (y) the Borrower shall not be obligated pursuant to Section 6.04(a) to gross-up payments to be made to a Recipient, or reimburse amounts paid or payable by a Recipient, in respect of such Taxes imposed by the United States if such Recipient is able to but has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 6.04(b). Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 6.04 and except as set forth in Section 14.04(b), the Credit Parties agree to pay any amounts and to indemnify each Recipient in the manner set forth in Section 6.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any additional amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

(c)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already reimbursed the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.04(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable out of pocket expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to (at its option) set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (c). Failure or delay on the part of the Administrative Agent to demand compensation pursuant to this Section 6.04(c) shall not constitute a waiver of the Administrative Agent's right to demand such compensation.

(d)      Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Taxing Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(e)      Each party's obligations under this Section 6.04 shall survive the resignation or replacement of the Borrower or Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

(f)      If any Lender or the Administrative Agent, as applicable, determines, in its sole discretion, that it has received a refund of an Indemnified Tax for which a payment has been made by the Borrower pursuant to this Agreement or any other Credit Document, which refund in the good faith judgment of such Lender or the Administrative Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender or the Administrative Agent, as the case may be, shall reimburse the Borrower for such amount (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender or the Administrative Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender or Administrative Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the Indemnified Tax giving rise to such refund had not been imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid in the first instance; provided, that the Borrower, upon the request of the Lender or the Administrative Agent, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority.  No Lender nor the Administrative Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower in connection with this clause (f) or any other provision of this Section 6.04.

SECTION 7.   Conditions Precedent to Credit Events on the Closing Date.

The obligation of each Lender with an Initial Term Loan Commitment to make Initial Term Loans on the Closing Date, is subject at the time of the making of such Loans to the satisfaction of the following conditions:

7.01.   Credit Agreement; Notes.

On or prior to the Closing Date, (i) each Holding Company and the Borrower shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent, and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same a Note executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

7.02.    Officer's Certificate.

On the Closing Date, the Administrative Agent shall have received a certificate in the form of Exhibit D, dated the Closing Date and signed on behalf of Holdings and the Borrower by the Chairman of the Board, the Chief Executive Officer, an Authorized Officer, the President or any Vice President of each such Credit Party, certifying on behalf of such Credit Party that (i) there exists no Default or Event of Default, (ii) all representations and warranties contained herein and in the other Credit Documents are true and correct and (iii) all of the conditions in this Section 7 have been satisfied.

7.03.    Opinions of Counsel.

On the Closing Date, the Administrative Agent shall have received from Haynes and Boone, LLP, special counsel to the Credit Parties and Meidu America, and Locke Lord LLP, special counsel to MD America Finance Corporation, Holdings, MDA Intermediate Holdco and Meidu America, customary opinions addressed to the Administrative Agent, the Collateral Agent and each of the Lenders and dated the Closing Date covering the matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request.

7.04.    Company Documents; Proceedings; etc.

(a)    On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party, together with good standing certificates, copies of the certificate or articles of incorporation or formation and by-laws operating agreement or limited liability company agreement (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(b)    On the Closing Date, all Company and legal proceedings and all instruments and agreements executed and delivered in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of Company proceedings, governmental approvals, good standing certificates and bring-down searches or certificates, if any, which the Administrative Agent reasonably may have requested in connection therewith, such documents and copies where appropriate to be certified by proper Company or Governmental Authorities.

7.05.    Material Agreements.

On the Closing Date, an Authorized Officer of Holdings shall certify to the Administrative Agent that true and correct copies of each the following documents existing and in effect as of the Closing Date were provided to the Administrative Agent electronically in the dataroom made accessible to the Administrative Agent and its counsel at https://mdae.sharefile.com:

EAST\159464702.32

(a)     all material agreements entered into by Holdings or any of its Subsidiaries governing the terms and relative rights of its capital stock and any agreements entered into by Holdings or any of its Subsidiaries, on the one hand, and its shareholders, on the other hand, relating to any such entity with respect to the voting of its capital stock (collectively, the "**Shareholders' Agreements**"), but excluding for the avoidance of doubt all employee stock options;

(b)     all material agreements (other than the Credit Documents and any Hedge Agreements), leases (other than Hydrocarbon Interests), indentures, purchase agreements, letters of credit, guarantees and joint venture agreements evidencing, securing or relating to Indebtedness of Holdings or any of its Subsidiaries or which create obligations of Holdings or any of its Subsidiaries to any issuers of surety or appeal bonds which is to remain outstanding after giving effect to the Transaction (collectively, the "**Existing Indebtedness Agreements**");

(c)     all Plans (and for each Plan that is required to file an annual report on Internal Revenue Service Form 5500-series, a copy of the most recent such report (including, to the extent required, the related financial and actuarial statements and opinions and other supporting statements, certifications, schedules and information), and for each Plan that is a "single-employer plan" as defined in Section 4001(a)(15) of ERISA, the most recently prepared actuarial valuation therefor) and any other "employee benefit plans" as defined in Section 3(3) of ERISA, and any other material agreements, plans or arrangements, with or for the benefit of current or former employees of Holdings or any of its Subsidiaries or any ERISA Affiliate (provided that the foregoing shall apply in the case of any multiemployer plan, as defined in 4001(a)(3) of ERISA, only to the extent that any document described herein is in the possession of Holdings or any Subsidiary of Holdings or any ERISA Affiliate or is reasonably available thereto from the sponsor or trustee of any such plan) (collectively, the "**Employee Benefit Plans**");

(d)     all existing, material employment agreements to which Holdings or any of its Subsidiaries is a party (collectively, the "**Employment Agreements**");

(e)     all existing, material non-compete agreements entered to which Holdings or any of its Subsidiaries is a party which restrict the activities of Holdings or any of its Subsidiaries (collectively, the "**Non-Compete Agreements**"); and

(f)     all collective bargaining agreements applying or relating to any employee of Holdings or any of any of its Subsidiaries (collectively, the "**Collective Bargaining Agreements**");

all of which Shareholders' Agreements, Existing Indebtedness Agreements, Employee Benefit Plans, Employment Agreements, Non-Compete Agreements and Collective Bargaining Agreements shall be in form and substance reasonably satisfactory to the Administrative Agent and shall be in full force and effect on the Closing Date, except as specified in such certificate.

7.06.    Adverse Change, Approvals.

(a)     Since December 31, 2017, nothing shall have occurred which has had, or could reasonably be expected to have, (i) a Material Adverse Effect or (ii) a material adverse effect on the Transaction.

(b)    On or prior to the Closing Date, all necessary governmental and material third party authorizations, approvals and/or consents in connection with the Transaction the other transactions contemplated hereby and the granting of Liens under the Credit Documents (including the authorizations, approvals and consents set forth on <u>Schedule XIII</u>) shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein. On the Closing Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

7.07.    <u>Litigation</u>.

On the Closing Date, there shall be no actions, suits or proceedings pending or threatened (i) with respect to the Transaction, this Agreement or any other Credit Document, or (ii) which has had, or could reasonably be expected to have, a Material Adverse Effect.

7.08.    <u>Subsidiaries Guaranty; Intercompany Subordination Agreement</u>.

(a)    On the Closing Date, each Subsidiary of Holdings (other than the Borrower and each Holding Company) shall have duly authorized, executed and delivered the Subsidiaries Guaranty in the form of <u>Exhibit E</u> (as amended, modified and/or supplemented from time to time, the "**Subsidiaries Guaranty**"), and the Subsidiaries Guaranty shall be in full force and effect.

(b)    On the Closing Date, each Credit Party and each other Subsidiary of Holdings which is an obligee or obligor with respect to any Intercompany Debt shall have duly authorized, executed and delivered the Intercompany Note, and the subordination provisions therein shall be in full force and effect.

7.09.    <u>Pledge Agreement and Meidu Pledge Agreement</u>.

(a)    On the Closing Date, (i) each Credit Party (A) shall have duly authorized, executed and delivered the Pledge Agreement in the form of <u>Exhibit F-1</u> (as amended, modified, restated and/or supplemented from time to time, the "**Pledge Agreement**") and (B) shall have delivered to the Collateral Agent, as Pledgee thereunder, all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, (x) endorsed in blank, or together with executed and undated endorsements for transfer, in the case of promissory notes constituting Pledge Agreement Collateral and (y) together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions reasonably necessary to perfect the security interests purported to be created by the Pledge Agreement have been taken, and the Pledge Agreement shall be in full force and effect.

(b)    On the Closing Date, Meidu America (i) shall have duly authorized, executed and delivered the Pledge Agreement in the form of <u>Exhibit F-2</u> (as amended, modified, restated

63

and/or supplemented from time to time, the "**Meidu Pledge Agreement**") and (ii) shall have delivered to the Collateral Agent, as Pledgee thereunder, all of the Meidu Pledge Agreement Collateral, together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Meidu Pledge Agreement Collateral, along with evidence that all other actions reasonably necessary to perfect the security interests purported to be created by the Meidu Pledge Agreement have been taken, and the Meidu Pledge Agreement shall be in full force and effect.

7.10.   Mortgage.

On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Mortgages in a form suitable for recording and perfecting Liens on not less than 90% of (a) the PV-10 Value of Proved Reserves of the Oil and Gas Properties evaluated in the Initial Reserve Report, (b) the PV-10 Value of PDP Reserves of the Oil and Gas Properties evaluated in the Initial Reserve Report and (c) the Fair Market Value of the Midstream Assets, including all related Rights of Way owned or leased by a Credit Party, all fee owned and leased processing facilities, all fee owned and leases compressor facilities, all fee owned field offices, and all land on which any of the foregoing is situated (subject to any exclusions expressly set forth in the Mortgages).

7.11.   Security Documents.

On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement in the form of Exhibit G (as amended, modified, restated and/or supplemented from time to time, the "**Security Agreement**") covering all of such Credit Party's Security Agreement Collateral, together with:

(a)     proper financing statements (Form UCC-1 or Form UCC-3, as applicable, or the equivalent) for filing under the UCC in the jurisdiction of organization or formation of each Credit Party as may be necessary to perfect or continue to perfect the security interests purported to be created by the Security Agreement;

(b)     evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary to perfect or continue to perfect the security interests intended to be created by the Security Agreement; and

(c)     evidence that all other actions necessary to perfect or continue to perfect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

7.12.   Initial Reserve Report; Title.

The Administrative Agent and the Lead Arrangers shall (i) have received the Initial Reserve Report and (ii) subject to Section 14.19, have received title opinions and other title materials, in each case, satisfactory to the Administrative Agent and the Lead Arrangers, with respect to the Oil and Gas Properties of the Credit Parties covering not less than 85% of each of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated in the reserve audit dated July

17, 2018 and prepared by Cawley, Gillespie & Associates, Inc. included in the Initial Reserve Report.

7.13. <u>Capitalization Information</u>.

Holdings shall have provided an accurate and complete capitalization table reflecting all of the direct and indirect owners of Holdings and its Subsidiaries (including the applicable ownership percentages) as of the Closing Date.

7.14. <u>Organization Chart</u>.

Holdings shall have provided an accurate and complete organization chart reflecting all of the direct and indirect subsidiaries of Holdings (including the applicable ownership percentages of each entity) as of the Closing Date, and the Administrative Agent and the Required Lenders, in their sole discretion, shall have been satisfied with the direct and indirect equity ownership of the Credit Parties.

7.15. <u>Financial Statements; Pro Forma Balance Sheet; Projections</u>.

On or prior to the Closing Date, the Administrative Agent shall have received (i) true and correct copies of the pro forma balance sheet and the Projections referred to in <u>Sections 9.05(a)</u> and <u>(d)</u>, which pro forma balance sheet and Projections shall be (x) in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, (y) evidence (1) a Total Leverage Ratio as of the Closing Date on a Pro Forma Basis of not greater than 3.00:1.00 and (2) Unrestricted cash and Cash Equivalents as of the Closing Date on a Pro Forma Basis of not less than an amount equal to $45,000,000.

7.16. <u>Solvency Certificate; Insurance Certificates, etc</u>.

On the Closing Date, the Administrative Agent shall have received:

(a) a solvency certificate from an Authorized Officer of Holdings in the form of <u>Exhibit H</u> hereto; and

(b) certificates of insurance and a lender's loss payable endorsement and such other endorsements as the Collateral Agent shall reasonably require, in each case complying with the requirements of <u>Section 10.03</u> for the business and properties of Holdings and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent and naming the Collateral Agent as an additional insured and/or as loss payee, and stating that such insurance shall not be canceled without providing at least 30 days' (or 10 days' for cancelation due to nonpayment of premium) prior written notice by the insurer to the Collateral Agent.

7.17. <u>Fees, etc</u>.

On the Closing Date, the Borrower shall have paid to the Administrative Agent, the Collateral Agent and each Lender (and each of their relevant affiliates) all documented or invoiced costs, fees and expenses (including, without limitation, legal fees and expenses

reimbursable hereunder) and other compensation contemplated hereby payable to the Administrative Agent, Collateral Agent or such Lender.

7.18. <u>AML, KYC</u>.

Administrative Agent, Collateral Agent each shall have received, not less than three Business Days prior to the Closing Date, all requested information in connection with OFAC, know your customer and anti-money laundering reviews of each Credit Party, to the extent such information was reasonably requested not less than five Business Days prior to the Closing Date.

7.19. <u>Lien Searches</u>.

On or prior to the Closing Date, the Administrative Agent shall have received customary lien searches conducted in the jurisdictions in which the Credit Parties are organized or conduct business and customary intellectual property searches, in each case, satisfactory to the Administrative Agent (dated as of a date satisfactory to the Administrative Agent), reflecting the absence of Liens on the assets of the Credit Parties other than Permitted Liens.

7.20. <u>Closing Checklist</u>.

On or prior to the Closing Date, all other conditions precedent set forth in the Closing Checklist that are not designated as "Post-Closing Matters" shall have been satisfied.

SECTION 8. <u>Conditions Precedent to All Credit Events</u>.

The obligation of each Lender to make Loans (including Initial Term Loans made on the Closing Date) is subject, at the time of each such Credit Event (except as hereinafter indicated), to the satisfaction or waiver of the following conditions.

8.01. <u>No Default; Representations and Warranties</u>.

At the time of each such Credit Event and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Credit Event (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

8.02. <u>Notice of Borrowing</u>.

Prior to making each Loan, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of <u>Section 2.03</u>.

8.03.    Conditions Precedent to Borrowings of Delayed Draw Term Loans.

With respect to any proposed Borrowing of Delayed Draw Term Loans, as of the date of such Borrowing, (a) before and after giving effect to such Credit Event, for the most recent Test Period for which financial statements have been delivered (i) the Borrower shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant (which, for purposes of Section 11.10, shall mean that the Adjusted Coverage Ratio is greater than 1.50:1.00) and (ii) the Total Leverage Ratio on a Pro Forma Basis shall not be greater than 3.00:1.00, (b) Unrestricted cash and Cash Equivalents of Holdings and its Subsidiaries immediately prior to such Credit Event shall not be greater than $17,500,000, (c) the trailing-30 day average West Texas Intermediate Crude price at the Cushing hub shall be not less than $50, and (d) the Borrower shall have delivered the final Reserve Report as of December 31, 2018 required to be delivered pursuant to Section 10.21.

In determining the satisfaction of the conditions specified in Section 7 or this Section 8, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date or the date of each Credit Event after the Closing Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which could reasonably be expected to have a Material Adverse Effect or a material adverse effect of the type described in Section 7.06, each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the applicable Credit Event of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the date of such Credit Event.  Upon the Administrative Agent's good faith determination that the conditions specified in Section 7 and this Section 8 have been met (after giving effect to the preceding sentence), then the applicable Credit Event shall have been deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the applicable Credit Event shall not release any Holding Company or the Borrower from any liability for failure to satisfy one or more of the applicable conditions contained in Section 7 and this Section 8).

The acceptance of the benefits of each Credit Event on or after the Closing Date shall constitute a representation and warranty by such Credit Party to the Administrative Agent and each of the Lenders that all the conditions specified in Section 7 and this Section 8 are satisfied in full as of such date.  All of the Notes, certificates, legal opinions and other documents and papers referred to in Section 7 and this Section 8, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 9.    Representations, Warranties and Agreements.

In order to induce the Lenders to enter into this Agreement and to make the Loans, each Credit Party makes the following representations, warranties and agreements, in each case after giving effect to the Transaction, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans with the occurrence of each Credit Event

on or after the Closing Date being deemed to constitute a representation and warranty that the matters specified in this <u>Section 9</u> are true and correct in all material respects on and as of the Closing Date and on the date of each such other Credit Event (it being understood and agreed that (a) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (b) any representation or warranty which by its terms is qualified by materiality or references to Material Adverse Effect shall be required to be true and correct in all respects).

9.01.  <u>Company Status</u>.

Each Credit Party and each of its respective Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No certifications by any Governmental Authority are required for operation of the business of Holdings and its Subsidiaries that are not in place, except for such certifications or agreements, the absence of which would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.02.  <u>Power and Authority</u>.

Each Credit Party and each of its respective Subsidiaries has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

9.03.  <u>No Violation</u>.

Neither the execution, delivery or performance by any Credit Party or any Subsidiary of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any Law or any order, writ, injunction or decree of any court or Governmental Authority, (ii) will, in any respect, conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each

68

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 94 of 300

case to which any Credit Party or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (including, without limitation, any Subordinated Debt), or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries.

9.04.   <u>Approvals</u>.

No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (x) as set forth on <u>Schedule XIII</u>, (y) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date or which, if not so obtained would not reasonably be expected to have a Material Adverse Effect, and (z) filings which are necessary to perfect the security interests created or intended to be created under the Security Documents), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

9.05.   <u>Financial Condition; Projections</u>.

(a)     The <u>pro forma</u> consolidated balance sheet of Holdings and its Subsidiaries as of the Closing Date (after giving effect to the Transaction), a copy of which has been furnished to the Lenders on November 5, 2018, presents a good faith estimate of the pro forma consolidated financial position of Holdings and its Subsidiaries as of such date.

(b)     Except as fully disclosed in the financial statements delivered pursuant to <u>Section 9.05(a)</u>, and except for the Indebtedness incurred under this Agreement and contingent obligations under the Hedge Agreements listed on <u>Schedule XVI</u> or Interest Rate Protection Agreements, there were as of the Closing Date no liabilities or obligations with respect to Holdings or any of its Subsidiaries of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be material to Holdings or any of its Subsidiaries.  As of the Closing Date, no Holding Company knows, and the Borrower does not know, of any basis for the assertion against it or any of its Subsidiaries of any liability or obligation of any nature whatsoever that is not fully disclosed in the financial statements delivered pursuant to <u>Section 9.05(a)</u> or referred to in the immediately preceding sentence which, either individually or in the aggregate, could reasonably be expected to be material to Holdings and its Subsidiaries taken as a whole.

(c)     The Projections delivered to the Administrative Agent and the Lenders prior to the Closing Date have been prepared in good faith and are based on assumptions believed by the Holding Companies and the Borrower to be reasonable when made, and there are no statements or conclusions in the Projections which are based upon or include information known to the Holding Companies or the Borrower to be misleading in any material respect or which fail to

take into account material information known to the Holding Companies or the Borrower regarding the matters reported therein. On the Closing Date, the Holding Companies and the Borrower believe that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections, and such differences may be material.

(d)     After giving effect to the Transaction, since December 31, 2017, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

9.06.     <u>Litigation</u>.

There are no actions, suits or proceedings pending or, to the knowledge of any Holding Company or the Borrower, threatened (i) with respect to the Transaction or any Credit Document or (ii) that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.07.     <u>True and Complete Disclosure</u>.

All factual information furnished by or on behalf of any Holding Company or the Borrower, to the Administrative Agent or any Lender (including, without limitation, all factual information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information hereafter furnished in writing by or on behalf of any Holding Company or the Borrower to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this <u>Section 9.07</u>, such factual information shall not include the Projections or any pro forma financial information.

9.08.     <u>Use of Proceeds; Margin Regulations</u>.

(a)     All proceeds of the Initial Term Loans will be used by the Borrower to make the Closing Date Distribution to pay fees and expenses incurred in connection with the Transaction and for the working capital and general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement.

(b)     All proceeds of the Delayed Draw Term Loans will be used by the Borrower for the working capital and general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement.

(c)     No part of any Credit Event (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Loan nor the use of the proceeds thereof nor the occurrence of any other Credit Event will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 96 of 300

9.09.   Tax Returns and Payments.

Each of Holdings and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate Taxing Authority all returns, statements, forms and reports for taxes (the "**Returns**") required to be filed by, or with respect to the income, properties or operations of, Holdings and/or any of its Subsidiaries, and such Returns accurately reflect in all respects all liability for Taxes of Holdings and its Subsidiaries, as applicable, for the periods covered thereby. Each of Holdings and each of its Subsidiaries has paid all Taxes and assessments payable by it which have become due, other than those that are being contested in good faith and for which adequate reserves have been provided for in accordance with GAAP. There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of Holdings or any of its Subsidiaries, threatened by any authority regarding any taxes relating to Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, none of Holdings or any of its Subsidiaries has entered into an agreement or waiver or been requested in writing to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of Holdings or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of Holdings or any of its Subsidiaries not to be subject to the normally applicable statute of limitations. Neither Holdings nor any of its Subsidiaries has incurred, nor will any of them incur, any tax liability in connection with the Transaction or any other transactions contemplated hereby other than any mortgage or stamp taxes required to file or record any Security Document (it being understood that the representation contained in this sentence does not cover any future tax liabilities of Holdings or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

9.10.   Compliance with ERISA.

Schedule IV sets forth each Plan as of the Closing Date; each Plan (and each related trust, insurance contract or fund) is in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or has adopted a prototype or volume submitter plan document and is entitled to reliance on the sponsor's opinion letter from the Internal Revenue Service; no Reportable Event has occurred; no Multiemployer Plan is insolvent; no Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds $2,500,000; no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has failed to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code; all contributions required to be made with respect to a Plan have been timely made; none of Holdings or any Subsidiary of Holdings or any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no proceedings have been instituted to terminate or appoint a trustee to administer any Plan; no action, suit, proceeding, hearing,

audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending or expected or has been threatened in writing; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of Holdings and its Subsidiaries and its ERISA Affiliates to all Plans which are Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Plan ended prior to the date of the most recent Credit Event, would not exceed $2,500,000; no lien imposed under the Code or ERISA on the assets of Holdings or any Subsidiary of Holdings or any ERISA Affiliate exists or is likely to arise on account of any Plan.

9.11.   Security Documents.

(a)   The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a first-lien legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has a fully perfected first-lien security interest in all right, title and interest in all of the Security Agreement Collateral described therein (subject to the terms of the Security Agreement), subject to no other Liens other than Permitted Liens.  The recordation of (x) the Grant of Security Interest in U.S. Patents and (y) the Grant of Security Interest in U.S. Trademarks in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and the recordation of the Grant of Security Interest in U.S. Copyrights in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

(b)   The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person.  Except for filings on Form UCC-1 made pursuant to the Pledge Agreement, no filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Pledge Agreement Collateral under the Pledge Agreement.

(c)   The security interests created under the Meidu Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Meidu Pledge Agreement Collateral described in the Meidu Pledge Agreement, subject to no security interests of any other Person.  Except for filings on Form UCC-1 made pursuant to the Meidu Pledge Agreement, no filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Meidu Pledge Agreement Collateral under the Meidu Pledge Agreement.

(d)     Each Mortgage creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons and subject to no other Liens (other than Permitted Liens).

9.12.   Properties; Title.

(a)     All material Oil and Gas Properties, Real Property and Midstream Assets owned or leased by Holdings or any of its Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule III.   Each of Holdings and each of its Subsidiaries has good and valid title to, licenses of, or rights use, all Real Property and Midstream Assets owned by it, including all Collateral reflected in the pro forma balance sheet referred to in Section 9.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the Ordinary Course of Business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

(b)     Each Credit Party and each Subsidiary has Defensible Title to, or valid leasehold interests in, all of its Covered Properties and good title to, or valid leasehold interests in, licenses of or rights to use, all personal property, in each case, necessary to, or used in the ordinary course of, its business, free and clear of all Liens except Permitted Liens.

(c)     After giving full effect to the Permitted Liens, Holdings or its Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate Holdings or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in Holdings' or such Subsidiary's net revenue interest in such Property.

(d)     All material leases and agreements necessary for the conduct of the business of Holdings and its Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     As of the Closing Date, Schedule XVII contains a true, accurate and complete list of all material preferential rights to purchase, required consents to assignment and lease forfeiture provisions affecting or contained in any lease or contractual obligation relating to any of the foregoing ("**Preferential Rights and Consents**").   Each of the material leases, licenses, subleases, Rights of Way, easements and servitudes or assignments of the foregoing (together with all amendments, modifications, supplements, renewals or extensions of any thereof) necessary for the conduct of the business of the Credit Parties and their respective Subsidiaries is in full force and effect and no Credit Party has knowledge of any breach, default or event or circumstance that has occurred and is continuing thereunder, or with the passage of time or giving of notice, or both, would give rise to a default, and each such agreement constitutes the

EAST\159464702.32

legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.  No material Preferential Rights and Consents exist other than those set forth on <u>Schedule XVII</u> or which have been disclosed in writing to Administrative Agent after the Closing Date.

(f)      The rights of each Credit Party and any of its applicable Subsidiaries to use the Midstream Assets are pursuant to valid and subsisting recorded deeds, leases, subleases, easements, rights of way, servitudes, permits, licenses and other instruments and agreements (collectively, "**Rights of Way**") in favor of the applicable Credit Party and any of its applicable Subsidiaries (or their predecessors in interest), except where the failure of the Midstream Assets to be so covered, individually or in the aggregate, (i) does not materially interfere with the ordinary conduct of business of Holdings and any applicable Subsidiary, (ii) does not materially detract from the value or the use of the portion of the Midstream Assets which are not covered and (iii) could not reasonably be expected to have a Material Adverse Effect.

(g)      The Rights of Way for the Midstream Assets grant or permit Holdings and any of its Subsidiaries the right to operate and maintain the Midstream Assets in, over, under, or across the land covered thereby, in all material respects, in the same way that a prudent owner and operator would operate and maintain similar assets and, in all material respects, in the same way as Holdings and any applicable Subsidiary (or their predecessor in interest) have operated and maintained the Midstream Assets prior to the Closing Date.

(h)      All Rights of Way necessary for the conduct of the business of Holdings and its Subsidiaries are valid and subsisting, in full force and effect, and there exists no breach, default or event or circumstance that, with the giving of notice or the passage of time or both, would give rise to a default under any such Rights of Way that could reasonably be expected to have a Material Adverse Effect.  All rental and other payments due under any Rights of Way by Holdings or any of its Subsidiaries (and, to Holdings' knowledge, their predecessors in interest) have been duly paid in accordance with the terms thereof, except to the extent that a failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(i)      The rights and properties presently owned, leased, subleased or licensed by Holdings for any of its Subsidiaries, including all Rights of Way, include all rights and properties necessary to permit Holdings and its Subsidiaries to conduct their businesses in accordance with prudent industry standards in all material respects in the same manner as such businesses have been conducted by their predecessors in interest prior to the Closing Date.

(j)      No eminent domain proceeding or taking is currently in process or, to the knowledge of Holdings and its Subsidiaries, is contemplated with respect to all or any material portion of the Oil and Gas Properties, the Midstream Assets or the other Real Property.

(k)      Holdings and its Subsidiaries own, or are licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to their business, and the use thereof by Holdings or any of its Subsidiary does not infringe upon the rights of any other

EAST\159464702.32

Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

9.13.   Capitalization.

(a)   On the Closing Date, the authorized capital stock and issued and outstanding stock of Holdings are described on Schedule XI hereto.  All outstanding shares of capital stock in Holdings have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  As of the Closing Date, except as set forth on Schedule XI hereto, Holdings does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights.

(b)   On the Closing Date, the authorized Equity Interests of the Borrower and each other direct or indirect Subsidiary of Holdings are described on Schedule XI hereto, all of which Equity Interests are issued and outstanding and are owned, directly or indirectly, by Holdings. All such outstanding Equity Interests have been duly and validly issued, are fully paid and non-assessable (to the extent applicable) and have been issued free of preemptive rights.  No Subsidiary of Holdings has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights except pursuant to the Senior Management Restricted Unit Agreements.

9.14.   [Reserved].

9.15.   Compliance with Statutes, etc.

Each of Holdings and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business, the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), and the holding of, or operation using, the Necessary Authorizations, except such non-compliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than as set forth on Schedule XIII, none of Holdings or any of its Subsidiaries has received any notice or communication from any Governmental Authority of non-compliance with any such applicable statutes, regulations, and orders that has not been fully cured or waived as of the date of this Agreement.

9.16.   Investment Company Act.

None of Holdings or any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

EAST\159464702.32

9.17.    <u>Insurance</u>.

<u>Schedule VII</u> sets forth a listing of all insurance maintained by Holdings and its Subsidiaries as of the Closing Date, with the amounts insured (and any deductibles) set forth therein.  Such insurance complies in with requirements of <u>Section 10.03</u>.

9.18.    <u>Environmental Matters</u>.

(a)    Each of Holdings and each of its Subsidiaries is, and for the past four years, has been, in compliance with all applicable Environmental Laws and the requirements of any permits issued to Holdings or any of its Subsidiaries under such Environmental Laws.  There are no pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened, Environmental Claims against Holdings or any of its Subsidiaries or any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries.  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of Holdings or any of its Subsidiaries, or any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries or with respect to any property adjoining or adjacent to any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries that would be reasonably expected (i) to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries or any Property owned, leased or operated by Holdings or any of its Subsidiaries or (ii) to cause any Property owned, leased or operated by Holdings or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy, use or transferability of such Property by Holdings or any of its Subsidiaries under any applicable Environmental Law.

(b)    Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Property owned, leased or operated by Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, any property adjoining or adjacent to any Property, where such generation, use, treatment, storage, transportation or Release has violated or would be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim against Holdings or any Subsidiary or any Real Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries.

(c)    Notwithstanding anything to the contrary in this Section 9.18, the representations and warranties made in this Section 9.18 shall be untrue only if the effect of any or all conditions, violations, Claims, Environmental Claims, restrictions, failures and noncompliances of the types described above would, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

9.19.    <u>Employment and Labor Relations</u>.

None of Holdings or any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against Holdings or

EAST\159464702.32

any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against Holdings or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of Holdings or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against Holdings or any of its Subsidiaries and (v) no wage and hour department investigation has been made of Holdings or any of its Subsidiaries, except (with respect to any matter specified in clauses (i) – (v) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

9.20.    Intellectual Property.

Each of Holdings and each of its Subsidiaries owns or has the right to use all Intellectual Property, whether owned or licensed pursuant to a license agreement (including, but not limited to, rights in computer programs, databases and formulas, or rights with respect to the foregoing) necessary for the present conduct of its business, without conflict with the Intellectual Property rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

9.21.    EEA Financial Institution.

No Credit Party is an EEA Financial Institution.

9.22.    Indebtedness.

Schedule VI sets forth a list of all Indebtedness for borrowed money in excess of $250,000 (including Contingent Obligations in respect of Indebtedness) of Holdings and its Subsidiaries as of the Closing Date and which is to remain outstanding after giving effect to the Transaction (excluding the Loans), in each case showing the aggregate principal amount thereof and the name of the respective borrower and any Credit Party or any of its Subsidiaries which directly or indirectly guarantees such debt.

9.23.    Representations and Warranties in Other Documents.

All representations and warranties set forth in the other Credit Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Closing Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

9.24.    Necessary Authorizations.

Except for any of the following matters that would not reasonably be expected to have a Material Adverse Effect:

EAST\159464702.32

(a)      Each Credit Party and each Subsidiary of a Credit Party has obtained all Necessary Authorizations, and all such Necessary Authorizations are in full force and effect. No other person has any right, title, or interest in or with respect to the Necessary Authorizations. Each Credit Party has performed all of its respective obligations required to have been performed under the Necessary Authorizations. There is no non-compliance under the terms of the Necessary Authorizations, nor has any Credit Party received any notice of any such non-compliance, which permits or, after notice or lapse of time or both, could reasonably be expected to permit revocation, cancellation, non-renewal, suspension or adverse modification of the Necessary Authorizations. To each Credit Party's knowledge, the Necessary Authorizations will be renewed in the ordinary course and there is no event, condition or circumstance which could reasonably be expected to present a substantial risk that the Necessary Authorizations would not be renewed in the ordinary course or could be revoked, cancelled or suspended or materially adversely modified or that any substantial fine or forfeiture could be imposed against the holder of the Necessary Authorization.

(b)      None of such Necessary Authorizations is the subject of any pending or, to each Credit Party's knowledge, threatened attack, application, objection, or enforcement action or any other petition with a Governmental Authority for revocation, termination, suspension, denial or material modification of a Necessary Authorization, by the grantor of the Necessary Authorization.  The actions of any applicable Governmental Authority granting all Necessary Authorizations have not been reversed, stayed, enjoined, annulled or suspended.

9.25.   <u>Sanctions; Anti-Corruption</u>.

(a)      None of the Credit Parties nor any of their directors, officers, or employees, nor to the knowledge of the Credit Parties, any Affiliates, agents, representatives, or other Persons acting for or on behalf of any Credit Parties is owned or controlled by Persons that are:  (i) the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, currently, Crimea, Cuba, Iran, North Korea and Syria).

(b)      The Credit Parties and their respective directors, officers and employees, and, to the knowledge of the Credit Parties, any Affiliates of any Credit Parties, and their respective agents, representatives, or other Persons acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption Law, in all material respects.

9.26.   <u>No Default</u>.

None of Holdings or any of its Subsidiaries is in default with respect to any other note, indenture, loan agreement, mortgage, lease, deed, or other agreement to which Holdings or such Subsidiary is a party or by which it is bound except as would not reasonably be expected to have a Material Adverse Effect.

9.27.  <u>Solvency</u>.

(a) The sum of the Indebtedness (including contingent liabilities) of Holdings and its Subsidiaries taken as a whole does not exceed the present fair saleable value (on a going concern basis) of the assets of Holdings and its Subsidiaries taken as a whole; (b) the capital of Holdings and each of its Subsidiaries is not unreasonably small in relation to the business of Holdings and each of its Subsidiaries; (c) the present fair salable value of the assets (on a going concern basis) of Holdings and its Subsidiaries, taken as a whole is greater than the amount that will be required to pay the probable liability of the debts (including contingent liabilities) of Holdings and its Subsidiaries as they become absolute and matured in the ordinary course; and (d) Holdings and each of its Subsidiaries do not intend to incur, or believe that they will incur, debts beyond their ability to pay such debt as they mature in the Ordinary Course of Business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the Ordinary Course of Business.

9.28.  <u>Maintenance of Properties</u>.

Except for such acts or failures to act, individually or in the aggregate, as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Credit Parties and their Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all applicable Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Credit Parties and their Subsidiaries.  Specifically in connection with the foregoing, except for, individually or in the aggregate, those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of any Credit Party or any Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of any Credit Party or any Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of such Credit Party or such Subsidiary.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by any Credit Party or any Subsidiary that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by any Credit Party or any Subsidiary, in a manner consistent with the Credit Parties' and their Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this <u>Section 9.28</u>, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect).

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 105 of 300

9.29.   <u>Gas Imbalances, Prepayments</u>.

Except as set forth on Schedule X or on the most recently delivered Reserve Report Certificate, on a net basis there are no gas imbalances, take or pay or other prepayments which would require any Credit Parties or Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor with an aggregate fair market value exceeding $1,000,000.

9.30.   <u>Marketing of Production</u>.

Except for contracts listed and in effect on the date hereof on <u>Schedule XV</u>, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Credit Parties represent that they or their Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of the Credit Parties' or their Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

9.31.   <u>Hedge Agreements</u>.

<u>Schedule XVI</u>, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower and Holdings pursuant to Section 10.01(d), sets forth, as of the date of such report, a true and complete list of all Hedge Agreements of each Credit Party and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

SECTION 10. <u>Affirmative Covenants</u>.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Total Commitment have terminated and the Loans and Notes (in each case together with interest thereon), fees and all other Obligations (other than indemnities described in <u>Section 14.13</u> which are not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01.   <u>Information Covenants</u>.

Holdings will furnish to the Administrative Agent, for delivery to each Lender:

(a)   <u>Monthly Reports</u>.   Within 35 days (or such longer time as the Administrative Agent may permit in its sole discretion) after the end of each fiscal month of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and retained earnings and statement of cash flows

80

for such fiscal month, and for the elapsed portion of the fiscal year ended with the last day of such fiscal month (together with detailed calculations of Consolidated EBITDAX for such month and on a trailing-12 month basis), all of which shall be certified by an Authorized Officer of Holdings that they fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to customary post-period corrections and adjustments, normal year-end audit adjustments and the absence of footnotes and (ii) operating summaries and lease operating statements in a form substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form reasonably satisfactory to the Administrative Agent, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year and comparable budgeted figures for such fiscal month as set forth in the applicable budget delivered pursuant to Section 10.01(f). Concurrently with the monthly delivery thereof pursuant to the Hedge Intercreditor Agreement, a copy of each Hedging Report (as defined in the Hedge Intercreditor Agreement), which such Hedging Report shall be substantially in the form of Exhibit O.

(b)    Quarterly Financial Statements.  Within 50 days (or such longer time as the Administrative Agent may permit in its sole discretion) after the close of each of the quarterly accounting periods in each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period (together with detailed calculations of Consolidated EBITDAX for such month and on a trailing-12 month basis), in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the applicable budget delivered pursuant to Section 10.01(f), all of which shall be certified by an Authorized Officer of Holdings that they fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period, (iii) operating summaries and lease operating statements in a form substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form reasonably satisfactory to the Administrative Agent, in each case setting forth comparative figures for the corresponding fiscal quarter in the prior fiscal year and comparable budgeted figures for such fiscal quarter as set forth in the applicable budget delivered pursuant to Section 10.01(f), and (iv) a quarterly EBITDA forecast on a consolidated basis for the remainder of such fiscal year, a historical summary of EBITDA to such date from the beginning of such fiscal year, together with an EBITDA forecast for the next fiscal year, in each case on a consolidated basis.

(c)    Annual Financial Statements.  Within 120 days (or such longer time as the Administrative Agent may permit in its sole discretion) after the close of each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified without qualification by BDO USA, LLC or other independent certified public

accountants of recognized national standing reasonably acceptable to the Administrative Agent, which audit was conducted in accordance with generally accepted auditing standards; provided that, at the option of the Borrower, such audited financial statements may be provided with respect to MDA Holdco and its Subsidiaries if accompanied by unaudited financial statements of Holdings and its Subsidiaries, together with a reconciliation of such audited and unaudited financial statements, and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal accounting period.

(d)    Certificate of Authorized Officer – Hedge Agreements.  Concurrently with any delivery of a Reserve Report pursuant to Section 10.21, a certificate of an Authorized Officer, in form and substance satisfactory to the Administrative Agent, certifying compliance with the requirements of Section 10.23 and Section 11.19, setting forth reasonably detailed calculations demonstrating such compliance, and setting forth as of the date of such Reserve Report, a true and complete list of all Hedge Agreements of each Credit Party and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on Schedule XVI, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(e)    Management Letters.  Promptly after Holdings' or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(f)    Budgets.  No later than 15 days prior to the first day of the fiscal year of Holdings ending December 31, 2019 and no later than 30 days prior to the first day of each subsequent fiscal year of Holdings, a budget in form substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form reasonably satisfactory to the Administrative Agent (including budgeted statements of income, cash flows and stockholders equity, balance sheets and operating figures) for each of the twelve months of such fiscal year prepared in detail, in each case setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

(g)    Officer's Certificates.  (i) At the time of the delivery of the financial statements provided for in Sections 10.01(b) and (c), a compliance certificate from an Authorized Officer of Holdings in the form of Exhibit I-1, setting forth reasonably detailed calculations demonstrating compliance with Sections 11.07, 11.08, 11.09, 11.11 and 11.21, (ii) at the time of the delivery of the reports provided for in Sections 10.01(a), a capital expenditures certificate from an Authorized Officer of Holdings in the form of Exhibit N and (iii) at the time of (A) the delivery of each Reserve Report provided for in Section 10.21, (B) the delivery of each Notice of Borrowing and (C) each other event that requires pro forma compliance with Section 11.10, a compliance certificate from an Authorized Officer of Holdings in the form of Exhibit I-2 setting forth reasonably detailed calculations demonstrating compliance with Section 11.10.

(h)    Notice of Default, Litigation and Material Events.  Promptly, and in any event within three Business Days after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any material litigation or governmental investigation or proceeding or

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 108 of 300

Environmental Claim pending against Holdings or any of its Subsidiaries or any of their respective properties that could reasonably be expected to have a Material Adverse Effect or (iii) any other material event, change or circumstance that could reasonably be expected to have a Material Adverse Effect.

(i)    Other Reports and Filings.  Promptly after the filing, delivery or receipt thereof, copies of all financial information, proxy materials, reports, notices and other material communications if any, which Holdings or any of its Subsidiaries shall (i) publicly file with the Securities and Exchange Commission or any successor thereto (the "**SEC**") or any Governmental Authority or (ii) deliver to or receive from holders (or any trustee, agent or any other representative therefor) of any Qualified Preferred Stock, any Subordinated Debt or any of its material Indebtedness pursuant to the terms of the documentation governing the same. Promptly after the delivery or receipt thereof, any notices, reports or other information to or from any Governmental Authority with regulatory authority over Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

(j)    Environmental Matters.  Promptly after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)    any pending or threatened Environmental Claim against Holdings or any of its Subsidiaries or any Real Property owned, leased or operated by Holdings or any of its Subsidiaries;

(ii)    any condition or occurrence on or arising from any Real Property owned, leased or operated by Holdings or any of its Subsidiaries that (a) results in noncompliance by Holdings or any of its Subsidiaries with any applicable Environmental Law or permit or (b) could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries or any such Real Property;

(iii)    any condition or occurrence on any Real Property owned, leased or operated by Holdings or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by Holdings or any of its Subsidiaries of such Real Property under any applicable Environmental Law; and

(iv)    the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by Holdings or any of its Subsidiaries to the extent required by applicable Environmental Law.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and Holdings' or such Subsidiary's response thereto.

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 109 of 300

(k)     Insurance.  Prior to the end of each fiscal year of Holdings, Holdings shall deliver updated insurance certificates evidencing all insurance policies of Holdings and its Subsidiaries maintained in accordance with Section 10.03 hereof, together with an explanation of any projected changes to such insurance coverage for the forthcoming fiscal year.

(l)     Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request.

(m)     Lender Calls.  Holdings will hold quarterly conference calls for the Lenders, at which calls will be reviewed the financial results of Holdings and its Subsidiaries and the budgets and projections presented for the current fiscal year of Holdings and such other matters as may be reasonably requested by the Administrative Agent.

10.02.  Books, Records and Inspections.

Holdings will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.  Holdings will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent, the Collateral Agent or any Lender to visit and inspect, under guidance of officers of Holdings or such Subsidiary, any of the properties of Holdings or such Subsidiary, and to examine the books of account of Holdings or such Subsidiary and discuss the affairs, finances and accounts of Holdings or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent, the Collateral Agent or any Lender may reasonably request.

10.03.  Maintenance of Property; Insurance.

(a)     Holdings will, and will cause each of its Subsidiaries to, (i) keep all property necessary to the business of Holdings and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, natural catastrophe and other covered occurrences or events that may cause damage to, or partial or complete loss of, the property, (ii) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and business of Holdings and its Subsidiaries (including, without limitation, policies with respect to (a) commercial general liability, (b) commercial auto, (c) workers compensation and employers liability; (d) umbrella and excess liability, (e) commercial property including coverage for material damages, (f) directors and officers liability, (g) employment practices liability, (h) crime, and (i) fiduciary liability, as set forth in Schedule VII) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of Holdings and its Subsidiaries (other than with respect to business interruption policies, which such policies shall provide for actual loss sustained of not less than one year in coverage), and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.  In addition to the requirements of the immediately

84

preceding sentence, Holdings and its Subsidiaries will at all times cause insurance of the types described in Schedule VII to be maintained (with the same scope of coverage as that described in Schedule VII) at levels which are consistent with their practices immediately before the Closing Date unless such change is mutually agreed by the Borrower and the Administrative Agent.

(b) Holdings will, and will cause each of its Subsidiaries to, at all times maintain (i) property insurance providing that Holdings and the Collateral Agent are loss payees, and (ii) commercial general liability insurance adding the Collateral Agent as an additional insured. Such policies (x) shall state that such insurance policies shall not be canceled without at least 30 days' (or 10 days' for cancellation due to nonpayment of premium) prior written notice thereof by the respective insurer to the Collateral Agent and (y) shall provide with respect to the commercial general liability, workers compensation, and commercial property insurance that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors.

(c) If Holdings or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 10.03, or if Holdings or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and each Holding Company and the Borrower jointly and severally agree to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

(d) Holdings will, and will cause each of its Subsidiaries to, operate its Oil and Gas Properties, Midstream Assets and other material Properties or cause such Oil and Gas Properties, Midstream Assets and other material Properties to be operated in a careful and efficient manner in accordance with customary practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and Midstream Assets and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(e) Holdings will, and will cause each of its Subsidiaries to, promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to so pay or discharge, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(f) Holdings will, and will cause each of its Subsidiaries to, promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards, the material obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties, Midstream Assets and other material Properties.

EAST\159464702.32

(g)     Holdings will, and will cause each of its Subsidiaries to, to the extent no Credit Party or Subsidiary is the operator of any Property, the Credit Parties shall, and shall cause the Subsidiaries to, use commercially reasonable efforts to cause the operator to comply with this Section 10.03.

10.04.  <u>Existence; Franchises</u>.

Holdings will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to (x) preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks and patents, each of which shall be held in the name of the Borrower or a Subsidiary Guarantor, and (y) maintain all Necessary Authorizations, each of which shall be held in the name of the Borrower or a Subsidiary Guarantor; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 10.04</u> shall prevent (i) sales of assets and other transactions by Holdings or any of its Subsidiaries in accordance with <u>Section 11.02</u> or (ii) the withdrawal by Holdings or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.05.  <u>Compliance with Statutes, etc</u>.

Holdings will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.06.  <u>Compliance with Environmental Laws</u>.

(a)     Holdings will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to Holdings or any of its Subsidiaries, or required of Holdings or any of its Subsidiaries by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, and will promptly pay or cause to be paid all costs and expenses required of Holdings or any of its Subsidiaries in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws, except such noncompliances  and nonpayment as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except for any of the following matters that could not reasonably be expected to have a Material Adverse Effect, none of Holdings or any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at or transported from any such Real Properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of Holdings or any of its Subsidiaries.

86

(b)    (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in Section 10.01(j), (ii) at any time that Holdings or any of its Subsidiaries are not in compliance with Section 10.06(a) or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the third to last paragraph of Section 12, the Holding Companies and the Borrower will (in each case) provide, at the sole expense of the Holding Companies and the Borrower and at the request of the Administrative Agent, an environmental site assessment report concerning any Real Property owned, leased or operated by Holdings or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action required of Holdings or any of its Subsidiaries under applicable Environmental Laws in connection with such Hazardous Materials on such Real Property.  If the Holding Companies or the Borrower fail to provide the same within 60 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Holding Companies and the Borrower, and the Holding Companies and the Borrower shall grant and hereby grant to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grant the Administrative Agent and the Lenders a non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Holding Companies and the Borrower, all at the sole expense of the Holding Companies and the Borrower.

10.07.  <u>ERISA</u>.

As soon as possible and, in any event, within ten (10) days after Holdings, any Subsidiary of Holdings or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, Holdings will deliver a written notification to each Lender setting forth the full details as to such occurrence and the action, if any, that Holdings, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by Holdings, such Subsidiary, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other Governmental Authority, or a Plan participant and any notices received by Holdings, such Subsidiary or ERISA Affiliate from the PBGC or any other Governmental Authority, or a Plan participant with respect thereto: that a Reportable Event has occurred (except to the extent that Holdings has previously delivered to the Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy the minimum funding standards of ERISA or the Code has occurred in any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code; that any contribution required to be made with respect to a Plan has not been timely made; that a Plan has been or could reasonably be expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Closing Date by $2,500,000; that proceedings could reasonably be expected to be or have been instituted

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 113 of 300

to terminate or appoint a trustee to administer a Plan; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that Holdings, any Subsidiary of Holdings or any ERISA Affiliate will or could reasonably be expected to incur any liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or any material liability with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA or, with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code), will or is expected to incur material liability under Section 4980B of the Code; or that Holdings or any Subsidiary of Holdings could reasonably be expected to incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA). Holdings will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA. In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of any reports, records, documents or other information required to be furnished to the PBGC or any other Governmental Authority, and any material notices received by Holdings, any Subsidiary of Holdings or any ERISA Affiliate with respect to any Plan, shall be delivered to the Lenders no later than ten (10) days after the date such records, documents and/or information has been furnished to the PBGC or any other Governmental Authority, as applicable, or such notice has been received by Holdings, the Subsidiary or the ERISA Affiliate, as applicable.

10.08.  End of Fiscal Years; Fiscal Quarters.

Holdings will cause (i) its and each of its Subsidiaries' fiscal years to end on December 31 of each calendar year and (ii) its and each of its Subsidiaries' fiscal quarters to end on March 31, June 30, September 30 and December 31 of each calendar year.

10.09.  Performance of Obligations.

Holdings will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.10.  Payment of Taxes.

Holdings will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of Holdings or any of its Subsidiaries not otherwise permitted under Section 11.01(a); provided that none of Holdings or any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper

proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

10.11.  <u>Use of Proceeds</u>.

The Borrower will use the proceeds of the Loans only as provided in <u>Section 9.08</u>.

10.12.  <u>Additional Security; Further Assurances; etc</u>.

(a)  At all times, the Credit Parties shall cause the Mortgaged Properties to represent at least 90% of (i) the PV-10 Value of Proved Reserves of the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, (ii) the PV-10 Value of PDP Reserves of the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and (iii) the Fair Market Value of the Midstream Assets, including all related Rights of Way owned or leased by a Credit Party, all fee owned processing facilities, all fee owned compressor facilities, all fee owned field offices, and all land owned by a Credit Party on which any of the foregoing is situated (subject to any exclusions expressly set forth in the Mortgages).

(b)  Holdings will, within 30 days of the creation or acquisition of any Subsidiary, (x) cause each Subsidiary Guarantor to execute the Subsidiaries Guaranty (or a joinder agreement thereto) and (y) will cause each other Credit Party to grant to the Collateral Agent for the benefit of the Secured Creditors security interests in all assets that constitute Collateral (including any Mortgages required to cause the Credit Parties to comply with <u>Section 10.12(a)</u>) not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "**Additional Security Documents**"), along with customary opinions of counsel, title opinions or other information, title insurance and other related documents as may be reasonably requested by the Collateral Agent as to any Real Property, Oil and Gas Properties and Midstream Assets, if any, subject to any Mortgages.  All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and Mortgages superior to and prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens.  The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect and preserve the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.

(c)  In connection with the delivery of each Reserve Report, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties to ascertain whether), after giving effect to acquisitions, dispositions and production, the Credit Parties are in compliance with <u>Section 10.12(a)</u>.  In the event that the Mortgaged Properties do not meet the requirement set forth <u>Section 10.12(a)</u>, then the Credit Parties shall grant, within 30 days of delivery of such Reserve Report, to the Administrative Agent as security for the Secured Obligations a first-priority Lien on additional Oil and Gas Properties not already subject to a Lien of the Security Documents such that after giving effect thereto, the Mortgaged Properties will meet the requirement set forth in <u>Section 10.12(a)</u>.  All such Liens will be created and

EAST\159464702.32

perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.  In order to comply with the foregoing, if any Subsidiary places a Lien on its Oil and Gas Properties and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 10.12(b).

(d)     If any Event of Default shall occur and be continuing, then the Borrower shall, and shall cause each of its Subsidiaries to, within 10 Business Days after notice by the Administrative Agent, grant to the Administrative Agent as security for the Secured Obligations a first-priority Lien (provided that Permitted Liens may exist, but subject to the provisos at the end of such definition) on all of their Oil and Gas Properties not already subject to a Lien of the Security Documents such that after giving effect thereto, the Mortgaged Properties will represent substantially all of the Oil and Gas Properties of the Borrower and its Subsidiaries.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficiently executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.

(e)     Subject to the terms of the Security Agreement, Holdings will, and will cause each of the other Credit Parties to, at the expense of the Credit Parties, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports, control agreements and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require.  Furthermore, Holdings will, and will cause the other Credit Parties to, deliver to the Collateral Agent such opinions of counsel, title information and other related documents as may be reasonably requested by the Administrative Agent to assure itself that this Section 10.12 has been complied with.

(f)     Notwithstanding any provision in this Agreement, any Security Document or other Credit Document to the contrary, (i) in no event is (x) any Excluded Asset (as defined in the Security Agreement) or (y) any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) included in the definition of "Collateral" and (ii) no Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) shall be subject to a Lien under any Security Document.

(g)     Each Holding Company and the Borrower agree that each action required by clauses (a) and (d) of this Section 10.12 shall be completed as soon as possible, but in no event later than 90 days after such action is requested to be taken by the Administrative Agent or the Required Lenders; provided that, in no event will Holdings or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 10.12.

(h)     Holdings will use commercially reasonable efforts, and will cause each of the other Credit Parties to use best efforts to, deliver to the Administrative Agent and the Collateral

EAST\159464702.32

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 116 of 300

Agent, landlord waivers with respect to each location or place of business at which personal property Collateral with a value in excess of $1,000,000 and/or books and records are located.

10.13.  Ownership of Subsidiaries; etc.

Except as set forth on Schedule V, as contemplated by the Senior Management Restricted Unit Agreements or pursuant to a Permitted Acquisition consummated in accordance with the terms hereof, Holdings will, and will cause each of its Subsidiaries to, own 100% of the Equity Interests of each of their Subsidiaries.

10.14.  Contributions.

(a)  Holdings will, upon its receipt thereof, contribute as an equity contribution to the capital of the Borrower, any cash proceeds received by Holdings from any Asset Sale, any incurrence of Indebtedness (other than incurrence of Intercompany Debt by Holdings), any Recovery Event, any sale or issuance of its equity, any cash capital contributions or any tax refunds.

(b)  The Borrower will use the proceeds of all equity contributions received by it from Holdings as provided in the relevant clause of Section 6.02 to the extent required to be so applied.

10.15.  Minimum Cash and Cash Equivalents.

At all times, Unrestricted cash and Cash Equivalents of Holdings and its Subsidiaries shall be not less than $7,500,000.

10.16.  Sanctions; Anti-Corruption Laws.

The Credit Parties shall maintain in effect policies and procedures designed to promote compliance by the Credit Parties and their respective Subsidiaries, directors, officers, employees, and agents with applicable Sanctions and with the FCPA and any other applicable anti-corruption Laws.

10.17.  Permitted Acquisitions.

(a)  Subject to the provisions of this Section 10.17 and the requirements contained in the definition of Permitted Acquisition, the Borrower and its Subsidiaries that are Credit Parties may from time to time effect Permitted Acquisitions, so long as (in each case except to the extent the Required Lenders otherwise specifically agree in writing in the case of a specific Permitted Acquisition): (i) no Event of Default shall have occurred and be continuing at the time of the consummation of the proposed Permitted Acquisition or immediately after giving effect thereto; (ii) the Borrower shall have given to the Administrative Agent and the Lenders at least 10 Business Days' prior written notice of any Permitted Acquisition (or such shorter period of time as may be reasonably acceptable to the Administrative Agent), which notice shall describe in reasonable detail the principal terms and conditions of such Permitted Acquisition; (iii) calculations are made by the Borrower with respect to the financial covenants contained in Sections 11.08 and 11.09, for the respective Calculation Period on a Pro Forma Basis as if the

respective Permitted Acquisition (as well as all other Permitted Acquisitions theretofore consummated after the first day of such Calculation Period) had occurred on the first day of such Calculation Period, and such calculations shall show that (x) such financial covenants would have been complied with if the Permitted Acquisition had occurred on the first day of such Calculation Period and (y) the Total Leverage Ratio for such Calculation Period shall not exceed 3.00:1.00 if the Permitted Acquisition had occurred on the first day of such Calculation Period; (iv) [reserved]; (v) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Permitted Acquisition (both before and after giving effect thereto), unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; (vi) on a Pro Forma Basis after giving effect to the Permitted Acquisition, Holdings and its Subsidiaries shall have a minimum of $20,000,000 of cash or Cash Equivalents on hand at such time at the consummation of the Permitted Acquisition; (vii) the Borrower shall have delivered to the Administrative Agent and each Lender a certificate executed by an Authorized Officer, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) through (vi), inclusive, and containing the calculations (in reasonable detail) (A) required by preceding clauses (iii) and (v) and (B) necessary to establish the Acquired EBITDAX of the Acquired Entity or Business acquired pursuant to each Permitted Acquisition for the most recently ended fiscal quarter for which financial statements are available for such Acquired Entity or Business; (viii) the aggregate amount of all Permitted Acquisitions by the Borrower and its Subsidiaries shall not exceed $5,000,000 during the term of this Agreement; and (ix) if, prior to or after giving effect to any proposed Permitted Acquisition, the Borrower and/or its Subsidiaries have or will have consummated Permitted Acquisitions in an aggregate amount equal to or greater than $1,000,000 during the term of this Agreement, then the Administrative Agent's consent (not to be unreasonably withheld) shall be required for each subsequent Permitted Acquisition and/or such contemplated Permitted Acquisition, as the case may be.

(b)    At the time of each Permitted Acquisition involving the creation or acquisition of a Subsidiary, or the acquisition of capital stock or other Equity Interests of any Person, the capital stock or other Equity Interests thereof created or acquired in connection with such Permitted Acquisition shall be pledged for the benefit of the Secured Creditors pursuant to (and to the extent required by) the relevant Security Document in accordance with Section 10.12.

(c)    The Borrower will cause each Subsidiary which is formed to effect, or is acquired pursuant to, a Permitted Acquisition to comply with, and to execute and deliver all of the documentation as and to the extent required by, Sections 10.12 and this Section 10.17, to the reasonable satisfaction of the Administrative Agent.

(d)    The consummation of each Permitted Acquisition shall be deemed to be a representation and warranty by each Holding Company and the Borrower that the certifications pursuant to this Section 10.17 are true and correct and that all conditions thereto have been satisfied and that same is permitted in accordance with the terms of this Agreement, which representation and warranty shall be deemed to be a representation and warranty for all purposes hereunder, including, without limitation, Sections 8 and 11.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 118 of 300

10.18.  <u>Maintenance of Company Separateness</u>.

Holdings will, and will cause each of its Subsidiaries to, satisfy customary Company formalities, including, as applicable, (i) the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting, (ii) the maintenance of separate Company records and (iii) the maintenance of separate bank accounts in its own name.  None of Holdings or any of its Subsidiaries shall take any action, or conduct its affairs in a manner, which is likely to result in the Company existence of Holdings or any of its Subsidiaries being ignored, or in the assets and liabilities of Holdings or any of its Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

10.19.  <u>Board Information Packages</u>.

Holdings will provide to the Administrative Agent a copy of the board package delivered to members of the Board of Directors of Holdings in advance of each meeting of the Board of Directors Holdings.  Portions of such board package may be redacted where and to the extent that Holdings reasonably believes that such redaction is reasonably necessary (i) to preserve attorney-client, work product or similar privilege between Holdings and its Subsidiaries, on the one hand, and their legal counsel, on the other or (ii) to comply with the terms and conditions of confidentiality agreements between Holdings and its Subsidiaries, on the one hand, and any third parties, on the other.

10.20.  <u>Keepwell</u>.

If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Hedge Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any other Credit Document in respect of Hedge Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this <u>Section 10.20</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.20, or otherwise under this Agreement or any other Credit Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Loan Party under this <u>Section 10.20</u> shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the other Credit Documents.  Each Qualified ECP Loan Party intends that this <u>Section 10.20</u> constitute, and this <u>Section 10.20</u> shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of the Borrower and each Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the CEA.

10.21.  <u>Reserve Reports</u>.

(a)     On or before March 15, May 15, September 15 and November 15 of each year, commencing March 15, 2019 for the year ending December 31, 2018, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of Holdings and its Subsidiaries as of the immediately preceding December 31, March 31, June 30 and September 30.  The Reserve Reports as of December 31 and June 30 of each year shall be prepared by one or more Approved Petroleum Engineers, shall be provided to the Administrative Agent in draft format no later than February 15 and August 15, respectively, and the Administrative Agent shall have the right, in its sole discretion, to have each such draft reserve report reviewed by an independent petroleum engineer of its choosing, at the expense of the Borrower, and to have such independent petroleum engineer meet with the Approved Petroleum Engineers and the Borrower's chief engineer and other personnel to discuss any statements, calculations, conclusions or other information in such draft reserve report prior to its finalization. The Reserve Reports as of March 31 and September 30 of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the immediately preceding December 31 Reserve Report or June 30 Reserve Report, as applicable. Within 30 days after the Closing Date, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of Holdings and its Subsidiaries as of September 30, 2018, which Reserve Report shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the Initial Reserve Report. Such Reserve Report shall be provided to the Administrative Agent in draft format no later than 15 days after the Closing Date, and the Administrative Agent shall have the right, in its sole discretion, to have such draft reserve report reviewed by an independent petroleum engineer of its choosing, at the expense of the Borrower, and to have such independent petroleum engineer meet with the Borrower's chief engineer and other personnel to discuss any statements, calculations, conclusions or other information in such draft reserve report prior to its finalization.

(b)     With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from an Authorized Officer in the form of Exhibit M attached hereto of the Borrower  (the "**Reserve Report Certificate**") certifying that in all material respects:  (i) there are no statements or conclusions in the Reserve Report which are based upon or include misleading information (or, with respect to any Reserve Report prepared by an Approved Petroleum Engineer, are based upon or include misleading information provided by or on behalf of any Credit Party or Subsidiary to such Approved Petroleum Engineer) or fail to take into account material information (or, with respect to any Reserve Report prepared by an Approved Petroleum Engineer, fail to take into account material information known to any Credit Party or Subsidiary but not disclosed to such Approved Petroleum Engineer) regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Credit Parties and the Subsidiaries and production and cost estimates contained in the Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Credit Parties and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate, (ii) the Credit Parties and the Subsidiaries own Defensible Title to the Oil and Gas Properties evaluated in such

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 120 of 300

Reserve Report and such Properties are free of all Liens except for Liens permitted by <u>Section 11.01</u>, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in <u>Section 9.29</u> with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require any Credit Party or any Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last certificate delivered pursuant to this Section 10.21(b), except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties sold and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Credit Parties could reasonably be expected to have been obligated to list on Schedule X had such agreement been in effect on the date hereof, (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating the percentage of the PV-10 Value of such Oil and Gas Properties that the value of such Mortgaged Properties represent, (vii) attached thereto is a true and complete list of all Hedge Agreements of the Credit Parties, detailing the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied), and the counterparty to each such Hedge Agreement, (viii) attached thereto are the calculations of the Borrower's compliance or non-compliance with the volume requirements of <u>Section 10.23</u>, including a detailed description and calculation of the Projected Oil and Gas Production for the Hedge Agreements then in effect, and (ix) as of the date of the certificate, no material Preferential Rights and Consents exist other than those set forth on <u>an attachment</u> to the certificate.

(c)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders, the compliance certificate required to be delivered pursuant to <u>Section 10.01(g)(iii)</u>.

10.22.   <u>Title Information</u>.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 10.21(a), the Borrower will deliver title opinions or other evidence of title reasonably acceptable to the Administrative Agent covering Oil and Gas Properties constituting not less than 85% of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated by such Reserve Report.

(b)    Within 90 days after notice from the Administrative Agent to cure any title defects or exceptions which are not Permitted Liens or a notice by the Administrative Agent that Borrower has failed to comply with Section 10.22(a), the Borrower shall (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 11.01 raised by such information or (ii) deliver title opinions or other information with respect to other Oil and Gas Properties evaluated in such Reserve Report reasonably acceptable to the Administrative Agent, so that the Administrative Agent, on behalf of the Secured Creditors, shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on Oil and Properties constituting not less

than 85% of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated by such Reserve Report.

10.23.  <u>Hedge Agreements</u>.

(a) Within thirty (30) days after the Closing Date, and (b) at all times thereafter, the Borrower shall enter into and maintain Hedge Agreements that (v) are in accordance with the requirements of Section 11.19, (w) are in the form of swaps or costless collars, (x) mitigate both commodity price risk and with respect to crude oil, locational basis risk with respect to differences in market prices between the WTI-Cushing and LLS (light Louisiana sweet) markets, (y) in the case of swaps, are at market prices designed to realize the Strip Price for the applicable notional volumes and tenor of such swaps at the time entered into, in the case of costless collars, are at prices acceptable to the Administrative Agent and in the case of basis hedges, are at market prices at the time entered into, and (z) otherwise have terms and conditions acceptable to the Administrative Agent, that, in each case, are for not less than (i) 65% of the Credit Parties' aggregate Projected Oil and Gas Production of crude oil and (ii) 65% of the Credit Parties' aggregate Projected Oil and Gas Production of crude oil, natural gas and natural gas liquids, calculated in the aggregate, in each case, measured at the time of entry into such Hedge Agreements, anticipated to be sold in the ordinary course of Borrower's business during the period of not less than thirty-six (36) months thereafter, on a rolling, forward looking basis (which may be required in the sole discretion of the Administrative Agent to be extended beyond the Maturity Date if any Loans remain outstanding after such date). For purposes of the immediately preceding sentence, the terms of a proposed Hedge Agreement shall be deemed to be acceptable to the Administrative Agent if the Administrative Agent has not objected within five (5) Business Days of its receipt of written notice of such terms. For the avoidance of doubt, the Borrower shall supplement the hedge requirements on a rolling, forward looking basis, in connection with the delivery of each Reserve Report pursuant to <u>Section 10.21</u>, to the extent necessary to be in compliance with the foregoing clause (b). Within forty-five (45) days after the Closing Date and thereafter as and when required pursuant to <u>Section 10.21</u>, the Borrower shall deliver to the Administrative Agent and each Lender a certificate executed by an Authorized Officer, certifying the Borrower's compliance with this <u>Section 10.23</u> and with <u>Section 11.19</u> and setting forth information regarding the Borrower's existing Hedge Agreements and detailed calculations demonstrating such compliance.

10.24.  <u>Volume of Production, Etc</u>.

Concurrently with the delivery of the monthly financial reports pursuant to <u>Section 10.01(a)</u> above (or in the case of clause (iii) below, concurrently with the delivery of the quarterly financial statements pursuant to <u>Section 10.01(b)</u> above), a report setting forth, for each calendar month during the then-current fiscal year to date, (i) the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, including transportation, gathering and marketing costs, and all categories of applicable expenses, (ii) an internally-prepared aggregate lease operating statement and (iii) a summary report of drilling development activity based on field level operating estimates, all in detail and in form

96

Case 20-34966    Document 136-1    Filed in TXSB on 11/03/20    Page 122 of 300

substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form satisfactory to Administrative Agent.

SECTION 11. <u>Negative Covenants</u>.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Total Commitment has terminated and the Loans and Notes (in each case, together with interest thereon), fees and all other Obligations (other than any indemnities described in <u>Section 14.13</u> which are not then due and payable) incurred hereunder and thereunder, are paid in full:

11.01. <u>Liens</u>.

Holdings will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired, or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to Holdings or any of its Subsidiaries), or assign any right to receive income; <u>provided</u> that the provisions of this <u>Section 11.01</u> shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "**Permitted Liens**"):

(a)    inchoate Liens for Taxes, assessments or governmental charges or levies not yet due or Liens for Taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)    Liens in respect of property or assets of Holdings or any of its Subsidiaries imposed by law, which were incurred in the Ordinary Course of Business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, operator's, materialmen's and mechanics' liens and other similar Liens arising in the Ordinary Course of Business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, and (x) which do not in the aggregate materially detract from the value of Holdings' or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of Holdings or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)    Liens in existence on the Closing Date which are listed, and the property subject thereto described, in <u>Schedule VIII</u>, plus renewals, replacements and extensions of such Liens, <u>provided</u> that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of Holdings or any of its Subsidiaries;

(d)    Liens created by or pursuant to this Agreement and the Security Documents which secure the Secured Obligations;

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 123 of 300

(e)      (x) licenses, sublicenses, leases or subleases granted by Holdings or any of its Subsidiaries to other Persons that are not materially interfering with, the conduct of the business of Holdings or any of its Subsidiaries and (y) any interest or title of a lessor, sublessor or licensor under any lease or license agreement not prohibited by this Agreement to which the Borrower or its Subsidiaries is a party;

(f)      Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 11.04(d), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligations and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of Holdings or any other asset of the Borrower or any Subsidiary of the Borrower;

(g)      Liens placed upon property, equipment or machinery acquired after the Closing Date and used in the Ordinary Course of Business of the Borrower or any of its Subsidiaries and placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such property, equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 11.04(d) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of Holdings or any of its Subsidiaries;

(h)      easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of Holdings or any of its Subsidiaries;

(i)      Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the Ordinary Course of Business;

(j)      Liens arising out of the existence of judgments or awards that would not result in an Event of Default under Section 12.09, for which adequate reserves have been established in accordance with GAAP;

(k)      statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(l)      Liens (other than Liens imposed under ERISA) incurred in the Ordinary Course of Business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the Ordinary Course of Business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business and consistent with past practices (exclusive of obligations in respect of the payment for borrowed money);

(m)      [reserved];

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 124 of 300

(n)     Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition, provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under Section 11.04(g), and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition and do not attach to any other asset of Holdings or any of its Subsidiaries;

(o)     Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)     Liens (x) incurred in the Ordinary Course of Business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Holdings or any Subsidiary, in each case granted in the Ordinary Course of Business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(r)     Any contractual rights of netting or set-off under any Interest Rate Protection Agreements permitted under Section 11.04(c);

(s)     contractual Liens which arise in the Ordinary Course of Business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; provided that any such Lien referred to in this clause does not materially impair the use of any material Property covered by such Lien for the purposes for which such Property is held by any Credit Party or any Subsidiary or materially impair the value of any material Property subject thereto;

(t)     easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of any Credit Party or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and

which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by any Credit Party or any Subsidiary or materially impair the value of such Property subject thereto; and

(u)  additional Liens of the Borrower or any Subsidiary of the Borrower not otherwise permitted by this Section 11.01 that do not secure obligations in excess of $2,000,000 in the aggregate for all such Liens at any time.

In connection with the granting of Liens of the type described in clauses (c), (f), (g), (i) and (n) of this Section 11.01 by the Borrower of any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

11.02.  Consolidation, Merger, Purchase or Sale of Assets, etc.

Holdings will not, and will not permit any of its Subsidiaries to, divide, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, plan of division, transaction of merger or consolidation, or convey, sell, assign, farm-out, convey or otherwise transfer (including by division of such Person), including pursuant to any production payment or similar conveyance, lease or otherwise dispose of all or any part of its property or assets (other than sales or licenses of seismic data or sales of Hydrocarbon production and inventory, in each case in the Ordinary Course of Business), or unwind or permit the early termination, assignment, novation or amendment of any Hedge Agreement transaction (other than any Hedge Agreement transaction that is rolled into a new Hedge Agreement transaction within three Business Days after such unwinding or early termination), or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions, and including by division of such Person) any part of the property or assets (other than purchases or other acquisitions of inventory, materials, assets and equipment in the Ordinary Course of Business) of any Person (or agree to do any of the foregoing at any future time, except for any such agreement that is expressly conditioned upon the consent or the Required Lenders or payment in full of the Obligations and termination of this Agreement), except that:

(a)  Capital Expenditures by the Borrower and its Subsidiaries shall be permitted to the extent not in violation of Section 11.07 and Section 11.11;

(b)  the Borrower and its Subsidiaries may, in the Ordinary Course of Business, liquidate or otherwise dispose of obsolete, surplus or worn-out property or property no longer used or useful in the operations of the Borrower and its Subsidiaries;

(c)  Investments may be made to the extent permitted by Section 11.05;

(d)  the Borrower and its Subsidiaries may sell, assign, farm-out, convey or otherwise transfer, including pursuant to any production payment or similar conveyance, Property (other than the capital stock or other Equity Interests of any Wholly-Owned Subsidiary), so long as (u) before and after giving effect to any such transaction, the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant

100

(which, for purposes of <u>Section 11.10</u>, shall mean that the Adjusted Coverage Ratio is greater than 1.50:1.00), (v) no Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (x) the consideration received by the Borrower or such Subsidiary consists of at least 100% cash and is paid at the time of the closing of such sale, <u>provided</u>, that the Borrower or such Subsidiary may exchange such Property for Property of reasonably equivalent Fair Market Value with the prior written consent of the Administrative Agent (in its sole discretion), (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by <u>Section 6.02(e)</u> and (z) the aggregate value of all such Property sold <u>plus</u> the aggregate value of all such Hedge Agreements that are Liquidated during such fiscal year (after giving effect to any replacement Hedge Agreements entered into at or about the same time as such Liquidation) received from all assets sold pursuant to this clause (d) shall not exceed 5% of the PV-10 Value of PDP Reserves as of the first day of such fiscal year in any fiscal year of Holdings;

(e)     the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the Ordinary Course of Business, accounts receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(f)     the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the Ordinary Course of Business and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as (x) no such grant contains non-disturbance or subordination agreements or otherwise affects the Collateral Agent's security interest in the Collateral that is subject thereto, (y) no Event of Default then exists or would result therefrom, and (z) each such grant is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value;

(g)     (i) the Borrower and any Subsidiary of the Borrower that is a Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower and any Subsidiary of the Borrower that is a Credit Party and (ii) any Subsidiary that is not a Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower or any of its Subsidiaries, in each case, so long as with respect to the Collateral, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the Collateral so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and all actions required to maintain said perfected status have been taken;

(h)     the Borrower and any of its Subsidiaries may merge or consolidate with and into, or be dissolved or liquidated into, the Borrower or any of its Subsidiaries, so long as (i) in the case of any such merger, consolidation, dissolution or liquidation involving the Borrower, the Borrower is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, (ii) in all other cases of any such merger, consolidation, dissolution or liquidation involving a Subsidiary Guarantor, such Subsidiary Guarantor is the surviving or continuing corporation of any such merger, consolidation, dissolution or liquidation, and (iii) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of the Borrower or such Subsidiary Guarantor shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 127 of 300

such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been taken;

(i)  Permitted Acquisitions may be consummated in accordance with the requirements of Section 10.17;

(j)  the Borrower and its Subsidiaries may liquidate or otherwise dispose of cash and Cash Equivalents in the Ordinary Course of Business, in each case for cash at Fair Market Value and in a transaction not otherwise prohibited by the other terms of this Agreement;

(k)  the termination or unwinding, in whole or in part, of any Interest Rate Protection Agreement; and

(l)  the Borrower and its Subsidiaries may sell, transfer or otherwise dispose of Oil and Gas Properties to which no Proved Reserves were attributed in the most recent Reserve Report provided the aggregate value of all such Property sold pursuant to this clause (l) shall not exceed $1,500,000 in any fiscal year of Holdings.

To the extent the Required Lenders waive the provisions of this Section 11.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 11.02 (other than to Holdings or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents (provided that such Lien shall continue as to any proceeds of such sale to the extent such assets constituted Collateral), and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

11.03.  Dividends.

Holdings will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to Holdings or any of its Subsidiaries, except that:

(a)  any Subsidiary of the Borrower may pay cash Dividends to the Borrower or to any Wholly-Owned Subsidiary of the Borrower;

(b)  The Borrower may pay cash Dividends to Holdings, so long as the proceeds thereof are promptly used by Holdings to pay operating expenses incurred in the Ordinary Course of Business (including, without limitation, outside directors and professional fees, expenses and indemnities) and other similar corporate overhead costs and expenses, provided that (x) the aggregate amount of all cash Dividends paid pursuant to this clause (b) shall not exceed $350,000 in any fiscal year of Holdings and (y) in no event shall such operating expenses be paid to Affiliates;

(c)  the Borrower may pay cash Dividends to MDA Holdco to be ultimately distributed to Meidu America at the times and in the amounts necessary to enable Meidu America to pay the Tax obligations of the MDA Consolidated Group that are attributable to income generated by the Borrower; provided that (x) the amount of cash Dividends paid pursuant to this clause (c) to enable Meidu America to pay the federal and state income Taxes of the MDA Consolidated Group shall not exceed the amount of such federal and state income Taxes actually

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 128 of 300

owing by the MDA Consolidated Group, and such Taxes shall be calculated by the MDA Consolidated Group utilizing all net operating losses and other Tax attributes that are available to the MDA Consolidated Group to reduce any such Taxes, and (y) any refunds of such Taxes received by the MDA Consolidated Group or any member thereof shall promptly be returned to the Borrower;

(d)     the Borrower may pay cash Dividends to Holdings for the purpose of enabling Holdings to redeem, repurchase or otherwise acquire for value, and Holdings may redeem, repurchase or otherwise acquire for value, outstanding shares of Holdings common Equity Interests (or options or warrants to purchase Holdings common Equity Interests) (i) following the death, disability or termination of employment of officers, directors or employees of Holdings or any of its Subsidiaries, provided that (x) the only consideration paid by Holdings in respect of such redemptions or purchases shall be cash, (y) at the time of any cash Dividend, purchase or payment permitted to be made pursuant to this Section 11.03(d), no Default or Event of Default shall then exist or result therefrom and (z) the aggregate amount of all such Dividends shall not exceed $1,000,000 (although no more than $250,000 of such Dividends may be paid in any fiscal year of Holdings); and (ii) from shareholders (other than officers, directors or employees of Holdings or any of its Subsidiaries), provided that (x) the only consideration paid by Holdings in respect of such redemptions or purchases shall be cash, (y) at the time of any cash Dividend, purchase or payment permitted to be made pursuant to this Section 11.03(d), no Default or Event of Default shall then exist or result therefrom and (z) the aggregate amount of all such Dividends shall not exceed $1,000,000 (although no more than $250,000 of such Dividends may be paid in any fiscal year of Holdings);

(e)     Holdings may pay regularly scheduled Dividends on its Qualified Preferred Stock pursuant to the terms thereof solely through the issuance of additional shares of such Qualified Preferred Stock (but not in cash), provided that in lieu of issuing additional shares of such Qualified Preferred Stock as Dividends, Holdings may increase the liquidation preference of the shares of Qualified Preferred Stock in respect of which such Dividends have accrued;

(f)     the Borrower's Subsidiaries may pay cash Dividends to the Borrower and the Borrower may pay cash Dividends to Holdings and Holdings may pay cash Dividends to holders of its Equity Interests, in each case, with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities; provided that the same proceeds shall not be used for any Capital Expenditures permitted pursuant to Section 11.07(f) or any loans, advances or other Investments permitted pursuant to Section 11.05(r);

(g)     the Borrower and Holdings (and each other intermediate Holding Company) may make the Closing Date Distribution to the extent constituting Dividends in accordance with the definition thereof;

(h)     on and after January 1, 2021, the Borrower and MDA Holdco may pay Dividends in accordance with and as required pursuant to the Senior Management Restricted Unit Agreements in an aggregate amount not to exceed $10,000,000 in any fiscal year of Holdings; provided that, before and after giving effect to any such Dividend, the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant

(which, for purposes of <u>Section 11.10</u>, shall mean that the Adjusted Coverage Ratio is greater than 1.50:1.00) and after giving effect to any such Dividend, Unrestricted cash and Cash Equivalents of Holdings and its Subsidiaries (in each case deposited to an account subject to a "control agreement" referred to in Section 3.9 of the Security Agreement) shall not be less than $40,000,000; and

(i)    the Borrower and Holdings (and each other intermediate Holding Company) may make the Special Distribution to the extent constituting Dividends in accordance with the definition thereof.

11.04.   <u>Indebtedness</u>.

Holdings will not, and will not permit any of its Subsidiaries to, (x) enter into any minimum volume commitments or similar obligations where Holdings or such Subsidiary would be obligated to pay for transportation capacity even if not used, or (y) contract, create, incur, assume or suffer to exist any Indebtedness, except, in the case of this clause (y):

(a)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on <u>Schedule VI</u> (the "**Existing Indebtedness**") (as reduced by any repayments of principal thereof) and any subsequent extension, renewal or refinancing thereof except to the extent set forth on <u>Schedule VI</u>, <u>provided</u> that the aggregate principal amount of the Indebtedness to be extended, renewed or refinanced does not increase from that amount outstanding at the time of any such extension, renewal or refinancing and, <u>provided</u> <u>further</u>, that any Intercompany Debt listed on <u>Schedule VI</u> (and subsequent extensions, refinancings, renewals, replacements and refundings thereof as permitted pursuant to this <u>Section 11.04(b)</u>) shall be subject to the requirements of the proviso to <u>Section 11.05(h)</u>;

(c)    Indebtedness of the Borrower under (i) Hedge Agreements (other than Interest Rate Protection Agreements) permitted under <u>Section 11.19</u> and (ii) Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this <u>Section 11.04</u>, so long as the entering into of such Interest Rate Protection Agreements are bona fide hedging activities and are not for speculative purposes;

(d)    Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in <u>Section 11.01(g)</u>, <u>provided</u> that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (d) exceed $2,500,000 at any time outstanding;

(e)    Indebtedness constituting Intercompany Loans to the extent permitted by <u>Section 11.05(h)</u>;

(f)    Indebtedness consisting of guaranties by the Borrower and its Wholly-Owned Subsidiaries of the Borrower that are Subsidiary Guarantors of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement;

(g)      Indebtedness of a Subsidiary of the Borrower acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness), provided that (x) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition and (y) the aggregate principal amount of all Indebtedness permitted by this clause (g) shall not exceed $1,000,000 at any one time outstanding;

(h)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business, so long as such Indebtedness is extinguished within four Business Days of the earlier its incurrence or any Credit Party becoming aware thereof;

(i)      Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 11.04(f);

(j)      with the prior written consent of the Administrative Agent in its sole discretion, Indebtedness of the Borrower or any of its Subsidiaries under clause (ix) of the definition of Indebtedness; and

(k)      additional Indebtedness incurred by the Borrower and any of its Subsidiaries in an aggregate principal amount not to exceed $2,500,000 at any one time outstanding, which Indebtedness shall be unsecured unless otherwise permitted under Section 11.01(r).

11.05.  Advances, Investments and Loans.

Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to, any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (in each case, including by division of any Person) (each of the foregoing an "**Investment**" and, collectively, "**Investments**"), except that the following shall be permitted:

(a)      the Borrower and its Subsidiaries may acquire and hold accounts receivables owing to any of them, if created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(b)      Holdings and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)      Holdings and its Subsidiaries may hold the Investments held by them on the Closing Date and described on Schedule IX, provided that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 11.05;

(d)  the Borrower and its Subsidiaries may acquire and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the Ordinary Course of Business;

(e)  the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the Ordinary Course of Business in an aggregate amount not to exceed $250,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(f)  Holdings and its Subsidiaries may acquire and hold obligations of their officers and employees in connection with such officers' and employees' acquisition of shares of Holdings common Equity Interests (so long as no cash is actually advanced by Holdings or any of its Subsidiaries in connection with the acquisition of such obligations);

(g)  the Borrower may enter into Hedge Agreements and Interest Rate Protection Agreements to the extent permitted by <u>Section 11.19</u> and <u>Section 11.04(c)</u>;

(h)  (I) any Credit Party may make intercompany loans and advances to any other Credit Party, (II) the Borrower and the Subsidiary Guarantors may make intercompany loans and advances to any Subsidiary which is not a Credit Party and (III) any Subsidiary which is not a Credit Party may make intercompany loans and advances to any Credit Party or any other Subsidiary (such intercompany loans and advances referred to in preceding clauses (I) through (III), collectively, the "**Intercompany Loans**"), <u>provided</u>, that (v) at no time shall the aggregate outstanding principal amount of all Intercompany Loans made pursuant to preceding subclause (II) of this clause (h), when added to the amount of contributions, acquisitions of Equity Interests, capitalizations and forgivenesses theretofore made pursuant to subclause (II) of <u>Section 11.05(i)</u> (for this purpose, taking the Fair Market Value of any property (other than cash) so contributed at the time of such contribution), exceed $1,000,000 (determined without regard to any write-downs or write-offs of such loans and advances and net of any returns on any such Investment in the form of a principal repayment, distribution, dividend or redemption, as applicable), (x) each Intercompany Loan shall be evidenced by an Intercompany Note, (y) each such Intercompany Note owned or held by a Credit Party shall be pledged to the Collateral Agent pursuant to the relevant Security Document and (z) any Intercompany Loans made to any Subsidiary Guarantor pursuant to this clause (h) shall cease to be permitted by this clause (h) if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

(i)  (I) any Credit Party may make Investments in any other Credit Party (other than a Holding Company) and (II) the Credit Parties may make capital contributions to, or acquire Equity Interests of, any Subsidiary which is not a Credit Party; <u>provided</u>, that (x) at no time shall the aggregate outstanding principal amount of all such Investments made pursuant to preceding subclause (II) of this clause (i), when added to the amount of Intercompany Loans theretofore made pursuant to subclause (II) of <u>Section 11.05(h)</u>, exceed $1,000,000 (determined without regard to any write-downs or write-offs of such loans and advances and net of any returns on any such Investment in the form of a principal repayment, distribution, dividend or redemption, as applicable), (y) any security interest granted to the Collateral Agent for the benefit of the Secured

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 132 of 300

Creditors pursuant to the Security Documents in any assets so contributed shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such contribution) and all actions required to maintain said perfected status have been taken and (z) any Investment made in or to any Subsidiary Guarantor pursuant to this clause (i) shall cease to be permitted hereunder if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

(j)     Holdings and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this Section 11.05);

(k)     Contingent Obligations permitted by Section 11.04, to the extent constituting Investments;

(l)     Permitted Acquisitions shall be permitted in accordance with the requirements of Section 10.17;

(m)     the Borrower and its Subsidiaries may receive and hold promissory notes and other non-cash consideration received in connection with any Disposition permitted by Section 11.02(d);

(n)     the Borrower and its Subsidiaries may make advances in the form of a prepayment of expenses to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the Ordinary Course of Business;

(o)     the Borrower and its Subsidiaries may make Permitted Business Investments;

(p)     in addition to Investments permitted by clauses (a) through (o) and clauses (q) and (r) of this Section 11.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person in an aggregate amount for all loans, advances and other Investments made pursuant to this clause (p) (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a distribution, dividend, redemption or sale) in the case of equity investments, not to exceed $1,000,000;

(q)     the Credit Parties may make the Closing Date Distribution and the Special Distribution, in each to the extent constituting loans, in accordance with their respective definitions thereof; and

(r)     in addition to Investments permitted by clauses (a) through (q) of this Section 11.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities; provided that the same proceeds shall not be used for any Capital Expenditures permitted pursuant to Section 11.07(f) or the payment of any Dividends permitted pursuant to Section 11.03(f).

EAST\159464702.32

11.06. <u>Transactions with Affiliates</u>.

Holdings will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of Holdings or any of its Subsidiaries (other than Holdings or any of its Subsidiaries), other than in the Ordinary Course of Business or on terms and conditions substantially as favorable to Holdings or such Subsidiary as would reasonably be obtained by Holdings or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)    Dividends may be paid to the extent provided in <u>Section 11.03</u>;

(b)    loans may be made and other transactions may be entered into by Holdings and its Subsidiaries to the extent permitted by <u>Sections 11.02</u>, <u>11.04</u> and <u>11.05</u>;

(c)    customary indemnities may be paid to non-officer directors of Holdings and its Subsidiaries;

(d)    customary fees and reimbursements may be paid to non-officer directors of Holdings and its Subsidiaries in an amount not to exceed $150,000 in any fiscal year;

(e)    Holdings may issue Holdings common Equity Interests and Qualified Preferred Stock; and

(f)    Holdings and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of Holdings and its Subsidiaries in the Ordinary Course of Business.

Notwithstanding anything to the contrary contained above in this <u>Section 11.06</u>, in no event shall Holdings or any of its Subsidiaries pay any management, consulting or similar fee to any of their respective Affiliates.

11.07. <u>Capital Expenditures</u>.

(a)    Holdings will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses, except that prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make such Capital Expenditures so long as the aggregate amount of all such Capital Expenditures does not exceed $2,500,000 in each fiscal year of Holdings.

(b)    In addition to the foregoing, prior to the occurrence of an Event of Default, in the event that the amount of Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses permitted to be made by the Borrower and its Subsidiaries pursuant to clause (a) above in any fiscal year of Holdings (before giving effect to any increase in such permitted Capital Expenditure amount pursuant to this clause (b)) is greater than the amount of Capital Expenditures actually made by the Borrower and its Subsidiaries during such fiscal year, the lesser of (x) such excess and (y) 50% of the applicable permitted

108

scheduled Capital Expenditure amount as set forth in such clause (a) above may be carried forward and utilized to make Capital Expenditures in the immediately succeeding fiscal year, provided that no amounts once carried forward pursuant to this Section 11.07(b) may be carried forward to any fiscal year of Holdings thereafter; provided, further, that in any fiscal year the corresponding amount set forth in Section 11.07(a) shall be deemed to have been utilized in full prior to the utilization of any amounts pursuant to this Section 11.07(b).

(c)    In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the amount of (x) Net Sale Proceeds received by the Borrower or any of its Subsidiaries from any Asset Sale so long as such Net Sale Proceeds are reinvested within 360 days following the date of such Asset Sale, but only to the extent that such Net Sale Proceeds are not otherwise required to be applied as a mandatory repayment pursuant to Section 6.02(e) and (y) Net Sale Proceeds received by the Borrower or any of its Subsidiaries from any Disposition that does not constitute an Asset Sale.

(d)    In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the amount of Net Cash Proceeds received by the Borrower or any of its Subsidiaries from any Recovery Event so long as such Net Cash Proceeds are used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of receipt of such Net Cash Proceeds from such Recovery Event, but only to the extent that such Net Cash Proceeds are not otherwise required to be applied as a mandatory repayment pursuant to Section 6.02(g).

(e)    In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) constituting Permitted Acquisitions effected in accordance with the requirements of Section 10.17.

(f)    In addition to the foregoing, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities (other than any Permitted Cure Securities issued or deemed issued to cure any non-compliance with this Section 11.07); provided that the same proceeds shall not be used for any loans, advances or other Investments permitted pursuant to Section 11.05(r) or the payment of any Dividends permitted pursuant to Section 11.03(f).

11.08.  Fixed Charge Coverage Ratio.

Holdings will not permit the Fixed Charge Coverage Ratio for any Test Period ending on the last day of a fiscal quarter of Holdings to be less than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending | Ratio |
| --- | --- |
| December 31, 2018 | 2.00:1.00 |
| March 31, 2019 | 2.00:1.00 |
| June 30, 2019 | 2.00:1.00 |
| September 30, 2019 | 2.00:1.00 |
| December 31, 2019 | 2.00:1.00 |
| March 31, 2020 | 2.00:1.00 |
| June 30, 2020 | 2.00:1.00 |
| September 30, 2020 | 2.00:1.00 |
| December 31, 2020 | 2.00:1.00 |
| March 31, 2021 | 2.50:1.00 |
| June 30, 2021 | 2.50:1.00 |
| September 30, 2021 | 2.50:1.00 |
| December 31, 2021 | 2.50:1.00 |
| March 31, 2022 | 2.50:1.00 |
| June 30, 2022 | 2.50:1.00 |
| September 30, 2022 | 2.50:1.00 |
| December 31, 2022 | 2.50:1.00 |
| March 31, 2023 | 2.50:1.00 |
| June 30, 2023 | 2.50:1.00 |
| September 30, 2023 | 2.50:1.00 |

11.09.  Total Leverage Ratio.

Holdings will not permit the Total Leverage Ratio for any Test Period ending on the last day of a fiscal quarter of Holdings to be greater than the ratio set forth opposite such fiscal quarter below:

| Fiscal Quarter Ending | Ratio |
| --- | --- |
| December 31, 2018 | 3.25:1.00 |
| March 31, 2019 | 3.25:1.00 |
| June 30, 2019 | 3.25:1.00 |
| September 30, 2019 | 3.25:1.00 |
| December 31, 2019 | 3.25:1.00 |
| March 31, 2020 | 3.00:1.00 |
| June 30, 2020 | 3.00:1.00 |
| September 30, 2020 | 3.00:1.00 |
| December 31, 2020 | 3.00:1.00 |
| March 31, 2021 | 2.75:1.00 |

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 136 of 300

| Fiscal Quarter Ending | Ratio |
| --- | --- |
| June 30, 2021 | 2.75:1.00 |
| September 30, 2021 | 2.75:1.00 |
| December 31, 2021 | 2.75:1.00 |
| March 31, 2022 | 2.50:1.00 |
| June 30, 2022 | 2.50:1.00 |
| September 30, 2022 | 2.50:1.00 |
| December 31, 2022 | 2.50:1.00 |
| March 31, 2023 | 2.50:1.00 |
| June 30, 2023 | 2.50:1.00 |
| September 30, 2023 | 2.50:1.00 |

11.10.  Adjusted Coverage Ratio.

Holdings will not permit the Adjusted Coverage Ratio as of the last day of any Test Period ending on or after December 31, 2018 to be less than 1.50:1.00; provided, that the Adjusted Coverage Ratio as of the last day of a Test Period may be less than 1.50:1.00 so long as (a) the Adjusted Coverage Ratio for each Test Period is not less than 1.30:1.00, (b) Holdings shall cause the Adjusted Coverage Ratio to be equal to or greater than 1.50:1.00 no later than the Test Period ending two fiscal quarters after the initial Test Period in which the Adjusted Coverage Ratio was less than 1.50:1.00, (c) after causing the Adjusted Coverage Ratio to be equal to or greater than 1.50:1.00 pursuant to the preceding clause (b), the Adjusted Coverage Ratio must be equal to or greater than 1.50:1.00 for two consecutive Test Periods, and (d) Holdings may only rely on this proviso to permit the Adjusted Coverage Ratio to be less than 1.50:1:00 two times during the term of this Agreement. For the avoidance of doubt, (1) Holdings will not permit the Adjusted Coverage Ratio for any Test Period ending on or after December 31, 2018 to be less than 1.30:1.00 and (2) any prepayment of the Loans to cause an increase in the Adjusted Coverage Ratio shall be subject to the applicable Prepayment Premium.

11.11.  Drilling and Exploration Expenses; Capitalized Drilling and Exploration Expenses.

(a)    Holdings will not, and will not permit any of its Subsidiaries to, incur any Drilling and Exploration Expenses, except that prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may incur Drilling and Exploration Expenses so long as the aggregate amount of all such Drilling and Exploration Expenses does not exceed $10,000,000 in each fiscal year of Holdings.

(b)    Holdings will not, and will not permit any of its Subsidiaries to, incur any Capitalized Drilling and Exploration Expenses, except that during any fiscal year of Holdings set forth below (taken as one accounting period), prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may incur Capitalized Drilling and Exploration Expenses so long as the aggregate amount of all such Capitalized Drilling and Exploration Expenses does not exceed in any fiscal year of Holdings set forth below the amount set forth opposite such fiscal year below:

| Fiscal Year Ending | Amount |
|---|---|
| December 31, 2018 | $105,000,000 |
| December 31, 2019 | $145,000,000 |
| December 31, 2020 | $127,500,000 |
| December 31, 2021 | $127,500,000 |
| December 31, 2022 | $127,500,000 |
| December 31, 2023 | $127,500,000 |

11.12. <u>Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.</u>

Holdings will not, and will not permit any of its Subsidiaries to:

(a)     amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests (including any shareholders' agreement and any Qualified Preferred Stock), or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (a) could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)     amend, modify, change or waive any Necessary Authorization or Material Agreement unless such amendment, modification, change or waiver could not reasonably be expected to be materially adverse to the interests of the Lenders or the Credit Parties;

(c)     designate any Indebtedness (or related interest obligations) as "Designated Senior Debt" or similar term except for the Obligations;

(d)     on and after the execution and delivery thereof, amend, modify or waive, or permit the amendment, modification or waiver of, any provision of the Intercompany Note without the prior consent of the Administrative Agent unless such amendment, modification or waiver could not reasonably be expected to be adverse to the interests of the Lenders;

(e)     make any principal or interest payment on, or any redemption or acquisition for value of, or any other payment with respect to any Subordinated Debt except as permitted by the subordination terms of the Subordinated Debt.

11.13. <u>Limitation on Certain Restrictions on Subsidiaries</u>.

Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interests or participation in its profits owned by Holdings or any of its Subsidiaries, or pay any Indebtedness owed to Holdings or any of its Subsidiaries, (b) make

112

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 138 of 300

loans or advances to Holdings or any of its Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of Holdings or any of its Subsidiaries, (iv) customary provisions restricting assignment of any licensing agreement (in which Holdings or any of its Subsidiaries is the licensee) or other contract entered into by Holdings or any of its Subsidiaries in the Ordinary Course of Business, (v) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vi) restrictions on the transfer of any asset subject to a Lien permitted by Section 11.01(c), (f), (g), (o) or (p).

11.14.  Limitation on Issuance of Equity Interests.

(a)    Holdings will not, and will not permit any of its Subsidiaries to, issue (i) any Preferred Equity (other than (x) Qualified Preferred Stock issued pursuant to clause (c) below) or (ii) any redeemable common stock or other redeemable common Equity Interests other than (x) common stock or other redeemable common Equity Interests that is or are redeemable at the sole option of Holdings or such Subsidiary, as the case may be or (y) redeemable common stock or other redeemable common Equity Interests that are not redeemable prior to 91 days following the Maturity Date.

(b)    Holdings will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests, (ii) for stock splits, stock dividends and other issuances which do not decrease the percentage ownership of Holdings or any of its Subsidiaries in any class of the capital stock or other Equity Interests of such Subsidiary, (iii) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement and (iv) a Non-Wholly Owned Subsidiary may issue Equity Interests, subject to compliance with Section 6.02(d).

(c)    Holdings may from time to time (i) issue Qualified Preferred Stock, so long as (x) no Default or Event of Default shall exist at the time of any such issuance or immediately after giving effect thereto, and (y) with respect to each issuance of Qualified Preferred Stock, the gross cash proceeds therefrom (or in the case of Qualified Preferred Stock directly issued as consideration for a Permitted Acquisition, the Fair Market Value of the assets received therefor) shall be at least equal to 100% of the liquidation preference thereof at the time of issuance and (ii) issue additional shares of Qualified Preferred Stock to pay in kind regularly scheduled Dividends on Qualified Preferred Stock theretofore issued in compliance with this Section 11.14(c).

11.15.  Business; etc.

(a)    Holdings will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by Holdings and its Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary or complimentary thereto with operations located in Madison, Grimes, Brazos, Robertson and Leon

Counties, Texas.  From and after the Effective Date, Holdings and its Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within Madison, Grimes, Brazos, Robertson and Leon Counties, Texas.

(b)      Notwithstanding the foregoing or anything else in this Agreement to the contrary, no Holding Company will engage in any business or own any significant assets or have any material liabilities other than (i) (x) its ownership of the Equity Interests of another Holding Company or the Borrower, as applicable, and (y) holding up to $500,000 of cash and Cash Equivalents in the aggregate for all Holding Companies at any time (together with any investment income thereon) and (ii) those liabilities which it is responsible for under this Agreement and the other Credit Documents to which it is a party, provided that each Holding Company may engage in those activities that are incidental to (x) the maintenance of its existence in compliance with applicable law and (y) legal, tax and accounting matters in connection with any of the foregoing activities.

(c)      Holdings will not make any significant change in accounting treatment or reporting practices, except as required by GAAP.

11.16.   Holding Companies.

No Holding Company will incur any liabilities for borrowed money (other than the guaranty of the Loans, other liabilities arising under the Credit Documents and guarantees permitted by this Agreement), Guaranty any Indebtedness (other than the Loans), enter into any employment agreements, leases or other contracts, own or acquire any assets (other than the Equity Interests of another Holding Company or the Borrower, as applicable, and any assets incidental to the foregoing) or engage itself in any operations or business other than its ownership of the Equity Interests of, and its management of, the other Credit Parties and their Subsidiaries; provided, that, each Holding Company may engage in those activities that are incidental to (i) the maintenance of its corporate existence in compliance with applicable law, (ii) legal, tax and accounting matters in connection with any of the foregoing or following activities, (iii) the entering into, and performing its obligations under, this Agreement and the Credit Documents, (iv) the incurrence and payment of any Taxes for which it may be liable and (v) the consummation of the Transaction; provided, however, that notwithstanding anything to the contrary in this Agreement, no Holding Company shall (1) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (2) sell or otherwise dispose of any Equity Interests of any Credit Party; or (3) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

11.17.   Certain Deposit Accounts.

None of the Credit Parties will maintain any  deposit account (other than any Excluded Account), unless such deposit account is (x) subject to a "control agreement" referred to in Section 3.9 of the Security Agreement or (y) otherwise under the "control" (within the meaning of Section 9-104 of the New York UCC) of the Collateral Agent.

11.18.  <u>Sanctions; Anti-Corruption Use of Proceeds</u>.

The Borrower will not, directly or indirectly, use the proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption Law, or (b) (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, Lead Arranger, Lender, underwriter, advisor, investor, or otherwise).

11.19.  <u>Restrictions on Hedge Agreements</u>.

Holdings will not, and will not permit any of its Subsidiaries to:

(a)     be party to or otherwise enter into any Hedge Agreement with any Person other than an Approved Counterparty;

(b)     purchase, assume or hold a speculative position in any commodities market or futures market or enter into any Hedge Agreement for speculative purposes;

(c)     be party to or otherwise enter into any Hedge Agreement that is entered into for reasons other than as a part of its normal business operations as a risk management strategy and/or hedge against changes resulting from market conditions related to a Credit Party's operations;

(d)     establish any hedge position or enter into any Hedge Agreement that covers any Oil and Gas Properties or Proved Reserves which do not constitute PDP Reserves reflected on the most recent Reserve Report delivered hereunder;

(e)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position that is secured with assets of Holdings or any of its Subsidiaries or otherwise post Cash or Cash Equivalents or margin in respect of its Hedge Agreement except pursuant to the Security Documents if such Hedge Agreement is a Secured Hedge Agreement;

(f)     be party to or otherwise enter into any fixed for floating Hedge Agreement in which any Credit Party pays fixed and receives floating except for Hedge Agreements entered into to offset existing Hedge Agreements to the extent the volume of production subject to such offsetting Hedge Agreements does not exceed 5% of Projected Oil and Gas Production as set forth in the most recently delivered Reserve Report, unless otherwise approved in writing by Administrative Agent and the Required Lenders in their reasonable discretion;

(g)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position with a duration longer than five years after the date the applicable Hedge Agreement is entered into or hedge position is established; or

(h)    be party to or otherwise enter into any Hedge Agreement or establish any hedge position, the notional volumes for which (when aggregated with other Hedge Agreements or hedges then in effect other than basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceed, as of the date such Hedge Agreement is entered into and as of the last day of each fiscal quarter, 90% of the Credit Parties' aggregate Projected Oil and Gas Production for each quarter during the 5-year period following such date of determination, for each of crude oil, natural gas and natural gas liquids, calculated separately.

11.20.    Gas Imbalances, Take-or-Pay or Other Prepayments.

Holdings and the Borrower will not, and will not permit any of their Subsidiaries to, (a) allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of any Credit Party or any Subsidiary that would require any Credit Party or Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor if such gas imbalances, take-or-pay or other prepayments, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (b) enter into minimum volume contracts for gathering, processing or transportation of production that require the payment of a fee in the event such minimum volumes are not met.

11.21.    General and Administrative Expenses.

Holdings will not permit the general and administrative expenses of Holdings and its Subsidiaries, *not including* litigation expenses (if any), determined on a consolidated basis in accordance with GAAP, to exceed $15,000,000 during any Test Period ending on the last day of a fiscal quarter of Holdings if the Total Leverage Ratio as of the last day of such Test Period is greater than 2.25:1.00.

SECTION 12. Events of Default.

Upon the occurrence of any of the following specified events (each, an "**Event of Default**"):

12.01.    Payments.

The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any Fees or any other amounts owing hereunder or under any other Credit Document; or

12.02.    Representations, etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

EAST\159464702.32

12.03.  Covenants.

Holdings or any of its Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 6.02, Section 10.01(a), (b), (c), (f), (g) and (h)(i), Section 10.04, 10.11, 10.15, 10.23 or Section 11 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document (other than those set forth in Sections 12.01 and 12.02) and such default under this Section 12.03(ii) shall continue unremedied for a period of 30 days after the occurrence thereof; or

12.04.  Default Under Other Agreements.

(i) Holdings or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond any period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of Holdings or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid (other than by (x) a regularly scheduled required prepayment or (y) a mandatory prepayment (unless such required prepayment or mandatory prepayment results from a default thereunder or an event of the type that constitutes an Event of Default)) beyond any period of grace, prior to the stated maturity thereof, provided that it shall not be a Default or an Event of Default under this Section 12.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $3,000,000; or

12.05.  Bankruptcy, etc.

Holdings or any of its Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"); or an involuntary case is commenced against Holdings or any of its Subsidiaries, and the petition is not dismissed within 60 days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of Holdings or any of its Subsidiaries, to operate all or any substantial portion of the business of Holdings or any of its Subsidiaries, or Holdings or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Holdings or any of its Subsidiaries, or there is commenced against Holdings or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or Holdings or any of its Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Holdings or any of its

Subsidiaries makes a general assignment for the benefit of creditors; or any Company action is taken by Holdings or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

12.06. <u>ERISA</u>.

(a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA; a Reportable Event shall have occurred; a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days; any determination that any Plan or Multiemployer Plan is considered at-risk or in endangered or critical status as defined in Section 303, 304 and 305 of ERISA or Sections 430, 431 and 432 of the Code; any Plan or Multiemployer Plan shall have had or is likely to have a trustee appointed to administer such Plan or Multiemployer Plan; any Plan or Multiemployer Plan is, shall have been or is likely to be the subject of termination proceedings under ERISA, a contribution required to be made with respect to a Plan or a Multiemployer Plan has not been timely made, Holdings or any Subsidiary of Holdings or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4071, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code, a "default" (within the meaning of Section 4219(c)(5) of ERISA) shall occur with respect to any Plan; (b) there shall result from any such event or events described in subsection (a) the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, described in subsection (b) individually and/or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect; or

12.07. <u>Security Documents</u>.

Any of the Security Documents shall fail or cease to be in full force and effect, or shall fail or cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by <u>Section 11.01</u>)), and subject to no other Liens (except as permitted by <u>Section 11.01</u>); or

12.08. <u>Guaranties</u>.

Any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party; or

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 144 of 300

12.09. <u>Judgments</u>.

One or more judgments or decrees shall be entered against Holdings or any Subsidiary of Holdings involving in the aggregate for Holdings and its Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $3,000,000; or

12.10. <u>Change of Control</u>.

A Change of Control shall occur; or

12.11. <u>No Waiver of Affiliate Operator's Liens</u>.

If an Affiliate of a Credit Party is an operator of a Credit Party's Oil and Gas Properties and has not waived any and all Liens in favor of such Affiliate encumbering such Oil and Gas Properties pursuant to an agreement that is in form and substance satisfactory to the Administrative Agent;

12.12. <u>Subordination</u>.

(i) The subordination provisions of the documents evidencing or governing any Subordinated Debt (the "**Subordinated Provisions**") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of applicable subordinated Indebtedness; or (ii) the Borrower or any other Credit Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordinated Provisions, (B) that the Subordinated Provisions exist for the benefit of the Administrative Agent, the Collateral Agent and the Lenders or (C) that all payments of principal of or premium and interest on the applicable subordinated Indebtedness, or realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordinated Provisions; or

12.13. <u>Hedge Agreements</u>.

There occurs (i) under any Hedge Agreement an "early termination date" (as defined or used in such Hedge Agreement, or words to similar effect) resulting from any event of default under such Hedge Agreement as to which Holdings or any of its Subsidiaries is the "defaulting party" (as defined or used in such Hedge Agreement, or words to similar effect) or a termination event under such Hedge Agreement as to which Holdings or any of its Subsidiaries is an "affected party" (as defined or used in such Hedge Agreement, or words to similar effect) and, in either event, the Hedge Termination Value owed by Holdings or any of its Subsidiaries as a result thereof is greater than $3,000,000 or (ii) any Triggering Event under clause (a) of the definition of Triggering Event, as defined in the Hedge Intercreditor Agreement;

then, and upon the occurrence of any such Event of Default as set forth in <u>Section 12.01</u> through and including <u>Section 12.13</u>, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Majority Lenders, shall, subject to the terms of the Hedge Intercreditor Agreement, by written notice to the Borrower,

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 145 of 300

take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 12.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clauses (i) and (ii) below shall occur automatically without the giving of any such notice): (i) declare the Total Commitment terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately and any Commitment Commission shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) enforce, as the Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; (iv) enforce each Guaranty; and (v) apply any cash collateral held by the Administrative Agent or the Collateral Agent pursuant to Section 6.02 to the repayment of the Obligations.

Notwithstanding anything to the contrary contained in this Section 12, in the event that the Credit Parties fail (or, but for the operation of this paragraph, would fail) to comply with the covenants set forth in Sections 11.07, 11.08, 11.09, 11.10 and 11.11 (such applicable covenants, the "**Financial Performance Covenants**") as of the last day of any fiscal quarter, at any time after such last day until the day that is ten (10) Business Days after the date the certificate calculating the applicable Financial Performance Covenants for such fiscal quarter is required to be delivered pursuant to Section 10.01(g) or, if earlier, on the date on which such certificate is delivered, Holdings shall have the right to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings (collectively, the "**Cure Right**"), which cash shall be contributed as common Equity Interests or Qualified Preferred Equity to the Borrower (such contributed amount, the "**Cure Amount**"); provided, however, that (i) there shall be no more than four Cure Rights exercised in the aggregate during the term of this Agreement, and no more than two Cure Rights exercised during any four consecutive fiscal quarter period, (ii) Cure Rights may not be exercised in successive fiscal quarters, (iii) for purposes of this paragraph, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Performance Covenants, (iv) for the avoidance of doubt, in recalculating the Financial Performance Covenants by increasing  Consolidated EBITDAX (or Capital Expenditures funded with proceeds of equity issuances) as set forth above, there shall be no pro forma effect given to any reduction of Loans made with the Cure Amount in such recalculation of the Financial Performance Covenants, (v) such Financial Performance Covenants shall be recalculated by increasing Consolidated EBITDAX (or Capital Expenditures funded with proceeds of equity issuances) with respect to such fiscal quarter and any four-quarter period that contains such fiscal quarter, solely for the purpose of measuring the Financial Performance Covenants and not for any other purpose under this Agreement (including any "baskets"), by an amount equal to the Cure Amount, (vi) any Cure Amount shall be applied to prepay the Loans pursuant to Section 6.02(c) and (vii) any Cure Amount used for purposes of complying with the Adjusted Coverage Ratio under Section 11.10 shall solely be calculated by decreasing Consolidated Indebtedness (to the extent the Loans are prepaid pursuant to Section 6.02(c)) and shall not be included for purposes of calculating the numerator of the definition of Adjusted Coverage Ratio.  If, after giving effect to the adjustments in this paragraph, the Borrower shall then be in compliance with the requirements of the Financial Performance

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 146 of 300

Covenants, the Borrower shall be deemed to have satisfied the requirements of the Financial Performance Covenants as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the Financial Performance Covenants that had occurred shall be deemed cured for the purposes of this Agreement.

SECTION 13. The Administrative Agent.

13.01.  Appointment.

The Lenders hereby irrevocably designate and appoint Loan Admin as Administrative Agent (for purposes of this Section 13 and Section 14.01, the term "Administrative Agent" also shall include Loan Admin in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

13.02.  Nature of Duties.

(a)     The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).   The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)     Notwithstanding any other provision of this Agreement or any provision of any other Credit Document, each Lead Arranger is named as such for recognition purposes only, and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Credit Documents or the transactions contemplated hereby and thereby; it being understood and agreed that each Lead Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Administrative Agent as, and to the extent, provided for under Sections 13.06 and 14.01.  Without limitation of the foregoing, neither

121

Lead Arranger shall, solely by reason of this Agreement or any other Credit Documents, have any fiduciary relationship in respect of any Lender or any other Person.

(c)        Each Lender unconditionally and irrevocably acquits and fully forever releases and discharges the Administrative Agent and all its affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and its respective heirs, legal representatives, successors and assigns (collectively, the "**Releasees**") on the date each interest payment on the Loans is made by the Borrower from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such party hereto ever had or now has against any of the Releasees and which has arisen at any time prior to the date of such interest payment out of this Agreement, the other Credit Documents or any other related documents, instruments, agreements or matters or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "**Released Claims**") (but in each case referred to in this clause (c), excluding any claims, demands, causes of actions, obligations, remedies, suits, damages or liabilities to the extent same occurred by reason of the gross negligence or willful misconduct of the Releasee to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  Each Lender covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

13.03.   <u>Lack of Reliance on the Administrative Agent</u>.

(a)        Each Lender from time to time party to this Agreement (i) confirms that it has received a copy of this Agreement and the other Credit Documents, together with copies of the financial statements referred to therein, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to become a Lender under this Agreement, (ii) agrees that it has made and will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Credit Documents and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, (iii) acknowledges and agrees that no fiduciary or advisory relationship between the Administrative Agent and any Lender is intended to be or has been created in respect of any of the transactions contemplated by this Agreement, (iv) acknowledges and agrees that the Administrative Agent, on the one hand, and each Lender on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, and no Lender relies on, any fiduciary duty on the Administrative Agent's part, (v) acknowledges and agrees that each Lender is capable of evaluating and understanding, and each such Lender understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement, (vi) acknowledges and agrees that the Administrative Agent or any of its Affiliates may have received fees or other compensation from any Credit Party or any Affiliate of any Credit Party in connection with this Agreement which may or may not be

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 148 of 300

publicly disclosed and such fees or compensation do not affect any Lender's independent credit decision to enter into the transactions contemplated by this Agreement, (vii) acknowledges and agrees that notwithstanding that no fiduciary or similar relationship exists between the Administrative Agent and any Lender, each such Lender hereby waives, to the fullest extent permitted by law, any claims it may have against the Administrative Agent or its Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Administrative Agent and its Affiliates shall have no liability (whether direct or indirect) to any Lender in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Lender, including any such Lender's affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and respective heirs, legal representatives, successors and assigns and creditors, in each case subject to and without limiting the terms of Section 13.02(a), and (viii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender.  The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

(b)     To the full extent permitted by applicable law, each party hereto and each Indemnified Person shall not assert, and hereby waives, any claim against any other party hereto or any other Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document, any other agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds thereof; provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.  No party hereto and no Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Person results from such Person's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.

13.04.  Certain Rights of the Administrative Agent.

If the Administrative Agent requests instructions from the Required Lenders or the Majority Lenders, as applicable, with respect to any act or action (including failure to act) in

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 149 of 300

connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders or the Majority Lenders, as applicable,; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, the Administrative Agent shall be entitled to refrain from any act or action, and neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent refraining from such act or action, unless or until the Administrative Agent shall have received, pursuant to an escrow arrangement reasonably satisfactory to it, from the Borrower or the Lenders an amount initially equal to $250,000 and supplemented or increased thereafter on a monthly basis to the extent necessary (in the reasonable judgment of the Administrative Agent) to reimburse the Administrative Agent for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature that may be imposed on, asserted against or incurred by the Administrative Agent as a result of such act or action and for which the Administrative Agent would be entitled to indemnification pursuant to <u>Section 13.06</u> or <u>Section 14.01</u> hereof.  Any amounts subject to such escrow arrangement remaining after payment in full of all such indemnification obligations shall be returned to the Lenders or the Borrower, as applicable.

13.05.  <u>Reliance</u>.

The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, e-mail, facsimile, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

13.06.  <u>Indemnification</u>.

To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature (including, without limitation, any customary indemnifications provided to a deposit account bank pursuant to a "control agreement" referred to in the Security Agreement) which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 150 of 300

13.07.  <u>The Administrative Agent in its Individual Capacity</u>.

The Person serving as the Administrative Agent hereunder shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein as Administrative Agent; and the terms "**Lender**," "**Required Lenders**," "**Majority Lenders**," "**holders of Notes**" or any similar terms shall, unless the context clearly indicates otherwise, include the Person serving as Administrative Agent hereunder in its respective individual capacities.  Such Person and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement which may or may not be publicly disclose and otherwise without having to account for the same to the Lenders.

13.08.  <u>Holders</u>.

The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof if such payee has been recorded on the Register unless and until a written notice of the assignment or  transfer thereof, as the case may be, shall have been filed with the Administrative Agent and such assignment or transfer shall have been recorded on the Register.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee or assignee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

13.09.  <u>Resignation by the Administrative Agent</u>.

(a)    The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 3 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under <u>Section 12.05</u> then exists, the Borrower.  Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as the Collateral Agent in which case the resigning Administrative Agent shall not be required to discharge any duties of the "Collateral Agent" under the Security Documents.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall, subject to the immediately following sentence, appoint a successor Administrative Agent hereunder or thereunder who shall be (x) a Lender or an Affiliate of a Lender or (y) a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (<u>provided</u> that the Borrower's approval shall not be required if an Event of Default then exists).  Each of the Lenders and the Borrower agree that TPG Specialty Lending, Inc. shall be have a right of first refusal to assume (but shall not be

125

required to assume) the role of Administrative Agent upon any resignation by the Administrative Agent (other than any resignation pursuant to clause (e) hereof), and if TPG Specialty Lending, Inc. accepts such appointment, it shall become the successor Administrative Agent with no further Lender or Borrower consent or action required.

(c)      If no successor Administrative Agent has been appointed pursuant to clause (b) above by the 3rd Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)      Upon a resignation of the Administrative Agent pursuant to this Section 13.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 13 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

(e)      Loan Admin may, by giving three (3) days' written notice to the Borrower, designate any Affiliate of Loan Admin to act as Administrative Agent hereunder, in which case Loan Admin shall be deemed to have resigned as Administrative Agent pursuant to preceding clause (a) and such designee shall be deemed to have been appointed as a successor Administrative Agent pursuant to preceding clause (b).

13.10.   Collateral Matters.

(a)      Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents and the Hedge Intercreditor Agreement for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(b)      The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than Holdings and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 11.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders

hereunder, to the extent required by Section 14.12) or (iv) as otherwise may be expressly provided in the relevant Security Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 13.10.

(c)      The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 13.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.11.   Delivery of Information.

The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Majority Lenders, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

13.12.   Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by the Administrative Agent (including, without limitation, any of its Affiliates).  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective officers, directors, employees, representatives, agents, sub-agents or advisors thereof.  The Administrative Agent shall not be responsible for the negligence or misconduct of any respective sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

13.13. <u>No Reliance on the Administrative Agent's Customer Identification Program: Certifications From Banks and Participants: Patriot Act.</u>

(a)    Each Lenders acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participants or assignee customer identification program, or other requirements imposed by the Patriot Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("**CIP Regulations**"), or any other Laws relating to the prevention of money laundering or the equivalent on any applicable jurisdiction, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby (1) any identity verification procedures, (2) any recordkeeping (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations; or other regulations issued under the Patriot Act, Each Lender, Affiliate, participant or assignee subject to Section 326 of the Patriot Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations or any equivalent provisions in any applicable jurisdiction.

(b)    Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification or if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the Patriot Act and the applicable regulations: (1) within ten days after the Closing Date, and (2) as such other times as are required under the Patriot Act.

(c)    The Patriot Act requires all financial institutions to obtain verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, the Administrative Agent or Lender may from time to time request, and each Credit Party shall provide to such agents or Lender, the Borrower's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the Patriot Act and any other Sanctions.

SECTION 14. <u>Miscellaneous.</u>

14.01. <u>Payment of Expenses, etc.</u>

(a)    The Borrower hereby agrees to: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, the reasonable fees and disbursements of DLA Piper LLP (US) and the Administrative Agent's other counsel and consultants) and each Lender (including, without limitation, the reasonable fees and disbursements of such Lender's counsel and consultants), in each case in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and

128

instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Administrative Agent and its Affiliates in connection with its or their syndication efforts with respect to this Agreement and, after the occurrence and during the continuation of an Event of Default, each of the Administrative Agent and Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel and consultants for the Administrative Agent and, after the occurrence and during the continuation of an Event of Default, counsel for the Lenders); (ii) pay and hold the Administrative Agent and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save the Administrative Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent or such Lender) to pay such taxes; and (iii) indemnify the Administrative Agent and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors (each, an "**Indemnified Person**") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any investigation, litigation or other proceeding (whether or not the Administrative Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by Holdings or any of its Subsidiaries at any location, whether or not owned, leased or operated by Holdings or any of its Subsidiaries, the non-compliance by Holdings or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against Holdings, any of its Subsidiaries or any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PERSON** (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Indemnified Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent or any Lender set forth in the preceding sentence may be unenforceable

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 155 of 300

because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(b)     To the fullest extent permitted by applicable law, neither any Holding Company nor the Borrower shall assert, and each hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

14.02.  Right of Setoff.

In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by applicable law, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender or any Affiliate, branch or agency thereof (including, without limitation, by branches and agencies of the Administrative Agent or such Lender or Affiliate wherever located) to or for the credit or the account of Holdings or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to Section 14.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

14.03.  Notices.

Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including e-mail for facsimile communications) and mailed, or delivered by electronic mail or facsimile: if to any Credit Party, at the address specified on Schedule II or in the other relevant Credit Documents; if to any Lender, at its address specified to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at

130

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 156 of 300

such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent. All such notices and communications shall, when mailed (certified return receipt required), delivered by facsimile or electronic mail, or sent by overnight courier, be effective when deposited in the mails, delivered to overnight courier, as the case may be, or sent by facsimile or electronic mail (with electronic confirmation of receipt), except that notices and communications to the Administrative Agent and any Credit Party shall not be effective until received by the Administrative Agent or the Borrower or any Credit Party, as the case may be.

14.04.  Benefit of Agreement; Assignments; Participations.

(a)     This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, no Credit Party may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders and, provided further, that, no Lender may transfer or assign its rights hereunder, except as provided in Sections 2.12 and 14.04(b), (c) and (d).

(b)     Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to (i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(A)), (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company, or (C) to any bank or financial institution that has provided financing to such Lender, or (ii) in the case of any Lender that is a fund or other entity that invests in loans, any other fund or other entity that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments with respect to the relevant Tranche have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans after giving effect to such assignment, (ii) in connection with any such assignment pursuant to clause (y) above, the consent of the Administrative Agent and, so long as no Default or Event of Default then exists, the Borrower, shall be required (such consent, in any case, not to be unreasonably withheld, delayed or conditioned), provided that the Borrower shall be deemed to have consented to any such

assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof, (iii) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $5,000 (which may be waived by the Administrative Agent in its sole discretion) and (iv) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 14.15.  To the extent of any assignment pursuant to this Section 14.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  At the time of each assignment pursuant to this Section 14.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Section 6.04(b)(ii) Certificate) described in Section 6.04(b).  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to Section 2.14 or this Section 14.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or 6.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).  Notwithstanding anything to the contrary in this Agreement, no Lender may assign any or all of its Loans or Commitments after the Closing Date to any holder of Equity Interests in Holdings without the consent of the Administrative Agent in its sole discretion, regardless of whether such proposed assignee is already a Lender hereunder.

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or any other bank or financial institution in support of borrowings made by such Lender from such Federal Reserve Bank, bank or financial institution and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)     Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with Section 14.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 6.04, 12.06, 13.06, 14.01 and 14.06), which shall survive as to such assigning Lender.

(e)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or any Credit Party or any Credit Party's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 158 of 300

shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Credit Parties, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and, <u>provided further</u>, that no Lender shall transfer or grant any participation under which the Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 14.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (z) release, compromise or subordinate all or substantially all of the value of the Guaranties or all or substantially all of the Collateral (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.  The Credit Parties agree that each Participant shall be entitled to the benefits of Sections 2.10 and 6.04 (subject to the requirements and limitations therein (it being understood that the documentation required under Sections 6.04(b) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 14.04; provided that such Participant (A) agrees to be subject to the provisions of Sections 2.12 and 2.13 as if it were an assignee under Section 14.04; and (B) shall not be entitled to receive any greater payment under Sections 2.10 or 6.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 159 of 300

Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

14.05. <u>No Waiver; Remedies Cumulative</u>.

No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing among the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

14.06. <u>Payments Pro Rata</u>.

(a)     Except as otherwise expressly provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than (i) if Lender that has expressly consented in writing to waive its <u>pro rata</u> share of any such payment, in which case such amounts shall be reallocated on a <u>pro rata</u> basis among the other Lenders or (ii) if all Lenders shall have expressly consented in writing to waive their <u>pro rata</u> share of such payment, such payment shall be returned to the Borrower) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) by or on behalf of a Credit Party, which is applicable to the payment of the principal of, or interest on, the Loans, or Commitment Commission of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

14.07. <u>Calculations; Computations</u>.

(a)    The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by Holdings to the Lenders); <u>provided</u> that, (i) except as otherwise specifically provided herein, all computations of Excess Cash Flow and all computations and all definitions (including accounting terms) used in determining compliance with <u>Sections 10.17, 11.08</u> and <u>11.09</u> shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of Holdings referred to in <u>Section 9.05(a)</u> for the fiscal year ended December 31, 2017, (ii) notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained herein or in any other Credit Document shall be calculated, in each case, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitted a Person to value its financial liabilities at the fair value thereof, (iii) any lease that was treated as an operating lease under GAAP at the time it was entered into that later becomes a capital lease as a result of a change in GAAP during the life of such lease, including any renewals, shall be treated as an operating lease for all purposes under this Agreement, and any lease that was treated as a capital lease under GAAP at the time it was entered into that later becomes an operating lease as a result of a change in GAAP during the life of such lease, including any renewals, shall be treated as a capital lease for all purposes under this Agreement, and (iv) to the extent expressly provided herein, certain calculations shall be made on a <u>Pro Forma Basis</u>.  In the event of any change in GAAP (any such change, for the purpose of this <u>Section 14.07</u>, an "**Accounting Change**") that occurs after the date of this Agreement, then the Credit Parties and the Administrative Agent, on behalf of the Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect any such Accounting Change with the desired result that the criteria for evaluating the financial condition of Holdings and its Subsidiaries shall be the same after such Accounting Change as if such Accounting Change had not been made, and until such time as such an amendment shall have been executed and delivered by the Credit Parties and Required Lenders, (A) all financial covenants, standards and terms in this Agreement shall be calculated and/or construed as if such Accounting Change had not been made, and (B) Holdings shall prepare footnotes to each certificate and the financial statements required to be delivered pursuant to <u>Sections 10.01(a)</u>, <u>(b)</u>, <u>(c)</u>, and <u>(f)</u> that show the differences between the financial statements delivered (which reflect such Accounting Change) and the basis for calculating financial covenant compliance (without reflecting such Accounting Change).

(b)    All computations of interest, Commitment Commission and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day and the last day) occurring in the period for which such interest, Commitment Commission or Fees are payable, except that interest computed by reference to Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 161 of 300

14.08. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL</u>.

(a)      THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE OR ANY SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK (OR (X) IN THE CASE OF ANY SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT IN THE STATE OR OTHER JURISDICTION IN WHICH THE RESPECTIVE COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS), AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE HOLDING COMPANIES OR THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORE-MENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE HOLDING COMPANIES OR THE BORROWER.  EACH OF THE HOLDING COMPANIES AND THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE HOLDING COMPANIES OR THE BORROWER AT ITS ADDRESS SET FORTH ON <u>SCHEDULE II</u>, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.      NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 162 of 300

LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE HOLDING COMPANIES OR THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14.09.   Counterparts.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof.

14.10.   Effectiveness.

This Agreement shall become effective on the date (the "**Closing Date**") on which each Holding Company, the Borrower, the Administrative Agent, each Lead Arranger and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it.  The Administrative Agent will give each Holding Company, the Borrower and each Lender prompt written notice of the occurrence of the Closing Date.

14.11.   Headings Descriptive.

The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 163 of 300

14.12.  <u>Amendment or Waiver; etc.</u>

(a)     Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be amended, modified, changed, waived, discharged or terminated unless such amended, modification, change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the written consent of each Lender (with Obligations being directly affected in the case of following clause (i)), (i) extend the final scheduled maturity of any Loan or Note, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to <u>Section 14.07(a)</u> shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents as of the Closing Date) under all the Security Documents, (iii) amend, modify or waive any provision of this <u>Section 14.12(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans and the Commitments on the Closing Date), (iv) reduce the "majority" voting threshold specified in the definitions of Majority Lenders or Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date) or change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder, (v) consent to the assignment or transfer by any Credit Party of, or the release of any Credit Party from, any of its rights and obligations under this Agreement, or (vi) change or have the effect of changing the priority or pro rata treatment of, or subordinating, any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise); <u>provided further</u>, that no such amendment, modification, change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of the Administrative Agent, amend, modify or waive any provision of <u>Section 12</u> or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent, (3) without the written consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (4) reduce the

EAST\159464702.32

amount of, or extend the date of, any Scheduled Repayment or any other scheduled payment hereunder to any Lender without the consent of such affected Lender, other than as otherwise expressly provided herein as of the Closing Date or (5) amend Section 14.06(a) hereof to provide that payments received and distributed by the Administrative Agent to the Lenders shall be made on a basis other than pro rata, without the consent of each Lender adversely affected by such amendment.

(b)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 14.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described below, to replace each such non-consenting Lender or Lenders with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination; provided that, the Borrower shall not have the right to replace a Lender solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 14.12(a).

(c)     Notwithstanding the foregoing, (x) this Agreement may be amended by an agreement in writing entered into by each Holding Company, the Borrower, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 14.04) in full of this principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(d)     Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency, without any further action by any other party.

14.13.   Survival.

All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 6.04, 13.06 and 14.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

14.14.  <u>Domicile of Loans</u>.

Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this <u>Section 14.14</u> would, at the time of such transfer, result in increased costs under <u>Section 2.10</u>, <u>2.11</u> or <u>6.04</u> from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes occurring after the date of the respective transfer).

14.15.  <u>Register</u>.

The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this <u>Section 14.15</u>, to maintain a register (the "**Register**") at one of its offices in the United States on which it will record the Commitments from time to time of each of the Lenders, the Loans made by (and stated interest owing to) each of the Lenders and each repayment in respect of the principal (and stated interest) amount of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to <u>Section 14.04(b)</u>. Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this <u>Section 14.15</u>, except to the extent such losses, claims, damages or liabilities results from the Administrative Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

14.16.  <u>Confidentiality</u>.

(a)      Subject to the provisions of clause (b) of this <u>Section 14.16</u>, each Lender agrees that it will not disclose without the prior consent of Holdings (other than to its directors, officers,

140

employees, auditors, agents, trustees, advisors or counsel to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 14.16 to the same extent as such Lender) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 14.16(a) by the respective Lender, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 14.16, (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 14.16, (viii) to (A) any bank or financial institution and (B) S&P, Moody's, Fitch Ratings Inc. and/or other ratings agencies, as such Lender deems necessary or appropriate in connection with such Lender's obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information, (ix) to its investors or potential investors as such Lender reasonably deems necessary or appropriate; provided, however, that such investors or potential investors shall be informed of the confidentiality of such information; or (x) to the NAIC or the SVO or, in each case, any similar organization that requires access to information about such Lender's investment portfolio.

(b)    Each of the Holding Companies and the Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), provided such Persons shall be subject to the provisions of this Section 14.16 to the same extent as such Lender.

(c)    Notwithstanding anything to the contrary contained in this Section 14.16, each of the Holding Companies and the Borrower hereby agrees that the Administrative Agent and its Affiliates may publicize its services in connection with this Agreement and the other Credit Documents and the transactions contemplated herein and therein, including, without limitation, through granting interviews with and providing information to the financial press and other media and by publicizing such services on its web-site or other electronic medium; provided, however, that the Administrative Agent and its Affiliates shall not publicize as contemplated above in this clause (c) until the earlier to occur of (i) the fifth day following the Closing Date and (ii) such date as Holdings or its Affiliates shall have publicly announced the consummation of the Transaction.  In addition, the Holding Companies and the Borrower hereby authorize the

EAST\159464702.32

Administrative Agent to place a customary "tombstone" advertisement regarding this Agreement and the transactions contemplated herein related hereto in publications of its choice at the Borrower's expense and with the Borrower's approval (not to be unreasonably withheld or delayed) of the form and content of such advertisement.

14.17.  <u>Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Pledges over Assets Not Located in the United States</u>.

The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all promissory notes executed by, and capital stock and other Equity Interests in, various Persons owned by the respective Credit Party be pledged, and delivered for pledge, pursuant to the Security Documents.  The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized or where the respective assets are located to create and perfect all security interests granted pursuant to the various Security Documents in accordance with such Security Documents and to take all actions under the laws of the applicable jurisdiction (including the United States and any State) thereof to perfect the security interests in the assets, capital stock and other Equity Interests of, and promissory notes issued by, any Person organized under the laws of said jurisdictions (in each case, to the extent said capital stock, other Equity Interests or promissory notes are owned by any Credit Party).  Except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of assets or promissory notes issued by, or capital stock or other Equity Interests in, any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, it is acknowledged that, as of the Closing Date, no actions have been required to be taken to perfect, under local law of the jurisdiction where the respective assets are located or of the Person who issued the respective promissory notes or whose capital stock or other Equity Interests are pledged, under Security Documents in accordance with the Security Documents.  The Borrower hereby agrees that, following any request by the Administrative Agent or the Required Lenders to do so, the Borrower will, and will cause its Subsidiaries to, take such actions under the local law of any jurisdiction with respect to which such actions have not already been taken as are determined by the Administrative Agent or the Required Lenders to be necessary or desirable in order to fully perfect and preserve the security interests granted pursuant to the various Security Documents under the laws of such jurisdictions.  If requested to do so pursuant to this <u>Section 14.17</u>, all such actions shall be taken in accordance with the provisions of this <u>Section 14.17</u> and <u>Section 10.12</u> and within the time periods set forth therein. All conditions and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing and so that same are not violated by reason of the failure to take actions under local law (but only with respect to capital stock of, other Equity Interests in, and promissory notes issued by, Persons organized under laws of jurisdictions other than the United States and any State thereof or assets located in jurisdictions other than the United States and any State thereof) not required to be taken in accordance with the provisions of this <u>Section 14.17</u>, provided that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation of warranties shall be required to be true and correct in all material

142

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 168 of 300

respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of Section 10.12 and this Section 14.17.

14.18.  Patriot Act.

Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") hereby notifies the Holding Companies and the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Holding Companies, the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Holding Companies, the Borrower and the other Credit Parties in accordance with the Patriot Act.

14.19.  Post-Closing Actions.

The Credit Parties hereby agree to deliver or take the actions described on Schedule XII hereto, within the applicable time periods set forth therein (which periods may be extended by the Administrative Agent in its sole discretion), in form and substance reasonably acceptable to the Administrative Agent.   All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), provided that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 14.19 and (y) all representations and warranties relating to the Security Documents shall be required to be true immediately after the actions required to be taken by this Section 14.19 have been taken (or were required to be taken).   The acceptance of the benefits of each Credit Event shall constitute a representation, warranty and covenant by the Borrower to each of the Lenders that the actions required pursuant to this Section 14.19 will be, or have been, taken within the relevant time periods referred to in this Section 14.19 and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct without any modification pursuant to this Section 14.19, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

14.20.  Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**").   If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.   In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal

143

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 169 of 300

as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

14.21.  Entire Agreement.

THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

14.22.  Acknowledgement and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution and (b) the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability: (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document: or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

14.23.  Hedge Intercreditor Agreement.

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, in the event of any conflict between the terms of any Credit Document and the terms of the Hedge Intercreditor Agreement, the terms of the Hedge Intercreditor Agreement will govern and control in all respects.

SECTION 15. Holding Companies Guaranty.

15.01.  Guaranty.

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Interest Rate Protection Agreements, and in recognition of the direct benefits to be received by each Holding Company from the proceeds of the Loans and the entering into of such Interest Rate Protection Agreements, each Holding Company hereby agrees with the Guaranteed Creditors as follows (the "**Holdings Guaranty**"): each Holding Company hereby, jointly and severally with each other Holding Company, unconditionally and irrevocably guarantees as primary obligor and

not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors.  If any or all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors becomes due and payable hereunder, each Holding Company, unconditionally and irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations.  If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event each Holding Company agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Holding Company, notwithstanding any revocation of this Holdings Guaranty or other instrument evidencing any liability of the Borrower, and such Holding Company shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

15.02.  Bankruptcy.

Additionally, each Holding Company jointly and severally, unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Section 12.05, and jointly and severally, irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, in lawful money of the United States.

15.03.  Nature of Liability.

The liability of each Holding Company hereunder is primary, absolute, joint and several, and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of each Holding Company hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Holding Company waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Guaranteed Creditors as contemplated in Section 15.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

15.04. <u>Independent Obligation</u>.

The obligations of each Holding Company hereunder are independent of the obligations of any other guarantor, any other party or the Borrower, and a separate action or actions may be brought and prosecuted against each Holding Company whether or not action is brought against any other guarantor, any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower be joined in any such action or actions.  Each Holding Company waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each Holding Company.

15.05. <u>Authorization</u>.

Each Holding Company authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against the Borrower, any other Credit Party or others or otherwise act or refrain from acting;

(d)    release or substitute any one or more endorsers, guarantors, the Borrower, other Credit Parties or other obligors;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors other than the Guaranteed Creditors;

(f)    apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Guaranteed Creditors regardless of what liability or liabilities of the Borrower remain unpaid;

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 172 of 300

(g)      consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any of such other instruments or agreements; and/or

(h)      take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Holding Company from its liabilities under this Holdings Guaranty.

15.06.  <u>Reliance</u>.

It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of any Holding Company or any of its Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

15.07.  <u>Subordination</u>.

Any indebtedness of the Borrower now or hereafter owing to any Holding Company is hereby subordinated to the Guaranteed Obligations owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of the Borrower to any Holding Company shall be collected, enforced and received by such Holding Company for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of such Holding Company under the other provisions of this Holdings Guaranty.  Prior to the transfer by any Holding Company of any note or negotiable instrument evidencing any such indebtedness of the Borrower to such Holding Company, such Holding Company shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each Holding Company hereby agrees with the Guaranteed Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash.

15.08.  <u>Waiver</u>.

(a)      Each Holding Company waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever.  Each Holding Company waives any defense based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than defense of payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of the Borrower, any Holding Company, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed

Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment of the Guaranteed Obligations to the extent of such payment. The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of any Holding Company hereunder except to the extent the Guaranteed Obligations have been paid.  Each Holding Company waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Holding Company against the Borrower or any other party or any security.

(b)     Each Holding Company waives all presentments, demands for performance, protests and notices, including without limitation notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations.  Each Holding Company assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Holding Company assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise such Holding Company of information known to them regarding such circumstances or risks.

(c)     Until such time as the Guaranteed Obligations have been paid in full in cash, each Holding Company hereby waives all rights of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against the Borrower or any other guarantor of the Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from the Borrower or any other guarantor which it may at any time otherwise have as a result of this Holdings Guaranty.

(d)     Each Holding Company warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

15.09.  Payments.

All payments made by each Holding Company pursuant to this Section 15 shall be made in Dollars and will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 6.03 and 6.04.

15.10.  <u>Maximum Liability</u>.

It is the desire and intent of each Holding Company and the Guaranteed Creditors that this Holdings Guaranty shall be enforced against each Holding Company to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If, however, and to the extent that, the obligations of any Holding Company under this Holdings Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of such Holding Company's obligations under this Holdings Guaranty shall be deemed to be reduced and such Holding Company shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

*        *        *

EAST\159464702.32

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

MD AMERICA ENERGY, LLC, as the Borrower

By: _____
    Name: Eric Waller
    Title:  Chief Executive Officer

[*Signature Page to Credit Agreement (MD America Energy)*]

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 176 of 300

MD AMERICA ENERGY HOLDINGS, INC.,
as Holdings and a Holding Company

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary


MD AMERICA INTERMEDIATE
HOLDINGS, LLC, as a Holding Company

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary


MD AMERICA HOLDINGS, LLC, as a
Holding Company

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary


*[Signature Page to Credit Agreement (MD America Energy)]*

LOAN ADMIN CO LLC
as Administrative Agent

By:_____
Name: Sean Chao
Title:  Authorized Signatory

LOAN ADMIN CO LLC
as Lead Arranger

By:_____
Name: Sean Chao
Title:  Authorized Signatory

GUGGENHEIM SECURITIES, LLC
as Lead Arranger

By: _____

Name: John Pantaleon

Title: Senior Managing Director

MC CREDIT FUND I LP
as Lender

By: _____

Name: Ashok Nayyar
Title:  Authorized Signatory

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM
INDEX NO. 652519/2020
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 06/16/2020

MC CREDIT FUND II LP
as Lender

By: _____
  Name: Ashok Nayyar
  Title:  Authorized Signatory

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 181 of 300

MC CREDIT FUND III (LOAN FUNDING) LP
as Lender

By:_____

Name: Ashok Nayyar
Title:   Authorized Signatory

TPG SPECIALTY LENDING, INC.
as Lender

By: _____
Name: Joshua Easterly
Title: Chief Executive Officer

[*Signature Page to Credit Agreement (MD America Energy)*]

TAO TALENTS, LLC
as Lender

By: _____
Name: Joshua Peck
Title: Vice President

ARENA LIMITED SPV, LLC
as Lender

By: _____

Name: Lawrence Cutler
Title:   Authorized Signatory

*[Signature Page to Credit Agreement (MD America Energy)]*

PRUDENTIAL LEGACY INSURANCE
COMPANY OF NEW JERSEY
   as Lender

By: PGIM, Inc., as investment manager

By: _____
   Name:  Brian Lemons
   Title:  Vice President

*[Signature Page to Credit Agreement (MD America Energy)]*

THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA
   as Lender

By:_____

   Name: Brian Lemons
   Title:  Vice President

*[Signature Page to Credit Agreement (MD America Energy)]*

# EXHIBIT B

EXECUTION VERSION

PLEDGE AGREEMENT

among

MD AMERICA ENERGY HOLDINGS, INC.

MD AMERICA INTERMEDIATE HOLDINGS, LLC

MD AMERICA HOLDINGS, LLC,

MD AMERICA ENERGY, LLC,

MD AMERICA PIPELINE, LLC,

MD AMERICA FINANCE CORPORATION

and

SUCH OTHER PLEDGORS PARTY HERETO,

as the PLEDGORS,

and

LOAN ADMIN CO LLC,

as PLEDGEE

Dated as of November 14, 2018

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 189 of 300

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | SECURITY FOR SECURED OBLIGATIONS | 3 |
| 2. | DEFINITIONS | 4 |
| 3. | PLEDGE OF SECURITIES, ETC | 7 |
| 4. | APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC | 13 |
| 5. | VOTING, ETC | 13 |
| 6. | DIVIDENDS AND OTHER DISTRIBUTIONS | 14 |
| 7. | REMEDIES IN CASE OF AN EVENT OF DEFAULT | 14 |
| 8. | REMEDIES, CUMULATIVE, ETC | 16 |
| 10. | APPLICATION OF PROCEEDS | 17 |
| 11. | PURCHASERS OF COLLATERAL | 17 |
| 12. | INDEMNITY; WAIVER OF CLAIMS | 17 |
| 13. | PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER | 18 |
| 14. | FURTHER ASSURANCES; POWER-OF-ATTORNEY | 19 |
| 15. | THE PLEDGEE AS COLLATERAL AGENT | 20 |
| 16. | TRANSFER BY THE PLEDGORS | 20 |
| 17. | REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS | 20 |
| 18. | PLEDGORS' OBLIGATIONS ABSOLUTE, ETC | 23 |
| 19. | REGISTRATION, ETC | 23 |
| 20. | TERMINATION; RELEASE. | 25 |
| 21. | NOTICES, ETC | 26 |
| 22. | WAIVER; AMENDMENT; OBLIGATIONS ABSOLUTE | 26 |
| 23. | SUCCESSORS AND ASSIGNS | 27 |
| 24. | HEADINGS DESCRIPTIVE | 27 |
| 25. | GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL | 27 |
| 26. | PLEDGOR'S DUTIES | 27 |
| 27. | COUNTERPARTS | 27 |
| 28. | SEVERABILITY | 27 |
| 30. | ADDITIONAL PLEDGORS | 28 |
| 31. | LIMITED OBLIGATIONS | 28 |

i

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 190 of 300

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

32.      RELEASE OF PLEDGORS ............................................................................. 28

ii

ANNEX A        -        SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION, LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS

ANNEX B        -        SCHEDULE OF SUBSIDIARIES

ANNEX C-1  -        SCHEDULE OF STOCK

ANNEX C-2  -        SCHEDULE OF CERTIFICATED SECURITIES

ANNEX D        -        SCHEDULE OF NOTES

ANNEX E        -        SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

ANNEX F        -        SCHEDULE OF PARTNERSHIP INTERESTS

ANNEX G        -        SCHEDULE OF CHIEF EXECUTIVE OFFICES

ANNEX H        -        FORM OF AGREEMENT REGARDING UNCERTIFICATED SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND PARTNERSHIP INTERESTS

EAST\160339437.6

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 192 of 300

## PLEDGE AGREEMENT

PLEDGE AGREEMENT (as amended, modified or supplemented from time to time, this "**Agreement**"), dated as of November 14 2018, among each of the undersigned pledgors (each, a "**Pledgor**" and, together with any other entity that becomes a pledgor hereunder pursuant to Section 30 hereof, the "**Pledgors**") and Loan Admin Co LLC, as collateral agent (the "**Collateral Agent**" and, together with any successor collateral agent, the "**Pledgee**"), for the benefit of the Secured Creditors (as defined below). Except as otherwise defined herein, all capitalized terms used herein and defined in the Credit Agreement (as defined below) shall be used herein as therein defined.

W I T N E S S E T H :

WHEREAS, MD America Energy Holdings, Inc., a Delaware corporation ("**Holdings**"), MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC., a Delaware limited liability company, MD America Energy, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors from time to time party thereto, the lenders from time to time party thereto (the "**Lenders**"), Loan Admin Co LLC, as administrative agent (together with any successor administrative agent, the "**Administrative Agent**") and Lead Arranger and Guggenheim Securities, LLC as Lead Arranger, have entered into a Credit Agreement, dated as of the date hereof (as amended, modified, restated and/or supplemented from time to time, the "**Credit Agreement**"), providing for the making of Loans to the Borrower, as contemplated therein;

WHEREAS, it is a condition precedent to the making of Loans to the Borrower under the Credit Agreement that each Pledgor shall have executed and delivered to the Pledgee this Agreement;

WHEREAS, pursuant to the Holdings Guaranty, each Holding Company has jointly and severally guaranteed the payment and performance when due of all Guaranteed Obligations as described therein;

WHEREAS, pursuant to the Subsidiaries Guaranty, the Subsidiaries party thereto have guaranteed, and the Subsidiaries that become parties thereto shall guarantee, in each case on a joint and several basis, the payment and performance when due of all Guaranteed Obligations as described therein; and

WHEREAS, each Pledgor will obtain benefits from the incurrence of Loans by the Borrower under the Credit Agreement and, if applicable, the entering into by the Borrower and/or one or more of the Subsidiaries of Holdings of Secured Hedge Agreements and, accordingly, desires to enter into this Agreement in order to satisfy the conditions described in the Credit Agreement and to induce the Lenders to make Loans and enter into Secured Hedge Agreements to the Borrower and other Credit Parties;

NOW, THEREFORE, in consideration of the foregoing and other benefits accruing to each Pledgor, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby makes the following representations and warranties to the Pledgee for the benefit of the

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 193 of 300

Secured Creditors and hereby covenants and agrees with the Pledgee for the benefit of the Secured Creditors as follows:

1.    SECURITY FOR SECURED OBLIGATIONS.  This Agreement is made by each Pledgor for the benefit of the Secured Creditors to secure:

(a)    the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, without limitation, principal, premium (including any Prepayment Premium), interest, fees, costs, and indemnities (including in each case, without limitation, all interest, fees and expenses that accrue after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Pledgor or any Subsidiary thereof at the rate provided for in the respective documentation, whether or not a claim for post-petition interest, fee or expense is allowed in any such proceeding)) of all Credit Parties to the Secured Creditors, whether now existing or hereafter incurred under, arising out of, or in connection with, the Credit Agreement and the other Credit Documents (including, without limitation, in the event such Pledgor is a Holding Company or any Subsidiary Guarantor that becomes party hereto, all such obligations, liabilities and indebtedness of such Pledgor under the Holdings Guaranty or the applicable Subsidiaries Guaranty, respectively) and the due performance and compliance by all Credit Parties of and with all of the terms, conditions and agreements contained in the Credit Agreement and in such other Credit Documents (all such obligations, liabilities and indebtedness under this clause (a) except to the extent consisting of obligations, liabilities or indebtedness with respect to Secured Hedge Agreements, being herein collectively called the "**Credit Document Obligations**");

(b)    the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations, liabilities and indebtedness (including, in each case, without limitation, all interest, fees and expenses that accrue after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency, reorganization or similar proceeding of any Credit Party or any of its Subsidiaries at the rate provided for in the respective documentation, whether or not a claim for post-petition interest, fee or expense is allowed in any such proceeding) owing by all Credit Parties to the Secured Creditors, now existing or hereafter incurred under, arising out of or in connection with any Secured Hedge Agreement to which such Credit Party is a party, whether such Secured Hedge Agreement is now in existence or hereinafter arising (including, without limitation, in the case of a Holding Company or a Subsidiary Guarantor that becomes party hereto, all such obligations, liabilities and indebtedness of such Pledgor under the Holdings Guaranty or the applicable Subsidiaries Guaranty, respectively), and the due performance and compliance by such Credit Parties of and with all of the terms, conditions and agreements contained in each such Secured Hedge Agreement (all such obligations, liabilities and indebtedness under this clause (b) being herein collectively called the "**Other Obligations**");

(c)    any and all sums advanced by the Pledgee in order to preserve the Collateral (as hereinafter defined) or preserve its security interest in the Collateral;

(d)     in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of such Pledgor referred to in clauses (i) and (ii) above, after an Event of Default shall have occurred and be continuing, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by the Pledgee of its rights hereunder, together with reasonable attorneys' fees and court costs (in each case to the extent reimbursable pursuant to the Credit Agreement);

(e)     all amounts paid by any Secured Creditor as to which such Secured Creditor has the right to reimbursement under Section 12 of this Agreement; and

(f)     all amounts owing to the Pledgee or any of its affiliates pursuant to any of the Credit Documents;

all such obligations, liabilities, indebtedness, sums and expenses set forth in clauses (a) through (f) of this Section 1 being herein collectively called the "**Secured Obligations**," it being acknowledged and agreed that the "Secured Obligations" shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement; provided that the term "**Secured Obligations**" shall not create any guarantee by any Pledgor of (or grant of security interest by any Pledgor to support) any Excluded Hedge Liabilities of such Pledgor.

2.     DEFINITIONS.

(a)     Reference to singular terms shall include the plural and vice versa.

(b)     The following capitalized terms used herein shall have the definitions specified below:

"**Administrative Agent**" shall have the meaning set forth in the recitals hereto.

"**Adverse Claim**" shall have the meaning given such term in Section 8-102(a)(1) of the UCC.

"**Agreement**" shall have the meaning set forth in the first paragraph hereof.

"**Borrower**" shall have the meaning set forth in the recitals of this Agreement.

"**Certificated Security**" shall have the meaning given such term in Section 8-102(a)(4) of the UCC.

"**CFC**" means a "controlled foreign corporation" as such term is defined in Section 957 of the Code.

"**CFC Holdco**" means a Subsidiary that has no material assets other than (i) the equity or indebtedness of one or more Foreign Subsidiaries that are CFCs and (ii) cash, cash equivalents and incidental assets related thereto held on a temporary basis.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 195 of 300

"**Clearing Corporation**" shall have the meaning given such term in Section 8-102(a)(5) of the UCC.

"**Collateral**" shall have the meaning set forth in Section 3(a) hereof.

"**Collateral Accounts**" shall mean any and all accounts established and maintained by the Pledgee in the name of any Pledgor to which Collateral may be credited.

"**Collateral Agent**" shall have the meaning set forth in the first paragraph of this Agreement.

"**Credit Agreement**" shall have the meaning set forth in the recitals hereto.

"**Credit Document Obligations**" shall have the meaning set forth in Section 1(a) hereof.

"**Domestic Subsidiary**" of any Person shall mean any Subsidiary of such Person incorporated or organized in the United States or any State thereof or the District of Columbia, other than any CFC Holdco.

"**Event of Default**" shall mean any Event of Default (or similar term, including any Termination Event under a Secured Hedge Agreement) under, and as defined in, the Credit Agreement or any Secured Hedge Agreement entered into with a Secured Creditor and shall in any event include, without limitation, any payment default on any of the Secured Obligations after the expiration of any applicable grace period.

"**Excluded Equity Interests**" shall mean (i) any capital stock in excess of 65% of the issued and outstanding voting capital stock of any first-tier Foreign Subsidiary or any first-tier CFC Holdco, (ii) any and all stock of any lower-tier Foreign Subsidiary or any lower-tier CFC Holdco and (iii) any and all stock in any Subsidiary of any Foreign Subsidiary or any CFC Holdco.

"**Financial Asset**" shall have the meaning given such term in Section 8-102(a)(9) of the UCC.

"**Foreign Subsidiary**" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"**Holdings**" shall have the meaning set forth in the recitals hereto.

"**Instrument**" shall have the meaning given such term in Section 9-102(a)(47) of the UCC.

"**Investment Property**" shall have the meaning given such term in Section 9-102(a)(49) of the UCC.

"**Lenders**" shall have the meaning set forth in the recitals hereto.

EAST\160339437.6

"**Limited Liability Company Assets**" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all limited liability company capital and interest in other limited liability companies), at any time owned by any Pledgor or represented by any Limited Liability Company Interest.

"**Limited Liability Company Interests**" shall mean the entire limited liability company membership interest at any time owned by any Pledgor in any limited liability company.

"**Location**" of any Pledgor shall mean such Pledgor's "location" as determined pursuant to Section 9-307 of the UCC.

"**Notes**" shall mean (x) all intercompany notes at any time issued to each Pledgor and (y) all other promissory notes from time to time issued to, or held by, each Pledgor.

"**Other Obligations**" shall have the meaning set forth in Section 1(b) hereof.

"**Partnership Assets**" shall mean all assets, whether tangible or intangible and whether real, personal or mixed (including, without limitation, all partnership capital and interest in other partnerships), at any time owned or represented by any Partnership Interest.

"**Partnership Interest**" shall mean the entire general partnership interest or limited partnership interest at any time owned by any Pledgor in any general partnership or limited partnership.

"**Pledged Notes**" shall have the meaning set forth in Section 3(e) hereof.

"**Pledgee**" shall have the meaning set forth in the first paragraph hereof.

"**Pledgor**" shall have the meaning set forth in the first paragraph hereof.

"**Proceeds**" shall have the meaning given such term in Section 9-102(a)(64) of the UCC and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Pledgee or any Pledgor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Registered Organization**" shall mean a "registered organization" as such term is defined in Section 9-102 (a) (70) of the UCC.

"**Required Secured Creditors**" shall have the meaning provided in the Security Agreement.

"**Secured Creditors**" shall have the meaning provided in the Security Agreement.

"**Secured Debt Agreements**" shall mean and include (i) this Agreement and the other Credit Documents and (ii) the Secured Hedge Agreements (as defined in the Hedge Intercreditor Agreement) entered into with any Secured Creditor.

"**Secured Obligations**" shall have the meaning set forth in Section 1 hereof.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, as in effect from time to time.

"**Securities Intermediary**" shall have the meaning given such term in Section 8-102(14) of the UCC.

"**Security**" and "**Securities**" shall have the meaning given such term in Section 8-102(a)(15) of the UCC and shall in any event also include all Stock and all Notes.

"**Security Entitlement**" shall have the meaning given such term in Section 8-102(a)(17) of the UCC.

"**Stock**" shall mean all of the issued and outstanding shares of capital stock at any time owned by any Pledgor of any corporation.

"**Termination Date**" shall have the meaning set forth in Section 20(a).

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided that all references herein to specific sections or subsections of the UCC are references to such sections or subsections, as the case may be, of the Uniform Commercial Code as in effect in the State of New York on the date hereof.

"**Uncertificated Security**" shall have the meaning given such term in Section 8-102(a)(18) of the UCC.

3.     PLEDGE OF SECURITIES, ETC.

(a)     Pledge.  To secure the Secured Obligations now or hereafter owed or to be performed by such Pledgor, each Pledgor does hereby grant, pledge and assign to the Pledgee for the benefit of the Secured Creditors, and does hereby create a continuing security interest in favor of the Pledgee for the benefit of the Secured Creditors in, all of its right, title and interest in and to the following, whether now existing or hereafter from time to time acquired (collectively, the "**Collateral**"):

(i)     each of the Collateral Accounts, including any and all assets of whatever type or kind deposited by such Pledgor in each such Collateral Account, whether now owned or hereafter acquired, existing or arising, including, without limitation, all Financial Assets, Investment Property, monies, checks, drafts, Instruments, Securities or interests therein of any type or nature deposited or required by the Credit Agreement or any other Secured Debt Agreement to be deposited in each such Collateral Account, and all investments and all certificates and other Instruments (including depository receipts, if any) from time to time

representing or evidencing the same, and all dividends, interest, distributions, cash and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing;

(ii)     all Securities owned or held by such Pledgor from time to time and all options and warrants owned by such Pledgor from time to time to purchase Securities, together with all rights, privileges, authority and powers of such Pledgor relating to such Securities in each such issuer or under any organizational document of each such issuer, and the certificates, instruments and agreements representing such Securities and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Securities;

(iii)    all Limited Liability Company Interests owned by such Pledgor from time to time and all of its right, title and interest in each limited liability company to which each such interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Limited Liability Company Interests and applicable law:

(A)     all the capital thereof and its interest in all profits, income, surpluses, losses, Limited Liability Company Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Limited Liability Company Interests;

(B)     all other payments due or to become due to such Pledgor in respect of Limited Liability Company Interests, whether under any limited liability company agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any limited liability company agreement or operating agreement, or at law or otherwise in respect of such Limited Liability Company Interests;

(D)     all present and future claims, if any, of such Pledgor against any such limited liability company for monies loaned or advanced, for services rendered or otherwise;

(E)     all of such Pledgor's rights under any limited liability company agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Limited Liability Company Interests, including any power to terminate, cancel or modify any such limited liability company agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Limited Liability Company Interests and any such limited liability company, to make determinations, to exercise

any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Limited Liability Company Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)     all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of the foregoing or in exchange for any or all thereof;

(iv)     all Partnership Interests owned by such Pledgor from time to time and all of its right, title and interest in each partnership to which each such interest relates, whether now existing or hereafter acquired, including, without limitation, to the fullest extent permitted under the terms and provisions of the documents and agreements governing such Partnership Interests and applicable law:

(A)     all the capital thereof and its interest in all profits, income, surpluses, losses, Partnership Assets and other distributions to which such Pledgor shall at any time be entitled in respect of such Partnership Interests;

(B)     all other payments due or to become due to such Pledgor in respect of Partnership Interests, whether under any partnership agreement or otherwise, whether as contractual obligations, damages, insurance proceeds or otherwise;

(C)     all of its claims, rights, powers, privileges, authority, options, security interests, liens and remedies, if any, under any partnership agreement or operating agreement, or at law or otherwise in respect of such Partnership Interests;

(D)     all present and future claims, if any, of such Pledgor against any such partnership for monies loaned or advanced, for services rendered or otherwise;

(E)     all of such Pledgor's rights under any partnership agreement or operating agreement or at law to exercise and enforce every right, power, remedy, authority, option and privilege of such Pledgor relating to such Partnership Interests, including any power to terminate, cancel or modify any partnership agreement or operating agreement, to execute any instruments and to take any and all other action on behalf of and in the name of any of such Pledgor in respect of such Partnership

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 200 of 300

Interests and any such partnership, to make determinations, to exercise any election (including, but not limited to, election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce, collect or receipt for any of the foregoing or for any Partnership Asset, to enforce or execute any checks, or other instruments or orders, to file any claims and to take any action in connection with any of the foregoing; and

(F)    all other property hereafter delivered in substitution for or in addition to any of the foregoing, all certificates and instruments representing or evidencing such other property and all cash, securities, interest, dividends, rights and other property at any time and from time to time received, receivable or otherwise distributed in respect of the foregoing or in exchange for any or all thereof;

(v)    all Security Entitlements owned by such Pledgor from time to time in any and all of the foregoing;

(vi)    all Financial Assets and Investment Property owned by such Pledgor from time to time; and

(vii)    all Proceeds of any and all of the foregoing;

provided that in no event shall any "Excluded Property" (as defined in the Security Agreement) or Excluded Equity Interests constitute Collateral hereunder.

(b)    <u>Procedures</u>.

(i)    To the extent that any Pledgor at any time or from time to time owns, acquires or obtains any right, title or interest in any Collateral, such Collateral shall automatically (and without the taking of any action by the respective Pledgor) be pledged pursuant to Section 3(a) of this Agreement and, in addition thereto, the respective Pledgor shall (to the extent provided below) take the following actions as set forth below (as promptly as practicable and, in any event, within 20 Business Days after it obtains such Collateral (or such longer period as agreed to by the Collateral Agent in its sole discretion)) for the benefit of the Pledgee and the other Secured Creditors:

(A)    with respect to a Certificated Security (other than a Certificated Security credited on the books of a Clearing Corporation or Securities Intermediary), the respective Pledgor shall physically deliver such Certificated Security to the Pledgee, endorsed to the Pledgee or endorsed in blank (and on the date hereof, the respective Pledgor shall deliver to the Pledgee the Certificated Securities set forth on <u>Annex C-2</u> hereto, endorsed to the Pledgee or endorsed in blank);

(B)    with respect to an Uncertificated Security (other than an Uncertificated Security credited on the books of a Clearing Corporation or

Securities Intermediary), and at any time when an Event of Default has occurred and is continuing, the respective Pledgor shall cause the issuer of such Uncertificated Security (or, in the case of an issuer that is not a Subsidiary of such Pledgor, will use its reasonable efforts to cause such issuer) to duly authorize and execute, and deliver to the Pledgee, an agreement for the benefit of the Pledgee and the other Secured Creditors substantially in the form of Annex H hereto (appropriately completed to the reasonable satisfaction of the Pledgee and with such modifications, if any, as shall be reasonably satisfactory to the Pledgee) pursuant to which such issuer agrees to comply with any and all instructions originated by the Pledgee without further consent by the registered owner and not to comply with instructions regarding such Uncertificated Security originated by any other Person other than a court of competent jurisdiction;

(C)    with respect to a Certificated Security, Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary (including a Federal Reserve Bank, Participants Trust Company or The Depository Trust Company), the respective Pledgor shall promptly notify the Pledgee thereof and shall promptly take all reasonable actions required (x) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary, and (y) to perfect the security interest of the Pledgee under applicable law (including, in any event, under Sections 9-314(a) and (c), 9-106 and 8-106(d) of the UCC. The Pledgor further agrees to take such actions as the Pledgee deems reasonably necessary or desirable to effect the foregoing;

(D)    with respect to a Partnership Interest or a Limited Liability Company Interest (other than a Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), (x) if such Partnership Interest or Limited Liability Company Interest is represented by a certificate and is a Security for purposes of the UCC, the procedure set forth in Section 3(b)(i)(A) hereof, and (y) if such Partnership Interest or Limited Liability Company Interest is not represented by a certificate or is not a Security for purposes of the UCC, the procedure set forth in Section 3(b)(i)(A) hereof;

(E)    with respect to any Note represented by a physical promissory note or similar physical instrument (other than any Note which does not have a principal amount in excess of $500,000), physical delivery of such Note to the Pledgee, endorsed to the Pledgee or endorsed in blank; provided that if the aggregate principal amount of all such Notes held by the Pledgors exceeds $1,000,000 at any time, the Pledgors shall deliver all such notes to the Pledgee, endorsed to the Pledgee or endorsed in blank; and

EAST\160339437.6

(F)    with respect to cash proceeds from any of the Collateral described in Section 3(a) hereof for which the Pledgee is entitled to retain pursuant to the terms of this Agreement, (i) establishment by the Pledgee of a cash account in the name of such Pledgor over which the Pledgee shall have "control" within the meaning of the UCC and at any time any Default or an Event of Default is in existence no withdrawals or transfers may be made therefrom by any Person except with the prior written consent of the Pledgee and (ii) deposit of such cash in such cash account.

(ii)    In addition to the actions required to be taken pursuant to Section 3(b) hereof, each Pledgor shall take the following additional actions with respect to the Securities and Collateral:

(A)    with respect to all Collateral of such Pledgor whereby or with respect to which the Pledgee may obtain "control" thereof within the meaning of Section 8-106 of the UCC (or under any provision of the UCC as same may be amended or supplemented from time to time, or under the laws of any relevant State other than the State of New York), the respective Pledgor shall take all actions as may be reasonably requested from time to time by the Pledgee so that "control" of such Collateral is obtained and at all times held by the Pledgee; and

(B)    each Pledgor shall from time to time cause appropriate financing statements (on Form UCC-1 or other appropriate form) under the Uniform Commercial Code as in effect in the various relevant States, covering all Collateral hereunder (with the form of such financing statements to be satisfactory to the Pledgee), to be filed in the relevant filing offices so that at all times the Pledgee has a security interest in all Investment Property and other Collateral which is perfected by the filing of such financing statements (in each case to the maximum extent perfection by filing may be obtained under the laws of the relevant States, including, without limitation, Section 9-312(a) of the UCC).

(c)    Subsequently Acquired Collateral.    If any Pledgor shall acquire (by purchase, stock dividend or similar distribution or otherwise) any additional Collateral at any time or from time to time after the date hereof, such Collateral shall automatically (and without any further action being required to be taken) be subject to the pledge and security interests created pursuant to Section 3(a) hereof and, furthermore, the respective Pledgor will thereafter take (or cause to be taken) all action (as promptly as practicable and, in any event, within 15 Business Days (or such longer time period as agreed by the Pledgee in its reasonable discretion) after it obtains such Collateral) with respect to such Collateral in accordance with the procedures set forth in Section 3(b) hereof, and will promptly thereafter deliver to the Pledgee (i) written notice describing such Collateral and stating that the same has been duly pledged in favor of the Pledgee (for the benefit of the Secured Creditors) hereunder, and (ii) such supplements to Annexes A through G hereto as are reasonably necessary to cause such annexes to be complete and accurate at

such time. Without limiting the foregoing, no Pledgor shall be required to pledge any Excluded Equity Interests or Excluded Property.

(d)     Transfer Taxes.     Each pledge of Collateral under Section 3(a) or Section 3(c) hereof shall be accompanied by any transfer tax stamps required, or such other documentation as will establish that any applicable tax has been paid, in connection with the pledge of such Collateral.

(e)     Definition of Pledged Notes.  All Notes at any time pledged or required to be pledged hereunder are hereinafter called the "**Pledged Notes**."

(f)     Certain Representations and Warranties Regarding the Collateral.  Each Pledgor represents and warrants that on the date hereof:  (i) the exact legal name of such Pledgor, the type of organization of such Pledgor, whether or not such Pledgor is a Registered Organization, the jurisdiction of organization of such Pledgor, such Pledgor's Location, the organizational identification number (if any) of such Pledgor, is listed on Annex A hereto; (ii) each Subsidiary of such Pledgor, and the direct ownership thereof, is listed in Annex B hereto; (iii) the Stock (and any warrants or options to purchase Stock) held by such Pledgor consists of the number and type of shares of the stock (or warrants or options to purchase any stock) of the corporations as described in Annex C-1 hereto; (iv) such Stock constitutes that percentage of the issued and outstanding capital stock of the issuing corporation as is set forth in Annex C-1 hereto; (v) the Notes held by such Pledgor consist of the promissory notes described in Annex D hereto where such Pledgor is listed as the lender; (vi) the Limited Liability Company Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex E hereto; (vii) each such Limited Liability Company Interest constitutes that percentage of the issued and outstanding equity interest of the issuing Person as set forth in Annex E hereto; (viii) the Partnership Interests held by such Pledgor consist of the number and type of interests of the Persons described in Annex F hereto; (ix) each such Partnership Interest constitutes that percentage or portion of the entire partnership interest of the Partnership as set forth in Annex F hereto; (x) the address of the chief executive office of such Pledgor is listed on Annex G hereto; (xi) the Pledgor has complied with the respective procedure set forth in Section 3(b)(i) hereof with respect to each item of Collateral described in Annexes B through F hereto; and (xii) on the date hereof, such Pledgor owns no Securities, Stock, Notes, Limited Liability Company Interests or Partnership Interests other than as set forth on Annexes B through F hereto.

4.     APPOINTMENT OF SUB-AGENTS; ENDORSEMENTS, ETC.  The Pledgee shall have the right to appoint one or more sub-agents for the purpose of retaining physical possession of the Collateral, which may be held (in the discretion of the Pledgee) in the name of the relevant Pledgor, endorsed or assigned in blank or in favor of the Pledgee or any nominee or nominees of the Pledgee or a sub-agent appointed by the Pledgee; provided, that no such appointment of a sub-agent shall affect the obligations of the Pledgee under this Agreement.

5.     VOTING, ETC.  Unless and until there shall have occurred and be continuing an Event of Default, each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral owned by it, and to give consents, waivers or

EAST\160339437.6

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 204 of 300

ratifications in respect thereof; provided that, in each case, no vote shall be cast or any consent, waiver or ratification given or any action taken or omitted to be taken which would violate, result in a breach of any covenant contained in, or be inconsistent with any of the terms of any Secured Debt Agreement unless otherwise permitted by the Secured Debt Agreements.  All such rights of each Pledgor to vote and to give consents, waivers and ratifications shall cease at any time after the occurrence and during the continuance of an Event of Default and upon prior or contemporaneous written notice of Pledgee of its intent to exercise its rights under this Agreement to the Pledgor (provided that no such notice shall be required if any Event of Default under Section 12.05 of the Credit Agreement has occurred and is continuing), and Section 7 hereof shall become applicable.

6.  DIVIDENDS AND OTHER DISTRIBUTIONS.  Unless and until there shall have occurred and be continuing an Event of Default, all cash dividends, cash distributions, cash Proceeds and other cash amounts payable in respect of the Collateral shall be paid to the respective Pledgor.  Following the occurrence and during the continuation of an Event of Default, and following written notice (other than with respect to an Event of Default under Section 12.05 of the Credit Agreement) that the Pledgee is exercising remedies hereunder, the Pledgee shall be entitled to receive directly, and to retain as part of the Collateral:

(a)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash dividends other than as set forth below) paid or distributed by way of dividend or otherwise in respect of the Collateral;

(b)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) paid or distributed in respect of the Collateral by way of stock-split, spin-off, split-up, reclassification, combination of shares or similar rearrangement; and

(c)  all other or additional stock, notes, certificates, limited liability company interests, partnership interests, instruments or other securities or property (including, but not limited to, cash) which may be paid in respect of the Collateral by reason of any consolidation, merger, exchange of stock, conveyance of assets, liquidation or similar corporate or other reorganization.

Nothing contained in this Section 6 shall limit or restrict in any way the Pledgee's right to receive the proceeds of the Collateral in any form in accordance with Section 3 of this Agreement.  All dividends, distributions or other payments which are received by any Pledgor contrary to the provisions of this Section 6 or Section 7 hereof shall be received in trust for the benefit of the Pledgee, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to the Pledgee as Collateral in the same form as so received (with any necessary endorsement).

7.  REMEDIES IN CASE OF AN EVENT OF DEFAULT.  If there shall have occurred and be continuing an Event of Default, then and in every such case, the Pledgee shall, subject to the terms of the Hedge Intercreditor Agreement, be entitled to exercise all of the rights, powers and remedies (whether vested in it by this Agreement, any other Secured Debt

EAST\160339437.6

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 205 of 300

Agreement or by law) for the protection and enforcement of its rights in respect of the Collateral, and the Pledgee shall be entitled to exercise all the rights and remedies of a secured party under the UCC as in effect in any relevant jurisdiction and also shall be entitled, without limitation, to exercise the following rights, which each Pledgor hereby agrees to be commercially reasonable:

(a)     to receive all amounts payable in respect of the Collateral otherwise payable under Section 6 hereof to the respective Pledgor;

(b)     to transfer all or any part of the Collateral into the Pledgee's name or the name of its nominee or nominees;

(c)     to accelerate any Pledged Note which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any Pledged Note (including, without limitation, to make any demand for payment thereon);

(d)     to appoint by instrument in writing a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and remove or replace from time to time any receiver or agent;

(e)     to institute proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(f)     to vote (and exercise all rights and powers in respect of voting) all or any part of the Collateral (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor hereby irrevocably constituting and appointing the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so);

(g)     at any time and from time to time to sell, assign and deliver, or grant options to purchase, all or any part of the Collateral, or any interest therein, at any public or private sale, without demand of performance, advertisement or notice of intention to sell or of the time or place of sale or adjournment thereof or to redeem or otherwise purchase or dispose of all or any part of the Collateral, or any interest therein (all of which are hereby waived by each Pledgor), for cash, on credit or for other property, for immediate or future delivery without any assumption of credit risk, and for such price or prices and on such terms as the Pledgee in its good faith judgment may determine to be commercially reasonable, provided that at least 10 days' written notice of the time and place of any such sale shall be given to the Borrower for the respective Pledgor. The Pledgee shall not be obligated to make any such sale of Collateral regardless of whether any such notice of sale has theretofore been given. Each Pledgor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security or the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Pledgee on behalf of the Secured Creditors may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Pledgee nor any other Secured

Case 20-34966    Document 136-1    Filed in TXSB on 11/03/20    Page 206 of 300

Creditor shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall any of them be under any obligation to take any action whatsoever with regard thereto; and

(h)     to set-off any and all Collateral against any and all Secured Obligations, and to withdraw any and all cash or other Collateral from any and all Collateral Accounts and to apply such cash and other Collateral to the payment of any and all Secured Obligations.

8.     REMEDIES, CUMULATIVE, ETC.  Each and every right, power and remedy of the Pledgee provided for in this Agreement or in any other Secured Debt Agreement, or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy.  The exercise or beginning of the exercise by the Pledgee or any other Secured Creditor of any one or more of the rights, powers or remedies provided for in this Agreement or any other Secured Debt Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the Pledgee or any other Secured Creditor of all such other rights, powers or remedies, and no failure or delay on the part of the Pledgee or any other Secured Creditor to exercise any such right, power or remedy shall operate as a waiver thereof. No notice to or demand on any Pledgor in any case shall entitle it to any other or further notice or demand in similar or other circumstances or constitute a waiver of any of the rights of the Pledgee or any other Secured Creditor to any other or further action in any circumstances without notice or demand.  The Secured Creditors agree that this Agreement may be enforced only by the action of the Pledgee, in each case, acting upon the instructions of the Required Secured Creditors, and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Pledgee for the benefit of the Secured Creditors upon the terms of this Agreement and the Security Agreement.

9.     RECEIVER'S POWERS.

(a)     Any receiver appointed by the Pledgee pursuant to Section 7 hereof is vested with the rights and remedies which could have been exercised by the Pledgee in respect of any Pledgor or the Collateral and such other powers and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration are within the sole and unfettered discretion of the Pledgee.

(b)     Any receiver appointed by the Pledgee pursuant to Section 7 hereof will act as agent for the Pledgee for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for the Pledgors. The receiver may sell, lease, or otherwise dispose of Collateral in accordance with the terms hereof as agent for the Pledgors or as agent for the Pledgee as the Pledgee may determine in its discretion. Each Pledgor agrees to ratify and confirm all actions of the receiver acting as agent for such Pledgor so long as such actions are taken in accordance with the terms hereof.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 207 of 300

(c)     The Pledgee, in appointing or refraining from appointing any receiver, does not incur liability to the receiver, the Pledgors or otherwise and is not responsible for any misconduct or negligence of such receiver except to the extent resulting from the gross negligence or willful misconduct of the Pledgee (as determined by a court of competent jurisdiction in a final and non-appealable decision) it being agreed that appointing or refraining from appointing any receiver in the reasonable judgment of the Pledgee's or based on the advice of advisors or counsel shall not constitute gross negligence or willful misconduct.

10.     APPLICATION OF PROCEEDS.

(a)     All monies collected by the Pledgee upon any sale or other disposition of the Collateral as a result of the exercise of any remedies by the Pledgee after the occurrence and during the continuance of an Event of Default pursuant to the terms of this Agreement, together with all other monies received by the Pledgee hereunder, shall, subject to the terms of the Hedge Intercreditor Agreement, be applied in the manner provided in Section 7.4 of the Security Agreement.

(b)     It is understood and agreed that the Pledgors shall remain jointly and severally liable with respect to their Secured Obligations to the extent of any deficiency between the (i) amount of the proceeds of the Collateral pledged by them hereunder and the collateral granted under the other Security Documents and (ii) aggregate amount of such Secured Obligations.

(c)     It is understood and agreed by each Pledgor and each Secured Creditor that the Pledgee shall have no liability for any determinations made by it in this Section 10, in each case except to the extent resulting from the gross negligence or willful misconduct of the Pledgee (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Each Pledgor and each Secured Creditor also agrees that the Pledgee may (but shall not be required to), at any time and in its sole discretion, and with no liability resulting therefrom, petition a court of competent jurisdiction regarding any application of Collateral in accordance with the requirements hereof, and the Pledgee shall be entitled to wait for, and may conclusively rely on, any such determination.

11.     PURCHASERS OF COLLATERAL.  Upon any sale of the Collateral by the Pledgee hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), the receipt of the Pledgee or the officer making such sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Pledgee or such officer or be answerable in any way for the misapplication or nonapplication thereof.

12.     INDEMNITY; WAIVER OF CLAIMS.

(a)     Indemnification.  Each Pledgor jointly and severally agrees to be bound by the provisions of Section 14.01 of the Credit Agreement with the same force and effect, and to the same extent, as if each reference therein to the Borrower were a reference to

EAST\160339437.6

such Pledgor. Any amounts paid by any indemnified person as to which such indemnified person has the right to reimbursement shall constitute Secured Obligations secured by the Collateral.

(b)     Waiver of Claims. Except as otherwise provided in this Agreement, EACH PLEDGOR HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE PLEDGEE'S TAKING POSSESSION OR THE PLEDGEE'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES, and each Pledgor hereby further waives, to the extent permitted by law:

(i)     all damages occasioned by such taking of possession or any such disposition except any damages which are the direct result of the Pledgee's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision);

(ii)     all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Pledgee's rights hereunder; and

(iii)     all rights of redemption, appraisement, valuation, stay, extension or moratorium now or hereafter in force under any applicable law in order to prevent or delay the enforcement of this Agreement or the absolute sale of the Collateral or any portion thereof, and each Pledgor, for itself and all who may claim under it, insofar as it or they now or hereafter lawfully may, hereby waives the benefit of all such laws.

Any sale of, or the grant of options to purchase, or any other realization upon, any Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the relevant Pledgor therein and thereto, and shall be a perpetual bar both at law and in equity against such Pledgor and against any and all Persons claiming or attempting to claim the Collateral so sold, optioned or realized upon, or any part thereof, from, through and under such Pledgor.

13.     PLEDGEE NOT A PARTNER OR LIMITED LIABILITY COMPANY MEMBER.

(a)     Nothing herein shall be construed to make the Pledgee or any other Secured Creditor liable as a member of any limited liability company or as a partner of any partnership and neither the Pledgee nor any other Secured Creditor by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless the Pledgee shall become the absolute owner of Collateral consisting of a Limited Liability Company Interest or a Partnership Interest pursuant hereto and is admitted as a member or partner of the respective Limited Liability Company or Partnership, this Agreement shall not be

EAST\160339437.6

construed as creating a partnership or joint venture between or among the Pledgee, any other Secured Creditor, any Pledgor and/or any other Person.

(b)     Except as provided in the last sentence of paragraph (a) of this Section 13, the Pledgee, by accepting this Agreement, did not intend to become a member of any limited liability company or a partner of any partnership or otherwise be deemed to be a co-venturer with respect to any Pledgor, any limited liability company, partnership and/or any other Person either before or after an Event of Default shall have occurred.  The Pledgee shall have only those powers set forth herein and the Secured Creditors shall assume none of the duties, obligations or liabilities of a member of any limited liability company or as a partner of any partnership or any Pledgor except as provided in the last sentence of paragraph (a) of this Section 13.

(c)     The Pledgee and the other Secured Creditors shall not be obligated to perform or discharge any obligation of any Pledgor as a result of the pledge hereby effected.

(d)     The acceptance by the Pledgee of this Agreement, with all the rights, powers, privileges and authority so created, shall not at any time or in any event obligate the Pledgee or any other Secured Creditor to appear in or defend any action or proceeding relating to the Collateral to which it is not a party, or to take any action hereunder or thereunder, or to expend any money or incur any expenses or perform or discharge any obligation, duty or liability under the Collateral.

14.     FURTHER ASSURANCES; POWER-OF-ATTORNEY.

(a)     Each Pledgor will, at its own expense and upon the reasonable request of the Pledgee, make, execute, endorse, acknowledge, file and/or deliver to the Pledgee from time to time such lists, descriptions and designations of its Collateral, warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports and other assurances or instruments and take such further steps relating to the Collateral and other property or rights covered by the security interest hereby granted, which the Pledgee deems reasonably necessary to perfect, preserve or protect its security interest in the Collateral and agrees to do such further acts and things and to execute and deliver to the Pledgee such additional conveyances, assignments, agreements and instruments as the Pledgee may reasonably require or deem reasonably necessary to carry into effect the purposes of this Agreement or to further assure and confirm unto the Pledgee its rights, powers and remedies hereunder or thereunder.

(b)     Each Pledgor hereby constitutes and appoints the Pledgee its true and lawful attorney-in-fact, irrevocably, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, from time to time solely after the occurrence and during the continuance of an Event of Default, in the Pledgee's reasonable discretion, to act, require, demand, receive and give acquittance for any and all monies and claims for monies due or to become due to such Pledgor under or arising

EAST\160339437.6

out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings and to execute any instrument which the Pledgee may deem necessary or advisable to accomplish the purposes of this Agreement, which appointment as attorney is coupled with an interest.

15.     THE PLEDGEE AS COLLATERAL AGENT.   The Pledgee will hold in accordance with this Agreement and the Hedge Intercreditor Agreement all items of the Collateral at any time received under this Agreement.  It is expressly understood, acknowledged and agreed by each Secured Creditor that by accepting the benefits of this Agreement, each such Secured Creditor acknowledges and agrees that the obligations of the Pledgee as holder of the Collateral and interests therein and with respect to the disposition thereof, and otherwise under this Agreement, are only those expressly set forth in this Agreement, in Section 13.10 of the Credit Agreement and in the Hedge Intercreditor Agreement.  The Pledgee shall act hereunder on the terms and conditions set forth herein and in Section 13.10 of the Credit Agreement. Notwithstanding anything to the contrary in this Agreement or any other Credit Document, in the event of any conflict between the terms of this Agreement and the terms of the Hedge Intercreditor Agreement, the terms of the Hedge Intercreditor Agreement will govern and control in all respects.

16.     TRANSFER BY THE PLEDGORS.   Except as otherwise permitted under the Credit Documents, no Pledgor will sell or otherwise dispose of, grant any option with respect to, or mortgage, pledge or otherwise encumber any of the Collateral or any interest therein.

17.     REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PLEDGORS.

(a)     Each Pledgor represents, warrants and covenants as to itself and each of its Subsidiaries that:

(i)     it is the legal, beneficial and (except as to securities credited on the books of a Clearing Corporation or a Securities Intermediary) record owner of, and has good and valid title to, all of its Collateral consisting of one or more Securities, Partnership Interests and Limited Liability Company Interests and that it has sufficient interest in all of its Collateral in which a security interest is purported to be created hereunder for such security interest to attach (subject, in each case, to no pledge, lien, mortgage, hypothecation, security interest, charge, option, Adverse Claim or other encumbrance whatsoever, except the liens and security interests created by the Secured Debt Agreements or other Permitted Liens);

(ii)     it has full power, authority and legal right to pledge all the Collateral pledged by it pursuant to this Agreement;

(iii)     this Agreement has been duly authorized, executed and delivered by such Pledgor and constitutes a legal, valid and binding obligation of such Pledgor enforceable against such Pledgor in accordance with its terms, except to

EAST\160339437.6

the extent that the enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(iv)     except to the extent already obtained or made no consent of any other party (including, without limitation, any stockholder, partner, member or creditor of such Pledgor or any of its Subsidiaries) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any Governmental Authority is required to be obtained by such Pledgor in connection with (A) the execution, delivery or performance of this Agreement by such Pledgor, (B) the validity or enforceability of this Agreement against such Pledgor (except as set forth in clause (iii) above), (C) the perfection or enforceability of the Pledgee's security interest in such Pledgor's Collateral, or (D) except for compliance with or as may be required by applicable securities laws, the exercise by the Pledgee of any of its rights or remedies provided herein;

(v)     neither the execution, delivery or performance by such Pledgor of this Agreement, nor compliance by it with the terms and provisions hereof nor the consummation of the transactions contemplated herein:  (A) will contravene any provision of any applicable law, statute, rule or regulation, or any applicable order, writ, injunction or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor; (B) will conflict or be inconsistent with or result in any material breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the properties or assets of such Pledgor or any of its Subsidiaries pursuant to the terms of any indenture, lease, mortgage, deed of trust, credit agreement, loan agreement or any other material agreement, contract or other instrument to which such Pledgor or any of its Subsidiaries is a party or is otherwise bound, or by which it or any of its properties or assets is bound or to which it may be subject; or (C) will violate any provision of the certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation or limited liability company agreement (or equivalent organizational documents), as the case may be, of such Pledgor or any of its Subsidiaries;

(vi)     all of such Pledgor's Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests has been duly and validly issued and acquired and are fully paid and non-assessable and are subject to no options to purchase or similar rights;

(vii)     each of such Pledgor's Pledged Notes constitutes, or when executed by the obligor thereof will constitute, the legal, valid and binding obligation of such obligor, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy,

EAST\160339437.6

insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

(viii)    the pledge, collateral assignment and delivery to the Pledgee of such Pledgor's Collateral consisting of Certificated Securities and Pledged Notes pursuant to this Agreement and the continued possession thereof by Pledgee creates a valid and perfected first priority security interest in such Certificated Securities and Pledged Notes, and the proceeds thereof, subject to no prior Lien or encumbrance or to any agreement purporting to grant to any third party a Lien or encumbrance (other than Permitted Liens);

(ix)    "control" (as defined in Section 8-106 of the UCC) has been obtained by the Pledgee over all of such Pledgor's Collateral consisting of Securities (including, without limitation, Notes which are Securities, if any) with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC except to the extent that the obligation of the applicable Pledgor to provide the Pledgee with "control" of such Collateral has not yet arisen under this Agreement; provided that in the case of the Pledgee obtaining "control" (as such term is used in the UCC) over Collateral consisting of a Security Entitlement, such Pledgor shall have taken all steps in its control and requested by the Pledgee so that the Pledgee obtains "control" (as such term is used in the UCC) over such Security Entitlement; and

(x)    the Pledgors shall not take any action to cause any limited liability, unit or other membership interest of the Collateral to be or become a "security" within the meaning of, or to be governed by, Article 8 of the Uniform Commercial Code as in effect under the laws of any state having jurisdiction, and shall not cause any Subsidiary to "opt in" or to take any other action seeking to establish any membership interest of the Collateral as a "security" or to become certificated unless such interest is certificated, pledged and delivered to the Pledgee in accordance with Section 3(b)(i)(A) hereof.

(b)    Each Pledgor covenants and agrees that it will defend the Pledgee's right, title and security interest in and to such Pledgor's Collateral and the proceeds thereof against the claims and demands of all persons whomsoever; and each Pledgor covenants and agrees that it will have like title to and right to pledge any other property at any time hereafter pledged to the Pledgee by such Pledgor as Collateral hereunder and will likewise defend the right thereto and security interest therein of the Pledgee and the other Secured Creditors.

(c)    Each Pledgor covenants and agrees that will take no action which would violate any of the terms of any Secured Debt Agreement.

(d)    No Pledgor shall change its legal name, its type of organization, its status as a Registered Organization (in the case of a Registered Organization), as the case may be, its jurisdiction of organization, its Location, or its organizational identification

EAST\160339437.6

number (if any), except that any such changes shall be permitted (so long as not in violation of the applicable requirements of the Secured Debt Agreements and so long as same do not involve (x) a Registered Organization ceasing to constitute same or (y) any Pledgor changing its jurisdiction of organization or Location from the United States or a State thereof to a jurisdiction of organization or Location, as the case may be, outside the United States or a State thereof) if (A) it shall have given notice to the Pledgee and the Administrative Agent not more than 30 days after each change to the information listed on Annex A (as adjusted for any subsequent changes thereto previously made in accordance with this sentence), together with a supplement to Annex A which shall correct all information contained therein for the respective Pledgor, and (B) in connection with such respective change or changes, it shall have taken all action reasonably requested by the Pledgee to maintain the security interests of the Pledgee in the Collateral intended to be granted hereby at all times fully perfected and in full force and effect. In addition, to the extent that any Pledgor does not have an organizational identification number on the date hereof and later obtains one, the Borrower on behalf of such Pledgor shall promptly thereafter notify the Pledgee and the Administrative Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Pledgee and the Administrative Agent to the extent necessary to maintain the security interest of the Pledgee in the Collateral intended to be granted hereby fully perfected and in full force and effect.

18.     PLEDGORS' OBLIGATIONS ABSOLUTE, ETC.   Prior to the Termination Date, the obligations of each Pledgor under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by any circumstance or occurrence whatsoever, including, without limitation:  (i) any renewal, extension, amendment or modification of or addition or supplement to or deletion from any Secured Debt Agreement or any other instrument or agreement referred to therein, or any assignment or transfer of any thereof (except to the extent that any such modification expressly and directly relates to such Pledgor's obligations under this Agreement); (ii) any waiver, consent, extension, indulgence or other action or inaction under or in respect of any such agreement or instrument including, without limitation, this Agreement; (iii) any furnishing of any additional security to the Pledgee or its assignee or any acceptance thereof or any release of any security by the Pledgee or its assignee; (iv) any invalidity or unenforceability, in whole or in part, of any such instrument or agreement or any term thereof; or (v) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to any Pledgor or any Subsidiary of any Pledgor, or any action taken with respect to this Agreement by any trustee or receiver, or by any court, in any such proceeding, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

19.     REGISTRATION, ETC.

(a)     If there shall have occurred and be continuing an Event of Default then, and in every such case, upon receipt by any Pledgor from the Pledgee of a written request or requests that such Pledgor cause any registration, qualification or compliance under any Federal or state securities law or laws to be effected with respect to all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or

23

Partnership Interests of, or owned by, such Pledgor, such Pledgor as soon as practicable and at its expense will cause such registration to be declared effected (and be kept effective) and will cause such qualification and compliance to be declared effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Collateral including, without limitation, registration under the Securities Act, as then in effect (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with any other governmental requirements; provided, that the Pledgee shall furnish to the Borrower on behalf of such Pledgor such information regarding the Pledgee as the Borrower on behalf of such Pledgor may reasonably request in writing and as shall be required in connection with any such registration, qualification or compliance.  The Borrower on behalf of the respective Pledgor will cause the Pledgee to be kept reasonably advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, will furnish to the Pledgee such number of prospectuses, offering circulars or other documents incident thereto as the Pledgee from time to time may reasonably request, and will indemnify the Pledgee, each other Secured Creditor and all others participating in the distribution of such Collateral against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same may have been caused by an untrue statement or omission based upon information furnished in writing to the Borrower on behalf of such Pledgor by the Pledgee or such other Secured Creditor expressly for use therein.

(b)      If at any time when the Pledgee shall determine to exercise its right to sell all or any part of the Collateral consisting of Securities, Limited Liability Company Interests or Partnership Interests pursuant to Section 7 hereof, and the Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act, as then in effect, the Pledgee may, in its sole and absolute discretion, sell such Collateral, as the case may be, or part thereof by private sale in such manner and under such circumstances as the Pledgee may deem reasonably necessary or advisable in order that such sale may legally be effected without such registration. Without limiting the generality of the foregoing, in any such event the Pledgee, in its sole and absolute discretion (i) may proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof shall have been filed under such Securities Act, (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In the event of any such sale, the Pledgee shall incur no responsibility or liability for selling all or any part of the Collateral at a price which the Pledgee, in its sole and absolute discretion, in good faith deems reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sale were deferred until after registration as aforesaid.

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 215 of 300

20.     TERMINATION; RELEASE.

(a)     After the Termination Date, this Agreement and the security interest created hereby shall automatically terminate (provided that all indemnities set forth herein including, without limitation, in Section 13 hereof, shall survive any such termination), and the Pledgee, at the written request and expense of the respective Pledgor, will promptly execute and deliver to such Pledgor a proper instrument or instruments (including UCC termination statements on form UCC-3) acknowledging the satisfaction and termination of this Agreement, and will duly assign, transfer and deliver to such Pledgor (without recourse and without any representation or warranty) such of the Collateral as may be in the possession of the Pledgee and as has not theretofore been sold or otherwise applied or released pursuant to this Agreement, subject to any required consents, together with any moneys at the time held by the Pledgee or any of its sub-agents hereunder and, with respect to any Collateral consisting of an Uncertificated Security, a Partnership Interest or a Limited Liability Company Interest (other than an Uncertificated Security, Partnership Interest or Limited Liability Company Interest credited on the books of a Clearing Corporation or Securities Intermediary), a termination of the agreement relating thereto executed and delivered by the issuer of such Uncertificated Security pursuant to Section 3(a)(i)(B) or by the respective partnership or limited liability company pursuant to Section 3(a)(i)(C).  As used in this Agreement, "**Termination Date**" shall mean the date upon which the Commitments under the Credit Agreement have been terminated and all Loans thereunder have been repaid in full, all Secured Hedge Agreements have been terminated and all other Secured Obligations (other than indemnities described in the Credit Documents, in each case which are not then due and payable) then due and payable have been paid in full in cash in accordance with the terms thereof.

(b)     In the event that any part of the Collateral is sold or otherwise disposed of (to a Person other than a Credit Party or a Subsidiary thereof) (x) at any time prior to the time at which all Secured Obligations (other than indemnities described in Section 12 hereof and described in Section 13.06 of the Credit Agreement, and any other indemnities set forth in any other Security Documents, in each case which are not then due and payable,) have been paid in full and all Commitments under the Credit Agreement have been terminated, in connection with a sale or other disposition permitted by the Secured Debt Agreements or is otherwise released at the direction of the Required Lenders (or all the Lenders if required by the Credit Agreement) or (y) at any time thereafter, to the extent permitted by the Secured Debt Agreements, and in the case of clauses (x) and (y), the proceeds of such sale or other disposition (or from such release) are applied in accordance with the terms of the Credit Agreement or such other Secured Debt Agreements, as the case may be, to the extent required to be so applied, the Pledgee, at the request and expense of such Pledgor, will duly release from the security interest created hereby (and will execute and deliver such documentation, including termination or partial release statements and the like in connection therewith) and assign, transfer and deliver to such Pledgor or to the applicable purchaser or transferee (if any) specified by such Pledgor (without recourse and without any representation or warranty) such of the Collateral as is then being (or has been) so sold or otherwise disposed of, or released, and as may be in the possession of the Pledgee (or, in the case of Collateral held by any sub-

25

agent designated pursuant to Section 4 hereto, such sub-agent) and has not theretofore been released pursuant to this Agreement, subject to any required consents.  Furthermore, upon the release of any Subsidiary Guarantor from the Subsidiaries Guaranty in accordance with the provisions thereof, such Pledgor (and the Collateral at such time pledged by the respective Pledgor pursuant hereto) shall be released from this Agreement.

(c)      At any time that a Pledgor desires that the Pledgee take any action to acknowledge or give effect to any release of Collateral pursuant to the foregoing Section 20(a) or (b), such Pledgor shall deliver to the Collateral Agent a certificate signed by an Authorized Officer of such Pledgor stating that the release of the respective Collateral is permitted pursuant to such Section 20(a) or (b).  At any time that the Borrower or the respective Pledgor desires that a Subsidiary of the Borrower which has been released from the Subsidiaries Guaranty be released hereunder as provided in the last sentence of Section 20(b) hereof, it shall deliver to the Pledgee a certificate signed by an Authorized Officer of the Borrower and the respective Pledgor stating that the release of the respective Pledgor (and its Collateral) is permitted pursuant to such Section 20(b).

(d)      The Pledgee shall have no liability whatsoever to any other Secured Creditor as the result of any release of Collateral by it in accordance with (or which the Pledgee in the absence of gross negligence and willful misconduct believes to be in accordance with) this Section 20.

21.      NOTICES, ETC.  All notices and other communications provided for hereunder shall be given in accordance with the notice provisions of Section 14.03 the Credit Agreement or at such other address or addressed to such other individual as shall have been furnished in writing to the party required to give notice hereunder.

22.      WAIVER; AMENDMENT; OBLIGATIONS ABSOLUTE.

(a)      Except as provided in Sections 20 and 31 hereof, none of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by each Pledgor directly affected thereby (it being understood that the addition or release of any Pledgor hereunder shall not constitute a change, waiver, discharge or termination affecting any Pledgor other than the Pledgor so added or released) and (in each case) the Pledgee (with the written consent of the Required Secured Creditors); provided, however, (i) that supplements to the Annexes hereto may be made without the consent of any Secured Creditor, other than the Collateral Agent, as provided herein or therein, and (ii) Pledgors may be released from their obligations hereunder and new Pledgors may be added hereto without the consent of any Secured Creditors other than the Pledgee, as provided herein or therein (subject to Section 13.12 of the Credit Agreement).

(b)      The obligations of each Pledgor hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (i) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of such Pledgor; (ii) any exercise or non-exercise, or any waiver of, any right, remedy, power or

EAST\160339437.6

privilege under or in respect of this Agreement or any other Secured Debt Agreement; or (iii) any amendment to or modification of any Secured Debt Agreement or any security for any of the Secured Obligations, whether or not such Pledgor shall have notice or knowledge of any of the foregoing.

23. SUCCESSORS AND ASSIGNS. This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to release and/or termination as set forth in Section 20 hereof, (ii) be binding upon each Pledgor, its successors and permitted assigns; provided, however, that no Pledgor shall assign any of its rights or obligations hereunder without the prior written consent of the Pledgee (with the prior written consent of the Required Secured Creditors), and (iii) inure, together with the rights and remedies of the Pledgee hereunder, to the benefit of the Pledgee, the other Secured Creditors and their respective successors, transferees and permitted assigns. All agreements, statements, representations and warranties made by each Pledgor herein or in any certificate or other instrument delivered by such Pledgor or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Creditors and shall survive the execution and delivery of this Agreement and the other Secured Debt Agreements regardless of any investigation made by the Secured Creditors or on their behalf.

24. HEADINGS DESCRIPTIVE. The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

25. GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL. Section 14.08 of the Credit Agreement is hereby incorporated by reference, mutatis mutandis.

26. PLEDGOR'S DUTIES. It is expressly agreed, anything herein contained to the contrary notwithstanding, that each Pledgor shall remain liable to perform all of the obligations, if any, assumed by it with respect to the Collateral and the Pledgee shall not have any obligations or liabilities with respect to any Collateral by reason of or arising out of this Agreement, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of any Pledgor under or with respect to any Collateral.

27. COUNTERPARTS. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be effective as delivery of an original executed counterpart hereof.

28. SEVERABILITY. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

29.     RECOURSE.  This Agreement is made with full recourse to each Pledgor and pursuant to and upon all the representations, warranties, covenants and agreements on the part of such Pledgor contained herein and in the other Secured Debt Agreements and otherwise in writing in connection herewith or therewith.

30.     ADDITIONAL PLEDGORS.  It is understood and agreed that any Subsidiary of Holdings that is required to execute a counterpart of this Agreement after the date hereof pursuant to the Credit Agreement or any other Credit Document shall become a Pledgor hereunder by (x) executing a counterpart hereof or a joinder agreement and delivering the same to the Pledgee, (y) delivering supplements to Annexes A through G hereto as are necessary to cause such annexes to be complete and accurate with respect to such additional Pledgor on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Pledgor had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Pledgee and the Administrative Agent and with all documents and actions required above to be executed or taken, as the case may be, to the reasonable satisfaction of the Pledgee and the Administrative Agent.

31.     LIMITED OBLIGATIONS.  It is the desire and intent of each Pledgor and the Secured Creditors that this Agreement shall be enforced against each Pledgor to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, in furtherance of the foregoing, it is noted that the obligations of each Pledgor constituting a Holding Company or a Subsidiary Guarantor have been limited as provided in the Holdings Guaranty or the applicable Subsidiaries Guaranty, if any.

32.     RELEASE OF PLEDGORS.  If at any time all of the Equity Interests of any Pledgor owned by Holdings or any of its Subsidiaries are sold to a Person other than a Credit Party in a transaction permitted pursuant to the Credit Agreement (and which does not violate the terms of any other Secured Debt Agreement then in effect), then, such Pledgor shall be automatically and irrevocably released as a Pledgor pursuant to this Agreement without any further action hereunder (it being understood that the sale of all of the Equity Interests in any Person that owns, directly or indirectly, all of the Equity Interests in any Pledgor shall be deemed to be a sale of all of the Equity Interests in such Pledgor for purposes of this Section 32), and the Pledgee is authorized and directed to and shall, execute and deliver such instruments of release as are reasonably requested by such Pledgor.  At any time that Holdings desires that a Pledgor be released from this Agreement as provided in this Section 32 and upon the request of the Pledgee, Holdings shall deliver to the Pledgee a certificate signed by an Authorized Officer of Holdings stating that the release of such Pledgor is permitted pursuant to this Section 32.  The Pledgee shall have no liability whatsoever to any other Secured Creditor as a result of the release of any Pledgor by it in accordance with, or which it believes to be in accordance with, this Section 32.

[*Remainder of this page intentionally left blank; signature page follows*]

EAST\160339437.6

IN WITNESS WHEREOF, each Pledgor and the Pledgee have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

PLEDGORS:

MD AMERICA ENERGY HOLDINGS, INC.

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary

MD       AMERICA       INTERMEDIATE HOLDINGS, LLC

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary

MD AMERICA HOLDINGS, LLC

By:_____
    Name: Haixiao Shao
    Title:  Treasurer & Secretary

[*Signature Page to Pledge Agreement (MD America Energy)*]

PLEDGORS (continued):

MD AMERICA ENERGY, LLC

By: _____
     Name: Eric Waller
     Title:  Chief Executive Officer

MD AMERICA PIPELINE , LLC

By: _____
     Name: Eric Waller
     Title:  Chief Executive Officer

[*Signature Page to Pledge Agreement (MD America Energy)*]

PLEDGORS (continued):

MD AMERICA FINANCE CORPORATION

By: _____
        Name: Eric Waller
        Title:  Chief Executive Officer

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 222 of 300

Accepted and Agreed to:

LOAN ADMIN CO LLC,
   as Collateral Agent and Pledgee

By: _____
    Name:  Sean Chao
    Title:   Authorized Signatory

<u>**ANNEX A**</u>

<u>**SCHEDULE OF LEGAL NAMES, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION, LOCATION AND ORGANIZATIONAL IDENTIFICATION NUMBERS**</u>

| <u>Legal Name</u> | <u>Jurisdiction</u> | <u>Organizational Numbers</u> |
|---|---|---|
| MD America Energy Holdings, Inc. | Delaware | 5375060 |
| MD America Energy, LLC | Delaware | 5078863 |
| MD America Intermediate Holdings, LLC | Delaware | 5376894 |
| MD America Holdings, LLC | Delaware | 5375063 |
| MD America Pipeline, LLC | Texas | 801235736 |
| MD America Finance Corporation | Delaware | 5078392 |

<u>Location and Address of all Pledgors:</u>
301 Commerce Street, Suite 2500
Fort Worth, Texas 76102

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM
NYSCEF DOC. NO. 4
INDEX NO. 652519/2020
RECEIVED NYSCEF: 06/16/2020

# ANNEX B

## SCHEDULE OF SUBSIDIARIES

MD America Energy Holdings, Inc. directly owns 100% of the Equity Interests of MD America Intermediate Holdings, LLC

MD America Intermediate Holdings, LLC directly owns 100% of the Equity Interests of MD America Holdings, LLC

MD America Holdings, LLC directly owns 100% of the Equity Interests of MD America Energy, LLC

MD America Energy, LLC directly owns 100% of the Equity Interests of each of MD America Pipeline, LLC and MD America Finance Corporation

Neither MD America Pipeline, LLC nor MD America Finance Corporation has any Subsidiaries

# ANNEX C-1

## SCHEDULE OF STOCK

| Pledgor | Stock Issuer | Class of Stock | Stock Cert. No. | Number of Shares | % of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|
| MD America Energy, LLC | MD America Finance Corporation | Common Stock | 2 | 100 shares | 100% |

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 226 of 300

**ANNEX C-2**

**SCHEDULE OF CERTIFICATED SECURITIES**

| Pledgor | Stock Issuer | Class of Stock | Stock Cert. No. | Number of Shares | % of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|
| MD America Energy, LLC | MD America Finance Corporation | Common Stock | 2 | 100 shares | 100% |

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM
NYSCEF DOC. NO. 4

INDEX NO. 652519/2020

RECEIVED NYSCEF: 06/16/2020

## ANNEX D

## SCHEDULE OF NOTES

MD America Energy, LLC has a Subordinated Promissory Note from Meidu Energy Corporation in the amount of $21,100,000.00 as of 10/30/2018. This agreement was signed and effective as of August 14, 2018, and has a final maturity date of June 30, 2030.

## ANNEX E

## SCHEDULE OF LIMITED LIABILITY COMPANY INTERESTS

MD America Energy Holdings, Inc. owns 100% of the equity interests in MD America Intermediate Holdings, LLC

MD America Energy, LLC owns 100% of the equity interests in MD America,Pipeline, LLC

MD America Intermediate Holdings, LLC of the equity interests in MD America Holdings, LLC

MD America Holdings, LLC of the equity interests in MD America Energy, LLC

# ANNEX F

## SCHEDULE OF PARTNERSHIP INTERESTS

None

## ANNEX G

## SCHEDULE OF CHIEF EXECUTIVE OFFICES

For all Pledgors:
301 Commerce Street, Suite 2500
Fort Worth, Texas 76102

## ANNEX H

## FORM OF AGREEMENT REGARDING UNCERTIFICATED SECURITIES, LIMITED LIABILITY COMPANY INTERESTS AND PARTNERSHIP INTERESTS

AGREEMENT (as amended, modified, restated and/or supplemented from time to time, this "**Agreement**"), dated as of _____, 20___, among the undersigned pledgor (the "**Pledgor**"), Loan Admin Co LLC, not in its individual capacity but solely as collateral agent under the Pledge Agreement referred to below (in such capacity, and together with any successor thereto, the "**Collateral Agent**"), and [_____], as the issuer of the Uncertificated Securities, Limited Liability Company Interests and/or Partnership Interests (each as defined below) (the "**Issuer**").

W I T N E S S E T H:

WHEREAS, the Pledgor, certain of its affiliates and the Collateral Agent have entered into a Pledge Agreement, dated as of November 14, 2018 (as amended, restated, modified and/or supplemented from time to time, the "**Pledge Agreement**"), under which, among other things, in order to secure the payment of the Secured Obligations (as defined in the Pledge Agreement), the Pledgor has or will pledge to the Collateral Agent for the benefit of the Secured Creditors (as defined in the Pledge Agreement), and grant a security interest in favor of the Collateral Agent for the benefit of the Secured Creditors in, all of the right, title and interest of the Pledgor in and to any and all Collateral (as defined in the Pledge Agreement) constituting ["uncertificated securities" (as defined in Section 8-102(a)(18) of the Uniform Commercial Code, as adopted in the State of New York) ("**Uncertificated Securities**")] [Partnership Interests (as defined in the Pledge Agreement)] [Limited Liability Company Interests (as defined in the Pledge Agreement)], from time to time by the Issuer, whether now existing or hereafter from time to time acquired by the Pledgor (with all of such [Uncertificated Securities] [Partnership Interests] [Limited Liability Company Interests] being herein collectively called the "**Issuer Pledged Interests**");

WHEREAS, the Pledgor desires the Issuer to enter into this Agreement in order to perfect the security interests of the Collateral Agent under the Pledge Agreement in the Issuer Pledged Interests, to vest in the Collateral Agent control of the Issuer Pledge Interests and to provide for the rights of the parties under this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Secured Party.  For the purposes of this Agreement, the "**Secured Party**" shall mean the Collateral Agent; provided that the Issuer may rely on the Collateral Agent's instructions as the Secured Party and shall have no duty to verify whether the Collateral Agent is eligible to act in the capacity of the Secured Party.

2.      The Pledgor hereby irrevocably authorizes and directs the Issuer, and the Issuer hereby agrees, to comply with any and all instructions and orders originated by the Collateral Agent (and its successors and assigns) regarding any and all of the Issuer Pledged Interests

without the further consent by the registered owner (including the Pledgor), and, following its receipt of a notice from the Collateral Agent stating that an "Event of Default" has occurred and is continuing, not to comply with any instructions or orders regarding any or all of the Issuer Pledged Interests originated by any person or entity other than the Collateral Agent (and its successors and assigns) or a court of competent jurisdiction.

3.      The Issuer hereby certifies that (i) no notice of any security interest, lien or other encumbrance or claim affecting the Issuer Pledged Interests (other than the security interest of the Collateral Agent) has been received by it, and (ii) the security interests of the Collateral Agent in the Issuer Pledged Interests have been registered in the books and records of the Issuer.

4.      The Issuer hereby represents and warrants that (i) the pledge by the Pledgor of, and the granting by the Pledgor of a security interest in, the Issuer Pledged Interests to the Collateral Agent, for the benefit of the Secured Creditors, does not violate the charter, by-laws, partnership agreement, membership agreement or any other agreement governing the Issuer or the Issuer Pledged Interests, and (ii) the Issuer Pledged Interests consisting of capital stock of a corporation are fully paid and nonassessable.

5.      All notices, statements of accounts, reports, prospectuses, financial statements and other communications to be sent to the Pledgor by the Issuer in respect of the Issuer will also be sent to the Collateral Agent at the following address:

> LOAN ADMIN CO LLC
> 2200 Atlantic Street, Suite 501
> Stamford, CT  06902
> Attention:  Sean Chao and Purvang Desai
> Facsimile:  (203) 989-9701

6.      Following its receipt of a notice from the Collateral Agent stating that the Collateral Agent is exercising exclusive control of the Issuer Pledged Interests in accordance with the Pledge Agreement and until the Collateral Agent shall have delivered written notice to the Issuer that all of the Secured Obligations have been paid in full and this Agreement is terminated, the Issuer will send any and all redemptions, distributions, interest or other payments in respect of the Issuer Pledged Interests from the Issuer for the account of the Collateral Agent only by wire transfers to such account as the Collateral Agent shall instruct.

7.      Except as expressly provided otherwise in Sections 5 and 6, all notices, instructions, orders and communications hereunder shall be sent or delivered by mail, telegraph, telex, telecopy, cable or overnight courier service and all such notices and communications shall, when mailed, telexed, telecopied, cabled or sent by overnight courier, be effective when deposited in the mails or delivered to overnight courier, prepaid and properly addressed for delivery on such or the next Business Day, or sent by telex or telecopier, except that notices and communications to the Collateral Agent or the Issuer shall not be effective until received.  All notices and other communications shall be in writing and addressed as follows:

(a)     if to the Pledgor, at:

_____

_____

_____

_____

Attention:_____

Telephone No.:

Fax No.:

(b)     if to the Collateral Agent at the address given in Section 5 hereof;

(c)     if to the Issuer, at:

_____

_____

_____

or at such other address as shall have been furnished in writing by any Person described above to the party required to give notice hereunder.  As used in this Section 7, "**Business Day**" means any day other than a Saturday, Sunday, or other day in which banks in New York are authorized to remain closed.

8.     This Agreement shall be binding upon the successors and assigns of the Pledgor and the Issuer and shall inure to the benefit of and be enforceable by the Collateral Agent and its successors and assigns.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall constitute one instrument.  In the event that any provision of this Agreement shall prove to be invalid or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain binding on all parties hereto.  None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever except in writing signed by the Collateral Agent, the Issuer and the Pledgor.

9.     THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

* * *

IN WITNESS WHEREOF, the Pledgor, the Collateral Agent and the Issuer have caused this Agreement to be executed by their duly elected officers duly authorized as of the date first above written.

[_____]
 as Pledgor

By: _____
 Name:
 Title:

[_____]
 as Issuer

By: _____
 Name:
 Title:

LOAN ADMIN CO LLC
 as Collateral Agent

By: _____
 Name:
 Title:

EAST\160339437.6

# EXHIBIT C

<u>NOTE</u>

$20,000,000

New York, New York
November 14, 2018

        FOR VALUE RECEIVED MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "**Borrower**") hereby promises to pay to ARENA LIMITED SPV, LLC or its registered assigns (the "**Lender**"), in lawful money of the United States of America in immediately available funds, at the Payment Office initially located at 2200 Atlantic Street, Suite 501, Stamford CT 06902, on the Maturity Date the principal sum of TWENTY MILLION DOLLARS ($20,000,000) or, if less, the unpaid principal amount of all Initial Term Loans and Delayed Draw Term Loans made by the Lender pursuant to the Credit Agreement, payable at such times and in such amounts as are specified in the Credit Agreement. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement (as defined herein).

        The Borrower also promises to pay interest on the unpaid principal amount of each Initial Term Loan and Delayed Draw Term Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Credit Agreement.

        This note (this "**Note**") is one of the Notes referred to in the Credit Agreement, dated as of the date hereof, by and among the Borrower, MD America Energy Holdings, Inc., a Delaware corporation, MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC, a Delaware limited liability company, the other Guarantors from time to time party thereto, the lenders from time to time party thereto, Loan Admin Co LLC, as Administrative Agent and Lead Arranger, and Guggenheim Securities, LLC, as Lead Arranger (as amended, restated, modified and/or supplemented from time to time, the "**Credit Agreement**"), and is entitled to the benefits thereof and of the other Credit Documents. This Note is secured by the Security Agreement, the Pledge Agreement and all other Security Documents and is entitled to the benefits of each Guaranty. As provided in the Credit Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Maturity Date, in whole or in part.

        In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Credit Agreement.

        The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

        **THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).**

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 237 of 300

IN WITNESS WHEREOF, the Borrower has caused its duly authorized officers to execute and deliver this Note as of the date first above written.

**BORROWER:**

MD AMERICA ENERGY, LLC, as Borrower

By: _____
    Name: Eric Waller
    Title:  Chief Executive Officer

*[Signature Page to Note (MD America Energy)]*

# EXHIBIT D

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 239 of 300

## NOTE

$29,500,000                                                   New York, New York
                                                             November 14, 2018

      FOR VALUE RECEIVED MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "**Borrower**") hereby promises to pay to PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY or its registered assigns (the "**Lender**"), in lawful money of the United States of America in immediately available funds, at the Payment Office initially located at 2200 Atlantic Street, Suite 501, Stamford CT 06902, on the Maturity Date the principal sum of TWENTY-NINE MILLION FIVE HUNDRED THOUSAND DOLLARS ($29,500,000) or, if less, the unpaid principal amount of all Initial Term Loans and Delayed Draw Term Loans made by the Lender pursuant to the Credit Agreement, payable at such times and in such amounts as are specified in the Credit Agreement.  Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement (as defined herein).

      The Borrower also promises to pay interest on the unpaid principal amount of each Initial Term Loan and Delayed Draw Term Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Credit Agreement.

      This note (this "**Note**") is one of the Notes referred to in the Credit Agreement, dated as of the date hereof, by and among the Borrower, MD America Energy Holdings, Inc., a Delaware corporation, MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC, a Delaware limited liability company, the other Guarantors from time to time party thereto, the lenders from time to time party thereto, Loan Admin Co LLC, as Administrative Agent and Lead Arranger, and Guggenheim Securities, LLC, as Lead Arranger (as amended, restated, modified and/or supplemented from time to time, the "**Credit Agreement**"), and is entitled to the benefits thereof and of the other Credit Documents. This Note is secured by the Security Agreement, the Pledge Agreement and all other Security Documents and is entitled to the benefits of each Guaranty. As provided in the Credit Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Maturity Date, in whole or in part.

      In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Credit Agreement.

      The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

      **THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).**

IN WITNESS WHEREOF, the Borrower has caused its duly authorized officers to execute and deliver this Note as of the date first above written.

**BORROWER:**

MD AMERICA ENERGY, LLC, as Borrower

By: _____
    Name: Eric Waller
    Title:   Chief Executive Officer

*[Signature Page to Note (MD America Energy)]*

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 241 of 300

# EXHIBIT E

<u>NOTE</u>

$5,500,000                                                                                    New York, New York
                                                                                                November 14, 2018


       FOR VALUE RECEIVED MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "**Borrower**") hereby promises to pay to THE PRUDENTIAL INSURANCE COMPANY OF AMERICA or its registered assigns (the "**Lender**"), in lawful money of the United States of America in immediately available funds, at the Payment Office initially located at 2200 Atlantic Street, Suite 501, Stamford CT 06902, on the Maturity Date the principal sum of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($5,500,000) or, if less, the unpaid principal amount of all Initial Term Loans and Delayed Draw Term Loans made by the Lender pursuant to the Credit Agreement, payable at such times and in such amounts as are specified in the Credit Agreement.  Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement (as defined herein).

       The Borrower also promises to pay interest on the unpaid principal amount of each Initial Term Loan and Delayed Draw Term Loan made by the Lender in like money at said office from the date hereof until paid at the rates and at the times provided in Section 2.08 of the Credit Agreement.

       This note (this "**Note**") is one of the Notes referred to in the Credit Agreement, dated as of the date hereof, by and among the Borrower, MD America Energy Holdings, Inc., a Delaware corporation, MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC, a Delaware limited liability company, the other Guarantors from time to time party thereto, the lenders from time to time party thereto, Loan Admin Co LLC, as Administrative Agent and Lead Arranger, and Guggenheim Securities, LLC, as Lead Arranger (as amended, restated, modified and/or supplemented from time to time, the "**Credit Agreement**"), and is entitled to the benefits thereof and of the other Credit Documents. This Note is secured by the Security Agreement, the Pledge Agreement and all other Security Documents and is entitled to the benefits of each Guaranty. As provided in the Credit Agreement, this Note is subject to voluntary prepayment and mandatory repayment prior to the Maturity Date, in whole or in part.

       In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Credit Agreement.

       The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note.

       **THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).**

IN WITNESS WHEREOF, the Borrower has caused its duly authorized officers to execute and deliver this Note as of the date first above written.

**BORROWER:**

MD AMERICA ENERGY, LLC, as Borrower

By:_____
     Name: Eric Waller
     Title:  Chief Executive Officer

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 244 of 300

# EXHIBIT F

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 245 of 300

Execution Version

# FIRST AMENDMENT TO CREDIT AGREEMENT

**THIS FIRST AMENDMENT TO CREDIT AGREEMENT** (this "Amendment"), dated as of December 20, 2019, is by and among MD AMERICA ENERGY HOLDINGS, INC., a Delaware corporation ("Holdings"), MD AMERICA INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company ("Intermediate Holdings"), MD AMERICA HOLDINGS, LLC, a Delaware limited liability company ("MDA Holdco"), MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "Borrower"), the Lenders (as hereinafter defined) party hereto, and LOAN ADMIN CO LLC, as administrative agent (in such capacity, the "Administrative Agent").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement (as defined below).

# W I T N E S S E T H

**WHEREAS**, the Borrower, Holdings, Intermediate Holdings, MDA Holdco, certain banks and financial institutions from time to time party thereto (the "Lenders"), the Administrative Agent and Loan Admin Co LLC and Guggenheim Securities, LLC as Lead Arrangers are parties to that certain Credit Agreement dated as of November 14, 2018 (as amended, modified, extended, restated, replaced, or supplemented prior to the date hereof, the "Credit Agreement");

**WHEREAS**, the parties hereto desire to amend certain provisions of the Credit Agreement; and

**WHEREAS**, the Lenders are willing to make such amendments to the Credit Agreement, in accordance with and subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
# AMENDMENTS TO CREDIT AGREEMENT

1.1     **Amendments to Credit Agreement**.  Effective as of the First Amendment Effective Date (as defined below), the Credit Agreement is amended to:

(a)   Insert in Section 1.01 in alphabetical order the following definitions:

"**Applicable Differentials**" shall mean (i) the price per barrel of natural gas liquids of the Credit Parties ("**NGLs**") sold as a percentage of the then-applicable price (as determined pursuant to the succeeding sentence) for crude oil (WTI Cushing), (ii) the difference between the Credit Parties received price per MMBTu and the then applicable price (as determined pursuant to the succeeding sentence) for natural gas (Henry Hub), (iii) the difference between the Credit Parties received price per barrel of crude oil and the then applicable price (as determined pursuant to the succeeding sentence) for crude oil (WTI Cushing), (iv) volume

reductions for gas shrink between the wellhead and the completion of gas processing and (v) the rate of extraction of NGLs per volume of gas produced (Bbl/MMcf), in each case, based upon the Credit Parties' lease operating statements and, with respect to gas shrink and NGL yield only, plant statements and determined on an average basis for the six month period ended as of any applicable date of determination and, in each case, applied on a consistent basis across each of the Credit Parties' wells. Oil and gas pricing shall be determined based upon the monthly average daily spot pricing referred to as Thomson Reuters WTI Spot Monthly Index and Henry Hub Monthly Index, respectively, published by NSAI at https://netherlandsewell.com/resources/ or such other source as may be agreed by the Borrower and the Administrative Agent (and, if such resource publishes the average of the daily spot pricing from more than one source, the average of such averages)."

""**Applicable Pricing Test Date**" shall mean:

(a) with respect to any calculation as of a fiscal quarter end, such fiscal quarter end date (or, in each case, if such date is not a Business Day, the Business Day immediately following such date);

(b) with respect to the delivery of each Notice of Borrowing pursuant to Section 8.02, ten (10) Business Days prior to the delivery of such Notice of Borrowing (or if such date is not a Business Day, the first Business Day immediately following); and

(c) with respect to any compliance certificate required to be delivered pursuant to Section 10.01(g)(iii)(C) for any event requiring pro forma compliance with Section 11.10, ten (10) Business Days prior to the occurrence of such event (or if such date is not a Business Day, the first Business Day immediately following).

""**Calculation Principles**" shall mean, in respect of the PV-10 Value, the PV-10 Value of PDP Reserves, and/or the PV-10 Value of Workover PDNP Reserves (each, an "**Applicable PV-10 Value**"), as applicable:

(a) the Applicable PV-10 Value shall be adjusted for any contract entered into by the Credit Parties prior to the date of determination which would impact the calculation of the Applicable PV-10 Value (and the Credit Parties shall provide a copy of such contract to the Administrative Agent together with reasonably detailed calculations of the adjustment to such Applicable PV-10 Value);

(b) lease operating expense included in the calculation of the Applicable PV-10 Value will be calculated based on actual lease operating expense for the twelve month period ended on the date of determination, with amounts excluded therefrom as non-recurring only to the extent

2

similar expenses have not otherwise been incurred by the Credit Parties in respect of any well in the twenty-four month period ended on the date of determination);

(c)     the Applicable PV-10 Value shall be calculated to reflect all Applicable Differentials;

(d)     the PV-10 Value and PV-10 Value of PDP Reserves shall be adjusted to give effect to the Hedge Agreements with Approved Counterparties in effect as of such date of determination, pursuant to which the value of such Hedge Agreement (the "**Hedge Value**") shall be determined based upon the present value (using an annual discount rate of 10%) of the difference between the Strip Price or, in the case of NGLs, the forward price for the applicable period quoted on the applicable exchange used in respect of such Hedge Agreement, and the strike price for such Hedge Agreement for each applicable period (and not, for the avoidance of doubt, based upon a mark-to-market valuation of such Hedge Agreement); and

(e)     unless otherwise specifically provided herein or otherwise agreed by the Administrative Agent in writing, all data included in the calculation of the Applicable PV-10 Value shall be derived from the Credit Parties' lease operating statements and, with respect to gas shrink and NGL yield only, plant statements."

""**First Amendment**" shall mean the First Amendment to this Agreement, dated as of the First Amendment Effective Date."

""**First Amendment Effective Date**" shall mean December 20, 2019."

""**Hedge Value**" shall have the meaning ascribed thereto in the definition of "Calculation Principles"."

""**NGLs**" shall have the meaning ascribed thereto in the definition of "Applicable Differentials"."

(b)     Amend and restate the definitions of "Projected Oil and Gas Production", "PV-10 Value", "PV-10 Value of PDP Reserves", "PV-10 Value of Workover PDNP Reserves" and "Reserve Report" in their respective entireties to read in full as follows:

"**Projected Oil and Gas Production**" shall mean the projected production of crude oil, natural gas or natural gas liquids (measured by volume unit or BTU equivalent, not sales price) from Oil and Gas Properties and interests owned by the Borrower and its Subsidiaries which have attributable to them proved developed producing reserves, as such

3

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 248 of 300

production is projected in the most recent Reserve Report, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation and otherwise delivered pursuant to this Agreement, (a) for purposes of Section 10.23(a), after deducting projected production from any Oil and Gas Properties or Hydrocarbon Interests sold or under contract for sale that had been included in such Reserve Report and after adding reasonable projected production from any Oil and Gas Properties or Hydrocarbon Interests that had not been reflected in such Reserve Report but that are reflected in a separate or supplemental report meeting the requirements of Section 10.21 and (b) for purposes of Section 10.23(b) and Section 11.19, making adjustments to account for Dispositions of Oil and Gas Properties included in such report and acquisitions of Oil and Gas Properties not included in such report, in each case consummated by the Borrower or any of its Subsidiaries and, in the case of acquisitions, to the extent such acquired Oil and Gas Properties are reflected in a separate or supplemental report meeting the requirements of Section 10.21 (and the Borrower hereby agrees to deliver to the Lenders such separate or supplemental report with the applicable compliance certificate delivered pursuant to Section 10.01(d)).  For purposes of this definition, the Strip Price shall be determined as of the Applicable Pricing Test Date, and the Strip Price shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**PV-10 Value**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses, and capital expenditures of the Credit Parties' Proved Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; provided that (a) the PV-10 Value shall be calculated in accordance with the Calculation Principles and (b) such calculations of the PV-10 Value shall be reasonably acceptable to the Administrative Agent.  For purposes of this definition, the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall be determined as of the Applicable Pricing Test Date, and the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**PV-10 Value of PDP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses and capital expenditures of the Credit Parties' PDP Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; <u>provided</u> that (a) the PV-10 Value of PDP Reserves shall be calculated in accordance with the Calculation Principles, (b) such calculations of the PV-10 Value of PDP Reserves shall be reasonably acceptable to the Administrative Agent and (c) PV-10 Value of PDP Reserves as of the Closing Date shall be deemed to be $122,915,440. For purposes of this definition, the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall be determined as of the Applicable Pricing Test Date, and the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**PV-10 Value of Workover PDNP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses and capital expenditures of the Credit Parties' Workover PDNP Reserves as set forth in the most recent certificate delivered pursuant to <u>Section 10.01(g)(iii)</u>, using information prepared by the chief engineer of the Borrower from the most recent Reserve Report delivered pursuant hereto (identified separately from PDNP Reserves), calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; <u>provided</u> that (a) such calculations of the PV-10 Value of Workover PDNP Reserves and calculations of Workover PDNP Reserves shall be reasonably acceptable to the Administrative Agent, (b) the PV-10 Value of Workover PDNP Reserves shall be calculated in accordance with the Calculation Principles and (c) PV-10 Value of Workover PDNP Reserves as of the Closing Date shall be deemed to be $0. For purposes of this

definition, the Strip Price shall be determined as of the Applicable Pricing Test Date, and the Strip Price shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**Reserve Report**" shall mean the Initial Reserve Report or, except as the context otherwise requires solely with respect to references to "draft" or "revised" Reserve Reports contained in Section 10.21, the most recent reserve report that is deemed "final and delivered" pursuant to Section 10.21, which reserve report shall, as of its date, set forth the oil and gas reserves attributable to the Oil and Gas Properties of the Credit Parties and which report shall be in form and substance reasonably satisfactory to the Administrative Agent, and shall, at a minimum, set forth each Credit Party's royalty interests, oil and gas reserves (including proved developed producing, proved developed non-producing, proved undeveloped and probable reserves) and a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date.

(c)     Amend and restate Section 10.21(a) of the Credit Agreement in its entirety to read in full as follows:

"(a)(i) On or prior to February 15, May 15, August 15 and November 15 of each year, commencing with the delivery of the December 31, 2019 Reserve Report on or prior to February 15, 2020, the Borrower shall furnish to the Administrative Agent and the Lenders a draft Reserve Report evaluating the Oil and Gas Properties of Holdings and its Subsidiaries as of the last date of the immediately preceding fiscal quarter. The draft Reserve Reports as of December 31 and June 30 of each year shall be prepared by one or more Approved Petroleum Engineers. The draft Reserve Reports as of March 31 and September 30 of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such draft Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the immediately preceding December 31 Reserve Report or June 30 Reserve Report, as applicable.

(ii)     The Administrative Agent shall have the right, in its sole discretion, to have each draft Reserve Report audited in accordance with SPE guidelines (such reserve report giving effect to any changes resulting from such audit, the "**Initial Audited Reserve Report**") by any one of Cawley, Gillespie & Associates, Inc., Netherland, Sewell and Associates, Inc., WD Von Gonten and Co., Ryder Scott Company or any other independent petroleum engineering firm agreed to by the Administrative Agent and the Borrower (any of the foregoing as selected by the Administrative Agent, an "**Approved Audit Firm**"). The Borrower shall make the Approved Petroleum Engineer and/or the Borrower's chief engineer and other personnel available to the Approved Audit Firm to discuss any statements, calculations, conclusions or other information in

6

such draft Reserve Report prior to its finalization. In order for the Administrative Agent to exercise its audit right, it shall provide written notice to the Borrower within 10 Business Days after its receipt of the applicable draft Reserve Report, otherwise such draft shall be deemed final and delivered.

If the Administrative Agent exercises its audit right, then the Administrative Agent will either:

(A) send written notice to the Borrower of its approval of the draft Reserve Report (which draft Reserve Report shall then be deemed final and delivered), or

(B) send the Borrower both (x) a copy of the Initial Audited Reserve Report and (y) either (1) in the event that the Adjusted Coverage Ratio as calculated using the Initial Audited Reserve Report is greater than or equal to 1.50:1.00 and the Initial Audited Reserve Report includes no comments or changes to any terms or sections of the draft Reserve Report other than the type curves, written notice of its formal disagreement with the type curves contained in the draft Reserve Report (this clause (B)(y)(1), a "**Type Curve Disagreement Notice**") or (2) in the event that the Adjusted Coverage Ratio as calculated using the Initial Audited Reserve Report is less than 1.50:1.00 or the Initial Audited Reserve Report includes comments or changes to any terms or sections of the draft Reserve Report other than the type curves, written notice of its request that the draft Reserve Report be revised (this clause (B)(y)(2), a "**Revision Request**").

If the Administrative Agent sends a Type Curve Disagreement Notice to the Borrower, the initial draft Reserve Report shall be deemed final and delivered, but no type curve calculations contained therein shall be deemed or considered to be binding on the Administrative Agent and the Lenders for purposes of future Reserve Reports and shall in no way prejudice the Administrative Agent or the Lenders' ability to challenge or disagree with future Reserve Reports and the type curves contained therein.

(iii) If the Administrative Agent sends a Revision Request to the Borrower, the Borrower shall deliver to the Administrative Agent a revised Reserve Report (a "**Revised Reserve Report**") within 10 Business Days after the date the Borrower receives such Revision Request from the Administrative Agent. Within 10 Business Days after its receipt of the applicable Revised Reserve Report, if the Administrative Agent has not communicated its approval of, or any objection to, such Revised Reserve Report in writing to the Borrower, such Revised Reserve Report shall be deemed final and delivered.

If by the end of such 10 Business Day period (A) the Administrative Agent shall have objected to such Revised Reserve Report and (B) the calculation of the Adjusted Coverage Ratio based on the Initial Audited Reserve Report is less than 1.50:1.00, the Administrative Agent shall

7

select a separate Approved Audit Firm (other than the Approved Audit Firm that prepared the Initial Audited Reserve Report) (the "**Second Approved Audit Firm**") to audit such Revised Reserve Report in accordance with SPE guidelines (such audited reserve report, the "**Second Audited Reserve Report**").  The Borrower shall make the Approved Petroleum Engineer and/or the Borrower's chief engineer and other personnel available to the Second Approved Audit Firm to discuss any statements, calculations, conclusions or other information in such Revised Reserve Report prior to its finalization.

If the calculation of the Adjusted Coverage Ratio based on the Second Audited Reserve Report is closer to the calculation of the Adjusted Coverage Ratio based on the Borrower's Revised Reserve Report, then the Borrower's Revised Reserve Report shall be deemed final and delivered. If the calculation of the Adjusted Coverage Ratio based on the Second Audited Reserve Report is closer to the calculation of the Adjusted Coverage Ratio based on the Initial Audited Reserve Report, then the Initial Audited Reserve Report shall be deemed final and delivered.

(iv)  Any Approved Audit Firm's audit set forth above with respect to the draft Reserve Reports shall be at the expense of the Borrower. Any Second Approved Audit Firm's audit set forth above shall be at the expense of the Borrower.  Notwithstanding the foregoing, any Approved Audit Firm's audit with respect to the March 31 and September 30 Reserve Reports shall be at the expense of the Lenders instructing the Administrative Agent to request such audit unless either (a) such audit does not "pass" the initial draft Reserve Report in accordance with SPE guidelines or (b) the calculation of the Adjusted Coverage Ratio based on such Initial Audited Reserve Report is less than 1.50:1.00, in either such case, such audit shall be at the Borrower's expense."

(d)     Amend and restate Section 11.19(h) of the Credit Agreement in its entirety to read in full as follows:

"(h)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position, the notional volumes for which (when aggregated with other Hedge Agreements or hedges then in effect other than basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceed, as of the date such Hedge Agreement is entered into, 90% of the Credit Parties' aggregate Projected Oil and Gas Production for each quarter during the 5-year period following such date of determination, for each of crude oil, natural gas and natural gas liquids, calculated separately."

(e)     Insert the following new Section 11.22 following Section 11.21 of the Credit Agreement:

8

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 253 of 300

"11.22. <u>Drilling Activity</u>. The Credit Parties shall not (a) incur any expenses in respect of the acquisition or drilling of any new wells after the First Amendment Effective Date, (b) make any payments in respect of such new wells, (c) purchase any new Hydrocarbon Interests after the First Amendment Effective Date or (d) unless to the extent reasonably necessary to complete the drilled but uncompleted wells listed on Schedule 11.22 to the First Amendment, incur any expenses or make any payments in respect of the completion of any wells after the First Amendment Effective Date, in each case, unless, at the time of incurrence or acquisition thereof, (i) the spot price for WTI Cushing shall have exceeded $65 per barrel for each of the prior 30 days, (ii) the Adjusted Coverage Ratio for the most recent Test Period for which a final Reserve Report shall have been delivered exceeds 1.65:1.00, and (iii) the Borrower shall have delivered to the Administrative Agent a certificate in form and substance reasonably acceptable to the Administrative Agent certifying as to the Credit Parties' satisfaction of the requirements of the foregoing clauses (i) and (ii). Notwithstanding the foregoing, this Section 11.22 shall be deemed not to apply and shall have no further force and effect following the First Equity Proceeds Loan Repayment (as defined in the First Amendment)."

(f)       [Reserved].

(g)       amend and restate footnote 3 to Annex 1 to Exhibit I-2 in its entirety as follows:

"For purposes of calculating the PV-10 Value of PDP Reserves and PV-10 Value of Workover PDNP Reserves in this clause (a), the Strip Price will be determined as of the Applicable Pricing Test Date, and the Strip Price shall not be re-determined for any subsequent delivery of a revised or final certificate for such period."

(h)       amend and restate footnote 6 to Annex 1 to Exhibit I-2 in its entirety as follows:

"PV-10 Value of PDP Reserves should be calculated in accordance with the Calculation Principles. The Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall be determined as of the Applicable Pricing Test Date, and the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall not be re-determined for any subsequent delivery of a revised or final certificate for such period."

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 254 of 300

## ARTICLE II
## CONDITIONS TO EFFECTIVENESS

**2.1** __Closing Conditions.__  This Amendment shall become effective as of the day and year first set forth above (the "First Amendment Effective Date") upon satisfaction (or waiver by the Administrative Agent) of the following conditions:

(a) **Executed Amendment.**  The Administrative Agent shall have received a copy of this Amendment duly executed by each of the Borrower, each other Credit Party, the Required Lenders and the Administrative Agent.

(b) **Expenses.**  The Borrower shall have paid in full all fees and expenses (including, without limitation, the fees and expenses of (i) DLA Piper LLP (US), counsel to the Administrative Agent, (ii) Vinson & Elkins L.L.P., counsel to TPG Specialty Lending, Inc. and (iii) Foley & Lardner LLP, counsel to Arena Limited SPV, LLC) required to be paid pursuant to the Credit Agreement and this Amendment.

## ARTICLE III
## MISCELLANEOUS AND OTHER AGREEMENTS

### 3.1    __Term Loan Prepayment__.

(a) On or prior to March 31, 2020, the Borrower shall (x) cause an aggregate amount of not less than $30,000,000 of cash common equity proceeds to be contributed to Holdings (which cash proceeds shall be subsequently contributed to the Borrower) and (y) prepay the Loans in an amount equal to $30,000,000 plus any premium or other amounts owed pursuant to Section 5.01 of the Credit Agreement (provided that only $15,000,000 of the repayment amount shall be subject the premium and other amounts owed under Section 5.01 of the Credit Agreement) (the contribution and prepayment described in the foregoing clauses (x) and (y), collectively, the "**First Equity Proceeds Loan Repayment**"). The First Equity Proceeds Loan Repayment shall (i) be deemed to be a voluntary prepayment made in accordance with Section 6.01 of the Credit Agreement for purposes of Section 5.01 of the Credit Agreement and (ii) be applied in accordance with Section 6.02(i) of the Credit Agreement. Notwithstanding anything to the contrary in the Credit Agreement or the Credit Documents, the Borrower shall be permitted, on the date that the First Equity Proceeds Loan Repayment is made, to provide an intercompany loan of up to $5,000,000 to any parent entity of the Borrower.  The Borrower shall cause such intercompany loan to be repaid in full within thirty (30) days following the making thereof.  Failure to comply with this Section 3.1(a) shall constitute an immediate Event of Default.

(b) If the First Equity Proceeds Loan Repayment is not made as and when required pursuant to the foregoing clause (a), on April 1, 2020 the Borrower shall pay to the Administrative Agent, for the account of the Lenders on a pro rata basis based on their respective Applicable Percentage of the aggregate Commitments and outstanding Loans, a fee in an amount equal to $2,000,000.  This fee is fully earned by the Lenders as

of the date hereof in consideration for, and as a material inducement to, the Lenders' agreement to enter into this Amendment and the Borrower's obligation to pay such fee shall be automatically cancelled and waived in the event that the First Equity Proceeds Loan Repayment is made in accordance with the foregoing clause (a).  The Borrower and the Guarantors agree that the foregoing fee is reasonable under the circumstances currently existing.  In no event will the payment of the fee described in this Section 3.1(b) cure or waive any Event of Default that would exist following any non-compliance by the Borrower with Section 3.1(a).

 **3.2** **Amended Terms.** On and after the First Amendment Effective Date, all references to the Credit Agreement in each of the Credit Documents shall hereafter mean the Credit Agreement as amended by this Amendment.  Except as specifically amended hereby or otherwise agreed, the Credit Agreement is hereby ratified and confirmed and shall remain in full force and effect according to its terms.

 **3.3** **Representations and Warranties of Credit Parties.** Each Credit Party represents and warrants as follows:

 (a) It has taken all necessary action to authorize the execution, delivery and performance of this Amendment.

 (b) This Amendment has been duly executed and delivered by such Person and constitutes such Person's legal, valid and binding obligation, enforceable in accordance with its terms, except as such enforceability may be subject to (i) bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

 (c) No consent, approval, authorization or order of, or filing, registration or qualification with, any court or governmental authority or third party is required in connection with the execution, delivery or performance by such Person of this Amendment.

 (d) After giving effect to this Amendment, the representations and warranties set forth in Section 9 of the Credit Agreement are true and correct as of the date hereof (except for those which expressly relate to an earlier date, which shall be true and correct as of such earlier date).

 (e) After giving effect to this Amendment, no event has occurred and is continuing which constitutes a Default or an Event of Default.

 (f) The Security Documents continue to create a valid security interest in, and Lien upon, the Collateral (as defined in the respective Security Document), in favor of the Administrative Agent, for the benefit of the Lenders, which security interests and Liens are perfected in accordance with the terms of the Security Documents and prior to all Liens other than Permitted Liens.

(g)     Except as specifically provided in this Amendment, the Obligations are not reduced or modified by this Amendment and are not subject to any offsets, defenses or counterclaims.

3.4     **Reaffirmation of Obligations.**  Each Credit Party in its capacity as borrower, debtor, grantor, pledgor, guarantor, assignor, or in other any other similar capacity in which such Credit Party grants liens or security interests in its property or otherwise acts as accommodation party or guarantor, as the case may be, hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Credit Documents to which it is a party (after giving effect hereto) and (ii) to the extent such Credit Party granted liens on or security interests in any of its property pursuant to any such Credit Document as security for or otherwise guaranteed Obligations under or with respect to the Credit Documents, ratifies and reaffirms such guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations as amended hereby.  Each Credit Party hereby consents to this Amendment and acknowledges that each of the Credit Documents remains in full force and effect and is hereby ratified and reaffirmed.  The execution of this Amendment shall not operate as a waiver of any right, power or remedy of Administrative Agent or the Lenders, constitute a waiver of any provision of any of the Credit Documents or serve to effect a novation of the Obligations.

3.5     **Acknowledgment of Rights; Release of Claims.**  Each Credit Party unconditionally and irrevocably acquits and fully and forever releases, remises, relieves and discharges and shall be deemed to have forever acquitted, remised, released and discharged the Administrative Agent, any Lender, any of their respective affiliates and any of their respective past and present partners, members, subsidiaries, affiliates, officers, employees, agents, attorneys, principals, directors and shareholders and each of their respective heirs, legal representatives, successors and assigns (collectively, the "**Releasees**") on the date hereof from any and all manner of action and actions, cause and causes of action, (including, without limitation, a claim for contribution), charge, counterclaim, debt, demand, dues, suit, sum of money, account, reckoning, bond, bill, specialty, covenant, contract, controversy, damages, judgment, expense, execution, lien, claim of liens, claim of costs, penalties, attorneys' fees, or any other compensation, recovery or relief on account of any liability, obligation, demand or cause of action of whatever nature, whether in law, equity or otherwise (including, without limitation, interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to any third party), whether known or unknown, fixed or contingent, joint and/or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, contractual or tortious, direct, indirect or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any or all of the Releasees, whether held in a personal or representative capacity, and which is based on any act, fact, event or omission or other matter, cause or thing occurring at or from the beginning of time to and including the date hereof directly or indirectly with respect to, based on, arising out of or in any way related to this Amendment, the other Credit Documents or any other related documents, instruments, agreements or matters or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse

12

related thereto (collectively, the "**Released Claims**"). Each Credit Party covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

**3.6     Reserve Reports and Calculations; Defaults; Financial Performance Covenants for December 31, 2019**.  Each of the parties hereto acknowledges and agrees that:

(a)     notwithstanding the parties' disagreement on the calculation of the Adjusted Coverage Ratio as of June 30, 2019 and September 30, 2019 (and the methodology utilized by the Borrower in calculating the Adjusted Coverage Ratio and components thereof as of such dates), as an accommodation to the Borrower in reliance of the representations, warranties, covenants and agreements set forth herein, for all purposes under the Credit Documents, the Adjusted Coverage Ratio as of each of June 30, 2019 and September 30, 2019 shall be deemed to be within the range of 1.50:1.00 and 1.30:1.00; provided that (i) the Administrative Agent reserves all rights with respect to determining whether the calculation of PV-10 Value, PV-10 Value of PDP Reserves, PV-10 Value of Workover PDNP Reserves for any future period are reasonably acceptable to the Administrative Agent (in accordance with such definitions), (ii) the methodology utilized by the Borrower in preparing its calculations of the Adjusted Coverage Ratio, PV-10 Value, PV-10 Value of PDP Reserves, PV-10 Value of Workover PDNP Reserves as of June 30, 2019 and as of September 30, 2019 are in no way binding upon the Administrative Agent, and (iii) such accommodation is a one-time event and shall not waive, affect or diminish any right of the Administrative Agent to not accept any future calculations of the Adjusted Coverage Ratio (or the components thereof) to the extent set forth in the Credit Agreement, nor shall it constitute a course of conduct or dealing among the parties;

(b)     after giving effect to this Amendment, no Default or Event of Default exists or is continuing and there exists no breach of any representation or warranty, in each case, solely in respect of any prior calculation of the Adjusted Coverage Ratio contained in any Compliance Certificate or Reserve Report Certificate delivered prior to the date hereof;

(c)     the financial covenants set forth in Section 11.09 and Section 11.10 of the Credit Agreement shall not be tested for the fiscal quarter ending December 31, 2019 (it being understood that (i) the Borrower shall still be required to deliver, on or prior to February 15, 2020, a Reserve Report prepared as of December 31, 2019 under Section 10.21 under the Credit Agreement (which shall be prepared in accordance with the Credit Agreement, as amended hereby) period and (ii) such waiver will not be a waiver of any provision in the Credit Documents requiring pro forma compliance with any Financial Performance Covenant, Section 11.09 of the Credit Agreement or Section 11.10 of the Credit Agreement and, for the avoidance of doubt, any such pro forma compliance shall be tested as if the financial covenants set forth in Section 11.09 and Section 11.10 of the Credit Agreement were tested for the fiscal quarter ending December 31, 2019); and

(d)     for purposes of clarifying Section 11.10 of the Credit Agreement, as a result of the foregoing clauses (a) and (c), it is understood and agreed that (1) it will constitute an Event of Default if the Adjusted Coverage Ratio is less than 1.50:1.00 for either of the Test

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 258 of 300

Periods ending March 31, 2020 or June 30, 2020, and (2) following the Test Period ending June 30, 2020, the Borrower may rely on the proviso to Section 11.10 one additional time during the term of the Credit Agreement;

*provided* that nothing contained in this Section 3.6, nor any past indulgence by the Administrative Agent or any Lender nor any other action or inaction on behalf of Administrative Agent or any Lender, shall constitute or be deemed to constitute a consent to, or waiver of, any other action or inaction of the Borrower or any of the other Credit Parties which constitutes (or would constitute) a violation of any provision of the Credit Agreement or any other Credit Document, or which results (or would result) in a Default or Event of Default under the Credit Agreement or any other Credit Document.

**3.7**    **Credit Document.**  This Amendment shall constitute a Credit Document under the terms of the Credit Agreement.

**3.8**    **Expenses.**  The Borrower agrees to pay all fees and expenses in connection with this Amendment to the extent required to be paid pursuant to the Credit Agreement.

**3.9**    **Entirety.**  This Amendment and the other Credit Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof.

**3.10**    **Counterparts; Telecopy.**  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.  Delivery of an executed counterpart to this Amendment by telecopy or other electronic means shall be effective as an original and shall constitute a representation that an original will be delivered.

**3.11**    **GOVERNING LAW.  THIS AMENDMENT AND THE OTHER CREDIT DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AMENDMENT OR ANY OTHER CREDIT DOCUMENT (EXCEPT, AS TO ANY OTHER CREDIT DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

**3.12**    **Successors and Assigns.**  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**3.13**    **Consent to Jurisdiction; Service of Process; Waiver of Venue; Waiver of Jury Trial.**  The jurisdiction, service of process, waiver of venue and waiver of jury trial provisions set forth in Section 14.08 of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis.*

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 259 of 300

IN WITNESS WHEREOF the parties hereto have caused this Amendment to be duly executed on the date first above written.

**MD AMERICA ENERGY HOLDINGS, INC.**, a Delaware corporation

By: _____
Name: Eric Wauer
Title: CEO

**MD AMERICA INTERMEDIATE HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: Eric Wauer
Title: CEO

**MD AMERICA HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: Eric Wauer
Title: CEO

**MD AMERICA ENERGY, LLC**, a Delaware limited liability company

By: _____
Name: Eric Wauer
Title: CEO

[SIGNATURE PAGE TO FIRST AMENDMENT TO CREDIT AGREEMENT (*MD America Energy*)]

**LOAN ADMIN CO LLC**, as the
Administrative Agent

By: _____
    Name:    Sean Chao
    Title:     Authorized Signatory

[SIGNATURE PAGE TO FIRST AMENDMENT TO CREDIT AGREEMENT (*MD America Energy*)]

**MC CREDIT FUND I LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


**MC CREDIT FUND IA (CAYMAN MASTER) LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


**MC CREDIT FUND II LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


**MC CREDIT FUND II SPV LLC**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


**MC CREDIT FUND III (DELAWARE) LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


[SIGNATURE PAGE TO FIRST AMENDMENT TO CREDIT AGREEMENT (*MD America Energy*)]

**MC CREDIT FUND III-U
(DELAWARE) LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory


**MC CREDIT FUND III (CAYMAN
MASTER) LP**, as a Lender

By: _____
    Name:    Ashok Nayyar
    Title:     Authorized Signatory

[SIGNATURE PAGE TO FIRST AMENDMENT TO CREDIT AGREEMENT (*MD America Energy*)]

**TPG SPECIALTY LENDING, INC.**, as a
Lender

By: _____

Name:

Title:

**TAO TALENTS, LLC**, as a Lender

By: _____
Name: Joshua Peck
Title: Vice President

**ARENA LIMITED SPV, LLC**, as a Lender

By: _____
    Name:
    Title:

**PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY**, as a Lender

By: PGIM, Inc., its investment manager

By: _____

Name:

Title: Brian E. Lemons
Vice President

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as a Lender

By: _____

Name: Brian E. Lemons

Title: Vice President

[SIGNATURE PAGE TO FIRST AMENDMENT TO CREDIT AGREEMENT (*MD America Energy*)]

**Schedule 11.22**

**Drilled but Uncompleted Wells as of the First Amendment Effective Date that may be Completed**

[to be attached]

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 268 of 300

# EXHIBIT G

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 269 of 300

*Execution Version*

Loan Admin Co LLC
2200 Atlantic Street, Fifth Floor
Stamford, CT 06902

April 1, 2020

## NOTICE OF INSTRUCTION

This Notice of Instruction (this "<u>Notice</u>") is entered into as of April 1, 2020 by (i) each Lender (as defined below) party hereto (collectively, the "<u>Necessary Lenders</u>"), (ii) the Administrative Agent (as defined below), and (iii) the Collateral Agent (as defined below) under each of the Pledge Agreement (as defined below) and the Parent Pledge Agreement (as defined below).

W I T N E S S E T H:

WHEREAS, reference is made to (i) that certain Credit Agreement, dated as of November 14, 2018 (as amended by that certain First Amendment to Credit Agreement, dated as of December 20, 2019, and as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among MD America Energy Holdings, Inc., a Delaware corporation, MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC, a Delaware limited liability company, MD America Energy, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), the Guarantors from time to time party thereto, the lenders from time to time party thereto (the "<u>Lenders</u>"), Loan Admin Co LLC ("<u>Loan Admin</u>"), as administrative agent (in such capacity, the "<u>Administrative Agent</u>") and Lead Arranger and Guggenheim Securities, LLC as Lead Arranger; (ii) that certain Pledge Agreement, dated as of November 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "<u>Pledge Agreement</u>") among each of the pledgors party thereto (each, a "<u>Pledgor</u>" and, together with any other entity that becomes a pledgor thereunder pursuant to Section 30 thereof, the "<u>Pledgors</u>") and Loan Admin as Collateral Agent and as Pledgee (as such terms are defined in the Pledge Agreement); and (iii) that certain Pledge Agreement, dated as of November 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "<u>Parent Pledge Agreement</u>") between MeiDu America, Inc., Delaware corporation (the "<u>Parent Pledgor</u>") and Loan Admin as Collateral Agent and as Pledgee (as such terms are defined in the Parent Pledge Agreement). All capitalized terms used herein but not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

WHEREAS, the Administrative Agent has informed the Lenders that the Specified Events of Default (as defined on <u>Exhibit A</u> hereto) have occurred and are continuing;

WHEREAS, (i) the Necessary Lenders constituting at least the Majority Lenders have determined to direct the Administrative Agent and Collateral Agent to exercise certain rights and remedies under the Credit Documents on behalf of the Lenders in connection with such Specified Events of Default and pursuant to Section 12 of the Credit Agreement, and (ii) each of the Administrative Agent and the Collateral Agent has agreed to appoint its Affiliate, MD Admin Co LLC, a Delaware limited liability company, as a sub-agent to the Administrative Agent and the Collateral Agent for purposes of enforcing any and all of the Administrative Agent's and the Collateral Agent's rights and remedies as directed by the Majority Lenders under each of the Credit Documents (the "<u>Sub-Agent</u>"); and

NOW THEREFORE, in consideration of the foregoing recitals, (i) the Necessary Lenders party hereto constituting at least the Majority Lenders hereby instruct the Administrative Agent and the Collateral Agent to deliver the Notice of Default and Exercise of Certain Remedies in substantially the form attached as <u>Exhibit A</u> hereto and (ii) each of the Administrative Agent and the Collateral agent

hereby irrevocably appoints Sub-Agent as the Administrative Agent's and the Collateral Agent's sub-agent for purposes of enforcing any and all of the Administrative Agent's and the Collateral Agent's rights and remedies under each of the Credit Documents.

By their execution hereof, the Necessary Lenders hereto ratify and affirm that (i) the Collateral Agent and the Administrative Agent shall each be entitled to indemnification in accordance with Section 13.06 of the Credit Agreement for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by Collateral Agent or the Administrative Agent (or any Affiliate of either of them) resulting from any act or omission of the Sub-Agent, provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements resulting from the Collateral Agent's or the Administrative Agent's (or their respective Affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision) and (ii) the Sub-Agent shall, in the exercise of the powers delegated to it by the Administrative Agent and the Collateral Agent, benefit from the provisions of Section 13 of the Credit Agreement to the same extent as each of the Administrative Agent and the Collateral Agent.

[Signature Pages Follows]

IN WITNESS WHEREOF, the undersigned, have caused this Notice to be duly executed and delivered as of the date first above written.

**Lenders:**

**MC CREDIT FUND I LP**, as a Lender

By: _____
Name: Ashok Nayyar
Title:   Authorized Signatory

**MC CREDIT FUND IA (CAYMAN MASTER) LP**, as a Lender

By: _____
Name: Ashok Nayyar
Title:   Authorized Signatory

**MC CREDIT FUND II LP**, as a Lender

By: _____
Name: Ashok Nayyar
Title:   Authorized Signatory

**MC CREDIT FUND III (DELAWARE) LP,** as a Lender

By: _____
Name: Ashok Nayyar
Title:   Authorized Signatory

**MC CREDIT FUND III-U (DELAWARE) LP,** as a Lender

By: _____
Name: Ashok Nayyar
Title:   Authorized Signatory

**[Signature Page to Notice of Instruction (MD America)]**

**MC CREDIT FUND III (CAYMAN MASTER) LP**, as a Lender

By: _____

Name: Ashok Nayyar
Title: Authorized Signatory

**[Signature Page to Notice of Instruction (MD America)]**

INDEX NO. 652519/2020
Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 273 of 300
RECEIVED NYSCEF: 06/16/2020

**TAO TALENTS, LLC**, as a Lender

By: _____

Name: Joshua Peck

Title: Vice President

**[Signature Page to Notice of Instruction (MD America)]**

**TPG SPECIALTY LENDING, INC.**, as a
Lender

By: _____
Name:
Title:

[Signature Page to Notice of Instruction (MD America)]

**ARENA LIMITED SPV, LLC**, as a Lender

By: _____

Name:  Lawrence Cutler

Title:

**PRUDENTIAL LEGACY INSURANCE
COMPANY OF NEW JERSEY,** as a Lender

By: PGIM, Inc., its investment manager

By: _____
Name: Brian N. Thomas
Title:  Vice President

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,** as a Lender

By: _____
Name: Brian N. Thomas
Title: Vice President

**[Signature Page to Notice of Instruction (MD America)]**

**ACKNOWLEDGED AND ACCEPTED:**

**LOAN ADMIN CO LLC,**
as Administrative Agent

By: _____
Name:  Sean Chao
Title:   Authorized Signatory


**LOAN ADMIN CO LLC,**
as Collateral Agent

By: _____
Name:  Sean Chao
Title:   Authorized Signatory


**MD ADMIN CO LLC,**
as Sub-Agent

By: _____
Name:  Sean Chao
Title:   Authorized Signatory


[Signature Page to Notice of Instruction (MD America)]

## Exhibit A

*[See Attached]*

Loan Admin Co LLC
2200 Atlantic Street, Fifth Floor
Stamford, CT 06902

April 1, 2020

MD America Energy Holdings, Inc.
301 Commerce Street, Suite 2500
Fort Worth, Texas 76012

MD America Intermediate Holdings, LLC
301 Commerce Street, Suite 2500
Fort Worth, Texas 76012

MD America Holdings, LLC.
301 Commerce Street, Suite 2500
Fort Worth, Texas 76012

MD America Energy, LLC
301 Commerce Street, Suite 2500
Fort Worth, Texas 76012

MeiDu America, Inc.
301 Commerce Street, Suite 2500
Fort Worth, Texas 76012

Re: <u>Notice of Default and Exercise of Certain Remedies under Credit Documents (this "**Notice**")</u>

Ladies and Gentlemen,

Reference is made to (i) that certain Credit Agreement, dated as of November 14, 2018 (as amended by that certain First Amendment to Credit Agreement, dated as of December 20, 2019 ("**Amendment No.1**"), and as further modified, supplemented, amended, restated (including any amendment and restatement thereof), extended or renewed from time to time, the "**Credit Agreement**"), among MD America Energy Holdings, Inc., a Delaware corporation, MD America Intermediate Holdings, LLC, a Delaware limited liability company, MD America Holdings, LLC., a Delaware limited liability company, MD America Energy, LLC, a Delaware limited liability company (the "**Borrower**"), the Guarantors from time to time party thereto, the lenders from time to time party thereto (the "**Lenders**"), Loan Admin Co LLC ("**Loan Admin**"), as administrative agent (in such capacity, the "**Administrative Agent**") and Lead Arranger and Guggenheim Securities, LLC as Lead Arranger, (ii) that certain Pledge Agreement, dated as of November 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Pledge Agreement**") among each of the pledgors party thereto (each, a "**Pledgor**" and, together with any other entity that becomes a pledgor thereunder pursuant to Section 30 thereof, the "**Pledgors**") and Loan Admin as Collateral Agent and as Pledgee (as such terms are defined in the Pledge Agreement); and (iii) that certain Pledge Agreement, dated as of November 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Parent Pledge Agreement**") between MeiDu America, Inc., Delaware corporation (the "**Parent Pledgor**") and Loan Admin as Collateral Agent and as Pledgee (as such terms are defined in the Parent Pledge Agreement). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement.

Borrower has failed to comply with Section 3.1(a) of Amendment No.1 with respect to the contribution and payment of the First Equity Proceeds Loan Repayment (as such term is defined in Amendment No.1) on or prior to March 31, 2020 (the "**Specified Contribution and Payment Requirements**").

This letter constitutes notice to you that, as a result of Borrower's failure to comply with the Specified Contribution and Payment Requirements, Events of Default under Section 12.01(i) of the Credit Agreement and the last sentence of Section 3.1(a) of Amendment No.1 have occurred and are continuing (the "**Specified Events of Default**").

This letter also constitutes notice to you that, as a result of the Specified Events of Default, the Administrative Agent and Collateral Agent hereby declare that they have elected to invoke the following rights and remedies under the Credit Documents, without prejudice to the rights of the Administrative Agent, the Collateral Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party or to exercise any other remedy available to it under the Credit Documents:

Pursuant to Section 7(f) of the Pledge Agreement, the Collateral Agent, as Pledgee thereunder, hereby elects to invoke its rights, powers and remedies under the Pledge Agreement to vote (and exercise all rights and powers in respect of voting) all of the Collateral (as defined in the Pledge Agreement), including all of the Equity Interests owned by each Pledgor pledged to it under the Pledge Agreement (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral (as defined in the Pledge Agreement) and otherwise act with respect thereto as though it were the outright owner thereof (each Pledgor, under the terms of the Pledge Agreement, having irrevocably constituted and appointed the Pledgee the proxy and attorney-in-fact of such Pledgor, with full power of substitution to do so). Simultaneously with the exercise by the Collateral Agent of its rights, powers and remedies as described in the immediately preceding sentence, the rights and powers of each Pledgor to vote (and exercise all rights and powers in respect of voting) all of the Collateral (as defined in the Pledge Agreement) of such Pledgor, including all of the Equity Interests owned by the such Pledgor pledged to the Collateral Agent, as Pledgee, under the Pledge Agreement (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral (as defined in the Pledge Agreement) shall be revoked, until further notice by the Collateral Agent.

Pursuant to Section 7(f) of the Parent Pledge Agreement, the Collateral Agent, as Pledgee thereunder, hereby elects to invoke its rights, powers and remedies under the Parent Pledge Agreement to vote (and exercise all rights and powers in respect of voting) all of the Collateral (as defined in the Parent Pledge Agreement), including all of the Equity Interests owned by the Parent Pledgor pledged to it under the Parent Pledge Agreement (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral (as defined in the Parent Pledge Agreement) and otherwise act with respect thereto as though it were the outright owner thereof (Parent Pledgor, under the terms of the Parent Pledge Agreement, having irrevocably constituted and appointed the Pledgee the proxy and attorney-in-fact of Parent Pledgor, with full power of substitution to do so). Simultaneously with the exercise by the Collateral Agent of its rights, powers and remedies as described in the immediately preceding sentence, the rights and powers of the Parent Pledgor to vote (and exercise all rights and powers in respect of voting) all of the Collateral (as defined in the Parent Pledge Agreement), including all of the Equity Interests owned by the Parent Pledgor pledged to the Collateral Agent, as Pledgee, under the Parent Pledge Agreement (whether or not transferred into the name of the Pledgee) and give all consents, waivers and ratifications in respect of the Collateral (as defined in the Parent Pledge Agreement) shall be revoked, until further notice by the Collateral Agent.

Until further written notice by each of the Administrative Agent and the Collateral Agent, each of the Administrative Agent and the Collateral Agent has appointed MD Admin Co LLC as the

Administrative Agent's and the Collateral Agent's sub-agent for the exercise of the foregoing remedy and any and all other rights and remedies set forth in the Credit Documents pursuant to Section 13.12 of the Credit Agreement.

Each and every right, power and remedy of the Administrative Agent, Collateral Agent and Lenders provided for in the Credit Agreement, the Pledge Agreement, the Parent Pledge Agreement or in any other Credit Document, or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by the Administrative Agent, the Collateral Agent (including by MD Admin Co LLC as its sub-agent) or any other Lender of any one or more of the rights, powers or remedies provided for in the Credit Agreement, the Pledge Agreement, the Parent Pledge Agreement or in any other Credit Document or now or hereafter existing at law or in equity or by statute or otherwise (including, without limitation, the Collateral Agent's election to exercise its voting rights with respect to the Collateral described above or to sell, assign or otherwise liquidate any or all of the Collateral as described above) shall not preclude the simultaneous or later exercise by the Administrative Agent, the Collateral Agent or any other Lender of all such other rights, powers or remedies, and no failure or delay on the part of the Administrative Agent, the Collateral Agent or any other Lender to exercise any such right, power or remedy shall operate as a waiver thereof.

The Administrative Agent, the Collateral Agent and Lenders further reserve all rights and remedies with respect to any other Defaults or Events of Default under the Credit Agreement, the Pledge Agreement, the Parent Pledge Agreement and the other Credit Documents that have occurred, whether known or unknown, and/or whether now or in the future existing. No oral representation or course of dealing or conduct on the part of any of the Administrative Agent, the Collateral Agent, any Lender or any of their respective officers, employees or agents, and no failure or delay by the Administrative Agent, the Collateral Agent or any Lender with respect to the exercise of any right, power, privilege or remedy under the Credit Agreement, the Pledge Agreement, the Parent Pledge Agreement or the other Credit Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

[Signature Pages Follows]

IN WITNESS WHEREOF, the undersigned, at the direction of the Majority Lenders, has caused this Notice to be duly executed and delivered as of the date first above written.

**LOAN ADMIN CO LLC,**
as Administrative Agent

By: _____
Name: Sean Chao
Title:   Authorized Signatory

**LOAN ADMIN CO LLC,**
as Collateral Agent and Pledgee

By: _____
Name: Sean Chao
Title:   Authorized Signatory

**MD ADMIN CO LLC,**
as Sub-Agent

By: _____
Name: Sean Chao
Title:   Authorized Signatory

**[Signature Page to Notice of Default and Exercise of Remedies (MD America)]**

# EXHIBIT H

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM INDEX NO. 652519/2020
NYSCEF DOC. NO. 10    Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 284 of 300    RECEIVED NYSCEF: 06/16/2020

*Execution Version*

## OMNIBUS UNANIMOUS WRITTEN CONSENT
## IN LIEU OF A MEETING
## OF

### THE BOARD OF DIRECTORS
### OF
### MD AMERICA ENERGY HOLDINGS, INC.,

### THE BOARD OF MANAGERS
### OF
### MD AMERICA INTERMEDIATE HOLDINGS, LLC,

### THE BOARD OF MANAGERS
### OF
### MD AMERICA HOLDINGS, LLC,

### THE BOARD OF MANAGERS
### OF
### MD AMERICA ENERGY, LLC,

### THE SOLE MANAGER
### OF
### MD AMERICA PIPELINE, LLC,

### AND

### THE BOARD OF DIRECTORS
### OF
### MD AMERICA FINANCE CORPORATION

### APRIL 1, 2020

The undersigned, being (i) all the members of the board of directors of MD America Energy Holdings, Inc., (ii) all the members of the board of managers of MD America Intermediate Holdings, LLC, a Delaware limited liability company, (iii) all the members of the board of managers of MD America Holdings, LLC, a Delaware limited liability company, (iv) all the members of the board of managers of MD America Energy, LLC, a Delaware limited liability company, (v) the sole manager of MD America Pipeline, LLC, a Texas limited liability company and (vi) all the members of the board of directors of MD America Finance Corporation, a Delaware Corporation (collectively, "***Companies***", and each a "***Company***"), acting by written consent without a meeting, in accordance with the provisions of the governing documents of each Company, and pursuant to applicable provisions of the Delaware General Corporation Law, the Delaware Limited Liability Company Act or the Texas Business Organizations Code, as applicable, does hereby consent to the adoption of the following resolutions.

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 285 of 300

1.     <u>Removal of Officers</u>.

WHEREAS, the undersigned has determined that the removal of Shao Haixiao (Jimmy) from his office as Secretary or Treasurer and Secretary of each Company, as applicable, as of the date hereof is necessary, advisable and in the best interests of each Company.

NOW THEREFORE, BE IT RESOLVED, that Shao Haixiao (Jimmy), the Secretary or the Treasurer and Secretary, as applicable, of each Company, is hereby removed from his office, effective immediately.

2.     <u>Appointment of Chairman</u>.

WHEREAS, each of the undersigned has determined that the appointment of Robert Warshauer as chairman (the "***Chairman***") of the board of directors or board of managers of each Company, as applicable, is necessary, advisable and in the best interests of each Company.

NOW THEREFORE, BE IT RESOLVED, that Robert Warshauer be, and hereby is, elected and appointed to serve as the Chairman of the board of directors or the board of managers of each Company, as applicable, and to hold office until a successor shall be duly elected and qualified or, if earlier, his death, resignation, or removal.

3.     <u>General Authorization</u>.

RESOLVED, that the Chairman, be, and hereby is, authorized and directed, in the name and on behalf of each Company, to take or cause to be taken all such further actions, including, without limitation, negotiating, signing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as the Chairman shall approve, the execution and delivery thereof to be conclusive evidence of such approval) all such further documents, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as the Chairman may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolutions, such determination to be conclusively evidenced by the taking of any such further action.

*[The Remainder of this Page Is Intentionally Left Blank.]*

EAST\173319999.3
March 31, 2020  4:19 PM

**IN WITNESS WHEREOF**, each undersigned has duly executed this written consent as of the date and year first above written.

**Members of the Board of Directors of each of MD America Energy Holdings, Inc. and MD America Finance Corporation**

_____
Robert Warshauer

_____
Donald G. Ritter

**Members of the Board of Managers of each of MD America Intermediate Holdings, LLC, MD America Holdings, LLC, and MD America Energy, LLC**

_____
Robert Warshauer

_____
Donald G. Ritter

**The Sole Manager of MD America Pipeline, LLC**

_____
Robert Warshauer,
as Manager of MD America Pipeline, LLC

_____
Donald G. Ritter,
as Manager of MD America Pipeline, LLC

[Signature Page to the Omnibus Unanimous Written Consent (MD America)]

IN WITNESS WHEREOF, each undersigned has duly executed this written consent as of the date and year first above written.

Members of the Board of Directors of each of MD America Energy Holdings, Inc. and MD America Finance Corporation

Robert Warshauer

Donald G. Ritter

Members of the Board of Managers of each of MD America Intermediate Holdings, LLC, MD America Holdings, LLC, and MD America Energy, LLC

Robert Warshauer

Donald G. Ritter

The Sole Manager of MD America Pipeline, LLC

Robert Warshauer,
as Manager of MD America Pipeline, LLC

Donald G. Ritter,
as Manager of MD America Pipeline, LLC

[Signature Page to the Omnibus Unanimous Written Consent (MD America)]

April 1, 2020

To:  MD America Energy Holdings, Inc.,
     MD America Intermediate Holdings, LLC,
     MD America Holdings, LLC,
     MD America Energy, LLC, and
     MD America Finance Corporation

I hereby accept my appointment as (i) a director of MD America Energy Holdings, Inc., a Delaware corporation (ii) a manager of MD America Intermediate Holdings, LLC, a Delaware limited liability company, (iii) a manager of MD America Holdings, LLC, a Delaware limited liability company, (iv) a manager of MD America Energy, LLC, a Delaware limited liability company, and (v) a director of MD America Finance Corporation, a Delaware corporation.

Donald G. Ritter

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 289 of 300

April 1, 2020

To:   MD America Energy Holdings, Inc.,
      MD America Intermediate Holdings, LLC,
      MD America Holdings, LLC,
      MD America Energy, LLC, and
      MD America Finance Corporation

I hereby accept my appointment as (i) a director of MD America Energy Holdings, Inc., a Delaware corporation (ii) a manager of MD America Intermediate Holdings, LLC, a Delaware limited liability company, (iii) a manager of MD America Holdings, LLC, a Delaware limited liability company, (iv) a manager of MD America Energy, LLC, a Delaware limited liability company, and (v) a director of MD America Finance Corporation, a Delaware corporation.

Robert Warshauer

# EXHIBIT I

Case 20-34966   Document 136-1   Filed in TXSB on 11/03/20   Page 291 of 300

# Conference Call

Jimmy Shao

Sat 4/11/2020 11:22 AM

To: robertwarshauer@gmail.com <robertwarshauer@gmail.com>; Don@enduranceresourcesllc.com <Don@enduranceresourcesllc.com>;

Cc: anayyar@mccp.com <anayyar@mccp.com>; Jonathan Tunis <jtunis@mccp.com>; Eric Waller <eric.waller@MDAMERICAENERGY.COM>;

Dear Mr. Ashok Nayyar, Mr. John Tunis,
Dear Mr. Robert Warshauer, Mr. Donald Ritter:
And Dear Eric:

How are you doing.
I received a call from Meidu minutes ago. Please see following.

1. They are arranging a senior executive from ZG group to have a conference call with Mr. Ashok Nayyar, Monday morning (April 13). This executive is more senior than Mr. Chen.
Mr. Ashok Nayyar, please let me know what time is good for your schedule. Thank you.

2. Meidu and its financial auditors will need certain financial information regarding their 2019 annual report and 2020 Q1 report. They plan to send these to me for translation. Please direct me the right communication channel, so I can furnish. Thank you.

Best Regards,
Jimmy Shao

MD America Energy, LLC
Office: (817) 288-4874
Cell:    (630) 408-5205
Fax:    (312) 276-4539
https://www.mdae.com
CONFIDENTIAL: The information contained in this email communication is confidential information intended only for the use of the addressee.

# EXHIBIT J

证券代码：**600175**        证券简称：美都能源        公告编号：**2020-012**

# 美都能源股份有限公司

## 关于全资子公司 MD America Energy.LLC 重大经营风险的提示性公告

> 本公司董事会及全体董事保证本公告内容不存在任何虚假记载、误导性陈述或者重大遗漏，并对其内容的真实性、准确性和完整性承担个别及连带责任。

一、基本情况说明

2018 年 11 月 14 日，公司全资子公司 MD America Energy.LLC（中文名：美都美国能源有限公司，以下简称"MDAE"）与贷款人 MC CREDIT FUND I LP、MC CREDIT FUND Ⅱ LP、MC CREDIT FUND Ⅲ（LOAN FUNDING） LP、TPG SPECIALTY LENDING, INC、TAO TALENTS, LLC、ARENA LIMITED SPV, LLC、PRUDENTIAL LEGACY INSURANCE COMPANY OF NEW JERSEY、THE PRUDENTIAL INSURANCE COMPANY OF AMERICA（以下合称"贷款人"）、管理代理人 Loan Admin Co LLC 签署了《贷款合同》（〈CREDIT AGREEMENT〉）。授信额度 2 亿美元，MDAE 分别于 2018 年 11 月 14 日提款 1 亿美元、于 2019 年 4 月 28 日提款 3000 万美元，合计提款 1.3 亿美元，期限 5 年。同时，签署了《质押协议》（〈PLEDGE AGREEMENT〉），抵（质）押品（"Collateral"）为：MDAE 全部股权及全部资产。根据《上市公司信息披露管理办法》及上海证券交易所信息披露规则要求，上市公司应对上述重要资产被抵押的情况进行及时披露，因信息披露负责人工作疏忽，上市公司未对上述事项进行临时公告。

上市公司在 2018 年年度报告第十一节"财务报告"第十四小节"（4）合并范围内各公司为自身对外借款进行的财产质押担保情况"中对 MADE 新增长期借款 1 亿美元的抵押担保情况进行了详细披露，具体内容如下：

单位：万元

| 担保单位 | 质押权人 | 质押标的 | 账面原值 | 账面价值 | 担保借款 | 借款到期 |
|---|---|---|---|---|---|---|

| | | 物 | | | 余额 | 日 |
|---|---|---|---|---|---|---|
| MDAmericaEnergyLLC | LONANDMINCOLLC | 该公司全部资产 | 786,321.52 | 786,321.52 | 1亿美元 | 2023 年 11 月 14 日 |

同时，上述内容也在年度审计报告十三、重大承诺事项中予以披露。

2019 年下半年，因美国与 OPEC+产油国之间的油价博弈愈演愈烈，MDAE 与贷款人、管理代理人就贷款担保物指标产生纠纷，经与贷款人、管理代理人沟通，各方于 2019 年 12 月 20 日签署了《贷款合同第一修正案》(〈FIRST AMENDMENT TO CREDIT AGREEMENT〉)，约定在 2020 年 3 月 31 日当日或之前 MDAE 提前偿还 3000 万美元的贷款，若无法按时偿还，则贷款人可根据《贷款合同》及《质押协议》的约定行使相应权利。

二、MDAE 目前的现状

2019 全年国际油价宽幅震荡后，2020 年第一季度国际石油价格剧烈下跌，WTI 油价跌幅超过 60%，加之新冠疫情全球蔓延，受此影响，MDAE 经营及融资出现困难，无法按照《贷款合同第一修正案》的约定在 2020 年 3 月 31 日当日或之前偿还 3000 万美元贷款。

2020 年 4 月 2 日，贷款人向上市公司美国子公司 MDAE 主要董事成员（闻掌华先生、Jimmy Shao 先生、Eric Waller 先生）发出违约通知，告知其已构成违约，贷款人称为了保护自身的权益将根据《质押协议》的约定，采取一定的补救措施，包括但不限于：1、罢免 MDAE 董事会全体成员，任命罗伯特•沃肖尔（Robert Warshauer）和唐纳德•G•里特（Donald G. Ritter）为 MDAE 董事会成员；2、将全部或部分抵（质）押品转让给质权人或其指定人；3、向任何有管辖权的法院提起诉讼；4、享有对全部或任何部分抵（质）押品（无论是否转移到质权人的名下）处置的投票表决权。收到通知后，上市公司美国子公司 MDAE 董事成员及管理层积极与对方进行沟通协商解决。2020 年 4 月 11、12 日，MDAE 管理层电话告知上市公司财务总监公司工作开展可能受限事项，上市公司得知此事项后，2020 年 4 月 13 日紧急召开会议进行商讨。

截止目前，上市公司未认可贷款方发出的上述通知，子公司 MDAE 管理层工

作开展虽受到贷款方单方面限制，但仍保持经营稳定，上市公司与子公司 MDAE 沟通正常。

### 三、上市公司拟采取的措施

上市公司在得知上述情况后，立即和贷款人进行沟通、协商解决方案。一方面保证 MDAE 日常生产经营不受影响；另一方面，上市公司也在积极寻找新增融资，以解决此次危机。

同时，上市公司也在第一时间通过美国境外子公司聘请律师处理此事宜，通过法律途径最大限度保护上市公司利益。

### 四、重大风险提示

若上市公司无法与贷款人就《贷款合同》及修正案和《质押协议》达成和解方案，而上市公司又无法找到替换该笔贷款的新增融资，贷款人可能将按照质押协议的约定采取进一步措施（包括起诉、拍卖等），若上市公司无法有效应对，则上市公司子公司 MDAE 可能将面临被拍卖或破产清算的风险。

公司将根据上述事项的相关进展或重大变化，按照《上海证券交易所股票上市规则》及其他有关要求及时履行信息披露义务。公司相关信息均以指定媒体中国证券报、上海证券报及上海证券交易所网站（www.sse.com.cn）刊登的公告为准，敬请广大投资者注意投资风险。


特此公告。


美都能源股份有限公司

董事会

2020 年 4 月 15 日

Here is a short summary translation of the announcement:

Subject: MDAE Major operation risk

1. MD America Energy LLC (MDAE) borrowed from Creditor.

List of Creditors: MC Credit, TPG, Tao, Arena, Prudential,

Administrator: Loan Admin Co

2. Total facility: $ 200 million, draw 100 and then 30, total 130 million USD.

3. Signed First Amendment Dec 2019 on 30 million payment.

4. Defaulted on 30 million payment on March 31, 2020

5. April 2, 2020, Creditor noticed MDAE:

Default, remedies including: (5.1) remove all BOD, appoint new director: Robert Warshauer, and Donald G. Ritter, (5.2) rights on all collateral, (5.3) rights of litigation, (5.4) rights of voting,

6 Public Co is working on resolve it.

# EXHIBIT K

FILED: NEW YORK COUNTY CLERK 06/16/2020 06:44 PM
NYSCEF DOC. NO. 13
INDEX NO. 652519/2020
RECEIVED NYSCEF: 06/16/2020

证券代码：600175　　　证券简称：*ST美都　　　公告编号：2020-056

# 美都能源股份有限公司

## 收到上海证券交易所关于公司股票终止上市相关

## 事项的监管工作函的公告

---

**特别提示**

本公司董事会及全体董事保证本公告内容不存在任何虚假记载、误导性陈述或者重大遗漏，并对其内容的真实性、准确性和完整性承担个别及连带责任。

---

公司于 2020 年 5 月 27 日收到上海证券交易所《关于美都能源股份有限公司股票终止上市相关事项的监管工作函》（上证公函【2020】0595 号）， 现将全文公告如下：

美都能源股份有限公司：

截至 2020 年 5 月 27 日，你公司股票已连续 20 个交易日每日收盘价均低于股票面值，触及本所《股票上市规则》第 14.3.1 条规定的终止上市条件，应当予以终止上市。你公司股票将自 5 月 28 日开市起停牌，本所将在此后的 15 个交易日内召开上市委员会进行审议，并根据上市委员会的审核意见，作出相应的终止上市决定。根据本所《股票上市规则》17.1 条的规定，现就相关事项要求如下：

一、公司全体董事、监事、高级管理人员应当勤勉尽责，维护公司正常生产经营活动，保护公司和全体股东利益。

二、公司股票被本所摘牌前，公司和全体董事、监事、高级管理人员及相关信息披露义务人应当继续遵守相关法律法规、行政法规、部门规章、其他规范性文件、股票上市规则和本所其他文件，并履行相关义务，披露重要信息。

三、公司及全体董事、监事、高级管理人员应及时回应投资者关切，积极做好沟通解释工作。

四、前期公司披露存在为控股股东及其关联方提供 10 亿元违规担保事项，我部已就相关事项发出工作函，要求公司制定具体整改措施和期限，尽快完成整改，目前公司整改工作尚未完成。同时，我部对公司 2019 年年度报告发出问询函，但公司未能按期回复。鉴于公司当前已触及终止上市情形，相关方应尽早明

Case 20-34966 Document 136-1 Filed in TXSB on 11/03/20 Page 299 of 300

确上述事项后续安排，及时履行信息披露义务，充分揭示存在的风险事项，提醒投资者理性投资。

五、公司应根据《股票上市规则》第 14.3.28 条等规定，尽快聘请主办券商，做好公司股票进入全国中小企业股份转让系统的具体安排和信息披露工作，确保公司股票在摘牌之日起 45 个交易日内可以挂牌转让，保护投资者股份转让权利。

请公司收到本工作函后立即披露。退市相关工作对投资者影响重大，你公司全体董事、监事和高级管理人员以及实际控制人应当本着对投资者负责的态度，勤勉尽责，认真落实本工作函各项要求，并按要求履行信息披露义务。

特此公告。

美都能源股份有限公司

董事会

2020 年 5 月 28 日

Case 20-34966  Document 136-1  Filed in TXSB on 11/03/20  Page 300 of 300

A short summary translation:

Meidu received notice from Shanghai Stock Exchange.

As of May 27, 2020, stock price has been below face value for consecutively 20 business days, trigger < Public Stock Regulation > RULE 14.3.1, it needs to be delisted.

Stock will be suspended starting May 28. This Stock Exchange will go through committee within 15 business days, and according to public security committee's review, will make final decision on delisting.

{N0271360 }