# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| **MD AMERICA ENERGY, LLC,** *et al.,* | § Case No. 20-34966 (DRJ) |
| | § |
| Debtors.[1] | § (Jointly Administered) |
| | § |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on October 12, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") entered an order [Docket No. 24] (the "Disclosure Statement Order"): (a) scheduling a hearing (the "Combined Hearing") on confirmation of the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as amended, supplemented, or otherwise modified from time to time, the "Plan")[2] and the adequacy of the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), (b) conditionally approving the Disclosure Statement, (c) establishing a deadline for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan and approving related procedures, (d) approving the solicitation procedures regarding votes to accept or reject the Plan, (e) approving the form and manner of notice of commencement of these Chapter 11 Cases and the Combined Hearing, and (f) allowing the notice period for the Disclosure Statement and Combined Hearing to run simultaneously.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors hereby file the Plan Supplement. The Plan Supplement contains the following documents (each as defined in the Plan): (a) the New Organizational Documents (b) the New First Lien Term Loan Documents; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) the identity of the members of the New Boards and the senior management team to be retained by the Reorganized Debtors as of the Effective Date; (g) the Schedule of Trade Claims; (h) the Schedule of Non-Released Persons; (i) the Valuation Analysis; and (j) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: MD America Energy, LLC (0164), MD America Energy Holdings, Inc. (5493), MD America Intermediate Holdings, LLC (3204), MD America Holdings, LLC (5748), MD America Pipeline, LLC, and MD America Finance Corporation (8321). The address of the Debtors' headquarters is: 301 Commerce Street, Suite 2500 Fort Worth, Texas 76102.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

the Plan Supplement through the Effective Date subject in all respects to the consent rights set forth herein and in the Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** the Combined Hearing will commence on **November 19, 2020 at 10:00 a.m.** prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is **November 13, 2020 at 5:00 p.m.** prevailing Central Time. Any objection to the Plan *must*: be (i) in writing, (ii) filed with the Clerk of the Court together with proof of service thereof, (iii) set forth the name of the objecting party, and the nature and amount of any claim or interest asserted by the objecting party against the estate or property of the Debtors, and state the legal and factual basis for such objection, (iv) if practicable, propose a modification to the Plan that would resolve such objections, and (v) conform to the applicable Bankruptcy Rules and the Bankruptcy Local Rules. In addition to being filed with the Clerk of the Court, any such objections should be served on those parties who have filed a notice of appearance in the Chapter 11 Cases and upon the following parties:

(i)     MD America Energy, LLC, 301 Commerce Street, Suite 2500 Fort Worth, Texas 76102 (Attn: Scott Avila, Chief Restructuring Officer);

(ii)    Counsel to the Debtors, Porter Hedges LLP, 1000 Main Street, Suite 3600, Houston, Texas 77002 (Attn: John F. Higgins and M. Shane Johnson);

(iii)   Counsel to the Term Loan Lenders, Vinson & Elkins LLP, The Grace Building 114 Avenue of the Americas, 32nd Floor, New York, NY 10036 (Attn: Steven M. Abramowitz, Kevin Heverin, and Steven Zundell);

(iv)    counsel to the Term Loan Agent, DLA Piper LLP, 1251 Avenue of the Americas, New York, NY 10020 (Attn: Rachel Ehrlich Albanese and Jamie Knox);

(v)     the United States Attorney's Office for the Southern District of Texas;

(vi)    the Internal Revenue Service; and

(vii)   The Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact the Claims and Noticing Agent, the Debtors' proposed solicitation agent in the chapter 11 cases (the "Claims and Noticing Agent"), by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/MDAmerica;  (b) writing to MD America Energy Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165; (c) emailing mdamericaballots@primeclerk.com (reference "MD

10786406

America" in the subject line); and/or (d) calling the Debtors' restructuring hotline at (877) 464-6899 (domestic toll-free) or (347) 817-4095 (international toll).

---

**ARTICLE VIII** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.F CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

---

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.

Dated:  November 3, 2020
Houston, Texas

**PORTER HEDGES LLP**

By:     */s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
Mark D. Jones (TX 24083273)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoungjohn@porterhedges.com
mjones@porterhedges.com

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **MD AMERICA ENERGY, LLC,** *et al.*, | § **Case No. 20-34966 (DRJ)** |
| | § |
| **Debtors.**[1] | § **(Joint Administration Pending)** |
| | § |

**PLAN SUPPLEMENT FOR THE DEBTORS' JOINT PREPACKAGED**
**CHAPTER 11 PLAN OF REORGANIZATION**

| **Exhibit** | **Description** |
|---|---|
| A | Form of New Organizational Documents |
| B | New First Lien Term Loan Documents |
| C | Schedule of Rejected Executory Contracts and Unexpired Leases |
| D | Schedule of Assumed Executory Contracts and Unexpired Leases |
| E | Schedule of Retained Causes of Action |
| F | Identity of New Boards and Senior Management |
| G | Schedule of Trade Claims |
| H | Schedule of Non-Released Persons |
| I | Valuation Analysis |

Certain documents, or portions thereof, including the Form of New Organizational Documents and the New First Lien Term Loan Documents, contained in the Plan Supplement remain subject to continuing negotiations among the Debtors and the Term Loan Lenders. The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and/or the Restructuring Support Agreement.

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: MD America Energy, LLC (0164), MD America Energy Holdings, Inc. (5493), MD America Intermediate Holdings, LLC (3204), MD America Holdings, LLC (5748), MD America Pipeline, LLC, and MD America Finance Corporation (8321). The address of the Debtors' headquarters is: 301 Commerce Street, Suite 2500 Fort Worth, Texas 76102.

## **EXHIBIT A**

**Form of New Organizational Documents**

[See Attached]

*Draft 11/3/20*

# AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# [●], LLC,[1]

# a Delaware Limited Liability Company

# [_], 2020

---

[1] **Note to Draft**: Entity name to be discussed/confirmed based on final structure.

**THE UNITS IN [●], LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION. NO UNIT MAY BE SOLD, TRANSFERRED, ASSIGNED OR OFFERED FOR SALE (WITHIN THE MEANING OF ANY SECURITIES LAW) UNLESS A REGISTRATION STATEMENT UNDER ALL APPLICABLE SECURITIES LAWS WITH RESPECT TO THE UNIT IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE UNIT. A UNIT ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF THIS AGREEMENT ARE SATISFIED.**

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

Section 1.01    Definitions.............................................................................................. 2
Section 1.02    Construction........................................................................................... 15

## ARTICLE II

### ORGANIZATIONAL AND OTHER MATTERS

Section 2.01    Formation; Ratification......................................................................... 15
Section 2.02    Name...................................................................................................... 16
Section 2.03    Limited Liability ................................................................................... 16
Section 2.04    Registered Address; Registered Agent; Principal Office; Other Offices.............. 16
Section 2.05    Purpose.................................................................................................. 16
Section 2.06    Foreign Qualification............................................................................ 16
Section 2.07    Term....................................................................................................... 16
Section 2.08    No State Law Partnership ..................................................................... 17
Section 2.09    Title to Company Assets ....................................................................... 17

## ARTICLE III

### UNITS; MEMBERS; REPRESENTATIONS

Section 3.01    Units Generally ..................................................................................... 17
Section 3.02    Common Units; Common Members...................................................... 17
Section 3.03    Unit Certificates ................................................................................... 17
Section 3.04    Conflicts of Interest.............................................................................. 18
Section 3.05    Representations and Warranties............................................................ 20

## ARTICLE IV

### CERTAIN AGREEMENTS OF THE COMPANY AND THE MEMBERS

Section 4.01    Books, Records and Access .................................................................. 21
Section 4.02    Tax Returns and Forms ......................................................................... 22
Section 4.03    Tax Partnership ..................................................................................... 23
Section 4.04    Tax Elections ........................................................................................ 23
Section 4.05    Partnership Representative.................................................................... 23
Section 4.06    Bank Accounts ...................................................................................... 24
Section 4.07    VCOC Amendment............................................................................... 24

i

# ARTICLE V

## CAPITAL CONTRIBUTIONS

Section 5.01   Initial Unit Issuances ................................................................................ 24
Section 5.02   Withdrawal of Capital .............................................................................. 25
Section 5.03   Capital Accounts ...................................................................................... 25

# ARTICLE VI

## ALLOCATIONS

Section 6.01   Allocations of Profits and Losses ............................................................ 26
Section 6.02   Special Tax Allocations ........................................................................... 26
Section 6.03   Income Tax Allocations ........................................................................... 28
Section 6.04   Income Tax Allocations with Respect to Depletable Properties ............ 29
Section 6.05   Other Allocation Rules ............................................................................ 30

# ARTICLE VII

## DISTRIBUTIONS

Section 7.01   Distributions ............................................................................................ 30
Section 7.02   Distributions in Kind ............................................................................... 31
Section 7.03   Tax Distributions ..................................................................................... 31
Section 7.04   Withholding and Other Tax Payments by the Company ......................... 31

# ARTICLE VIII

## ACTIONS BY MEMBERS

Section 8.01   Meetings ................................................................................................... 33
Section 8.02   Place of Meetings .................................................................................... 33
Section 8.03   Notice of Meetings .................................................................................. 33
Section 8.04   Record Date ............................................................................................. 33
Section 8.05   Quorum .................................................................................................... 33
Section 8.06   Proxies ..................................................................................................... 33
Section 8.07   Action by Members Without a Meeting .................................................. 34
Section 8.08   Waiver of Notice ..................................................................................... 34
Section 8.09   Conduct of Meetings ............................................................................... 34
Section 8.10   No Power to Manage ............................................................................... 34

# ARTICLE IX

## MANAGEMENT OF THE COMPANY

Section 9.01   Management .............................................................................................. 34
Section 9.02   Board of Managers .................................................................................. 35

Section 9.03    Officers ................................................................................................. 38
Section 9.04    Actions Requiring Supermajority Approval ....................................... 38
Section 9.05    Compliance Program ........................................................................... 39

## ARTICLE X

## INDEMNIFICATION

Section 10.01   Power to Indemnify in Actions, Suits or Proceedings .......................... 40
Section 10.02   Authorization of Indemnification ........................................................ 40
Section 10.03   Expenses Payable in Advance ............................................................. 41
Section 10.04   Nonexclusivity of Indemnification and Advancement of Expenses..................... 41
Section 10.05   Survival of Indemnification and Advancement of Expenses............................... 41
Section 10.06   Limitation on Indemnification ............................................................. 42
Section 10.07   Indemnification of Employees and Agents........................................... 42
Section 10.08   Severability ......................................................................................... 42
Section 10.09   Waiver of Members' Fiduciary Duties; Limitation of Liability .......................... 42
Section 10.10   Indemnitor of First Resort................................................................... 44
Section 10.11   Insurance .............................................................................................. 45

## ARTICLE XI

## TRANSFER OF UNITS

Section 11.01   Approved Sale...................................................................................... 45
Section 11.02   Conversion to a Corporation; Public Offering..................................... 47
Section 11.03   Registration Rights.............................................................................. 49
Section 11.04   Tag Along Rights ................................................................................. 50
Section 11.05   Certain Events Not Deemed Transfers ................................................ 51
Section 11.06   Transfer and Exchange ........................................................................ 51
Section 11.07   Determination of Fair Market Value.................................................... 52
Section 11.08   Substituted Members ........................................................................... 52
Section 11.09   Right of First Offer .............................................................................. 52

## ARTICLE XII

## LIMITATIONS ON TRANSFERS

Section 12.01   Restrictions on Transfer...................................................................... 54
Section 12.02   Restrictive Legends............................................................................. 55
Section 12.03   Spouses ................................................................................................ 56
Section 12.04   Termination of Certain Restrictions.................................................... 56

## ARTICLE XIII

## ISSUANCE OF ADDITIONAL UNITS

Section 13.01   Issuance of Additional Units............................................................... 57

Section 13.02  Preemptive Rights ................................................................................................. 58

ARTICLE XIV

DISSOLUTION AND LIQUIDATION

Section 14.01  Dissolution ............................................................................................................ 59
Section 14.02  Effect of Dissolution ............................................................................................ 60
Section 14.03  Liquidation Upon Dissolution ............................................................................ 60
Section 14.04  Negative Capital Accounts .................................................................................. 60
Section 14.05  Winding Up and Certificate of Cancellation ..................................................... 60

ARTICLE XV

MISCELLANEOUS PROVISIONS

Section 15.01  Notices .................................................................................................................. 61
Section 15.02  Governing Law ..................................................................................................... 61
Section 15.03  Exclusive Jurisdiction; Waiver of Jury Trial; Severability. ................................ 61
Section 15.04  Entire Agreement; Amendments.......................................................................... 62
Section 15.05  Confidentiality ...................................................................................................... 64
Section 15.06  Non-Disparagement .............................................................................................. 65
Section 15.07  Waiver .................................................................................................................. 66
Section 15.08  Severability ........................................................................................................... 66
Section 15.09  Ownership of Property and Right of Partition .................................................... 66
Section 15.10  Further Assurances................................................................................................ 66
Section 15.11  Parties in Interest.................................................................................................. 66
Section 15.12  Specific Performance ............................................................................................ 66
Section 15.13  Counterparts .......................................................................................................... 67
Section 15.14  Publicity ................................................................................................................ 67
Section 15.15  No Effect On Lender Relationship ..................................................................... 67

iv

**EXHIBITS**

Exhibit A        Common Members
Exhibit B        Initial Board of Managers And Initial Officers
Exhibit C        Consent of Spouse
Exhibit D        Adoption Agreement

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## [●], LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of [●], LLC, a Delaware limited liability company (the "**Company**"), dated effective as of [_], 2020 (the "**Effective Date**"), is adopted, executed and agreed to by the Members (as defined below) that are signatories hereto or that execute an Adoption Agreement (as defined below) after the Effective Date.

## W I T N E S S E T H:

[WHEREAS, pursuant to the Plan of Reorganization, holders of debt of MD America Energy, LLC received common stock of MD America Energy Holdings, Inc. in partial satisfaction of such debt;]

WHEREAS, the Company has been formed as a limited liability company under the Delaware Limited Liability Company Act (the "**Act**") by filing a certificate of formation with the Secretary of State of the State of Delaware on [_____], [____] (the "**Certificate**");

WHEREAS, on [_____], [__], [__] entered into that limited liability company agreement of the Company (the "**Original Agreement**") as the sole member of the Company;

WHEREAS, each of the Members set forth on Exhibit A desires to contribute its respective common stock of MD America Energy Holdings, Inc., to the Company pursuant to that certain [Equity Contribution Agreement dated as of the Effective Date among the Members and the Company] (the "**Equity Contribution Agreement**") in exchange for the number of Common Units set forth opposite such Member's name on Exhibit A (the "**Effective Date Contributions**"); and

WHEREAS, in connection with the Effective Date Contributions, the parties hereto desire: (a) for this Agreement to amend, supersede and restate the Original Agreement in its entirety, and (b) to admit to the Company as Members certain parties not previously admitted as Members as provided herein.][2]

## [OR]

[WHEREAS, the Company has been formed as a limited liability company under the Delaware Limited Liability Company Act (the "**Act**") by filing a certificate of formation with the Secretary of State of the State of Delaware on July 29, 2013 (the "**Certificate**");

WHEREAS, on July 29, 2013, MD America Intermediate Holdings, LLC entered into that limited liability company agreement of the Company (the "**Original Agreement**") as the sole member of the Company;

---

[2] **Note to Draft**: To be used in the event lenders contribute equity in MD America Holdings to a newly formed limited liability company in exchange for equity therein.

1

**WHEREAS**, pursuant to the Plan of Reorganization, holders of debt of MD America Energy, LLC received units of MD America Holdings, LLC in partial satisfaction of such debt; and

**WHEREAS**, in connection with such partial satisfaction, the parties hereto desire: (a) for this Agreement to amend, supersede and restate the Original Agreement in its entirety, (b) to provide for the withdrawal of MD America Intermediate Holdings, LLC as a Member of the Company; and (c) to admit to the Company as Members certain parties not previously admitted as Members as provided herein.][3]

**NOW**, **THEREFORE**, in consideration of the premises and the covenants and provisions hereinafter contained, the Members hereby amend and restate the Original Agreement in its entirety and further agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   *Definitions*.   As used in this Agreement, the following terms have the following meanings:

"**Accredited Investor**" has the meaning set forth in Regulation D promulgated under the Securities Act.

"**Act**" has the meaning set forth in the recitals of this Agreement.

"**Adjusted Capital Account**" means the Capital Account maintained for each Member, (a) increased by any amounts that such Member is obligated to restore or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(*c*), 1.704-2(g)(1) and 1.704-2(i)(5), and (b) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*) with respect to such Member.  The foregoing definition of "Adjusted Capital Account" is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(*d*) and 1.704-2 and shall be interpreted consistently therewith.

"**Adoption Agreement**" means an agreement between the Company and a newly-admitted Member substantially in the form of Exhibit D or any other form approved by the Board of Managers.

"**Affected Member**" has the meaning set forth in Section 5.03(b).

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly through one or more intermediaries, Controlling, Controlled by or under common Control with such Person; *provided*, *however*, that none of the Company nor its Subsidiaries shall be considered an Affiliate of any Member's Investment Group.

---

[3] **Note to Draft**: To be used in the event lenders exchange debt for equity of MD America Holdings, LLC, in which case, this LLC Agreement will amend and restate the LLC Agreement of MD America Holdings, LLC.

"**Affiliate Agreement**" means any contract (or series of related contracts) between (A) the Company or any of its Subsidiaries, on the one hand, and (B) any Member or any member of its Investment Group, on the other hand; *provided,* that, notwithstanding anything to the contrary set forth herein, the following shall not be deemed Affiliate Agreements hereunder (and, for the avoidance of doubt, transactions with respect thereto shall not require Affiliate Agreement Approval): (x) the Credit Agreement and any documents relating thereto and (y) contracts and other transactions expressly contemplated under this Agreement (including contracts and other transactions in connection with (i) indemnification and advancement of expenses to a Covered Person pursuant to Article X, (ii) an Approved Sale pursuant to Section 11.01, (iii) registration rights pursuant to Section 11.03 and (iv) issuances of Equity Securities pursuant to Section 13.02).

"**Affiliate Agreement Approval**" means the affirmative written approval of Members owning at least a majority of the Disinterested Units.

"**Agreement**" has the meaning set forth in the preamble of this document.

"**Allocation Period**" means the period (a) commencing on the date hereof or, for any Allocation Period other than the first Allocation Period, the day following the end of a prior Allocation Period, and (b) ending (i) on the last day of each Fiscal Year; (ii) the day preceding any day in which an adjustment to the Book Value of the Company's properties pursuant to clauses (b)(i), (b)(ii), (b)(iii) or (b)(v) of the definition of Book Value occurs; (iii) immediately after any day in which an adjustment to the Book Value of the Company's properties pursuant to clause (b)(iv) of the definition of Book Value occurs; or (iv) on any other date determined by the Board of Managers.

"**Approved Budget**" means any annual capital, operating or project budget approved by the Board of Managers in accordance with this Agreement and then in effect.

"**Approved Sale**" has the meaning set forth in Section 11.01(a).

"**Arena**" means, Arena Limited SPV, LLC and any other Person that is part of Arena's Investment Group that becomes a Member in accordance with this Agreement; *provided, however*, that whenever a consent or approval is required by Arena hereunder, such consent or approval shall be deemed given if such consent or approval is given by any Member that is a member of Arena's Investment Group.

"**Assumed Tax Liability**" means, with respect to any Member as of any Fiscal Year, the product of (a) the U.S. federal taxable income (other than taxable income incurred in connection with (i) a Sale Transaction, a Public Offering, a Recapitalization or Reorganization; (ii) the receipt of a guaranteed payment for services by such Member; or (iii) the forfeiture or repurchase of Units from such Member or another Member) allocated by the Company to such Member in such Fiscal Year and all prior Fiscal Years, *less* the U.S. federal taxable loss allocated by the Company to such Member in such Fiscal Year and all prior Fiscal Years (taking into account for purposes of clause (a), (x) items determined at the Member level with respect to Depletable Properties owned by the Company, as if such items were allocated at the Company level and (y) any applicable limitations on the deductibility of capital losses and disregarding the effect of any deduction under Section 199A of the Code and the deductibility of state and local income taxes for U.S. federal income tax

3

purposes (unless such deductibility is not subject to any limitations)); *multiplied by* (b) the highest applicable U.S. federal, state and local income tax rate (including any tax rate imposed on "net investment income" by Code Section 1411) applicable to an individual or, if higher, a corporation, resident in San Francisco, California or New York, New York (as applicable, based upon which location would result in the highest tax rate) with respect to the character of U.S. federal taxable income or loss allocated by the Company to such Member (*e.g.*, capital gains or losses, dividends, ordinary income, etc.) during each applicable Fiscal Year.

"**Bipartisan Budget Act**" means Sections 6221 through 6241 of the Code, together with any final or temporary Treasury Regulations, Revenue Rulings, and case law interpreting Sections 6221 through 6241 of the Code (and any analogous provision of state or local tax law).

"**Blocker Corporation**" means a special purpose Person that is classified as a corporation for U.S. federal income tax purposes that directly or indirectly owns Units.

"**Board Approval**" means, the affirmative vote, or written consent of the Managers representing at least a majority of the total Designee Votes available to be cast at a meeting at which a quorum is or would be present.

"**Board Designee**" has the meaning set forth in Section 9.02(a).

"**Board Designee Threshold**" has the meaning set forth in Section 9.02(a).

"**Board of Managers**" has the meaning set forth in Section 9.01(a).

"**Book Value**" means, with respect to any property of the Company, such property's adjusted basis for U.S. federal income tax purposes (which, in the case of any Depletable Property, shall be determined pursuant to Treasury Regulations Section 1.613A-3(e)(3)(iii)(*c*)), except as follows:

(a)      The initial Book Value of any property contributed by a Member to the Company shall be the Fair Market Value of such property as of the date of such contribution.

(b)      The Book Values of all properties shall be adjusted to equal their respective Fair Market Values in connection with (i) the acquisition of an interest (or additional interest) in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution to the Company or in exchange for the performance of more than a *de minimis* amount of services to or for the benefit of the Company; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(*g*)(*1*); (iv) the acquisition of an interest in the Company by any new or existing Member upon the exercise of a non-compensatory option in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*s*); or (v) any other event to the extent determined by the Board of Managers to be permitted and necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(*q*); *provided*, *however*, that adjustments pursuant to clauses (b)(i), (b)(ii) and (b)(iv) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.  If any non-compensatory options are

4

outstanding upon the occurrence of an event described in clauses (b)(i) through (b)(v) above, the Company shall adjust the Book Values of its properties in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(*f*)(*1*) and 1.704-1(b)(2)(iv)(*h*)(*2*).

(c)     The Book Value of property distributed to a Member shall be adjusted to equal the Fair Market Value of such property as of the date of such distribution.

(d)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) (including any such adjustments pursuant to Treasury Regulation Section 1.734-2(b)(1)), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*) and clause (g) of the definition of Profits or Losses or Section 6.02(h); *provided*, *however*, that the Book Value of property shall not be adjusted pursuant to this clause (d) to the extent that the Board of Managers reasonably determines an adjustment pursuant to clause (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

(e)     If the Book Value of property has been determined or adjusted pursuant to clauses (a), (b) or (d) of this definition, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits, Losses, Simulated Depletion and other items allocated pursuant to Article VI.

"**Capital Account**" has the meaning set forth in Section 5.03(a).

"**Capital Contribution**" means, with respect to any Member, the amount of money and the initial Book Value of any property contributed or deemed to have been contributed to the Company by such Member, in accordance with Article V.   Any reference to the Capital Contributions of a Member will include the Capital Contributions made by a predecessor holder of such Member's Units to the extent the Capital Contribution was made in respect of Units Transferred to such Member.

"**Capital Interest Percentage**" means, at any time of determination and as to any Member, the percentage of the total distributions that would be made to such Member if the assets of the Company were sold for their respective Book Values, all liabilities of the Company were paid in accordance with their terms (limited in the case of non-recourse liabilities to the Book Value of the property securing such liabilities), all items of Company Profit, Loss, income, gain, loss and deduction were allocated to the Members in accordance with Article VI, and the resulting net proceeds were distributed to the Members in accordance with Article XIV; *provided*, *however*, that the Board of Managers may determine that the Members' Capital Interest Percentages should be determined based upon a hypothetical sale of the assets of the Company for their respective Fair Market Values (instead of Book Values) in order to ensure that such percentages correspond to the Members' "proportionate interests in partnership capital" as defined in Treasury Regulation Section 1.613A-3(e)(2)(ii).   The foregoing definition of Capital Interest Percentage is intended to result in a percentage for each Member that corresponds with the Member's "proportionate interest in partnership capital" as defined in Treasury Regulation Section 1.613A-3(e)(2)(ii), and Capital Interest Percentage shall be interpreted consistently therewith.

"**CCO**" has the meaning set forth in <u>Section 9.05(b)</u>.

"**Certificate**" has the meaning set forth in the recitals of this Agreement.

"**Code**" means the United States Internal Revenue Code of 1986.

"**Commission**" means the United States Securities and Exchange Commission.

"**Common Majority**" means the holder(s) of a majority of the outstanding Common Units.

"**Common Member**" means any Member that holds one or more Common Units.

"**Common Sharing Percentage**" means, as to any Common Member, as of the time of determination, the percentage obtained by *dividing* (x) the number of Common Units held by such Common Member *by* (y) the total number of issued and outstanding Common Units held by all of the Members as of the time of determination.

"**Common Unit**" means a Unit in the Company having the rights and obligations specified with respect to the Common Units in this Agreement.

"**Company**" has the meaning set forth in the preamble of this Agreement.

"**Company Group**" means, collectively, the Company and its Subsidiaries.

"**Company Level Taxes**" means any federal, state, or local taxes, additions to tax, penalties, and interest payable by the Company or any Subsidiary thereof as a result of any examination of the Company's or any of its Subsidiaries' affairs by any federal, state, or local tax authorities, including resulting administrative and judicial proceedings under the Bipartisan Budget Act.

"**Compensatory Membership Interest**" means an interest in the Company that is described in proposed Treasury Regulation Section 1.721-1(b)(3) or any successor provision.

"**Compliance Program**" means a bona fide compliance program that is reasonably designed to ensure compliance by the Company and its Subsidiaries with all applicable civil and criminal laws and regulations applicable to the businesses of the Company and its Subsidiaries, including, where applicable, anti-bribery and anticorruption, anti-money laundering, and sanctions laws.

"**Continuation Election**" has the meaning set forth in <u>Section 14.01(b)</u>.

"**Control**" (including the correlative terms "**Controlled by**" and "**Controlling**") means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Co-Seller**" has the meaning set forth in <u>Section 11.04(a)</u>.

"**Covered Audit Adjustment**" means an adjustment to any partnership-related item (within the meaning of Section 6241(2)(B) of the Code) to the extent such adjustment results in an "imputed underpayment" as described in Section 6225(b) of the Code or any analogous provision of state or local law.

"**Covered Indemnitors**" has the meaning set forth in Section 10.10.

"**Covered Person**" means:

(a)       each current and former (i) Member and each of its Affiliates (excluding, for purposes of this definition, the Company and its Subsidiaries), and its and their respective officers, directors, partners, stockholders, managers, members and employees, (ii) Manager (solely in such Person's capacity as a Manager), (iii) Officer (solely in such Person's capacity as an Officer) and (iv) Partnership Representative (solely in such Person's capacity as Partnership Representative); and

(b)       each Person not identified in clause (a) of this definition who is a current or former manager, director or officer of any Subsidiary of the Company or who served in such a capacity (in each case, solely in such Person's capacity as such) for any other entity or enterprise at the request of the Company, whom the Board of Managers expressly designates as a Covered Person in a written resolution,

in each case of clause (a) or (b) of this definition, whether or not such Person continues to have the applicable status; *provided, however*, notwithstanding anything to the contrary in this Agreement, a Person who would, but for this proviso, solely be a Covered Person as a result of such Person's relationship with the Company or its Subsidiaries prior to the Effective Date (and not as a result of such Person's relationship with the Company from and after the Effective Date), shall not be a Covered Person hereunder.

"**Credit Agreement**" means that certain Credit Agreement dated as of [_____], 2020, by and among the [Company, as Holdings, [MD America Energy, LLC, a Delaware limited liability company], as Borrower, [Loan Admin Co LLC], as administrative agent, the lenders from time to time party thereto, and the other Persons party thereto, as the same may be amended from time to time.]

"**Depletable Property**" means each separate oil and gas property as defined in Code Section 614.

"**Depreciation**" means, for each Allocation Period an amount equal to the depreciation, amortization or other cost recovery deduction (excluding depletion) allowable for U.S. federal income tax purposes with respect to property for such Allocation Period, except that (a) with respect to any such property the Book Value of which differs from its adjusted tax basis for U.S. federal income tax purposes and which difference is being eliminated by use of the "remedial method" pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such Allocation Period shall be the amount of book basis recovered for such Allocation Period under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2) and (b) with respect to any other such property the Book Value of which differs from its adjusted tax basis at the beginning of such Allocation Period, Depreciation shall be an amount which bears the same ratio to such beginning

Book Value as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such Allocation Period bears to such beginning adjusted tax basis; *provided*, *however*, that if the adjusted tax basis of any property at the beginning of such Allocation Period is zero dollars ($0.00), Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Board of Managers.

"**Designee Vote**" has the meaning set forth in Section 9.02(b)(i).

"**Disinterested Units**" means the Common Units held by the Members other than the Common Units held by the Member(s) that are (or whose Investment Group member is) the subject of any Affiliate Agreement.

"**Distributable Property**" means the excess of cash and property on hand over the amount that the Board of Managers determines is required to be retained as a reserve to meet any liabilities or proposed expenditures of the Company and its Subsidiaries that are (a) accrued or reasonably foreseeable or (b) otherwise reasonably necessary to be retained.

"**Dragging Holders**" has the meaning set forth in Section 11.01(a).

"**Economic Risk of Loss**" has the meaning set forth in Treasury Regulation Section 1.752-2(a).

"**Effective Date**" has the meaning set forth in the preamble of this Agreement.

"**Effective Date Contributions**" has the meaning set forth in the recitals of this Agreement.

"**Election Period**" has the meaning set forth in Section 11.09(c).

["**Equity Contribution Agreement**" has the meaning set forth in the recitals of this Agreement.]

"**Equity Securities**" has the meaning set forth in Section 13.02(a).

"**Excluded Claims**" has the meaning set forth in Section 10.09(h).

"**Fair Market Value**" has the meaning set forth in Section 11.07.

"**Family Member**" has the meaning set forth in Section 12.01(c).

"**Family Trust**" has the meaning set forth in Section 12.01(c).

"**Fiscal Year**" means the fiscal year of the Company, which shall end on December 31 of each calendar year unless, for U.S. federal income tax purposes, another fiscal year is required or the Board of Managers designates another fiscal year. Unless otherwise determined by the Board of Managers, the Company shall have the same fiscal year for U.S. federal income tax purposes and for accounting purposes.

"**Holder**" means (a) any Person that was a Member immediately prior to a Public Offering owning Registrable Securities that have not been sold to the public and (b) any Transferee of Registrable Securities in a private transaction after a Public Offering.

"**Investment Group**" means, with respect to any Person, collectively, such Person, its Affiliates and its and their respective limited partners, general partners, members, managed accounts, stockholders and portfolio companies. For the avoidance of doubt, neither the Company nor its Subsidiaries nor any of its employees shall be deemed part of the Investment Group of any Member.

"**Investor Members**" means, collectively, each of Arena, MC Credit, Prudential and Sixth Street.

"**Investor Parties**" has the meaning set forth in Section 3.04(a).

"**Liquidation Event**" has the meaning set forth in Section 14.01(a).

"**Manager**" means a member of the Board of Managers.

"**MC Credit**" means, collectively, MC Credit Fund I LP, a Delaware limited partnership, MC Credit Fund IA (Cayman Master) LP, a [Cayman Islands] limited partnership, MC Credit Fund II LP, a Delaware limited partnership, MC Credit Fund III (Delaware) LP, a Delaware limited partnership, MC Credit Fund III-U (Delaware) LP, a Delaware limited partnership, MC Credit Fund III (Cayman Master) LP, a [Cayman Islands] limited partnership, and any other Person that is part of MC Credit's Investment Group that becomes a Member in accordance with this Agreement; *provided*, *however*, that whenever a consent or approval is required by MC Credit hereunder, such consent or approval shall be deemed given if such consent or approval is given by any member of MC Credit's Investment Group.

"**Member**" means any Person (but not any Affiliate or entity in which such Person has an equity interest) executing this Agreement as of the Effective Date as a member or hereafter admitted to the Company as a member in accordance with this Agreement, but such term does not include any Person that has ceased to be a member of the Company.

"**Member Group**" means, collectively, Members that are part of the same Investment Group.

"**Member Nonrecourse Debt**" has the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" has the meaning assigned to the term "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2).

"**Member Nonrecourse Deduction**" has the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(1).

"**Minimum Gain**" has the meaning assigned to the term "partnership minimum gain" in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"**Nonrecourse Deduction**" has the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(1).

"**Offer Period**" has the meaning set forth in Section 11.09(c).

"**Officers**" has the meaning set forth in Section 9.03.

"**Original Agreement**" has the meaning set forth in the recitals of this Agreement.

"**Other Investments**" has the meaning set forth in Section 3.04(a)(i).

"**Participation Offer**" has the meaning set forth in Section 11.04(a).

"**Partnership Representative**" has the meaning assigned to that term in Section 6223 of the Code and any "designated individual," if applicable, as defined in the Treasury Regulations promulgated thereunder (including, in each case, any similar capacity or role under relevant state or local law).

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, bank trust company, land trust, business trust or other organization, whether or not a legal entity, custodian, trustee-executor, administrator, nominee or entity in a representative capacity and any government or agency or political subdivision thereof.

"**Plan of Reorganization**" means a plan of reorganization confirmed by an order of the United States Bankruptcy Court for the Southern District of Texas, dated [November [17], 2020, in In re: MD America Energy, LLC., et al. (Case No. 20-34966) under Chapter 11 of Title 11 of the United States Code.

"**Preemptive Rights Holder**" has the meaning set forth in Section 13.02(a).

"**Proceeding**" has the meaning set forth in Section 10.01.

"**Profits**" or "**Losses**" means, for each Allocation Period, an amount equal to the Company's taxable income or loss for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)     any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" or "Losses" shall be added to such taxable income or loss;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" or "Losses," shall be subtracted from such taxable income or loss;

(c)      in the event the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall, except to the extent allocated pursuant to Section 6.02, be taken into account for purposes of computing Profits or Losses;

(d)      gain or loss resulting from any disposition of property (other than Depletable Property) with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(e)      gain resulting from any disposition of a Depletable Property with respect to which gain is recognized for U.S. federal income tax purposes shall be treated as being equal to the corresponding Simulated Gain;

(f)      in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation;

(g)      to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(h)      any items that are allocated pursuant to Section 6.02 shall not be taken into account in computing Profits and Losses, but the amounts of the items of income, gain, loss or deduction available to be specially allocated pursuant to Section 6.02 will be determined by applying rules analogous to those set forth in clauses (a) through (g) above.

"**Prudential**" means, collectively, Prudential Legacy Insurance Company of New Jersey, a New Jersey corporation and The Prudential Insurance Company of America, a New Jersey corporation and any other Person that is part of Prudential's Investment Group that becomes a Member in accordance with this Agreement; *provided*, *however*, that whenever a consent or approval is required by Prudential hereunder, such consent or approval shall be deemed given if such consent or approval is given by any other Member that is a member of Prudential's Investment Group.

"**Public Entity**" has the meaning set forth in Section 11.02(a).

"**Public Offering**" means the sale, in an underwritten public offering registered pursuant to an effective registration statement under the Securities Act, of Equity Securities of the Public Entity approved by the Board of Managers in accordance with Section 11.02(a).

"**Purchased Common Units**" has the meaning set forth in Section 11.04(d).

"**Purchased Percentage**" has the meaning set forth in Section 11.04(d).

"**Recapitalization**" has the meaning set forth in Section 11.02(c)(i).

"**Registrable Securities**" means securities of the Public Entity owned by a Holder which are (a) the same class as the Equity Securities sold in the Public Offering or (b) convertible into, exercisable for, or exchangeable for securities described in clause (a).

"**Related Documents**" means this Agreement, [the Equity Contribution Agreement][ and [●]].[4]

"**Relative Proceeds**" means the relative proceeds received, or to be received, by a Member in an Approved Sale or a distribution pursuant to Section 7.01, *divided by* the aggregate proceeds received, or to be received, by all Members in such Approved Sale or distribution.

"**Renounced Business Opportunity**" has the meaning set forth in Section 3.04(c).

"**Reorganization**" has the meaning set forth in Section 11.02(a).

"**Requested Common Units**" has the meaning set forth in Section 11.04(c).

"**Requested Tag Seller Percentage**" has the meaning set forth in Section 11.04(b).

"**ROFO Notice**" has the meaning set forth in Section 11.09(a).

"**ROFO Offered Units**" has the meaning set forth in Section 11.09(b).

"**ROFO Offeree**" has the meaning set forth in Section 11.09(a).

"**ROFO Offeror**" has the meaning set forth in Section 11.09(a).

"**ROFO Response Offer**" has the meaning set forth in Section 11.09(c).

"**ROFO Transaction**" has the meaning set forth in Section 11.09(a).

"**Sale Transaction**" means (i) the acquisition of the Company by another Person by means of any transaction or series of related transactions (including any stock acquisition, reorganization, merger or consolidation), other than a transaction or series of related transactions in which at least a majority of the total voting power or economic rights represented by the outstanding securities of the Company or such other surviving or resulting entity (or if the Company or such other surviving or resulting entity is a wholly-owned Subsidiary immediately following such acquisition, its parent) following such transaction or series of related transactions is held by the Common Members immediately prior to such transaction or series of related transactions and/or Affiliates of such Common Members, (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole (which need not include a sale of the equity of the Subsidiaries if all or substantially all of the other assets of the Subsidiaries are

---

[4] **Note to Draft**: To be updated pending confirmation of transaction structure.

included in any disposition) by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned Subsidiary of the Company or to any Member or its Affiliate or (iii) a Liquidation Event.

"**Securities Act**" means the United States Securities Act of 1933, and the rules and regulations thereunder as in effect from time to time.

"**Shelf Registration Statement**" means a registration statement of the Public Entity filed with the Commission on Form S-3 (or any successor form or other appropriate form under the Securities Act) for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any similar rule that may be adopted by the Commission) covering the Registrable Securities, as applicable.

"**Simulated Basis**" means the Book Value of any Depletable Property. The Simulated Basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Capital Interest Percentage as of the time such Depletable Property is acquired by the Company (and any additions to such Simulated Basis resulting from expenditures required to be capitalized in such Simulated Basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such Simulated Basis to be in accordance with their Capital Interest Percentages as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Capital Interest Percentages as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's Depletable Properties pursuant to clause (b) of the definition of Book Value.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis) and in the manner specified in Treasury Regulation Section 1.704-1(b)(2)(iv)($k$)(*2*). For purposes of computing Simulated Depletion with respect to any Depletable Property, the Simulated Basis of such property shall be deemed to be the Book Value of such property, and in no event shall such allowance, in the aggregate, exceed such Simulated Basis.

"**Simulated Gain**" means the amount of gain realized from the sale or other disposition of Depletable Property as calculated in Treasury Regulation Section 1.704-1(b)(2)(iv)($k$)(*2*).

"**Simulated Loss**" means the amount of loss realized from the sale or other disposition of Depletable Property as calculated in Treasury Regulation Section 1.704-1(b)(2)(iv)($k$)(*2*).

"**Sixth Street**" means, collectively, Sixth Street Specialty Lending, Inc., a Delaware corporation, TAO Talents, LLC, a Delaware limited liability company, and any other Person that is part of Sixth Street's Investment Group that becomes a Member in accordance with this Agreement; *provided*, *however*, that whenever a consent or approval is required by Sixth Street hereunder, such consent or approval shall be deemed given if such consent or approval is given by any Member that is a member of Sixth Street's Investment Group.

"**Subsidiary**" means, with respect to any Person: (a) any corporation, partnership, limited liability company or other business entity of which a majority of the equity interests entitled to

vote under ordinary circumstances in the election of directors (or in the selection of any other similar governing body in the case of an entity other than a corporation) are at the time owned or Controlled by such Person or by one or more of the other direct or indirect Subsidiaries of such Person or a combination thereof (regardless of whether, at the time, equity interests of any other class or classes shall have, or might have, voting power by reason of the occurrence of any contingency); (b) a partnership in which such Person or any direct or indirect Subsidiary of such Person is a general partner; or (c) a limited liability company in which such Person or any direct or indirect Subsidiary of such Person is a managing member or manager.

"**Substituted Member**" means a Person who is admitted as a Member to the Company pursuant to Section 11.08(b) in place of and with the rights of a Member and who is shown as a Member on the books and records of the Company.

"**Tag-Along Transferee**" has the meaning set forth in Section 11.04(a).

"**Tag Sale**" has the meaning set forth in Section 11.04(a).

"**Tag Sale Value**" means, as of the date of a Tag Sale, the value of one hundred percent (100%) of the equity of the Company determined by reference to the aggregate consideration to be paid by the proposed Tag-Along Transferee in the Tag Sale, as determined by the Board of Managers.

"**Tag Seller**" has the meaning set forth in Section 11.04(a).

"**Tax Distribution**" means, with respect to any Member for any Fiscal Year, the excess, if any, of (a) the Assumed Tax Liability of such Member as of such Fiscal Year, over (b) the amount of distributions made to such Member pursuant to Section 7.01(a) during such Fiscal Year and all prior Fiscal Years, plus the amount of distributions made to such Member pursuant to Section 7.03 with respect to all prior Fiscal Years.

"**Tax Distribution Date**" means, with respect to each Fiscal Year, the first March 15 following the end of such Fiscal Year.

"**Transfer**" means the sale, assignment, encumbrance, pledge, hypothecation, conveyance, transfer or other voluntary disposition (by gift or otherwise, and whether as security or otherwise), whether made at the time a Member was admitted as a Member of the Company or thereafter, by a Member of all or a portion of his, her or its Units (including any rights therein, economic or otherwise). For purposes of this definition, "Transfer" of a Unit includes (a) the sale, assignment, encumbrance, pledge, hypothecation, conveyance, transfer or other voluntary disposition (by gift or otherwise, and whether as security or otherwise) of an equity interest in any Person (including any rights therein, economic or otherwise) substantially all of the assets of which consist, directly or indirectly, of Units, (b) the merger or consolidation of a Member, or of any Person referred to in clause (a), with another Person, (c) the incurrence of debt secured by, or obtained with a pledge of, an equity interest in any Person referred to in clause (a), or (d) the transfer of (or a vote in favor of transferring) control of any Person referred to in clause (a); *provided*, that, notwithstanding the foregoing, neither (x) any disposition of equity interests in a private equity fund, debt fund, or affiliated funds (including any sale of all or a portion of such fund or its ultimate parent) or any disposition to direct or indirect limited partners or other equityholders thereof nor (y) the public

14

trading of equity interests of a publicly traded parent of any Member shall constitute a "Transfer" for purposes of this definition, and transactions described in the foregoing clauses (x) and (y) shall not be restricted by this Agreement.   "**Transferor**," "**Transferee**," "**Transferred**" and "**Transferring**" have meanings corresponding to the foregoing.

"**Treasury Regulations**" means the final or temporary regulations promulgated by the United States Department of the Treasury under the Code.

"**Unit**" means a membership interest in the Company representing a fractional part of the limited liability company interests in the Company of all the Members and shall include Common Units; *provided*, *however*, that any series or group of Units issued shall have the relative rights, powers and duties set forth in this Agreement and the equity interest represented by such series or group of Units shall be determined in accordance with such relative rights, powers and duties set forth in this Agreement.

"**VCOC Amendment**" has the meaning set forth in Section 4.07.

Section 1.02   *Construction*.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter.  The singular shall include the plural and the plural shall include the singular whenever appropriate.  All references to Articles and Sections refer to articles and sections of this Agreement, all references to "employed by the Company" shall be construed as meaning "actively and continuously employed by or providing services as a consultant to, one or more members of the Company Group," all references to Exhibits are to Exhibits attached to this Agreement, each of which is made a part of this Agreement for all purposes and all references to "including" shall be construed as meaning "including without limitation."  All references to dollars refer to United States dollars.  The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.  The word "or" shall not be exclusive.  Unless the context requires otherwise, all references to laws, regulations, contracts, agreements and instruments refer to such laws, regulations, contracts, agreements and instruments as they may be amended from time to time, and references to particular provisions of laws or regulations include a reference to the corresponding provisions of any succeeding law or regulation.  The Table of Contents and the Article, Section and Exhibit titles and headings in this Agreement are inserted for convenience only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

## ARTICLE II

## ORGANIZATIONAL AND OTHER MATTERS

Section 2.01   *Formation; Ratification*.

(a)      The Company was organized as a Delaware limited liability company in accordance with the Act by the filing of the Certificate on [_____], [____].[5]  The rights and obligations of the Members and the administration and termination of the Company shall be governed by this

---

[5] **Note to Draft**: To be updated pending determination of final structure.

Agreement and the Act.  This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101(7) of the Act.  To the extent that this Agreement is inconsistent in any respect with the Act, this Agreement will control except to the extent provided in <u>Section 10.08</u> and <u>Section 15.08</u>.

(b)      The Members hereby ratify any and all acts taken or caused to be taken by any "authorized person" (within the meaning of the Act) in the name of or on behalf of the Company prior to the date hereof.

Section 2.02    *Name*.  The name of the Company is "[●], LLC"[6] and the business of the Company shall be conducted under that name or under any other name adopted by the Board of Managers from time to time in accordance with the Act.

Section 2.03    *Limited Liability*.  Subject to <u>Section 7.04</u>, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company and no Member shall be obligated personally for any of such debts, obligations or liabilities solely by reason of being a Member.

Section 2.04    *Registered Address; Registered Agent; Principal Office; Other Offices*.  The registered address of the Company in the State of Delaware required to be maintained by the Act shall be the initial registered address designated in the Certificate or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in any manner provided by law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent designated in the Certificate or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by the Act.  The principal office of the Company shall be at such place as the Board of Managers may designate from time to time.  The Company may have such other offices as the Board of Managers may determine appropriate.

Section 2.05    *Purpose*.  Unless otherwise determined by the Board of Managers at any time, the purpose of the Company is to (a) hold the Equity Securities of [●],[7] (b) acquire, explore, develop and produce oil and natural gas assets and (c) engage in any activities necessary, appropriate, desirable, ancillary, convenient or incidental thereto that are permitted by the Act and the Board of Managers.

Section 2.06    *Foreign Qualification*.  Prior to conducting business in any jurisdiction other than the State of Delaware, the Board of Managers shall cause the Company to comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction.

Section 2.07    *Term*.  The Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and shall continue in existence until it is liquidated or dissolved in accordance with this Agreement and the Act.

---

[6] **<u>Note to Draft</u>**: To be updated pending determination of final structure.

[7] **<u>Note to Draft</u>**: To be updated pending determination of final structure.

Section 2.08   *No State Law Partnership*.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

Section 2.09   *Title to Company Assets*.  Title to the Company's assets, whether real, personal or mixed and whether tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, Manager or Officer shall have any ownership interest in such Company assets.  Title to any or all of the Company assets may be held in the name of the Company or one or more of its Subsidiaries or one or more nominees, as the Board of Managers may determine.  All Company assets shall be recorded as the property of the Company in its books and records, irrespective of the name in which record title to such Company assets is held.

## ARTICLE III

## UNITS; MEMBERS; REPRESENTATIONS

Section 3.01   *Units Generally*.  There shall initially be one (1) class of Units referred to as "Common Units."

Section 3.02   *Common Units; Common Members*.  Subject to Section 9.04 and Section 13.02, the Board of Managers shall have the authority to issue, on behalf of the Company and subject to the remainder of this Section 3.02, an unlimited number of Common Units.  The identity of all of the Common Members as of the Effective Date, the number and issue date of the Common Units held by each Common Member, and the Common Sharing Percentage of each Common Member are reflected on Exhibit A, which shall be amended as necessary by the Board of Managers to reflect any changes in such information.  Subject to Section 9.04, Common Units may be issued, and the Persons to whom such Common Units are issued, if not already Common Members, may be admitted as additional Common Members only after, in each case (a) Board Approval thereof and (b) such Person executes an Adoption Agreement and any other agreements and instruments in form and substance as the Board of Managers may deem necessary or desirable to effect such admission.  The Company shall amend Exhibit A from time to time solely with Board Approval so that it reflects a true and complete list of the Common Members, the number and issue date of the Common Units held by each Common Member and the Common Sharing Percentage attributable to each Common Member.

Section 3.03   *Unit Certificates*.  Units may be (but need not be) represented by certificates in such form as the Board of Managers shall from time to time approve, but shall be recorded in a register thereof maintained by the Company.  If the Board of Managers elects to certificate the Units and a mutilated Unit certificate is surrendered to the Company or if a Member claims and submits an affidavit or other evidence, satisfactory to the Board of Managers, to the effect that the Unit certificate has been lost, destroyed or wrongfully taken, the Company shall issue a replacement Unit certificate if the requirements of the Board of Managers are met.  If required by the Board of Managers, such Member must provide an indemnity bond, or other form of indemnity, sufficient in the judgment of the Board of Managers to protect the Company against any loss which may be suffered.  The Company may charge such Member for its reasonable out-of-pocket

expenses in replacing a Unit certificate which has been mutilated, lost, destroyed or wrongfully taken. Units issued as of the Effective Date are not certificated.

Section 3.04    *Conflicts of Interest*.

(a)    <u>Generally</u>.    Each Member acknowledges that each Common Member and its Investment Group, and each of their respective designees to the Board of Managers (collectively, the "**Investor Parties**"):

(i)    (A) have participated (directly or indirectly) or will continue to participate (directly or indirectly) in private equity, venture capital and other debt or equity investments in corporations, joint ventures, limited liability companies, general partnerships, limited partnerships and other entities, including those engaged in various aspects of the business described in <u>Section 2.05</u> ("**Other Investments**") that may be, are or will be competitive with the business of the Company or its Subsidiaries or that could be suitable for the Company or its Subsidiaries, (B) have interests in, participate with, aid and maintain seats on the boards of directors or similar governing bodies of, Other Investments and (C) may develop or become aware of business opportunities for Other Investments; and

(ii)    may or will, as a result of or arising from the matters referenced in subclause (i) above, the nature of such Investor Party's business and other factors, have conflicts of interest or potential conflicts of interest with any of the Company, its Affiliates or other Members.

(b)    <u>Waiver of Conflicts</u>.    Each of the Members (in its capacity as such and in its own name and in the name and on behalf of each of the Company and its Subsidiaries) expressly waives any such conflicts of interest and agrees that none of the Investor Parties shall have any liability to any Member, any Affiliate thereof, or the Company or any of its Affiliates with respect to such conflicts of interest or potential conflicts of interest and acknowledges and agrees that none of the Investor Parties and their respective representatives will have any duty to disclose to the Company, any other Member or the Board of Managers any business opportunities, whether or not competitive with the business of the Company or any of its Subsidiaries and whether or not the Company or any of its Subsidiaries might be interested in such business opportunity for themselves. Each of the Members (and the Members on behalf of the Company and its Subsidiaries) also acknowledges and agrees that the Investor Parties and their respective representatives have duties not to disclose confidential information of or related to the Other Investments. For the avoidance of doubt, the foregoing waiver shall not limit the confidentiality restrictions set forth in <u>Section 15.05</u>. Each of the Members (in his, her or its own name and in the name and on behalf of the Company and its Subsidiaries) hereby:

(i)    agrees that (A) the terms of this <u>Section 3.04</u> to the extent that they modify or limit a duty or other obligation, if any, that any of the Investor Parties may have to the Company or another Member under the Act or other applicable law, rule or regulation, are reasonable in form, scope and content; and (B) the terms of this <u>Section 3.04</u> shall control to the fullest extent possible if such terms conflict with a duty or other obligation, if any, that the Investor Parties may have to the Company or another Member, under the Act, any

other applicable law, rule or regulation, or otherwise (including pursuant to any other provision of this Agreement); and

        (ii)    waives any duty or other obligation, if any, that any of the Investor Parties may have to the Company or another Member, pursuant to the Act or any other applicable law, rule or regulation, or otherwise (including pursuant to any other provisions of this Agreement) to the extent necessary to give effect to the terms of this <u>Section 3.04</u>.

        (c)    <u>Business Opportunities</u>.  Each of the Company and the Members (in his, her or its own name and in the name and on behalf of the Company and its Subsidiaries) acknowledges and agrees that the Company (on behalf of itself and its Subsidiaries) hereby renounces any interest or expectancy in any business opportunity, transaction or other matter in which any of the Investor Parties participates or desires to participate and that involves any aspect related to the business or affairs of any of the Company and its Subsidiaries (each such business opportunity, a "**<u>Renounced Business Opportunity</u>**").  None of the Investor Parties shall have any obligation to communicate or offer any Renounced Business Opportunity to the Company, its Subsidiaries or any Member thereof and may pursue any Renounced Business Opportunity solely for its own account.

        (d)    <u>Affiliate Agreements</u>.  The Company shall not and shall not cause or permit any of its Subsidiaries to, without first obtaining Affiliate Agreement Approval, directly or indirectly enter into, enter into any commitment to enter into, extend, amend, waive, supplement or terminate (other than pursuant to its terms) any Affiliate Agreement. Notwithstanding the provisions of <u>Section 11.07</u>, to the extent the Board of Managers votes to determine the value of any non-cash property in connection with the Company's entry into or performance under an Affiliate Agreement, the determination of the value of such property shall also be subject to approval by an Affiliate Agreement Approval.

        (e)    <u>Acknowledgement</u>.  Each of the Members (in his, her or its own name and in the name and on behalf of the Company and its Subsidiaries) acknowledges and agrees that (i) the execution and delivery of this Agreement by each Member is of material benefit to the Company, its Subsidiaries and the Members, and that the Members would not be willing to (x) execute and deliver this Agreement and (y) make their agreed [Capital Contributions] to the Company, without the benefit of this <u>Section 3.04</u> and <u>Section 10.09</u> and the agreement of the parties thereto; and (ii) they have reviewed and understand the provisions of Sections 18-1101(b) and (c) of the Act.

        (f)    <u>Survival and Amendments</u>.  Any amendment, modification or repeal of <u>Section 3.04(a)</u>, <u>Section 3.04(b)</u>, <u>Section 3.04(c)</u>, or this <u>Section 3.04(f)</u> shall be prospective only and shall not in any way affect the limitations on liability of the Investor Parties, or terminate, reduce or impair the right of any past, present or future Investor Party, under and in accordance with the provisions of <u>Section 3.04(a)</u>, <u>Section 3.04(b)</u>, <u>Section 3.04(c)</u>, and this <u>Section 3.04(f)</u> as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

Section 3.05    *Representations and Warranties*.

(a)     Each Member hereby severally (solely with respect to itself) and not jointly represents and warrants to the Company and each other Member that the following statements are true and correct as of the date such Person is first admitted as a Member and shall be true and correct at all times that such Member is a Member:

(i)     if such Member is a corporation, limited liability company, partnership or other entity, such Member is duly incorporated, organized or formed (as applicable), validly existing, and (if applicable) in good standing under the laws of the jurisdiction of its incorporation, organization or formation; and such Member has full corporate, limited liability company, partnership or other applicable power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by its board of directors, stockholders, managers, members, partners, trustees, beneficiaries or other applicable Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by such Member have been duly taken;

(ii)     such Member has duly executed and delivered this Agreement and the other documents contemplated herein, and, assuming due execution by the other parties hereto and thereto, such documents constitute the legal, valid and binding obligation of such Member enforceable against such Member in accordance with the terms of each such document (except as may be limited by bankruptcy, insolvency or similar laws of general application and by the effect of general principles of equity, regardless of whether considered at law or in equity);

(iii)     such Member's authorization, execution, delivery and performance of this Agreement does not and shall not (A) conflict with, or result in a breach, default or violation of, (x) the organizational documents of such Member, (y) any contract, obligation or agreement to which such Member is a party or is otherwise subject or (z) any law, order, judgment, decree, writ, injunction or arbitral award to which such Member is subject; or (B) require any consent, approval or authorization from, filing or registration with, or notice to, any governmental authority or other Person, unless such requirement has already been satisfied;

(iv)     the Units to be acquired by such Member pursuant to this Agreement will be acquired for investment for such Member's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of applicable securities laws;

(v)     such Member is an experienced investor in securities and acknowledges that it can bear the economic risk of its investment in the Units acquired pursuant to this Agreement and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Units;

(vi)     such Member is an Accredited Investor;

(vii)    such Member has had an opportunity to discuss the Company's and its Subsidiaries' businesses, management, financial affairs and the terms and conditions of the offering of Units with the Company's management;

(viii)    such Member understands that the Units issued hereunder have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of such Member's representations as expressed herein; such Member further understands that the Units acquired by it hereunder are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such Member must hold the Units acquired by it hereunder indefinitely unless such Units are registered with the Commission and qualified by state authorities or an exemption from such registration and qualification requirements is available; in particular, such Member is aware that the Units may not be sold pursuant to Rule 144 promulgated under the Securities Act unless all of the conditions of Rule 144 are met (and, among the conditions for use of Rule 144 may be availability of current information to the public about the Company, and such information is not now available and the Company has no plans to make such information available);

(ix)    such Member understands that no public market now exists for the Units or any other Equity Securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Units or any other Equity Securities issued by the Company;

(x)    if such Member (or the beneficiary of or any Person controlling such Member) is employed by the Company, such Member (or such Person) is not subject to and has not breached any non-competition, non-solicitation, confidentiality or other duties imposed on him or her (or such Person) with respect to any current or prior employer or any other Person in any respect that will adversely affect any of the Company or its Affiliates; and

(xi)    if an individual, such Member is of the full age of majority and is legally competent to execute this Agreement and to take all action pursuant hereto.

## ARTICLE IV

## CERTAIN AGREEMENTS OF THE COMPANY AND THE MEMBERS

Section 4.01    *Books, Records and Access*.

(a)    <u>Maintenance of Books and Records</u>.  The Company shall keep and maintain proper and complete books and records of accounts, taxes, financial information and all matters pertaining to the Company (and its Subsidiaries).  During regular business hours, upon reasonable notice and in a manner that does not unreasonably interfere with the business of the Company and its Subsidiaries, each Member Group holding a Common Sharing Percentage of at least ten percent (10%) shall have the reasonable right (i) to consult from time to time with the Officers and the supervisors or independent accountants of the Company (and its Subsidiaries) at their respective

places of business regarding operating and financial matters and (ii) to visit and inspect any of the properties or assets of the Company or any of its Subsidiaries. Without limiting any other rights afforded to each Manager under applicable law, each Manager shall have the same right to access and inspect the books and records of the Company at any time for any reason reasonably related to such Manager's position as a Manager of the Company, with such rights being equivalent to a director's rights to access and inspect the books and records of a corporation incorporated under the laws of the State of Delaware. Notwithstanding anything in the foregoing sentence to the contrary, if any Member Group ceases to hold a Common Sharing Percentage of at least ten percent (10%) due to any dilution caused by an issuance pursuant to clause (ii) or (v) of Section 13.02(d), such dilution shall not be considered when calculating such Member Group's Common Sharing Percentage for purposes of determining whether such Member is entitled to rights under the second sentence of this Section 4.01(a).

(b)    Information Rights.

(i)    The Company shall provide to each Common Member copies of all material information provided pursuant to the Credit Agreement and the following reports:

(A)    within one hundred and twenty (120) days of the Company's year-end, audited consolidated financial statements of the Company and a schedule showing any variance between actual and budgeted figures;

(B)    within fifty (50) days of the end of any fiscal quarter, quarterly unaudited consolidated financial statements of the Company for the previous quarter and a schedule showing any variance between actual and budgeted figures;

(C)    within thirty-five (35) days of the end of each fiscal month, unaudited monthly financial and business summary reports;

(D)    within thirty (30) days of the end of the Company's year-end, copies of any Approved Budget;

(E)    prompt notice of any event that would reasonably be expected to have a material effect on the Company's financial condition, business or operations; and

(F)    concurrently with delivery to any lender (or agent thereof) of the Company or any of its Subsidiaries, any report or document to be delivered to such lender or agent pursuant to the terms of any credit or other financing agreement of the Company or any of its Subsidiaries; and such other reports and information as any Common Member may reasonably request.

Section 4.02    *Tax Returns and Forms*. The Company shall prepare and timely file all U.S. federal, state, local and foreign tax and information returns required to be filed by the Company. Unless otherwise determined by the Board of Managers, any income tax return of the Company shall be prepared by an independent public accounting firm selected by the Board of Managers. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is reasonably necessary to enable the Company's tax returns to be

timely prepared and filed.  The Company shall deliver to each Member as soon as applicable after the end of each Fiscal Year, but in any event before March 15 of the subsequent year, an Internal Revenue Service Schedule K-1 together with such additional information as may be required by the Members (or their owners) in order to file their individual returns reflecting the Company's operations.  The Company shall also (a) provide each Investor Member with an estimate of its share of the Company's taxable income for the period beginning on January 1 through September 30 for each Fiscal Year by October 20 of each such Fiscal Year, including an estimate of state and local apportionment information and (b) cause an estimated Internal Revenue Service Schedule K-1 or any successor form to be prepared and delivered to the Members by February 15 after the end of each Fiscal Year, including any appropriate state and local apportionment information.  The Company shall bear the costs of the preparation and filing of such Company tax returns and forms.

Section 4.03  *Tax Partnership*.  Except as provided in Section 11.02, it is the intention of the Members that the Company be classified as a partnership for U.S. federal income tax purposes.  Unless otherwise approved by the Board of Managers, and subject to Section 15.04(d), neither the Company nor any Member shall make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law or to be classified as other than a partnership pursuant to Treasury Regulation Section 301.7701-3.

Section 4.04  *Tax Elections*.  On the appropriate forms or tax returns, unless otherwise determined by the Board of Managers, the Company shall:

(a)    adopt the calendar year as the Company's Fiscal Year, if permitted under the Code;

(b)    adopt the accrual method of accounting for U.S. federal income tax purposes;

(c)    elect to amortize the organizational expenses of the Company as permitted by Code Section 709(b);

(d)    if requested by a Member, elect in a timely manner pursuant to Section 754 of the Code and the Treasury Regulations promulgated thereunder, and pursuant to corresponding provisions of applicable state and local tax laws, to adjust the basis of Company property;

(e)    elect to deduct intangible drilling and development costs when incurred; and

(f)    make any other election the Board of Managers may deem appropriate.  Upon request of the Board of Managers, each Member shall cooperate in good faith with the Company in connection with the Company's efforts to elect out of the application of the company-level audit and adjustment rules of the Bipartisan Budget Act, if applicable.

Section 4.05  *Partnership Representative*.  The Board of Managers may authorize the Partnership Representative to take any and all actions determined by the Board of Managers, MC Credit and Sixth Street and permissible under the Bipartisan Budget Act. The Partnership Representative is the Person mutually appointed by Sixth Street and MC Credit to serve as the Partnership Representative; *provided*, if Sixth Street and MC Credit do not jointly agree to a Partnership Representative within thirty (30) days after beginning good faith discussions related thereto, the initial Partnership Representative shall be Sixth Street (or an affiliate thereof). Pursuant

23

to Section 15.04(c)(v), the Board of Managers shall have the authority to amend this Section 4.05 to give effect to the provisions of the Bipartisan Budget Act and each Member agrees to be bound by the provisions of any such amendment.  The Partnership Representative is hereby authorized to take such actions and to execute and file all statements and forms on behalf of the Company that are approved by the Board of Managers, MC Credit and Sixth Street and are permitted or required by the applicable provisions of the Bipartisan Budget Act (including a "push-out" election under Section 6226 of the Code or any analogous election under state or local tax law) or in connection with any other tax proceeding and shall not take any action without such approval. Each Member shall cooperate with the Partnership Representative and do or refrain from doing any or all things requested by the Partnership Representative and approved by the Board of Managers, MC Credit and Sixth Street (including paying any and all resulting taxes, additions to tax, penalties and interest in a timely fashion) in connection with any examination of the Company's affairs by any federal, state, or local tax authorities, including resulting administrative and judicial proceedings. No Member shall have any claim against the Partnership Representative, any Manager or the Company for any actions taken (or any failures to take action) by such Persons in good faith. All reasonable, documented cost or expense incurred by the Partnership Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

Section 4.06   *Bank Accounts*.  The Board of Managers shall cause the Company to establish and maintain one or more separate bank and investment accounts for Company funds in the Company's name with such financial institutions and firms as the Board of Managers may select and designate signatories thereon.  The Company may not commingle the Company's funds with the funds of any other Person other than, as determined by the Board of Managers, the Company's Subsidiaries.

Section 4.07   *VCOC Amendment*.  If any Investor Member notifies the Company that the provisions of this Agreement should be amended or a separate agreement should be entered into to preserve the qualification of such Person as a "venture capital operating company" (as defined by the regulations issued by the United States Department of Labor at Section 2510.3-101 of Part 2510 of Chapter XXV, Title 29 of the United States Code of Federal Regulations) or otherwise to ensure that the assets of such Person are not "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, in each case, as reasonably determined by such Member in consultation with the other Investor Members, then the Company shall amend this Agreement or enter into a separate agreement as is determined by the Board of Managers to be reasonably necessary to preserve such qualification of such Person or otherwise to ensure that the assets of such Person are not "plan assets" with an instrument executed by the Company and such Person without the consent of any other party hereto (each a "**VCOC Amendment**").

## ARTICLE V

## CAPITAL CONTRIBUTIONS

Section 5.01   *Initial Unit Issuances*.

(a)      On or prior to the Effective Date each Member has contributed or is deemed to have contributed the [Effective Date Contributions] in exchange for the Common Units set forth

24

opposite such Member's name on Exhibit A. Other than the Capital Contributions made on or prior to the Effective Date, no Member shall be required to make any Capital Contributions to the Company without the prior written consent of such Member.

(b)     Notwithstanding anything herein to the contrary, the mere approval or consent by the Members or the Board of Managers of any contractual obligation (including any acquisition or other transaction) by the Company or any of its Subsidiaries shall not be deemed an implicit consent by such Person to a capital call or otherwise to an additional obligation to make a Capital Contribution to the Company.

Section 5.02     *Withdrawal of Capital*.  No Member shall have the right to withdraw any capital from the Company; *provided*, *however*, that the Board of Managers may determine to distribute capital to the Members from time to time in accordance with the terms hereof.

Section 5.03     *Capital Accounts*.

(a)     A separate capital account (a "**Capital Account**") shall be established and maintained for each Member in accordance with the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv).  Each Member's Capital Account shall be increased by the amount of money contributed by such Member to the Company (including, to the extent applicable, pursuant to Section 5.03(b)), the initial Book Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume, or take subject to, under Code Section 752), allocations to such Member of Profits pursuant to Section 6.01 and any other items of income or gain allocated to such Member pursuant to Section 6.02, in the case of a Member receiving a Compensatory Membership Interest, the amount included in the Member's compensation income under Code Section 83(a), 83(b) or 83(d)(2), and any other increases allowed or required by Treasury Regulation Section 1.704-1(b)(2)(iv); and shall be decreased by the amount of money distributed to such Member by the Company, the Book Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that such Member is considered to assume, or take subject to, under Code Section 752), allocations to such Member of Losses pursuant to Section 6.01 and any other items of loss or deduction allocated to such Member pursuant to Section 6.02, and any other decreases allowed or required by Treasury Regulation Section 1.704-1(b)(2)(iv).  A Member that has more than one class or series of Units shall have a single Capital Account that reflects all such Units; *provided*, *however*, that the Capital Accounts shall be maintained in such manner as will facilitate a determination of the portion of each Capital Account attributable to each class or series of Units.

(b)     If any Company Level Tax (i) for purposes of maintaining Capital Accounts and allocating Profits and Losses, is treated as an expense of the Company, and (ii) for purposes of Article VII, relates to one or more Members (each such Member, an "**Affected Member**") and is recoverable from such Affected Members in accordance with Section 7.04, then to the extent that the Board of Managers determines it is appropriate for purposes of properly maintaining Capital Accounts (including by avoiding duplicative reductions thereto), the Company (A) shall allocate the expense with respect to such tax to the Affected Members in accordance with Section 6.02(j), (B) to the extent the Company recovers the Company Level Tax by payment from the Affected Members (whether directly or in repayment of a deemed loan), shall increase the Affected Members' Capital Accounts by the amount of such payment, which shall be deemed a contribution

for purposes of Section 5.03(a) (notwithstanding that, for all other purposes of this Agreement, the amount of such payment shall not be treated as a Capital Contribution and shall not reduce the amount that the Affected Members are otherwise obligated to contribute to the Company), and (C) to the extent the Company recovers the Company Level Tax by reducing the distributions to which the Affected Members would otherwise be entitled to receive, shall not reduce the Capital Account of the Affected Members by the amount of the distributions that were offset (notwithstanding that for purposes of Article VII, the amount of such distributions that were offset will be treated as having been distributed to the Affected Members).

(c)     In the event of a Transfer of Units made in accordance with this Agreement, the Capital Account of the Transferor that is attributable to the Transferred Units shall carry over to the Transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(*l*).

(d)     Except as otherwise required by the Act, no Member shall have any liability to restore all or any portion of a deficit balance in such Member's Capital Account, whether upon or prior to a liquidation of the Company or otherwise.

## ARTICLE VI

## ALLOCATIONS

Section 6.01     *Allocations of Profits and Losses*.  After giving effect to the allocations under Section 6.02, Profits and Losses (and to the extent reasonably determined necessary and appropriate by the Board of Managers to achieve the resulting Capital Account balances described below, any allocable items of gross income, gain, loss and expense includable in the computation of Profits and Losses) for each Allocation Period shall be allocated among the Members during such Allocation Period, in such a manner as shall cause the Capital Accounts of the Members (as adjusted to reflect all allocations under Section 6.02 and all distributions through the end of such Allocation Period) to equal, as nearly as possible, (a) the amount such Members would receive if all assets of the Company on hand at the end of such Allocation Period were sold for cash equal to their Book Values, all liabilities of the Company were satisfied in cash in accordance with their terms (limited in the case of non-recourse liabilities to the Book Value of the property securing such liabilities) and all remaining or resulting cash were distributed to the Members under Section 7.01, *minus* (b) such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets, and the amount any such Member is treated as obligated to contribute to the Company, computed immediately after the hypothetical sale of assets.

Section 6.02     *Special Tax Allocations*.  The following allocations shall be made in the following order:

(a)     Nonrecourse Deductions shall be allocated to the Members as determined by the Board of Managers, to the extent permitted by the Treasury Regulations.

(b)     Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse

Debt as determined under Treasury Regulation Section 1.704-2(b)(4).  If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss.  This Section 6.02(b) is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(c)     Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for an Allocation Period (or if there was a net decrease in Minimum Gain for a prior Allocation Period and the Company did not have sufficient amounts of income and gain during prior periods to allocate among the Members under this Section 6.02(c)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)).  This Section 6.02(c) is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(d)     Notwithstanding any provision hereof to the contrary except Section 6.02(c) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for an Allocation Period (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Allocation Period and the Company did not have sufficient amounts of income and gain during prior periods to allocate among the Members under this Section 6.02(d)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)).  This Section 6.02(d) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(e)     Notwithstanding any provision hereof to the contrary except Sections 6.02(a) and 6.02(b), no Losses or other items of loss or expense shall be allocated to any Member to the extent that such allocation would cause such Member to have a deficit balance in its Adjusted Capital Account (or increase any existing deficit balance in its Adjusted Capital Account) at the end of such Allocation Period.  All Losses and other items of loss and expense in excess of the limitation set forth in this Section 6.02(e) shall be allocated to the Members who do not have a deficit balance in their Adjusted Capital Accounts in proportion to their relative positive Adjusted Capital Accounts but only to the extent that such Losses and other items of loss and expense do not cause any such Member to have a deficit in its Adjusted Capital Account.

(f)     Notwithstanding any provision hereof to the contrary except Sections 6.02(c) and 6.02(d), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*) shall be allocated items of income and gain (consisting of a *pro rata* portion of each item of income, including gross income, and gain for the Allocation Period) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible; *provided*, *however*, that an allocation pursuant to this Section 6.02(f) shall be made only if and to the extent that such Member would have a deficit Adjusted Capital Account balance after all other allocations provided for in this Article VI have been tentatively made as if this Section 6.02(f) were not in this Agreement.

This Section 6.02(f) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(g)     In the event that any Member has a deficit balance in its Adjusted Capital Account at the end of any Allocation Period, such Member shall be allocated items of Company gross income, gain and Simulated Gain in the amount of such deficit as quickly as possible; *provided*, *however*, that an allocation pursuant to this Section 6.02(g) shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided for in this Article VI have been tentatively made as if Section 6.02(f) and this Section 6.02(g) were not in this Agreement.

(h)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) (including any such adjustments pursuant to Treasury Regulation Section 1.734-2(b)(1)) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(*2*) or 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Units, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(*2*) if such Treasury Regulation Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*)(*4*) applies.

(i)     Simulated Depletion for each Depletable Property, and Simulated Loss upon the disposition of a Depletable Property, shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.

(j)     Items of income, gain, loss, expense or credit resulting from a Covered Audit Adjustment shall be allocated to the Members in accordance with the applicable provisions of the Bipartisan Budget Act.

Section 6.03     *Income Tax Allocations*.

(a)     All items of income, gain, loss and deduction for U.S. federal income tax purposes shall be allocated in the same manner as the corresponding item is allocated pursuant to Section 6.01 or 6.02, except as otherwise provided in this Section 6.03 or Section 6.04.

(b)     In accordance with the principles of Code Section 704(c) and the Treasury Regulations thereunder (including the Treasury Regulations applying the principles of Code Section 704(c) to changes in Book Values), income, gain, deduction and loss with respect to any Company property having a Book Value that differs from such property's adjusted U.S. federal income tax basis shall, solely for U.S. federal income tax purposes, be allocated among the Members in order to account for any such difference using such method or methods as reasonably determined by the Board of Managers to be appropriate and in accordance with the applicable Treasury Regulations.

(c)     Any (i) recapture of depreciation or any other item of deduction shall be allocated, in accordance with Treasury Regulation Sections 1.1245-1(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of any remedial allocations)

and (ii) recapture of grants or credits shall be allocated to the Members in accordance with applicable law.

(d)    Tax credits of the Company shall be allocated among the Members as provided in Treasury Regulation Sections 1.704-1(b)(4)(ii) and 1.704-1(b)(4)(viii).

(e)    Allocations pursuant to this Section 6.03 are solely for purposes of U.S. federal, state and local taxes and, except as otherwise specifically provided, shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

(f)    If, as a result of an exercise of a non-compensatory option to acquire an interest in the Company, a Capital Account reallocation is required under Treasury Regulation Section 1.704-1(b)(2)(iv)(*s*)(*3*), the Company shall make corrective allocations pursuant to Treasury Regulation Section 1.704-1(b)(4)(x).

Section 6.04    *Income Tax Allocations with Respect to Depletable Properties.*

(a)    Cost and percentage depletion deductions with respect to any Depletable Property shall be computed separately by the Members rather than the Company.  For purposes of such computations, the U.S. federal income tax basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Capital Interest Percentage as of the time such Depletable Property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Capital Interest Percentages as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Capital Interest Percentages as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's Depletable Properties pursuant to clause (b) of the definition of Book Value.  The Company shall inform each Member of such Member's allocable share of the U.S. federal income tax basis of each Depletable Property promptly following the acquisition of such Depletable Property by the Company, any adjustment resulting from expenditures required to be capitalized in such basis, and any reallocation of such basis as provided in the previous sentence.

(b)    For purposes of the separate computation of gain or loss by each Member on the taxable disposition of Depletable Property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such Depletable Property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gains.

(c)    The allocations described in this Section 6.04 are intended to be applied in accordance with the Members' "interests in partnership capital" under Code Section 613A(c)(7)(D); *provided*, *however*, that the Members understand and agree that the Board of Managers may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to Depletable Properties, in such manner as determined consistent with the principles outlined in Section 6.03(b).

29

The provisions of this Section 6.04(c) and the other provisions of this Agreement relating to allocations under Code Section 613A(c)(7)(D) are intended to comply with Treasury Regulation Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(d)     Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each Depletable Property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company.  Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each Depletable Property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company.  The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.

Section 6.05     *Other Allocation Rules*.

(a)     All items of income, gain, loss, deduction and credit allocable to an interest in the Company that may have been Transferred shall be allocated between the Transferor and the Transferee in accordance with a method selected by the Board of Managers and permissible under Code Section 706 and the Treasury Regulations thereunder.

(b)     The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be allocated to the Members in any manner determined by the Board of Managers and permissible under the Treasury Regulations.

(c)     The definition of Capital Account set forth in Section 5.03(a) and the allocations set forth in Sections 6.02, 6.03, 6.04 and the preceding provisions of this Section 6.05 are intended to comply with the Treasury Regulations.  If the Board of Managers determines that the determination of a Member's Capital Account or the allocations to a Member is not in compliance with the Treasury Regulations, the Board of Managers is authorized to make any appropriate adjustments.

(d)     Notwithstanding anything in this Article VI to the contrary, all Compensatory Membership Interests that are subject to a "substantial risk of forfeiture" within the meaning of Code Section 83 and for which no Code Section 83(b) election was made shall not be treated as outstanding Units of the Company for purposes of Sections 5.03(a), 6.01, 6.02, 6.03 and 6.04 and such Units shall not have a corresponding Capital Account balance until such time as such Units are not subject to a substantial risk of forfeiture within the meaning of Code Section 83.

## ARTICLE VII

## DISTRIBUTIONS

Section 7.01     *Distributions*.

(a)     Subject to Section 7.03 and 14.03, all Distributable Property of the Company shall be distributed to the Common Members, *pro rata* in accordance with each Common Member's Common Sharing Percentage at such time or times (if any) as the Board of Managers determines in its sole discretion.

(b)     In the event the Board of Managers elects to distribute shares of capital stock or other equity interests to the Members in accordance with this Section 7.01, the Board of Managers, in its sole discretion, may elect to make such distribution subject to restrictions (including the use of escrow accounts, lock-ups or other contractual restrictions on the beneficial rights in respect of such shares or other equity interests) so long as such restrictions do not adversely affect the intended economic rights, preferences, privileges or powers of the Common Units pursuant to the foregoing provisions of this Section 7.01.

(c)     Distributions may be made in cash or property, as determined by the Board of Managers in its sole judgment (except as provided in Section 7.03 requiring cash with respect to Tax Distributions); provided that (i) except as otherwise provided in the following clause (ii), any such distributions to the Members shall consist of the same relative composition of cash and/or property to each Member, and (ii) if any Member is given an option as to the composition of cash and/or property to be received for a particular distribution, each Member holding the same class of Units shall be given the same option.

Section 7.02     *Distributions in Kind*.  No Member has any right to demand or receive a distribution from the Company in any form other than cash.

Section 7.03     *Tax Distributions*. Notwithstanding anything to the contrary in this Article VII, the Company shall, subject to the availability of proceeds (as determined by the Board of Managers in good faith), make cash distributions to the Common Members *pro rata* in accordance with each Common Member's Common Sharing Percentage on the Tax Distribution Date with respect to each Fiscal Year to the extent of the required Tax Distribution, if any, of such Common Member for such Fiscal Year; *provided*, *however*, the Company may, upon election by the Board of Managers in its sole discretion, make such cash distributions *pro rata* in accordance with each Common Member's Common Sharing Percentage on a quarterly basis based upon estimates of the required Tax Distribution in a manner sufficient to permit the Common Members to satisfy their respective quarterly estimated tax payment obligations.  All quarterly tax distributions to a Common Member shall be treated as an advance of, and shall offset, the cash distribution payable to the Member (pursuant to this Section 7.03) on the next Tax Distribution Date.

Section 7.04     *Withholding and Other Tax Payments by the Company*.

(a)     Each of the Company and its Subsidiaries may withhold from distributions, allocations or portions thereof if it is required to do so by any applicable rule, regulation or law, and each Member hereby authorizes the Company and its Subsidiaries to withhold or pay on behalf of or with respect to such Member any amount of U.S. federal, state, provincial, local or foreign taxes that the Board of Managers determines, in good faith, that the Company or any of its Subsidiaries is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  To the extent that any tax is paid by (or withheld from amounts payable to) the Company or any of its Subsidiaries and the Board of Managers determines,

in good faith, that such tax relates to one or more specific Members (including any Company Level Taxes), such tax shall be treated as an amount of taxes withheld or paid with respect to such Member pursuant to this Section 7.04.  Any determinations made by the Board of Managers pursuant to this Section 7.04(a) shall be binding upon the Members.

(b)      For all purposes under this Agreement, any amounts withheld or paid with respect to a Member pursuant to this Section 7.04 shall offset any distributions to which such Member is entitled concurrently with such withholding or payment and shall be treated as having been distributed to such Member pursuant to Section 7.01 at the time such offset is made.  To the extent that the cumulative amount of such withholding or payment exceeds the distributions to which such Member is entitled concurrently with such withholding or payment, the amount of such excess shall be considered a loan from the Company to such Member, with interest accruing at the greater of (1) the applicable underpayment rate for such period, as specified in Section 6621 of the Code and (2) the primary rate of interest then publicly quoted by J.P. Morgan Chase & Co. or, at the request of the Board of Managers, the amount of such excess shall be promptly paid to the Company by the Member on whose behalf such withholding is required to be made; *provided*, *however*, that any such payment shall not be treated as a Capital Contribution and shall not reduce the amount that a Member is otherwise obligated to contribute to the Company.  Any such loan shall be satisfied out of distributions to which such Member would otherwise be subsequently entitled (and to the extent satisfied out of such distributions, such amounts shall be treated as distributed to such Member pursuant to Section 7.01 at the time of such satisfaction) until such loan becomes due and payable in full, which shall occur at such time as when the Board of Managers requests that the Member pay such amount to the Company.  Each Member hereby unconditionally and irrevocably grants to the Company a security interest in such Member's Units to secure such Member's obligation to pay to the Company any amounts required to be paid pursuant to this Section 7.04.  Each Member shall take such actions as the Company may request in order to perfect or enforce the security interest created hereunder.  Each Member shall indemnify and hold harmless the Company, the other Members, the Partnership Representative and the Board of Managers from and against any liability (including any liability for Company Level Taxes) with respect to income attributable to or distributions or other payments to such Member.

(c)      Notwithstanding any other provision of this Agreement, (i) any Person who ceases to be a Member shall be treated as a Member for purposes of this Section 7.04 and (ii) the obligations of a Member pursuant to this Section 7.04 shall survive indefinitely with respect to any taxes withheld or paid by the Company or a Subsidiary of the Company that relate to the period during which such Person was actually a Member, regardless of whether such taxes are assessed, withheld or otherwise paid during such period; *provided*, *however*, that if the Board of Managers determines in good faith that seeking indemnification for Company Level Taxes from a former Member is not practicable, or that seeking such indemnification has failed, then, in either case, the Board of Managers may (A) recover any liability for Company Level Taxes from the substituted Member that acquired directly or indirectly the applicable interest in the Company from such former Member or (B) treat such liability for Company Level Taxes as a Company expense.

## ARTICLE VIII

## ACTIONS BY MEMBERS

Section 8.01  *Meetings*.  Annual meetings of Members may, but need not, be held.  The annual meeting of Members may be held at such place and on such date as the Board of Managers may designate.  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Board of Managers or by any Member or Members who hold at least twenty-five percent (25%) of the Common Units.

Section 8.02  *Place of Meetings*.  The Board of Managers may designate any place, either within or outside the State of Delaware, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal executive office of the Company.

Section 8.03  *Notice of Meetings*.  Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three (3) nor more than thirty (30) days before the date of the meeting, either personally or by mail, by or at the direction of the Board of Managers or Person calling the meeting, to each Member entitled to vote at such meeting.

Section 8.04  *Record Date*.  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

Section 8.05  *Quorum*.  Members holding at least a Common Majority represented in person or by proxy shall constitute a quorum at any meeting of Members.

Section 8.06  *Proxies*.  At all meetings of Members, a Common Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Board of Managers before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.  A facsimile or other electronic transmission by the Common Member, or a facsimile or other electronic reproduction of an executed writing shall be effective for purposes of this Section 8.06.  The chair of the meeting shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chair of the meeting, in which event such inspector or inspectors shall decide all such questions.  A proxy shall be with full power of substitution and shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Should a proxy designate two (2) or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority or, if only two (2) Persons are designated as proxies, then both, of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of

voting or giving consents thereby conferred, or if only one (1) be present, then such powers may be exercised by that one.

Section 8.07    *Action by Members Without a Meeting*.  Any action required or permitted to be taken at a meeting of Members may be taken without a meeting (or notice) if the action is evidenced by one or more written consents describing the action to be taken by the Members that are signed by the Common Majority.  Action taken under this <u>Section 8.07</u> is effective when the requisite number of Members required to approve such action have signed the consent, unless the consent specifies a different effective date.  The record date for determining Members entitled to take action without a meeting is the date the first Member signs and delivers to the Company a written consent.  An electronic mail or similar transmission by a Member, or a facsimile or other electronic reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this <u>Section 8.07</u>.

Section 8.08    *Waiver of Notice*.  When any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at or after the time stated therein, shall be equivalent to the giving of such notice.

Section 8.09    *Conduct of Meetings*.  All meetings of the Members shall be presided over by the chair of the meeting, who shall be chosen by the Board of Managers from among the Managers and the Officers.  The chair of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order.

Section 8.10    *No Power to Manage*.  Except for the rights expressly reserved to one or more Members hereunder, none of the Members in his, her or its capacities as a Member shall have any power or authority to (a) manage the business or affairs of the Company, (b) enter into any agreements on behalf of the Company or (c) bind any other Members to any contracts or agreements.

## ARTICLE IX

## MANAGEMENT OF THE COMPANY

Section 9.01    *Management*.

(a)    The business and affairs of the Company shall be managed by or under the direction of a board of managers (the "**Board of Managers**"), to whom, subject to the limitations set forth in this Agreement and as otherwise required by the Act, the Members hereby delegate, and in which is vested, the full, exclusive and complete power, authority and discretion to manage and control the administration, affairs and operations of the Company.  Each Manager shall be a "manager" of the Company as defined in Section 18-101(10) of the Act.  Except as explicitly specified in this Agreement, all actions, determinations, elections, judgments, approvals, considerations, amendments, calls or designations taken or omitted to be taken by the Board of Managers pursuant to this Agreement (whether to the Board of Managers' satisfaction, sole discretion or otherwise) shall be taken or omitted to be taken only with Board Approval.

34

(b)     To the fullest extent permitted by the Act, a Person, in performing his or her duties and obligations as a Manager under this Agreement, shall (i) serve in such capacity to represent the interests of the Member(s) that designated such Manager and (ii) be entitled to act or omit to act at the direction of the Member(s) that designated such Person to serve on the Board of Managers, considering only such factors, including the separate interests of the Member(s) that designated such Manager and factors specified by such Member(s), as such Manager chooses to consider.  Notwithstanding anything to the contrary, any action of a Manager or failure to act, taken or omitted in good faith reliance on the foregoing provision shall not, as between the Company and the other Members, on the one hand, and the Manager or Member(s) designating such Manager, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent that such exists under the Act or any other applicable law, rule or regulation) on the part of such Manager or its designating Member(s) or any other Manager or Member.  To the fullest extent permitted by the Act, none of the Managers shall owe any fiduciary duties to the Company or any of the Members; *provided*, *however*, that the Board of Managers shall act in accordance with the implied contractual covenant of good faith and fair dealing consistent with the terms of this Agreement.

(c)     Unless explicitly provided otherwise in this Agreement (including Section 9.04), the Board of Managers shall have the power, right and authority on behalf and in the name of the Company and its Subsidiaries to carry out any and all of the objects and purposes of the Company and its Subsidiaries and to perform all acts which the Board of Managers, in its sole discretion, may deem necessary or desirable.

(d)     The Company is solely responsible for the operation, maintenance and control of the Company's assets and facilities.  Nothing herein shall be taken to impose any duties, responsibilities or obligations, express or implied, on any member of any Investor Party in connection with, or relating to, compliance with, or liability under, applicable laws relating, in full or in part, to the protection of the environment, natural resources or human health or safety, including those laws relating to the storage, generation, use, handling, manufacture, processing, transportation, treatment, release and disposal of hazardous substances or petroleum or any fraction thereof.

Section 9.02   *Board of Managers*.

(a)     Size and Designees.

(i)     Each Member Group holding a Common Sharing Percentage of at least ten percent (10%) (the "**Board Designee Threshold**") shall have the right to appoint one (1) designee to the initial Board of Managers (each, a "**Board Designee**" and collectively, the "**Board Designees**"); *provided*, *however*, that if, at any time, a Member Group no longer holds a Common Sharing Percentage of at least ten percent (10%), the Board Designee appointed by such Member Group shall be automatically (without any further action by any Person) removed from the Board of Managers and the number of Managers composing the Board of Managers shall be automatically decreased accordingly; *further provided*, that if such Member Group no longer holds a Common Sharing Percentage of at least ten percent (10%) due to any dilution caused by an issuance pursuant to clauses (ii) or (v) of Section 13.02(d), such dilution shall not be considered when calculating such Member

35

Group's Common Sharing Percentage for purposes of determining the Board Designee Threshold with respect to such Member Group.

(ii)     The initial Board Designees are set forth on <u>Exhibit B</u>.

(iii)    Any Board Designee may be removed at any time with or without cause by the Member Group that designated such Manager pursuant to this <u>Section 9.02(a)</u>.

(iv)    In the event that a vacancy is created on the Board of Managers by the death, disability, retirement, resignation or removal of any Manager in accordance with this Agreement, such vacancy shall be filled only by consent of the Person(s) then entitled to designate such Manager pursuant to this <u>Section 9.02(a)</u>.

(v)     Any Person(s) entitled to designate a Manager may do so at any time by written notice to the Company.  Other than as set forth in <u>Section 9.02(a)(i)</u>, any Board Designee may be removed only by consent of the Member(s) entitled to designate such Board Designee.

(b)     <u>Votes per Manager; Quorum; Required Vote for Board Action</u>.

(i)     Each Manager shall be entitled to a number of votes equal to the Common Sharing Percentage of the applicable Member Group appointing such Manager (collectively, the "**Designee Vote**").

(ii)    Unless otherwise required by this Agreement, the presence of Managers holding at least a majority of the total Designee Vote, shall constitute a quorum for the transaction of business at a meeting of the Board of Managers.

(iii)   Unless provided otherwise in this Agreement, any action (including the giving of consent, waivers or approvals) by the Board of Managers shall require Board Approval.

(c)     <u>Place of Meetings; Order of Business</u>.  The Board of Managers may hold its meetings in such place or places, within or without the State of Delaware, as the Board of Managers may from time to time determine by resolution.  At all meetings of the Board of Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Board of Managers.

(d)     <u>Regular Meetings</u>.  Regular meetings of the Board of Managers shall be held at such times and places as shall be designated from time to time by resolution of the Board of Managers.  Notice of such regular meetings shall not be required if held at the times and places set forth in the relevant resolution and such resolution has been provided to each Manager.

(e)     <u>Special Meetings</u>.  Special meetings of the Board of Managers may be called by any Manager or Managers having at least 50% of the Designee Votes (in the aggregate) on at least twenty-four (24) hours personal, written or electronic notice to each Manager, which notice must include appropriate dial-in information to permit each Manager to participate in such meeting by

means of telephone conference.  Such notice need not state the purpose or purposes of such meeting, except as may otherwise be required by the Act.

(f)      Action Without a Meeting.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action so taken shall be signed by Managers representing the requisite number of Designee Votes that would be required to take the applicable action at a meeting of the Board of Managers and, when so signed, such written consent shall constitute Board Approval of such action, and notice of any such action taken shall be provided to those Managers who have not consented in writing promptly following the taking of such action.

(g)      Telephonic Conference Meeting.  Subject to the requirement for notice of meetings, members of the Board of Managers may participate in a meeting by means of a conference telephone or similar communications equipment by means of which all individuals participating in the meeting can hear each other, and participation in such a meeting shall constitute presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(h)      Waiver of Notice Through Attendance.  Attendance of a Manager at any meeting of the Board of Managers (including by telephone) shall constitute a waiver of notice of such meeting, except where such Manager attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened and notifies the other Managers at such meeting of such purpose.

(i)      Reliance on Books, Reports and Records.  Each Manager shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or reports made to the Company by any of its Officers or by an independent certified public accountant or by an appraiser selected with reasonable care by the Board of Managers, or in relying in good faith upon other records of the Company.  Furthermore, each Manager (in such Person's capacity as a Manager) may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by an officer, agent or representative of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Manager engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing.

(j)      Costs and Expenses.  The Company shall pay all reasonable, documented, out-of-pocket expenses incurred by the Managers in connection with their participation in meetings of the Board of Managers (and committees thereof) and attending to the business of the Company, in each case, subject to any expense policy adopted by the Company.

(k)      Committees.  The Board of Managers may appoint or create any committees of the Board of Managers with the affirmative vote, or written consent, of the Managers representing at

least 75.0% of the Designee Votes; *provided*, that each Manager shall have the right, but not the obligation, to serve on each committee.

Section 9.03   *Officers*.   The Board of Managers may appoint such officers of the Company, including the chief executive officer of the Company, as the Board of Managers may deem necessary or advisable (collectively, the "**Officers**"), and such Officers shall have the power, authority and duties delegated herein or otherwise in writing by the Board of Managers.   Officers may be given titles or may be designated as "authorized persons." To the extent authorized by the Board of Managers, any Officer may have responsibility for the management of the normal and customary day-to-day operations of the Company and act on behalf of, bind and execute and deliver documents in the name and on behalf of the Company and its Subsidiaries, in each case, consistent with Approved Budgets and subject to Section 9.04.   The Officers of the Company as of the Effective Date are set forth on Exhibit B.   The Officers of the Company are required to promptly notify the Board of Managers of any material occurrences or incidents relating to the Company's or any of its Subsidiaries' business or operations.   The Board of Managers may, in its sole discretion, remove any Officer with or without cause at any time.

Section 9.04   *Actions Requiring Supermajority Approval*.   Notwithstanding anything in this Agreement to the contrary, but subject to Sections 11.01 and 11.02, none of the Company or any of the Company's Subsidiaries may take any of the following actions, without prior written consent of the Members holding (in the aggregate) at least a 75.0% Common Sharing Percentage:

(a)   authorizing, reclassifying or issuing any additional Units (including any Common Units or other Equity Securities) or any other security;

(b)   changing the size or composition of the Board of Managers, other than as a result of a Member Group holding, or ceasing to hold, a Common Sharing Percentage of at least ten percent (10%) in accordance with Section 9.02(a)(i);

(c)   incurring or issuing any indebtedness (including all debt, liens, guarantees, capital leases, and negative pledges), other than incurrence of indebtedness pursuant to the Credit Agreement or agreements previously authorized by Members holding (in the aggregate) at least a 75.0% Common Sharing Percentage, or entering into a material amendment of any existing or authorized indebtedness that would result in the extension of the maturity of such indebtedness, or the incurrence or issuance of any additional indebtedness;

(d)   lending money to or investing in any person or entity other than a wholly-owned Subsidiary of the Company or guarantying any Person's liabilities other than a wholly-owned Subsidiary;

(e)   dissolving or liquidating the Company in accordance with Article XIV or commencing a voluntary bankruptcy or similar proceeding involving the Company or any of its Subsidiaries;

(f)   acquiring any business (whether by stock or asset purchase, merger, consolidation or otherwise);

(g)      effecting a Public Offering or a Reorganization in connection therewith, including as provided in Section 11.02;

(h)      (i) initiating any material litigation or other legal or administrative proceeding or entering into any settlement agreement or series of settlement agreements with respect to or otherwise resolving any material litigation or other legal or administrative proceeding or (ii) authorizing or consenting to the commencement by any Covered Person of any material litigation or other legal or administrative proceeding in accordance with Section 10.06;

(i)      changing the purpose of the Company as set forth in Section 2.05 in any material manner or entry into a material transaction inconsistent with such purpose;

(j)      effecting any Sale Transaction, other than any Sale Transaction in compliance with the terms of Article XI (including Section 11.01 and Section 11.04);

(k)      hiring or terminating a chief executive officer, chief operating officer or chief financial officer of the Company or any of its Subsidiaries;

(l)      establishing or changing the compensation of any officer or executive of the Company or any of its Subsidiaries;

(m)      approving any budget in respect of any period beginning on or after January 1, 2021;

(n)      approving or amending any budget that has an aggregate variance (positive or negative) in excess of 10% of such prior year's applicable budget; and

(o)      committing or agreeing to do any of the foregoing.

Section 9.05   *Compliance Program.*

(a)      The Board of Managers will exercise commercially reasonable efforts to (i) adopt and implement a Compliance Program promptly following the Effective Date, (ii) manage, operate and maintain such Compliance Program in accordance with the terms thereof and applicable law, and (iii) review (or direct certain Company agents or service providers to review) and, if necessary, amend or update the Compliance Program from time to time in accordance with applicable law. In establishing the Compliance Program, the Board of Managers will take into account the principles set forth in the U.S. Department of Justice, Criminal Division's, "Evaluation of Corporate Compliance Programs" or the Department of Justice's then-equivalent guidance on compliance programs, in effect on the Effective Date.

(b)      The Board of Managers will oversee the Compliance Program; *provided* that a chief compliance officer (which may be an Officer of the Company) (the "**CCO**") shall have responsibility for the management of the normal and customary day-to-day operation and management of the Compliance Program. The CCO will have reasonable, direct access to the Board of Managers, including any committee that may be created and designated by the Board of Managers to oversee the Compliance Program. The CCO, in consultation with the Board of Managers and any such committee, will review the Compliance Program from time to time and in

such manner as the Board of Managers and the CCO shall determine in good faith is reasonably necessary and update it as needed pursuant to such review.  The CCO and Board of Managers shall promptly notify the Members should the Company be investigated for, charged with, plead guilty or no contest to, or be convicted of any criminal activity.

(c)      Each Member shall have the reasonable right, from time to time, to access and inspect the books and records of the Company to confirm compliance with the Compliance Program then in effect, or any previous iteration of the Compliance Program.

## ARTICLE X

## INDEMNIFICATION

Section 10.01 *Power to Indemnify in Actions, Suits or Proceedings*.  To the maximum extent permitted by applicable law and subject to <u>Section 10.06</u>, the Company shall indemnify any Covered Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that such Person is a Covered Person (each, a "**Proceeding**"), against any and all losses, claims, expenses (including attorneys' fees), costs, liabilities, damages, judgments, fines and amounts paid in settlement actually and reasonably incurred by such Covered Person in connection with such Proceeding (excluding, for the avoidance of doubt, any costs, liabilities, damages, judgments, fines and amounts paid in settlement in respect of any Excluded Claims); *provided*, *however*, that such Covered Person shall not be indemnified by the Company if there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter for which such Covered Person is seeking indemnification hereunder, and taking into account the acknowledgments and agreements set forth in this Agreement, such Covered Person committed bad faith, fraud or willful or intentional misconduct or criminal wrongdoing or, in the case of an Officer (in such Person's capacity as such), such Officer did not meet the applicable standard of conduct under <u>Section 10.09(f)</u>.  Any indemnification provided hereunder shall be satisfied solely out of the assets of the Company (including available insurance coverage, if any), as an expense of the Company and, accordingly, no Covered Person shall be subject to personal liability by reason of these indemnification provisions.

Section 10.02 *Authorization of Indemnification*.

(a)      Except as provided in <u>Section 10.03</u>, any indemnification under this <u>Article X</u> (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of a Covered Person is proper in the circumstances because he or she has met the applicable standard of conduct set forth in <u>Section 10.01</u>.  The determination of whether a Covered Person has met the standard of conduct that entitled it to indemnification hereunder shall be made by the Board of Managers (subject to the presumptions in <u>Section 10.02(b)</u>).  To the extent that a Covered Person has been successful on the merits or otherwise in defense of any Proceeding referred to in <u>Section 10.01</u>, or in defense of any claim, issue or matter therein, he, she or it shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection therewith, without the necessity of authorization in the specific case.

(b)      In making a determination with respect to entitlement to indemnification hereunder, the Person making such determination (including the Board of Managers) shall presume that a Covered Person is entitled to indemnification under this Agreement if such Covered Person has submitted a request for indemnification in accordance with Article X, and the Company shall have the burden of proof to overcome that presumption in connection with the making by any Person of any determination contrary to that presumption. Neither the failure of the Company to have made a determination prior to the commencement of any action that indemnification is proper in the circumstances because the applicable Covered Person has met the applicable standard of conduct, nor an actual determination by the Company that the applicable Covered Person has not met such applicable standard of conduct, shall be a defense in any such action or create a presumption that such Covered Person has not met the applicable standard of conduct.

Section 10.03  *Expenses Payable in Advance*.  Upon written request by a Covered Person, the Company shall pay reasonable expenses incurred (or reasonably expected to be incurred) by such Covered Person in defending or investigating a Proceeding in advance of (a) the final disposition of such Proceeding and (b) the determination of whether such Covered Person has met the standard of conduct that entitles such Covered Person to indemnification hereunder; *provided, however*, prior to payment (or advancement) by the Company of any such expenses, the Covered Person shall provide an unsecured undertaking to the Company to repay all such amounts if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Article X; *provided*, *further*, that in no event shall the Company be required to pay or advance to any Covered Person any amounts in connection with a Proceeding for which the Company is not obligated to indemnify pursuant to Section 10.06.

Section 10.04  *Nonexclusivity of Indemnification and Advancement of Expenses*.  The indemnification and advancement of expenses provided by or granted pursuant to this Article X shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement, contract, a vote of Members or Board of Managers or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, it being the policy of the Company that indemnification of the Persons specified in Section 10.01 shall be made to the fullest extent permitted by applicable law. The provisions of this Article X shall not be deemed to preclude the indemnification of any Person who is not specified in Section 10.01, but whom the Company has the power or obligation to indemnify under the provisions of the Act or otherwise.

Section 10.05  *Survival of Indemnification and Advancement of Expenses*.  The indemnification and advancement of expenses provided by, or granted pursuant to, this Article X shall, unless otherwise provided when authorized or ratified, inure to the benefit of the heirs, executors and administrators of a Covered Person.  Any amendment, modification or repeal of this Section 10.05 or any provision hereof shall be prospective only and shall not in any way affect the limitations on liability of the Covered Persons, or terminate, reduce or impair the right of any past, present or future Covered Person, under and in accordance with the provisions of this Article X as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

Section 10.06 *Limitation on Indemnification*. Notwithstanding anything contained in this Article X to the contrary, except for proceedings to enforce rights to indemnification, the Company shall not be obligated to indemnify any Covered Person in connection with (a) a proceeding (or part thereof) initiated by such Covered Person on behalf of such Covered Person unless such proceeding (or part thereof) was authorized or consented to by the Board of Managers or (b) any proceeding (or part thereof) initiated by the Company, other than a proceeding brought in accordance with Subchapter X of the Act against such Covered Person, unless such proceeding (or part thereof) was authorized or consented to by the Board of Managers with the affirmative vote, or written consent of the Managers representing at least 75.0% of the Designee Votes.

Section 10.07 *Indemnification of Employees and Agents*. The Company may, to the extent authorized from time to time by the Board of Managers, provide rights to indemnification and the advancement of expenses to employees and agents of the Company or its Subsidiaries similar to those conferred in this Article X to Covered Persons.

Section 10.08 *Severability*. The provisions of this Article X are intended to comply with the Act. To the extent that any provision of this Article X authorizes or requires indemnification or the advancement of expenses contrary to the Act or the Certificate, the Company's power to indemnify or advance expenses under such provision shall be limited to that permitted by the Act and the Certificate and any limitation required by the Act or the Certificate shall not affect the validity of any other provision of this Article X.

Section 10.09 *Waiver of Members' Fiduciary Duties; Limitation of Liability*.

(a)       No Member, in its capacity as a Member, shall have any fiduciary or other duty to the Company, any other Member, any Manager or any other Person that is a party to or is otherwise bound by this Agreement other than the implied contractual covenant of good faith and fair dealing and other than such Member's express obligations under this Agreement.

(b)       To the maximum extent permitted by applicable law, whenever a Member, in its capacity as a Member, is permitted or required to make a decision or take an action or omit to take an action (including wherever in this Agreement any Member is permitted or required to make, grant or take a determination, a decision, consent, vote, judgment or action at its "discretion," "sole discretion" or under a grant of similar authority or latitude), such Member shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to give any consideration to any other interest or factors whatsoever. For the avoidance of doubt, the Members acknowledge and agree that any determinations, decisions, requests, votes, consents, judgments, actions or omissions taken by each of the Members, including any Board Designee in his or her capacity as a Manager, in each case, are deemed to be taken in such Person's capacity as a Member. To the maximum extent permitted by applicable law, no Member shall be liable to the Company or to any other Member for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of duties including fiduciary duties) taken or omitted by such Member (excluding, for the avoidance of doubt, losses sustained or liabilities incurred in respect of any Excluded Claims), unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such

Member engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing; *provided*, *however*, the foregoing shall not limit or otherwise affect a Member's liability with respect to a breach of the express terms of this Agreement applicable to such Member.

(c)      Each Covered Person may rely, and shall incur no liability in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, and may rely on a certificate signed by an officer, agent or representative of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, in each case unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, action or inaction, such Covered Person engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing.

(d)      To the maximum extent permitted by applicable law, no Manager (in such Person's capacity as a Manager) shall be liable to the Company or to any Member for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of duties including fiduciary duties) taken or omitted by such Manager (in such Person's capacity as a Manager) (excluding, for the avoidance of doubt, losses sustained or liabilities incurred in respect of any Excluded Claims), unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such Manager (in such Person's capacity as a Manager) engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing.

(e)      Any Manager (in such Person's capacity as a Manager) shall be entitled to rely on the provisions of this Agreement and on the advice of counsel, accountants and other professionals that is provided to the Company or such Manager, and such Manager shall not be liable to the Company or to any Member for such reliance on this Agreement or such advice; *provided*, *however*, that there has not been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such reliance, and taking into account the acknowledgments and agreements set forth in this Agreement, such Manager engaged in bad faith, fraud or willful or intentional misconduct or criminal wrongdoing.

(f)      Each Officer (in such Person's capacity as an Officer) shall have such fiduciary duties that an officer of the Company would have if the Company were a corporation organized under the laws of the State of Delaware. To the maximum extent permitted by applicable law, no Officer (in such Person's capacity as such) shall be liable to the Company or to any Member for losses sustained or liabilities incurred as a result of any act or omission (in relation to the Company, any transaction, any investment or any business decision or action, including for breach of duties including fiduciary duties) taken or omitted by such Officer (in such Person's capacity as such) (excluding, for the avoidance of doubt, losses sustained or liabilities incurred in respect of any Excluded Claims), unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of such act or omission, and taking into account the acknowledgments and agreements set forth in this Agreement, such Officer (in such Person's capacity as such) would have had such liability for such act or omission that an officer of

43

the Company would have if the Company were a corporation organized under the laws of the State of Delaware.

(g)      NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, TO THE FULLEST EXTENT PERMITTED BY LAW, NO MEMBER (IN HIS, HER OR ITS CAPACITY AS A MEMBER) OR MANAGER (IN HIS OR HER CAPACITY AS A MANAGER) SHALL BE LIABLE TO THE COMPANY, TO ANY MEMBER OR TO ANY OTHER PERSON MAKING CLAIMS ON BEHALF OF THE FOREGOING FOR EXEMPLARY, PUNITIVE, OR SPECIAL DAMAGES OR, EXCEPT TO THE EXTENT THE SAME ARE REASONABLY FORESEEABLE, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES, IN EACH CASE REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, VIOLATION OF ANY APPLICABLE DECEPTIVE TRADE PRACTICES ACT OR SIMILAR LAW OR ANY OTHER LEGAL OR EQUITABLE DUTY OR PRINCIPLE, AND THE COMPANY AND EACH MEMBER HEREBY RELEASES EACH OTHER MEMBER (IN HIS, HER OR ITS CAPACITY AS A MEMBER) AND MANAGER (IN HIS OR HER CAPACITY AS A MANAGER) FOR ANY SUCH DAMAGES; *PROVIDED, HOWEVER*, THAT: ANY AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO A CLAIM BY A THIRD PARTY WILL NOT BE DEEMED WAIVED OR RELEASED UNDER THIS SECTION 10.09(g); AND (II) THIS SECTION 10.09(g) SHALL NOT RELEASE ANY MEMBER OR MANAGER FROM, NOR LIMIT ANY MEMBER OR MANAGER'S LIABILITY FOR, CLAIMS OR LIABILITIES ARISING FROM SUCH MEMBER'S OR MANAGER'S FRAUD.

(h)      Notwithstanding anything in this Agreement to the contrary, nothing in this Section 10.09 shall limit or waive any claims against, actions, rights to sue, other remedies or other recourse the Company, any Member or any other Person may have against any Member, Manager or Officer for a breach of contract claim relating to any binding agreement, including (but subject to Section 10.09(g)) this Agreement (collectively, "**Excluded Claims**").

Section 10.10  *Indemnitor of First Resort*.  As a result of agreements or obligations arising outside of this Agreement, it may be the case that individual Covered Persons have certain rights to indemnification, advancement of expenses or insurance provided by certain of their respective indemnitors (collectively, the "**Covered Indemnitors**").  However, regardless of whether or not there are any such rights to indemnification, advancement of expenses or insurance provided by any Covered Indemnitor, (a) the Company is the indemnitor of first resort (*i.e.*, the Company's obligations to the Covered Persons are primary and any obligation of the Covered Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any Covered Person are secondary), (b) the Company shall be required to advance the full amount of expenses incurred by the Covered Persons and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement (or any other agreement between the Company and the Covered Persons) and (c) the Company hereby irrevocably waives, relinquishes and releases each of the Covered Indemnitors from any and all claims against any of the Covered Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof.  Regardless of any advancement or payment by the Covered Indemnitors on behalf of any Covered Person with respect to any claim for which a Covered Person has sought indemnification from the Company, (i) the foregoing shall not be affected and (ii) the Covered Indemnitors shall have a right of

contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company.

Section 10.11 *Insurance*. The Company shall, to the extent determined to be appropriate by the Board of Managers, directly or indirectly, maintain insurance (including directors' and officers' insurance), at its expense, to protect each Manager and Officer, and the Company may maintain such insurance to protect itself and any other Person, in each case against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under the Act.

## ARTICLE XI

## TRANSFER OF UNITS

Section 11.01 *Approved Sale*.

(a)    Notwithstanding anything to the contrary contained in this Agreement, at any time after the date of this Agreement, upon the written request of Members holding (in the aggregate) at least a 75.0% Common Sharing Percentage (such members, the "**Dragging Holders**") may cause, after giving prior written notice to the Company and the other Members (a "**Drag-Along Sale Notice**"), a Sale Transaction (and each of the Member's participation therewith) (an "**Approved Sale**"), in accordance with the terms of this Section 11.01; *provided* that each Member shall have a reasonable period of time (not to exceed five business days) to review and execute any agreements, certificates, documents and instruments required to be executed by such Member in connection therewith. Any Member who sells any of its Units pursuant to the terms of this Section 11.01 shall be subject to substantially the same terms and conditions as the Dragging Holders, including any indemnification holdback, subject to Section 11.01(b). No Member shall be required to make representations, warranties or indemnities (excluding indemnification holdbacks subject to Section 11.01(b)), other than limited and customary representations, warranties and indemnities concerning the Units subject to a sale under this Section 11.01, including but not limited to (A) each Member's valid ownership of such Units, free and clear of all liens, claims and encumbrances (excluding those arising under applicable securities laws) and (B) each Member's authority, power and right to enter into and consummate such Approved Sale without violating any other agreement to which such Member is a party or its assets are bound. Subject to the limitations set forth in this Section 11.01, each Member shall take all actions requested by the Dragging Holders in connection with the consummation of the Approved Sale including tendering such Member's Units and consenting to, voting for and waiving any dissenters rights, appraisal rights or similar rights and participating in any exchange or other transaction required in connection with such Approved Sale; *provided*, *however*, that no Member shall be required under this Section 11.01 to (i) agree to any non-competition or non-solicitation covenant, (ii) defend or indemnify any of the purchasers of such Approved Sale on a joint and several basis, nor (iii) assume or incur any liability in excess of the amount to be distributed or paid to such Member in connection with the Approved Sale, except with respect to fraud or willful misconduct by such Member or indemnification for representations or warranties made by such Member related to such Member's ownership, power and authority to enter into and consummate such Approved Sale and ability to convey title.

(b)    In any Approved Sale, each holder of Units shall receive the same proportion of the aggregate consideration from such Approved Sale that such holder would have received if such aggregate consideration were Distributable Property (and such aggregate consideration shall be deemed Distributable Property for all purposes of this Section 11.01) that was being distributed by the Company pursuant to Section 7.01(a) and, for this purpose, such aggregate consideration will be computed based upon (i) the cash included in such consideration distributed in such distribution, *plus* (ii) the Fair Market Value of any non-cash property included in such consideration distributed in such distribution; *provided*, *however*, that notwithstanding anything to the contrary herein, the Board of Managers, in its sole discretion, may elect to make any such a distribution of non-cash property subject to restrictions (including the use of escrow accounts, lock-ups or other contractual restrictions on the beneficial rights in respect of such shares or other equity interests) so long as such restrictions do not adversely affect the intended economic rights, preferences, privileges or powers of the Members in respect of their Common Units, pursuant to Section 7.01; *provided*, *however*, that such restrictions apply *pro rata* to holders of Common Units according to their Relative Proceeds (in the case of escrow accounts and holdbacks); *provided*, *further*, that the amount of Distributable Property, and the recipients thereof, shall be determined by application of Section 7.01 at the time of each distribution, and each such determination shall only take into account Distributable Property actually distributed at such time or prior to such time. Notwithstanding anything to the contrary in this Agreement, in the event the consideration from an Approved Sale includes any escrowed, heldback or other contingent payment amounts, no Member's liability for such amounts shall exceed such Member's *pro rata* share (based upon the allocation set forth in the first sentence of this Section 11.01(b) by treating such liability as reducing the amount of Distributable Property) of such aggregate liability.

(c)    If the Approved Sale is a transaction for which Rule 506 under the Securities Act (or any similar rule then in effect) may be available with respect to such transaction (including a merger, consolidation or other reorganization), the Members (other than those qualifying as Accredited Investors) shall, at the request of the Dragging Holders, appoint a purchaser representative (as such term is defined in Rule 501 under the Securities Act) designated by, and reasonably acceptable to the Dragging Holders and the Company shall pay the fees of such purchaser representative.    However, if any Member declines to appoint the purchaser representative designated by the Dragging Holders, such Member shall, if required, appoint another purchaser representative, and such Member shall be responsible for the fees of the purchaser representative so appointed.

(d)    Each of the Members shall bear his, her or its *pro rata* share (based upon the allocation set forth in Section 11.01(b) by treating the costs as reducing the amount of Distributable Property) of the fees and expenses incurred in the Approved Sale to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party.  Notwithstanding anything to the contrary, for purposes of this Section 11.01(d), fees, costs and expenses (including legal and expert fees and expenses) incurred by the Dragging Holders in connection with the consummation of an Approved Sale in accordance with this Section 11.01 shall be deemed to be for the benefit of all Members for purposes of this Section 11.01(d) whether or not the Approved Sale is consummated.   Other fees, costs and expenses incurred by the Members on their own behalf will not be considered costs of the transaction hereunder.

(e)     In connection with an Approved Sale, at the request of the Dragging Holders, the Members and the Company shall use reasonable efforts to structure such transaction in a manner that results in a disposition of the securities of each Blocker Corporation, rather than a disposition of the interests in the Company owned, directly or indirectly, by such Blocker Corporation.

(f)     Following the provision of the Drag-Along Sale Notice pursuant to <u>Section 11.01(a)</u>, the Dragging Holders shall have a period of ninety (90) calendar days to execute definitive documents for the Sale Transaction on the terms and conditions set forth herein. If definitive documents for such Sale Transaction are not executed within such ninety (90) calendar day period, or the Sale Transaction is thereafter terminated, the Dragging Holders shall return to each of the other Members all agreements, certificates, documents and instruments in the possession of the Dragging Holders executed by or on behalf of the other Members in connection with such proposed Sale Transaction, and any subsequent Transfer of Units pursuant to an Approved Sale shall require compliance with this <u>Section 11.01</u>.

Section 11.02  *Conversion to a Corporation; Public Offering*.

(a)     The Board of Managers, may in accordance with <u>Section 9.04(g)</u> cause a Public Offering.  In connection with a Public Offering, the Board of Managers may (but shall not be obligated to) (i) cause the conversion of all or any portion of the Company or Subsidiary of the Company into a corporation, by (A) the Transfer of all of the assets of the Company, subject to the Company's liabilities, or the Transfer of any portion of such assets and liabilities, to one or more corporations in exchange for shares of any such corporations and the subsequent distribution of the cash proceeds following the sale of such shares in accordance with the provisions of this Agreement, at such time as the Board of Managers may determine, to the Members, (B) the conversion of the Company or a Subsidiary of the Company into a corporation pursuant to Section 18-216 of the Act (or any successor section thereto); (C) the Transfer by each Member of Units held by such Member to one or more corporations in exchange for shares of any such corporation (including by merger of the Company into a corporation) or (D) filing an election pursuant to Treasury Regulation Section 301.7701-3(c) or (ii) cause the Company to use any other structure or means by which to effect a Public Offering, including by the conversion of the Company or any portion of the Company or any Subsidiary of the Company into one or more corporations, limited liability companies, limited partnerships or other business entities (any such conversion or other means described in subclauses (i) or (ii), a "**Reorganization**" and the resulting entity (whether the Company or a Subsidiary or other Affiliate of the Company or any successor thereto), whose Equity Securities are sold in the Public Offering, the "**Public Entity**").  The Members shall take all actions reasonably requested by the Board of Managers in connection with the consummation of such Reorganization, including consenting to, voting for and waiving any dissenters rights, appraisal rights or similar rights and participating in any exchange or other transaction required in connection with such Reorganization.  No Member shall have any right to vote, consent to or approve any Reorganization.  The Company shall pay any and all reasonable organizational, legal and accounting expenses and filing fees incurred by the Company or the Members in connection with such Reorganization; *provided*, *however*, that the Board of Managers may select, on behalf of itself and/or the Public Entity, any accounting firm, legal counsel, underwriters or any other providers in connection with such Reorganization.

(b)     In connection with any Reorganization involving a Transfer of Units, each holder of Units agrees to the Transfer of its Units in accordance with the terms of conversion or exchange, as applicable, as provided by the Board of Managers.  In connection with any such Reorganization, each holder of Units shall receive, in exchange for the Units held by such holder, capital stock, options or other securities with substantially similar economic and other rights, privileges and preferences as the Units being exchanged had prior to the consummation of such Reorganization as reasonably determined by the Board of Managers and taking into account the equity value of the Public Entity implied by the price and amount of securities sold in the Public Offering.  Each holder of Units further agrees that as of the effective date of such conversion or exchange any Unit outstanding thereafter that shall not have been tendered for conversion or exchange shall represent only the right to receive the amount of shares, options or other securities as provided in the terms of such conversion or exchange.

(c)     Each of the Members shall take all necessary or desirable actions reasonably requested by the Board of Managers in connection with the consummation of a Public Offering, including compliance with the requirements of all laws and regulatory bodies that are applicable or that have jurisdiction over such Public Offering.  If such Public Offering is an underwritten offering:

(i)     and the managing underwriters advise the Company in writing that in their opinion the Company's capital structure would adversely affect the marketability of the offering, each Member shall consent to and vote for a recapitalization, reorganization or exchange (each, a "**Recapitalization**") of any class of the Company's Equity Securities into securities that the managing underwriters and the Board of Managers find acceptable and shall take all necessary and desirable actions in connection with the consummation of such Recapitalization; *provided*, *however*, that each holder of a class of Units shall receive the same type of security with respect to such Units and shall be subject to the same restrictions on lock-up and transferability unless otherwise agreed to by the Members; and

(ii)     if requested by the managing underwriters, each of the Members shall execute customary lock-up agreements with respect to their Units or any securities received by them in any attendant Reorganization or Recapitalization.

(d)     Notwithstanding anything to the contrary herein, in connection with any Reorganization or Recapitalization involving the issuance or distribution of shares or other equity interests to the Members, the Board of Managers, in its sole discretion, may elect to make such issuance or distribution subject to restrictions (including the use of escrow accounts, lock-ups or other contractual restrictions on the beneficial rights in respect of such shares or other equity interests) so long as such restrictions do not adversely affect the intended economic rights, preferences, privileges or powers of the Members in respect of their Common Units, pursuant to Section 7.01.

(e)     The provisions of this Section 11.02 are not intended to and shall not in any way diminish the power and authority of the Board of Managers or the Board of Managers' right to cause a Public Offering, Reorganization or Approved Sale in accordance with Section 11.01.

48

(f)       Notwithstanding anything to the contrary in this Agreement, the Board of Managers may elect to cause the Company to effect an initial public offering of a Subsidiary of the Company or another entity that is not the Company or its successor without complying with the terms of this Section 11.02, in which case, such initial public offering shall not be deemed to be a Public Offering and this Agreement shall remain and continue in full force and effect thereafter in accordance with its terms.

(g)       Without limiting the foregoing, at the request of an Investor Party indirectly holding Common Units through a Blocker Corporation and with the approval of the Board of Managers, the Members and the Company shall use reasonable efforts to cause the Public Offering to (i) involve the merger, amalgamation or consolidation of any Blocker Corporation into the Public Entity in a transaction intended to qualify as a tax-free reorganization or the utilization of such Blocker Corporation as the Public Entity or (ii) be otherwise structured so that the Blocker Corporation is not subject to a level of corporate tax on the Public Offering or subsequent dividend payments or sales of shares.

Section 11.03 *Registration Rights*.  At or prior to the consummation of an initial Public Offering, the Public Entity and the Holders shall enter (and each of the Members shall cause the Public Entity to enter) into a registration rights agreement in customary form providing for registration rights of Registrable Securities, which registration rights agreement shall include provisions incorporating, among other terms:

(a)       demand registration rights in favor of the Company to the extent it holds Registrable Securities;

(b)       the obligation of the Public Entity to file a Shelf Registration Statement as soon as practicable following "shelf" eligibility, which Shelf Registration Statement shall offer to include in such registration all Registrable Securities held by Holders of Registrable Securities who are not entitled to transfer such Registrable Securities pursuant to Rule 144 under the Securities Act without volume limitations;

(c)       "piggyback" registration rights in favor of all holders of Registrable Securities;

(d)       customary provisions in respect of priority in demand and "piggyback" registrations;

(e)       customary provisions in respect of lock-up periods in connection with the initial Public Offering and any subsequent Public Offering;

(f)       customary blackout periods for demand registration rights and shelf registration rights intended to prevent interference with material transactions of the Public Entity;

(g)       customary provisions obligating the Public Entity to bear all reasonable fees and expenses relating to registration of Registrable Securities, other than (i) any fees or expenses of any counsel retained by a holder of Registrable Securities and (ii) any underwriter's fees (including discounts and commissions) related to the distribution of Registrable Securities not sold by the Public Entity; *provided* that, notwithstanding the foregoing clause (i), the Company shall pay or reimburse the reasonable fees and disbursements of one counsel retained in connection with each

49

such registration on behalf of the Members or former Members (which shall be counsel selected by the requesting Person in the event of a registration effected pursuant to the demand registration rights described in clause (a) above, or counsel selected by holders of a majority of the Registrable Securities being registered in the event of any other registration); and

(h)     customary indemnification provisions.

Section 11.04  *Tag Along Rights*.

(a)     Subject to Sections 11.05, 11.09, and 12.01, if prior to a Public Offering, any Common Member (the "**Tag Seller**") desires to effect a Transfer of any of its Common Units to a third party (such third party the "**Tag-Along Transferee**," and such Transfer, a "**Tag Sale**") and the requisite Members do not elect to exercise their rights, if any, under Section 11.01 to require the Common Members (a "**Co-Seller**") to Transfer their Common Units, then at least fifteen (15) days prior to the closing of such Tag Sale, the Tag Seller shall make a written offer (the "**Participation Offer**") to each other holder of Common Units to include in the proposed Tag Sale a number of Common Units owned and designated by any Co-Seller in accordance with the terms of this Section 11.04; *provided*, *however*, that if the consideration to be received by the Tag Seller includes any securities, then, unless the Tag Seller and the Tag-Along Transferee both reasonably determine that an exemption is otherwise available under the Securities Act and all applicable state securities laws for such transaction, only Co-Sellers who have certified to the reasonable satisfaction of the Tag Seller that they are Accredited Investors (or who have appointed a purchaser representative (as such term is defined in Rule 501 under the Securities Act)) shall be entitled to participate in such Tag Sale.

(b)     The Participation Offer shall describe the terms and conditions of the proposed Tag Sale, including (i) the aggregate number of Common Units proposed to be sold by the Tag Seller, (ii) the percentage such number represents of the total number of outstanding Common Units then held by the Tag Seller and its Investment Group (the "**Requested Tag Seller Percentage**") and (iii) the per Unit purchase price proposed to be paid by the Tag-Along Transferee for such Units. The Participation Offer shall be conditioned upon (A) the consummation of the transactions contemplated in the Participation Offer with the Tag-Along Transferee named therein and (B) each Co-Seller's execution and delivery of all agreements and other documents as the Tag Seller is required to execute and deliver in connection with such Tag Sale.

(c)     Each Co-Seller (in the aggregate with its Investment Group) shall have the right, exercisable by delivery of a written notice to the Tag Seller at any time within ten (10) days after receipt of the Participation Offer, to request to include in such Tag Sale up to the number of such Co-Seller's (in the aggregate with its Investment Group) Common Units that equals the product of the total number of such Co-Seller's (in the aggregate with its Investment Group) Common Units, *multiplied by* the Requested Tag Seller Percentage.  The Tag Seller shall determine the total number of Common Units so requested to be included by the Co-Sellers (together with the Common Units proposed to be sold by the Tag Seller, the "**Requested Common Units**").

(d)     Promptly following the completion of the procedures described in Section 11.04(c), the Tag Seller shall notify the Tag-Along Transferee of the total number of Requested Common Units.  If the Tag-Along Transferee is unwilling to purchase all of the Requested Common Units,

(i) the Tag Seller shall determine what percentage of the Requested Common Units such Tag-Along Transferee is willing to purchase in the aggregate (such percentage, the "**Purchased Percentage**") and (ii) the number of Requested Common Units that otherwise would have been sold in the Tag Sale by the Tag Seller and each exercising Co-Seller shall be reduced on a *pro rata* basis (based on the total number of Requested Common Units each such holder elected to sell) so that the aggregate number of Common Units sold in such Tag Sale equals the number of Requested Common Units, *multiplied by* the Purchased Percentage (the "**Purchased Common Units**").

(e)     The Purchased Common Units of any Co-Seller sold in any Tag Sale shall entitle such Co-Seller to receive the amount (if any) that such Co-Seller would have received in respect of such Units if the Tag Sale Value had been distributed by the Company in a complete liquidation pursuant to the rights and preferences set forth in Section 7.01 in effect immediately prior to such Tag Sale.  If any holder of Units sold in a Tag Sale receives consideration from such Tag Sale in a manner other than as contemplated by such rights and preferences or in excess of the amount to which such holder is entitled in accordance with such rights and preferences, then such holder shall take such action as is necessary so that such consideration shall be immediately reallocated among and distributed to the holders of Units sold in such Tag Sale in accordance with such rights and preferences.

(f)     If the Tag Seller is subject to any indemnification holdback in the consideration paid to it for Units sold pursuant to this Section 11.04, any Co-Seller who sells any of its Units pursuant to the terms of this Section 11.04 shall be subject to the same indemnification holdback (including by means of an escrow) as such Tag Seller in accordance with such Co-Seller's share of the consideration that is Distributable Property (as determined by Section 7.01) paid by the acquiring party; *provided*, *however*, that the amount of Distributable Property, and the recipients thereof, shall be determined by application of Section 7.01 at the time of each distribution, and each such determination shall only take into account Distributable Property actually distributed at such time or prior to such time.

(g)     If any Tag Sale is not completed on or before the later of (i) 90 days following the delivery of the Participation Offer or (ii) such later date as provided in the definitive documentation related to such Tag Sale, then any such Tag Seller must comply anew with the obligations under this Section 11.04 with respect to such Tag Sale.

Section 11.05  *Certain Events Not Deemed Transfers*.  In no event shall (a) any transaction that, if consummated, would constitute a Liquidation Event, a Reorganization, a Recapitalization, a Public Offering or an Approved Sale constitute a Tag Sale for purposes of Section 11.04, (b) any Transfer, sale or disposition of Units to any Investor Party be subject to Section 11.04 or Section 11.09, and (c) any Transfer, sale or disposition of Units pursuant to Section 11.01 or any Transfer, sale or disposition of Units by a Co-Seller pursuant to Section 11.04 be subject to Section 11.09.

Section 11.06  *Transfer and Exchange*.  When Units are presented to the Company with a request to register the Transfer of such Units or to exchange such Units for Units of other authorized denominations, the Company shall register the Transfer or make the exchange as requested if the requirements of this Agreement for such transaction are met; *provided*, *however*, that the Units surrendered for Transfer or exchange shall be duly endorsed or accompanied by a written instrument of Transfer in form reasonably satisfactory to the Company, duly executed by

the holder thereof or its attorney-in-fact and duly authorized in writing.  No service charge shall be made for any registration of Transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith.

Section 11.07  *Determination of Fair Market Value*.  For purposes of this Agreement, the "**Fair Market Value**" of any property means, as of the time of determination, the then fair market value of such property as reasonably determined in good faith by the Board of Managers, which determination shall be conclusive for all purposes.

Section 11.08  *Substituted Members*.

(a)     Unless a Transferee becomes a Substituted Member in accordance with <u>Section 11.08(b)</u>, such Transferee shall not be entitled to any of the rights granted to a Member hereunder, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions attributable to the Transferred Units to which the Transferring Member would otherwise be entitled, to the extent such items are Transferred.

(b)     A Transferee of any Common Units of any Member in accordance with <u>Section 12.01</u> shall become a Substituted Member entitled to all the rights of a Common Member, if, and only if, (i) the Transfer or assignment has been made in accordance with the Agreement and (ii) the Transferee or assignee executes and delivers an Adoption Agreement and any other instruments, in form and substance satisfactory to the Board of Managers, as the Board of Managers may deem necessary or desirable to effect such substitution, and (iii) unless otherwise determined by the Board of Managers, (A) at least 10 business days before such Transfer, the Transferor delivers to the Company an affidavit of non-foreign status with respect to such Transferor that satisfies the requirements of Section 1446(f)(2) of the Code or other documentation establishing a valid exemption from withholding pursuant to Section 1446(f) of the Code or (B) contemporaneously with the Transfer, the Transferee withholds and remits to the Internal Revenue Service the amount of tax required to be withheld upon the Transfer by Section 1446(f) of the Code (and provides evidence to the Company of such withholding and remittance promptly thereafter).  The Company shall be entitled to treat the record owner of any Units as the absolute owner thereof in all respects and shall incur no liability for distributions of cash or other property made to such owner until such time as a Transfer of such interest that complies with the terms of this Agreement has been effected.  Notwithstanding anything to the contrary, in connection with any Transfer of any Common Units by any Member in accordance with <u>Section 12.01</u>, or any transfer of Units described in the proviso of the definition of "Transfer," such Member may Transfer or assign any or all of its rights hereunder.

Section 11.09  *Right of First Offer*.

(a)     If any Member (the "**ROFO Offeror**") desires to Transfer any of its Common Units to any Person that is not an Affiliate of the ROFO Offeror (other than any Transfer pursuant to an Approved Sale or any Transfer by a Co-Seller pursuant to <u>Section 11.04</u>) (each, a "**ROFO Transaction**"), then in each case, the ROFO Offeror shall provide written notice of its desire to engage in such ROFO Transaction (a "**ROFO Notice**"), at least thirty (30) days prior to the closing of such ROFO Transaction, to each other Common Member (each, a "**ROFO Offeree**").  If

requested by a Common Member, the Company shall promptly disclose to the Common Members any material non-public information not previously disclosed to the Common Members in order to facilitate the ROFO Transaction in compliance with applicable securities laws.

(b)      In the ROFO Notice, the ROFO Offeror shall set forth the number of Common Units (the "**ROFO Offered Units**") the ROFO Offeror desires to Transfer in the ROFO Transaction and other terms and conditions (including the price per Unit with respect to the ROFO Offered Units) on which the ROFO Offeror is willing to consummate the Transfer of the ROFO Offeror's Units to the ROFO Offeree.

(c)      During the thirty (30) day period following receipt of the ROFO Notice (the "**Offer Period**"), any ROFO Offeree may provide a written response (a "**ROFO Response Offer**") to the ROFO Offeror electing to purchase all (but not less than all) of the ROFO Offered Units at a price per Common Unit determined by the ROFO Offeree set forth in the ROFO Response Offer (*provided*, *however*, that such price per Common Unit must be greater than or equal to the price per Unit set forth in the ROFO Notice), subject to the terms and conditions set forth in the ROFO Notice. During the fifteen (15) day period (the "**Election Period**") following the expiration of the Offer Period, the ROFO Offeror may elect to consummate the Transfer to such ROFO Offeree(s) that provide the highest price in their ROFO Response Offer(s), on the terms and conditions set forth in such ROFO Response Offer(s) (with respect to price) and the ROFO Notice (with respect to the terms and conditions other than price); *provided*, *however*, that (i) for the avoidance of doubt, the ROFO Offeror may, in its sole discretion, reject each ROFO Response Offer (or any ROFO Response Offer that does not set forth the highest price among any received ROFO Response Offers) and (ii) if more than one ROFO Response Offer is timely provided that elects to purchase the ROFO Offered Units at the same price, and such price is the highest offered among any other ROFO Response Offers, then, if the ROFO Offeror elects to consummate the Transfer with respect to any such ROFO Offeree, the ROFO Offeror shall sell and each of the ROFO Offerees who delivered a ROFO Response Offer at such price shall purchase its *pro rata* share (based on its Common Sharing Percentage relative to the Common Sharing Percentages of the other participating ROFO Offerees) of the ROFO Offered Units.  Notwithstanding anything in the foregoing to the contrary, if the ROFO Offeror elects to consummate the Transfer to any ROFO Offeree(s) (which ROFO Offeree(s) must have provided the highest price in their ROFO Response Offer in accordance with this Section 11.09(c)), then the ROFO Offeror must consummate the Transfer with each and every ROFO Offeree (on a pro rata basis based on its Common Sharing Percentage relative to the Common Sharing Percentages of the other participating ROFO Offerees) that offered such price in its ROFO Response Offer.

(d)      If (i) no ROFO Offeree elects to make a ROFO Response Offer within the Offer Period, (ii) each ROFO Offeree declines in writing the right to elect to make a ROFO Response Offer or (iii) the ROFO Offeree(s) that the ROFO Offeror elects to consummate the Transfer with pursuant to Section 11.09(a) fail(s) to consummate the purchase of the ROFO Offered Units within forty five (45) days of the expiration of the Election Period, then, in each case, the ROFO Offeror shall have the right to consummate the relevant ROFO Transaction, subject to Sections 11.04 or 12.01(b), as applicable, at any time within ninety (90) days following the expiration of the Election Period on terms and conditions substantially similar to (and, in no event, more favorable in the aggregate to the buyer of the ROFO Offered Units) the terms and conditions set forth in the ROFO Notice.

(e)     If the ROFO Offeror, following receipt of a ROFO Response Offer, elects during the Election Period not to consummate the ROFO Transaction with the ROFO Offeree(s) or fails to deliver an election to the ROFO Offeree(s) that delivered a ROFO Response Offer, the ROFO Offeror may not consummate such ROFO Transaction with any other Person (not Affiliated with the ROFO Offeror) unless the ROFO Offered Units are first re-offered to the ROFO Offerees anew in accordance with this Section 11.09.

(f)     If a ROFO Offeree elects to make a ROFO Response Offer within the Offer Period and ROFO Offeror accepts such ROFO Response Offer during the Election Period, then the purchase of the ROFO Offered Units by the ROFO Offeree shall (i) be at the price per Common Unit set forth in such ROFO Response Offer and (ii) take place and the payments thereafter shall be made by the later of (A) forty five (45) days following the expiration of the Election Period and (B) the date specified in the ROFO Notice.

(g)     If the ROFO Offeror accepts any ROFO Response Offer, during the 45-day period following the expiration of the Election Period, the ROFO Offeror shall take all reasonably necessary actions to consummate any ROFO Transaction, including with unrelated third parties, if applicable, and including entering into further agreements and transfer documents and delivering certificates and instruments and consents as may be deemed required, necessary or appropriate.

## ARTICLE XII

## LIMITATIONS ON TRANSFERS

Section 12.01  *Restrictions on Transfer*.

(a)     Except as otherwise contemplated by this Agreement, including Section 11.01, Section 11.02, Section 11.04, Section 11.09 and this Section 12.01, any Member may Transfer its Common Units without the prior consent of any other Person. Any purported Transfer in violation of this Article XII or, if applicable, the provisions of Article XI shall be void *ab initio* and of no force or effect.  Other than Transfers pursuant to Article XI, each Member shall cause any proposed Transferee of any Unit to agree in writing, in an instrument in form and substance reasonably satisfactory to the Board of Managers, to take and hold such securities subject to the provisions and upon conditions specified in this Agreement.  No Person shall make or suffer any Transfer of its, his or her Units if such Transfer would (i) cause the Company or any Member to become subject to regulation under either the Investment Company Act of 1940 or the Investment Advisers Act of 1940, (ii) violate, as applicable, the registration provisions of the Securities Act or the registration or qualification provisions of any applicable securities law, (iii) without the unanimous consent of the Members, create a risk the Company would be treated as a publicly traded partnership (within the meaning of Code Section 7704) for U.S. federal income tax purposes or (iv) to the extent the common stock of MD America Energy Holdings, Inc. is acquired by the Investor Members in a transaction structured to comply with Code Section 382(l)(5), without the prior written consent of the Members holding (in the aggregate) at least a 75.0% Common Sharing Percentage, cause MD America Energy Holdings, Inc. to experience an ownership change (within the meaning of Code Section 382).

54

(b)      Except as otherwise contemplated by <u>Section 11.01</u>, <u>Section 11.02</u>, <u>Section 11.04</u>, and <u>Section 11.09</u>, Units shall not be Transferred by any Member before (i) satisfaction of the applicable conditions set forth in this <u>Section 12.01</u>, and (ii) if applicable, compliance with the provisions of <u>Article XI</u>.

(c)      Subject to <u>Section 12.01(b)</u>, any Member who is an individual may Transfer by way of gift all or any of its Units to a spouse, lineal descendant or legally adopted child of such Member (a "**Family Member**") or to a trust or other entity whose sole and exclusive beneficiaries are and remain at all times such Member or Family Members of such Member (a "**Family Trust**"), but only to the extent (i) such Transfer is for *bona fide* estate planning purposes and (ii) such Transferee executes and delivers to the Company an Adoption Agreement.

(d)      Nothing herein shall limit any restrictions, conditions and/or other requirements with respect to a Transfer of Units set forth in the Credit Agreement or any other contract that a Member or its Affiliate is party to and, to the extent an Affiliate of a Member is subject to any such restrictions, conditions and/or other requirements in the Credit Agreement or other contract, such restrictions, conditions and/or other requirements shall apply to the Member that is an Affiliate of such Person.

Section 12.02  *Restrictive Legends*.

(a)      <u>Securities Act Legend</u>.  Each Unit held by a Member, and each Unit issued to any subsequent Transferee of such Unit, if certificated, shall be stamped or otherwise imprinted with a legend in substantially the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR PURSUANT TO THE SECURITIES OR "BLUE SKY" LAWS OF ANY JURISDICTION.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNTIL THE HOLDER HEREOF PROVIDES EVIDENCE SATISFACTORY TO THE ISSUER (WHICH, IN THE DISCRETION OF THE ISSUER, MAY INCLUDE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER) THAT SUCH OFFER, SALE, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE LAWS.

(b)      <u>Other Legends</u>.  Each Unit issued to each Member or to a subsequent Transferee, if certificated, shall include a legend in substantially the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER, VOTING AND OTHER TERMS AND CONDITIONS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY

COMPANY AGREEMENT OF **[●], LLC** DATED EFFECTIVE AS OF [_], 2020, AS AMENDED, RESTATED AND/OR MODIFIED FROM TIME TO TIME, A COPY OF WHICH MAY BE OBTAINED FROM **[●], LLC** AT ITS PRINCIPAL EXECUTIVE OFFICES.    THE HOLDER OF THIS CERTIFICATE AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH AGREEMENT.

Section 12.03  *Spouses*.

(a)      As a condition to becoming or remaining a Member, each Member that is an individual and is or becomes married, shall cause his or her spouse to promptly execute an agreement in the form of Exhibit C.

(b)      Any Units held by an individual who has failed to cause his or her spouse to execute an agreement in the form of Exhibit C and any Units held by a Person who is an assignee shall be subject to the right (but not the obligation) of the Company to acquire all of such Person's Common Units for the Fair Market Value thereof, determined as of the date the Company elects to acquire such Common Units.

(c)      In the event of a property settlement or separation agreement between a Member that is an individual and his or her spouse, such Member shall use his or her best efforts to assign to his or her spouse only the right to share in profits and losses, to receive distributions, and to receive allocations of income, gain, loss, deduction or credit or similar item to which the Member was entitled, to the extent assigned.

(d)      If a spouse or former spouse of a Member that is an individual acquires a Unit in the Company without prior Board Approval, such spouse or former spouse hereby grants, as evidenced by Exhibit C, an irrevocable power of attorney (which shall be coupled with an interest) to the original Member who held such Units, as the case may be, to vote or to give or withhold such approval as such original Member shall himself or herself vote or approve with respect to such matter and without the necessity of the taking of any action by any such spouse or former spouse.  Such power of attorney shall not be affected by the subsequent disability or incapacity of the spouse or former spouse granting such power of attorney.  Such spouse or former spouse agrees that the Company shall have the right (but not the obligation) at any time to purchase all of the Common Units, if any, acquired by such spouse or former spouse at the Fair Market Value thereof, determined as of the date the Company elects to purchase such Common Units.

(e)      This Section 12.03 shall apply *mutatis mutandis* to each Member, Transferee or any of their respective Affiliates that is Controlled by (or for the benefit of) any current or former employee of the Company or any of its Subsidiaries, which employee is married or becomes married, and such employee's spouse.

Section 12.04 *Termination of Certain Restrictions*.    Notwithstanding the foregoing provisions of this Article XII, the legend requirements of Section 12.02(a) shall terminate as to any Unit (a) when and so long as such Unit shall have been effectively registered under the Securities Act and disposed of pursuant thereto or disposed of pursuant to the provisions of Rule

144 under the Securities Act (or any successor rule) thereof or (b) when the Company shall have received an opinion of counsel (or such other evidence) reasonably satisfactory to it that such Unit may be Transferred without registration thereof under the Securities Act and that such legend may be removed.  Whenever the restrictions imposed by <u>Section 12.02(a)</u> shall terminate as to any Unit, the holder thereof, if such Unit is certificated, shall be entitled to receive from the Company, at the Company's expense, a new certificate not bearing the restrictive legend set forth in <u>Section 12.02(a)</u>.

## ARTICLE XIII

## ISSUANCE OF ADDITIONAL UNITS

Section 13.01 *Issuance of Additional Units*.

(a)     Subject to the provisions of this Agreement, the Board of Managers is hereby authorized to cause the Company from time to time to issue to any Person or Persons additional Units in one or more classes, or one or more series of any of such classes, with such designations, preferences and relative, participating, optional or other special rights, powers and duties, all as shall be determined by the Board of Managers in its sole and absolute discretion and without the approval of any of the Members, including:

(i)     the allocations of items of Company income, gain, loss, deduction and credit to each such class or series of Units;

(ii)     the right of each such class or series of Units to share in Company distributions;

(iii)     the rights of each such class or series of Units upon dissolution and liquidation of the Company;

(iv)     the price at and the terms and conditions on which such class or series of Units may be redeemed by the Company, if such Units are redeemable by the Company;

(v)     the rate at and the terms and conditions on which such class or series of Units may be converted into any other class or series of Units, if any class or series of Units are issued with the privilege of conversion; and

(vi)     the right of such class or series of Units to vote on matters relating to the relative rights and preferences of such class or other matters

(b)     Upon the issuance of any class or series of Units, and subject to the terms of this Agreement, the Board of Managers may amend any provision of this Agreement and may add any new provision to this Agreement, and execute, swear to, acknowledge, deliver, file and record an amended Certificate and whatever other documents may be required in connection therewith, as shall be necessary or desirable to reflect the issuance of such class or series of Units and the relative rights and preferences of such class or series of Units as to the matters set forth in the preceding sentence.

(c)     The Board of Managers is authorized and directed to do all things it deems to be necessary or advisable in connection with any such future issuance to reflect the issuance of the Units and the admission of any Member acquiring the Units, including compliance with any statute, rule, regulation or guideline of any U.S. federal, state, or other governmental agency or any securities exchange on which the Units or other such security is listed for trading.

Section 13.02  *Preemptive Rights*.

(a)     *General*.  Each Common Member that, together with its Investment Group, holds at least ten percent (10%) of the issued and outstanding Common Units, and is an Accredited Investor (or has appointed a purchaser representative (as such term is defined in Rule 501 under the Securities Act)) (a "**Preemptive Rights Holder**") shall have a preemptive right to purchase its *pro rata* share (based on its Common Sharing Percentage) of all Equity Securities, as defined below, that the Company may, from time to time, propose to issue and sell after the date hereof and prior to the date of a Public Offering, other than the Equity Securities excluded by Section 13.02(d).  Notwithstanding anything in the foregoing sentence to the contrary, if any Common Member, together with its Affiliates, ceases to hold at least ten percent (10%) of the issued and outstanding Common Units due to any dilution caused by an issuance pursuant to clauses (ii) or (v) of Section 13.02(d), such dilution shall not be considered when calculating such Common Member's and its Affiliates' percentage of issued and outstanding Common Units for purposes of determining whether such Common Member is entitled to preemptive rights under this Section 13.02.  The term "**Equity Securities**" means (i) any Unit, (ii) any security convertible, with or without consideration, into any Unit (including any option to purchase such a convertible security), (iii) any security carrying any warrant or right to subscribe to or purchase any Unit or (iv) any such warrant or right.

(b)     *Exercise of Rights*.  If the Company proposes to issue any Equity Securities (other than Equity Securities excluded by Section 13.02(d)) after the date hereof and prior to the date of Public Offering, the Company shall give each Preemptive Rights Holder written notice of its intention, describing the Equity Securities, the price and terms and conditions upon which such Equity Securities are to be issued or sold.  Subject to Section 13.02(d), each Preemptive Rights Holder shall have twenty (20) days from the giving of such notice to agree to purchase up to its *pro rata* share of the Equity Securities *plus* the additional amount of Equity Securities such Member would like to purchase in excess of its *pro rata* share (the "**Over-Allotment Amount**"), if any, if other Preemptive Rights Holders do not elect to purchase their full *pro rata* share of the Equity Securities, for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the quantity of Equity Securities to be purchased. The rights of each Preemptive Rights Holder to purchase an amount of Equity Securities in excess of each such Preemptive Rights Holder's *pro rata* share of Equity Securities shall be allocated among those Preemptive Rights Holders desiring Over-Allotment Amounts in a manner determined in writing by such Preemptive Rights Holders (or, in the absence of agreement by such Preemptive Rights Holders, on a pro rata basis in relation to the Common Sharing Percentages of the Preemptive Rights Holders, but not in excess of the Over-Allotment Amount requested by a Preemptive Rights Holder).

(c)     Notwithstanding the foregoing, the Company shall not be required to offer or sell such Equity Securities to any such Preemptive Rights Holder if such offer or sale would cause the Company to violate any applicable securities law requirements.

(d)     *Excluded Securities*.   The preemptive rights of the Preemptive Rights Holders established by this <u>Section 13.02</u> shall have no application to any of the following Equity Securities:

(i)     Common Units issued on the date hereof;

(ii)     Any Equity Securities issued to employees of the Company or any of its Subsidiaries or to any individual serving as a Manager of (or otherwise providing services to) the Company or any of their respective Subsidiaries;

(iii)     any Equity Securities issued for consideration pursuant to a merger, consolidation, acquisition or similar business combination or strategic transaction;

(iv)     any Equity Securities issued in connection with any split, dividend or recapitalization by the Company;

(v)     any Equity Securities issued pursuant to any equipment leasing arrangement, or debt financing from a bank or similar financial institution; and

(vi)     any Equity Securities that are issued by the Company pursuant to a Reorganization, Recapitalization or a registration statement filed under the Securities Act.

## ARTICLE XIV

## DISSOLUTION AND LIQUIDATION

Section 14.01 *Dissolution*

(a)     Subject to <u>Section 14.01(b)</u>, the Company shall be liquidated and its affairs shall be wound up on the first to occur of the following events (each a "**<u>Liquidation Event</u>**") and no other event shall cause the Company's dissolution:

(i)     the consent of the Board of Managers and Members holding (in the aggregate) at least a 75.0% Common Sharing Percentage, in accordance with <u>Section 9.04(e)</u>;

(ii)     at any time when there are no Members; and

(iii)     entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

(b)     If the Liquidation Event described in <u>Section 14.01(a)(ii)</u> shall occur, the Company shall not be dissolved, and the business of the Company shall be continued, if the requirements of

Section 18-801 of the Act for the avoidance of dissolution are satisfied (a "**Continuation Election**").

(c)      Except as otherwise provided in this <u>Section 14.01</u>, to the maximum extent permitted by the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the commencement or consummation of separation proceedings shall not constitute a Liquidation Event and, notwithstanding the occurrence of any such event or circumstance, the business of the Company shall be continued without dissolution.

Section 14.02  *Effect of Dissolution*.  On the occurrence of a Liquidation Event, unless a Continuation Election is made, the Company shall cease carrying on its business but shall not terminate until the winding up of the affairs of the Company is completed, the assets of the Company shall have been distributed as provided below and a certificate of cancellation of the Company under the Act has been filed with the Secretary of State of the State of Delaware.

Section 14.03  *Liquidation Upon Dissolution*.  On the occurrence of a Liquidation Event, unless a Continuation Election is made, sole and plenary authority to effectuate the liquidation of the assets of the Company shall be vested in the Board of Managers, who shall have full power and authority to sell, assign and encumber any and all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.  The proceeds of liquidation of the assets of the Company distributable upon a dissolution and winding up of the Company shall be applied in the following order of priority:

(a)      first, to the creditors of the Company, including creditors who are Members, in the order of priority provided by applicable law, in satisfaction of all liabilities and obligations of the Company (of any nature whatsoever, including fixed or contingent, matured or unmatured, legal or equitable, secured or unsecured), whether by payment or the making of reasonable provision for payment thereof; and

(b)      thereafter, to the Members in accordance with <u>Article VII</u>.

Section 14.04  *Negative Capital Accounts*.  No Member shall be liable to the Company or to any other Member for any negative balance outstanding in each such Member's Capital Account, whether such negative Capital Account results from the allocation of losses or other items of deduction and loss to such Member or from distributions to such Member, and such Member shall not have any obligation to make any contribution to the capital of the Company with respect to such deficit and such deficit shall not be considered a debt owed to the Company or, except as required by the Act, to any other Person for any purpose whatsoever.

Section 14.05  *Winding Up and Certificate of Cancellation*.  The winding up of the Company shall be completed when all of its debts, liabilities and obligations have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members.  Upon the completion of the winding up of the Company, a certificate of cancellation of the Company shall be filed with the Secretary of State of the State of Delaware.

## ARTICLE XV

## MISCELLANEOUS PROVISIONS

Section 15.01 *Notices*. All notices provided for or permitted to be given pursuant to this Agreement must be in writing and shall be given or served by (a) depositing the same with a national overnight delivery service company which tracks deliveries, addressed to the party to be notified, with all charges paid and proof of receipt requested, (b) delivering such notice in person to such party or (c) facsimile and, in any event, also be delivered via electronic mail. All notices are to be sent to or made at the Company's principal office (with a copy, which shall not constitute notice, to each of the Members at the addresses set forth in Exhibit A). All notices given in accordance with this Agreement shall be effective upon delivery at the address of the addressee. Each Member shall have the right from time to time to change his, her or its address by written notice to the other Members.

Section 15.02 *Governing Law*. THIS AGREEMENT AND THE OBLIGATIONS OF THE MEMBERS HEREUNDER SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER SUCH CONSTRUCTION TO THE LAWS OF ANOTHER JURISDICTION.

Section 15.03 *Exclusive Jurisdiction; Waiver of Jury Trial; Severability.*

(a)     The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any federal court of the United States of America or other Delaware state court located in Wilmington, Delaware, and appropriate appellate courts therefrom, over any dispute arising out of or relating to this Agreement or the other Related Documents or any of the transactions contemplated hereby or thereby, and each party hereby irrevocably agrees that all claims in respect of such dispute may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable *l*aw, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or the other Related Documents or any of the transactions contemplated hereby or thereby brought in such courts or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. This consent to jurisdiction is being given solely for purposes of this Agreement and the other Related Documents and is not intended to, and shall not, confer consent to jurisdiction with respect to any other dispute in which a party to this Agreement or any other Related Document may become involved. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action, proceeding or counterclaim of the nature specified in this subsection (b) by the mailing of a copy thereof in the manner specified by the provisions of Section 15.01. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OR ANY OTHER RELATED DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(b)     In the event of a direct conflict between the provisions of this Agreement and (i) any provision of the Certificate or (ii) any mandatory, non-waivable provision of the Act, such provision of the Certificate or the Act shall control. If any provision of the Act provides that it may be varied or superseded in the limited liability company agreement of a limited liability company (or otherwise by agreement of the members or managers of a limited liability company), such provision shall be deemed superseded and waived in its entirety if this Agreement contains a provision addressing the same issue or subject matter.

(c)     If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

Section 15.04  *Entire Agreement; Amendments*.

(a)     This Agreement and its Exhibits constitute the entire agreement among the Members relative to the formation and governance of the Company and supersede all prior contracts or agreements with respect to the Company, whether oral or written, including the Original Agreement.

(b)     Notwithstanding anything to the contrary in this Agreement, in addition to any other approvals required under this Agreement (including Section 9.04, to the extent expressly required thereby), any amendment, modification, supplement or restatement of this Agreement (including any Exhibit or Schedule hereto) or the Certificate and any waiver of any provision thereof shall also require approval from a Common Majority; provided, however, that:

(i)     no amendment of this Agreement shall be effected that modifies a Member's limited liability without the consent and approval of such Member;

(ii)     no amendment of this Agreement shall be effected that disproportionately and adversely alters a Member's interest in the Company relative to the interests of other Members in respect of the same class or series of Units without the consent and approval of such Member;

(iii)     no amendment of this Agreement shall be effected that by its express terms treats any Member in a manner that is adversely different than the manner in which such amendment would treat any other Member in respect of the same class or series of membership interests without the consent and approval of such Member;

(iv)     no amendment of this Agreement shall be effected that modifies the Board Designee Threshold to require a Common Sharing Percentage in excess of ten percent (10%) without the approval of each Member Group that would lose its right to appoint a Board Designee as a result of such amendment;

(v)        no amendment of this Agreement shall be effected that modifies the right of a Manager to have a number of votes equal to the proportional voting equity ownership in the Company held by the applicable Member Group appointing such Manager without the approval of each Member Group then entitled to appoint a Manager;

(vi)        no amendment of this Agreement shall be effected that impacts a Member's obligations or non-obligations to contribute capital to the Company or guaranty any Company obligations without the consent and approval of such Member;

(vii)        no amendment of this Agreement shall be effected that modifies or amends the requirement in any provision of this Agreement calling for the consent, vote or approval of the Members holding (in the aggregate) at least a specified Common Sharing Percentage without the consent of the Members holding such specified Common Sharing Percentage;

(viii)        no amendment shall be effected that modifies the obligations of the Members, Board of Managers, or CCO in respect of the authorization, adoption, implementation, operation or maintenance of the Compliance Program without the unanimous approval of all of the Common Members;

(ix)        no amendment of this Agreement that adversely affects the rights of any indemnitee under Article X with respect to acts or omissions of such indemnitee at any time prior to such amendment shall apply to such indemnitee without the written consent of such indemnitee; and

(x)        no amendment of this Agreement shall be effected that modifies or amends the requirement in any provision of this Agreement calling for the consent, vote or approval of the Managers holding (in the aggregate) at least a specified Designee Vote threshold, without the consent of Managers holding (in the aggregate) at least such specified Designee Vote.

(c)        Notwithstanding the foregoing, the Board of Managers shall be authorized to amend this Agreement, without the approval of any Member, pursuant to Article XIII or with respect to any of the following matters:

(i)        entering into any VCOC Amendment;

(ii)        entering into agreements with Persons that are Transferees or new Members pursuant to the terms of this Agreement, providing that such Transferees or new Members will be bound by this Agreement and will become Members of the Company and in accordance with Article XII;

(iii)        (A) satisfying any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the Commission, the Internal Revenue Service or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the Board of Managers deems to be in the best interest of the Company or (B) changing the name of the Company;

63

(iv)    curing any ambiguity or correcting or supplementing any provision hereof that may be incomplete or inconsistent with any other provision hereof, so long as such amendment under this clause (iv) does not adversely affect the rights or obligations of any Member; and

(v)    complying with or administering in an equitable manner the provisions of the Bipartisan Budget Act of 2015 and any Treasury Regulations or other administrative pronouncements promulgated thereunder in any manner determined by the Board of Managers.

(d)    Notwithstanding anything to the contrary in this Agreement, in addition to any other approvals required under this Agreement (including Section 9.04):

(i)    there shall not be any change in the tax classification for U.S. federal income tax purposes of the Company or any of its Subsidiaries without the consent and approval of the affected Member(s), other than (A) pursuant to Section 11.02(a)(i)(B) or Section 11.02(a)(i)(D), as applicable, or (B) as would not have a material and adverse impact on such Member's investment in the Company; and

(ii)    the Company will not, directly or indirectly through its Subsidiaries, form or invest in a foreign entity that subjects any Member to non-U.S. tax filing requirements without the approval of such Member.

Section 15.05  *Confidentiality*.

(a)    Each Member agrees that all non-public information received from or otherwise relating to, the Company, any of the Investor Parties or any third party who has entrusted the Company with confidential information with the expectation that such information will be kept confidential, is confidential and will not be (i) disclosed or otherwise released to any other Person without the prior consent of the Board of Managers or (ii) used for anything other than as necessary and appropriate in carrying out the business of the Company.   The obligations of the parties hereunder do not preclude any of the Investor Parties from: (w) disclosing information to their respective beneficial owners, actual or potential financing sources, employees, advisors or representatives, so long as such Persons are informed of the confidential nature of such information, (x) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation in connection with fundraising efforts, financial reporting, investment opportunities, Transfers or proposed Transfers of Units or otherwise, so long as such Persons are informed of the confidential nature of such information and required to comply with the confidentiality restrictions in this Section 15.05, (y) disclosure to any rating agency when required by it, so long as such Persons are informed of the confidential nature of such information and required to comply with the confidentiality restrictions in this Section 15.05, and (z) disclosure required or requested in connection with any public filings, whether pursuant to any securities laws or regulations or rules promulgated therefor (including the Investment Company Act of 1940 or otherwise) or by the National Association of Insurance Commissioners (and any successor thereto) or any representative thereof or pursuant to legal or judicial process; *provided*, *however*, that with respect to any disclosure pursuant to subclause (z), other than any such request in connection with any

64

examination of the financial condition or other routine examination of such disclosing party, the disclosing party shall use reasonable best efforts to notify the Company and each Member Group holding a Common Sharing Percentage of at least ten percent (10%) in advance of such disclosure so as to permit the Company and such Member Groups holding a Common Sharing Percentage of at least ten percent (10%), as applicable, to seek a protective order or otherwise contest such disclosure, and such disclosing party shall use reasonable best efforts to cooperate, at the expense of the Company, with the Company and any such Member Group holding a Common Sharing Percentage of at least ten percent (10%) in pursuing such protective order; *provided, however*, that if a Member Group no longer holds a Common Sharing Percentage of at least ten percent (10%) due to any dilution caused by an issuance pursuant to clauses (ii) or (v) of Section 13.02(d), such dilution shall not be considered when calculating such Member Group's Common Sharing Percentage for purposes of this Section 15.05(a). Notwithstanding the foregoing, no Investor Party nor any of its advisors or representatives will be precluded from representing third parties or acting as a principal in transactions which may involve the Company or another company in the industry in which the Company operates, *provided* that such Investor Party or advisor or representative complies with the disclosure restrictions set forth in this Section 15.05.

(b)     Notwithstanding anything to the contrary in this Agreement, the Investor Parties shall each have the right in connection with a Transfer approved by the Board of Managers or pursuant to Section 11.01 to require the Company and its Subsidiaries and its and their respective officers, employees, representatives and advisors to cooperate fully with potential acquirors in any proposed or prospective Transfer of any Investor Party's Units, as applicable, by taking all customary and other actions reasonably requested, including making the Company's properties, books and records, and other assets reasonably available for inspection by such potential acquirors, establishing a physical or electronic data room including materials customarily made available to potential acquirors in connection with such processes and being reasonably available for presentations, interviews and other diligence activities, in each case subject to reasonable and customary confidentiality provisions; *provided, however*, that any such potential acquirer shall enter into a customary non-disclosure agreement with the Company with terms substantially similar to this Section 15.05.  The Company shall provide assistance with respect to these actions as reasonably requested by the Investor Parties.

Section 15.06 *Non-Disparagement*.  Each Member agrees that, in communications with Persons other than the Members and the Company, he or she shall not disparage the Company or any of its Members (and their Affiliates, members and partners)[, or any of the current employees of any of the foregoing].[8]  Under no circumstances shall any Member, in communications with Persons other than the Members and the Company, disparage any business practice, policy, statement, valuation or report that is made, conducted or published by the Company or any other Member (and their Affiliates, members and partners)[, or any of the current employees of any of the foregoing].[9]  Notwithstanding the foregoing, this Section 15.06 shall not be construed to prohibit or restrain any criticism or other statements made, directly or indirectly, in communications exclusively between or among any of the Members or the Company or their respective attorneys, to the extent such communications or statements are made in the ordinary

---

[8] **NTD**: Subject to further SSP review.

[9] **NTD**: Subject to further SSP review.

course of business, and shall not be construed to prohibit a Member giving truthful testimony under oath in any legal proceeding or making truthful statements that are required by law or legal process.

Section 15.07 *Waiver*.  No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of his, her or its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder.  Failure on the part of any Member to complain of any act or to declare any other Member in default, regardless of how long such failure continues, shall not constitute a waiver of rights hereunder.

Section 15.08 *Severability*.  Subject to <u>Section 10.08</u>, if any provision of this Agreement or the application thereof to any Person or circumstances shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 15.09 *Ownership of Property and Right of Partition*.  A Unit in the Company shall be personal property for all purposes.  No Member shall have any right to partition the property owned by the Company.

Section 15.10 *Further Assurances*.   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

Section 15.11 *Parties in Interest*.  This Agreement shall be binding solely upon, be enforceable solely by, and inure solely to the benefit of, the Company, each Member and his, her or its respective successors, permitted assigns and Transferees, and, except as otherwise provided in <u>Section 3.04</u> and <u>Article X</u>, nothing in this Agreement (express or implied) is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.  Each Covered Person is an intended third-party beneficiary, and is hereby granted third-party beneficiary status, with respect to <u>Article X</u> and shall be entitled to enforce such obligations as if such Covered Person were a party hereto. Each [Term Loan Lender] (as defined in the Credit Agreement) is an intended third-party beneficiary, and is hereby granted third-party beneficiary status, with respect to <u>Section 12.01(d)</u> and shall be entitled to enforce such provision as if such [Term Loan Lender] were a party hereto.

Section 15.12 *Specific Performance*.  Each Member agrees that the other Members would be damaged irreparably and would have no adequate remedy at law in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached.  Accordingly, each Member shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement by the other Members and to enforce specifically this Agreement and the terms and provisions hereof, this being in addition to any other remedies to which such Member is entitled at law or in equity, without proof of actual damages or any obligation to post any bond or other security as a prerequisite to obtaining equitable relief.  Each

Member agrees not to dispute or resist any such application for relief on the basis that another Member has an adequate remedy at law or that damage arising from such non-performance or breach is not irreparable.

Section 15.13 *Counterparts*.   This Agreement may be executed in any number of counterparts (including by facsimile or other electronic means) with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument

Section 15.14 *Publicity*.  Neither the Company nor any Member shall, and they shall cause their respective Affiliates not to, make any press release, public announcement or other public communication (including an internet posting, web blog or other electronic publication) that (a) makes reference to the Company, this Agreement or the transactions contemplated herein without prior Board Approval or (b) makes reference to any Investor Party without prior written approval of such Investor Party.

Section 15.15 *No Effect On Lender Relationship*.   The Company and the Members acknowledge and agree that, notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any Member or its Investment Group (a) in its or their capacity as a lender or as agent for lenders to the Company or any of its Subsidiaries pursuant to any agreement under which the Company or any of its Subsidiaries has (now or in the future) borrowed money, including the Credit Agreement, or (b) in its or their capacity as a lender or as agent for lenders to any other Person who has (now or in the future) borrowed money. Without limiting the generality of the foregoing, any such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (x) its or any of its Investment Group's status as a Member, (y) the interests of the Company or its Subsidiaries or (z) any duty it may have to any Member, except as may be required under the applicable loan documents or by commercial law applicable to creditors generally. No consent, approval, vote or other action taken or required to be taken by a Member in such capacity shall in any way impact, affect or alter the rights and remedies of the other Members or any of their Affiliates as a lender or agent for lenders.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY
LEFT BLANK; SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as of the date first written above.

**COMMON MEMBERS:**

**SIXTH STREET**

**SIXTH STREET SPECIALTY LENDING, INC.**

By: _____
     Name:
     Title:

**TAO TALENTS, LLC**

By: _____
     Name:
     Title:

## MC CREDIT

**MC Credit Fund I LP**

By: _____
     Name:
     Title:

**MC Credit Fund IA (Cayman Master) LP**

By: _____
     Name:
     Title:

**MC Credit Fund II LP**

By: _____
     Name:
     Title:

**MC Credit Fund III (Delaware) LP**

By: _____
     Name:
     Title:

**MC Credit Fund III-U (Delaware) LP**

By: _____
     Name:
     Title:

**MC Credit Fund III (Cayman Master) LP**

By: _____

Name:

Title:

**<u>PRUDENTIAL</u>**

**Prudential Legacy Insurance Company of New Jersey**

By:   _____
       Name:
       Title:

**The Prudential Insurance Company of America**

By:   _____
       Name:
       Title:

**<u>ARENA</u>**

**Arena Limited SPV, LLC**


By: _____

Name:

Title:

**EXHIBIT A**

## COMMON MEMBERS

| Name | Business Address and Contact | Number Common Units Issued and Issue Date | Common Sharing Percentage |
|---|---|---|---|
| Sixth Street Specialty Lending, Inc. .............................. | 2100 McKinney Ave, Suite 1500 Dallas Texas 75201 Attn: Joshua Peck; Sixth Street Legal<br><br>E-mail: jpeck@tpg.com; TSSPlegal@tpg.com<br><br>with a copy to:<br><br>Vinson & Elkins L.L.P. 2001 Ross Avenue, Suite 3900 Dallas, TX 75201 Attention: Peter C. Marshall Facsimile: 214-999-7849 | [15,000] – Effective Date | 15.0% |
| TAO Talents, LLC | 2100 McKinney Ave, Suite 1500 Dallas Texas 75201 Attn: Joshua Peck; Sixth Street Legal E-mail: jpeck@tpg.com; TSSPlegal@tpg.com<br><br>with a copy to :<br><br>Vinson & Elkins L.L.P. 2001 Ross Avenue, Suite 3900 Dallas, TX 75201 Attention: Peter C. Marshall Facsimile: 214-999-7849 | [25,000] – Effective Date | 25.0% |
| *Total Sixth Street* | *N/A* | **[40,000] – Effective Date** | **40.0%** |
| MC Credit Fund I LP .............................. | Sean Chao 2200 Atlantic Street Suite 501 Stamford, CT 06902 | [14,400] – Effective Date | 14.4% |

Exhibit A

| Name | Business Address and Contact | Number Common Units Issued and Issue Date | Common Sharing Percentage |
|---|---|---|---|
| MC Credit Fund IA (Cayman Master) LP<br>................................... | Sean Chao<br>2200 Atlantic Street<br>Suite 501<br>Stamford, CT 06902 | [3,100] – Effective Date | 3.1% |
| MC Credit Fund II LP<br>................................... | Sean Chao<br>2200 Atlantic Street<br>Suite 501<br>Stamford, CT 06902 | [7,500] – Effective Date | 7.5% |
| MC Credit Fund III (Delaware) LP<br>................................... | Sean Chao<br>2200 Atlantic Street<br>Suite 501<br>Stamford, CT 06902 | [2,700] – Effective Date | 2.7% |
| MC Credit Fund III-U (Delaware) LP<br>................................... | Sean Chao<br>2200 Atlantic Street<br>Suite 501<br>Stamford, CT 06902 | [1,700] – Effective Date | 1.7% |

Exhibit A

| Name | Business Address and Contact | Number Common Units Issued and Issue Date | Common Sharing Percentage |
|---|---|---|---|
| MC Credit Fund III (Cayman Master) LP <br> ............................................... | Sean Chao <br> 2200 Atlantic Street <br> Suite 501 <br> Stamford, CT 06902 | [3,100] – Effective Date | 3.1% |
| *Total MC Credit* | *N/A* | **[32,500] – Effective Date** | **32.5%** |
| Prudential Legacy Insurance Company of New Jersey | Attn: Christopher Halloran <br> Prudential Legacy Insurance Company of New Jersey <br> 2200 Ross Avenue <br> Suite 4300W <br> Dallas, TX 75201 <br> Email: <br> Chris.Halloran@pgim.com <br><br> with a copy to: <br><br> Attn: Paul D. Moak <br> Gray Reed & McGraw LLP <br> 1300 Post Oak Blvd. <br> Suite 2000 <br> Houston, TX 77056 <br> Email: <br> pmoak@grayreed.com | [14,750] – Effective Date | 14.75% |

Exhibit A

| Name | Business Address and Contact | Number Common Units Issued and Issue Date | Common Sharing Percentage |
|---|---|---|---|
| The Prudential Insurance Company of America | Attn: Christopher Halloran<br>Prudential Insurance Company of America<br>2200 Ross Avenue<br>Suite 4300W<br>Dallas, TX 75201<br>Email: Chris.Halloran@pgim.com<br><br>with a copy to:<br><br>Attn: Paul D. Moak<br>Gray Reed & McGraw LLP<br>1300 Post Oak Blvd.<br>Suite 2000<br>Houston, TX 77056<br>Email: pmoak@grayreed.com | [2,750] – Effective Date | 2.75% |
| *Total Prudential* | *N/A* | **[17,500] – Effective Date** | **17.5%** |
| Arena Limited SPV, LLC<br>.................................... | c/o Arena Investors, LP<br>Attn: Greg White<br>The Chrysler Building<br>405 Lexington Avenue<br>59th Floor<br>New York, NY 10174<br>Email: gwhite@arenaco.com<br>with copies to:<br><br>c/o Arena Investors, LP<br>Attn: Spencer Rolfe<br>The Chrysler Building<br>405 Lexington Avenue<br>59th Floor<br>New York, NY 10174<br>Email: srolfe@arenaco.com | [10,000] – Effective Date | 10.0% |

Exhibit A

| Name | Business Address and Contact | Number Common Units Issued and Issue Date | Common Sharing Percentage |
|---|---|---|---|
| | and<br><br>Timothy Spear<br>Foley & Lardner LLP<br>1000 Louisiana Street, Suite 2000<br>Houston, TX 77002<br>Office: 713.276.5993<br>Mobile: 281.797.5105<br>Email: tspear@foley.com | | |
| Total | **N/A** | [100,000] | 100% |

Exhibit A

**EXHIBIT B**

## INITIAL BOARD OF MANAGERS AND INITIAL OFFICERS

<u>Initial Board of Managers</u>

*Sixth Street Designee:*

- Bryan Walker

*MC Credit Designees:*

- Jonathan Tunis

*Prudential Designee:*

- Christopher Halloran

*Arena Designee:*

- Greg White

<u>Initial Officer</u>

Michael Dye                    Chief Executive Officer
Timothy Bozeman                Chief Operating Officer

<u>Exhibit B</u>

**EXHIBIT C**

**CONSENT OF SPOUSE**

       I, the undersigned spouse of _____, one of the Members of **[●], LLC** (the "**Company**"), hereby acknowledge that I have read the Amended and Restated Limited Liability Company Agreement of the Company, dated [_], 2020 (the "**Agreement**"), as amended, restated or supplemented from time to time in accordance with its terms, and that I understand its contents.  I hereby consent to and approve of the provisions of the Agreement, as it may be amended, restated or supplemented from time to time in accordance with its terms, and agree that the Units (as defined in the Agreement) held by my spouse and my interest in such Units are subject to such provisions.  I hereby agree, for the benefit of the Company (which is relying hereupon) that (i) my spouse's interest in the Company is subject to the Agreement and the other agreements referred to therein and any interest I may have in the Company or its equity shall be irrevocably bound by the Agreement and the other agreements referred to therein and any marital, elective share or community property interests I may have in the Company or its equity shall be similarly bound and (ii) I will take no action at any time to hinder the operations of the Company.

       Dated: _____, 20__

 

_____

Name: _____
Address: _____
_____

Exhibit C

**EXHIBIT D**

**ADOPTION AGREEMENT**

This Adoption Agreement is executed by the undersigned pursuant to the Amended and Restated Limited Liability Company Agreement of **[●], LLC** (the "**Company**"), dated as of [_], 2020, as amended, restated or supplemented from time to time in accordance with its terms, a copy of which is attached hereto and is incorporated herein by reference (the "**Agreement**").  By the execution of this Adoption Agreement, the undersigned agrees as follows:

1.      Acknowledgment.  The undersigned acknowledges that **[**he/she**]** is acquiring **[_____]** Units of the Company as a Common Member, subject to the terms and conditions of the Agreement (including the Exhibits thereto), as amended from time to time.  Capitalized terms used herein without definition are defined in the Agreement and are used herein with the same meanings set forth therein.

2.      Agreement.  The undersigned hereby joins in, and agrees to be bound by, subject to, and enjoy the benefit of the applicable rights and obligations set forth in, the Agreement (including the Exhibits thereto), with the same force and effect as if he/she were originally a party thereto.

3.      Notice.  Any notice required or permitted by the Agreement shall be given to the undersigned at the address listed below.

Exhibit D

EXECUTED AND DATED on this            day of                             , 20         .

_____
[Name]

Notice Address:_____

_____

_____

Facsimile:_____

Exhibit D

**<u>EXHIBIT B</u>**

**New First Lien Term Loan Documents**

[See Attached]

*Draft 11/3/2020*

_____
_____

**AMENDED AND RESTATED CREDIT AGREEMENT**

AMONG

**[MD AMERICA ENERGY HOLDINGS, INC.]**,
AS HOLDINGS AND A HOLDING COMPANY,

**MD AMERICA ENERGY, LLC**,
AS THE BORROWER,

**[MD AMERICA INTERMEDIATE HOLDINGS, LLC AND
MD AMERICA HOLDINGS, LLC]**,
EACH AS A HOLDING COMPANY,

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

AND

**LOAN ADMIN CO LLC**,
AS ADMINISTRATIVE AGENT

_____

DATED AS OF NOVEMBER [__], 2020

_____
_____

Table of Contents
(continued)

|  |  |  | Page |
|---|---|---|---|
| SECTION 1. | Definitions and Accounting Terms. | | 2 |
| 1.01. | Defined Terms. | | 2 |
| 1.02. | Divisions. | | 43 |
| SECTION 2. | Amount and Terms of Loans. | | 43 |
| 2.01. | The Loans. | | 43 |
| 2.02. | [Reserved]. | | 44 |
| 2.03. | [Reserved]. | | 44 |
| 2.04. | [Reserved]. | | 44 |
| 2.05. | Notes. | | 44 |
| 2.06. | Conversions. | | 44 |
| 2.07. | Pro Rata Borrowings. | | 45 |
| 2.08. | Interest. | | 45 |
| 2.09. | Interest Periods. | | 46 |
| 2.10. | Increased Costs, Illegality, etc. | | 47 |
| 2.11. | Compensation. | | 49 |
| 2.12. | Change of Lending Office. | | 49 |
| 2.13. | Replacement of Lenders. | | 49 |
| 2.14. | Alternate Rate of Interest. | | 50 |
| SECTION 3. | [Reserved]. | | 53 |
| SECTION 4. | Fees; Reductions of Commitment. | | 53 |
| 4.01. | Administrative Agency Fees. | | 53 |
| 4.02. | Mandatory Reduction of Commitments. | | 53 |
| SECTION 5. | Prepayment Premiums. | | 53 |
| 5.01. | Prepayment Premium. | | 53 |
| 5.02. | Acceleration of Loans. | | 54 |
| 5.03. | Waiver. | | 54 |
| SECTION 6. | Prepayments; Payments; Taxes. | | 54 |
| 6.01. | Voluntary Prepayments. | | 54 |
| 6.02. | Mandatory Repayments. | | 55 |
| 6.03. | Method and Place of Payment. | | 58 |
| 6.04. | Net Payments. | | 58 |

i

Table of Contents
(continued)

Page

SECTION 7.    Conditions Precedent. ................................................................. 61

7.01.  Amended and Restated Credit Agreement; Notes. ............................. 62

7.02.  Officer's Certificate. ......................................................................... 62

7.03.  Company Documents; Proceedings; etc. ........................................... 62

7.04.  Adverse Change, Approvals. ............................................................. 62

7.05.  Litigation. .......................................................................................... 63

7.06.  Subsidiaries Guaranty. ...................................................................... 63

7.07.  Pledge Agreement. ............................................................................ 63

7.08.  Mortgage. .......................................................................................... 63

7.09.  Security Documents. .......................................................................... 64

7.10.  Initial Reserve Report; Title. ............................................................ 64

7.11.  Organization Chart. ........................................................................... 64

7.12.  Financial Statements; Pro Forma Balance Sheet; Projections. ............................. 64

7.13.  Solvency Certificate; Insurance Certificates, etc. ............................. 65

7.14.  Fees, etc. ............................................................................................ 65

7.15.  AML, KYC. ....................................................................................... 65

7.16.  Lien Searches. ................................................................................... 65

7.17.  No Default; Representations and Warranties. .................................... 66

7.18.  Outstanding Indebtedness. ................................................................. 66

7.19.  Beneficial Ownership Regulation. ..................................................... 66

7.20.  Bankruptcy Items. ............................................................................. 66

SECTION 8.    [Reserved]. ................................................................................ 67

SECTION 9.    Representations, Warranties and Agreements. ........................... 67

9.01.  Company Status. ................................................................................ 67

9.02.  Power and Authority. ......................................................................... 67

9.03.  No Violation. ..................................................................................... 68

9.04.  Approvals. .......................................................................................... 68

9.05.  Financial Condition; Projections. ...................................................... 68

9.06.  Litigation. .......................................................................................... 69

9.07.  True and Complete Disclosure. ......................................................... 69

9.08.  Use of Proceeds; Margin Regulations. .............................................. 69

ii

Table of Contents
(continued)

                                                                                    Page

9.09.   Tax Returns and Payments..............................................................70

9.10.   Compliance with ERISA.................................................................70

9.11.   Security Documents.........................................................................71

9.12.   Properties; Title...............................................................................72

9.13.   Capitalization..................................................................................74

9.14.   [Reserved].......................................................................................74

9.15.   Compliance with Statutes, etc.........................................................74

9.16.   Investment Company Act.................................................................74

9.17.   Insurance.........................................................................................75

9.18.   Environmental Matters.....................................................................75

9.19.   Employment and Labor Relations....................................................75

9.20.   Intellectual Property.........................................................................76

9.21.   EEA Financial Institution.................................................................76

9.22.   Indebtedness.....................................................................................76

9.23.   Representations and Warranties in Other Documents.......................76

9.24.   Necessary Authorizations.................................................................76

9.25.   Sanctions; Anti-Corruption..............................................................77

9.26.   No Default........................................................................................77

9.27.   Solvency...........................................................................................77

9.28.   Maintenance of Properties................................................................78

9.29.   Gas Imbalances, Prepayments..........................................................78

9.30.   Marketing of Production...................................................................79

9.31.   Hedge Agreements............................................................................79

SECTION 10.   Affirmative Covenants...........................................................79

10.01.   Information Covenants.....................................................................79

10.02.   Books, Records and Inspections......................................................83

10.03.   Maintenance of Property; Insurance................................................83

10.04.   Existence; Franchises.......................................................................85

10.05.   Compliance with Statutes, etc.........................................................85

10.06.   Compliance with Environmental Laws............................................85

10.07.   ERISA...............................................................................................86

iii

Table of Contents
(continued)

Page

10.08.  End of Fiscal Years; Fiscal Quarters. ................................................................. 87

10.09.  Performance of Obligations. ................................................................................. 87

10.10.  Payment of Taxes. ................................................................................................ 87

10.11.  Use of Proceeds. ................................................................................................... 88

10.12.  Additional Security; Further Assurances; etc. ...................................................... 88

10.13.  Ownership of Subsidiaries; etc. ............................................................................ 90

10.14.  Contributions. ....................................................................................................... 90

10.15.  Minimum Cash and Cash Equivalents. ................................................................. 90

10.16.  Sanctions; Anti-Corruption Laws. ........................................................................ 90

10.17.  Permitted Acquisitions. ......................................................................................... 90

10.18.  Maintenance of Company Separateness. ............................................................... 92

10.19.  Board Information Packages. ................................................................................. 92

10.20.  Keepwell. .............................................................................................................. 92

10.21.  Reserve Reports. ................................................................................................... 93

10.22.  Title Information. ................................................................................................... 95

10.23.  Hedge Agreements. ............................................................................................... 96

10.24.  Volume of Production, Etc. ................................................................................... 96

10.25.  Post-Closing Matters ............................................................................................ 97

SECTION 11.      Negative Covenants. ................................................................................ 97

11.01.  Liens.  97

11.02.  Consolidation, Merger, Purchase or Sale of Assets, etc. ..................................... 101

11.03.  Dividends. ............................................................................................................ 103

11.04.  Indebtedness. ........................................................................................................ 104

11.05.  Advances, Investments and Loans. ...................................................................... 105

11.06.  Transactions with Affiliates. ................................................................................ 108

11.07.  Capital Expenditures. ........................................................................................... 108

11.08.  Fixed Charge Coverage Ratio. ............................................................................. 110

11.09.  Total Leverage Ratio. ........................................................................................... 110

11.10.  Adjusted Coverage Ratio. ..................................................................................... 110

11.11.  Drilling and Exploration Expenses; Capitalized Drilling and Exploration
        Expenses. .............................................................................................................. 110

iv

Table of Contents
(continued)

Page

11.12. Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc. ..................................... 110

11.13. Limitation on Certain Restrictions on Subsidiaries. .......................................... 111

11.14. Limitation on Issuance of Equity Interests. ....................................................... 111

11.15. Business; etc. ...................................................................................................... 112

11.16. Holding Companies. ........................................................................................... 113

11.17. Certain Deposit Accounts. .................................................................................. 113

11.18. Sanctions; Anti-Corruption Use of Proceeds. ................................................... 113

11.19. Restrictions on Hedge Agreements. ................................................................... 113

11.20. Gas Imbalances, Take-or-Pay or Other Prepayments. ...................................... 114

11.21. General and Administrative Expenses. ............................................................... 114

SECTION 12.        Events of Default. ........................................................................... 115

12.01. Payments. ............................................................................................................ 115

12.02. Representations, etc. ........................................................................................... 115

12.03. Covenants. ........................................................................................................... 115

12.04. Default Under Other Agreements. ...................................................................... 115

12.05. Bankruptcy, etc. .................................................................................................. 116

12.06. ERISA. ................................................................................................................ 116

12.07. Security Documents. ........................................................................................... 117

12.08. Guaranties. .......................................................................................................... 117

12.09. Judgments. ........................................................................................................... 117

12.10. Change of Control. .............................................................................................. 117

12.11. No Waiver of Affiliate Operator's Liens. ........................................................... 117

12.12. Subordination. ..................................................................................................... 117

12.13. Hedge Agreements. ............................................................................................. 118

12.14. Remedies; Equity Cure. ...................................................................................... 118

SECTION 13.        The Administrative Agent. .............................................................. 119

13.01. Appointment. ....................................................................................................... 119

13.02. Nature of Duties. ................................................................................................. 119

13.03. Lack of Reliance on the Administrative Agent. .................................................. 120

13.04. Certain Rights of the Administrative Agent. ...................................................... 122

13.05. Reliance. .............................................................................................................. 122

v

Table of Contents
(continued)

13.06.  Indemnification. ............................................................................... 122

13.07.  The Administrative Agent in its Individual Capacity. ....................... 123

13.08.  Holders. ............................................................................................ 123

13.09.  Resignation by the Administrative Agent. ........................................ 123

13.10.  Collateral Matters. ............................................................................ 125

13.11.  Delivery of Information. .................................................................... 126

13.12.  Delegation of Duties. ........................................................................ 126

13.13.  No Reliance on the Administrative Agent's Customer Identification
        Program: Certifications From Banks and Participants: Patriot Act. .................. 126

SECTION 14.      Miscellaneous. .................................................................... 127

14.01.  Payment of Expenses, etc. ................................................................ 127

14.02.  Right of Setoff. ................................................................................. 129

14.03.  Notices. ............................................................................................. 129

14.04.  Benefit of Agreement; Assignments; Participations. ........................ 129

14.05.  No Waiver; Remedies Cumulative. ................................................... 132

14.06.  Payments Pro Rata. ........................................................................... 133

14.07.  Calculations; Computations. ............................................................ 133

14.08.  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE;
        WAIVER OF JURY TRIAL. .............................................................. 134

14.09.  Counterparts. ..................................................................................... 135

14.10.  Effectiveness. .................................................................................... 136

14.11.  Headings Descriptive. ....................................................................... 136

14.12.  Amendment or Waiver; etc. .............................................................. 136

14.13.  Survival. ............................................................................................ 138

14.14.  Domicile of Loans. ........................................................................... 138

14.15.  Register. ............................................................................................ 138

14.16.  Confidentiality. ................................................................................. 139

14.17.  Special Provisions Regarding Pledges of Equity Interests in, and
        Promissory Notes Owed by, Persons Not Organized in the United States or
        Pledges over Assets Not Located in the United States. ..................... 140

14.18.  Patriot Act. ....................................................................................... 141

14.19.  Interest Rate Limitation. ................................................................... 141

14.20.  Entire Agreement. ............................................................................. 141

vi

Table of Contents
(continued)

Page

14.21. Acknowledgement and Consent to Bail-In of Affected Financial
Institutions.................................................................................................142

14.22. Hedge Intercreditor Agreement. ..............................................................142

14.23. Acknowledgement Regarding Any Supported QFCs .................................142

14.24. Amendment and Restatement. ...................................................................143

SECTION 15.    Holding Companies Guaranty ........................................................143

15.01. Guaranty.....................................................................................................143

15.02. Bankruptcy..................................................................................................144

15.03. Nature of Liability.......................................................................................144

15.04. Independent Obligation..............................................................................144

15.05. Authorization..............................................................................................145

15.06. Reliance.......................................................................................................146

15.07. Subordination..............................................................................................146

15.08. Waiver.........................................................................................................146

15.09. Payments.....................................................................................................147

15.10. Maximum Liability. ....................................................................................147

vii

**SCHEDULES**

SCHEDULE I               Commitments and Applicable Percentage

SCHEDULE II              Credit Party Addresses

SCHEDULE III             Real Property

SCHEDULE IV              Plans

SCHEDULE V               Non Wholly-Owned Subsidiaries

SCHEDULE VI              Insurance

SCHEDULE VII             Existing Liens

SCHEDULE VIII            Existing Investments

SCHEDULE IX              Gas Imbalances

SCHEDULE X               Capitalization

SCHEDULE XI              Post-Closing Matters

SCHEDULE XII             Necessary Authorizations

SCHEDULE XIII            Capitalized Labor Expense

SCHEDULE XIV             Marketing Agreements

SCHEDULE XV              Hedge Agreements

SCHEDULE XVI             Preferential Rights and Consents

SCHEDULE XVII            Specified Real Property

EAST\177251518.5

**EXHIBITS**

EXHIBIT A        Form of Notice of Conversion/Continuation

EXHIBIT B        Form of Note

EXHIBIT C        Form of Section 6.04(b)(ii) Certificate

EXHIBIT D        Form of Officer's Certificate

EXHIBIT E        Form of Subsidiaries Guaranty

EXHIBIT F        Form of Pledge Agreement

EXHIBIT G        Form of Security Agreement

EXHIBIT H        Form of Solvency Certificate

EXHIBIT I-1        Form of Compliance Certificate

EXHIBIT I-2        Form of Adjusted Coverage Ratio Compliance Certificate

EXHIBIT J        Form of Assignment and Assumption Agreement

EXHIBIT K        Form of Intercompany Note

EXHIBIT L        Form of Reserve Report Certificate

EXHIBIT M        Form of Capital Expenditures Certificate

EXHIBIT N        Form of Hedging Report

EXHIBIT O        Form of Hedge Intercreditor Agreement

AMENDED AND RESTATED CREDIT AGREEMENT, dated as of November [__], 2020 among [MD AMERICA ENERGY HOLDINGS, INC., a Delaware corporation ("**Holdings**"), MD AMERICA INTERMEDIATE HOLDINGS, LLC, a Delaware limited liability company ("**MDA Intermediate Holdco**"), MD AMERICA HOLDINGS, LLC, a Delaware limited liability company ("**MDA Holdco**" and, together with Holdings and MDA Intermediate Holdco, collectively, the "**Holding Companies**," each of which is a "**Holding Company**")][1], MD AMERICA ENERGY, LLC, a Delaware limited liability company (the "**Borrower**"), the Lenders party hereto from time to time, and LOAN ADMIN CO LLC, as Administrative Agent.  All capitalized terms used herein and defined in <u>Section 1.01</u> are used herein as therein defined.

W <u>I</u> T <u>N</u> E <u>S S</u> E <u>T</u> H:

WHEREAS, on October 12, 2020 (the "**Petition Date**"), each of the Credit Parties (as defined below) commenced a voluntary case (each a "**Chapter 11 Case**", and collectively, the "**Chapter 11 Cases**") under Chapter 11 of Title 11 of the United States Code, and the Chapter 11 Cases were jointly administered in the Bankruptcy Court (as defined below);

WHEREAS, prior to the Petition Date, financing was provided to the Borrower pursuant to that certain Credit Agreement dated as of November 14, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "**Pre-Petition Credit Agreement**"), among the Holding Companies, the Borrower, the lenders from time to time party thereto (the "**Pre-Petition Lenders**"), Loan Admin Co LLC and Guggenheim Securities, LLC, as "Lead Arrangers", and Loan Admin Co LLC, as "Administrative Agent" for the Pre-Petition Lenders pursuant to which the Pre-Petition Lenders extended "Loans" (as defined in the Pre-Petition Credit Agreement) to the Borrower;

WHEREAS, in connection with the Chapter 11 Cases, the Credit Parties have filed the Joint Prepackaged Chapter 11 Plan of Reorganization of MD America Energy, LLC, *et al.* (together with all annexes, exhibits, schedules and supplements thereto,  in each case, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Prepackaged Plan**"), which was filed with the Bankruptcy Court on October 12, 2020 and which was confirmed pursuant to an order entered by the Bankruptcy Court on November [__], 2020 (the "**Confirmation Order**"), which Confirmation Order, inter alia, authorized and approved the restructuring of the Pre-Petition Credit Agreement and the Borrower's entry into and performance under this Agreement; and

WHEREAS, the parties hereto desire to amend and restate in its entirety the Pre-Petition Credit Agreement in the form of this Agreement to (a) restructure and rearrange a portion of the outstanding Pre-Petition Loans (as defined below) under the Pre-Petition Credit Agreement (but not to repay or pay off any such indebtedness) and (b) amend certain other terms of the Pre-Petition Credit Agreement in certain respects as provided in this Agreement.

NOW, THEREFORE, subject to and upon the terms and conditions set forth herein, the parties hereto agree that Pre-Petition Credit Agreement is hereby amended, renewed, extended

---

[1] [**NTD**:  Determination of which parent entities will be guarantors is subject to final tax structure.]

and restated in its entirety in the form of this Agreement.  The parties hereto further agree as follows:

SECTION 1.   <u>Definitions and Accounting Terms</u>.

1.01.   <u>Defined Terms</u>.

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Acquired EBITDAX**" shall mean, for any Acquired Entity or Business acquired pursuant to a Permitted Acquisition and for any period, the Consolidated EBITDAX as determined for such Acquired Entity or Business, for such period on a basis substantially the same (with necessary reference changes) as provided in the definition of Consolidated EBITDAX contained herein, except that (i) all references therein and in the component definitions used in determining Consolidated EBITDAX to "Holdings and its Subsidiaries" shall be deemed to be references to the respective Acquired Entity or Business and (ii) the adjustments contained in clause (iv) of the first sentence of the definition of Consolidated EBITDAX shall not be made.

"**Acquired Entity or Business**" shall mean either (x) the assets constituting a business, division or product line of any Person not already a Subsidiary of the Borrower or (y) 100% of the Equity Interests of any such Person.

"**Additional Security Documents**" shall have the meaning provided in <u>Section 10.12</u>.

"**Adjusted Consolidated Net Income**" shall mean, for any period, the result of (a) Consolidated Net Income for such period <u>plus</u> (b) the sum of the amount of all net non-cash charges (including, without limitation, depreciation, amortization, deferred tax expense, accretion of asset retirement obligations and non-cash interest expense) and net non-cash losses which were included in arriving at Consolidated Net Income for such period, <u>less</u> (c) the amount of all net non-cash gains and non-cash credits which were included in arriving at Consolidated Net Income for such period.

"**Adjusted Consolidated Working Capital**" shall mean, at any time, the result of (a) Consolidated Current Assets (but excluding therefrom all cash and Cash Equivalents) <u>less</u> (b) Consolidated Current Liabilities at such time.

"**Adjusted Coverage Ratio**" shall mean, on any date of determination, the ratio of (a) the PV-10 Value of PDP Reserves *plus* PV-10 Value of Workover PDNP Reserves in an aggregate amount not to exceed $5,000,000 *plus* all cash and Cash Equivalents in accounts subject to a "control agreement" referred to in Section 3.9 of the Security Agreement *minus* Drilling and Completion Related Payables and Accruals, to (b) Consolidated Indebtedness. For purposes of calculating the Adjusted Coverage Ratio, (i) PV-10 Value of PDP Reserves at any time shall be calculated to account for Dispositions and acquisitions of Oil and Gas Properties consummated by the Borrower or any of its Subsidiaries (provided that, in the case of any such acquisition, the Administrative Agent shall have received a Reserve Report evaluating the PDP Reserves and Workover PDNP Reserves subject thereto) and any Liquidation of any Hedge Agreement, in

2

each case occurring since the date of the Reserve Report most recently delivered pursuant hereto, (ii) the amount of cash and Cash Equivalents shall be calculated to (A) deduct any amount of cash used for acquisitions of Oil and Gas Properties since the most recent balance sheet and (B) add any cash received from Dispositions of Oil and Gas Properties (other than cash used to repay Consolidated Indebtedness) and (iii) Consolidated Indebtedness shall be calculated to (A) add any Consolidated Indebtedness incurred in connection with any acquisition of Oil and Gas Properties since the most recent balance sheet and (B) deduct any Consolidated Indebtedness repaid with proceeds of the Disposition of Oil and Gas Properties; provided that all such adjustments pursuant to the foregoing clauses (i), (ii) and (iii) shall be reasonably acceptable to the Required Lenders.

"**Administrative Agent**" shall mean Loan Admin Co LLC, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to <u>Section 13.09</u>.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and senior executive officers of such Person), controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person or (ii) to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; <u>provided</u>, <u>however</u>, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof.

"**Agreement**" shall mean this Amended and Restated Credit Agreement, as it may be modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"**Applicable Differentials**" shall mean (i) the price per barrel of natural gas liquids of the Credit Parties ("**NGLs**") sold as a percentage of the then-applicable price (as determined pursuant to the succeeding sentence) for crude oil (WTI Cushing), (ii) the difference between the Credit Parties received price per MMBTu and the then applicable price (as determined pursuant to the succeeding sentence) for natural gas (Henry Hub), (iii) the difference between the Credit Parties received price per barrel of crude oil and the then applicable price (as determined pursuant to the succeeding sentence) for crude oil (WTI Cushing), (iv) volume reductions for gas shrink between the wellhead and the completion of gas processing and (v) the rate of extraction of NGLs per volume of gas produced (Bbl/MMcf), in each case, based upon the Credit Parties' lease operating statements and, with respect to gas shrink and NGL yield only, plant statements and determined on an average basis for the six month period ended as of any applicable date of determination and, in each case, applied on a consistent basis across each of the Credit Parties' wells. Oil and gas pricing shall be determined based upon the monthly average daily spot pricing referred to as Thomson Reuters WTI Spot Monthly Index and Henry Hub Monthly Index,

respectively, published by NSAI at https://netherlandsewell.com/resources/ or such other source as may be agreed by the Borrower and the Required Lenders (and, if such resource publishes the average of the daily spot pricing from more than one source, the average of such averages).

"**Applicable Margin**" shall mean (i) with respect to any Eurodollar Loan, a percentage per annum equal to 7.75% and (ii) with respect to any Base Rate Loan, a percentage per annum equal to 6.75%.

"**Applicable Percentage**" shall mean, at any time, a fraction (expressed as a percentage) the numerator of which is equal to the aggregate principal amount of all Loans outstanding at such time held by the applicable Lender and the denominator of which is equal to the aggregate principal amount of all Loans outstanding at such time.  As of the Closing Date, the Applicable Percentage of each Lender is set forth on Schedule I.

"**Applicable Pricing Test Date**" shall mean:

(a) with respect to any calculation as of a fiscal quarter end, such fiscal quarter end date (or, in each case, if such date is not a Business Day, the Business Day immediately following such date); and

(b)  with respect to any compliance certificate required to be delivered pursuant to Section 10.01(g)(iii)(B) for any event requiring pro forma compliance with Section 11.10, ten (10) Business Days prior to the occurrence of such event (or if such date is not a Business Day, the first Business Day immediately following).

"**Approved Counterparty**" shall mean (a) the Administrative Agent, any Lender or any Affiliate of the foregoing, (b) BP Energy Company, (c) Shell Trading Risk Management, LLC, (d) Koch Supply & Trading, LP, (e) J. Aron & Company LLC, (f) Cargill Incorporated and (g) any other Person approved by the Required Lenders.

"**Approved Petroleum Engineers**" shall mean (a) VSO Petroleum Consultants, Inc., Netherland, Sewell and Associates, Inc., WD Von Gonten and Co., Ryder Scott Company and (b) any other independent petroleum engineers reasonably acceptable to the Required Lenders and the Borrower.

"**Asset Sale**" shall mean any Disposition other than to Holdings or a Wholly-Owned Subsidiary of Holdings but excluding (x) Dispositions pursuant to Sections 11.02(b), (e), (f), (g), (h) and (i), and (y) other Dispositions that generate Net Sale Proceeds of less than $1,000,000 individually (or with respect to a series of related Dispositions) or $2,500,000 in the aggregate in any fiscal year of Holdings.

"**Assignment and Assumption Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit J (appropriately completed).

"**Authorized Officer**" shall mean, with respect to (i) delivering a Notice of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of Holdings or the Borrower to deliver such notices pursuant to this Agreement and that has or have appropriate signature cards or incumbency certificates on file with the Administrative Agent, (ii) delivering financial information and officer's certificates

4

pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of Holdings or the Borrower, or any other person or persons that has or have been authorized by the board of directors of Holdings or the Borrower to deliver such information and certificates, provided that Holdings or the Borrower shall have notified the Administrative Agent in writing of such authorization and that such person or persons shall have appropriate signature cards or incumbency certificates on file with the Administrative Agent, and (iii) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of Holdings or the Borrower.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" shall have the meaning provided in Section 12.05.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of Texas (Houston Division), any appellate court having jurisdiction over the Chapter 11 Cases from time to time, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"**Base Rate**" shall mean, for any day, a rate per annum equal to the highest of (a) the Prime Rate, (b) the sum of one half of one percent (0.50%) per annum and the Federal Funds Rate, (c) the daily one month Eurodollar Rate (the "LIBOR" rate as published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, as published in another publication selected by the Administrative Agent)) divided by a number equal to 1.00 minus the Reserve Percentage plus 100 basis points (1.00%), and (d) 2.50%, in each instance, as of such day.  Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Rate or the Eurodollar Rate for an Interest Period of one (1) month.

"**Base Rate Loan**" shall mean each Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Benchmark Replacement**" shall mean, the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any

evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; *provided* that, if the Benchmark Replacement as so determined would be less than 1.50%, the Benchmark Replacement will be deemed to be 1.50% for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides, in consultation with the Borrower, may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"**Benchmark Replacement Date**" shall mean the earlier to occur of the following events with respect to LIBOR:

> (1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; or

> (2) in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to LIBOR:

EAST\177251518.5

(1)     a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR;

(2)     a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"**Benchmark Transition Start Date**" shall mean (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the [90th] day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than [90] days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

"**Benchmark Unavailability Period**" shall mean, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with Section 2.14 of this Agreement and (y) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to Section 2.14 of this Agreement.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**BHC Act Affiliate**" means, as to any Person, an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"**Borrower**" shall have the meaning provided in the first paragraph of this Agreement.

"**Borrowing**" shall mean the borrowing of one Type of Loan on a given date (or resulting from a conversion or conversions on such date) having in the case of Eurodollar Loans the same Interest Period, provided that Base Rate Loans incurred pursuant to Section 2.10(b) shall be considered part of the related Borrowing of Eurodollar Loans.

"**Business Day**" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, New York or Houston, Texas, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in U.S. dollar deposits in the interbank Eurodollar market.

"**Calculation Period**" shall mean, with respect to any Permitted Acquisition or any other event expressly required to be calculated on a Pro Forma Basis pursuant to the terms of this Agreement, the Test Period most recently ended prior to the date of such Permitted Acquisition or other event for which financial statements have been delivered to the Lenders pursuant to Section 10.01(b) or (c), as applicable.

"**Calculation Principles**" shall mean, in respect of the PV-10 Value, the PV-10 Value of PDP Reserves, and/or the PV-10 Value of Workover PDNP Reserves (each, an "**Applicable PV-10 Value**"), as applicable:

(a)     the Applicable PV-10 Value shall be adjusted for any contract entered into by the Credit Parties prior to the date of determination which would impact the calculation of the Applicable PV-10 Value (and the Credit Parties shall provide a copy of such contract to the Administrative Agent together with reasonably detailed calculations of the adjustment to such Applicable PV-10 Value);

(b)     lease operating expense included in the calculation of the Applicable PV-10 Value will be calculated based on actual lease operating expense for the twelve month period ended on the date of determination, with amounts excluded therefrom as non-recurring only to the extent similar expenses have not otherwise been incurred by the Credit Parties in respect of any well in the twenty-four month period ended on the date of determination);

(c)     the Applicable PV-10 Value shall be calculated to reflect all Applicable Differentials;

(d)     the PV-10 Value and PV-10 Value of PDP Reserves shall be adjusted to give effect to the Hedge Agreements with Approved Counterparties in effect as of such date of determination, pursuant to which the value of such Hedge Agreement (the "**Hedge Value**") shall be determined based upon the present value (using an annual discount rate of 10%) of the difference between the Strip Price or, in the case of NGLs, the forward price for the applicable period quoted on the applicable exchange used in respect of such Hedge Agreement, and the

strike price for such Hedge Agreement for each applicable period (and not, for the avoidance of doubt, based upon a mark-to-market valuation of such Hedge Agreement); and

(e)     unless otherwise specifically provided herein or otherwise agreed by the Required Lenders in writing, all data included in the calculation of the Applicable PV-10 Value shall be derived from the Credit Parties' lease operating statements and, with respect to gas shrink and NGL yield only, plant statements.

"**Capital Expenditures**" shall mean, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capitalized Lease Obligations incurred by such Person, but shall in any event (a) include all expenditures for acquisitions of direct interests in Oil and Gas Properties (including acquisitions of oil and gas leases and unproven acreage, but excluding Permitted Acquisitions) and (b) exclude all expenditures by such person that constitute Permitted Acquisitions effected in accordance with the requirements of Section 10.17.

"**Capitalized Drilling and Exploration Expenses**" shall mean any costs or expenses that are required to be capitalized and recorded on the balance sheet as part of long-term assets under the Successful Efforts method of accounting under Statement of Financial Accounting Standards 19.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, all rental obligations of such Person which, under GAAP, are or will be required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles.

"**Cash Collateralized**" shall mean to be pledged and deposited with or delivered to the issuer of a letter of credit, cash or deposit account balances. "**Cash Collateral**" shall have a meaning analogous to the foregoing and shall include the proceeds of such cash or deposit account balances.

"**Cash Equivalents**" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than six months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within six months from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six months from the date of acquisition by such Person, (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (i) above entered into with any bank meeting the qualifications specified in clause (iii) above, (v) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P 1 or the equivalent

9

thereof by Moody's and in each case maturing not more than six months after the date of acquisition by such Person, (vi) Investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (v) above.

"**CEA**" shall mean the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same has been amended and may hereafter be amended from time to time, 42 U.S.C. § 9601 et seq.

"**CFTC**" shall mean the Commodity Futures Trading Commission.

["**Change of Control**" shall mean (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than the Permitted Investors, shall become the beneficial owner, directly or indirectly, of 50% or more on a fully diluted basis of the economic or voting interests in Parent, (ii) Parent shall at any time cease to own, directly or indirectly, 100% of the Equity Interests of Holdings, (iii) Holdings shall at any time cease to own, directly or indirectly, 100% of the Equity Interests of each of the Borrower, MDA Holdco and MDA Intermediate Holdco; or (iv) the Board of Directors of Holdings shall cease to consist of a majority of Continuing Directors. For purposes of this definition, "beneficial owner" is used as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act.][2]

"**CIP Regulations**" shall have the meaning provided in Section 13.13.

"**Claims**" shall have the meaning provided in the definition of "**Environmental Claims**".

"**Closing Date**" shall have the meaning provided in Section 14.10.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.  Section references to the Code are to the Code, as in effect at the date of this Agreement and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"**Collateral**" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Pledge Agreement Collateral, all Security Agreement Collateral, all Mortgaged Properties, and all cash and Cash Equivalents delivered as collateral pursuant to Section 6.02 or Section 11. Notwithstanding any provision in this Agreement, any Security Document or other Credit Document to the contrary, in no event is any Excluded Asset (as defined in the Security Agreement) or any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) included in the definition of "Collateral," and no Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) shall be subject to a Lien under any Security Document.

---

[2] [**NTD**: Subject to final credit party structure.]

"**Collateral Agent**" shall mean the Administrative Agent acting as collateral agent for the Secured Creditors pursuant to the Security Documents.

"**Commitment**" shall mean, for each Lender, the amount of Loans such Lender is committed to make (or be deemed to have made on the Closing Date), as shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15. The name of each Lender and such Lender's corresponding Commitment are set forth on Schedule I, as such Commitment will be terminated pursuant to Section 4.02 on the Closing Date.

"**Company**" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"**Consolidated Current Assets**" shall mean, at any time, the consolidated current assets of Holdings and its Subsidiaries at such time, but excluding current assets from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business (other than accounts receivable with respect to any non-contingent periodic settlement payments due thereunder).

"**Consolidated Current Liabilities**" shall mean, at any time, the consolidated current liabilities of Holdings and its Subsidiaries at such time, but excluding (i) the current portion of any Indebtedness under this Agreement, (ii) the current portion of any other long-term Indebtedness which would otherwise be included therein, (iii) deferred tax liabilities, (iv) the current portion of interest payable and (v) current liabilities (A) associated with asset retirement obligations relating to Oil and Gas Properties or (B) from commodity price risk management activities arising in the ordinary course of the Oil and Gas Business (other than accounts payable with respect to any non-contingent periodic settlement payments due thereunder).

"**Consolidated EBITDAX**" shall mean, for any period, Consolidated Net Income for such period adjusted by adding thereto (in each case to the extent deducted in determining Consolidated Net Income for such period), without duplication, the amount of:

(i) total interest expense (inclusive of amortization of deferred financing fees and other original issue discount and banking fees, charges and commissions) of Holdings and its Subsidiaries determined on a consolidated basis for such period;

(ii) provision for taxes based on income and foreign withholding taxes for Holdings and its Subsidiaries determined on a consolidated basis for such period;

(iii) all depreciation, depletion, amortization expense and accretion of asset retirement obligations of Holdings and its Subsidiaries determined on a consolidated basis for such period;

(iv) any fees, expenses or charges (other than depreciation, depletion or amortization expense as described in the preceding clause (iii)) actually incurred and related to (A) any Permitted Acquisition or Disposition (whether or not successful) or any other Investment not in the Ordinary Course of Business permitted under Section 11.02 or 11.05, (B) any issuance of any Equity Interests permitted under Section 11.06(e) or (C) any Indebtedness issuance permitted under Section 11.04 (such fees and expenses

11

described in this clause (iv), collectively, "**Transaction Fees**"); provided, that the aggregate amount of Transaction Fees added back to Consolidated EBITDAX pursuant to this clause (iv) shall not exceed 15% of Consolidated EBITDAX in any four-quarter period (calculated without giving effect to such add-back);

(v)  the amount of all fees and expenses incurred in connection with the Transactions, the Chapter 11 Cases, and the Prepackaged Plan, in each case, as reflected in a funds flow memorandum or otherwise disclosed to the Administrative Agent;

(vi) non-cash stock-based employee compensation;

(vii)  if Holdings and its Subsidiaries account for their oil and gas operations using successful efforts or a similar method of accounting, consolidated exploration and abandonment expenses of Holdings and its Subsidiaries;

(viii)  any non-recurring or extraordinary losses or expenses (less any non-recurring or extraordinary gains or income);

(ix) any non-cash losses (less any non-cash gains);

(x)  any losses from sales of assets other than Hydrocarbons sold in the Ordinary Course of Business (less any gains from sales of assets other than any Hydrocarbons sold in the Ordinary Course of Business); and

(xi) other unusual out-of-pocket expenses, including restructuring charges, that are reasonably acceptable to the Required Lenders.

For the avoidance of doubt, it is understood and agreed that, to the extent any amounts are excluded from Consolidated Net Income by virtue of the proviso to the definition thereof contained herein, any add backs to Consolidated Net Income in determining Consolidated EBITDAX as provided above shall be limited (or denied) in a fashion consistent with the proviso to the definition of "Consolidated Net Income" contained herein.

"**Consolidated Indebtedness**" shall mean, at any time, the sum of (without duplication) (i) all Indebtedness of Holdings and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capitalized Lease Obligations on the liability side of a consolidated balance sheet of Holdings and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of Holdings and its Subsidiaries of the type described in clauses (ii) (except to the extent Cash Collateralized with cash from the balance sheet), (viii) and (x) of the definition of Indebtedness, and (iii) all Contingent Obligations of Holdings and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) and (ii); provided that the amount of Indebtedness in respect of Hedge Agreements shall not include any unrealized net loss position of Holdings and/or its Subsidiaries thereunder on a marked-to-market basis.

"**Consolidated Interest Expense**" shall mean, for any period, (i) the total consolidated cash interest expense and payment-in-kind interest expense of Holdings and its Subsidiaries (including, without limitation, all commissions, discounts and other commitment and banking fees and charges (e.g., fees with respect to letters of credit and Interest Rate Protection

EAST\177251518.5

Agreements)) for such period, adjusted to exclude (to the extent same would otherwise be included in the calculation above in this clause (i)) the amortization of any deferred financing costs for such period, plus (ii) without duplication, (x) that portion of Capitalized Lease Obligations of Holdings and its Subsidiaries on a consolidated basis representing the interest factor for such period and (y) the "deemed interest expense" (i.e., the interest expense which would have been applicable if the respective obligations were structured as on-balance sheet financing arrangements) with respect to all Indebtedness of Holdings and its Subsidiaries of the type described in clause (viii) of the definition of Indebtedness contained herein (to the extent same does not arise from a financing arrangement constituting an operating lease) for such period.

"**Consolidated Net Income**" shall mean, for any period, the net income (or loss) of Holdings and its Subsidiaries determined on a consolidated basis for such period (taken as a single accounting period) in accordance with GAAP, provided that the underlying mathematical drivers, policies and procedures used to calculate capitalization of labor expense remain constant with those used in preparation of the fiscal year ended December 31, 2019 financial statements as set forth in Schedule XIII and provided, further, that the following items shall be excluded in computing Consolidated Net Income (without duplication): (i) the net income (or loss) of any Person in which a Person or Persons other than Holdings and its Wholly-Owned Subsidiaries has an Equity Interest or Equity Interests to the extent of such Equity Interests held by Persons other than Holdings and its Wholly-Owned Subsidiaries in such Person, (ii) except for determinations expressly required to be made on a Pro Forma Basis, the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or all or substantially all of the Property or assets of such Person are acquired by a Subsidiary, (iii) the net income of any Subsidiary to the extent that the declaration or payment of cash Dividends by such Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary, (iv) unrealized losses and gains under derivative instruments included in the determination of Consolidated Net Income, including, without limitation those resulting from the application of Financial Accounting Standards Board Accounting Standards Codification 815 ("**FASB ASC 815**"), and any asset impairment writedowns on Oil and Gas Properties under GAAP or SEC guidelines.

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, Dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (iv) to pay contingent cash purchase price, earn-out, and other similar obligations incurred in connection with an acquisition or (v) otherwise to assure or hold harmless

13

the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Continuing Directors**" shall mean the directors of Holdings on the Closing Date and each other director of Holdings if such director's nomination for election to the Board of Directors of Holdings is recommended or approved by (x) Parent or (y) a majority of the then Continuing Directors.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"**Covered Entity**" means any of the following:  (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning set forth in <u>Section 14.23</u>.

"**Covered Properties**" shall mean the Oil and Gas Properties of the Credit Parties covered by the most recently delivered Reserve Report (which shall mean on the Closing Date, the Initial Reserve Report), other than (a) those Oil and Gas Properties disposed of since the date of such Reserve Report in accordance with and to the extent permitted by the terms of this Agreement and (b) leases that have expired in accordance with their terms.

"**Credit Documents**" shall mean, collectively, the following (as the same may be amended, modified, supplemented, renewed, restated or replaced from time to time): this Agreement, the Subsidiaries Guaranty, each Security Document, the Intercompany Notes, each other subordination agreement relating to the Obligations and, after the execution and delivery thereof pursuant to the terms of this Agreement, each Note and each other Security Document and all other agreements, documents, certificates and instruments executed and delivered to the Administrative Agent, the Collateral Agent or any Lender in their capacity as such by any Credit Party in connection therewith, including, without limitation, all letters for the payments of fees, guaranties and collateral documents.

"**Credit Event**" shall mean the restructuring and rearrangement of a portion of the Pre-Petition Loans with the deemed funding of the Loans pursuant the terms of this Agreement on the Closing Date.

"**Credit Party**" shall mean each Holding Company, the Borrower and each Subsidiary Guarantor, and the "**Credit Parties**" shall mean all of them, collectively.

14

"**Cure Amount**" shall have the meaning provided in <u>Section 12.14(b)</u>.

"**Cure Right**" shall have the meaning provided in <u>Section 12.14(b)</u>.

"**Default**" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defensible Title**" shall mean, with respect to any Covered Property of any Credit Party, title of such Credit Party to such Covered Property that, although not constituting perfect, merchantable or marketable title, (a) is evidenced by instruments filed of record or other documentation so as to be sufficient to successfully defend against claims of bona fide purchasers for value or other Persons entitled to protection of applicable recording laws that such Credit Party does not have title to such Covered Property (<u>provided</u>, <u>however</u>, that this clause (a) shall not impose a standard for "defensible title" that is broader or more difficult to satisfy than the meaning of "defensible title" under applicable law (if any) of the State in which such Covered Property is located, and if such applicable law exists, clause (a) shall be deemed replaced by the legal standard of "defensible title" in effect in such State), and (b) is free and clear of all Liens other than Permitted Liens.

"**Deposit Account**" shall have the meaning provided in the Security Agreement.

"**Disclosure Statement Approval Date**" shall mean the date on which the Bankruptcy Court has entered an order approving the Credit Parties' disclosure statements (as amended, supplemented or otherwise modified through such date) for the Prepackaged Plan.

"**Disposition**" shall mean any sale, transfer or other disposition of any asset (including, without limitation, any Equity Interests or other securities of another Person) by Holdings or any of its Subsidiaries to any Person (including by way of redemption by such Person or by way of a sale and leaseback transaction).

"**Dividend**" shall mean, with respect to any Person, that such Person has declared or paid a dividend or distribution, or returned any equity capital to its stockholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests or Qualified Preferred Stock of such Person) or cash to its stockholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests) or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any shares of any class of the capital stock or any other Equity Interests of such Person outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests).  Without limiting the foregoing, (i) "Dividends" shall include all of the foregoing actions effected by division of any Person and (ii) "Dividends" with respect to any Person shall also include all payments made or required to be made by such

Person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollars**" and the sign "**$**" shall each mean freely transferable lawful money of the United States.

"**Domestic**" shall mean incorporated or organized in the United States or any State or territory thereof or the District of Columbia.

"**Drilling and Completion Related Payables and Accruals**" shall mean, as of any date a determination thereof is to be made, Borrower's estimate (prepared in good faith and based on assumptions believed by the Borrower to be reasonable when made) of any accrued or invoiced but unpaid drilling and completion costs associated with assets that are included in the calculation of PV-10 Value of PDP Reserves.

"**Drilling and Exploration Expenses**" shall mean any costs and expenses that are required to be charged to the income statement as part of that period's expenses under the Successful Efforts method of accounting under Statement of Financial Accounting Standards 19.

"**Early Opt-in Election**" shall mean the occurrence of:

    (1)    (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.14 of this Agreement are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and

    (2)    (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"**EEA Financial Institution**" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligibility Date**" shall mean, with respect to each Credit Party and each Hedge Agreement, the date on which this Agreement or any Credit Document becomes effective with respect to such Hedge Agreement (for the avoidance of doubt, the Eligibility Date shall be the effective date of such Hedge Agreement if this Agreement or any Credit Document is then in effect with respect to such Credit Party, and otherwise it shall be the effective date of this Agreement and/or such Credit Document(s) to which such Credit Party is a party).

"**Eligible Contract Participant**" shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

"**Eligible Transferee**" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding Holdings and its Subsidiaries and Affiliates; provided, that "Eligible Transferee" shall not include any natural Person.

"**Environmental Claims**" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, liens, notices of non-compliance or violation, investigations or proceedings (hereafter, "**Claims**") relating in any way to any Hazardous Materials, Environmental Law or any permit issued, or any approval given, under any such Environmental Law, including, without limitation, (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief in connection with alleged injury or threat of injury to health, safety or the environment due to the presence, release of or exposure to Hazardous Materials.

"**Environmental Law**" shall mean any Law, relating in any way to the environment, health and safety, Hazardous Materials or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which any Credit Party or any Subsidiary is conducting or at any time has conducted business, or where any Property of any Credit Party or any Subsidiary is located, including, without limitation: CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3803 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq.; the Hazardous Material Transportation Act, 49 U.S.C. § 1801 et seq.; the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"**Equity Interests**" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interest in (however designated) equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

17

"**ERISA Affiliate**" shall mean each person (as defined in Section 3(9) of ERISA) which together with Holdings or a Subsidiary of Holdings would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) or (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code or Section 302 of ERISA).

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eurodollar Loan**" shall mean each Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"**Eurodollar Rate**" shall mean, for any Interest Period with respect to a Loan, the rate per annum determined by the Administrative Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (a) the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by the Administrative Agent which has been approved by the Intercontinental Exchange Benchmark Administration as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "**LIBOR Alternate Source**"), at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by the Administrative Agent at such time (which determination shall be conclusive absent manifest error), provided that if the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page) or the rate that appears on a LIBOR Alternate Source, as applicable, shall be less than 1.50%, such rate shall be deemed to be 1.50% for the purposes of this Agreement), by (b) a number equal 1.00 minus the Reserve Percentage.  The Eurodollar Rate may also be expressed by the following formula:

|  | Average of London interbank offered rates quoted by Bloomberg or appropriate successor as shown on |
| --- | --- |
| Eurodollar Rate = | Bloomberg          Page          BBAM1 |
|  | 1.00 – Reserve Percentage |

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date.  The Administrative Agent shall give reasonably prompt notice to the Borrower of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"**Event of Default**" shall have the meaning provided in Section 12.

"**Excess Cash Flow**" shall mean, for any Excess Cash Payment Period, the remainder of (a) the sum of, without duplication, (i) Adjusted Consolidated Net Income for such period and (ii) the decrease, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period, minus (b) the sum of, without duplication, (i) the aggregate amount of all Capital Expenditures made by Holdings and its Subsidiaries during such period (other than Capital Expenditures to the extent financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness), (ii) the amount of any Capital Expenditures that Holdings and its Subsidiaries are committed to make during the subsequent Excess Cash Payment Period; *provided* that (x) if any Capital Expenditures are deducted from Excess Cash Flow pursuant to this clause (b)(ii), such amount shall be added to Excess Cash Flow for the immediately succeeding Excess Cash Payment Period if such Capital Expenditure is not actually made within such Excess Cash Payment Period or if such Capital Expenditure is financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness  and (y) no deduction shall be taken in the immediately succeeding Excess Cash Payment Period when such amounts (other than amounts added to Excess Cash Flow pursuant to clause (x) of this proviso) deducted pursuant to this clause (b)(ii) are actually spent,  (iii) the aggregate amount of all Investments made by Holdings and its Subsidiaries pursuant to Section 11.05(e), (n) and (o) during such period (other than Investments to the extent financed with equity proceeds, Equity Interests, Asset Sale proceeds, insurance proceeds or Indebtedness), (iv) the aggregate amount of permanent principal payments of Indebtedness for borrowed money of Holdings and its Subsidiaries and the permanent repayment of the principal component of Capitalized Lease Obligations of Holdings and its Subsidiaries during such period (other than repayments made with the proceeds of Asset Sales, sales or issuances of Equity Interests, insurance or Indebtedness), (v) the increase, if any, in Adjusted Consolidated Working Capital from the first day to the last day of such period and (vi) the aggregate amount of all cash payments made in respect of all Permitted Acquisitions consummated by Holdings and its Subsidiaries during such period (other than any such payments to the extent financed with equity proceeds, Asset Sale proceeds, insurance proceeds or Indebtedness).

"**Excess Cash Payment Date**" shall mean the date occurring 120 days after the last day of each fiscal year of Holdings (commencing with the fiscal year of Holdings ended December 31, 2021).

"**Excess Cash Payment Period**" shall mean (i) with respect to the repayment required on the first Excess Cash Payment Date, the fiscal year of Holdings ending December 31, 2021, and (ii) with respect to the repayment required on each successive Excess Cash Payment Date, the immediately preceding fiscal year of Holdings.

"**Excess Cash Percentage**" shall mean, at any time with respect to an Excess Cash Payment Period, 50%; provided that if the Total Leverage Ratio at the end of the applicable Excess Cash Payment Period is (x) less than or equal to [2.50:1.00] but greater than [2.00:1.00] (as set forth in the officer's certificate delivered pursuant to Section 10.01(g) for the fiscal quarter or fiscal year, as the case may be, of Holdings then last ended for which financial statements are available), such percentage shall be 25% or (y) less than or equal to [2.00:1.00] (as set forth in the officer's certificate delivered pursuant to Section 10.01(g) for the fiscal

quarter or fiscal year, as the case may be, of Holdings then last ended for which financial statements are available), such percentage shall be 0%.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, and regulations promulgated thereunder, as amended.

"**Excluded Account**" shall mean (a) accounts which are used solely as an escrow account or as a fiduciary or trust account, (b) any other account that is contractually obligated to be segregated from the other assets of the Credit Parties, in each case, for the benefit of unaffiliated third parties, (c) any disbursement or payroll accounts used solely for such purposes, (d) any accounts solely holding withheld income taxes, payroll taxes or other employment-related taxes or amounts to be paid over to employee health or benefits plans, (e) cash collateral accounts subject to Permitted Liens under clause (l) or (r) of the definition thereof), (f) suspense accounts and other accounts all of the deposits in which consist of monies of third parties, including working interest owners, royalty owners and the like, and (g) any other accounts with a balance of less than $250,000 individually or $1,000,000 in the aggregate at all times.

"**Excluded Hedge Liability**" or "**Excluded Hedge Liabilities**" shall mean, with respect to each Credit Party, each of its Hedge Obligations if, and only to the extent that, all or any portion of this Agreement or any Credit Document that relates to such Hedge Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Credit Party's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Hedge Agreement.  Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Credit Document, the foregoing is subject to the following provisos: (a) if a Hedge Obligation arises under a master agreement governing more than one Hedge Agreement, this definition shall apply only to the portion of such Hedge Obligation that is attributable to Hedge Agreements for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Credit Party for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Hedge Agreement; (b) if a guarantee of a Hedge Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Hedge Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Credit Party executing this Agreement or the Credit Documents and a Hedge Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of "Excluded Hedge Liability or Liabilities" with respect to each such Person shall only be deemed applicable to (i) the particular Hedge Obligations that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Hedge Obligations constitute Excluded Hedge Liabilities.

"**Excluded Taxes**" shall have the meaning in Section 6.04(a).

"**Extraordinary Receipts**" means any cash received by any Credit Party not in the ordinary course of business (and not consisting of proceeds relating to an event described in Section 6.02(c), Section 6.02(d), Section 6.02(e), Section 6.02(f) or Section 6.02(g) of this Agreement) consisting of (a) proceeds of judgments, proceeds of settlements, or other

consideration of any kind received in connection with any cause of action or claim, (b) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Credit Party or any of its Subsidiaries), (c) any tax refunds or (d) any business interruption insurance proceeds; provided that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"**Fair Market Value**" shall mean, with respect to any asset (including any Equity Interests of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of Holdings, or the Subsidiary of Holdings selling such asset.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations, published guidance or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements (and any foreign legislation, regulations or published guidance implemented to give effect to such intergovernmental agreements) entered into to implement the foregoing.

"**FCPA**" shall have the meaning provided in Section 9.25(b)

"**Federal Funds Rate**" shall mean for any day the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN" (or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by the Administrative Agent (an "**Alternate Source**") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by the Administrative Agent at such time (which determination shall be conclusive absent manifest error)); provided however, that if such day is not a Business Day, the Federal Funds Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Rate changes, the rate of interest with respect to any advance to which the Federal Funds Rate applies will change automatically without notice to the Borrower, effective on the date of any such change.

"**Federal Reserve Bank of New York's Website**" shall mean the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Fees**" shall mean all amounts payable pursuant to or referred to in the Credit Documents.

"**Financial Performance Covenants**" shall have the meaning provided in Section 12.14(b).

"**Fixed Charge Coverage Ratio**" shall mean, for any period, the ratio of (a) Consolidated EBITDAX for such period minus the sum of, without duplication (i) the aggregate amount of all Maintenance Capital Expenditures made by Holdings and its Subsidiaries in cash during such period (other than Capital Expenditures, to the extent financed with cash equity proceeds, reimbursed from landlords, Disposition proceeds, insurance proceeds or Indebtedness), (ii) the amount of all cash payments made by Holdings and its Subsidiaries in respect of income taxes or income tax liabilities during such period (excluding taxes related to Dispositions not in the Ordinary Course of Business), and (iii) the aggregate amount of all cash Dividends (including stock repurchases and redemptions) paid by Holdings during such period, other than Dividends paid with the proceeds of any issuance of Equity Interests, to (b) Fixed Charges for such period; *provided that* (i) for purposes of any calculation of the Fixed Charge Coverage Ratio pursuant to this Agreement, Consolidated EBITDAX shall be determined on a Pro Forma Basis in accordance with clause (iii) of the definition of "Pro Forma Basis" contained herein.

"**Fixed Charges**" shall mean, for any period, the sum, without duplication, of (i) Consolidated Interest Expense paid in cash during such period, and (ii) the scheduled principal amount of all amortization payments on all Indebtedness of Holdings and its Subsidiaries for such period (including the principal component of all Capitalized Lease Obligations) as determined on the first day of such period (or, with respect to a given issue of Indebtedness incurred thereafter, on the date of the incurrence thereof but after giving effect to all prior payments thereof).

"**Flood Laws**" shall mean all applicable laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other applicable laws related thereto.

"**GAAP**" shall mean generally accepted accounting principles in the United States as in effect from time to time; provided that determinations in accordance with GAAP for purposes of Sections 6.02, 10.17 and 11, including defined terms as used therein, and for all purposes of determining the Financial Performance Covenants, are subject (to the extent provided therein) to Section 14.07(a).

"**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision of the foregoing, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guaranteed Creditors**" shall mean and include each of the Administrative Agent, the Collateral Agent, the Lenders and each party (other than any Credit Party) party to an Interest Rate Protection Agreement or a Secured Hedge Agreement to the extent such party constitutes a Secured Creditor under the Security Documents.

"**Guaranteed Obligations**" shall mean (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest on each Note issued by, and all Loans made to, the Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) thereon) of the Borrower to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document to which the Borrower is a party and the due performance and compliance by the Borrower with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document and (ii) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), liabilities and indebtedness (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) of the Borrower owing under any Secured Hedge Agreement or any Interest Rate Protection Agreement entered into by the Borrower with (x) any Lender or any affiliate thereof (even if such Lender subsequently ceases to be a Lender under this Agreement for any reason) so long as such Lender or affiliate participates in such Interest Rate Protection Agreement and their subsequent assigns, if any, (y) any Approved Counterparty or (z) any other Person approved by the Administrative Agent, in each case whether now in existence or hereafter arising, and the due performance and compliance with all terms, conditions and agreements contained therein.

["**Guarantor**" shall mean each Holding Company and each Subsidiary Guarantor.]

"**Guaranty**" shall mean each of the Holdings Guaranty and the Subsidiaries Guaranty.

"**Hazardous Materials**" shall mean (a) any petroleum, petroleum hydrocarbons, petroleum products, petroleum by-products, petroleum breakdown products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives of any of the foregoing, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls and radon gas; (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous waste," "hazardous materials," "extremely hazardous substances," "restricted hazardous waste," "toxic substances," "toxic pollutants," "contaminants," or "pollutants," or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or Release of which is prohibited, limited or regulated by any Governmental Authority under any applicable Environmental Law.

"**Hedge Agreement**" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices

23

or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Credit Party or any Subsidiary shall be a Hedge Agreement.

"**Hedge Intercreditor Agreement**" shall mean an Intercreditor Agreement in the form of Exhibit O, as amended, modified, restated and/or supplemented from time to time pursuant to the terms thereof.

"**Hedge Obligation**" shall mean any obligation to pay or perform under any agreement, contract or transaction that constitutes a Hedge Agreement.

"**Hedge Termination Value**" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined by the counterparties to such Hedge Agreements so long as written evidence thereof from such counterparty is provided to Administrative Agent on or prior to such date and if no such evidence is provided, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender) acceptable to Administrative Agent in its reasonable discretion.

"**Hedge Value**" shall have the meaning ascribed thereto in the definition of "Calculation Principles".

"**Holding Companies**" and "**Holding Company**" shall have the meanings provided in the first paragraph of this Agreement.

"**Holdings**" shall have the meaning provided in the first paragraph of this Agreement.

["**Holdings Guaranty**" shall have the meaning provided in Section 15.01.]

"**Hydrocarbon Interests**" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests relating to oil, gas or other hydrocarbons, including any reserved or residual interests of whatever nature.

"**Hydrocarbons**" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"**Indebtedness**" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (ii) (x) the maximum amount available to be drawn or paid under all letters of credit, bankers'

acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and (y) all unpaid drawings and unreimbursed payments in respect of such letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all indebtedness of the types described in clause (i), (ii), (iv), (v), (vi), (vii) or (viii) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person (provided that, if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the Fair Market Value of the property to which such Lien relates), (iv) all Capitalized Lease Obligations of such Person, (v) all obligations of such Person to pay a specified purchase price for goods or services, or to pay for the delivery of a specified quantity of goods, whether or not delivered or accepted, i.e., take-or-pay and similar obligations, (vi) all Contingent Obligations of such Person in respect of Indebtedness of any third Person of the types described in clause (i), (ii), (iii) (iv), (v), (vii) or (viii) of this definition, (vii) all obligations under any Hedge Agreement or under any similar type of agreement, (viii) all Off-Balance Sheet Liabilities of such Person, (ix) any obligation of a Person in respect of a farm-in agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an Oil and Gas Property, (x) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services, in each case, that are more than 60 days past the date such amounts were due to be paid and (xi) in-kind obligations relating to net oil or natural gas balancing positions arising in the Ordinary Course of Business. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing, Indebtedness shall not include (x) deferred tax and other credits incurred by any Person in accordance with customary practices and in the Ordinary Course of Business of such Person or (y) purchase price adjustments, earn-outs, and other similar obligations incurred by any Person in connection with acquisitions, in each case except to the extent such items are reflected or are required to be reflected on the balance sheet of such Person as indebtedness pursuant to GAAP.

"**Indemnified Person**" shall have the meaning provided in Section 14.01(a).

"**Indemnified Taxes**" shall have the meaning in Section 6.04(a).

"**Initial Reserve Report**" shall mean the reserve report as of June 30, 2020, prepared by [_____] and delivered to the Administrative Agent on August [15], 2020.[3]

"**Insolvency Event**" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under the

---

[3] [**NTD**:  Assumes emergence prior to November 15, 2020.]

Bankruptcy Code), or regulatory restrictions, (b) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due, (d) with respect to a Lender, such Lender is unable to perform hereunder to the application of applicable law or (e) in the good faith determination of the Administrative Agent or the Collateral Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"**Intellectual Property**" shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, or design right.

"**Intercompany Debt**" shall mean any Indebtedness, payables or other obligations, whether now existing or hereafter incurred, owed by Holdings or any Subsidiary of Holdings to Holdings or any other Subsidiary of Holdings.

"**Intercompany Loans**" shall have the meaning provided in Section 11.05(h).

"**Intercompany Note**" shall mean a promissory note evidencing Intercompany Loans, duly executed and delivered substantially in the form of Exhibit K (or such other form as shall be satisfactory to the Administrative Agent in its sole discretion), with blanks completed in conformity herewith.

"**Interest Determination Date**" shall mean, with respect to any Loan, the second Business Day prior to the commencement of any Interest Period relating to such Loan.

"**Interest Period**" shall have the meaning provided in Section 2.09.

"**Interest Rate Protection Agreement**" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"**Investments**" shall have the meaning provided in Section 11.05.

"**Law**" shall mean laws, common law, statutes, judgments, decrees, rules, constitutions, treaties, conventions, regulations, codes, ordinances, orders, and enforceable policies, guidelines or similar requirements of all Governmental Authorities.

"**Leaseholds**" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

EAST\177251518.5

"**Lender**" shall mean each Person that becomes a "Lender" hereunder on the Closing Date or pursuant to Section 2.13 or 14.04 in each case as evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15.  For the purpose of any Credit Document which provides for the granting of a security interest or other Lien to the Collateral Agent for the benefit of Lenders as security for the Obligations, "**Lenders**" shall include any Affiliate of a Lender to which such Obligation is owed.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"**Liquidate**" shall mean, with respect to any Hedge Agreement, (a) the sale, assignment, novation, unwind or termination of all or any part of such Hedge Agreement or (b) the creation of an offsetting position against all or any part of such Hedge Agreement.  The terms "**Liquidated**" and "**Liquidation**" have correlative meanings thereto.

"**Loan**" shall have the meaning provided in Section 2.01.

"**Loan Admin**" shall mean Loan Admin Co LLC, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"**Maintenance Capital Expenditures**" shall mean Capital Expenditures with respect to the replacement, repair, maintenance and upkeep of any fixed or capital asset (to the extent capitalized on the financial statements of Holdings and its Subsidiaries).

"**Majority Lenders**" shall mean, at any time, one or more Lenders (and if there are two or more non-affiliated Lenders, at least two non-affiliated Lenders) the sum of whose outstanding Loans and Commitments at such time represents at least 50.1% of the sum of all outstanding Loans and Commitments at such time.

"**Margin Stock**" shall have the meaning provided in Regulation U.

"**Material Adverse Effect**" shall mean (i) a material adverse effect on the business, operations, property, assets, liabilities, financial condition or prospects of the Borrower or of Holdings and its Subsidiaries, taken as a whole, or (ii) a material adverse effect (x) on the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent under the Credit Documents, taken as a whole, or (y) on the ability of the Credit Parties, taken as a whole, to perform their obligations hereunder or under any other Credit Document.

"**Material Agreement**" shall mean any agreement or series of related agreements to which any Credit Party is a party, the termination or breach of which, individually or in the aggregate, would be reasonably expected to be materially adverse to the business of the Credit Parties taken as a whole.

"**Maturity Date**" shall mean November [__], 2024.

"**Maximum Rate**" shall have the meaning provided in <u>Section 14.19</u>.

"**MDA Consolidated Group**" shall mean the consolidated group for U.S. federal income tax purposes that includes the Credit Parties.

"**MDA Holdco**" shall have the meaning provided in the first paragraph of this Agreement.

"**MDA Intermediate Holdco**" shall have the meaning provided in the first paragraph of this Agreement.

"**Midstream Assets**" shall mean all property used in gathering systems and pipeline systems and all equipment, processing, compressor, treatment, storage, transportation, extraction, exchange or manufacturing facilities or other similar facilities, natural gas, liquid product and other storage tanks, liquid product truck loading terminals and any other assets used in connection with, and contracts, recorded fee deeds, leases, easements, rights of way, servitudes, permits, licenses, instruments and other rights in respect of, the gathering, compressing, treating, transporting or processing of Hydrocarbons and the water distribution, supply, treatment and disposal services thereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean a mortgage, deed of trust, leasehold mortgage, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt or similar security instrument, pursuant to which such Credit Party grants a Lien on certain of their Oil and Gas Properties, Midstream Assets and Real Property, in a forma and substance reasonably satisfactory to the Administrative Agent, as it may be amended, supplemented or otherwise modified from time to time.

"**Mortgaged Property**" shall mean any Oil and Gas Properties, Midstream Assets and Real Property owned or leased by Holdings or any of its Subsidiaries which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"**Multiemployer Plan**" shall mean any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA that is subject to Title IV of ERISA to which a Credit Party makes, is making or is obligated to make contributions or has made or been obligated to make contributions during the preceding five years if a Credit Party has liability thereunder or to which the Credit Party has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**NAIC**" shall mean the National Association of Insurance Commissioners.

"**Necessary Authorizations**" shall mean all material authorizations, consents, permits, approvals, waivers, licenses, and exemptions from, and all filings and registrations with, and all reports to, any Governmental Authority whether federal, state, local, and all agencies thereof, which are required for the transactions contemplated by the Credit Documents and necessary to the conduct of the businesses and the ownership (or licensure or lease) of the properties and assets of the Credit Parties.

"**Net Cash Proceeds**" shall mean for any event requiring a repayment of Loans pursuant to Section 6.02, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith).

"**Net Sale Proceeds**" shall mean for any Disposition, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such Disposition, net of (i) reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer taxes arising therefrom), (ii) payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such Disposition, (iii) the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness of the Lenders pursuant to this Agreement) which is secured by the respective assets which were sold or otherwise disposed of, and (iv) the estimated net marginal increase in income taxes which will be payable by Holdings' consolidated group or any Subsidiary of Holdings with respect to the fiscal year of Holdings in which the Disposition occurs as a result of such Disposition; provided, however, that such gross proceeds shall not include any portion of such gross cash proceeds which Holdings determines in good faith should be reserved for post-closing adjustments (to the extent Holdings delivers to the Lenders a certificate signed by an Authorized Officer as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than twelve months following the date of the respective Disposition), the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the actual post-closing adjustments payable by Holdings or any of its Subsidiaries shall constitute Net Sale Proceeds on such date received by Holdings and/or any of its Subsidiaries from such Disposition.

"**NGLs**" shall have the meaning ascribed thereto in the definition of "Applicable Differentials".

"**Non-Qualifying Party**" shall mean any Credit Party that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"**Non-Wholly Owned Subsidiary**" shall mean, as to any Person, each Subsidiary of such Person which is not a Wholly-Owned Subsidiary of such Person.

"**Note**" shall have the meaning provided in Section 2.05(a).

"**Notice of Conversion/Continuation**" shall have the meaning provided in Section 2.06.

"**Notice Office**" shall mean the office of the Administrative Agent located at 2200 Atlantic Street, Suite 501, Stamford CT 06902, Attention: Sean Chao and Purvang Desai or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**Obligations**" shall mean all amounts owing to the Administrative Agent, the Collateral Agent, any Lender or Affiliate of a Lender pursuant to the terms of an Interest Rate Protection Agreement, or any Lender pursuant to the terms of this Agreement or any other Credit Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of Holdings or any of its Subsidiaries, whether or not allowed in such case or proceeding).

"**OFAC**" shall have the meaning provided in Section 9.25(a).

"**Off-Balance Sheet Liabilities**" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any obligation under a Synthetic Lease or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"**Oil and Gas Business**" shall mean:

(1)     the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(2)     the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(3)     any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which the Credit Parties or their Subsidiaries, directly or indirectly, participate;

(4)     any business relating to oil field sales and service; and

(5)     any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (4) of this definition.

"**Oil and Gas Properties**" shall mean all Hydrocarbon Interests and related property owned by a Person.

"**Ordinary Course of Business**" shall mean, with respect to each Credit Party, the ordinary course of such Credit Party's business as conducted on the Closing Date or any business that is reasonably related, similar, complementary, incidental, corollary, ancillary to or a reasonable extension, development or expansion of its business.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution,

delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document.

"**Parent**" shall mean [_____], a [_____].

"**Parent Governance Documents**" means, with respect to the Parent, any documents, certificates or other agreements for the governance of the Parent, including, without limitation, the [certificate of formation], [limited liability company agreement] and any other similar organizational or formation documents, as applicable, of the Parent, in each case, as amended, restated, supplemented or otherwise modified from time to time..

"**Participant**" shall have the meaning provided in Section 14.04(e).

"**Patriot Act**" shall have the meaning provided in Section 14.18.

"**Payment Office**" shall mean the office of the Administrative Agent located at 2200 Atlantic Street, Suite 501, Stamford CT 06902 or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**PDP Reserves**" shall mean "proved developed producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines.

"**Permitted Acquisition**" shall mean the acquisition by the Borrower (or a Wholly-Owned Subsidiary of the Borrower which is a Credit Party) of an Acquired Entity or Business (including by way of merger of such Acquired Entity or Business with and into such Credit Party (so long as the Credit Party is the surviving corporation)), provided that (in each case) (A) the consideration paid or to be paid by such Credit Party consists solely of cash, Holdings common Equity Interests, Qualified Preferred Stock, the issuance or incurrence of Indebtedness otherwise permitted by Section 11.04 and the assumption/acquisition of any Indebtedness (calculated at face value) which is permitted to remain outstanding in accordance with the requirements of Section 11.04, (B) in the case of the acquisition of 100% of the Equity Interests of any Acquired Entity or Business (including by way of merger), such Acquired Entity or Business shall own no Equity Interests of any other Person unless (w) such Acquired Entity or Business owns 100% of the Equity Interests of such other Person, (x) if such Acquired Entity or Business owns Equity Interests in any other Person which is a Non-Wholly Owned Subsidiary of such Acquired Entity or Business, (1) such Acquired Entity or Business shall not have been created or established in contemplation of, or for purposes of, the respective Permitted Acquisition and (2) any such Non-Wholly Owned Subsidiary of the Acquired Entity or Business shall have been a Non-Wholly Owned Subsidiary of such Acquired Entity or Business prior to the date of the respective Permitted Acquisition and shall not have been created or established in contemplation thereof (y) such Equity Interests have a Fair Market Value of less than $1,000,000 or (z) the acquisition of such Equity Interests would be separately permitted pursuant to Section 11.05 (in which case any applicable basket will be charged for the Fair Market Value thereof), (C) other than businesses, divisions and product lines with a Fair Market Value of up to $2,000,000 in the aggregate for all Permitted Acquisitions (measured at the time thereof), the business, division or product line

31

acquired pursuant to the respective Permitted Acquisition, or the business of the Person acquired pursuant to the respective Permitted Acquisition and its Subsidiaries taken as a whole, is in the United States, (D) the Acquired Entity or Business acquired pursuant to the respective Permitted Acquisition is in a business permitted by Section 11.15 and (E) all requirements of Sections 10.17, 11.02 and 11.15 applicable to Permitted Acquisitions are satisfied. Notwithstanding anything to the contrary contained in the immediately preceding sentence, an acquisition which does not otherwise meet the requirements set forth above in the definition of "Permitted Acquisition" shall constitute a Permitted Acquisition if, and to the extent, the Required Lenders agree in writing, prior to the consummation thereof, that such acquisition shall constitute a Permitted Acquisition for purposes of this Agreement.

"**Permitted Business Investment**" shall mean any Investment made in the ordinary course of, and of a nature that is or shall have become customary in, the business of the Credit Parties and the Subsidiaries (as permitted by Section 11.15), including investments or expenditures for actively exploiting, exploring for, acquiring, developing, producing, processing, gathering, marketing or transporting oil, natural gas or other Hydrocarbons and minerals through agreements, transactions, interests or arrangements which permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil and Gas Business jointly with third parties, including:

(1) ownership interests in oil, natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests; and

(2) Investments in the form of or pursuant to operating agreements, working interests, royalty interests, mineral leases, processing agreements, farm-in agreements, farm-out agreements, contracts for the sale, transportation or exchange of oil, natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies, but provided, in each case of an Investment in any joint venture, partnership, limited liability company or other Person, that (i) the Equity Interest in such Person is pledged to secure the Secured Obligations and (ii) the aggregate amount of all such Investments made during the term of this Agreement (net of any dividend, distribution or other return on such Investments) shall not exceed 15% of PV-10 Value of PDP Reserves at the time made and (iii) the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant (which, for purposes of Section 11.10, shall mean that the Adjusted Coverage Ratio is greater than 1.50:1.00)) with third parties whose principal lines of business include the Oil and Gas Business (other than Investments in any master limited partnerships or other publicly traded Person).

"**Permitted Cure Securities**" shall mean any Holdings common Equity Interests or Qualified Preferred Stock issued pursuant to the Cure Right.

"**Permitted Investors**" means Sixth Street Specialty Lending, Inc. (formerly known as TPG Specialty, Inc.), TAO Talents, LLC, MC Credit Fund I LP, MC Credit Fund IA (Cayman Master) LP, MC Credit Fund II, LP, MC Credit Fund III (Delaware) LP, MC Credit Fund III-U (Delaware) LP, MC Credit Fund III (Cayman Master) LP, Arena Limited SPV, LLC, Prudential Legacy Insurance Company of New Jersey, The Prudential Insurance Company of America and any Affiliates of each of the foregoing.

"**Permitted Liens**" shall have the meaning provided in <u>Section 11.01</u>.

"**Person**" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Plan**" shall mean any "plan" defined in Section 3(3) of ERISA (other than a Multiemployer Plan) which is subject to Title IV of ERISA, and which is contributed to by a Credit Party or any such plan to which a Credit Party is required to contribute or has any liability (contingent or otherwise), including any liability on account of any ERISA Affiliate.

"**Pledge Agreement**" shall have the meaning provided in <u>Section 7.07(i)(A)</u>.

"**Pledge Agreement Collateral**" shall mean all "Collateral" as defined in the Pledge Agreement.

"**Pledgee**" shall have the meaning provided in the Pledge Agreement.

"**Preferred Equity**", as applied to the Equity Interests of any Person, shall mean Equity Interests of such Person (other than common Equity Interests of such Person) of any class or classes (however designed) that ranks prior, as to the payment of Dividends or as to the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of such Person, to shares of Equity Interests of any other class of such Person, and shall include any Qualified Preferred Stock.

"**Prepackaged Plan**" shall have the meaning provided in the recitals hereto.

"**Prepayment Premium**" shall have the meaning providing in <u>Section 5.01</u>.

"**Pre-Petition Credit Agreement**" shall have the meaning provided in the recitals hereto.

"**Pre-Petition Credit Documents**" shall have the meaning given to the term "Credit Documents" in the Pre-Petition Credit Agreement.

"**Pre-Petition Lenders**" shall have the meaning provided in the recitals hereto.

"**Pre-Petition Loans**" shall mean the "Loans" under and as defined in the Pre-Petition Credit Agreement made by the Pre-Petition Lenders to the Borrower pursuant to the Pre-Petition Credit Agreement that are outstanding immediately prior to the Closing Date.

"**Prime Rate**" shall mean a variable per annum rate, as of any date of determination, equal to the rate as of such date published in the "Money Rates" section of *The Wall Street*

*Journal* as being the "Prime Rate" (or, if more than one rate is published as the Prime Rate, then the highest of such rates). The Prime Rate will change as of the date of publication in *The Wall Street Journal* of a Prime Rate that is different from that published on the preceding Business Day.  In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the Prime Rate, the Administrative Agent shall choose a reasonably comparable index or source to use as the basis for the Prime Rate.

"**Pro Forma Basis**" shall mean, in connection with any calculation of compliance with any financial covenant or financial term, the calculation thereof after giving effect on a pro forma basis to (x) the incurrence of any Indebtedness (other than revolving Indebtedness) after the first day of the relevant Calculation Period or Test Period, as the case may be, as if such Indebtedness had been incurred (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, (y) the permanent repayment of any Indebtedness (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) after the first day of the relevant Test Period or Calculation Period, as the case may be, as if such Indebtedness had been retired or repaid on the first day of such Test Period or Calculation Period, as the case may be, and (z) any Permitted Acquisition then being consummated as well as any other Permitted Acquisition if consummated after the first day of the relevant Test Period or Calculation Period, as the case may be, as if such Permitted Acquisition was consummated on the first day of such Test Period or Calculation Period, as the case may be, with the following rules to apply in connection therewith:

(i)      all Indebtedness (x) (other than revolving Indebtedness) incurred or issued after the first day of the relevant Test Period or Calculation Period (whether incurred to finance a Permitted Acquisition, to refinance Indebtedness or otherwise) shall be deemed to have been incurred or issued (and the proceeds thereof applied) on the first day of such Test Period or Calculation Period, as the case may be, and remain outstanding through the date of determination (and thereafter, in the case of projections pursuant to Section 10.17(a)) and (y) (other than revolving Indebtedness, except to the extent accompanied by a corresponding permanent commitment reduction) permanently retired or redeemed after the first day of the relevant Test Period or Calculation Period, as the case may be, shall be deemed to have been retired or redeemed on the first day of such Test Period or Calculation Period, as the case may be, and remain retired through the date of determination (and thereafter, in the case of projections pursuant to Section 10.17(a));

(ii)      all Indebtedness assumed to be outstanding pursuant to preceding clause (i) shall be deemed to have borne interest at (x) the rate applicable thereto, in the case of fixed rate indebtedness, or (y) the rates which would have been applicable thereto during the respective period when same was deemed outstanding, in the case of floating rate Indebtedness (although interest expense with respect to any Indebtedness for periods while same was actually outstanding during the respective period shall be calculated using the actual rates applicable thereto while same was actually outstanding); provided that all Indebtedness (whether actually outstanding or deemed outstanding) bearing interest at a

floating rate of interest shall be tested on the basis of the rates applicable at the time the determination is made pursuant to said provisions; and

        (iii)    in making any determination of Consolidated EBITDAX on a Pro Forma Basis, pro forma effect shall be given to any Permitted Acquisition and any Asset Sale if effected during the respective Calculation Period or Test Period (or thereafter, for purposes of determinations pursuant to Section 10.17(a) only) as if same had occurred on the first day of the respective Calculation Period or Test Period, as the case may be, taking into account, in the case of any Permitted Acquisition, factually supported and identifiable expected pro forma "run rate" cost savings, expense reductions, other operational initiatives, improvements and changes and synergies related to such Permitted Acquisition that, in each case, have resulted from, or are projected by Holdings in good faith to result from actions which have been taken or are expected to be taken no later than three months after the date of such pro forma event, as if such cost savings, improvements, changes, expense reductions or synergies were realized on the first day of the respective period in an amount not to exceed 10% of Consolidated EBITDAX of the prospective acquired business or Collateral; provided that any such adjustments to Consolidated EBITDAX pursuant to this clause (iii) shall be reasonably acceptable to the Required Lenders.

      "**Projected Oil and Gas Production**" shall mean the projected production of crude oil, natural gas or natural gas liquids (measured by volume unit or BTU equivalent, not sales price) from Oil and Gas Properties and interests owned by the Borrower and its Subsidiaries which have attributable to them proved developed producing reserves, as such production is projected in the most recent Reserve Report, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation and otherwise delivered pursuant to this Agreement, (a) for purposes of Section 10.23, after deducting projected production from any Oil and Gas Properties or Hydrocarbon Interests sold or under contract for sale that had been included in such Reserve Report and after adding reasonable projected production from any Oil and Gas Properties or Hydrocarbon Interests that had not been reflected in such Reserve Report but that are reflected in a separate or supplemental report meeting the requirements of Section 10.21 and (b) for purposes of Section 10.23 and Section 11.19, making adjustments to account for Dispositions of Oil and Gas Properties included in such Reserve Report and acquisitions of Oil and Gas Properties not included in such Reserve Report, in each case consummated by the Borrower or any of its Subsidiaries and, in the case of acquisitions, to the extent such acquired Oil and Gas Properties are reflected in a separate or supplemental report meeting the requirements of Section 10.21 (and the Borrower hereby agrees to deliver to the Lenders such separate or supplemental report with the applicable compliance certificate delivered pursuant to Section 10.01(d)). For purposes of this definition, the Strip Price shall be determined as of the Applicable Pricing Test Date, and the Strip Price shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**Projections**" shall mean the projections that were prepared by or on behalf of the Borrower in connection with the Transaction and delivered to the Administrative Agent and the Lenders on [_____], 2020.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Proved Reserves**" shall mean those Oil and Gas Properties designated as "proved" (in accordance with SPE definitions and regulations) in the Reserve Report most recently delivered to the Administrative Agent pursuant to this Agreement.

"**PV-10 Value**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses, and capital expenditures of the Credit Parties' Proved Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; underlined that (a) the PV-10 Value shall be calculated in accordance with the Calculation Principles and (b) such calculations of the PV-10 Value shall be reasonably acceptable to the Required Lenders.  For purposes of this definition, the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall be determined as of the Applicable Pricing Test Date, and the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**PV-10 Value of PDP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses  and capital expenditures of the Credit Parties' PDP Reserves as set forth in the most recent Reserve Report delivered pursuant hereto, calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; underlined that (a) the PV-10 Value of PDP Reserves shall be calculated in accordance with the Calculation Principles and (b) such calculations of the PV-10 Value of PDP Reserves shall be reasonably acceptable to the Required Lenders.  For purposes of this definition, the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall be determined as of the Applicable Pricing Test Date, and the Strip Price and the Hedge Value of Hedge Agreements with Approved Counterparties in effect as of such date of determination shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**PV-10 Value of Workover PDNP Reserves**" shall mean, as of any date of determination, the present value of estimated future revenues less severance and ad valorem taxes, operating, gathering, transportation and marketing expenses and capital expenditures of the Credit Parties' Workover PDNP Reserves as set forth in the most recent certificate delivered pursuant to Section 10.01(g)(iii), using information prepared by the chief engineer of the Borrower from the most recent Reserve Report delivered pursuant hereto (identified separately from PDNP Reserves), calculated in accordance with the SPE guidelines and using the Strip Price as set forth in the last sentence of this definition, adjusted for any basis differential, quality and gravity, using prices and costs as of the date of estimation without future escalation, without giving effect to non-property related expenses such as general and administrative expenses, debt service, future income tax expense and depreciation, depletion and amortization, and discounted using an annual discount rate of 10%; provided that (a) such calculations of the PV-10 Value of Workover PDNP Reserves and calculations of Workover PDNP Reserves shall be reasonably acceptable to the Required Lenders and (b) the PV-10 Value of Workover PDNP Reserves shall be calculated in accordance with the Calculation Principles.  For purposes of this definition, the Strip Price shall be determined as of the Applicable Pricing Test Date, and the Strip Price shall not be re-determined for any subsequent delivery of a revised or final certificate for such period.

"**QFC**"  has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**"  shall have the meaning provided in Section 14.23.

"**Qualified ECP Loan Party**" shall mean each Credit Party that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

"**Qualified Preferred Stock**" shall mean any Preferred Equity of Holdings so long as the terms of any such Preferred Equity (x) do not contain any mandatory put, redemption (other than solely for other Qualified Preferred Stock), repayment, sinking fund or other similar provision prior to the date that is six months after the Maturity Date (as the same may be amended or extended hereunder), (y) do not require the cash payment of Dividends that would otherwise be prohibited by the terms of this Agreement or any other agreement or contract of Holdings or any of its Subsidiaries and (z) in the case of Preferred Equity of Holdings that was not issued prior to the Closing Date, (1) do not contain any covenants (other than periodic reporting requirements), (2) do not grant the holders thereof any voting rights except for (I) voting rights required to be granted to such holders under applicable law and (II) limited customary voting rights on fundamental matters such as mergers, consolidations, sales of all or substantially all of the assets of Holdings, or liquidations involving Holdings, and (3) are otherwise reasonably satisfactory to the Administrative Agent.

"**Quarterly Payment Date**" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"**Real Property**" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"**Recipient**" shall mean (a) the Administrative Agent and (b) any Lender, as applicable.

"**Recovery Event**" shall mean the receipt by Holdings or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable (i) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of Holdings or any of its Subsidiaries and (ii) under any policy of insurance required to be maintained under Section 10.03.

"**Register**" shall have the meaning provided in Section 14.15.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" shall mean actively or passively disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, migrating or the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Released Claims**" shall have the meaning provided in Section 13.02(b).

"**Releasees**" shall have the meaning provided in Section 13.02(b).

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Replaced Lender**" shall have the meaning provided in Section 2.13.

"**Replacement Lender**" shall have the meaning provided in Section 2.13.

"**Reportable Event**" shall mean an event described in Section 4043(c) of ERISA with respect to a Plan other than those events as to which the 30-day notice period has been waived.

"**Required Lenders**" shall mean, at any time, one or more Lenders (and if there are two or more non-affiliated Lenders, at least two non-affiliated Lenders) the sum of whose outstanding Loans and Commitments at such time represents at least 66 2/3% of the sum of all outstanding Loans and Commitments at such time.

"**Required Prepayment Date**" shall have the meaning provided in Section 6.02(k).

"**Reserve Percentage**" shall mean, as of any day, the maximum percentage (expressed as a decimal) in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to Eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

"**Reserve Report**" shall mean the Initial Reserve Report or, except as the context otherwise requires solely with respect to references to "draft" or "revised" Reserve Reports contained in Section 10.21, the most recent reserve report that is deemed "final and delivered" pursuant to Section 10.21, which reserve report shall, as of its date, set forth the oil and gas reserves attributable to the Oil and Gas Properties of the Credit Parties and which report shall be in form and substance reasonably satisfactory to the Required Lenders, and shall, at a minimum, set forth each Credit Party's royalty interests, oil and gas reserves (including proved developed producing, proved developed non-producing, proved undeveloped and probable reserves) and a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date.

"**Reserve Report Certificate**" shall have the meaning set forth in Section 10.21(b).

"**Resignation Event**" shall mean the occurrence of the sum of the outstanding Loans of Loan Admin and any of its Affiliates being less than the lesser of (i) $[          ] and (ii) [   ]% of the aggregate outstanding Loans of all Lenders at any time.

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Restricted**" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of Holdings or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Creditors (other than Permitted Liens) or (iii) are not otherwise generally available for use by Holdings or such Subsidiary.

"**Returns**" shall have the meaning provided in Section 9.09.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Sanctions**" shall have the meaning provided in Section 9.25(a).

"**Scheduled Repayment**" shall have the meaning provided in Section 6.02(b).

"**SEC**" shall have the meaning provided in Section 10.01(i).

"**Section 6.04(b)(ii) Certificate**" shall have the meaning provided in Section 6.04(b)(ii).

39

"**Secured Creditors**" shall have the meaning assigned that term in the respective Security Documents.

"**Secured Hedge Agreement**" shall mean any Hedge Agreement (a) entered into pursuant to in compliance with this Agreement and by or among any Credit Parties and any Approved Counterparty, (b) with respect to which the Approved Counterparty executes the Hedge Intercreditor Agreement or a joinder thereto and (c) which contains no requirement, agreement or covenant for Holdings or any Subsidiary to post collateral or margin to secure their obligations under such Hedge Agreement or to cover market exposures, other than a requirement that such obligations be secured by the Security Documents.

"**Secured Obligations**" shall have the meaning assigned that term in the respective Security Documents.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Agreement**" shall have the meaning provided in Section 7.09.

"**Security Agreement Collateral**" shall mean all "Collateral" as defined in the Security Agreement.

"**Security Document**" shall mean and include each of the Security Agreement, the Pledge Agreement, each Mortgage, each landlord waiver, each control agreement and, after the execution and delivery thereof, each Additional Security Document.

"**SOFR**" with respect to any day shall mean the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**SPE**" shall mean the Society of Petroleum Engineers.

"**Strip Price**" shall mean, as of any date of the determination thereof, the five-year (60 month) strip price for crude oil (WTI Cushing) and natural gas (Henry Hub), with such price held flat for each subsequent year, quoted on the New York Mercantile Exchange (or its successor) and published in a nationally recognized publication for such pricing as selected by Administrative Agent; provided, however, in the event that the New York Mercantile Exchange no longer provides futures contract price quotes for five- year (60 month) periods or if the New York Mercantile Exchange no longer provides such futures contract quotes or has ceased to operate, the Required Lenders shall designate another period and/or nationally recognized commodities exchange to replace the period and/or New York Mercantile Exchange for purposes of the references to the period and/or New York Mercantile Exchange, which in the Administrative Agent's opinion is the most comparable to obtain the appropriate Strip Price for the purposes of this Agreement.

"**Subordinated Debt**" shall mean any unsecured Indebtedness of a Credit Party incurred from time to time that is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to the Administrative Agent.

"**Subordinated Provisions**" shall have the meaning provided in Section 12.12(i).

"**Subsidiaries Guaranty**" shall have the meaning provided in Section 7.06.

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of Holdings.

"**Subsidiary Guarantor**" shall mean each Subsidiary.

"**Supported QFC**" shall have the meaning provided in Section 14.23.

"**Synthetic Lease**" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"**Taxes**" (or "**Tax**" as the context may require) shall mean any taxes, charges, fees, levies, penalties or other assessments imposed by any Taxing Authority, including, income, premium, excise, property, sales, use, value added, goods and services, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions to tax attributable thereto.

"**Taxing Authority**" shall mean any Governmental Authority with the authority to impose Tax.

"**Term SOFR**" shall mean the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Test Period**" shall mean each period of four consecutive fiscal quarters of Holdings then last ended, in each case taken as one accounting period

"**Total Commitment**" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time, which, immediately prior to giving effect to the Credit Event on the Closing Date, is $60,000,000 as set forth on Schedule I.

"**Total Leverage Ratio**" shall mean, on any date of determination, the ratio of (x) an amount equal to (A) Consolidated Indebtedness on such date minus (B) the amount of all Unrestricted cash and Cash Equivalents on such date that are in accounts subject to a "control agreement" referred to in Section 3.9 of the Security Agreement to (y) Consolidated EBITDAX for the Test Period most recently ended on or prior to such date; provided that (i)  for purposes of

any calculation of the Total Leverage Ratio pursuant to this Agreement, Consolidated EBITDAX shall be determined on a Pro Forma Basis in accordance with clause (iii) of the definition of "Pro Forma Basis" contained herein and (ii) solely for purposes of any calculation of the Total Leverage Ratio pursuant to Section 10.17(a), Consolidated Indebtedness shall be determined on a Pro Forma Basis in accordance with the requirements of the definition of "Pro Forma Basis" contained herein.

"**Transactions**" shall mean, collectively, (i) the deemed restructuring and rearrangement of a portion of the Pre-Petition Loans with the deemed issuance of Loans on the Closing Date and the use of proceeds thereof and (ii) the payment of all fees and expenses in connection with the foregoing.

"**Type**" shall mean the type of Loan determined with regard to the interest option applicable thereto, i.e., whether a Base Rate Loan or a Eurodollar Loan.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unfunded Current Liability**" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the Fair Market Value of all plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"**United States**" and "**U.S.**" shall each mean the United States of America.

"**Unrestricted**" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents are not Restricted.

"**U.S. Special Resolution Regimes**" shall have the meaning provided in Section 14.23.

"**Waivable Payment**" shall have the meaning provided in Section 6.02(k).

"**Wholly-Owned Subsidiary**" shall mean, as to any Person, (i) any corporation 100% of whose Equity Interests are at the time owned by such Person and/or one or more Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time.

"**Workover PDNP Reserves**" shall mean "proved developed non-producing oil and gas reserves" as such term is defined by the SPE in its standards and guidelines, but limited to only those "proved developed non-producing oil and gas reserves" associated with expected workovers of currently producing and/or previously producing wells.  For the avoidance of doubt Workover PDNP Reserves shall not include drilled but uncompleted wells.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.02.   Divisions.

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 2.   Amount and Terms of Loans.

2.01.   The Loans.  Subject to and upon the terms and conditions set forth herein and in accordance with the Prepackaged Plan, each Lender with a Commitment shall be deemed, on a several basis, to have made a term loan (each, a "**Loan**" and, collectively, the "**Loans**") to the Borrower in an aggregate principal amount equal to such Lender's Commitment on the Closing Date, which Loans (i) will be deemed to restructure and rearrange a portion of the Pre-Petition Loans on the Closing Date pursuant to Section 2.02, (ii) shall be denominated in Dollars and (iii) shall, at the option of the Borrower, be incurred and maintained as, and/or converted into Base Rate Loans or Eurodollar Loans.  Once repaid, Loans incurred hereunder may not be reborrowed.  All references herein to a "Loan" or "Loans", to "principal" or the "principal amount" of any Loan or Loans and other terms of like import shall mean Loans incurred by the

Borrower, minus repayments and prepayments of Loans pursuant to this Agreement.  As of the Closing Date, the Loans will be Eurodollar Loans with an Interest Period of three (3) months.

2.02.   [Reserved].

2.03.   [Reserved].

2.04.   [Reserved].

2.05.   Notes.

(a)      The Borrower's obligation to pay the principal of, and interest on, the Loans made or deemed to be made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 14.15 and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of Exhibit B, with blanks appropriately completed in conformity herewith (each, a "**Note**" and, collectively, the "**Notes**").

(b)      Each Lender will note on its internal records the amount of each Loan made or deemed to be made by it and each payment in respect thereof and prior to any transfer of any of its Notes will record on the reverse side thereof the outstanding principal amount of Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(c)      Notwithstanding anything to the contrary contained above in this Section 2.05 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.  Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in preceding clause (b).  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans.

2.06.   Conversions.

The Borrower shall have the option to convert, on any Business Day, all or a portion of the outstanding principal amount of Loans made pursuant to one or more Borrowings of one or more Types of Loans into a Borrowing of another Type of Loan, provided that, (i) except as otherwise provided in Section 2.10(b), Eurodollar Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted and (ii) unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into Eurodollar Loans if no Event of Default is in existence on the date of the conversion.  Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 2:00 P.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans

44

into Eurodollar Loans, three Business Days' prior notice and (y) in the case of conversions of Eurodollar Loans into Base Rate Loans, one Business Day's prior notice (each, a "**Notice of Conversion/Continuation**"), in each case in the form of <u>Exhibit A</u>, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings pursuant to which such Loans were incurred and, if to be converted into Eurodollar Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

2.07.   <u>Pro Rata Borrowings</u>.

The deemed Borrowings of Loans under this Agreement on the Closing Date shall be incurred from the Lenders pro rata on the basis of their Commitments as in effect immediately prior to such deemed Borrowings.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

2.08.   <u>Interest</u>.

(a)   The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from and including the date of Borrowing thereof until and including the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Base Rate Loan to a Eurodollar Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall be equal to the sum of the relevant Applicable Margin <u>plus</u> the Base Rate.

(b)   The Borrower agrees to pay interest in respect of the unpaid principal amount of each Eurodollar Loan from the date of Borrowing thereof until and including the earlier of (i) the payment in full of such principal amount and (ii) the conversion of such Eurodollar Loan to a Base Rate Loan pursuant to <u>Section 2.06</u>, <u>2.09</u> or <u>2.10</u>, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the relevant Applicable Margin <u>plus</u> the Eurodollar Rate for such Interest Period.

(c)   While any Event of Default exists, upon the election of the Administrative Agent or the request of the Required Lenders (or automatically upon the occurrence of any Event of Default set forth in <u>Sections 12.01</u> or <u>12.05</u>), (A) the Borrower shall pay interest on the outstanding principal balance of the Loans and, to the extent permitted by law, interest thereon, at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by the applicable Loans and (B) all other Obligations shall bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate applicable to Base Rate Loans from time to time. Interest that accrues under this <u>Section 2.08(b)</u> shall be payable in cash on demand.

(d)   Accrued (and theretofore unpaid) interest shall be payable in respect of each Loan (x) quarterly in arrears on the applicable Quarterly Payment Date (it being understood and agreed that such amount shall be calculated through, and payable in respect of, the end of such calendar quarter even if such Quarterly Payment Date is prior to the end of such calendar quarter), (y) on the date of any repayment or prepayment in full of all outstanding Loans, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)     Upon each Interest Determination Date, the Administrative Agent shall determine the Eurodollar Rate for each Interest Period applicable to the respective Eurodollar Loans and shall promptly notify the Borrower and the applicable Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

2.09.   Interest Periods.

If the Borrower gives any Notice of Conversion/Continuation in respect of the conversion into any Eurodollar Loan prior to 2:00 P.M. (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such Eurodollar Loan, the Borrower shall have the right to elect the interest period (each, an "**Interest Period**") applicable to such Eurodollar Loan, which Interest Period shall, at the option of the Borrower, be a one, two, three or six month period, underlined provided that (in each case):

(a)     all Eurodollar Loans comprising a Borrowing shall at all times have the same Interest Period;

(b)     the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(c)     each Interest Period shall end on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as applicable; provided that if any Interest Period for a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(d)     if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)     no Interest Period may be selected at any time when an Event of Default is then in existence;

(f)     no Interest Period in respect of any Borrowing shall be selected which extends beyond the Maturity Date; and

(g)     no Interest Period in respect of any Borrowing of Loans shall be selected which extends beyond any date upon which a mandatory repayment of such Loans, as the case may be, will be required to be made under Section 6.02(b), as the case may be, if the aggregate principal amount of such Loans, as the case may be, which have Interest Periods which will expire after such date will be in excess of the aggregate principal amount of such Loans, as the case may be, then outstanding less the aggregate amount of such required repayment.

If by 2:00 P.M. (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of Eurodollar Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such Eurodollar Loans as provided above, the Borrower shall be deemed to have elected to convert such Eurodollar Loans into Base Rate Loans effective as of the expiration date of such current Interest Period.

2.10.   <u>Increased Costs, Illegality, etc.</u>

(a)     In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto but, with respect to clause (i) below, may be made only by the Administrative Agent):

(i)      on any Interest Determination Date that, by reason of any changes arising after the date of this Agreement affecting the interbank Eurodollar market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of "Eurodollar Rate"; or

(ii)     at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, such as, but not limited to: (A) a change in law which subjects any Lender to any Taxes (other than Indemnified Taxes) in respect of payments of the principal of or interest on the Loans or the Notes or any other amounts payable hereunder or (B) a change in official reserve requirements, but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Closing Date affecting such Lender, the interbank Eurodollar market or the position of such Lender in such market (including that the Eurodollar Rate with respect to such Eurodollar Loan does not adequately and fairly reflect the cost to such Lender of funding such Eurodollar Loan); or

(iii)    at any time, that the making or continuance of any Eurodollar Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the interbank Eurodollar market;

then, and in any such event, such Lender (or the Administrative Agent, in the case of clause (i) above) shall promptly give notice to the Borrower and, except in the case of clause (i) above, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, Eurodollar Loans shall automatically convert into Loans that accrue interest at the Base Rate and no Loans that accrue interest at the Eurodollar Rate shall be available until such time as the

47

Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist, (y) in the case of clause (ii) above, the Borrower agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent manifest error, be final and conclusive and binding on all the parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in <u>Section 2.10(b)</u> as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any Eurodollar Loan is affected by the circumstances described in <u>Section 2.10(a)(ii)</u>, the Borrower may, and in the case of a Eurodollar Loan affected by the circumstances described in <u>Section 2.10(a)(iii)</u>, the Borrower shall, either (x) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent written notice on the same date that the Borrower was notified by the affected Lender or the Administrative Agent pursuant to <u>Section 2.10(a)(ii) or (iii)</u> or (y) if the affected Eurodollar Loan is then outstanding, upon at least three Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Loan into a Base Rate Loan, <u>provided</u> that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this <u>Section 2.10(b)</u>.

(c)     If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Borrower agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, <u>provided</u> that such Lender's determination of compensation owing under this <u>Section 2.10(c)</u> shall, absent manifest error, be final and conclusive and binding on all the parties hereto.  Each Lender, upon determining that any additional amounts will be payable pursuant to this <u>Section 2.10(c)</u>, will give prompt written notice thereof to the Borrower, which notice shall show in reasonable detail the basis for calculation of such additional amounts, although the failure to give any such notice shall not release or diminish the Borrower's obligation to pay additional amounts pursuant to this <u>Section 2.10(c)</u> upon the subsequent receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.10</u> shall not constitute a waiver of such Lender's right to demand such compensation.

2.11.   Compensation.

The Borrower agrees to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a conversion from or into, Eurodollar Loans does not occur on a date specified therefor in the applicable Notice of Conversion/Continuation (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 2.10(a)); (ii) if any prepayment or repayment (including any prepayment or repayment made pursuant to Section 6.01, Section 6.02 or as a result of an acceleration of the Loans pursuant to Section 12) or a conversion of any of its Loans occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Loans is not made on any date specified in a notice of prepayment given by the Borrower; or (iv) as a consequence of (x) any other default by the Borrower to repay Loans when required by the terms of this Agreement or any Note held by such Lender or (y) any election made pursuant to Section 2.10(b).

2.12.   Change of Lending Office.

Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section.  Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Sections 2.10 and 6.04.

2.13.   Replacement of Lenders.

Upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii) or (iii), Section 2.10(c) or Section 6.04 with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders or (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in Section 14.12(b), then the  Borrower may, with the consent of the Administrative Agent (in its sole discretion) and in accordance with Section 14.04(b), if no Default or Event of Default then exists or would exist after giving effect to such replacement, replace such Lender (the "**Replaced Lender**") with one or more other Eligible Transferees (collectively, the "**Replacement Lender**") or, in the case of a replacement as provided in Section 14.12(b) where the consent of the respective Lender is required with respect to less than all of its Loans, to replace the outstanding Loans of such Lender where the consent of such Lender would otherwise be individually required, with identical Loans provided by the Replacement Lender; provided that:

(a)      at the time of any replacement pursuant to this Section 2.13, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 14.04(b) (and with all fees payable pursuant to said Section 14.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the outstanding Loans of, the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the respective Replaced Lender and (B) an amount equal to all accrued, but theretofore unpaid, fees owing to the Replaced Lender pursuant to the Credit Documents pursuant to Sections 4.01 and 5.01; and

(b)      all obligations of the Borrower then owing to the Replaced Lender (other than those specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.11) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.13, the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.13 and Section 14.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 14.15 and, if so requested by the Replacement Lender, delivery to the Replacement Lender of the appropriate Note or Notes executed by the Borrower, the Replacement Lender shall become a Lender hereunder and, unless the respective Replaced Lender continues to have outstanding Loans hereunder, the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 6.04, 13.06, 14.01 and 14.06), which shall survive as to such Replaced Lender.

2.14.    Alternate Rate of Interest. If prior to the commencement of any Interest Period for any Eurodollar Loan:

(a) the Administrative Agent shall have reasonably determined (which determination shall be conclusive absent manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Required Lenders that by reason of any changes arising after the date of this Agreement the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders in writing as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (or until a Benchmark

Replacement is implemented in accordance with clause (c) below) (which it shall do promptly upon becoming aware thereof), (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods), (y) the Eurodollar Rate component shall no longer be utilized in determining the Base Rate, in each case, until such time a Benchmark Replacement is implemented in accordance with clause (c) below, and (z) all Eurodollar Loans shall automatically be converted to Base Rate Loans at the end of the applicable Interest Period (or sooner if the Administrative Agent cannot continue to lawfully maintain such affected Eurodollar Loans at the Eurodollar Rate) until such time a Benchmark Replacement is implemented in accordance with clause (c) below. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

(c)    Effect of Benchmark Transition Event.

(i)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Credit Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders; provided, that, such amendment with respect to an Early Opt-in Election will become effective on an earlier date to the extent that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 2.14(c)(i) will occur prior to the applicable Benchmark Transition Start Date.

(ii)    Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent, in consultation with the Borrower, will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iii)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark

Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 2.14(c)(iii) including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.14(c)(iii).

(iv)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of Base Rate based upon LIBOR will not be used in any determination of Base Rate.

EAST\177251518.5

SECTION 3.   [Reserved].

SECTION 4.   Fees; Reductions of Commitment.

4.01.   Administrative Agency Fees. The Borrower agrees to pay to the Administrative Agent, for its own account, an annual administrative agency fee in an amount equal to $[_____] per year or such other amount agreed to in writing from time to time after the Closing Date by Holdings or any of its Subsidiaries and the Administrative Agent and/or the Collateral Agent (with the approval of the Required Lenders).  Such administrative agency fee shall be become due and payable in advance on the Closing Date and each anniversary thereof.  Notwithstanding anything to the contrary in this Agreement, the other Credit Documents or the Pre-Petition Credit Documents, this Section 4.01 and the administrative agency fee set forth herein supersedes and replaces the "Fee Letter" (as defined in the Pre-Petition Credit Agreement) and any other fee letter among Holdings or any of its Subsidiaries and Loan Admin, in its capacity as administrative agent, collateral agent or otherwise that are in effect immediately prior to the Closing Date.

4.02.   Mandatory Reduction of Commitments.   In addition to any other mandatory commitment reductions pursuant to this Agreement, the Total Commitment (and the Commitment of each Lender) shall terminate in its entirety on the Closing Date (after giving effect to the deemed issuance of the Loans on such date).

SECTION 5.   Prepayment Premiums.

5.01.   Prepayment Premium.  Upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Section 6.01, Section 6.02(c) through Section 6.02(h) or Section 6.02(j)(ii) (in each case, whether or not a Default exists) or as a result of and immediately upon an acceleration of the Loans pursuant to Section 12 (or upon the occurrence of any prepayment or repayment of all or a portion of the principal of the Loans pursuant to Section 6.02, but solely to the extent that the action giving rise to such prepayment or repayment constitutes a Default hereunder, it being understood and agreed that the Prepayment Premium shall be payable in connection with any prepayment under Section 6.02(c) or Section 11.10), then, in addition to the payment of the principal amount of the Loans, accrued and unpaid interest, and Fees, the Borrower shall pay the following prepayment or repayment premium (each a "**Prepayment Premium**") to the Lenders:

(a)      if any such prepayment or repayment occurs after the Closing Date but on or prior to the first anniversary of the Closing Date, the Borrower shall pay the Lenders a prepayment premium equal to 12.00% of the principal amount of the Loans prepaid or repaid at such time;

(b)      if any such prepayment or repayment occurs after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, the Borrower shall pay the Lenders a prepayment premium equal to 8.00% of the principal amount of the Loans prepaid or repaid at such time;

(c)      if any such prepayment or repayment occurs after the second anniversary of the Closing Date but on or prior to the third anniversary of the Closing Date, the Borrower shall pay

53

the Lenders a prepayment premium equal to 4.00% of the principal amount of the Loans prepaid or repaid at such time; and

(d)  if any such prepayment or repayment occurs after the third anniversary of the Closing Date, the Borrower shall not be obligated to pay any prepayment premium.

5.02.  Acceleration of Loans.  The Borrower agrees that the prepayment premiums required under Section 5.01 are a reasonable calculation of the Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from a prepayment of the Loan.  All prepayment premiums under Section 5.01 shall be in addition to all other amounts which may be due to the Lenders from time to time pursuant to the terms of this Agreement and the other Credit Documents.  All of the Loans shall be subject to the prepayment premiums set forth in  Section 5.01 and the payment of one prepayment premium on a portion of the Loans shall not excuse or reduce the payment of a premium on any subsequent prepayment or repayment of the Loans. For all purposes of this Section 5, upon any acceleration of any Loans, the Prepayment Premium shall be due and payable upon such date of acceleration as if such Loans were repaid on such date, regardless of whether the Loans are actually repaid on such date.

5.03.  Waiver.  THE CREDIT PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY ACCELERATION, IN EACH CASE, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED UNDER APPLICABLE LAW.  The Credit Parties expressly agree that (i) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between Lenders and the Credit Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium, (iv) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 5.03, (v) their agreement to pay the Prepayment Premium is a material inducement to the Lenders to make the Loans, and (vi) the Prepayment Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such event.

SECTION 6.  Prepayments; Payments; Taxes.

6.01.  Voluntary Prepayments.

The Borrower shall have the right to prepay the Loans, subject to Section 2.11 and, if applicable, the Prepayment Premium, in whole or in part at any time and from time to time on the following terms and conditions: (i) the Borrower shall give the Administrative Agent prior to 2:00 P.M. (New York City time) at the Notice Office (x) at least seven Business Days' prior written notice of its intent to prepay Base Rate Loans and (y) at least seven Business Days' prior written notice of its intent to prepay Eurodollar Loans, which notice (in each case) may be conditioned on the occurrence of a specified transaction and revoked if such transaction does not

occur and shall specify the amount of such prepayment and the Types of Loans to be prepaid and, in the case of Eurodollar Loans, the specific Borrowing or Borrowings pursuant to which such Eurodollar Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders; (ii) each partial prepayment of Loans pursuant to this Section 6.01 shall be in an aggregate principal amount of at least $10,000,000 or such lesser amount approved by the Administrative Agent; (iii) each voluntary prepayment of Loans pursuant to this Section 6.01 shall be applied to the Loans on a pro rata basis (with the Applicable Percentage of the aggregate amount of such prepayment to be applied as a prepayment of the Loans); and (iv) each prepayment of Loans pursuant to this Section 6.01 shall reduce the then remaining Scheduled Repayments thereof on a pro rata basis (based upon the then remaining principal amount of each such Scheduled Repayment after giving effect to all prior reductions thereto).

6.02.   Mandatory Repayments.

(a)      [Reserved].

(b)      In addition to any other mandatory repayments pursuant to this Section 6.02, on each Quarterly Payment Date commencing on the Quarterly Payment Date for the quarter ending March 31, 2021, the Borrower shall be required to repay an amount equal to 0.625% of the aggregate original principal amount of all outstanding Loans (each such repayment, as the same may be reduced as provided in Section 6.01 or 6.02(h), a "**Scheduled Repayment**").  For the avoidance of doubt, Scheduled Repayments shall not be subject to any Prepayment Premium.

(c)      In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from the issuance of any Permitted Cure Securities or any other cash Cure Amount, an amount equal to 100% of the Net Cash Proceeds of the issuance of Permitted Cure Securities or such cash Cure Amount shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(h).

(d)      In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any issuance or incurrence by Holdings or any of its Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 11.04), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of Section 6.02(i).

(e)      In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Asset Sale, an amount equal to 100% of the Net Sale Proceeds therefrom shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(i); provided, however, that such Net Sale Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and such Net Sale Proceeds shall be used to purchase assets (other

than inventory and working capital) used or to be used in the businesses permitted pursuant to Section 11.15 within 360 days following the date of such Asset Sale or the purchase of such assets shall have been committed to pursuant to a definitive agreement within such 360-day period (provided that such purchase is then consummated within 90 days thereafter), and provided further, that if all or any portion of such Net Sale Proceeds not required to be so applied as provided above in this Section 6.02(e) are not so reinvested within such applicable period (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Sale Proceeds from such Asset Sale, such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(e) without regard to the preceding proviso.

(f)     In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each Excess Cash Payment Date, an amount equal to the Excess Cash Percentage of the Excess Cash Flow for the related Excess Cash Payment Period.

(g)     In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives any cash proceeds from any Recovery Event (other than Recovery Events where the Net Cash Proceeds therefrom do not exceed $1,000,000), an amount equal to 100% of the Net Cash Proceeds from such Recovery Event shall be applied on such date as a mandatory repayment in accordance with the requirements of Section 6.02(i); provided, however, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and Holdings has delivered a certificate to the Administrative Agent on such date stating that such Net Cash Proceeds shall be used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of the receipt of such Net Cash Proceeds or the replacement or restoration of such assets shall have been committed to pursuant to a definitive agreement within such 360-day period (provided that such replacement or restoration is then consummated within 90 days thereafter) (which certificate shall set forth the estimates of the Net Cash Proceeds to be so expended), and provided further, that if all or any portion of such Net Cash Proceeds not required to be so applied pursuant to the preceding proviso are not so used within 360 days after the date of the receipt of such Net Cash Proceeds (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds relating to such Recovery Event as set forth above), such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(g) without regard to the immediately preceding proviso.

(h)     In addition to any other mandatory repayments pursuant to this Section 6.02, subject to the Prepayment Premium, on each date on or after the Closing Date upon which Holdings or any of its Subsidiaries receives Extraordinary Receipts, an amount equal to 100% of the Net Cash Proceeds of such Extraordinary Receipts shall be applied on such date as a mandatory repayment in accordance with the requirements of Sections 6.02(i); provided, however, that such Net Cash Proceeds shall not be required to be so applied on such date so long as no Default or Event of Default then exists and such Net Cash Proceeds shall be used to purchase assets (other than inventory and working capital) used or to be used in the businesses permitted pursuant to Section 11.15 within 360 days following the date of receipt of such Extraordinary Receipts or the purchase of such assets shall have been committed to pursuant to a

EAST\177251518.5

definitive agreement within such 360-day period (provided that such purchase is then consummated within 90 days thereafter), and provided further, that if all or any portion of such Net Cash Proceeds not required to be so applied as provided above in this Section 6.02(h) are not so reinvested within such applicable period (or such earlier date, if any, as Holdings or the relevant Subsidiary determines not to reinvest the Net Cash Proceeds from such Extraordinary Receipts, such remaining portion shall be applied on the last day of such period (or such earlier date, as the case may be) as provided above in this Section 6.02(h) without regard to the preceding proviso.  Notwithstanding anything to the contrary in this Agreement, any amount of Net Cash Proceeds used to purchase assets as provided herein shall be in addition to, and not considered or deemed to be a part of, any Capital Expenditures described in and limited by Sections 11.07 and 11.11.

(i)     Each amount required to be repaid pursuant to Sections 6.02(b), (c), (d), (e), (f), (g) and (h) and applied in accordance with this Section 6.02(i) shall be applied to reduce the then remaining Scheduled Repayments of the Loans on a pro rata basis (based upon the then remaining principal amounts of the Scheduled Repayments of such Loans after giving effect to all prior reductions thereto).

(j)     In addition to any other mandatory repayments pursuant to this Section 6.02, (i) all then outstanding Loans shall be repaid in full on the Maturity Date, and (ii) unless the Required Lenders otherwise agree in writing, subject to the Prepayment Premium, all then outstanding Loans shall be repaid in full on the date on which a Change of Control occurs.

(k)     Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "**Waivable Payment**") of the Loans in accordance with clauses (c) through (h) above, not later than 2:00 p.m., New York City time, three (3) Business Days prior to the date (the "**Required Prepayment Date**") on which the Borrower elects (or is otherwise required) to make such Waivable Payment, the Borrower shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's pro rata share of such Waivable Payment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to the Administrative Agent of its election to do so not later than 2:00 p.m., New York City time, the second Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option); provided, however, that (A) in the event that the Required Lenders elect to refuse a Waivable Payment, the Waivable Payment shall be deemed to have been refused by all Lenders and (B) in the event that the Required Lenders do not elect to refuse a Waivable Payment, the Waivable Payment shall be deemed to have been accepted by all Lenders.  On the Required Prepayment Date, if the Waivable Payment has not been declined pursuant to the proviso in the immediately preceding sentence, the Borrower shall pay to the Administrative Agent the amount of the Waivable Payment, which amount shall be applied by the Administrative Agent to prepay the Loans of all Lenders (which prepayment shall be applied to the scheduled installments of principal of the Loans in accordance with Section 6.02(i)).  Any Waivable Payment declined pursuant to this clause may be retained by the Borrower and used for any purpose not prohibited by this Agreement.

(l)     With respect to each repayment of Loans required by this <u>Section 6.02</u>, the Borrower may designate the Types of Loans which are to be repaid, <u>provided</u> that:   (i) repayments of Eurodollar Loans pursuant to this <u>Section 6.02</u> may only be made on the last day of an Interest Period applicable thereto unless all Eurodollar Loans have been paid in full; and (ii) each repayment of any Loans made pursuant to a Borrowing shall be applied <u>pro rata</u> among such Loans.  In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion.

6.03.   <u>Method and Place of Payment</u>.

Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 P.M. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office.  Any payments received by the Administrative Agent after such time shall be deemed to have been received on the next Business Day and any applicable interest or fee shall continue to accrue.  Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

6.04.   <u>Net Payments</u>.

(a)     All payments made by any Credit Party hereunder and under any Credit Document will be made without setoff, counterclaim or other defense. Except as provided in <u>Section 6.04(b)</u>, all such payments will be made free and clear of, and without deduction or withholding for, any Taxes now or hereafter imposed by any Taxing Authority with respect to such payments (other than (i) any Tax imposed on or measured by the net income (however denominated), franchise Taxes and branch profits Taxes imposed on a Recipient pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such Recipient is located or any subdivision thereof or therein or as the result of any present or former connection with such jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement or any other Credit Document, or sold or assigned an interest in any Loan or Credit Document), (ii) U.S. federal income withholding Taxes imposed on amounts payable to or for the account of a Recipient pursuant to a law in effect on the date on which such Recipient becomes a party hereto (other than pursuant to an assignment request by the Borrower under <u>Section 2.13</u>) or such Recipient changes its lending office, except that this clause (ii) shall not apply to the extent that, pursuant to this <u>Section 6.4(a)</u>, amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or to such Recipient immediately before it changed its lending office, (iii) Taxes attributable to such recipient's failure to comply with <u>Section 6.04(b)</u> and (iv) any withholding Taxes imposed under FATCA (all such Taxes referred to collectively as "**Excluded Taxes**")) and all interest, penalties, Other Taxes, or similar liabilities with respect to such non-Excluded Taxes, levies,

imposts, duties, fees, assessments or other charges (all such non-Excluded Taxes, levies, Other Taxes, imposts, duties, fees, assessments or other charges being referred to collectively as "**Indemnified Taxes**"). If any Indemnified Taxes are so levied or imposed, the relevant Credit Party shall pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that the payment of such amounts due under this Agreement or under any Credit Document, after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein or in such Credit Document had no such withholding or deduction been made. If any amounts are payable or paid or required to be withheld in respect of Indemnified Taxes pursuant to the preceding sentence, the relevant Credit Party will furnish to the Administrative Agent as soon as reasonably practicable after the date the payment of any Indemnified Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Credit Party. Each of the Credit Parties agrees to indemnify and hold harmless each Recipient, and reimburse such Recipient upon its written request, for the amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to additional amounts payable under this <u>Section 6.04</u>) so levied or imposed and paid by (or withheld upon payment made to) such Recipient.

(b)     Each Recipient that is a United States Person (as such term is defined in Section 7701(a)(30) of the Code), shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Recipient becomes a Recipient under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), a copy of an executed Internal Revenue Service Form W-9 certifying that such Recipient is exempt from U.S. federal backup withholding tax. Each Recipient that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes agrees, to the extent it is legally entitled to do so, to deliver to the Borrower and the Administrative Agent on or prior to the Closing Date or, in the case of a Recipient that is an assignee or transferee of an interest under this Agreement pursuant to <u>Section 2.13</u> or <u>14.04(b)</u> (unless the respective Recipient was already a Recipient hereunder immediately prior to such assignment or transfer), on the date of such assignment or transfer to such Recipient, (i) two accurate and complete signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to a complete exemption or a reduced rate under an income tax treaty) (or successor forms) certifying to such Recipient's entitlement as of such date to a complete exemption from (or a reduced rate of) United States withholding tax with respect to payments to be made under this Agreement and under any Credit Document, or (ii) if the Recipient is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code and cannot deliver either Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to a complete exemption under an income tax treaty) (or any successor forms) pursuant to clause (i) above, (x) a certificate substantially in the form of <u>Exhibit C</u> (any such certificate, a "**Section 6.04(b)(ii) Certificate**") and (y) two accurate and complete signed copies of Internal Revenue Service Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest exemption) (or successor form) certifying to such Recipient's entitlement as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement and under any Credit Document. If a payment made to a Recipient under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower and the Administrative Agent at the time or times

prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of the previous sentence, "FATCA" shall include any amendments made to FATCA after the date of this Agreement. In addition, each Recipient agrees that from time to time after the Closing Date, when a lapse in time or change in circumstances renders the previous certification obsolete or inaccurate in any material respect, such Recipient will deliver to the Borrower and the Administrative Agent two new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN-E or Form W-8BEN (with respect to the benefits of any income tax treaty), or Form W-8BEN-E or Form W-8BEN (with respect to the portfolio interest exemption) and a Section 6.04(b)(ii) Certificate, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Recipient to a continued exemption from or reduction in United States withholding tax with respect to payments under this Agreement and any Credit Document, or such Recipient shall immediately notify the Borrower and the Administrative Agent of its inability to deliver any such Form or Certificate, in which case such Recipient shall not be required to deliver any such Form or Certificate pursuant to this Section 6.04(b). Notwithstanding anything to the contrary contained in Section 6.04(a), but subject to Section 14.04(b) and the immediately succeeding sentence, (x) the Borrower shall be entitled, to the extent they are required to do so by law, to deduct or withhold income or similar Taxes imposed by the United States (or any political subdivision or Taxing Authority thereof or therein) from any amounts payable hereunder for the account of any Recipient for U.S. federal income tax purposes to the extent that such Recipient has not provided to the Borrower such Internal Revenue Service Forms and other documentation required to be provided to the Borrower pursuant to this Section 6.04(b) that establish a complete exemption from such deduction or withholding and (y) the Borrower shall not be obligated pursuant to Section 6.04(a) to gross-up payments to be made to a Recipient, or reimburse amounts paid or payable by a Recipient, in respect of such Taxes imposed by the United States if such Recipient is able to but has not provided to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to this Section 6.04(b). Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this Section 6.04 and except as set forth in Section 14.04(b), the Credit Parties agree to pay any amounts and to indemnify each Recipient in the manner set forth in Section 6.04(a) (without regard to the identity of the jurisdiction requiring the deduction or withholding) in respect of any additional amounts deducted or withheld by it as described in the immediately preceding sentence as a result of any changes that are effective after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof, relating to the deducting or withholding of such Taxes.

(c)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already reimbursed the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.04(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to

such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable out of pocket expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to (at its option) set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (c). Failure or delay on the part of the Administrative Agent to demand compensation pursuant to this Section 6.04(c) shall not constitute a waiver of the Administrative Agent's right to demand such compensation.

(d)     Payment of Other Taxes by the Borrower.  The Borrower shall timely pay to the relevant Taxing Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(e)     Each party's obligations under this Section 6.04 shall survive the resignation or replacement of the Borrower or Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

(f)     If any Lender or the Administrative Agent, as applicable, determines, in its sole discretion, that it has received a refund of an Indemnified Tax for which a payment has been made by the Borrower pursuant to this Agreement or any other Credit Document, which refund in the good faith judgment of such Lender or the Administrative Agent, as the case may be, is attributable to such payment made by the Borrower, then the Lender or the Administrative Agent, as the case may be, shall reimburse the Borrower for such amount (net of all reasonable out-of-pocket expenses (including Taxes) of such Lender or the Administrative Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender or Administrative Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no worse position (taking into account expenses or any Taxes imposed on the refund) than it would have been in if the Indemnified Tax giving rise to such refund had not been imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid in the first instance; provided, that the Borrower, upon the request of the Lender or the Administrative Agent, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender or the Administrative Agent in the event the Lender or the Administrative Agent is required to repay such refund to such Governmental Authority.  No Lender nor the Administrative Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower in connection with this clause (f) or any other provision of this Section 6.04.

SECTION 7.   Conditions Precedent.

The effectiveness of this Agreement, including the deemed restructuring and rearrangement of a portion of the Pre-Petition Loans pursuant to the terms of this Agreement

with Loans deemed funded by the Lenders on the Closing Date, is subject to the satisfaction of the following conditions:

7.01.   <u>Amended and Restated Credit Agreement; Notes</u>.

On or prior to the Closing Date, (i) each Holding Company and the Borrower shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent, and (ii) there shall have been delivered to the Administrative Agent for the account of each of the Lenders that has requested same a Note (or amendment and restatement thereof) executed by the Borrower, in each case in the amount, maturity and as otherwise provided herein.

7.02.   <u>Officer's Certificate</u>.

On the Closing Date, the Administrative Agent shall have received a certificate in the form of <u>Exhibit D</u>, dated the Closing Date and signed on behalf of Holdings and the Borrower by the Chairman of the Board, the Chief Executive Officer, an Authorized Officer, the President or any Vice President of each such Credit Party, certifying on behalf of such Credit Party that (i) there exists no Default or Event of Default, (ii) all representations and warranties contained herein and in the other Credit Documents are true and correct and (iii) all of the conditions in this <u>Section 7</u> have been satisfied.

7.03.   <u>Company Documents; Proceedings; etc</u>.

(a)   On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by an Authorized Officer of such Credit Party, and attested to by the Secretary or any Assistant Secretary of such Credit Party, together with good standing certificates, copies of the certificate or articles of incorporation or formation and by-laws operating agreement or limited liability company agreement (or other equivalent organizational documents), as applicable, of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(b)   On the Closing Date, all Company and legal proceedings and all instruments and agreements executed and delivered in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Administrative Agent, and the Administrative Agent shall have received all information and copies of all documents and papers, including records of Company proceedings, governmental approvals, good standing certificates and bring-down searches or certificates, if any, which the Administrative Agent reasonably may have requested in connection therewith, such documents and copies where appropriate to be certified by proper Company or Governmental Authorities.

7.04.   <u>Adverse Change, Approvals</u>.

(a)   Since the Petition Date and excluding the pendency of the Chapter 11 Cases, nothing shall have occurred which has had, or could reasonably be expected to have, (i) a Material Adverse Effect or (ii) a material adverse effect on the Transaction.

(b)     On or prior to the Closing Date, all necessary governmental and material third party authorizations, approvals and/or consents in connection with the Transaction the other transactions contemplated hereby and the granting of Liens under the Credit Documents (including the authorizations, approvals and consents set forth on Schedule XII) shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein. On the Closing Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the Transaction or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

7.05.   Litigation.

On the Closing Date, other than the Chapter 11 Cases, there shall be no actions, suits or proceedings pending or threatened (i) with respect to the Transaction, this Agreement or any other Credit Document, or (ii) which has had, or could reasonably be expected to have, a Material Adverse Effect.

7.06.   Subsidiaries Guaranty.   On the Closing Date, each Subsidiary of Holdings (other than the Borrower and each Holding Company) shall have duly authorized, executed and delivered the Subsidiaries Guaranty in the form of Exhibit E (as amended, modified and/or supplemented from time to time, the "**Subsidiaries Guaranty**"), and the Subsidiaries Guaranty shall be in full force and effect.

7.07.   Pledge Agreement.   On the Closing Date, (i) each Credit Party (A) shall have duly authorized, executed and delivered the amended and restated pledge agreement in the form of Exhibit F (as amended, modified, restated and/or supplemented from time to time, the "**Pledge Agreement**") and (B) shall have delivered to the Collateral Agent, as Pledgee thereunder, all of the Pledge Agreement Collateral, if any, referred to therein and then owned by such Credit Party, (x) endorsed in blank, or together with executed and undated endorsements for transfer, in the case of promissory notes constituting Pledge Agreement Collateral and (y) together with executed and undated endorsements for transfer in the case of Equity Interests constituting certificated Pledge Agreement Collateral, along with evidence that all other actions reasonably necessary to perfect the security interests purported to be created by the Pledge Agreement have been taken, and the Pledge Agreement shall be in full force and effect.

7.08.   Mortgage.

On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Mortgages in a form suitable for recording and perfecting Liens on (a) the Specified Real Property and (b) not less than 90% of (i) the PV-10 Value of Proved Reserves of the Oil and Gas Properties evaluated in the Initial Reserve Report, (ii) the PV-10 Value of PDP Reserves of the Oil and Gas Properties evaluated in the Initial Reserve Report and (iii) the Fair Market Value of the Midstream Assets (including any Specified Real Property, as applicable), including all related Rights of Way owned or leased by a Credit Party, all fee owned and leased

processing facilities, all fee owned and leases compressor facilities, all fee owned field offices, and all land on which any of the foregoing is situated (subject to any exclusions expressly set forth in the Mortgages).

7.09.   Security Documents.

On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the amended and restated security agreement in the form of Exhibit G (as amended, modified, restated and/or supplemented from time to time, the "**Security Agreement**") covering all of such Credit Party's Security Agreement Collateral, together with:

(a)      proper financing statements (Form UCC-1 or Form UCC-3, as applicable, or the equivalent) for filing under the UCC in the jurisdiction of organization or formation of each Credit Party as may be necessary to perfect or continue to perfect the security interests purported to be created by the Security Agreement;

(b)      evidence of the completion of all other recordings and filings of, or with respect to, the Security Agreement as may be necessary to perfect or continue to perfect the security interests intended to be created by the Security Agreement; and

(c)      evidence that all other actions necessary to perfect or continue to perfect the security interests purported to be created by the Security Agreement have been taken, and the Security Agreement shall be in full force and effect.

7.10.   Initial Reserve Report; Title.

The Administrative Agent shall (i) have received the Initial Reserve Report and (ii) have received title opinions and other title materials, in each case, satisfactory to the Administrative Agent, with respect to the Oil and Gas Properties of the Credit Parties covering not less than 85% of each of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated in the Initial Reserve Report.

7.11.   Organization Chart.

Holdings shall have provided an accurate and complete organization chart reflecting all of the direct and indirect subsidiaries of Holdings (including the applicable ownership percentages of each entity) as of the Closing Date, and the Administrative Agent and the Required Lenders, in their sole discretion, shall have been satisfied with the direct and indirect equity ownership of the Credit Parties.

7.12.   Financial Statements; Pro Forma Balance Sheet; Projections.

On or prior to the Closing Date, the Administrative Agent shall have received true and correct copies of the pro forma balance sheet and the Projections referred to in Sections 9.05(a) and 9.05(d), which pro forma balance sheet and Projections shall (a) be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and (b) evidence (i) a pro forma Total Leverage Ratio as of the Closing Date of not greater than 2.50:1.00 and

(ii) Unrestricted cash and Cash Equivalents as of the Closing Date on a Pro Forma Basis of not less than an amount equal to $[_____].

7.13.  Solvency Certificate; Insurance Certificates, etc.

On the Closing Date, the Administrative Agent shall have received:

(a)      a solvency certificate from an Authorized Officer of Holdings in the form of Exhibit H hereto; and

(b)      certificates of insurance and a lender's loss payable endorsement and such other endorsements as the Collateral Agent shall reasonably require, in each case complying with the requirements of Section 10.03 for the business and properties of Holdings and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent and naming the Collateral Agent as an additional insured and/or as loss payee, and stating that such insurance shall not be canceled without providing at least 30 days' (or 10 days' for cancelation due to nonpayment of premium) prior written notice by the insurer to the Collateral Agent.

7.14.  Fees, etc.

On the Closing Date, the Borrower shall have paid to the Administrative Agent, the Collateral Agent and each Lender (and each of their relevant affiliates) all documented or invoiced costs, fees and expenses (including, without limitation, legal fees and expenses reimbursable hereunder) and other compensation contemplated hereby payable to the Administrative Agent, Collateral Agent or such Lender.

7.15.  AML, KYC.

Administrative Agent, Collateral Agent each shall have received, not less than three Business Days prior to the Closing Date, all requested information in connection with OFAC, know your customer and anti-money laundering reviews of each Credit Party, to the extent such information was reasonably requested not less than five Business Days prior to the Closing Date.

7.16.  Lien Searches.

On or prior to the Closing Date, the Administrative Agent shall have received customary lien searches conducted in the jurisdictions in which the Credit Parties are organized or conduct business and customary intellectual property searches, in each case, satisfactory to the Administrative Agent (dated as of a date satisfactory to the Administrative Agent), reflecting the absence of Liens on the assets of the Credit Parties other than those being assigned or released on or prior to the Closing Date or Permitted Liens.

7.17.   <u>No Default; Representations and Warranties</u>. At the time of the Closing Date and immediately after giving effect to this Agreement (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct on such date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

7.18.   <u>Outstanding Indebtedness</u>. After giving effect to the Transactions and the consummation of the Prepackaged Plan, the Credit Parties shall have no Indebtedness of the types described in clauses (i), (ii), (iii) and (iv) of the definition thereof, except Indebtedness permitted pursuant to <u>Section 11.04(a)</u>.

7.19.   <u>Beneficial Ownership Regulation</u>.  To the extent requested by any Lender or the Administrative Agent from the Borrower directly at least five (5) Business Days prior to the Closing Date, the Borrower, to the extent qualifying as a "legal entity customer" under the Beneficial Ownership Regulation, shall deliver to each such Lender or Administrative Agent a Beneficial Ownership Certification prior to the Closing Date (*provided* that, upon the execution and delivery of such Lender of its signature page to this Agreement, the condition set forth in this <u>Section 7.19</u>  shall be deemed satisfied).

7.20.   <u>Bankruptcy Items.</u>

(a)     The Bankruptcy Court shall have entered the Confirmation Order confirming the Prepackaged Plan and approving the corresponding disclosure statement, in each case, in form and substance acceptable to the Required Lenders, and which Confirmation Order shall be in full force and effect and shall not (i) have been stayed, reversed, vacated, amended, supplemented or otherwise modified in a manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders or (ii) be the subject of any appeal, unless in each case, waived in writing by the Administrative Agent and the Required Lenders.

(b)     The effective date under the Prepackaged Plan (which Prepackaged Plan shall be satisfactory to the Required Lenders) shall have occurred or shall have occurred concurrently with the effectiveness of this Agreement (and all conditions precedent thereto as set forth therein shall have been satisfied or waived in accordance with the terms thereof).

In determining the satisfaction of the conditions specified in this <u>Section 7</u>, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which could reasonably be expected to have a Material Adverse Effect or a material adverse effect of the type described in <u>Section 7.04</u>, each Lender which has not notified the Administrative Agent in writing prior to the Closing Date of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the Closing Date.  Upon the Administrative Agent's good faith determination that the conditions specified in this <u>Section 7</u> have been met (after giving effect to the preceding sentence), then the Closing Date and the Credit Event on the Closing Date shall have been deemed to have occurred, regardless of any

subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the Credit Event shall not release any Holding Company or the Borrower from any liability for failure to satisfy one or more of the applicable conditions contained in this Section 7).

The acceptance of the benefits of the Credit Event on the Closing Date shall constitute a representation and warranty by such Credit Party to the Administrative Agent and each of the Lenders that all the conditions specified in this Section 7 are satisfied in full as of such date.  All of the Notes, certificates and other documents and papers referred to in this Section 7, unless otherwise specified, shall be delivered to the Administrative Agent at the Notice Office for the account of each of the Lenders and, except for the Notes, in sufficient counterparts or copies for each of the Lenders and shall be in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 8.    [Reserved].

SECTION 9.    Representations, Warranties and Agreements.

In order to induce the Lenders to enter into this Agreement and to make the Loans, each Credit Party makes the following representations, warranties and agreements, in each case after giving effect to the Transactions and the effectiveness of the Prepackaged Plan, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Loans with the occurrence of the Credit Event on the Closing Date being deemed to constitute a representation and warranty that the matters specified in this Section 9 are true and correct in all respects on and as of the Closing Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

9.01.    Company Status.

Each Credit Party and each of its respective Subsidiaries (i) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified or authorized which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No certifications by any Governmental Authority are required for operation of the business of Holdings and its Subsidiaries that are not in place, except for such certifications or agreements, the absence of which would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.02.    Power and Authority.

Each Credit Party and each of its respective Subsidiaries has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and has taken all necessary Company action to authorize the

execution, delivery and performance by it of each of such Credit Documents.  Each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

9.03.   No Violation.

Neither the execution, delivery or performance by any Credit Party or any Subsidiary of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) will contravene any provision of any Law or any order, writ, injunction or decree of any court or Governmental Authority, (ii) will, in any respect, conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its Subsidiaries pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party or any of its Subsidiaries is a party or by which it or any of its property or assets is bound or to which it may be subject (including, without limitation, any Subordinated Debt), or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of any Credit Party or any of its Subsidiaries.

9.04.   Approvals.

No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (x) as set forth on Schedule XII, (y) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date or which, if not so obtained would not reasonably be expected to have a Material Adverse Effect, and (z) filings which are necessary to perfect the security interests created or intended to be created under the Security Documents), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party or any Subsidiary in connection with, (i) the execution, delivery and performance of any Credit Document or (ii) the legality, validity, binding effect or enforceability of any such Credit Document.

9.05.   Financial Condition; Projections.

(a)   The pro forma consolidated balance sheet of Holdings and its Subsidiaries prepared as of the Closing Date (after giving effect to the Transactions and consummation of the Prepackaged Plan), a copy of which has been furnished to the Lenders on [_____], 2020, presents a good faith estimate of the pro forma consolidated financial position of Holdings and its Subsidiaries as of such date.

68

EAST\177251518.5

(b)      The Projections delivered to the Administrative Agent and the Lenders prior to the Closing Date have been prepared in good faith and are based on assumptions believed by the Holding Companies and the Borrower to be reasonable when made, and there are no statements or conclusions in the Projections which are based upon or include information known to the Holding Companies or the Borrower to be misleading in any material respect or which fail to take into account material information known to the Holding Companies or the Borrower regarding the matters reported therein.  On the Closing Date, the Holding Companies and the Borrower believe that the Projections are reasonable and attainable, it being recognized by the Lenders, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Projections may differ from the projected results included in such Projections, and such differences may be material.

(c)      After giving effect to the Transactions, since the Disclosure Statement Approval Date, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

9.06.   Litigation.

There are no actions, suits or proceedings pending or, to the knowledge of any Holding Company or the Borrower, threatened (i) with respect to the Transaction or any Credit Document or (ii) that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

9.07.   True and Complete Disclosure.

All factual information furnished by or on behalf of any Holding Company or the Borrower, to the Administrative Agent or any Lender (including, without limitation, all factual information contained in the Credit Documents) for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information hereafter furnished in writing by or on behalf of any Holding Company or the Borrower to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 9.07, such factual information shall not include the Projections or any pro forma financial information. As of the Closing Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

9.08.   Use of Proceeds; Margin Regulations.

(a)      All proceeds of the Loans will be used (or be deemed to be used) by the Borrower (i) to restructure and rearrange a portion of the Pre-Petition Loans with Loans hereunder in accordance with the Prepackaged Plan and Section 2.01 and (ii) for the working capital and general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement.

(b)     No part of any Loan (or the proceeds thereof) has been or will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the Credit Event nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

9.09.   Tax Returns and Payments.

Each of Holdings and each of its Subsidiaries has timely filed or caused to be timely filed with the appropriate Taxing Authority all returns, statements, forms and reports for taxes (the "**Returns**") required to be filed by, or with respect to the income, properties or operations of, Holdings and/or any of its Subsidiaries, and such Returns accurately reflect in all respects all liability for Taxes of Holdings and its Subsidiaries, as applicable, for the periods covered thereby. Each of Holdings and each of its Subsidiaries has paid all Taxes and assessments payable by it which have become due, other than those that are being contested in good faith and for which adequate reserves have been provided for in accordance with GAAP. There is no action, suit, proceeding, investigation, audit or claim now pending or, to the best knowledge of Holdings or any of its Subsidiaries, threatened by any authority regarding any taxes relating to Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, none of Holdings or any of its Subsidiaries has entered into an agreement or waiver or been requested in writing to enter into an agreement or waiver extending any statute of limitations relating to the payment or collection of taxes of Holdings or any of its Subsidiaries, or is aware of any circumstances that would cause the taxable years or other taxable periods of Holdings or any of its Subsidiaries not to be subject to the normally applicable statute of limitations. Neither Holdings nor any of its Subsidiaries has incurred, nor will any of them incur, any tax liability in connection with the Transaction or any other transactions contemplated hereby other than any mortgage or stamp taxes required to file or record any Security Document (it being understood that the representation contained in this sentence does not cover any future tax liabilities of Holdings or any of its Subsidiaries arising as a result of the operation of their businesses in the ordinary course of business).

9.10.   Compliance with ERISA.

Schedule IV sets forth each Plan as of the Closing Date; each Plan (and each related trust, insurance contract or fund) is in substantial compliance with its terms and with all applicable laws, including without limitation ERISA and the Code; each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code or has adopted a prototype or volume submitter plan document and is entitled to reliance on the sponsor's opinion letter from the Internal Revenue Service; no Reportable Event has occurred; no Multiemployer Plan is insolvent; no Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds $1,000,000; no Plan which is subject to Section 412 of the Code or Section 302 of ERISA has failed to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code; all contributions required to be made with respect to a Plan have been timely made; none of

Holdings or any Subsidiary of Holdings or any ERISA Affiliate has incurred any material liability (including any indirect, contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code or expects to incur any such liability under any of the foregoing sections with respect to any Plan; no proceedings have been instituted to terminate or appoint a trustee to administer any Plan; no action, suit, proceeding, hearing, audit or investigation with respect to the administration, operation or the investment of assets of any Plan (other than routine claims for benefits) is pending or expected or has been threatened in writing; using actuarial assumptions and computation methods consistent with Part 1 of subtitle E of Title IV of ERISA, the aggregate liabilities of Holdings and its Subsidiaries and its ERISA Affiliates to all Plans which are Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Plan ended prior to the Closing Date, would not exceed $1,000,000; no lien imposed under the Code or ERISA on the assets of Holdings or any Subsidiary of Holdings or any ERISA Affiliate exists or is likely to arise on account of any Plan.

9.11.   Security Documents.

(a)     The provisions of the Security Agreement are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a first-lien legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral described therein, and the Collateral Agent, for the benefit of the Secured Creditors, has a fully perfected first-lien security interest in all right, title and interest in all of the Security Agreement Collateral described therein (subject to the terms of the Security Agreement), subject to no other Liens other than Permitted Liens.  The recordation of (x) the Grant of Security Interest in U.S. Patents and (y) the Grant of Security Interest in U.S. Trademarks in the respective form attached to the Security Agreement, in each case in the United States Patent and Trademark Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States trademarks and patents covered by the Security Agreement, and the recordation of the Grant of Security Interest in U.S. Copyrights in the form attached to the Security Agreement with the United States Copyright Office, together with filings on Form UCC-1 made pursuant to the Security Agreement, will create, as may be perfected by such filings and recordation, a perfected security interest in the United States copyrights covered by the Security Agreement.

(b)     The security interests created under the Pledge Agreement in favor of the Collateral Agent, as Pledgee, for the benefit of the Secured Creditors, constitute perfected security interests in the Pledge Agreement Collateral described in the Pledge Agreement, subject to no security interests of any other Person.  Except for filings on Form UCC-1 made pursuant to the Pledge Agreement, no filings or recordings are required in order to perfect (or maintain the perfection or priority of) the security interests created in the Pledge Agreement Collateral under the Pledge Agreement.

(c)     Each Mortgage creates, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in and mortgage lien on the respective Mortgaged Property in favor of the Collateral Agent (or such other trustee as may be required or

71

desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons and subject to no other Liens (other than Permitted Liens).

9.12.   Properties; Title.

(a)     All material Oil and Gas Properties, Real Property and Midstream Assets owned or leased by Holdings or any of its Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule III.   Each of Holdings and each of its Subsidiaries has good and valid title to, licenses of, or rights use, all Real Property and Midstream Assets owned by it, including all Collateral reflected in the pro forma balance sheet referred to in Section 9.05(a) (except as sold or otherwise disposed of since the date of such balance sheet in the Ordinary Course of Business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.

(b)     Each Credit Party and each Subsidiary has Defensible Title to, or valid leasehold interests in, all of its Covered Properties and good title to, or valid leasehold interests in, licenses of or rights to use, all personal property, in each case, necessary to, or used in the ordinary course of, its business, free and clear of all Liens except Permitted Liens.

(c)     After giving full effect to the Permitted Liens, Holdings or its Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate Holdings or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in Holdings' or such Subsidiary's net revenue interest in such Property.

(d)     All material leases and agreements necessary for the conduct of the business of Holdings and its Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)     As of the Closing Date, Schedule XVI contains a true, accurate and complete list of all material preferential rights to purchase, required consents to assignment and lease forfeiture provisions affecting or contained in any lease or contractual obligation relating to any of the foregoing ("**Preferential Rights and Consents**").   Each of the material leases, licenses, subleases, Rights of Way, easements and servitudes or assignments of the foregoing (together with all amendments, modifications, supplements, renewals or extensions of any thereof) necessary for the conduct of the business of the Credit Parties and their respective Subsidiaries is in full force and effect and no Credit Party has knowledge of any breach, default or event or circumstance that has occurred and is continuing thereunder, or with the passage of time or giving of notice, or both, would give rise to a default, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights

generally or by equitable principles. No material Preferential Rights and Consents exist other than those set forth on <u>Schedule XVI</u> or which have been disclosed in writing to Administrative Agent after the Closing Date.

(f)     The rights of each Credit Party and any of its applicable Subsidiaries to use the Midstream Assets are pursuant to valid and subsisting recorded deeds, leases, subleases, easements, rights of way, servitudes, permits, licenses and other instruments and agreements (collectively, "**Rights of Way**") in favor of the applicable Credit Party and any of its applicable Subsidiaries (or their predecessors in interest), except where the failure of the Midstream Assets to be so covered, individually or in the aggregate, (i) does not materially interfere with the ordinary conduct of business of Holdings and any applicable Subsidiary, (ii) does not materially detract from the value or the use of the portion of the Midstream Assets which are not covered and (iii) could not reasonably be expected to have a Material Adverse Effect.

(g)     The Rights of Way for the Midstream Assets grant or permit Holdings and any of its Subsidiaries the right to operate and maintain the Midstream Assets in, over, under, or across the land covered thereby, in all material respects, in the same way that a prudent owner and operator would operate and maintain similar assets and, in all material respects, in the same way as Holdings and any applicable Subsidiary (or their predecessor in interest) have operated and maintained the Midstream Assets prior to the Closing Date.

(h)     All Rights of Way necessary for the conduct of the business of Holdings and its Subsidiaries are valid and subsisting, in full force and effect, and there exists no breach, default or event or circumstance that, with the giving of notice or the passage of time or both, would give rise to a default under any such Rights of Way that could reasonably be expected to have a Material Adverse Effect. All rental and other payments due under any Rights of Way by Holdings or any of its Subsidiaries (and, to Holdings' knowledge, their predecessors in interest) have been duly paid in accordance with the terms thereof, except to the extent that a failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(i)     The rights and properties presently owned, leased, subleased or licensed by Holdings for any of its Subsidiaries, including all Rights of Way, include all rights and properties necessary to permit Holdings and its Subsidiaries to conduct their businesses in accordance with prudent industry standards in all material respects in the same manner as such businesses have been conducted by their predecessors in interest prior to the Closing Date.

(j)     No eminent domain proceeding or taking is currently in process or, to the knowledge of Holdings and its Subsidiaries, is contemplated with respect to all or any material portion of the Oil and Gas Properties, the Midstream Assets or the other Real Property.

(k)     Holdings and its Subsidiaries own, or are licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to their business, and the use thereof by Holdings or any of its Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

9.13.    Capitalization.

(a)    On the Closing Date, after giving effect to the Prepackaged Plan, the authorized capital stock and issued and outstanding stock of Holdings are described on Schedule X hereto. After giving effect to the Prepackaged Plan, all outstanding shares of capital stock in Holdings have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  As of the Closing Date, after giving effect to the Prepackaged Plan and except as set forth on Schedule X hereto, Holdings does not have outstanding any capital stock or other securities convertible into or exchangeable for its capital stock or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its capital stock or any stock appreciation or similar rights.

(b)    On the Closing Date, the authorized Equity Interests of the Borrower and each other direct or indirect Subsidiary of Holdings are described on Schedule X hereto, all of which Equity Interests are issued and outstanding and are owned, directly or indirectly, by Holdings. All such outstanding Equity Interests have been duly and validly issued, are fully paid and non-assessable (to the extent applicable) and have been issued free of preemptive rights.  No Subsidiary of Holdings has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.

9.14.    [Reserved].

9.15.    Compliance with Statutes, etc.

Each of Holdings and each of its Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business, the ownership of its property (including, without limitation, applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), and the holding of, or operation using, the Necessary Authorizations, except such non-compliance as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than as set forth on Schedule XII, none of Holdings or any of its Subsidiaries has received any notice or communication from any Governmental Authority of non-compliance with any such applicable statutes, regulations, and orders that has not been fully cured or waived as of the date of this Agreement.

9.16.    Investment Company Act.

None of Holdings or any of its Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

9.17.  <u>Insurance</u>.

<u>Schedule VI</u> sets forth a listing of all insurance maintained by Holdings and its Subsidiaries as of the Closing Date, with the amounts insured (and any deductibles) set forth therein.  Such insurance complies in with requirements of <u>Section 10.03</u>.

9.18.  <u>Environmental Matters</u>.

(a)     Each of Holdings and each of its Subsidiaries is, and for the past four years, has been, in compliance with all applicable Environmental Laws and the requirements of any permits issued to Holdings or any of its Subsidiaries under such Environmental Laws.  There are no pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened, Environmental Claims against Holdings or any of its Subsidiaries or any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries.  There are no facts, circumstances, conditions or occurrences with respect to the business or operations of Holdings or any of its Subsidiaries, or any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries or with respect to any property adjoining or adjacent to any Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries that would be reasonably expected (i) to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries or any Property owned, leased or operated by Holdings or any of its Subsidiaries or (ii) to cause any Property owned, leased or operated by Holdings or any of its Subsidiaries to be subject to any restrictions on the ownership, lease, occupancy, use or transferability of such Property by Holdings or any of its Subsidiaries under any applicable Environmental Law.

(b)     Hazardous Materials have not at any time been generated, used, treated or stored on, or transported to or from, or Released on or from, any Property owned, leased or operated by Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, any property adjoining or adjacent to any Property, where such generation, use, treatment, storage, transportation or Release has violated or would be reasonably expected to violate any applicable Environmental Law or give rise to an Environmental Claim against Holdings or any Subsidiary or any Real Property currently or formerly owned, leased or operated by Holdings or any of its Subsidiaries.

(c)     Notwithstanding anything to the contrary in this <u>Section 9.18</u>, the representations and warranties made in this <u>Section 9.18</u> shall be untrue only if the effect of any or all conditions, violations, Claims, Environmental Claims, restrictions, failures and noncompliances of the types described above would, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

9.19.  <u>Employment and Labor Relations</u>.

None of Holdings or any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against Holdings or

75

any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against any of them, (ii) no strike, labor dispute, slowdown or stoppage pending against Holdings or any of its Subsidiaries or, to the knowledge of Holdings or any of its Subsidiaries, threatened against Holdings or any of its Subsidiaries, (iii) no union representation question exists with respect to the employees of Holdings or any of its Subsidiaries, (iv) no equal employment opportunity charges or other claims of employment discrimination are pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against Holdings or any of its Subsidiaries and (v) no wage and hour department investigation has been made of Holdings or any of its Subsidiaries, except (with respect to any matter specified in clauses (i) – (v) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

9.20.    Intellectual Property.

Each of Holdings and each of its Subsidiaries owns or has the right to use all Intellectual Property, whether owned or licensed pursuant to a license agreement (including, but not limited to, rights in computer programs, databases and formulas, or rights with respect to the foregoing) necessary for the present conduct of its business, without conflict with the Intellectual Property rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

9.21.    EEA Financial Institution.

No Credit Party is an Affected Financial Institution.

9.22.    Indebtedness.  As of the Closing Date, after giving effect to the Transactions and the consummation of the Prepackaged Plan, the Credit Parties have no outstanding Indebtedness of the types described in clauses (i), (ii), (iii) and (iv) in the definition thereof, except Indebtedness permitted pursuant to Section 11.04(a).

9.23.    Representations and Warranties in Other Documents.

All representations and warranties set forth in the other Credit Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the Closing Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

9.24.    Necessary Authorizations.

Except for any of the following matters that would not reasonably be expected to have a Material Adverse Effect:

(a)      Each Credit Party and each Subsidiary of a Credit Party has obtained all Necessary Authorizations, and all such Necessary Authorizations are in full force and effect. No other person has any right, title, or interest in or with respect to the Necessary Authorizations. Each Credit Party has performed all of its respective obligations required to have been performed

under the Necessary Authorizations. There is no non-compliance under the terms of the Necessary Authorizations, nor has any Credit Party received any notice of any such non-compliance, which permits or, after notice or lapse of time or both, could reasonably be expected to permit revocation, cancellation, non-renewal, suspension or adverse modification of the Necessary Authorizations. To each Credit Party's knowledge, the Necessary Authorizations will be renewed in the ordinary course and there is no event, condition or circumstance which could reasonably be expected to present a substantial risk that the Necessary Authorizations would not be renewed in the ordinary course or could be revoked, cancelled or suspended or materially adversely modified or that any substantial fine or forfeiture could be imposed against the holder of the Necessary Authorization.

(b)     None of such Necessary Authorizations is the subject of any pending or, to each Credit Party's knowledge, threatened attack, application, objection, or enforcement action or any other petition with a Governmental Authority for revocation, termination, suspension, denial or material modification of a Necessary Authorization, by the grantor of the Necessary Authorization.  The actions of any applicable Governmental Authority granting all Necessary Authorizations have not been reversed, stayed, enjoined, annulled or suspended.

9.25.   Sanctions; Anti-Corruption.

(a)     None of the Credit Parties nor any of their directors, officers, or employees, nor to the knowledge of the Credit Parties, any Affiliates, agents, representatives, or other Persons acting for or on behalf of any Credit Parties is owned or controlled by Persons that are:  (i) the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including, currently, Crimea, Cuba, Iran, North Korea and Syria).

(b)     The Credit Parties and their respective directors, officers and employees, and, to the knowledge of the Credit Parties, any Affiliates of any Credit Parties, and their respective agents, representatives, or other Persons acting or benefiting in any capacity in connection with the Loans or other transactions hereunder, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption Law, in all material respects.

9.26.   No Default.

None of Holdings or any of its Subsidiaries is in default with respect to any other note, indenture, loan agreement, mortgage, lease, deed, or other agreement to which Holdings or such Subsidiary is a party or by which it is bound except as would not reasonably be expected to have a Material Adverse Effect.

9.27.   Solvency.

After giving effect to the Prepackaged Plan, (a) the sum of the Indebtedness (including contingent liabilities) of Holdings and its Subsidiaries taken as a whole does not exceed the

present fair saleable value (on a going concern basis) of the assets of Holdings and its Subsidiaries taken as a whole; (b) the capital of Holdings and each of its Subsidiaries is not unreasonably small in relation to the business of Holdings and each of its Subsidiaries; (c) the present fair salable value of the assets (on a going concern basis) of Holdings and its Subsidiaries, taken as a whole is greater than the amount that will be required to pay the probable liability of the debts (including contingent liabilities) of Holdings and its Subsidiaries as they become absolute and matured in the ordinary course; and (d) Holdings and each of its Subsidiaries do not intend to incur, or believe that they will incur, debts beyond their ability to pay such debt as they mature in the Ordinary Course of Business.  For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability in the Ordinary Course of Business.

      9.28.   <u>Maintenance of Properties</u>.

Except for such acts or failures to act, individually or in the aggregate, as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Credit Parties and their Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all applicable Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Credit Parties and their Subsidiaries.  Specifically in connection with the foregoing, except for, individually or in the aggregate, those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of any Credit Party or any Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of any Credit Party or any Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of such Credit Party or such Subsidiary.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by any Credit Party or any Subsidiary that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by any Credit Party or any Subsidiary, in a manner consistent with the Credit Parties' and their Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this <u>Section 9.28</u>, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect).

      9.29.   <u>Gas Imbalances, Prepayments</u>.

Except as set forth on <u>Schedule IX</u> or on the most recently delivered Reserve Report Certificate, on a net basis there are no gas imbalances, take or pay or other prepayments which would require any Credit Parties or Subsidiaries to deliver Hydrocarbons produced from the Oil

and Gas Properties at some future time without then or thereafter receiving full payment therefor with an aggregate fair market value exceeding $500,000.

9.30.   Marketing of Production.

Except for contracts listed and in effect on the date hereof on Schedule XIV, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Credit Parties represent that they or their Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of the Credit Parties' or their Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

9.31.   Hedge Agreements.

Schedule XV, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower and Holdings pursuant to Section 10.01(d), sets forth, as of the date of such report, a true and complete list of all Hedge Agreements of each Credit Party and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

SECTION 10. Affirmative Covenants.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Total Commitment have terminated and the Loans and Notes (in each case together with interest thereon), fees and all other Obligations (other than indemnities described in Section 14.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

10.01.   Information Covenants.

Holdings will furnish to the Administrative Agent, for delivery to each Lender:

(a)   Monthly Reports.   Within 35 days (or such longer time as the Required Lenders may permit in their sole discretion) after the end of each fiscal month of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal month and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal month, and for the elapsed portion of the fiscal year ended with the last day of such fiscal month (together with detailed calculations of Consolidated EBITDAX for such month and on a trailing-12 month basis), all of which shall be certified by an Authorized Officer of Holdings that they fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their

operations for the periods indicated, subject to customary post-period corrections and adjustments, normal year-end audit adjustments and the absence of footnotes and (ii) operating summaries and lease operating statements in a form substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form reasonably satisfactory to the Administrative Agent, in each case setting forth comparative figures for the corresponding fiscal month in the prior fiscal year and comparable budgeted figures for such fiscal month as set forth in the applicable budget delivered pursuant to Section 10.01(f). Concurrently with the monthly delivery thereof pursuant to the Hedge Intercreditor Agreement, a copy of each Hedging Report (as defined in the Hedge Intercreditor Agreement), which such Hedging Report shall be substantially in the form of Exhibit N.

(b)     Quarterly Financial Statements.  Within 50 days (or such longer time as the Required Lenders may permit in their sole discretion) after the close of each of the quarterly accounting periods in each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly accounting period (together with detailed calculations of Consolidated EBITDAX for such month and on a trailing-12 month basis), in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior fiscal year and comparable budgeted figures for such quarterly accounting period as set forth in the applicable budget delivered pursuant to Section 10.01(f), all of which shall be certified by an Authorized Officer of Holdings that they fairly present in all material respects in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, (ii) management's discussion and analysis of the important operational and financial developments during such quarterly accounting period, (iii) operating summaries and lease operating statements in a form substantially similar to that most recently furnished to and approved by Administrative Agent prior to the Closing Date or such other form reasonably satisfactory to the Administrative Agent, in each case setting forth comparative figures for the corresponding fiscal quarter in the prior fiscal year and comparable budgeted figures for such fiscal quarter as set forth in the applicable budget delivered pursuant to Section 10.01(f), and (iv) a quarterly EBITDA forecast on a consolidated basis for the remainder of such fiscal year, a historical summary of EBITDA to such date from the beginning of such fiscal year, together with an EBITDA forecast for the next fiscal year, in each case on a consolidated basis.

(c)     Annual Financial Statements.  Within 120 days (or such longer time as the Required Lenders may permit in their sole discretion) after the close of each fiscal year of Holdings, (i) the consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year and the related consolidated statements of income and retained earnings and statement of cash flows for such fiscal year setting forth comparative figures for the preceding fiscal year and certified without qualification by *[BDO USA, LLC]* or other independent certified public accountants of recognized national standing reasonably acceptable to the Required Lenders, which audit was conducted in accordance with generally accepted auditing standards; provided that, at the option of the Borrower, such audited financial statements may be provided with respect to MDA Holdco and its Subsidiaries if accompanied by unaudited financial statements of Holdings and its Subsidiaries, together with a reconciliation of such audited and unaudited

financial statements, and (ii) management's discussion and analysis of the important operational and financial developments during such fiscal accounting period.

(d)   Certificate of Authorized Officer – Hedge Agreements.   Concurrently with any delivery of a Reserve Report pursuant to Section 10.21, a certificate of an Authorized Officer, in form and substance satisfactory to the Administrative Agent, certifying compliance with the requirements of Section 10.23 and Section 11.19, setting forth reasonably detailed calculations demonstrating such compliance (including detailed calculations of the Projected Oil and Gas Production for the Hedge Agreements then in effect), and setting forth as of the date of such Reserve Report, a true and complete list of all Hedge Agreements of each Credit Party and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on Schedule XV, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(e)   Management Letters.   Promptly after Holdings' or any of its Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto.

(f)   Budgets.   No later than 30 days prior to the first day of each fiscal year of Holdings, commencing with the fiscal year ending December 31, 2021, a budget in form and substance reasonably satisfactory to the Required Lenders (including budgeted statements of income, cash flows and stockholders equity, balance sheets and operating figures) for each of the twelve months of such fiscal year prepared in detail, in each case setting forth, with appropriate discussion, the principal assumptions upon which such budget is based.

(g)   Officer's Certificates.   (i) At the time of the delivery of the financial statements provided for in Sections 10.01(b) and (c), a compliance certificate from an Authorized Officer of Holdings in the form of Exhibit I-1, setting forth reasonably detailed calculations demonstrating compliance with Sections 11.07, 11.08, 11.09, 11.11 and 11.21, (ii) at the time of the delivery of the reports provided for in Sections 10.01(a), a capital expenditures certificate from an Authorized Officer of Holdings in the form of Exhibit M and (iii) at the time of (A) the delivery of each Reserve Report provided for in Section 10.21 and (B) each other event that requires pro forma compliance with Section 11.10, a compliance certificate from an Authorized Officer of Holdings in the form of Exhibit I-2 setting forth reasonably detailed calculations demonstrating compliance with Section 11.10.

(h)   Notice of Default, Litigation and Material Events.   Promptly, and in any event within three Business Days after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default, (ii) any material litigation or governmental investigation or proceeding or Environmental Claim pending against Holdings or any of its Subsidiaries or any of their respective properties that could reasonably be expected to have a Material Adverse Effect or (iii) any other material event, change or circumstance that could reasonably be expected to have a Material Adverse Effect.

(i)      Other Reports and Filings.  Promptly after the filing, delivery or receipt thereof, copies of all financial information, proxy materials, reports, notices and other material communications if any, which Holdings or any of its Subsidiaries shall (i) publicly file with the Securities and Exchange Commission or any successor thereto (the "**SEC**") or any Governmental Authority or (ii) deliver to or receive from holders (or any trustee, agent or any other representative therefor) of any Qualified Preferred Stock, any Subordinated Debt or any of its material Indebtedness pursuant to the terms of the documentation governing the same. Promptly after the delivery or receipt thereof, any notices, reports or other information to or from any Governmental Authority with regulatory authority over Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

(j)      Environmental Matters.  Promptly after any officer of Holdings or any of its Subsidiaries obtains knowledge thereof, notice of one or more of the following environmental matters to the extent that such environmental matters, either individually or when aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)      any pending or threatened Environmental Claim against Holdings or any of its Subsidiaries or any Real Property owned, leased or operated by Holdings or any of its Subsidiaries;

(ii)      any condition or occurrence on or arising from any Real Property owned, leased or operated by Holdings or any of its Subsidiaries that (a) results in noncompliance by Holdings or any of its Subsidiaries with any applicable Environmental Law or permit or (b) could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries or any such Real Property;

(iii)      any condition or occurrence on any Real Property owned, leased or operated by Holdings or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by Holdings or any of its Subsidiaries of such Real Property under any applicable Environmental Law; and

(iv)      the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by Holdings or any of its Subsidiaries to the extent required by applicable Environmental Law.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and Holdings' or such Subsidiary's response thereto.

(k)      Insurance.  Prior to the end of each fiscal year of Holdings, Holdings shall deliver updated insurance certificates evidencing all insurance policies of Holdings and its Subsidiaries maintained in accordance with Section 10.03 hereof, together with an explanation of any projected changes to such insurance coverage for the forthcoming fiscal year.

82

(l)      Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to Holdings or any of its Subsidiaries as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request. Promptly following any reasonable request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with the Beneficial Ownership Regulation or applicable "know your customer" requirements under the Patriot Act or other applicable anti-money laundering laws.

(m)      Lender Calls.  Holdings will hold quarterly conference calls for the Lenders, at which calls will be reviewed the financial results of Holdings and its Subsidiaries and the budgets and projections presented for the current fiscal year of Holdings and such other matters as may be reasonably requested by the Administrative Agent.

10.02.  Books, Records and Inspections.

Holdings will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP and all requirements of law shall be made of all dealings and transactions in relation to its business and activities.  Holdings will, and will cause each of its Subsidiaries to, permit officers and designated representatives of the Administrative Agent, the Collateral Agent or any Lender to visit and inspect, under guidance of officers of Holdings or such Subsidiary, any of the properties of Holdings or such Subsidiary, and to examine the books of account of Holdings or such Subsidiary and discuss the affairs, finances and accounts of Holdings or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent, the Collateral Agent or any Lender may reasonably request.

10.03.  Maintenance of Property; Insurance.

(a)      Holdings will, and will cause each of its Subsidiaries to, (i) keep all property necessary to the business of Holdings and its Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events, natural catastrophe and other covered occurrences or events that may cause damage to, or partial or complete loss of, the property, (ii) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and business of Holdings and its Subsidiaries (including, without limitation, policies with respect to (a) commercial general liability, (b) commercial auto, (c) workers compensation and employers liability; (d) umbrella and excess liability, (e) commercial property including coverage for material damages, (f) directors and officers liability, (g) employment practices liability, (h) crime, and (i) fiduciary liability, as set forth in Schedule VI) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of Holdings and its Subsidiaries (other than with respect to business interruption policies, which such policies shall provide for actual loss sustained of not less than one year in coverage), and (iii) furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.  In addition to the requirements of the immediately preceding sentence, Holdings and its Subsidiaries will at all times cause insurance of the types

83

described in Schedule VI to be maintained (with the same scope of coverage as that described in Schedule VI) at levels which are consistent with their practices immediately before the Closing Date unless such change is mutually agreed by the Borrower and the Administrative Agent.

(b)     Holdings will, and will cause each of its Subsidiaries to, at all times maintain (i) property insurance providing that Holdings and the Collateral Agent are loss payees, and (ii) commercial general liability insurance adding the Collateral Agent as an additional insured. Such policies (x) shall state that such insurance policies shall not be canceled without at least 30 days' (or 10 days' for cancellation due to nonpayment of premium) prior written notice thereof by the respective insurer to the Collateral Agent and (y) shall provide with respect to the commercial general liability, workers compensation, and commercial property insurance that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Collateral Agent and the other Secured Creditors.

(c)     If Holdings or any of its Subsidiaries shall fail to maintain insurance in accordance with this Section 10.03, or if Holdings or any of its Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and each Holding Company and the Borrower jointly and severally agree to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

(d)     Holdings will, and will cause each of its Subsidiaries to, operate its Oil and Gas Properties, Midstream Assets and other material Properties or cause such Oil and Gas Properties, Midstream Assets and other material Properties to be operated in a careful and efficient manner in accordance with customary practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and Midstream Assets and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(e)     Holdings will, and will cause each of its Subsidiaries to, promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to so pay or discharge, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(f)     Holdings will, and will cause each of its Subsidiaries to, promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards, the material obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties, Midstream Assets and other material Properties.

EAST\177251518.5

(g)     Holdings will, and will cause each of its Subsidiaries to, to the extent no Credit Party or Subsidiary is the operator of any Property, the Credit Parties shall, and shall cause the Subsidiaries to, use commercially reasonable efforts to cause the operator to comply with this Section 10.03.

10.04.  Existence; Franchises.

Holdings will, and will cause each of its Subsidiaries to, do or cause to be done, all things necessary to (x) preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks and patents, each of which shall be held in the name of the Borrower or a Subsidiary Guarantor, and (y) maintain all Necessary Authorizations, each of which shall be held in the name of the Borrower or a Subsidiary Guarantor; provided, however, that nothing in this Section 10.04 shall prevent (i) sales of assets and other transactions by Holdings or any of its Subsidiaries in accordance with Section 11.02 or (ii) the withdrawal by Holdings or any of its Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.05.  Compliance with Statutes, etc.

Holdings will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.06.  Compliance with Environmental Laws.

(a)     Holdings will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws and permits applicable to Holdings or any of its Subsidiaries, or required of Holdings or any of its Subsidiaries by, the ownership, lease or use of its Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, and will promptly pay or cause to be paid all costs and expenses required of Holdings or any of its Subsidiaries in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws, except such noncompliances  and nonpayment as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except for any of the following matters that could not reasonably be expected to have a Material Adverse Effect, none of Holdings or any of its Subsidiaries will generate, use, treat, store, Release or dispose of, or permit the generation, use, treatment, storage, Release or disposal of Hazardous Materials on any Real Property now or hereafter owned, leased or operated by Holdings or any of its Subsidiaries, or transport or permit the transportation of Hazardous Materials to or from any such Real Property, except for Hazardous Materials generated, used, treated, stored, Released or disposed of at or transported from any such Real Properties in compliance in all material respects with all applicable Environmental Laws and as required in connection with the normal operation, use and maintenance of the business or operations of Holdings or any of its Subsidiaries.

(b)     (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in <u>Section 10.01(j)</u>, (ii) at any time that Holdings or any of its Subsidiaries are not in compliance with <u>Section 10.06(a)</u> or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the third to last paragraph of <u>Section 12</u>, the Holding Companies and the Borrower will (in each case) provide, at the sole expense of the Holding Companies and the Borrower and at the request of the Administrative Agent, an environmental site assessment report concerning any Real Property owned, leased or operated by Holdings or any of its Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, indicating the presence or absence of Hazardous Materials and the potential cost of any removal or remedial action required of Holdings or any of its Subsidiaries under applicable Environmental Laws in connection with such Hazardous Materials on such Real Property.  If the Holding Companies or the Borrower fail to provide the same within 60 days after such request was made, the Administrative Agent may order the same, the cost of which shall be borne by the Holding Companies and the Borrower, and the Holding Companies and the Borrower shall grant and hereby grant to the Administrative Agent and the Lenders and their respective agents access to such Real Property and specifically grant the Administrative Agent and the Lenders a non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Holding Companies and the Borrower, all at the sole expense of the Holding Companies and the Borrower.

10.07.  <u>ERISA</u>.

As soon as possible and, in any event, within ten (10) days after Holdings, any Subsidiary of Holdings or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following, Holdings will deliver a written notification to each Lender setting forth the full details as to such occurrence and the action, if any, that Holdings, such Subsidiary or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given or filed by Holdings, such Subsidiary, the Plan administrator or such ERISA Affiliate to or with the PBGC or any other Governmental Authority, or a Plan participant and any notices received by Holdings, such Subsidiary or ERISA Affiliate from the PBGC or any other Governmental Authority, or a Plan participant with respect thereto: that a Reportable Event has occurred (except to the extent that Holdings has previously delivered to the Lenders a certificate and notices (if any) concerning such event pursuant to the next clause hereof); that a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan is subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof), and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 is reasonably expected to occur with respect to such Plan within the following 30 days; that a failure to satisfy the minimum funding standards of ERISA or the Code has occurred in any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code; that any contribution required to be made with respect to a Plan has not been timely made; that a Plan has been or could reasonably be expected to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA; that a Plan has an Unfunded Current Liability which, when added to the aggregate amount of Unfunded Current Liabilities with respect to all other Plans, exceeds the aggregate amount of such Unfunded Current Liabilities that existed on the Closing Date by $1,000,000; that proceedings could reasonably be expected to be or have been instituted

86

to terminate or appoint a trustee to administer a Plan; that a proceeding has been instituted pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that Holdings, any Subsidiary of Holdings or any ERISA Affiliate will or could reasonably be expected to incur any liability (including any indirect, contingent, or secondary liability) to or on account of the termination of or withdrawal from a Plan under Section 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or any material liability with respect to a Plan under Section 401(a)(29), 4971, 4975 or 4980 of the Code or Section 409, 502(i) or 502(l) of ERISA or, with respect to a group health plan (as defined in Section 607(1) of ERISA or Section 4980B(g)(2) of the Code), will or is expected to incur material liability under Section 4980B of the Code; or that Holdings or any Subsidiary of Holdings could reasonably be expected to incur any material liability pursuant to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides benefits to retired employees or other former employees (other than as required by Section 601 of ERISA). Holdings will deliver to each of the Lenders copies of any records, documents or other information that must be furnished to the PBGC with respect to any Plan pursuant to Section 4010 of ERISA. In addition to any certificates or notices delivered to the Lenders pursuant to the first sentence hereof, copies of any reports, records, documents or other information required to be furnished to the PBGC or any other Governmental Authority, and any material notices received by Holdings, any Subsidiary of Holdings or any ERISA Affiliate with respect to any Plan, shall be delivered to the Lenders no later than ten (10) days after the date such records, documents and/or information has been furnished to the PBGC or any other Governmental Authority, as applicable, or such notice has been received by Holdings, the Subsidiary or the ERISA Affiliate, as applicable.

   10.08.   End of Fiscal Years; Fiscal Quarters.

   Holdings will cause (i) its and each of its Subsidiaries' fiscal years to end on December 31 of each calendar year and (ii) its and each of its Subsidiaries' fiscal quarters to end on March 31, June 30, September 30 and December 31 of each calendar year.

   10.09.   Performance of Obligations.

   Holdings will, and will cause each of its Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other agreement, contract or instrument by which it is bound, except such non-performances as would not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

   10.10.   Payment of Taxes.

   Holdings will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of Holdings or any of its Subsidiaries not otherwise permitted under Section 11.01(a); provided that none of Holdings or any of its Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim which is being contested in good faith and by proper

proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP.

10.11.  <u>Use of Proceeds</u>.

The Borrower will use the proceeds of the Loans only as provided in <u>Section 9.08</u>.

10.12.  <u>Additional Security; Further Assurances; etc</u>.

(a)      At all times, the Credit Parties shall cause the Mortgaged Properties to represent at least 90% of (i) the PV-10 Value of Proved Reserves of the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, (ii) the PV-10 Value of PDP Reserves of the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and (iii) the Fair Market Value of the Midstream Assets, including all related Rights of Way owned or leased by a Credit Party, all fee owned processing facilities, all fee owned compressor facilities, all fee owned field offices, and all land owned by a Credit Party on which any of the foregoing is situated (subject to any exclusions expressly set forth in the Mortgages).   Notwithstanding anything to the contrary in this clause (a), the Credit Parties shall at all times maintain any acreage, field offices and other Real Property owned by the Credit Parties described on Schedule XVII (the "Specified Real Property") as Mortgaged Properties.

(b)      Holdings will, within 30 days of the creation or acquisition of any Subsidiary, (x) cause each Subsidiary Guarantor to execute the Subsidiaries Guaranty (or a joinder agreement thereto) and (y) will cause each other Credit Party to grant to the Collateral Agent for the benefit of the Secured Creditors security interests in all assets that constitute Collateral (including any Mortgages required to cause the Credit Parties to comply with <u>Section 10.12(a)</u>) not covered by the original Security Documents and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders (collectively, the "**Additional Security Documents**"), along with customary opinions of counsel, title opinions or other information, title insurance and other related documents as may be reasonably requested by the Collateral Agent as to any Real Property, Oil and Gas Properties and Midstream Assets, if any, subject to any Mortgages.   All such security interests and Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Collateral Agent and shall constitute valid and enforceable perfected security interests, hypothecations and Mortgages superior to and prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens.   The Additional Security Documents or instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect and preserve the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.

(c)      In connection with the delivery of each Reserve Report, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties to ascertain whether), after giving effect to acquisitions, dispositions and production, the Credit Parties are in compliance with <u>Section 10.12(a)</u>.   In the event that the Mortgaged Properties do not meet the requirement set forth <u>Section 10.12(a)</u>, then the Credit Parties shall grant, within 30 days of delivery of such Reserve Report, to the Administrative Agent as security for the Secured

Obligations a first-priority Lien on additional Oil and Gas Properties not already subject to a Lien of the Security Documents such that after giving effect thereto, the Mortgaged Properties will meet the requirement set forth in Section 10.12(a).  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.  In order to comply with the foregoing, if any Subsidiary places a Lien on its Oil and Gas Properties and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 10.12(b).

(d)     If any Event of Default shall occur and be continuing, then the Borrower shall, and shall cause each of its Subsidiaries to, within 10 Business Days after notice by the Administrative Agent, grant to the Administrative Agent as security for the Secured Obligations a first-priority Lien (provided that Permitted Liens may exist, but subject to the provisos at the end of such definition) on all of their Oil and Gas Properties not already subject to a Lien of the Security Documents such that after giving effect thereto, the Mortgaged Properties will represent substantially all of the Oil and Gas Properties of the Borrower and its Subsidiaries.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficiently executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.

(e)     Subject to the terms of the Security Agreement, Holdings will, and will cause each of the other Credit Parties to, at the expense of the Credit Parties, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, certificates, reports, control agreements and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as the Collateral Agent may reasonably require.  Furthermore, Holdings will, and will cause the other Credit Parties to, deliver to the Collateral Agent such opinions of counsel, title information and other related documents as may be reasonably requested by the Administrative Agent to assure itself that this Section 10.12 has been complied with.

(f)     Notwithstanding any provision in this Agreement, any Security Document or other Credit Document to the contrary, (i) in no event is (x) any Excluded Asset (as defined in the Security Agreement) or (y) except with respect to the field office building described on Schedule XVII any Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) included in the definition of "Collateral" and (ii) except with respect to the field office building described on Schedule XVII, no Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Laws) shall be subject to a Lien under any Security Document.

(g)     Each Holding Company and the Borrower agree that each action required by clauses (a) and (d) of this Section 10.12 shall be completed as soon as possible, but in no event later than 90 days after such action is requested to be taken by the Administrative Agent or the Required Lenders; provided that, in no event will Holdings or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts, to obtain consents from third parties with respect to its compliance with this Section 10.12.

(h)     Holdings will use commercially reasonable efforts, and will cause each of the other Credit Parties to use best efforts to, deliver to the Administrative Agent and the Collateral Agent, landlord waivers with respect to each location or place of business at which personal property Collateral with a value in excess of $1,000,000 and/or books and records are located.

10.13.  <u>Ownership of Subsidiaries; etc</u>.

Except as set forth on <u>Schedule V</u>, Holdings will, and will cause each of its Subsidiaries to, own 100% of the Equity Interests of each of their Subsidiaries.

10.14.  <u>Contributions</u>.

(a)     Holdings will, upon its receipt thereof, contribute as an equity contribution to the capital of the Borrower, any cash proceeds received by Holdings from any Asset Sale, any incurrence of Indebtedness (other than incurrence of Intercompany Debt by Holdings), any Recovery Event, any sale or issuance of its equity, any cash capital contributions or any tax refunds.

(b)     The Borrower will use the proceeds of all equity contributions received by it from Holdings as provided in the relevant clause of <u>Section 6.02</u> to the extent required to be so applied.

10.15.  <u>Minimum Cash and Cash Equivalents</u>.

At all times, Unrestricted cash and Cash Equivalents of Holdings and its Subsidiaries shall be not less than $7,500,000.

10.16.  <u>Sanctions; Anti-Corruption Laws</u>.

The Credit Parties shall maintain in effect policies and procedures designed to promote compliance by the Credit Parties and their respective Subsidiaries, directors, officers, employees, and agents with applicable Sanctions and with the FCPA and any other applicable anti-corruption Laws.

10.17.  <u>Permitted Acquisitions</u>.

(a)     Subject to the provisions of this <u>Section 10.17</u> and the requirements contained in the definition of Permitted Acquisition, the Borrower and its Subsidiaries that are Credit Parties may from time to time effect Permitted Acquisitions, so long as (in each case except to the extent the Required Lenders otherwise specifically agree in writing in the case of a specific Permitted Acquisition): (i) no Event of Default shall have occurred and be continuing at the time of the consummation of the proposed Permitted Acquisition or immediately after giving effect thereto; (ii) the Borrower shall have given to the Administrative Agent and the Lenders at least 10 Business Days' prior written notice of any Permitted Acquisition (or such shorter period of time as may be reasonably acceptable to the Administrative Agent), which notice shall describe in reasonable detail the principal terms and conditions of such Permitted Acquisition; (iii) calculations are made by the Borrower with respect to the financial covenants contained in <u>Sections 11.08</u> and <u>11.09</u>, for the respective Calculation Period on a Pro Forma Basis as if the

90

respective Permitted Acquisition (as well as all other Permitted Acquisitions theretofore consummated after the first day of such Calculation Period) had occurred on the first day of such Calculation Period, and such calculations shall show that (x) such financial covenants would have been complied with if the Permitted Acquisition had occurred on the first day of such Calculation Period and (y) the pro forma Total Leverage Ratio for such Calculation Period shall not exceed 2.50:1.00 if the Permitted Acquisition had occurred on the first day of such Calculation Period; (iv) [reserved]; (v) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Permitted Acquisition (both before and after giving effect thereto), unless stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date; (vi) on a Pro Forma Basis after giving effect to the Permitted Acquisition, Holdings and its Subsidiaries shall have a minimum of $20,000,000 of cash or Cash Equivalents on hand at such time at the consummation of the Permitted Acquisition; (vii) the Borrower shall have delivered to the Administrative Agent and each Lender a certificate executed by an Authorized Officer, certifying to the best of such officer's knowledge, compliance with the requirements of preceding clauses (i) through (vi), inclusive, and containing the calculations (in reasonable detail) (A) required by preceding clauses (iii) and (v) and (B) necessary to establish the Acquired EBITDAX of the Acquired Entity or Business acquired pursuant to each Permitted Acquisition for the most recently ended fiscal quarter for which financial statements are available for such Acquired Entity or Business; (viii) the aggregate amount of all Permitted Acquisitions by the Borrower and its Subsidiaries shall not exceed $5,000,000 during the term of this Agreement; and (ix) if, prior to or after giving effect to any proposed Permitted Acquisition, the Borrower and/or its Subsidiaries have or will have consummated Permitted Acquisitions in an aggregate amount equal to or greater than $1,000,000 during the term of this Agreement, then the Administrative Agent's consent (not to be unreasonably withheld) shall be required for each subsequent Permitted Acquisition and/or such contemplated Permitted Acquisition, as the case may be.

(b)      At the time of each Permitted Acquisition involving the creation or acquisition of a Subsidiary, or the acquisition of capital stock or other Equity Interests of any Person, the capital stock or other Equity Interests thereof created or acquired in connection with such Permitted Acquisition shall be pledged for the benefit of the Secured Creditors pursuant to (and to the extent required by) the relevant Security Document in accordance with Section 10.12.

(c)      The Borrower will cause each Subsidiary which is formed to effect, or is acquired pursuant to, a Permitted Acquisition to comply with, and to execute and deliver all of the documentation as and to the extent required by, Sections 10.12 and this Section 10.17, to the reasonable satisfaction of the Administrative Agent.

(d)      The consummation of each Permitted Acquisition shall be deemed to be a representation and warranty by each Holding Company and the Borrower that the certifications pursuant to this Section 10.17 are true and correct and that all conditions thereto have been satisfied and that same is permitted in accordance with the terms of this Agreement, which representation and warranty shall be deemed to be a representation and warranty for all purposes hereunder, including, without limitation, Sections 8 and 11.

10.18.  Maintenance of Company Separateness.

Holdings will, and will cause each of its Subsidiaries to, satisfy customary Company formalities, including, as applicable, (i) the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting, (ii) the maintenance of separate Company records and (iii) the maintenance of separate bank accounts in its own name.  None of Holdings or any of its Subsidiaries shall take any action, or conduct its affairs in a manner, which is likely to result in the Company existence of Holdings or any of its Subsidiaries being ignored, or in the assets and liabilities of Holdings or any of its Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

10.19.  Board Information Packages.

Holdings will provide to the Administrative Agent a copy of the board package delivered to members of the Board of Directors of Holdings in advance of each meeting of the Board of Directors Holdings.  Portions of such board package may be redacted where and to the extent that Holdings reasonably believes that such redaction is reasonably necessary (i) to preserve attorney-client, work product or similar privilege between Holdings and its Subsidiaries, on the one hand, and their legal counsel, on the other or (ii) to comply with the terms and conditions of confidentiality agreements between Holdings and its Subsidiaries, on the one hand, and any third parties, on the other.

10.20.  Keepwell.

If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Hedge Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any other Credit Document in respect of Hedge Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 10.20 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.20, or otherwise under this Agreement or any other Credit Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Loan Party under this Section 10.20 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the other Credit Documents.  Each Qualified ECP Loan Party intends that this Section 10.20 constitute, and this Section 10.20 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of the Borrower and each Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the CEA.

10.21.  <u>Reserve Reports</u>.

(a)  (i) On or prior to February 15, May 15, August 15 and November 15 of each year, commencing with the delivery of the [September 30, 2020 Reserve Report] on or prior to [November 15, 2020][4], the Borrower shall furnish to the Administrative Agent and the Lenders a draft Reserve Report evaluating the Oil and Gas Properties of Holdings and its Subsidiaries as of the last date of the immediately preceding fiscal quarter. The draft Reserve Reports as of December 31 and June 30 of each year shall be prepared by one or more Approved Petroleum Engineers.  The draft Reserve Reports as of March 31 and September 30 of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such draft Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the immediately preceding December 31 Reserve Report or June 30 Reserve Report, as applicable.

(ii)  The Required Lenders shall have the right, in their sole discretion, to have each draft Reserve Report audited in accordance with SPE guidelines (such reserve report giving effect to any changes resulting from such audit, the "**Initial Audited Reserve Report**") by any one of VSO Petroleum Consultants, Inc., Netherland, Sewell and Associates, Inc., WD Von Gonten and Co., Ryder Scott Company or any other independent petroleum engineering firm agreed to by the Required Lenders and the Borrower (any of the foregoing as selected by the Required Lenders, an "**Approved Audit Firm**").  The Borrower shall make the Approved Petroleum Engineer and/or the Borrower's chief engineer and other personnel available to the Approved Audit Firm to discuss any statements, calculations, conclusions or other information in such draft Reserve Report prior to its finalization. In order for the Required Lenders to exercise their audit right, the Administrative Agent (at the direction of the Required Lenders) shall provide written notice to the Borrower within 10 Business Days after its receipt of the applicable draft Reserve Report, otherwise such draft shall be deemed final and delivered.

If the Required Lenders exercise their audit right, then the Administrative Agent (at the direction of the Required Lenders) will either:

(A) send written notice to the Borrower of the Required Lenders' approval of the draft Reserve Report (which draft Reserve Report shall then be deemed final and delivered), or

(B) send the Borrower both (x) a copy of the Initial Audited Reserve Report and (y) either (1) in the event that the Adjusted Coverage Ratio as calculated using the Initial Audited Reserve Report is greater than or equal to 1.50:1.00 and the Initial Audited Reserve Report includes no comments or changes to any terms or sections of the draft Reserve Report other than the type curves, written notice of the Required Lenders' formal disagreement with the type curves contained in the draft Reserve Report (this clause (B)(y)(1), a "**Type Curve Disagreement Notice**") or (2) in the event that the Adjusted Coverage Ratio as calculated using the Initial Audited Reserve Report is less than 1.50:1.00 or the Initial Audited Reserve Report includes comments or changes to any terms or sections of the draft Reserve Report other than the type curves, written notice of

---

[4] [**NTD**:  Assumes emergence / closing prior to November 15, 2020.  If closing occurs after November 15, 2020, the September 30, 2020 Reserve Report will be the "Initial Reserve Report".]

the Required Lenders' request that the draft Reserve Report be revised (this clause (B)(y)(2), a "**Revision Request**").

If the Administrative Agent (at the direction of the Required Lenders) sends a Type Curve Disagreement Notice to the Borrower, the initial draft Reserve Report shall be deemed final and delivered, but no type curve calculations contained therein shall be deemed or considered to be binding on the Administrative Agent and the Lenders for purposes of future Reserve Reports and shall in no way prejudice the Administrative Agent or the Lenders' ability to challenge or disagree with future Reserve Reports and the type curves contained therein.

(iii)    If the Administrative Agent (at the direction of the Required Lenders) sends a Revision Request to the Borrower, the Borrower shall deliver to the Administrative Agent a revised Reserve Report (a "**Revised Reserve Report**") within 10 Business Days after the date the Borrower receives such Revision Request from the Administrative Agent. Within 10 Business Days after its receipt of the applicable Revised Reserve Report, if the Administrative Agent has not communicated the Required Lenders' approval of, or any objection to, such Revised Reserve Report in writing to the Borrower, such Revised Reserve Report shall be deemed final and delivered.

If by the end of such 10 Business Day period (A) the Administrative Agent (at the direction of the Required Lenders) shall have objected to such Revised Reserve Report and (B) the calculation of the Adjusted Coverage Ratio based on the Initial Audited Reserve Report is less than 1.50:1.00, the Required Lenders shall select a separate Approved Audit Firm (other than the Approved Audit Firm that prepared the Initial Audited Reserve Report) (the "**Second Approved Audit Firm**") to audit such Revised Reserve Report in accordance with SPE guidelines (such audited reserve report, the "**Second Audited Reserve Report**"). The Borrower shall make the Approved Petroleum Engineer and/or the Borrower's chief engineer and other personnel available to the Second Approved Audit Firm to discuss any statements, calculations, conclusions or other information in such Revised Reserve Report prior to its finalization.

If the calculation of the Adjusted Coverage Ratio based on the Second Audited Reserve Report is closer to the calculation of the Adjusted Coverage Ratio based on the Borrower's Revised Reserve Report, then the Borrower's Revised Reserve Report shall be deemed final and delivered. If the calculation of the Adjusted Coverage Ratio based on the Second Audited Reserve Report is closer to the calculation of the Adjusted Coverage Ratio based on the Initial Audited Reserve Report, then the Initial Audited Reserve Report shall be deemed final and delivered.

(iv)    Any Approved Audit Firm's audit set forth above with respect to the draft Reserve Reports shall be at the expense of the Borrower. Any Second Approved Audit Firm's audit set forth above shall be at the expense of the Borrower. Notwithstanding the foregoing, any Approved Audit Firm's audit with respect to the March 31 and September 30 Reserve Reports shall be at the expense of the Lenders instructing the Administrative Agent to request such audit unless either (a) such audit does not "pass" the initial draft Reserve Report in accordance with SPE guidelines or (b) the calculation of the Adjusted Coverage Ratio based on such Initial Audited Reserve Report is less than 1.50:1.00, in either such case, such audit shall be at the Borrower's expense.

(b)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from an Authorized Officer in the form of

Exhibit L attached hereto of the Borrower  (the "**Reserve Report Certificate**") certifying that in all material respects:  (i) there are no statements or conclusions in the Reserve Report which are based upon or include misleading information (or, with respect to any Reserve Report prepared by an Approved Petroleum Engineer, are based upon or include misleading information provided by or on behalf of any Credit Party or Subsidiary to such Approved Petroleum Engineer) or fail to take into account material information (or, with respect to any Reserve Report prepared by an Approved Petroleum Engineer, fail to take into account material information known to any Credit Party or Subsidiary but not disclosed to such Approved Petroleum Engineer) regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Credit Parties and the Subsidiaries and production and cost estimates contained in the Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Credit Parties and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate, (ii) the Credit Parties and the Subsidiaries own Defensible Title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 11.01, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 9.29 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require any Credit Party or any Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last certificate delivered pursuant to this Section 10.21(b), except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties sold and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Credit Parties could reasonably be expected to have been obligated to list on Schedule XIV had such agreement been in effect on the date hereof, (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating the percentage of the PV-10 Value of such Oil and Gas Properties that the value of such Mortgaged Properties represent, (vii) attached thereto is a true and complete list of all Hedge Agreements of the Credit Parties, detailing the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied), and the counterparty to each such Hedge Agreement, and (viii) as of the date of the certificate, no material Preferential Rights and Consents exist other than those set forth on an attachment to the certificate.

(c)     With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders, the compliance certificate required to be delivered pursuant to Section 10.01(g)(iii).

10.22.   Title Information.

(a)     On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 10.21(a), the Borrower will deliver title opinions or other evidence of title reasonably acceptable to the Required Lenders covering Oil and Gas Properties

constituting not less than 85% of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated by such Reserve Report.

(b)     Within 90 days after notice from the Administrative Agent to cure any title defects or exceptions which are not Permitted Liens or a notice by the Administrative Agent that Borrower has failed to comply with Section 10.22(a), the Borrower shall (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 11.01 raised by such information or (ii) deliver title opinions or other information with respect to other Oil and Gas Properties evaluated in such Reserve Report reasonably acceptable to the Required Lenders, so that the Administrative Agent, on behalf of the Secured Creditors, shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on Oil and Properties constituting not less than 85% of the PV-10 Value and the PV-10 Value of PDP Reserves evaluated by such Reserve Report.

10.23.   Hedge Agreements.

(a) Within fifteen (15) days after the Closing Date and (b) thereafter, as of the last day of each fiscal quarter, beginning with the fiscal quarter ending [December 31, 2020], the Borrower shall deliver to the Administrative Agent evidence reasonably satisfactory to it that the Credit Parties shall be party to commodity Hedge Agreements that (v) are in accordance with the requirements of Section 11.19, (w) are in the form of swaps or costless collars, (x) mitigate both commodity price risk and with respect to crude oil, locational basis risk with respect to differences in market prices between the WTI-Cushing and LLS (light Louisiana sweet) markets, (y) in the case of swaps, are at market prices designed to realize the Strip Price for the applicable notional volumes and tenor of such swaps at the time entered into, in the case of costless collars, are at prices acceptable to the Required Lenders and in the case of basis hedges, are at market prices at the time entered into, and (z) otherwise have terms and conditions acceptable to the Required Lenders, that, in each case, hedge notional volumes covering not less than (i) 65% of the Credit Parties' aggregate Projected Oil and Gas Production of crude oil and (ii) 65% of the Credit Parties' aggregate Projected Oil and Gas Production of crude oil, natural gas and natural gas liquids, calculated in the aggregate, in each case, measured at the time of entry into such Hedge Agreements, anticipated to be sold in the ordinary course of Borrower's business during the period of not less than twelve (12) consecutive calendar months following the last day of such fiscal quarter (or date, in the case of clause (a) above). For purposes of the immediately preceding sentence, the terms of a proposed Hedge Agreement shall be deemed to be acceptable to the Required Lenders if sufficient Lenders constituting the Required Lenders have not objected within five (5) Business Days after its receipt of written notice of such terms. Concurrently with the delivery of each Reserve Report, the Borrower shall deliver to the Administrative Agent and each Lender a certificate executed by an Authorized Officer pursuant to Section 10.01(d), certifying the Borrower's compliance with this Section 10.23 and with Section 11.19 and setting forth information regarding the Borrower's existing Hedge Agreements and detailed calculations demonstrating such compliance.

10.24.   Volume of Production, Etc.

Concurrently with the delivery of the monthly financial reports pursuant to Section 10.01(a) above (or in the case of clause (iii) below, concurrently with the delivery of the

quarterly financial statements pursuant to Section 10.01(b) above), the Borrower shall furnish to the Administrative Agent a report setting forth, for each calendar month during the then-current fiscal year to date, (i) the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, including transportation, gathering and marketing costs, and all categories of applicable expenses, (ii) an internally-prepared aggregate lease operating statement and (iii) a summary report of drilling development activity based on field level operating estimates, all in detail and in form satisfactory to the Required Lenders.

10.25. Post-Closing Matters. Holdings will, and will cause each of its Subsidiaries to, deliver or take the actions described on Schedule XI hereto, within the applicable time periods set forth therein (which periods may be extended by the Administrative Agent in its sole discretion), in form and substance reasonably acceptable to the Administrative Agent. All conditions precedent and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing (and to permit the taking of the actions described above within the time periods required above, rather than as elsewhere provided in the Credit Documents), provided that (x) to the extent any representation and warranty would not be true because the foregoing actions were not taken on the Closing Date, the respective representation and warranty shall be required to be true and correct in all material respects at the time the respective action is taken (or was required to be taken) in accordance with the foregoing provisions of this Section 10.25 and (y) all representations and warranties relating to the Security Documents shall be required to be true immediately after the actions required to be taken by this Section 10.25 have been taken (or were required to be taken). The acceptance of the benefits of the Credit Event shall constitute a representation, warranty and covenant by the Borrower to each of the Lenders that the actions required pursuant to this Section 10.25 will be, or have been, taken within the relevant time periods referred to in this Section 10.25 and that, at such time, all representations and warranties contained in this Agreement and the other Credit Documents shall then be true and correct without any modification pursuant to this Section 10.25, and the parties hereto acknowledge and agree that the failure to take any of the actions required above, within the relevant time periods required above, shall give rise to an immediate Event of Default pursuant to this Agreement.

SECTION 11. Negative Covenants.

Each Credit Party hereby covenants and agrees that on and after the Closing Date and until the Total Commitment has terminated and the Loans and Notes (in each case, together with interest thereon), fees and all other Obligations (other than any indemnities described in Section 14.13 which are not then due and payable) incurred hereunder and thereunder, are paid in full:

11.01. Liens.

Holdings will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired,

or sell any such property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable with recourse to Holdings or any of its Subsidiaries), or assign any right to receive income; provided that the provisions of this Section 11.01 shall not prevent the creation, incurrence, assumption or existence of the following (Liens described below are herein referred to as "**Permitted Liens**"):

(a)     inchoate Liens for Taxes, assessments or governmental charges or levies not yet due or Liens for Taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)     Liens in respect of property or assets of Holdings or any of its Subsidiaries imposed by law, which were incurred in the Ordinary Course of Business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, operator's, materialmen's and mechanics' liens and other similar Liens arising in the Ordinary Course of Business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, and (x) which do not in the aggregate materially detract from the value of Holdings' or such Subsidiary's property or assets or materially impair the use thereof in the operation of the business of Holdings or such Subsidiary or (y) which are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)     Liens in existence on the Closing Date which are listed, and the property subject thereto described, in Schedule VII, plus renewals, replacements and extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, secured by such Liens does not increase from that amount outstanding at the time of any such renewal, replacement or extension and (y) any such renewal, replacement or extension does not encumber any additional assets or properties of Holdings or any of its Subsidiaries;

(d)     Liens created by or pursuant to this Agreement and the Security Documents which secure the Secured Obligations;

(e)     (x) licenses, sublicenses, leases or subleases granted by Holdings or any of its Subsidiaries to other Persons that are not materially interfering with, the conduct of the business of Holdings or any of its Subsidiaries and (y) any interest or title of a lessor, sublessor or licensor under any lease or license agreement not prohibited by this Agreement to which the Borrower or its Subsidiaries is a party;

(f)     Liens upon assets of the Borrower or any of its Subsidiaries subject to Capitalized Lease Obligations to the extent such Capitalized Lease Obligations are permitted by Section 11.04(d), provided that (x) such Liens only serve to secure the payment of Indebtedness arising under such Capitalized Lease Obligations and (y) the Lien encumbering the asset giving rise to the Capitalized Lease Obligation does not encumber any asset of Holdings or any other asset of the Borrower or any Subsidiary of the Borrower;

(g)     Liens placed upon property, equipment or machinery acquired after the Closing Date and used in the Ordinary Course of Business of the Borrower or any of its Subsidiaries and

placed at the time of the acquisition thereof by the Borrower or such Subsidiary or within 90 days thereafter to secure Indebtedness incurred to pay all or a portion of the purchase price thereof or to secure Indebtedness incurred solely for the purpose of financing the acquisition of any such property, equipment or machinery or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount, provided that (x) the Indebtedness secured by such Liens is permitted by Section 11.04(d) and (y) in all events, the Lien encumbering the equipment or machinery so acquired does not encumber any other asset of Holdings or any of its Subsidiaries;

(h)        easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of Holdings or any of its Subsidiaries;

(i)        Liens arising from precautionary UCC financing statement filings regarding operating leases entered into in the Ordinary Course of Business;

(j)        Liens arising out of the existence of judgments or awards that would not result in an Event of Default under Section 12.09, for which adequate reserves have been established in accordance with GAAP;

(k)        statutory and common law landlords' liens under leases to which the Borrower or any of its Subsidiaries is a party;

(l)        Liens (other than Liens imposed under ERISA) incurred in the Ordinary Course of Business in connection with workers compensation claims, unemployment insurance and social security benefits and Liens securing the performance of bids, tenders, leases and contracts in the Ordinary Course of Business, statutory obligations, surety bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business and consistent with past practices (exclusive of obligations in respect of the payment for borrowed money);

(m)        [reserved];

(n)        Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition, provided that (x) any Indebtedness that is secured by such Liens is permitted to exist under Section 11.04(g), and (y) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition and do not attach to any other asset of Holdings or any of its Subsidiaries;

(o)        Liens arising out of any conditional sale, title retention, consignment or other similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the Ordinary Course of Business to the extent such Liens do not attach to any assets other than the goods subject to such arrangements;

(p)        Liens (x) incurred in the Ordinary Course of Business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or

assets, and (y) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Holdings or any Subsidiary, in each case granted in the Ordinary Course of Business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(r)     Any contractual rights of netting or set-off under any Interest Rate Protection Agreements permitted under Section 11.04(c);

(s)     contractual Liens which arise in the Ordinary Course of Business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; provided that any such Lien referred to in this clause does not materially impair the use of any material Property covered by such Lien for the purposes for which such Property is held by any Credit Party or any Subsidiary or materially impair the value of any material Property subject thereto;

(t)     easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of any Credit Party or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by any Credit Party or any Subsidiary or materially impair the value of such Property subject thereto; and

(u)     additional Liens of the Borrower or any Subsidiary of the Borrower not otherwise permitted by this Section 11.01 that do not secure obligations in excess of $500,000 in the aggregate for all such Liens at any time.

In connection with the granting of Liens of the type described in clauses (c), (f), (g), (i) and (n) of this Section 11.01 by the Borrower for any of its Subsidiaries, the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

100

11.02.  Consolidation, Merger, Purchase or Sale of Assets, etc.

Holdings will not, and will not permit any of its Subsidiaries to, divide, wind up, liquidate or dissolve its affairs or enter into any partnership, joint venture, plan of division, transaction of merger or consolidation, or convey, sell, assign, farm-out, convey or otherwise transfer (including by division of such Person), including pursuant to any production payment or similar conveyance, lease or otherwise dispose of all or any part of its property or assets (other than sales or licenses of seismic data or sales of Hydrocarbon production and inventory, in each case in the Ordinary Course of Business), or unwind or permit the early termination, assignment, novation or amendment of any Hedge Agreement transaction (other than any Hedge Agreement transaction that is rolled into a new Hedge Agreement transaction within three Business Days after such unwinding or early termination), or enter into any sale-leaseback transactions, or purchase or otherwise acquire (in one or a series of related transactions, and including by division of such Person) any part of the property or assets (other than purchases or other acquisitions of inventory, materials, assets and equipment in the Ordinary Course of Business) of any Person (or agree to do any of the foregoing at any future time, except for any such agreement that is expressly conditioned upon the consent or the Required Lenders or payment in full of the Obligations and termination of this Agreement), except that:

(a)  Capital Expenditures by the Borrower and its Subsidiaries shall be permitted to the extent not in violation of Section 11.07 and Section 11.11;

(b)  the Borrower and its Subsidiaries may, in the Ordinary Course of Business, liquidate or otherwise dispose of obsolete, surplus or worn-out property or property no longer used or useful in the operations of the Borrower and its Subsidiaries;

(c)  Investments may be made to the extent permitted by Section 11.05;

(d)  the Borrower and its Subsidiaries may sell, assign, farm-out, convey or otherwise transfer, including pursuant to any production payment or similar conveyance, Property (other than the capital stock or other Equity Interests of any Wholly-Owned Subsidiary), so long as (u) before and after giving effect to any such transaction, the Credit Parties shall be in compliance on a Pro Forma Basis with Section 10.15 and each Financial Performance Covenant (which, for purposes of Section 11.10, shall mean that the Adjusted Coverage Ratio is greater than [1.50]:1.00), (v) no Event of Default then exists or would result therefrom, (w) each such sale is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value, (x) the consideration received by the Borrower or such Subsidiary consists of at least 100% cash and is paid at the time of the closing of such sale, provided, that the Borrower or such Subsidiary may exchange such Property for Property of reasonably equivalent Fair Market Value with the prior written consent of the Required Lenders (in their sole discretion), (y) the Net Sale Proceeds therefrom are applied and/or reinvested as (and to the extent) required by Section 6.02(e) and (z) the aggregate value of all such Property sold plus the aggregate value of all such Hedge Agreements that are Liquidated during such fiscal year (after giving effect to any replacement Hedge Agreements entered into at or about the same time as such Liquidation) received from all assets sold pursuant to this clause (d) shall not exceed 5% of the PV-10 Value of PDP Reserves as of the first day of such fiscal year in any fiscal year of Holdings;

(e) the Borrower and its Subsidiaries may sell or discount, in each case without recourse and in the Ordinary Course of Business, accounts receivable arising in the Ordinary Course of Business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(f) the Borrower and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the Ordinary Course of Business and not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries, in each case so long as (x) no such grant contains non-disturbance or subordination agreements or otherwise affects the Collateral Agent's security interest in the Collateral that is subject thereto, (y) no Event of Default then exists or would result therefrom, and (z) each such grant is in an arm's-length transaction and the Borrower or the respective Subsidiary receives at least Fair Market Value;

(g) (i) the Borrower and any Subsidiary of the Borrower that is a Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower and any Subsidiary of the Borrower that is a Credit Party and (ii) any Subsidiary that is not a Credit Party may convey, sell or otherwise transfer all or any part of its business, properties and assets to the Borrower or any of its Subsidiaries, in each case, so long as with respect to the Collateral, any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the Collateral so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer) and all actions required to maintain said perfected status have been taken;

(h) the Borrower and any of its Subsidiaries may merge or consolidate with and into, or be dissolved or liquidated into, the Borrower or any of its Subsidiaries, so long as (i) in the case of any such merger, consolidation, dissolution or liquidation involving the Borrower, the Borrower is the surviving or continuing entity of any such merger, consolidation, dissolution or liquidation, (ii) in all other cases of any such merger, consolidation, dissolution or liquidation involving a Subsidiary Guarantor, such Subsidiary Guarantor is the surviving or continuing corporation of any such merger, consolidation, dissolution or liquidation, and (iii) any security interests granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in the assets of the Borrower or such Subsidiary Guarantor shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been taken;

(i) Permitted Acquisitions may be consummated in accordance with the requirements of Section 10.17;

(j) the Borrower and its Subsidiaries may liquidate or otherwise dispose of cash and Cash Equivalents in the Ordinary Course of Business, in each case for cash at Fair Market Value and in a transaction not otherwise prohibited by the other terms of this Agreement;

(k) the termination or unwinding, in whole or in part, of any Interest Rate Protection Agreement; and

(l)     the Borrower and its Subsidiaries may sell, transfer or otherwise dispose of Oil and Gas Properties to which no Proved Reserves were attributed in the most recent Reserve Report provided the aggregate value of all such Property sold pursuant to this clause (l) shall not exceed $500,000 in any fiscal year of Holdings.

To the extent the Required Lenders waive the provisions of this Section 11.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 11.02 (other than to Holdings or a Subsidiary thereof), such Collateral shall be sold free and clear of the Liens created by the Security Documents (provided that such Lien shall continue as to any proceeds of such sale to the extent such assets constituted Collateral), and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

11.03.  Dividends.

Holdings will not, and will not permit any of its Subsidiaries to, authorize, declare or pay any Dividends with respect to Holdings or any of its Subsidiaries, except that:

(a)     any Subsidiary of the Borrower may pay cash Dividends to the Borrower or to any Wholly-Owned Subsidiary of the Borrower;

(b)     The Borrower may pay cash Dividends to Holdings, so long as the proceeds thereof are promptly used by Holdings to pay operating expenses incurred in the Ordinary Course of Business (including, without limitation, outside directors and professional fees, expenses and indemnities) and other similar corporate overhead costs and expenses, provided that (x) the aggregate amount of all cash Dividends paid pursuant to this clause (b) shall not exceed $200,000 in any fiscal year of Holdings and (y) in no event shall such operating expenses be paid to Affiliates;

(c)     [the Borrower may pay cash Dividends to MDA Holdco to be ultimately distributed to Parent at the times and in the amounts necessary to enable Parent to pay the Tax obligations of the MDA Consolidated Group that are attributable to income generated by the Borrower; provided that (x) the amount of cash Dividends paid pursuant to this clause (c) to enable Parent to pay the federal and state income Taxes of the MDA Consolidated Group shall not exceed the amount of such federal and state income Taxes actually owing by the MDA Consolidated Group, and such Taxes shall be calculated by the MDA Consolidated Group utilizing all net operating losses and other Tax attributes that are available to the MDA Consolidated Group to reduce any such Taxes, and (y) any refunds of such Taxes received by the MDA Consolidated Group or any member thereof shall promptly be returned to the Borrower;][5]

(d)     the Borrower may pay cash Dividends to Holdings for the purpose of enabling Holdings to redeem, repurchase or otherwise acquire for value, and Holdings may redeem, repurchase or otherwise acquire for value, outstanding shares of Holdings common Equity Interests (or options or warrants to purchase Holdings common Equity Interests) (i) following the death, disability or termination of employment of officers, directors or employees of Holdings or any of its Subsidiaries, provided that (x) the only consideration paid by Holdings in respect of

---

[5] [**NTD**: Subject to final tax structure.]

such redemptions or purchases shall be cash, (y) at the time of any cash Dividend, purchase or payment permitted to be made pursuant to this Section 11.03(d), no Default or Event of Default shall then exist or result therefrom and (z) the aggregate amount of all such Dividends shall not exceed $500,000 (although no more than $150,000 of such Dividends may be paid in any fiscal year of Holdings); and (ii) from shareholders (other than officers, directors or employees of Holdings or any of its Subsidiaries), provided that (x) the only consideration paid by Holdings in respect of such redemptions or purchases shall be cash, (y) at the time of any cash Dividend, purchase, payment permitted to be made pursuant to this Section 11.03(d), no Default or Event of Default shall then exist or result therefrom and (z) the aggregate amount of all such Dividends shall not exceed $500,000 (although no more than $150,000 of such Dividends may be paid in any fiscal year of Holdings);

(e)      Holdings may pay regularly scheduled Dividends on its Qualified Preferred Stock pursuant to the terms thereof solely through the issuance of additional shares of such Qualified Preferred Stock (but not in cash), provided that in lieu of issuing additional shares of such Qualified Preferred Stock as Dividends, Holdings may increase the liquidation preference of the shares of Qualified Preferred Stock in respect of which such Dividends have accrued;

(f)      the Borrower's Subsidiaries may pay cash Dividends to the Borrower and the Borrower may pay cash Dividends to Holdings and Holdings may pay cash Dividends to holders of its Equity Interests, in each case, with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities; provided that the same proceeds shall not be used for any Capital Expenditures permitted pursuant to Section 11.07(f) or any loans, advances or other Investments permitted pursuant to Section 11.05(r); and

(g)      the Borrower's Subsidiaries may pay cash Dividends to the Borrower and the Borrower may pay cash Dividends to Holdings and Holdings may pay cash Dividends in an aggregate amount not to exceed $[        ] during the term of this Agreement.[6]

11.04.   Indebtedness.

Holdings will not, and will not permit any of its Subsidiaries to, (x) enter into any minimum volume commitments or similar obligations where Holdings or such Subsidiary would be obligated to pay for transportation capacity even if not used, or (y) contract, create, incur, assume or suffer to exist any Indebtedness, except, in the case of this clause (y):

(a)      Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(b)      [reserved];

(c)      Indebtedness of the Borrower under (i) Hedge Agreements (other than Interest Rate Protection Agreements) permitted under Section 11.19 and (ii) Interest Rate Protection Agreements entered into with respect to other Indebtedness permitted under this Section 11.04,

---

[6] [**NTD**:  Discuss size of general restricted payment basket to allow for dividends / repurchases.]

EAST\177251518.5

so long as the entering into of such Interest Rate Protection Agreements are bona fide hedging activities and are not for speculative purposes;

(d)      Indebtedness of the Borrower and its Subsidiaries evidenced by Capitalized Lease Obligations and purchase money Indebtedness described in Section 11.01(g), provided that in no event shall the sum of the aggregate principal amount of all Capitalized Lease Obligations and purchase money Indebtedness permitted by this clause (d) exceed $2,500,000 at any time outstanding;

(e)      Indebtedness constituting Intercompany Loans to the extent permitted by Section 11.05(h);

(f)      Indebtedness consisting of guaranties by the Borrower and its Wholly-Owned Subsidiaries of the Borrower that are Subsidiary Guarantors of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement;

(g)      Indebtedness of a Subsidiary of the Borrower acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness), provided that (x) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition and (y) the aggregate principal amount of all Indebtedness permitted by this clause (g) shall not exceed $500,000 at any one time outstanding;

(h)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business, so long as such Indebtedness is extinguished within four Business Days of the earlier its incurrence or any Credit Party becoming aware thereof;

(i)      Indebtedness of the Borrower or any of its Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets in accordance with the requirements of this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale, and are not guaranteed by any other Person except as permitted by Section 11.04(f);

(j)      with the prior written consent of the Required Lenders in their sole discretion, Indebtedness of the Borrower or any of its Subsidiaries under clause (ix) of the definition of Indebtedness; and

(k)      additional Indebtedness incurred by the Borrower and any of its Subsidiaries in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding, which Indebtedness shall be unsecured unless otherwise permitted under Section 11.01(r).

11.05.   Advances, Investments and Loans.

Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in, or make any capital contribution to,

any other Person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (in each case, including by division of any Person) (each of the foregoing an "**Investment**" and, collectively, "**Investments**"), except that the following shall be permitted:

(a)     the Borrower and its Subsidiaries may acquire and hold accounts receivables owing to any of them, if created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(b)     Holdings and its Subsidiaries may acquire and hold cash and Cash Equivalents;

(c)     Holdings and its Subsidiaries may hold the Investments held by them on the Closing Date and described on <u>Schedule VIII</u>, <u>provided</u> that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this <u>Section 11.05</u>;

(d)     the Borrower and its Subsidiaries may acquire and own Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the Ordinary Course of Business;

(e)     the Borrower and its Subsidiaries may make loans and advances to their officers and employees for moving, relocation and travel expenses and other similar expenditures, in each case in the Ordinary Course of Business in an aggregate amount not to exceed $100,000 at any time (determined without regard to any write-downs or write-offs of such loans and advances);

(f)     Holdings and its Subsidiaries may acquire and hold obligations of their officers and employees in connection with such officers' and employees' acquisition of shares of Holdings common Equity Interests (so long as no cash is actually advanced by Holdings or any of its Subsidiaries in connection with the acquisition of such obligations);

(g)     the Borrower may enter into Hedge Agreements and Interest Rate Protection Agreements to the extent permitted by <u>Section 11.19</u> and <u>Section 11.04(c)</u>;

(h)     (I) any Credit Party may make intercompany loans and advances to any other Credit Party, (II) the Borrower and the Subsidiary Guarantors may make intercompany loans and advances to any Subsidiary which is not a Credit Party and (III) any Subsidiary which is not a Credit Party may make intercompany loans and advances to any Credit Party or any other Subsidiary (such intercompany loans and advances referred to in preceding clauses (I) through (III), collectively, the "**Intercompany Loans**"), <u>provided</u>, that (v) at no time shall the aggregate outstanding principal amount of all Intercompany Loans made pursuant to preceding subclause (II) of this clause (h), when added to the amount of contributions, acquisitions of Equity Interests, capitalizations and forgivenesses theretofore made pursuant to subclause (II) of <u>Section 11.05(i)</u> (for this purpose, taking the Fair Market Value of any property (other than cash) so contributed at the time of such contribution), exceed $500,000 (determined without regard to any write-downs or write-offs of such loans and advances and net of any returns on any such Investment in the form of a principal repayment, distribution, dividend or redemption, as

applicable), (x) each Intercompany Loan shall be evidenced by an Intercompany Note, (y) each such Intercompany Note owned or held by a Credit Party shall be pledged to the Collateral Agent pursuant to the relevant Security Document and (z) any Intercompany Loans made to any Subsidiary Guarantor pursuant to this clause (h) shall cease to be permitted by this clause (h) if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

(i)       (I) any Credit Party may make Investments in any other Credit Party (other than a Holding Company) and (II) the Credit Parties may make capital contributions to, or acquire Equity Interests of, any Subsidiary which is not a Credit Party; provided, that (x) at no time shall the aggregate outstanding principal amount of all such Investments made pursuant to preceding subclause (II) of this clause (i), when added to the amount of Intercompany Loans theretofore made pursuant to subclause (II) of Section 11.05(h), exceed $500,000 (determined without regard to any write-downs or write-offs of such loans and advances and net of any returns on any such Investment in the form of a principal repayment, distribution, dividend or redemption, as applicable), (y) any security interest granted to the Collateral Agent for the benefit of the Secured Creditors pursuant to the Security Documents in any assets so contributed shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such contribution) and all actions required to maintain said perfected status have been taken and (z) any Investment made in or to any Subsidiary Guarantor pursuant to this clause (i) shall cease to be permitted hereunder if such Subsidiary Guarantor ceases to be a Subsidiary Guarantor;

(j)       Holdings and its Subsidiaries may own the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement (so long as all amounts invested in such Subsidiaries are independently justified under another provision of this Section 11.05);

(k)       Contingent Obligations permitted by Section 11.04, to the extent constituting Investments;

(l)       Permitted Acquisitions shall be permitted in accordance with the requirements of Section 10.17;

(m)       the Borrower and its Subsidiaries may receive and hold promissory notes and other non-cash consideration received in connection with any Disposition permitted by Section 11.02(d);

(n)       the Borrower and its Subsidiaries may make advances in the form of a prepayment of expenses to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the Ordinary Course of Business;

(o)       the Borrower and its Subsidiaries may make Permitted Business Investments;

(p)       in addition to Investments permitted by clauses (a) through (o) and clause (q) of this Section 11.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person in an aggregate amount for all loans, advances and other Investments made pursuant to this clause (p) (determined without regard to any write-downs or write-offs thereof), net of cash repayments of principal in the case of loans, sale proceeds in the case of Investments in the form of debt instruments and cash equity returns (whether as a

distribution, dividend, redemption or sale) in the case of equity investments, not to exceed $500,000;

(q)     in addition to Investments permitted by clauses (a) through (q) of this Section 11.05, the Borrower and its Subsidiaries may make additional loans, advances and other Investments to or in a Person with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities; provided that the same proceeds shall not be used for any Capital Expenditures permitted pursuant to Section 11.07(f) or the payment of any Dividends permitted pursuant to Section 11.03(f).

11.06.  Transactions with Affiliates.

Holdings will not, and will not permit any of its Subsidiaries to, enter into any transaction or series of related transactions with any Affiliate of Holdings or any of its Subsidiaries (other than Holdings or any of its Subsidiaries), other than in the Ordinary Course of Business or on terms and conditions substantially as favorable to Holdings or such Subsidiary as would reasonably be obtained by Holdings or such Subsidiary at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the following in any event shall be permitted:

(a)     Dividends may be paid to the extent provided in Section 11.03;

(b)     loans may be made and other transactions may be entered into by Holdings and its Subsidiaries to the extent permitted by Sections 11.02, 11.04 and 11.05;

(c)     customary indemnities may be paid to non-officer directors of Holdings and its Subsidiaries;

(d)     customary fees and reimbursements may be paid to non-officer directors of Holdings and its Subsidiaries in an amount not to exceed $150,000 in any fiscal year;

(e)     Holdings may issue Holdings common Equity Interests and Qualified Preferred Stock; and

(f)     Holdings and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of Holdings and its Subsidiaries in the Ordinary Course of Business.

Notwithstanding anything to the contrary contained above in this Section 11.06, in no event shall Holdings or any of its Subsidiaries pay any management, consulting or similar fee to any of their respective Affiliates.

11.07.  Capital Expenditures.

(a)     Holdings will not, and will not permit any of its Subsidiaries to, make any Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and

Exploration Expenses, except that prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make such Capital Expenditures so long as the aggregate amount of all such Capital Expenditures does not exceed $2,500,000 in each fiscal year of Holdings.

(b)      In addition to the foregoing, prior to the occurrence of an Event of Default, in the event that the amount of Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses permitted to be made by the Borrower and its Subsidiaries pursuant to clause (a) above in any fiscal year of Holdings (before giving effect to any increase in such permitted Capital Expenditure amount pursuant to this clause (b)) is greater than the amount of Capital Expenditures actually made by the Borrower and its Subsidiaries during such fiscal year, the lesser of (x) such excess and (y) 50% of the applicable permitted scheduled Capital Expenditure amount as set forth in such clause (a) above may be carried forward and utilized to make Capital Expenditures in the immediately succeeding fiscal year, provided that no amounts once carried forward pursuant to this Section 11.07(b) may be carried forward to any fiscal year of Holdings thereafter; provided, further, that in any fiscal year the corresponding amount set forth in Section 11.07(a) shall be deemed to have been utilized in full prior to the utilization of any amounts pursuant to this Section 11.07(b).

(c)      In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the amount of (x) Net Sale Proceeds received by the Borrower or any of its Subsidiaries from any Asset Sale so long as such Net Sale Proceeds are reinvested within 360 days following the date of such Asset Sale, but only to the extent that such Net Sale Proceeds are not otherwise required to be applied as a mandatory repayment pursuant to Section 6.02(e) and (y) Net Sale Proceeds received by the Borrower or any of its Subsidiaries from any Disposition that does not constitute an Asset Sale.

(d)      In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the amount of Net Cash Proceeds received by the Borrower or any of its Subsidiaries from any Recovery Event so long as such Net Cash Proceeds are used to replace or restore any properties or assets in respect of which such Net Cash Proceeds were paid within 360 days following the date of receipt of such Net Cash Proceeds from such Recovery Event, but only to the extent that such Net Cash Proceeds are not otherwise required to be applied as a mandatory repayment pursuant to Section 6.02(g).

(e)      In addition to the foregoing, prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) constituting Permitted Acquisitions effected in accordance with the requirements of Section 10.17.

(f)     In addition to the foregoing, the Borrower and its Subsidiaries may make additional Capital Expenditures that are not Maintenance Capital Expenditures or Capitalized Drilling and Exploration Expenses (which such Capital Expenditures will not be included in any determination under Section 11.07(a) or (b)) with the identifiable net cash proceeds of any issuances of common Equity Interests in Holdings or Qualified Preferred Stock, in each case not including any Permitted Cure Securities (other than any Permitted Cure Securities issued or deemed issued to cure any non-compliance with this Section 11.07); provided that the same proceeds shall not be used for any loans, advances or other Investments permitted pursuant to Section 11.05(q) or the payment of any Dividends permitted pursuant to Section 11.03(f).

11.08.   Fixed Charge Coverage Ratio.

Holdings will not permit the Fixed Charge Coverage Ratio to be less than 2.00 to 1.00 as of the last day of any Test Period, commencing with the Test Period ending March 31, 2021.

11.09.   Total Leverage Ratio.

Holdings will not permit the Total Leverage Ratio to be greater than 3.00 to 1.00 as of the last day of any Test Period, commencing with the Test Period ending March 31, 2021.

11.10.   Adjusted Coverage Ratio.

Holdings will not permit the Adjusted Coverage Ratio to be less than 1.05 to 1.00 as of the last day of any Test Period, commencing with the Test Period ending March 31, 2021.

11.11.   Drilling and Exploration Expenses; Capitalized Drilling and Exploration Expenses.

(a)     Holdings will not, and will not permit any of its Subsidiaries to, incur any Drilling and Exploration Expenses, except that prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may incur Drilling and Exploration Expenses so long as the aggregate amount of all such Drilling and Exploration Expenses does not exceed $10,000,000 in any fiscal year of Holdings.

(b)     Holdings will not, and will not permit any of its Subsidiaries to, incur any Capitalized Drilling and Exploration Expenses, except that prior to the occurrence of an Event of Default, the Borrower and its Subsidiaries may incur Capitalized Drilling and Exploration Expenses so long as the aggregate amount of all such Capitalized Drilling and Exploration Expenses does not exceed $30,000,000 in any fiscal year of Holdings.

11.12.   Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.

Holdings will not, and will not permit any of its Subsidiaries to:

(a)     amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement or by-laws (or the equivalent

organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests (including any shareholders' agreement and any Qualified Preferred Stock), or enter into any new agreement with respect to its capital stock or other Equity Interests, unless such amendment, modification, change or other action contemplated by this clause (a) could not reasonably be expected to be materially adverse to the interests of the Lenders;

(b)       amend, modify, change or waive any Necessary Authorization or Material Agreement unless such amendment, modification, change or waiver could not reasonably be expected to be materially adverse to the interests of the Lenders or the Credit Parties;

(c)       designate any Indebtedness (or related interest obligations) as "Designated Senior Debt" or similar term except for the Obligations;

(d)       on and after the execution and delivery thereof, amend, modify or waive, or permit the amendment, modification or waiver of, any provision of the Intercompany Note without the prior consent of the Administrative Agent unless such amendment, modification or waiver could not reasonably be expected to be adverse to the interests of the Lenders;

(e)       make any principal or interest payment on, or any redemption or acquisition for value of, or any other payment with respect to any Subordinated Debt except as permitted by the subordination terms of the Subordinated Debt.

11.13.   Limitation on Certain Restrictions on Subsidiaries.

Holdings will not, and will not permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any such Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other Equity Interests or participation in its profits owned by Holdings or any of its Subsidiaries, or pay any Indebtedness owed to Holdings or any of its Subsidiaries, (b) make loans or advances to Holdings or any of its Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Credit Documents, (iii) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of Holdings or any of its Subsidiaries, (iv) customary provisions restricting assignment of any licensing agreement (in which Holdings or any of its Subsidiaries is the licensee) or other contract entered into by Holdings or any of its Subsidiaries in the Ordinary Course of Business, (v) restrictions on the transfer of any asset pending the close of the sale of such asset, and (vi) restrictions on the transfer of any asset subject to a Lien permitted by Section 11.01(c), (f), (g), (o) or (p).

11.14.   Limitation on Issuance of Equity Interests.

(a)       Holdings will not, and will not permit any of its Subsidiaries to, issue (i) any Preferred Equity (other than (x) Qualified Preferred Stock issued pursuant to clause (c) below) or (ii) any redeemable common stock or other redeemable common Equity Interests other than (x) common stock or other redeemable common Equity Interests that is or are redeemable at the sole option of Holdings or such Subsidiary, as the case may be or (y) redeemable common stock or

other redeemable common Equity Interests that are not redeemable prior to 91 days following the Maturity Date.

(b)      Holdings will not permit any of its Subsidiaries to issue any capital stock or other Equity Interests (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, capital stock or other Equity Interests, except (i) for transfers and replacements of then outstanding shares of capital stock or other Equity Interests, (ii) for stock splits, stock dividends and other issuances which do not decrease the percentage ownership of Holdings or any of its Subsidiaries in any class of the capital stock or other Equity Interests of such Subsidiary, (iii) for issuances by Subsidiaries of the Borrower which are newly created or acquired in accordance with the terms of this Agreement and (iv) a Non-Wholly Owned Subsidiary may issue Equity Interests, subject to compliance with Section 6.02(d).

(c)      Holdings may from time to time (i) issue Qualified Preferred Stock, so long as (x) no Default or Event of Default shall exist at the time of any such issuance or immediately after giving effect thereto, and (y) with respect to each issuance of Qualified Preferred Stock, the gross cash proceeds therefrom (or in the case of Qualified Preferred Stock directly issued as consideration for a Permitted Acquisition, the Fair Market Value of the assets received therefor) shall be at least equal to 100% of the liquidation preference thereof at the time of issuance and (ii) issue additional shares of Qualified Preferred Stock to pay in kind regularly scheduled Dividends on Qualified Preferred Stock theretofore issued in compliance with this Section 11.14(c).

11.15.  Business; etc.

(a)      Holdings will not, and will not permit any of its Subsidiaries to, engage directly or indirectly in any business other than the businesses engaged in by Holdings and its Subsidiaries as of the Closing Date and reasonable extensions thereof and businesses ancillary or complimentary thereto with operations located in Madison, Grimes, Brazos, Robertson and Leon Counties, Texas.  From and after the Effective Date, Holdings and its Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within Madison, Grimes, Brazos, Robertson and Leon Counties, Texas.

(b)      Notwithstanding the foregoing or anything else in this Agreement to the contrary, no Holding Company will engage in any business or own any significant assets or have any material liabilities other than (i) (x) its ownership of the Equity Interests of another Holding Company or the Borrower, as applicable, and (y) holding up to $500,000 of cash and Cash Equivalents in the aggregate for all Holding Companies at any time (together with any investment income thereon) and (ii) those liabilities which it is responsible for under this Agreement and the other Credit Documents to which it is a party, provided that each Holding Company may engage in those activities that are incidental to (x) the maintenance of its existence in compliance with applicable law and (y) legal, tax and accounting matters in connection with any of the foregoing activities.

(c)      Holdings will not make any significant change in accounting treatment or reporting practices, except as required by GAAP.

11.16.  <u>Holding Companies</u>.

No Holding Company will incur any liabilities for borrowed money (other than the guaranty of the Loans, other liabilities arising under the Credit Documents and guarantees permitted by this Agreement), Guaranty any Indebtedness (other than the Loans), enter into any employment agreements, leases or other contracts, own or acquire any assets (other than the Equity Interests of another Holding Company or the Borrower, as applicable, and any assets incidental to the foregoing) or engage itself in any operations or business other than its ownership of the Equity Interests of, and its management of, the other Credit Parties and their Subsidiaries; provided, that, each Holding Company may engage in those activities that are incidental to (i) the maintenance of its corporate existence in compliance with applicable law, (ii) legal, tax and accounting matters in connection with any of the foregoing or following activities, (iii) the entering into, and performing its obligations under, this Agreement and the Credit Documents, (iv) the incurrence and payment of any Taxes for which it may be liable and (v) the consummation of the Transaction; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in this Agreement, no Holding Company shall (1) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (2) sell or otherwise dispose of any Equity Interests of any Credit Party; or (3) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

11.17.  <u>Certain Deposit Accounts</u>.

None of the Credit Parties will maintain any  deposit account (other than any Excluded Account), unless such deposit account is (x) subject to a "control agreement" pursuant to Section 3.9 of the Security Agreement or (y) otherwise under the "control" (within the meaning of Section 9-104 of the New York UCC) of the Collateral Agent.

11.18.  <u>Sanctions; Anti-Corruption Use of Proceeds</u>.

The Borrower will not, directly or indirectly, use the proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption Law, or (b) (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as Administrative Agent, Lender, underwriter, advisor, investor, or otherwise).

11.19.  <u>Restrictions on Hedge Agreements</u>.

Holdings will not, and will not permit any of its Subsidiaries to:

(a)      be party to or otherwise enter into any Hedge Agreement with any Person other than an Approved Counterparty;

(b)      purchase, assume or hold a speculative position in any commodities market or futures market or enter into any Hedge Agreement for speculative purposes;

113

(c)     be party to or otherwise enter into any Hedge Agreement that is entered into for reasons other than as a part of its normal business operations as a risk management strategy and/or hedge against changes resulting from market conditions related to a Credit Party's operations;

(d)     establish any hedge position or enter into any Hedge Agreement that covers any Oil and Gas Properties or Proved Reserves which do not constitute PDP Reserves reflected on the most recent Reserve Report delivered hereunder;

(e)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position that is secured with assets of Holdings or any of its Subsidiaries or otherwise post Cash or Cash Equivalents or margin in respect of its Hedge Agreement except pursuant to the Security Documents if such Hedge Agreement is a Secured Hedge Agreement;

(f)     be party to or otherwise enter into any fixed for floating Hedge Agreement in which any Credit Party pays fixed and receives floating except for Hedge Agreements entered into to offset existing Hedge Agreements to the extent the volume of production subject to such offsetting Hedge Agreements does not exceed 5% of Projected Oil and Gas Production as set forth in the most recently delivered Reserve Report, unless otherwise approved in writing by Administrative Agent and the Required Lenders in their reasonable discretion;

(g)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position with a duration longer than five years after the date the applicable Hedge Agreement is entered into or hedge position is established; or

(h)     be party to or otherwise enter into any Hedge Agreement or establish any hedge position, the notional volumes for which (when aggregated with other Hedge Agreements or hedges then in effect other than basis differential swaps on volumes already hedged pursuant to other Hedge Agreements) exceed, as of the date such Hedge Agreement is entered into, 90% of the Credit Parties' aggregate Projected Oil and Gas Production for each quarter during the 5-year period following such date of determination, for each of crude oil, natural gas and natural gas liquids, calculated separately.

11.20.   Gas Imbalances, Take-or-Pay or Other Prepayments.

Holdings and the Borrower will not, and will not permit any of their Subsidiaries to, (a) allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of any Credit Party or any Subsidiary that would require any Credit Party or Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor if such gas imbalances, take-or-pay or other prepayments, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (b) enter into minimum volume contracts for gathering, processing or transportation of production that require the payment of a fee in the event such minimum volumes are not met.

11.21.   General and Administrative Expenses.

Holdings will not permit the general and administrative expenses of Holdings and its Subsidiaries, *not including* litigation expenses (if any), determined on a consolidated basis in

accordance with GAAP, to exceed $5,000,000 during any Test Period ending on the last day of such Test Period, commencing with the Test Period ending December 31, 2021.

SECTION 12. Events of Default.

Upon the occurrence of any of the following specified events (each, an "**Event of Default**"):

12.01.  Payments.

The Borrower shall (i) default in the payment when due of any principal of any Loan or any Note or (ii) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any Fees or any other amounts owing hereunder or under any other Credit Document; or

12.02.  Representations, etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made; or

12.03.  Covenants.

Holdings or any of its Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 6.02, Section 10.01(a), (b), (c), (f), (g) and (h)(i), Section 10.04, 10.11, 10.15, 10.23, 10.25 or Section 11 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement or any other Credit Document (other than those set forth in Sections 12.01 and 12.02) and such default under this Section 12.03(ii) shall continue unremedied for a period of 30 days after the occurrence thereof; or

12.04.  Default Under Other Agreements.

(i) Holdings or any of its Subsidiaries shall (x) default in any payment of any Indebtedness (other than the Obligations) beyond any period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its stated maturity, or (ii) any Indebtedness (other than the Obligations) of Holdings or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid (other than by (x) a regularly scheduled required prepayment or (y) a mandatory prepayment (unless such required prepayment or mandatory prepayment results from a default thereunder or an event of the type that constitutes an Event of Default)) beyond any period of grace, prior to the stated maturity

115

thereof, provided that it shall not be a Default or an Event of Default under this Section 12.04 unless the aggregate principal amount of all Indebtedness as described in preceding clauses (i) and (ii) is at least $1,000,000; or

12.05.  Bankruptcy, etc.

Holdings or any of its Subsidiaries shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "**Bankruptcy Code**"); or an involuntary case is commenced against Holdings or any of its Subsidiaries, and the petition is not dismissed within 60 days after the filing thereof; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of Holdings or any of its Subsidiaries, to operate all or any substantial portion of the business of Holdings or any of its Subsidiaries, or Holdings or any of its Subsidiaries commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to Holdings or any of its Subsidiaries, or there is commenced against Holdings or any of its Subsidiaries any such proceeding which remains undismissed for a period of 60 days after the filing thereof, or Holdings or any of its Subsidiaries is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or Holdings or any of its Subsidiaries makes a general assignment for the benefit of creditors; or any Company action is taken by Holdings or any of its Subsidiaries for the purpose of effecting any of the foregoing; or

12.06.  ERISA.

(a) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof under Section 412 of the Code or Section 302 of ERISA or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code or Section 303 or 304 of ERISA; a Reportable Event shall have occurred; a contributing sponsor (as defined in Section 4001(a)(13) of ERISA) of a Plan shall be subject to the advance reporting requirement of PBGC Regulation Section 4043.61 (without regard to subparagraph (b)(1) thereof) and an event described in subsection .62, .63, .64, .65, .66, .67 or .68 of PBGC Regulation Section 4043 shall be reasonably expected to occur with respect to such Plan within the following 30 days; any determination that any Plan or Multiemployer Plan is considered at-risk or in endangered or critical status as defined in Section 303, 304 and 305 of ERISA or Sections 430, 431 and 432 of the Code; any Plan or Multiemployer Plan shall have had or is likely to have a trustee appointed to administer such Plan or Multiemployer Plan; any Plan or Multiemployer Plan is, shall have been or is likely to be the subject of termination proceedings under ERISA, a contribution required to be made with respect to a Plan or a Multiemployer Plan has not been timely made, Holdings or any Subsidiary of Holdings or any ERISA Affiliate has incurred or is likely to incur any liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4071, 4201, 4204 or 4212 of ERISA or Section 401(a)(29), 4971 or 4975 of the Code, a "default" (within the meaning of Section 4219(c)(5) of ERISA) shall occur with respect to any Plan; (b) there shall result from any such event or events described in subsection (a) the imposition of a lien, the granting of a security interest, or a liability or a material risk of incurring a liability; and (c) such lien, security interest or liability, described in

116

subsection (b) individually and/or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect; or

12.07.   Security Documents.

Any of the Security Documents shall fail or cease to be in full force and effect, or shall fail or cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 11.01)), and subject to no other Liens (except as permitted by Section 11.01); or

12.08.   Guaranties.

Any Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Subsidiary Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party; or

12.09.   Judgments.

One or more judgments or decrees shall be entered against Holdings or any Subsidiary of Holdings involving in the aggregate for Holdings and its Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $1,000,000; or

12.10.   Change of Control.

A Change of Control shall occur; or

12.11.   No Waiver of Affiliate Operator's Liens.

If an Affiliate of a Credit Party is an operator of a Credit Party's Oil and Gas Properties and has not waived any and all Liens in favor of such Affiliate encumbering such Oil and Gas Properties pursuant to an agreement that is in form and substance satisfactory to the Administrative Agent;

12.12.   Subordination.

(i) The subordination provisions of the documents evidencing or governing any Subordinated Debt (the "**Subordinated Provisions**") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of applicable subordinated Indebtedness; or (ii) the Borrower or any other Credit Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordinated Provisions, (B) that the Subordinated Provisions exist for the benefit of the Administrative Agent, the Collateral Agent and the Lenders or (C) that all payments of principal of or premium and interest on the applicable subordinated Indebtedness, or

realized from the liquidation of any property of any Credit Party, shall be subject to any of the Subordinated Provisions; or

12.13.  Hedge Agreements.

There occurs (i) under any Hedge Agreement an "early termination date" (as defined or used in such Hedge Agreement, or words to similar effect) resulting from any event of default under such Hedge Agreement as to which Holdings or any of its Subsidiaries is the "defaulting party" (as defined or used in such Hedge Agreement, or words to similar effect) or a termination event under such Hedge Agreement as to which Holdings or any of its Subsidiaries is an "affected party" (as defined or used in such Hedge Agreement, or words to similar effect) and, in either event, the Hedge Termination Value owed by Holdings or any of its Subsidiaries as a result thereof is greater than $1,000,000 or (ii) any Triggering Event under clause (a) of the definition of Triggering Event, as defined in the Hedge Intercreditor Agreement;

12.14.  Remedies; Equity Cure.

(a)     Upon the occurrence of any such Event of Default as set forth in Section 12.01 through and including Section 12.13, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Majority Lenders, shall, subject to the terms of the Hedge Intercreditor Agreement, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party (provided that, if an Event of Default specified in Section 12.05 shall occur with respect to the Borrower, the result which would occur upon the giving of written notice by the Administrative Agent as specified in clause (i) below shall occur automatically without the giving of any such notice): (i) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (ii) enforce, as the Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents; (iii) enforce each Guaranty; and (iv) apply any cash collateral held by the Administrative Agent or the Collateral Agent pursuant to Section 6.02 to the repayment of the Obligations.

(b)     Notwithstanding anything to the contrary contained in this Section 12, in the event that the Credit Parties fail (or, but for the operation of this paragraph, would fail) to comply with the covenants set forth in Sections 11.07, 11.08, 11.09, 11.10 and 11.11 (such applicable covenants, the "**Financial Performance Covenants**") as of the last day of any fiscal quarter, at any time after such last day until the day that is ten (10) Business Days after the date the certificate calculating the applicable Financial Performance Covenants for such fiscal quarter is required to be delivered pursuant to Section 10.01(g) or, if earlier, on the date on which such certificate is delivered, Holdings shall have the right to issue Permitted Cure Securities for cash or otherwise receive cash contributions to the capital of Holdings (collectively, the "**Cure Right**"), which cash shall be contributed as common Equity Interests or Qualified Preferred Equity to the Borrower (such contributed amount, the "**Cure Amount**"); provided, however, that (i) there shall be no more than four Cure Rights exercised in the aggregate during the term of this

118

Agreement, and no more than two Cure Rights exercised during any four consecutive fiscal quarter period, (ii) Cure Rights may not be exercised in successive fiscal quarters, (iii) for purposes of this paragraph, the Cure Amount shall be no greater than the amount required for purposes of complying with the Financial Performance Covenants, (iv) for the avoidance of doubt, in recalculating the Financial Performance Covenants by increasing  Consolidated EBITDAX (or Capital Expenditures funded with proceeds of equity issuances) as set forth above, there shall be no pro forma effect given to any reduction of Loans made with the Cure Amount in such recalculation of the Financial Performance Covenants, (v) such Financial Performance Covenants shall be recalculated by increasing Consolidated EBITDAX (or Capital Expenditures funded with proceeds of equity issuances) with respect to such fiscal quarter and any four-quarter period that contains such fiscal quarter, solely for the purpose of measuring the Financial Performance Covenants and not for any other purpose under this Agreement (including any "baskets"), by an amount equal to the Cure Amount, (vi) any Cure Amount shall be applied to prepay the Loans pursuant to Section 6.02(c) and (vii) any Cure Amount used for purposes of complying with the Adjusted Coverage Ratio under Section 11.10 shall solely be calculated by decreasing Consolidated Indebtedness (to the extent the Loans are prepaid pursuant to Section 6.02(c)) and shall not be included for purposes of calculating the numerator of the definition of Adjusted Coverage Ratio.  If, after giving effect to the adjustments in this paragraph, the Borrower shall then be in compliance with the requirements of the Financial Performance Covenants, the Borrower shall be deemed to have satisfied the requirements of the Financial Performance Covenants as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the Financial Performance Covenants that had occurred shall be deemed cured for the purposes of this Agreement.

SECTION 13. The Administrative Agent.

13.01. Appointment.

The Lenders hereby irrevocably designate and appoint Loan Admin as Administrative Agent (for purposes of this Section 13 and Section 14.01, the term "Administrative Agent" also shall include Loan Admin in its capacity as Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

13.02. Nature of Duties.

(a)     The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Neither the Administrative Agent nor any of its officers, directors, agents, employees or affiliates shall be

liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).   The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender or the holder of any Note; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.

(b)    Each Lender unconditionally and irrevocably acquits and fully forever releases and discharges the Administrative Agent and all its affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and its respective heirs, legal representatives, successors and assigns (collectively, the "**Releasees**") on the date each interest payment on the Loans is made by the Borrower from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which such party hereto ever had or now has against any of the Releasees and which has arisen at any time prior to the date of such interest payment out of this Agreement, the other Credit Documents or any other related documents, instruments, agreements or matters or the enforcement or attempted or threatened enforcement by any of the Releasees of any of their respective rights, remedies or recourse related thereto (collectively, the "**Released Claims**") (but in each case referred to in this clause (c), excluding any claims, demands, causes of actions, obligations, remedies, suits, damages or liabilities to the extent same occurred by reason of the gross negligence or willful misconduct of the Releasee to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).  Each Lender covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Releasees any action or other proceeding based upon any of the Released Claims.

13.03.   <u>Lack of Reliance on the Administrative Agent</u>.

(a)    Each Lender from time to time party to this Agreement (i) confirms that it has received a copy of this Agreement and the other Credit Documents, together with copies of the financial statements referred to therein, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to become a Lender under this Agreement, (ii) agrees that it has made and will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Credit Documents and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, (iii) acknowledges and agrees that no fiduciary or advisory relationship between the Administrative Agent and any Lender is intended to be or has been created in respect of any of the transactions contemplated by this Agreement,

(iv) acknowledges and agrees that the Administrative Agent, on the one hand, and each Lender on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, and no Lender relies on, any fiduciary duty on the Administrative Agent's part, (v) acknowledges and agrees that each Lender is capable of evaluating and understanding, and each such Lender understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement, (vi) acknowledges and agrees that the Administrative Agent or any of its Affiliates may have received fees or other compensation from any Credit Party or any Affiliate of any Credit Party in connection with this Agreement which may or may not be publicly disclosed and such fees or compensation do not affect any Lender's independent credit decision to enter into the transactions contemplated by this Agreement, (vii) acknowledges and agrees that notwithstanding that no fiduciary or similar relationship exists between the Administrative Agent and any Lender, each such Lender hereby waives, to the fullest extent permitted by law, any claims it may have against the Administrative Agent or its Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Administrative Agent and its Affiliates shall have no liability (whether direct or indirect) to any Lender in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of any Lender, including any such Lender's affiliates, members, partners, subsidiaries, officers, employees, agents, attorneys, principals, directors and shareholders and respective heirs, legal representatives, successors and assigns and creditors, in each case subject to and without limiting the terms of Section 13.02(a), and (viii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Credit Documents are required to be performed by it as a Lender.  The Administrative Agent shall not be responsible to any Lender or the holder of any Note for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

(b)     To the full extent permitted by applicable law, each party hereto and each Indemnified Person shall not assert, and hereby waives, any claim against any other party hereto or any other Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document, any other agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds thereof; provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.  No party hereto and no Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Person results from such Person's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final and non-appealable decision);

provided, however, that the foregoing provisions shall not relieve the Borrower of its indemnification obligations as provided in Section 14.01(a) to the extent any Indemnified Person is found liable for any such damages.

13.04.  Certain Rights of the Administrative Agent.

If the Administrative Agent requests instructions from the Required Lenders or the Majority Lenders, as applicable, with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders or the Majority Lenders, as applicable,; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, the Administrative Agent shall be entitled to refrain from any act or action, and neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent refraining from such act or action, unless or until the Administrative Agent shall have received, pursuant to an escrow arrangement reasonably satisfactory to it, from the Borrower or the Lenders an amount initially equal to $250,000 and supplemented or increased thereafter on a monthly basis to the extent necessary (in the reasonable judgment of the Administrative Agent) to reimburse the Administrative Agent for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature that may be imposed on, asserted against or incurred by the Administrative Agent as a result of such act or action and for which the Administrative Agent would be entitled to indemnification pursuant to Section 13.06 or Section 14.01 hereof.  Any amounts subject to such escrow arrangement remaining after payment in full of all such indemnification obligations shall be returned to the Lenders or the Borrower, as applicable.

13.05.  Reliance.

The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, e-mail, facsimile, order or other document or telephone message signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent.

13.06.  Indemnification.

To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature (including, without limitation, any customary indemnifications provided to a deposit account bank pursuant to a "control agreement" referred to in the Security Agreement) which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any

way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.07.   <u>The Administrative Agent in its Individual Capacity</u>.

The Person serving as the Administrative Agent hereunder shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein as Administrative Agent; and the terms "**Lender**," "**Required Lenders**," "**Majority Lenders**," "**holders of Notes**" or any similar terms shall, unless the context clearly indicates otherwise, include the Person serving as Administrative Agent hereunder in its respective individual capacities.  Such Person and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement which may or may not be publicly disclose and otherwise without having to account for the same to the Lenders.

13.08.   <u>Holders</u>.

The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof if such payee has been recorded on the Register unless and until a written notice of the assignment or  transfer thereof, as the case may be, shall have been filed with the Administrative Agent and such assignment or transfer shall have been recorded on the Register.  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee or assignee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

13.09.   <u>Resignation by the Administrative Agent</u>.

(a)   The Administrative Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 3 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under <u>Section 12.05</u> then exists, the Borrower.  Any such resignation by an Administrative Agent hereunder shall also constitute its resignation as the Collateral Agent in which case the resigning Administrative Agent shall not be required to discharge any duties of the "Collateral Agent" under the Security Documents.  Such resignation shall take effect upon the appointment of a successor Administrative Agent pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation by the Administrative Agent, the Required Lenders shall, subject to the immediately following sentence, appoint a successor Administrative Agent hereunder or thereunder who shall be (x) a Lender or an Affiliate of a Lender or (y) a commercial bank or trust company reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld or delayed (provided that the Borrower's approval shall not be required if an Event of Default then exists).  Each of the Lenders and the Borrower agree that if Sixth Street Specialty Lending, Inc. (formerly known as TPG Specialty Lending, Inc.) (together with its Affiliates, "**Sixth Street**"), at the time of any Resignation Event, holds Loans in excess of the lesser of (i) $[      ] and (ii) [   ]% of the aggregate outstanding Loans of all Lenders at such time, Sixth Street shall be have a right of first refusal to assume (but shall not be required to assume) the role of Administrative Agent upon any resignation by the Administrative Agent (other than any resignation pursuant to clause (e) hereof), and if Sixth Street accepts such appointment, it shall become the successor Administrative Agent with no further Lender or Borrower consent or action required.  Upon any Resignation Event, Loan Admin (or any of its Affiliates) shall promptly (and in any event within three (3) Business Days) resign as the Administrative Agent and Collateral Agent and shall, if applicable, permit Sixth Street to be appointed pursuant to this clause (b), and Sixth Street, if applicable, hereby agrees to be so appointed, as the successor "Administrative Agent" and "Collateral Agent" for all purposes under this Agreement and the other Credit Documents in accordance with this Section 13.09 (it being understood that no approval or consent by the Borrower or the Required Lenders is required for such appointment pursuant to this clause (b)).  In connection with any such resignation by Loan Admin (or any of its Affiliates, as the case may be), Loan Admin (or any of its Affiliates, as the case may be) shall execute and deliver all such lien assignments and other documentation, and take such further actions, as Sixth Street may reasonably request to carry out the transition of the agency roles as to Sixth Street as set forth herein.

(c)    If no successor Administrative Agent has been appointed pursuant to clause (b) above by the 3rd Business Day after the date such notice of resignation was given by the Administrative Agent, the Administrative Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of the Administrative Agent hereunder and/or under any other Credit Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided above.

(d)    Upon a resignation of the Administrative Agent pursuant to this Section 13.09, the Administrative Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this Section 13 (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of the Administrative Agent for all of its actions and inactions while serving as the Administrative Agent.

(e)    Loan Admin may, by giving three (3) days' written notice to the Borrower, designate any Affiliate of Loan Admin to act as Administrative Agent hereunder, in which case Loan Admin shall be deemed to have resigned as Administrative Agent pursuant to preceding clause (a) and such designee shall be deemed to have been appointed as a successor Administrative Agent pursuant to preceding clause (b).

(f)    So long as Loan Admin or one of its Affiliates is the Administrative Agent to the extent permitted under this Agreement, upon the occurrence of Loan Admin or any of its

EAST\177251518.5

Affiliates that are Lenders assigning all or a portion of its outstanding Loans to any Person other than an Affiliate that would result in the occurrence of a Resignation Event, Loan Admin (or its Affiliates) shall promptly (and in any event within three (3) Business Days) provide written notice to Sixth Street specifying (i) the portion of the outstanding Loans assigned, (ii) the identity of the assignee and (iii) the sum of its then existing outstanding Loans after giving effect to such assignment.  Upon Sixth Street's reasonable request, Loan Admin (or its Affiliates) will provide Sixth Street with access to (or a copy of) the Register then in effect.

      13.10.   Collateral Matters.

      (a)     Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents and the Hedge Intercreditor Agreement for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

      (b)     The Lenders hereby authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) constituting property being sold or otherwise disposed of (to Persons other than Holdings and its Subsidiaries) upon the sale or other disposition thereof in compliance with Section 11.02, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by Section 14.12) or (iv) as otherwise may be expressly provided in the relevant Security Documents.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 13.10.

      (c)     The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 13.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its

EAST\177251518.5

gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

13.11.  Delivery of Information.

The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Majority Lenders, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

13.12.  Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by the Administrative Agent (including, without limitation, any of its Affiliates).  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective officers, directors, employees, representatives, agents, sub-agents or advisors thereof.  The Administrative Agent shall not be responsible for the negligence or misconduct of any respective sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

13.13.  No Reliance on the Administrative Agent's Customer Identification Program: Certifications From Banks and Participants: Patriot Act.

(a)  Each Lenders acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participants or assignee customer identification program, or other requirements imposed by the Patriot Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("**CIP Regulations**"), or any other Laws relating to the prevention of money laundering or the equivalent on any applicable jurisdiction, including any programs involving any of the following items relating to or in connection with any of the Credit Parties, their Affiliates or their agents, the Credit Documents or the transactions hereunder or contemplated hereby (1) any identity verification procedures, (2) any recordkeeping (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations; or other regulations issued under the Patriot Act, Each Lender, Affiliate, participant or assignee subject to Section 326 of the Patriot Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations or any equivalent provisions in any applicable jurisdiction.

(b)     Each Lender or assignee or participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification or if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the Patriot Act and the applicable regulations: (1) within ten days after the Closing Date, and (2) as such other times as are required under the Patriot Act.

(c)     The Patriot Act requires all financial institutions to obtain verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, the Administrative Agent or Lender may from time to time request, and each Credit Party shall provide to such agents or Lender, the Borrower's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the Patriot Act and any other Sanctions.

SECTION 14.  <u>Miscellaneous</u>.

14.01.  <u>Payment of Expenses, etc</u>.

(a)     The Borrower hereby agrees to: (i) whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, the reasonable fees and disbursements of DLA Piper LLP (US) and the Administrative Agent's other counsel and consultants) and each Lender (including, without limitation, the reasonable fees and disbursements of such Lender's counsel and consultants), in each case in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Administrative Agent and its Affiliates in connection with its or their syndication efforts with respect to this Agreement and, after the occurrence and during the continuation of an Event of Default, each of the Administrative Agent and Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of counsel and consultants for the Administrative Agent and, after the occurrence and during the continuation of an Event of Default, counsel for the Lenders); (ii) pay and hold the Administrative Agent and each of the Lenders harmless from and against any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and save the Administrative Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Administrative Agent or such Lender) to pay such taxes; and (iii) indemnify the Administrative Agent and each Lender, and each of their respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors (each, an "**Indemnified Person**") from and hold each of them

harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, (a) any indemnity obligation or investigation, litigation or other proceeding (whether or not the Administrative Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Loans hereunder or the consummation of the Transaction or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or (b) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by Holdings or any of its Subsidiaries at any location, whether or not owned, leased or operated by Holdings or any of its Subsidiaries, the non-compliance by Holdings or any of its Subsidiaries with any Environmental Law (including applicable permits thereunder) applicable to any Real Property, or any Environmental Claim asserted against Holdings, any of its Subsidiaries or any Real Property at any time owned, leased or operated by Holdings or any of its Subsidiaries, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PERSON** (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Indemnified Person to be indemnified (as determined by a court of competent jurisdiction in a final and non-appealable decision)).   To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

(b)     To the fullest extent permitted by applicable law, neither any Holding Company nor the Borrower shall assert, and each hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

14.02.  <u>Right of Setoff</u>.

In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by applicable law, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender or any Affiliate, branch or agency thereof (including, without limitation, by branches and agencies of the Administrative Agent or such Lender or Affiliate wherever located) to or for the credit or the account of Holdings or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to <u>Section 14.04(b)</u>, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

14.03.  <u>Notices</u>.

Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including e-mail for facsimile communications) and mailed, or delivered by electronic mail or facsimile: if to any Credit Party, at the address specified on <u>Schedule II</u> or in the other relevant Credit Documents; if to any Lender, at its address specified to the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed (certified return receipt required), delivered by facsimile or electronic mail, or sent by overnight courier, be effective when deposited in the mails, delivered to overnight courier, as the case may be, or sent by facsimile or electronic mail (with electronic confirmation of receipt), except that notices and communications to the Administrative Agent and any Credit Party shall not be effective until received by the Administrative Agent or the Borrower or any Credit Party, as the case may be.

14.04.  <u>Benefit of Agreement; Assignments; Participations</u>.

(a)      This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; <u>provided</u>, <u>however</u>, no Credit Party may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Lenders and, <u>provided further</u>, that, no Lender may transfer or assign its rights hereunder, except as provided in <u>Sections 2.12</u> and <u>14.04(b)</u>, <u>(c)</u> and <u>(d)</u>.

(b)      Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its outstanding Obligations hereunder to

(i)(A) its parent company and/or any affiliate of such Lender which is at least 50% owned by such Lender or its parent company (provided that any fund that invests in loans and is managed or advised by the same investment advisor of another fund which is a Lender (or by an Affiliate of such investment advisor) shall be treated as an affiliate of such other Lender for the purposes of this sub-clause (x)(i)(A)), (B) to one or more other Lenders or any affiliate of any such other Lender which is at least 50% owned by such other Lender or its parent company, or (C) to any bank or financial institution that has provided financing to such Lender, or (ii) in the case of any Lender that is a fund or other entity that invests in loans, any other fund or other entity that invests in loans and is managed or advised by the same investment advisor of any Lender or by an Affiliate of such investment advisor or (y) assign all, or if less than all, a portion equal to at least $5,000,000 in the aggregate for the assigning Lender or assigning Lenders, of such outstanding Obligations hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single Eligible Transferee), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, provided that (i) upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.05 (with appropriate modifications) to the extent needed to reflect the revised outstanding Loans after giving effect to such assignment, (ii) in connection with any such assignment pursuant to clause (y) above, the consent of the Administrative Agent and, so long as no Default or Event of Default then exists, the Borrower, shall be required (such consent, in any case, not to be unreasonably withheld, delayed or conditioned), provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof, (iii) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $5,000 (which may be waived by the Administrative Agent in its sole discretion) and (iv) no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to Section 14.15.   To the extent of any assignment pursuant to this Section 14.04(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its outstanding Loans.  At the time of each assignment pursuant to this Section 14.04(b) to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally entitled to do so, provide to the Borrower the appropriate Internal Revenue Service Forms (and, if applicable, a Section 6.04(b)(ii) Certificate) described in Section 6.04(b).  To the extent that an assignment of all or any portion of outstanding Obligations owing to a Lender pursuant to Section 2.14 or this Section 14.04(b) would, at the time of such assignment, result in increased costs under Section 2.10 or 6.04 from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).  Notwithstanding anything to the contrary in this Agreement, no Lender may assign any or all of its Loans after the Closing Date unless it (together with its Affiliates) simultaneously assigns to the same assignee (or

Affiliates thereof) a ratable portion of such Lender's (and its Affiliates') Equity Interests in the Parent immediately prior to giving effect to such assignment, and only to the extent such assignment of Equity Interests is permitted under the Parent Governance Documents (and only after compliance with any requirements in connection therewith) of the Parent then in effect.

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Loans and Notes hereunder to a Federal Reserve Bank or any other bank or financial institution in support of borrowings made by such Lender from such Federal Reserve Bank, bank or financial institution and, with prior notification to the Administrative Agent (but without the consent of the Administrative Agent or the Borrower), any Lender which is a fund may pledge all or any portion of its Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)     Any Lender which assigns all of its Loans hereunder in accordance with Section 14.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.10, 2.11, 6.04, 12.06, 13.06, 14.01 and 14.06), which shall survive as to such assigning Lender.

(e)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or any Credit Party or any Credit Party's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Credit Parties, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and, provided further, that no Lender shall transfer or grant any participation under which the Participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (x) extend the final scheduled maturity of any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 14.07(a) shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Total Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (y) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (z) release, compromise or subordinate all or substantially all of the value of the Guaranties or all or substantially all of the Collateral (except as expressly provided in the Credit Documents) supporting the Loans

hereunder in which such participant is participating. In the case of any such participation, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation. The Credit Parties agree that each Participant shall be entitled to the benefits of <u>Sections 2.10</u> and <u>6.04</u> (subject to the requirements and limitations therein (it being understood that the documentation required under <u>Sections 6.04(b)</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 14.04</u>; provided that such Participant (A) agrees to be subject to the provisions of <u>Sections 2.12</u> and <u>2.13</u> as if it were an assignee under <u>Section 14.04</u>; and (B) shall not be entitled to receive any greater payment under <u>Sections 2.10</u> or <u>6.04</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

14.05.  <u>No Waiver; Remedies Cumulative</u>.

No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing among the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

14.06.  <u>Payments Pro Rata</u>.

(a)     Except as otherwise expressly provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than (i) if Lender that has expressly consented in writing to waive its <u>pro</u> <u>rata</u> share of any such payment, in which case such amounts shall be reallocated on a <u>pro</u> <u>rata</u> basis among the other Lenders or (ii) if all Lenders shall have expressly consented in writing to waive their <u>pro</u> <u>rata</u> share of such payment, such payment shall be returned to the Borrower) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)     Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise) by or on behalf of a Credit Party, which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

14.07.  <u>Calculations; Computations</u>.

(a)     The financial statements to be furnished to the Lenders pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by Holdings to the Lenders); <u>provided</u> that, (i) except as otherwise specifically provided herein, all computations of Excess Cash Flow and all computations and all definitions (including accounting terms) used in determining compliance with <u>Sections 10.17, 11.08</u> and <u>11.09</u> shall utilize GAAP and policies in conformity with those used to prepare the audited financial statements of Holdings referred to in <u>Section 9.05(a)</u> for the fiscal year ended December 31, 2019, (ii) notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared, and all financial covenants contained herein or in any other Credit Document shall be calculated, in each case, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitted a Person to value its financial liabilities at the fair value thereof, (iii) any lease that was treated as an operating lease under GAAP at the time it was entered into that later becomes a capital lease as a result of a change in GAAP during the life of such lease, including any renewals, shall be treated as an operating lease for all purposes under this Agreement, and any lease that was treated as a capital lease under GAAP at the time it was entered into that later becomes an operating lease as a result of a change in GAAP during the life of such lease, including any renewals, shall be treated as a capital lease for all purposes under this Agreement, and (iv) to the extent expressly

133

provided herein, certain calculations shall be made on a Pro Forma Basis. In the event of any change in GAAP (any such change, for the purpose of this Section 14.07, an "**Accounting Change**") that occurs after the date of this Agreement, then the Credit Parties and the Administrative Agent, on behalf of the Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect any such Accounting Change with the desired result that the criteria for evaluating the financial condition of Holdings and its Subsidiaries shall be the same after such Accounting Change as if such Accounting Change had not been made, and until such time as such an amendment shall have been executed and delivered by the Credit Parties and Required Lenders, (A) all financial covenants, standards and terms in this Agreement shall be calculated and/or construed as if such Accounting Change had not been made, and (B) Holdings shall prepare footnotes to each certificate and the financial statements required to be delivered pursuant to Sections 10.01(a), (b), (c), and (f) that show the differences between the financial statements delivered (which reflect such Accounting Change) and the basis for calculating financial covenant compliance (without reflecting such Accounting Change).

(b)     All computations of interest and other Fees hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first day and the last day) occurring in the period for which such interest or Fees are payable, except that interest computed by reference to Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

14.08.  GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.

(a)     THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE OR ANY SECURITY DOCUMENT, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES). ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK (OR (X) IN THE CASE OF ANY SECURITY DOCUMENT, PROCEEDINGS MAY ALSO BE BROUGHT BY THE ADMINISTRATIVE AGENT OR COLLATERAL AGENT IN THE STATE OR OTHER JURISDICTION IN WHICH THE RESPECTIVE COLLATERAL IS LOCATED OR ANY OTHER RELEVANT JURISDICTION AND (Y) IN THE CASE OF ANY BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS WITH RESPECT TO ANY CREDIT PARTY, ACTIONS OR PROCEEDINGS RELATED TO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS MAY BE BROUGHT IN SUCH COURT HOLDING SUCH BANKRUPTCY, INSOLVENCY OR SIMILAR PROCEEDINGS), AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH OF

THE HOLDING COMPANIES AND THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE HOLDING COMPANIES OR THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFORE-MENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE HOLDING COMPANIES OR THE BORROWER. EACH OF THE HOLDING COMPANIES AND THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE HOLDING COMPANIES OR THE BORROWER AT ITS ADDRESS SET FORTH ON SCHEDULE II, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING. EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE HOLDING COMPANIES OR THE BORROWER IN ANY OTHER JURISDICTION.

(b)     EACH OF THE HOLDING COMPANIES AND THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

14.09. Counterparts.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the

Administrative Agent.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof.

14.10.  <u>Effectiveness</u>.

This Agreement shall become effective on the date (the "**Closing Date**") on which each Holding Company, the Borrower, the Administrative Agent and each of the Lenders shall have signed a counterpart hereof (whether the same or different counterparts) and shall have delivered the same to the Administrative Agent at the Notice Office or, in the case of the Lenders, shall have given to the Administrative Agent telephonic (confirmed in writing), written or telex notice (actually received) at such office that the same has been signed and mailed to it.  The Administrative Agent will give each Holding Company, the Borrower and each Lender prompt written notice of the occurrence of the Closing Date.

14.11.  <u>Headings Descriptive</u>.

The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

14.12.  <u>Amendment or Waiver; etc</u>.

(a)      Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be amended, modified, changed, waived, discharged or terminated unless such amended, modification, change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiaries Guaranty and the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders), <u>provided</u> that no such change, waiver, discharge or termination shall, without the written consent of each Lender (with Obligations being directly affected in the case of following clause (i)), (i) extend the final scheduled maturity of any Loan or Note, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to <u>Section 14.07(a)</u> shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i)), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents as of the Closing Date) under all the Security Documents, (iii) amend, modify or waive any provision of this <u>Section 14.12(a)</u> (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans and the Commitments on the Closing Date), (iv) reduce the "majority" voting threshold specified in the definitions of Majority Lenders or Required Lenders (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date) or change the percentage of the Commitments

136

or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder, (v) consent to the assignment or transfer by any Credit Party of, or the release of any Credit Party from, any of its rights and obligations under this Agreement, or (vi) change or have the effect of changing the priority or pro rata treatment of, or subordinating, any payments (including voluntary and mandatory prepayments), Liens, proceeds of Collateral or reductions in Commitments (including as a result in whole or in part of allowing the issuance or incurrence, pursuant to this Agreement or otherwise, of new loans or other Indebtedness having any priority over any of the Obligations in respect of payments, Liens, Collateral or proceeds of Collateral, in exchange for any Obligations or otherwise); provided further, that no such amendment, modification, change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Total Commitment shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 12 or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent, (3) without the written consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (4) reduce the amount of, or extend the date of, any Scheduled Repayment or any other scheduled payment hereunder to any Lender without the consent of such affected Lender, other than as otherwise expressly provided herein as of the Closing Date or (5) amend Section 14.06(a) hereof to provide that payments received and distributed by the Administrative Agent to the Lenders shall be made on a basis other than pro rata, without the consent of each Lender adversely affected by such amendment.

(b)     If, in connection with any proposed change, waiver, discharge or termination of or to any of the provisions of this Agreement as contemplated by clauses (i) through (v), inclusive, of the first proviso to Section 14.12(a), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then the Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required are treated as described below, to replace each such non-consenting Lender or Lenders with one or more Replacement Lenders pursuant to Section 2.13 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination; provided that, the Borrower shall not have the right to replace a Lender solely as a result of the exercise of such Lender's rights (and the withholding of any required consent by such Lender) pursuant to the second proviso to Section 14.12(a).

(c)     Notwithstanding the foregoing, (x) this Agreement may be amended by an agreement in writing entered into by each Holding Company, the Borrower, the Required Lenders and the Administrative Agent if at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 14.04) in full of this principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement and (y) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (A) to

137

add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Credit Documents with the Loans and the accrued interest and fees in respect thereof and (B) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

(d)    Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency, without any further action by any other party.

14.13.  Survival.

All indemnities set forth herein including, without limitation, in Sections 2.10, 2.11, 6.04, 13.06 and 14.01 shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations.

14.14.  Domicile of Loans.

Each Lender may transfer and carry its Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Loans pursuant to this Section 14.14 would, at the time of such transfer, result in increased costs under Section 2.10, 2.11 or 6.04 from those being charged by the respective Lender prior to such transfer, then the Borrower shall not be obligated to pay such increased costs (although the Borrower shall be obligated to pay any other increased costs of the type described above resulting from changes occurring after the date of the respective transfer).

14.15.  Register.

The Borrower hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 14.15, to maintain a register (the "**Register**") at one of its offices in the United States on which it will record the Commitments of the Lenders, the Loans made by (and stated interest owing to) each of the Lenders and each repayment in respect of the principal (and stated interest) amount of the Loans of each Lender. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans. With respect to any Lender, the transfer of any Loans of a Lender and the rights to the principal of, and interest on, such Loans shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Loans and prior to such recordation all amounts owing to the transferor with respect to such Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Loans shall be recorded by the Administrative Agent on the Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 14.04(b). Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one

or more new Notes in the same aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this Section 14.15, except to the extent such losses, claims, damages or liabilities results from the Administrative Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

14.16.  Confidentiality.

(a)      Subject to the provisions of clause (b) of this Section 14.16, each Lender agrees that it will not disclose without the prior consent of Holdings (other than to its directors, officers, employees, auditors, agents, trustees, advisors or counsel to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 14.16 to the same extent as such Lender) any information with respect to Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 14.16(a) by the respective Lender, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent or the Collateral Agent, (vi) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 14.16, (vii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Loans or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section 14.16, (viii) to (A) any bank or financial institution and (B) S&P, Moody's, Fitch Ratings Inc. and/or other ratings agencies, as such Lender deems necessary or appropriate in connection with such Lender's obtaining financing; provided, however, that such financial institution or ratings agency shall be informed of the confidentiality of such information, (ix) to its investors or potential investors as such Lender reasonably deems necessary or appropriate; provided, however, that such investors or potential investors shall be informed of the confidentiality of such information; or (x) to the NAIC or the SVO or, in each case, any similar organization that requires access to information about such Lender's investment portfolio.

(b)     Each of the Holding Companies and the Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), provided such Persons shall be subject to the provisions of this <u>Section 14.16</u> to the same extent as such Lender.

(c)     Notwithstanding anything to the contrary contained in this <u>Section 14.16</u>, each of the Holding Companies and the Borrower hereby agrees that the Administrative Agent and its Affiliates may publicize its services in connection with this Agreement and the other Credit Documents and the transactions contemplated herein and therein, including, without limitation, through granting interviews with and providing information to the financial press and other media and by publicizing such services on its web-site or other electronic medium; provided, however, that the Administrative Agent and its Affiliates shall not publicize as contemplated above in this clause (c) until the earlier to occur of (i) the fifth day following the Closing Date and (ii) such date as Holdings or its Affiliates shall have publicly announced the consummation of the Transaction.  In addition, the Holding Companies and the Borrower hereby authorize the Administrative Agent to place a customary "tombstone" advertisement regarding this Agreement and the transactions contemplated herein related hereto in publications of its choice at the Borrower's expense and with the Borrower's approval (not to be unreasonably withheld or delayed) of the form and content of such advertisement.

14.17.   <u>Special Provisions Regarding Pledges of Equity Interests in, and Promissory Notes Owed by, Persons Not Organized in the United States or Pledges over Assets Not Located in the United States</u>.

The parties hereto acknowledge and agree that the provisions of the various Security Documents executed and delivered by the Credit Parties require that, among other things, all promissory notes executed by, and capital stock and other Equity Interests in, various Persons owned by the respective Credit Party be pledged, and delivered for pledge, pursuant to the Security Documents.  The parties hereto further acknowledge and agree that each Credit Party shall be required to take all actions under the laws of the jurisdiction in which such Credit Party is organized or where the respective assets are located to create and perfect all security interests granted pursuant to the various Security Documents in accordance with such Security Documents and to take all actions under the laws of the applicable jurisdiction (including the United States and any State) thereof to perfect the security interests in the assets, capital stock and other Equity Interests of, and promissory notes issued by, any Person organized under the laws of said jurisdictions (in each case, to the extent said capital stock, other Equity Interests or promissory notes are owned by any Credit Party).  Except as provided in the immediately preceding sentence, to the extent any Security Document requires or provides for the pledge of assets or promissory notes issued by, or capital stock or other Equity Interests in, any Person organized under the laws of a jurisdiction other than those specified in the immediately preceding sentence, it is acknowledged that, as of the Closing Date, no actions have been required to be taken to perfect, under local law of the jurisdiction where the respective assets are located or of the Person who issued the respective promissory notes or whose capital stock or other Equity Interests are pledged, under Security Documents in accordance with the Security Documents.  The Borrower hereby agrees that, following any request by the Administrative

140

Agent or the Required Lenders to do so, the Borrower will, and will cause its Subsidiaries to, take such actions under the local law of any jurisdiction with respect to which such actions have not already been taken as are determined by the Administrative Agent or the Required Lenders to be necessary or desirable in order to fully perfect and preserve the security interests granted pursuant to the various Security Documents under the laws of such jurisdictions.  If requested to do so pursuant to this Section 14.17, all such actions shall be taken in accordance with the provisions of this Section 14.17 and Section 10.12 and within the time periods set forth therein.  All conditions and representations contained in this Agreement and the other Credit Documents shall be deemed modified to the extent necessary to effect the foregoing and so that same are not violated by reason of the failure to take actions under local law (but only with respect to capital stock of, other Equity Interests in, and promissory notes issued by, Persons organized under laws of jurisdictions other than the United States and any State thereof or assets located in jurisdictions other than the United States and any State thereof) not required to be taken in accordance with the provisions of this Section 14.17, provided that to the extent any representation or warranty would not be true because the foregoing actions were not taken, the respective representation of warranties shall be required to be true and correct in all material respects at such time as the respective action is required to be taken in accordance with the foregoing provisions of Section 10.12 and this Section 14.17.

      14.18.  Patriot Act.

      Each Lender subject to the USA PATRIOT ACT (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") hereby notifies the Holding Companies and the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Holding Companies, the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Holding Companies, the Borrower and the other Credit Parties in accordance with the Patriot Act.

      14.19.  Interest Rate Limitation.

      Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

      14.20.  Entire Agreement.

      THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL

AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

14.21.   Acknowledgement and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution and (b) the effects of any Bail-In Action on any such liability, including, if applicable: (i) a reduction in full or in part or cancellation of any such liability: (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document: or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

14.22.   Hedge Intercreditor Agreement.

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, in the event of any conflict between the terms of any Credit Document and the terms of the Hedge Intercreditor Agreement, the terms of the Hedge Intercreditor Agreement will govern and control in all respects.

14.23.   Acknowledgement Regarding Any Supported QFCs.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and, each such QFC, a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in

142

property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

14.24.  <u>Amendment and Restatement</u>.  It is the intention of the parties hereto that this Agreement amends, restates, supersedes and replaces the Pre-Petition Credit Agreement in its entirety; *provided*, that, (a) such amendment and restatement shall operate to renew, amend, modify, and extend all of the rights, duties, liabilities and obligations of the Borrower under the Pre-Petition Credit Agreement and under the Pre-Petition Credit Documents, which rights, duties, liabilities and obligations are hereby renewed, amended, modified and extended, and shall not act as a novation thereof, and (b) the Liens securing the "Secured Obligations" under and as defined in the Pre-Petition Credit Agreement and the rights, duties, liabilities and obligations of the Borrower and the Guarantors under the Pre-Petition Credit Agreement and the Pre-Petition Credit Documents to which they are a party shall not be extinguished but shall be carried forward and shall secure such "Secured Obligations", as amended, renewed, extended and restated hereby.  The parties hereto ratify and confirm each of the Pre-Petition Credit Documents entered into prior to the Closing Date (but excluding the Pre-Petition Credit Agreement and, for the avoidance of doubt, the "Meidu Pledge Agreement" (as defined in the Pre-Petition Credit Agreement)) and agree that such Pre-Petition Credit Documents continue to be legal, valid, binding and enforceable in accordance with their terms (except to the extent amended, restated and/or superseded in connection with the transactions contemplated hereby).  The Borrower represents and warrants that, as of the Closing Date, there are no claims or offsets against, or defenses or counterclaims to, its obligations (or the obligations of any Guarantor) under the Pre-Petition Credit Agreement or any of the other Pre-Petition Credit Documents.

SECTION 15.  <u>Holding Companies Guaranty</u>.

15.01.  <u>Guaranty</u>.

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and to induce the other Guaranteed Creditors to enter into Interest Rate Protection Agreements, and in recognition of the direct benefits to be received by each Holding Company from the proceeds of the Loans and the entering into of such Interest Rate Protection Agreements, each Holding Company hereby agrees with the Guaranteed Creditors as follows (the "**Holdings Guaranty**"): each Holding Company hereby, jointly and severally with each other Holding Company, unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors.  If any or all of the Guaranteed Obligations of the Borrower to the Guaranteed Creditors becomes due and payable hereunder, each Holding Company, unconditionally and

irrevocably, promises to pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed Obligations.  If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event each Holding Company agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Holding Company, notwithstanding any revocation of this Holdings Guaranty or other instrument evidencing any liability of the Borrower, and such Holding Company shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

15.02.  Bankruptcy.

Additionally, each Holding Company jointly and severally, unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations to the Guaranteed Creditors whether or not due or payable by the Borrower upon the occurrence of any of the events specified in Section 12.05, and jointly and severally, irrevocably and unconditionally promises to pay such indebtedness to the Guaranteed Creditors, or order, on demand, in lawful money of the United States.

15.03.  Nature of Liability.

The liability of each Holding Company hereunder is primary, absolute, joint and several, and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of each Holding Company hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, or (b) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (c) any payment on or in reduction of any such other guaranty or undertaking, or (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, or (e) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Holding Company waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (f) any action or inaction by the Guaranteed Creditors as contemplated in Section 15.05, or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

15.04.  Independent Obligation.

The obligations of each Holding Company hereunder are independent of the obligations of any other guarantor, any other party or the Borrower, and a separate action or actions may be

brought and prosecuted against each Holding Company whether or not action is brought against any other guarantor, any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower be joined in any such action or actions.  Each Holding Company waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance which operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each Holding Company.

15.05.  Authorization.

Each Holding Company authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

(a)      change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Holdings Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)      take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)      exercise or refrain from exercising any rights against the Borrower, any other Credit Party or others or otherwise act or refrain from acting;

(d)      release or substitute any one or more endorsers, guarantors, the Borrower, other Credit Parties or other obligors;

(e)      settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to its creditors other than the Guaranteed Creditors;

(f)      apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Guaranteed Creditors regardless of what liability or liabilities of the Borrower remain unpaid;

(g)      consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or

supplement this Agreement, any other Credit Document, any Interest Rate Protection Agreement or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Holding Company from its liabilities under this Holdings Guaranty.

15.06.  Reliance.

It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of any Holding Company or any of its Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

15.07.  Subordination.

Any indebtedness of the Borrower now or hereafter owing to any Holding Company is hereby subordinated to the Guaranteed Obligations owing to the Guaranteed Creditors; and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of the Borrower to any Holding Company shall be collected, enforced and received by such Holding Company for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of such Holding Company under the other provisions of this Holdings Guaranty.  Prior to the transfer by any Holding Company of any note or negotiable instrument evidencing any such indebtedness of the Borrower to such Holding Company, such Holding Company shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each Holding Company hereby agrees with the Guaranteed Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably paid in full in cash.

15.08.  Waiver.

(a)     Each Holding Company waives any right (except as shall be required by applicable statute and cannot be waived) to require any Guaranteed Creditor to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever.  Each Holding Company waives any defense based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than defense of payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of the Borrower, any Holding Company, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment of the Guaranteed Obligations to the extent of such payment. The Guaranteed Creditors may, at their election, foreclose on any security held by the

Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Guaranteed Creditors may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of any Holding Company hereunder except to the extent the Guaranteed Obligations have been paid.   Each Holding Company waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of such Holding Company against the Borrower or any other party or any security.

(b)     Each Holding Company waives all presentments, demands for performance, protests and notices, including without limitation notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Holdings Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations.   Each Holding Company assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which such Holding Company assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise such Holding Company of information known to them regarding such circumstances or risks.

(c)     Until such time as the Guaranteed Obligations have been paid in full in cash, each Holding Company hereby waives all rights of subrogation which it may at any time otherwise have as a result of this Holdings Guaranty (whether contractual, under Section 509 of the Bankruptcy Code, or otherwise) to the claims of the Guaranteed Creditors against the Borrower or any other guarantor of the Guaranteed Obligations and all contractual, statutory or common law rights of reimbursement, contribution or indemnity from the Borrower or any other guarantor which it may at any time otherwise have as a result of this Holdings Guaranty.

(d)     Each Holding Company warrants and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law of public policy, such waivers shall be effective only to the maximum extent permitted by law.

15.09.   Payments.

All payments made by each Holding Company pursuant to this Section 15 shall be made in Dollars and will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 6.03 and 6.04.

15.10.   Maximum Liability.

It is the desire and intent of each Holding Company and the Guaranteed Creditors that this Holdings Guaranty shall be enforced against each Holding Company to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If, however, and to the extent that, the obligations of any Holding Company under this

Holdings Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of such Holding Company's obligations under this Holdings Guaranty shall be deemed to be reduced and such Holding Company shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

\*        \*        \*

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

**MD AMERICA ENERGY HOLDINGS, INC.**, as Holdings and a Holding Company

By:_____
Name:
Title:

**MD AMERICA INTERMEDIATE HOLDINGS, LLC**, as a Holding Company

By:_____
Name:
Title:

**MD AMERICA HOLDINGS, LLC**, as a Holding Company

By:_____
Name:
Title:

**MD AMERICA ENERGY, LLC**, as the Borrower

By:_____
Name:
Title:

[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT - MD AMERICA ENERGY, LLC]

**LOAN ADMIN CO LLC**,
as Administrative Agent


By:_____
Name:
Title:

**SIXTH STREET SPECIALTY LENDING, INC. (formerly known as TPG Specialty Lending, Inc.),**
as a Lender


By:_____
Name:
Title:

**TAO TALENTS, LLC**,
as a Lender


By:_____
Name:
Title:

**MC CREDIT FUND I LP,**
as a Lender

By:_____
Name:
Title:

**MC CREDIT FUND IA (CAYMAN
MASTER) LP,**
as a Lender

By:_____
Name:
Title:

**MC CREDIT FUND II LP,**
as a Lender

By:_____
Name:
Title:

**MC CREDIT FUND III (DELAWARE) LP,**
as a Lender

By:_____
Name:
Title:

**MC CREDIT FUND III-U (DELAWARE)
LP,**
as a Lender

By:_____
Name:
Title:

**MC CREDIT FUND III (CAYMAN
MASTER) LP,**
as a Lender

By:_____
Name:
Title:

[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AGREEMENT - MD AMERICA ENERGY, LLC]

**ARENA LIMITED SPV, LLC**,
as a Lender


By:_____
Name:
Title:

**PRUDENTIAL LEGACY INSURANCE
COMPANY OF NEW JERSEY**,
as a Lender

By:  PGIM, Inc., its investment manager

By:_____
Name:
Title:

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA**,
as a Lender

By:_____
Name:
Title:

**SCHEDULE I**

**COMMITMENTS AND APPLICABLE PERCENTAGE**

| Name of Lender | Applicable Percentage | Commitment |
|---|---|---|
| Sixth Street Specialty Lending, Inc. | [_____]% | $[_____] |
| TAO Talents, LLC | [_____]% | $[_____] |
| MC Credit Fund I LP | [_____]% | $[_____] |
| MC Credit Fund IA (Cayman Master) LP | [_____]% | $[_____] |
| MC Credit Fund II LP | [_____]% | $[_____] |
| MC Credit Fund III (Delaware) LP | [_____]% | $[_____] |
| MC Credit Fund III-U (Delaware) LP | [_____]% | $[_____] |
| MC Credit Fund III (Cayman Master) LP | [_____]% | $[_____] |
| Arena Limited SPV, LLC | [_____]% | $[_____] |
| Prudential Legacy Insurance Company of New Jersey | [_____]% | $[_____] |
| The Prudential Insurance Company of America | [_____]% | $[_____] |
| **TOTAL COMMITMENT** | **100.00%** | **$60,000,000.00** |

**SCHEDULE II**

**CREDIT PARTY ADDRESSES**

MD America Energy Holdings, Inc., MD America Energy, LLC, MD America Intermediate Holdings, LLC, MD America Pipeline, LLC, MD America Finance Corporation and MD America Holdings, LLC

301 Commerce Street, Suite 2500
Fort Worth, Texas 76102
Direct: 817-288-7800
Fax:  817-288-7801
Attn:  [_____]

**SCHEDULE III**

**REAL PROPERTY**

**SCHEDULE IV**

**PLANS**

[None]

## **SCHEDULE V**

## **NON WHOLLY-OWNED SUBSIDIARIES**

None.

**SCHEDULE VI**

**INSURANCE**

**<u>SCHEDULE VII</u>**

**<u>EXISTING LIENS</u>**

None.

**SCHEDULE VIII**

**EXISTING INVESTMENTS**

MD America Energy, LLC has a Subordinated Promissory Note from Meidu Energy Corporation in the amount of $21,100,000 as of October 30, 2018. This agreement was signed and effective as of August 14, 2018, and has a final maturity date of June 30, 2030.

## **SCHEDULE IX**

## **GAS IMBALANCES**

[None.]

## SCHEDULE X

## CAPITALIZATION

| Name of Owner | Name of Issuer | Authorized Number of Shares | Number of Shares / Interests Owned | Class of Interests | Percentage of Class Owned | Certificate No. |
|---|---|---|---|---|---|---|
| [_____] | MD America Energy Holdings, Inc. | [1,000] | [1,000] | Common Stock | 100% | [3] |
| MD America Energy Holdings, Inc. | MD America Intermediate Holdings, LLC | N/A | 100% of Membership Interests | N/A | N/A | N/A |
| MD America Intermediate Holdings, LLC | MD America Holdings, LLC | N/A | 100% of Membership Interests | N/A | N/A | N/A |
| MD America Holdings, LLC | MD America Energy, LLC | N/A | 100% of Membership Interests | N/A | N/A | N/A |
| MD America Energy, LLC | MD America Finance Corporation | 100 | 100 | Common Stock | 100% | 2 |
| MD America Energy, LLC | MD America Pipeline, LLC | N/A | 100% of Membership Interests | N/A | N/A | N/A |

## SCHEDULE XI

## POST CLOSING MATTERS

1.      The Credit Parties shall deliver to the Administrative Agent, within thirty (30) days after the Closing Date (or such longer period agreed to by the Administrative Agent in its sole discretion), an account control agreement or agreements in form and substance reasonably acceptable to the Administrative Agent and in favor of the Collateral Agent, executed by the relevant account bank and the relevant Credit Party, with respect to each Deposit Account listed in Annex F to the Security Agreement (other than any Excluded Account).

2.      [The Borrower shall, within thirty (30) days after the Closing Date (or such longer period agreed to by the Administrative Agent in its sole discretion), physically deliver to the Collateral Agent the original promissory note referred to in Schedule IX, endorsed to the Collateral Agent as Pledgee under the Pledge Agreement or endorsed in blank.]

**SCHEDULE XII**

**NECESSARY AUTHORIZATIONS**

[None.]

## SCHEDULE XIII

## CAPITALIZED LABOR EXPENSE

In accordance with FAS 19, internal labor costs shall be capitalized when incurred when these labor costs are associated with:

1. The drilling and equipping of exploratory wells and exploratory-type stratigraphic test wells that have proved reserves.
2. The drilling and equipping of wells that are not yet completed.
3. The cost of acquiring or constructing equipment and facilities that are not yet completed and installed.
4. Obtaining access to proved reserves and providing facilities for extracting, treating, gathering, and storing oil and gas, including the drilling and equipping of development wells and development-type stratigraphic test wells (whether those wells are successful or unsuccessful) and service wells.
5. The cost of acquiring or constructing support equipment and facilities used in oil and gas producing activities.

On the contrary to the items stated above, the Borrower does not capitalize any labor associated with full-time employees as these employees perform a various number of functions that may not be related to a capitalizable item. However, the Borrower will capitalize work performed by any contractor in which the work itself can specifically be identified as being associated with a capitalizable project.

**SCHEDULE XIV**

**MARKETING AGREEMENTS**

[None.]

**SCHEDULE XV**

**HEDGE AGREEMENTS**

[See attached]

**SCHEDULE XVI**

**PREFERENTIAL RIGHTS AND CONSENTS**

[None.]

**SCHEDULE XVII**

**SPECIFIED REAL PROPERTY**[7]

1. Frac Pond Acreage: ~208.7 acres composed of six tracts in Madison County, Texas. Old Reservoir Lane, North Zulch, TX 77872.
2. Field Office Land: ~14.992 Acres (front yard of 2 acres and back pad of 12 acres). 3683 Hwy 21 West TX (Madison County).
3. Field Office Building: 3683 Hwy 21 West TX, County.
4. EMU Lane Land: ~10 acres located in the "White Shadows" subdivision in North Zulch, Texas 77872.

---

[7] NTD: MDAE to provide legal descriptions.

## **EXHIBIT C**

### **Schedule of Rejected Executory Contracts and Unexpired Leases**

The Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to reject all Executory Contracts or Unexpired Leases, other than those set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, with respect to (i) employment agreements, (ii) restricted unit agreements, (iii) indemnity agreements, (iv) the Transaction Bonus Plan, (v) engagement letters with any financial institutions, (vi) contracts that constitute a contract or agreement with any direct or indirect holder of equity interests in the Debtors or any of their Affiliates, (vii) contracts that constitute a non-competition agreement, area of mutual interest agreement or any other agreement that purports to restrict, limit or prohibit the manner in which, or the locations in which, the Debtors conduct business, (viii) any Unexpired Lease under which a Debtor is the lessor or the lessee of real or personal property, or (ix) contracts that have resulted or can reasonably be expected to result in payments or obligations of Debtors or Reorganized Debtors of more than $100,000 per year.

Entry of the Confirmation Order shall constitute the Court's order approving the assumption and assignment or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code. Unless otherwise indicated, assumption and assignment or rejection, as applicable of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.

The preceding paragraphs shall not apply to Executory Contracts or Unexpired Leases: (1) that have been previously rejected by a Final Order; (2) that are the subject of a motion to reject that is pending on the Effective Date; or (3) that are subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date, if any.

10786406

## EXHIBIT D

### Schedule of Assumed Executory Contracts and Unexpired Leases

The Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to reject all Executory Contracts or Unexpired Leases, other than those set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, with respect to (i) employment agreements, (ii) restricted unit agreements, (iii) indemnity agreements, (iv) the Transaction Bonus Plan, (v) engagement letters with any financial institutions, (vi) contracts that constitute a contract or agreement with any direct or indirect holder of equity interests in the Debtors or any of their Affiliates, (vii) contracts that constitute a non-competition agreement, area of mutual interest agreement or any other agreement that purports to restrict, limit or prohibit the manner in which, or the locations in which, the Debtors conduct business, (viii) any Unexpired Lease under which a Debtor is the lessor or the lessee of real or personal property, or (ix) contracts that have resulted or can reasonably be expected to result in payments or obligations of Debtors or Reorganized Debtors of more than $100,000 per year.

The Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume and assign to the Reorganized Debtors or their designated assignee Executory Contracts or Unexpired Leases, other than those set forth on the Schedule of Rejected Executory Contracts and Unexpired Leases, with respect to (i) an oil and gas lease, overriding royalty interest, net profits interest, production payment or similar interest, (ii) right-of-way, easement, surface agreement, surface use agreement or similar contract or agreement, provided that the Waller Surface Use Agreement is specifically rejected, (iii) joint operating agreement, development agreement, participation agreement, exploration agreement, farmin / farmout agreement or similar agreement, (iv) marketing, transportation, processing, compression, treatment or gathering agreement if such contract can be terminated by a Debtor without penalty on 60 days or less notice, (v) a contract or agreement relating to water sourcing, disposal or transportation, (vi) seismic agreement or other geophysical acquisition agreement or license, (vii) master service agreement (provided that any services orders issued pursuant to a master service agreement shall be covered by this paragraph), or (viii) insurance policies and any agreements, documents, or instruments relating thereto. **All Executory Contracts or Unexpired Leases that the Debtors seek to assume that are not listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall have a proposed cure amount of $0.**

Entry of the Confirmation Order shall constitute the Court's order approving the assumption and assignment or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code. Unless otherwise indicated, assumption and assignment or rejection, as applicable of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.

10786406

The preceding three paragraphs shall not apply to Executory Contracts or Unexpired Leases: (1) that have been previously rejected by a Final Order; (2) that are the subject of a motion to reject that is pending on the Effective Date; or (3) that are subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date, if any.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable counterparties and the Required Consenting Term Lenders. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or related Cure Claim must be Filed, served and actually received by the Debtors and the Required Consenting Term Lenders at least seven (7) days before the Confirmation Hearing; provided that this objection deadline applies to all Executory Contracts or Unexpired Leases proposed to be assumed and assigned by the Debtors, whether or not they are specifically listed on the Schedule of Assumed Executory Contracts and Unexpired Leases.**

Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or the proposed Cure Claim will be deemed to have assented to such assumption and the Cure Claim. Payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, to such counterparty of the amount set forth on the applicable Cure Notice shall, as a matter of law, satisfy any and all monetary defaults under the applicable Executory Contract or Unexpired Lease. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or assumption and assignment, such dispute shall be resolved by a Final Order of the Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

## **ASSUMPTION SCHEDULE**

[See Attached]

MD AMERICA ENERGY, LLC & MD AMERICA PIPELINE, LLC

**MASTER LIST OF EXECUTORY CONTRACTS**

$   -

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MD America Energy, LLC | 1519 Surveying, LLC | ADDRESS ON FILE | Land Surveyor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 2 | MD America Energy, LLC | 5J Oilfield Services, LLC | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 3 | MD America Energy, LLC | A1 Smiths Septic Service | ADDRESS ON FILE | Septic Service | 30 Days Written Notice | N/A | 0.00 | X | | |
| 4 | MD America Energy, LLC | A2D | ADDRESS ON FILE | software | 10/21/2021 | N/A | 0.00 | X | | |
| 5 | MD America Energy, LLC | AAA Well Service, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 6 | MD America Energy, LLC | ABCO ENERGY CORPORATION | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 7 | MD America Energy, LLC | Acid & Cementing Service, Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 8 | MD America Energy, LLC | ACME Trucking Line, Inc | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 9 | MD America Energy, LLC | Acock Consulting LLC | ADDRESS ON FILE | Drilling and Completion Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 10 | MD America Energy, LLC | ADVANCE HYDROCARBON CORP | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 11 | MD America Energy, LLC | AEGAN CAPITAL CORPORATION | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 12 | MD America Energy, LLC | Aly Energy Services, LLC (Austin Chalk) | ADDRESS ON FILE | Solids Control | 30 Days Written Notice | N/A | 0.00 | X | | |
| 13 | MD America Energy, LLC | American Eagle Logistics, LLC | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 14 | MD America Energy, LLC | AMORUSO PETROLEUM LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 15 | MD America Energy, LLC | April Maxey | ADDRESS ON FILE | Independent Contractor | can term anytime | N/A | 0.00 | X | | |
| 16 | MD America Energy, LLC | Aqua Transfer & Energy Services LLC | ADDRESS ON FILE | Water Transfer | 30 Days Written Notice | N/A | 0.00 | X | | |
| 17 | MD America Energy, LLC | ARCHROCK PARTNERS OPERATING LLC | ADDRESS ON FILE | renting compressors | at any time | N/A | 0.00 | X | | |
| 18 | MD America Energy, LLC | Archrock Partners Operating, LLC | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 19 | MD America Energy, LLC | Arizona Exploration, LC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 20 | MD America Energy, LLC | ARK-LA-TEX WIRELINE SERVICES, LLC | ADDRESS ON FILE | Wireline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 21 | MD America Energy, LLC | ARTHUR G. ALTSCHUL | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 22 | MD America Energy, LLC | Athabasca Energy Corp | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 23 | MD America Energy, LLC | ATLANTIC PACIFIC MARINE CORP. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 24 | MD America Energy, LLC | Aveda Transportation and Energy Services | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 25 | MD America Energy, LLC | B&B ENERGY MANAGEMENT LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 26 | MD America Energy, LLC | BAGWELL NO. 6 FAMILY LP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 27 | MD America Energy, LLC | Baker Hughes | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 28 | MD America Energy, LLC | Baker Tilley | ADDRESS ON FILE | Accounting back office support and wolfepak | 90 day notice required | N/A | 0.00 | X | | |
| 29 | MD America Energy, LLC | Barnette & Benefield, Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 30 | MD America Energy, LLC | Baseline Energy Services, LP | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 31 | MD America Energy, LLC | Basic Energy Services | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 32 | MD America Energy, LLC | Bayou Workover Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 33 | MD America Energy, LLC | Bearkat Oilfield Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 34 | MD America Energy, LLC | Beaver Pipeline Construction, LLC | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 35 | MD America Energy, LLC | Bennett On-Site Services, LLC (BOSS) | ADDRESS ON FILE | Drilling Mud | 30 Days Written Notice | N/A | 0.00 | X | | |
| 36 | MD America Energy, LLC | Bestest Inc | ADDRESS ON FILE | Testing Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 37 | MD America Energy, LLC | BETTY T JOHNSTON | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 38 | MD America Energy, LLC | BETTY T JOHNSTON MARITAL TRUST | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 39 | MD America Energy, LLC | Betty T. Johnston Marital Trust | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 40 | MD America Energy, LLC | Bio Tech Inc | ADDRESS ON FILE | Well Chemicals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 41 | MD America Energy, LLC | BJ Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 42 | MD America Energy, LLC | Black Gold Rental Tools, Inc | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 43 | MD America Energy, LLC | Blocker Energy Services, Inc | ADDRESS ON FILE | Drilling and Completion Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 44 | MD America Energy, LLC | Blocker Flowback Services, Inc | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 45 | MD America Energy, LLC | Blue Tick | ADDRESS ON FILE | Land System | 6/1/2021 | N/A | 0.00 | X | | |
| 46 | MD America Energy, LLC | Bluegrass Energy Enhancement Fund, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 47 | MD America Energy, LLC | BOBBY L. TEMPLE | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 48 | MD America Energy, LLC | Boerne Land & Cattle Co., Inc. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 49 | MD America Energy, LLC | Bohler Fishing & Rental Tools, Inc | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 50 | MD America Energy, LLC | Boomerang Transit LLC | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 51 | MD America Energy, LLC | BP AMERICA PRODUCTION CO. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 52 | MD America Energy, LLC | Brazos River Agreement | ADDRESS ON FILE | Water | 12/31/2021 | N/A | 0.00 | X | | |
| 53 | MD America Energy, LLC | Brinkman Water | ADDRESS ON FILE | Water | Expires 6/27/2024 | N/A | 0.00 | X | | |
| 54 | MD America Energy, LLC | BRYAN FORMAN | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 55 | MD America Energy, LLC | BRYAN FORMAN - TRUSTEE | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 56 | MD America Energy, LLC | Bulldog Wireline, Inc | ADDRESS ON FILE | Slickline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 57 | MD America Energy, LLC | BURK ROYALTY CO., LTD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 58 | MD America Energy, LLC | BURTON OIL SERVICE OPERATIONS | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 59 | MD America Energy, LLC | BUTTES RESOURCES COMPANY | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 60 | MD America Energy, LLC | BWS Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 61 | MD America Energy, LLC | C & E Production | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 62 | MD America Energy, LLC | Caddo Oilfield Construction, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 63 | MD America Energy, LLC | Caddo Oilfield Construction, LLC | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 64 | MD America Energy, LLC | Calbri Energy, Inc | ADDRESS ON FILE | Drilling and Completion Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 65 | MD America Energy, LLC | Calbri Logistics, LLC | ADDRESS ON FILE | Sand Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 66 | MD America Energy, LLC | Cannon Contracting Services LLC | ADDRESS ON FILE | Safety | 30 Days Written Notice | N/A | 0.00 | X | | |
| 67 | MD America Energy, LLC | Carla Petroleum | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 68 | MD America Energy, LLC | Cedar Land Ranch | ADDRESS ON FILE | ROW | long as, we are using the ROW | N/A | 0.00 | X | | |
| 69 | MD America Energy, LLC | Centex Supply | ADDRESS ON FILE | Supply House | 30 Days Written Notice | N/A | 0.00 | X | | |
| 70 | MD America Energy, LLC | Cessac Welding Service, Inc | ADDRESS ON FILE | Welder | 30 Days Written Notice | N/A | 0.00 | X | | |
| 71 | MD America Energy, LLC | CGG | ADDRESS ON FILE | software | 11/1/2020 | N/A | 0.00 | X | | |
| 72 | MD America Energy, LLC | Chemical Weed Control | ADDRESS ON FILE | Weed Control | 30 Days Written Notice | N/A | 0.00 | X | | |
| 73 | MD America Energy, LLC | CHRIS P ALFORD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 74 | MD America Energy, LLC | CIMA | ADDRESS ON FILE | Marketing services for product sales | month (30 day notice required) | N/A | 0.00 | X | | |
| 75 | MD America Energy, LLC | City Center | ADDRESS ON FILE | Office Lease Agreement | August 31, 2020 | N/A | 0.00 | X | | |
| 76 | MD America Energy, LLC | CJ Holding Co | ADDRESS ON FILE | Frac | 30 Days Written Notice | N/A | 0.00 | X | | |
| 77 | MD America Energy, LLC | CLEAVER PROPERTIES, LTD. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 78 | MD America Energy, LLC | Clements Fluids Buffalo, LTD | ADDRESS ON FILE | Kill Fluids | 30 Days Written Notice | N/A | 0.00 | X | | |
| 79 | MD America Energy, LLC | CML EXPLORATION LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 80 | MD America Energy, LLC | Coastal Chemical LLC | ADDRESS ON FILE | Well Chemicals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 81 | MD America Energy, LLC | Combatt Oilfield Solutions, LLC | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 82 | MD America Energy, LLC | CONNERS CONSTRUCTION CO, INC | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 83 | MD America Energy, LLC | Contek Solutions, LLC | ADDRESS ON FILE | Enviromental Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 84 | MD America Energy, LLC | Core Laboratories LP | ADDRESS ON FILE | Science | 30 Days Written Notice | N/A | 0.00 | X | | |
| 85 | MD America Energy, LLC | Credence Gas Services | ADDRESS ON FILE | gas measurement services | at any time | N/A | 0.00 | X | | |
| 86 | MD America Energy, LLC | CRIMSON EXPLORATION OPERATING, INC. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 87 | MD America Energy, LLC | CSI Compressco LP | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 88 | MD America Energy, LLC | CTI ENERGY SERVICES, LLC | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 89 | MD America Energy, LLC | Curtis & Son Vacuum Service, Inc | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 90 | MD America Energy, LLC | D&B RENTAL SERVICES | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 91 | MD America Energy, LLC | DAN. A. KELLOGG | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 92 | MD America Energy, LLC | DANA GAY FALK REVOCABLE TRUST | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 93 | MD America Energy, LLC | Daniel Marcum | ADDRESS ON FILE | Independent Contractor | can term anytime | N/A | 0.00 | X | | |
| 94 | MD America Energy, LLC | DANIEL OSTERMANN | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 95 | MD America Energy, LLC | Davis Chemical Services, LLC | ADDRESS ON FILE | Well Chemicals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 96 | MD America Energy, LLC | DECCA CONSULTING, INC | ADDRESS ON FILE | Drilling and Completion Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 97 | MD America Energy, LLC | Deep Well Energy Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 98 | MD America Energy, LLC | Devon Energy Production Company,L.P | ADDRESS ON FILE | PSA | Unknown | N/A | 0.00 | X | | |
| 99 | MD America Energy, LLC | DIALOG WIRELINE SERVICES LLC | ADDRESS ON FILE | Wireline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 100 | MD America Energy, LLC | DIAMOND JK CONSTRUCTION LLC | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 101 | MD America Energy, LLC | DNOW L.P | ADDRESS ON FILE | Supply House | 30 Days Written Notice | N/A | 0.00 | X | | |
| 102 | MD America Energy, LLC | Drilling Info Enverus | ADDRESS ON FILE | software | 11/1/2020 | N/A | 0.00 | X | | |
| 103 | MD America Energy, LLC | Driskill Dynamics, LLC | ADDRESS ON FILE | Drilling and Completion Consultant | 30 Days Written Notice | N/A | 0.00 | X | | |
| 104 | MD America Energy, LLC | DUKE MINERALS, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 105 | MD America Energy, LLC | EAGLE AUTOMATION LIMITED | ADDRESS ON FILE | Automation | 30 Days Written Notice | N/A | 0.00 | X | | |
| 106 | MD America Energy, LLC | EAGLE FORD MINERALS, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 107 | MD America Energy, LLC | Eagle Tubulars LLC | ADDRESS ON FILE | Tubular Supplier | 30 Days Written Notice | N/A | 0.00 | X | | |
| 108 | MD America Energy, LLC | Ellis Rudy, Ltd. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 109 | MD America Energy, LLC | Encore Wellhead Systems, LLC | ADDRESS ON FILE | Wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 110 | MD America Energy, LLC | Endurance Lift Solutions | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 111 | MD America Energy, LLC | ENERGY & EXPLORATION PARTNERS, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 112 | MD America Energy, LLC | Enersafe, Inc | ADDRESS ON FILE | Safety | 30 Days Written Notice | N/A | 0.00 | X | | |
| 113 | MD America Energy, LLC | ERC Industries | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 114 | MD America Energy, LLC | ERC Industries Inc. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 115 | MD America Energy, LLC | Estis Compression | ADDRESS ON FILE | renting compressors | 1 year notice | N/A | 0.00 | X | | |
| 116 | MD America Energy, LLC | Estis Compression, LLC | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 117 | MD America Energy, LLC | ETX ENERGY, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 118 | MD America Energy, LLC | EXPRESS ENERGY SVCS OPERATING LP | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 119 | MD America Energy, LLC | Expro Americas, LLC | ADDRESS ON FILE | Wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 120 | MD America Energy, LLC | Fairway Transport | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 121 | MD America Energy, LLC | FAS-LINE SERVICES, INC | ADDRESS ON FILE | Water Transfer | 30 Days Written Notice | N/A | 0.00 | X | | |
| 122 | MD America Energy, LLC | FAULCONER 1996 LIMITED PARTNERSHIP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 123 | MD America Energy, LLC | FESCO LTD | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 124 | MD America Energy, LLC | Fleaux Services of Lousiana, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 125 | MD America Energy, LLC | Fleming Oilfield Services, LP | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 126 | MD America Energy, LLC | Flowco Production Solutions, LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 127 | MD America Energy, LLC | Fluid Delivery Solutions, LLC | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 128 | MD America Energy, LLC | Fluid Disposal Specialties, Inc | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 129 | MD America Energy, LLC | FMC TECHNOLOGIES INC | ADDRESS ON FILE | Wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 130 | MD America Energy, LLC | Folse Land Services, LLC | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 131 | MD America Energy, LLC | Forward Resources | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 132 | MD America Energy, LLC | FOWLER TRANSPORTATION LTD | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 133 | MD America Energy, LLC | FOX ENERGY ASSETS, INC. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 134 | MD America Energy, LLC | Franks International, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 135 | MD America Energy, LLC | FREDERICK M. SMITH | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 136 | MD America Energy, LLC | Garfield Partners LP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 137 | MD America Energy, LLC | George S. and Janice L. Webb | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 138 | MD America Energy, LLC | GEORGE SANFORD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 139 | MD America Energy, LLC | Georgia Ruth Keefer Lebel | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 140 | MD America Energy, LLC | GEOSOUTHERN ENERGY CORPORATION | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 141 | MD America Energy, LLC | GILES MCCRARY | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 142 | MD America Energy, LLC | GR Energy Services Management LP | ADDRESS ON FILE | Wireline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 143 | MD America Energy, LLC | GR Wireline, LP | ADDRESS ON FILE | Wireline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 144 | MD America Energy, LLC | Great Plains Gas Compression Holdings LLC | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 145 | MD America Energy, LLC | GUNNELS & SON RESTROOM SERVICES,LLC | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 146 | MD America Energy, LLC | Gunnels & Sons | ADDRESS ON FILE | renting facilities | at any time | N/A | 0.00 | X | | |
| 147 | MD America Energy, LLC | HALLIBURTON ENERGY SERVICES, INC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 148 | MD America Energy, LLC | HAWKWOOD ENERGY, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 149 | MD America Energy, LLC | Hayley O. Johnson | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 150 | MD America Energy, LLC | HERSCHEL HODGES, LTD. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 151 | MD America Energy, LLC | Hornet Fishing,LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 152 | MD America Energy, LLC | HUDNALL EXPLORATION LTD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 153 | MD America Energy, LLC | Hydroline, LLC | ADDRESS ON FILE | Water Transfer | 30 Days Written Notice | N/A | 0.00 | X | | |
| 154 | MD America Energy, LLC | Hy-Point Energy, Inc | ADDRESS ON FILE | Fuel | 30 Days Written Notice | N/A | 0.00 | X | | |
| 155 | MD America Energy, LLC | ICENHOWER OIL & GAS, INC | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |
| 156 | MD America Energy, LLC | IHS Global | ADDRESS ON FILE | software | 9/1/2021 | N/A | 0.00 | X | | |
| 157 | MD America Energy, LLC | Industrial Engine LLC | ADDRESS ON FILE | Well equipment | 30 Days Written Notice | N/A | 0.00 | X | | |
| 158 | MD America Energy, LLC | Invoke | ADDRESS ON FILE | Ad Valorem taxes | Through tax year 2020 | N/A | 0.00 | X | | |
| 159 | MD America Energy, LLC | Iron Horse Tools, LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 160 | MD America Energy, LLC | J Bar Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 161 | MD America Energy, LLC | J&B Propane | ADDRESS ON FILE | Fuel | 30 Days Written Notice | N/A | 0.00 | X | | |
| 162 | MD America Energy, LLC | J. T. LANGHAM, JR. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 163 | MD America Energy, LLC | JA Oilfield Manufacturing Inc | ADDRESS ON FILE | Well equipment | 30 Days Written Notice | N/A | 0.00 | X | | |
| 164 | MD America Energy, LLC | Jacam Chemicals 2013, LLC | ADDRESS ON FILE | Well Chemicals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 165 | MD America Energy, LLC | JAMES A HARDY | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 166 | MD America Energy, LLC | JAMES L STARR | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 167 | MD America Energy, LLC | Jason Emmitee /Bame Energy | ADDRESS ON FILE | Independent Contractor | active; can term with notice | N/A | 0.00 | X | | |
| 168 | MD America Energy, LLC | JAYSIMS ENERGY LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 169 | MD America Energy, LLC | JEFFREY S. CORNELIUS | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 170 | MD America Energy, LLC | JHE Holdings, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 171 | MD America Energy, LLC | Jimmie Landreth | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 172 | MD America Energy, LLC | Joe Sowell | ADDRESS ON FILE | Site Rental | long as, we are using the ROW | N/A | 0.00 | X | | |
| 173 | MD America Energy, LLC | John Heinsius | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 174 | MD America Energy, LLC | JOHN N. SANFORD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 175 | MD America Energy, LLC | John Wayne Keefer | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 176 | MD America Energy, LLC | JOY TRUST ORGANIZATION | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 177 | MD America Energy, LLC | JWCI Land Consultants | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 178 | MD America Energy, LLC | K&C Custom Services, LLC | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 179 | MD America Energy, LLC | K2 RESOURCES | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 180 | MD America Energy, LLC | Kaiser-Francis Oil Co | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 181 | MD America Energy, LLC | KAZTEK INVESTORS #11 | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 182 | MD America Energy, LLC | Keane Frac TX, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 183 | MD America Energy, LLC | Kelvin Johnson | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 184 | MD America Energy, LLC | Kenergy Oilfield Solutions, LLC | ADDRESS ON FILE | Kill Fluids | 30 Days Written Notice | N/A | 0.00 | X | | |
| 185 | MD America Energy, LLC | Kenneth C. Nelson | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 186 | MD America Energy, LLC | Key Energy Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 187 | MD America Energy, LLC | Kimark Systems, Inc | ADDRESS ON FILE | Flare | 30 Days Written Notice | N/A | 0.00 | X | | |
| 188 | MD America Energy, LLC | Kona Oil & Gas Properties, LP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 189 | MD America Energy, LLC | KThree Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 190 | MD America Energy, LLC | KVH Partners | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 191 | MD America Energy, LLC | Larry T. Long | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 192 | MD America Energy, LLC | LATX Operations LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 193 | MD America Energy, LLC | LEGACY PRESSURE CONTROL, INC | ADDRESS ON FILE | Wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 194 | MD America Energy, LLC | LEGGETTE, BRASHEARS & GRAHAM, INC | ADDRESS ON FILE | Legal | 30 Days Written Notice | N/A | 0.00 | X | | |
| 195 | MD America Energy, LLC | Liberty Lift Solutions, LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 196 | MD America Energy, LLC | Liberty Materials, Inc | ADDRESS ON FILE | Sand | 30 Days Written Notice | N/A | 0.00 | X | | |
| 197 | MD America Energy, LLC | Light Tower Rentals | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 198 | MD America Energy, LLC | Lightning Oilfield Services, Inc | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 199 | MD America Energy, LLC | LOBO EXPLORATION, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 200 | MD America Energy, LLC | Lone Star Hydrostatic LLC | ADDRESS ON FILE | Testing Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 201 | MD America Energy, LLC | Lone Star Services | ADDRESS ON FILE | Cleaning Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 202 | MD America Energy, LLC | Long Industries, Inc | ADDRESS ON FILE | Equipment | 30 Days Written Notice | N/A | 0.00 | X | | |
| 203 | MD America Energy, LLC | Longhorn Septic Service, LLC | ADDRESS ON FILE | Septic Service | 30 Days Written Notice | N/A | 0.00 | X | | |
| 204 | MD America Energy, LLC | LOST CIRCULATION MANAGEMENT, LLC | ADDRESS ON FILE | Drilling Mud | 30 Days Written Notice | N/A | 0.00 | X | | |
| 205 | MD America Energy, LLC | Lucas Petroleum Group | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 206 | MD America Energy, LLC | Luisa Muskus & Alfredo Muskus | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 207 | MD America Energy, LLC | Lumen- Century Link | ADDRESS ON FILE | Mast Service Agreement | 30 Days Written Notice | N/A | 0.00 | X | | |
| 208 | MD America Energy, LLC | MAGNUM OIL TOOLS INTERNATIONAL, LTD | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 209 | MD America Energy, LLC | Manti Equity Partners LP | ADDRESS ON FILE | PSA | Unknown | N/A | 0.00 | X | | |
| 210 | MD America Energy, LLC | Mary Campbell Family Partnership,Ltd. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 211 | MD America Energy, LLC | Maverick Field Services LLC | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 212 | MD America Energy, LLC | McClung Energy Services, LLC | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 213 | MD America Energy, LLC | McCurdy Services Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 214 | MD America Energy, LLC | McFARLAND FAMILY TRUST | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 215 | MD America Energy, LLC | MEDIAPARK LIMITED | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 216 | MD America Energy, LLC | Mercer Well Service | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 217 | MD America Energy, LLC | Mills Trucking, LLC | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 218 | MD America Energy, LLC | MIOIL, LTD | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 219 | MD America Energy, LLC | Mobius | ADDRESS ON FILE | Advisory and assessing commodity positions and exposure | month (30 day notice required) | N/A | 0.00 | X | | |
| 220 | MD America Energy, LLC | MONSTER HEAVY HAULERS LLC | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 221 | MD America Energy, LLC | Nancy Nuche | ADDRESS ON FILE | ROW | long as, we are using the ROW | N/A | 0.00 | X | | |
| 222 | MD America Energy, LLC | NATIONAL OILWELL VARCO, LP | ADDRESS ON FILE | Supply House | 30 Days Written Notice | N/A | 0.00 | X | | |
| 223 | MD America Energy, LLC | Navasota Oilfield Serrvices Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 224 | MD America Energy, LLC | NAVISOTA OILFIELD SERVICES INC | ADDRESS ON FILE | Wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 225 | MD America Energy, LLC | Nettles Group | ADDRESS ON FILE | ROW | long as, we are using the ROW | N/A | 0.00 | X | | |
| 226 | MD America Energy, LLC | NEW JERSEY ZINC EXPLORATION CO | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 227 | MD America Energy, LLC | New Jersey Zinc Exploration Company | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 228 | MD America Energy, LLC | Nitro-Lift Technologies, LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 229 | MD America Energy, LLC | NOEL TAYLOR | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 230 | MD America Energy, LLC | Odessa Pumps and Equipment Inc | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 231 | MD America Energy, LLC | Oil Patch Group | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 232 | MD America Energy, LLC | Oil States Energy Services, LLC | ADDRESS ON FILE | wellhead | 30 Days Written Notice | N/A | 0.00 | X | | |
| 233 | MD America Energy, LLC | O'Neal Trucking | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 234 | MD America Energy, LLC | OpenInvoice | ADDRESS ON FILE | Electronic invoice processing | 30 day notice | N/A | 0.00 | X | | |
| 235 | MD America Energy, LLC | Orchestrate HR | ADDRESS ON FILE | Payroll Provider | active; can term with notice | N/A | 0.00 | X | | |
| 236 | MD America Energy, LLC | OTA Compression, LLC | ADDRESS ON FILE | Compression | 30 Days Written Notice | N/A | 0.00 | X | | |
| 237 | MD America Energy, LLC | Owner used for Unknown Interest | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 238 | MD America Energy, LLC | P & L Testing, LLC | ADDRESS ON FILE | Testing Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 239 | MD America Energy, LLC | Pason Systems USA Corp | ADDRESS ON FILE | Rig Monitoring | 30 Days Written Notice | N/A | 0.00 | X | | |
| 240 | MD America Energy, LLC | Patricia Lynn Keefer Brewer | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 241 | MD America Energy, LLC | Patriot Artificial Lift LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 242 | MD America Energy, LLC | Patriot Well Solutions LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 243 | MD America Energy, LLC | Patterson Services Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 244 | MD America Energy, LLC | PEC-Premier Safety Opertions, LLC | ADDRESS ON FILE | Safety | 30 Days Written Notice | N/A | 0.00 | X | | |
| 245 | MD America Energy, LLC | PERCHERON | ADDRESS ON FILE | Land Service | Written notice | N/A | 0.00 | X | | |
| 246 | MD America Energy, LLC | Percheron Energy LLC | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 247 | MD America Energy, LLC | PetroMax Operating Co., Inc. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 248 | MD America Energy, LLC | Pico Proprane | ADDRESS ON FILE | renting propane tanks | at any time | N/A | 0.00 | X | | |
| 249 | MD America Energy, LLC | Pinnergy, Ltd | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 250 | MD America Energy, LLC | PLM | ADDRESS ON FILE | Land Service | 30 day notice | N/A | 0.00 | X | | |
| 251 | MD America Energy, LLC | PML Exploration Service | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 252 | MD America Energy, LLC | PML EXPLORATION SERVICES, LLC | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 253 | MD America Energy, LLC | PPI SPV SUB, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 254 | MD America Energy, LLC | Praeda Proppants & Logistics, LLC | ADDRESS ON FILE | Sand Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 255 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 6 Months | 170216 | 0.00 | X | | |
| 256 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 6 Months | 170605 | 0.00 | X | | |
| 257 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 6 Months | 180805 | 0.00 | X | | |
| 258 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 6 Months | 180806 | 0.00 | X | | |
| 259 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 4 Months | 180808 | 0.00 | X | | |
| 260 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 4 Months | 180905 | 0.00 | X | | |
| 261 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 10 Months | 181019 | 0.00 | X | | |
| 262 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 181108 | 0.00 | X | | |
| 263 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 181109 | 0.00 | X | | |
| 264 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 181110 | 0.00 | X | | |
| 265 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 181201 | 0.00 | X | | |
| 266 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 181202 | 0.00 | X | | |
| 267 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 4 Months | 190102 | 0.00 | X | | |
| 268 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 190115 | 0.00 | X | | |
| 269 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 190204 | 0.00 | X | | |
| 270 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 1 Months | 190205 | 0.00 | X | | |
| 271 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 2 Months | 190207 | 0.00 | X | | |
| 272 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 2 Months | 190211 | 0.00 | X | | |
| 273 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 3 Months | 190301 | 0.00 | X | | |
| 274 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 3 Months | 190302 | 0.00 | X | | |
| 275 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 3 Months | 190303 | 0.00 | X | | |
| 276 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 3 Months | 190304 | 0.00 | X | | |
| 277 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 4 Months | 190305 | 0.00 | X | | |
| 278 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 4 Months | 190306 | 0.00 | X | | |
| 279 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 11 Months | 200615 | 0.00 | X | | |
| 280 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 11 Months | 200701 | 0.00 | X | | |
| 281 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 11 Months | 200702 | 0.00 | X | | |
| 282 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 12 Months | 200710 | 0.00 | X | | |
| 283 | MD America Energy, LLC | PRECISION COMPRESSION LLC | ADDRESS ON FILE | renting compressors | 12 Months | 200712 | 0.00 | X | | |
| 284 | MD America Energy, LLC | Premier Directional Drilling, LLC | ADDRESS ON FILE | Directional Drilling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 285 | MD America Energy, LLC | Premium Oilfield Services | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 286 | MD America Energy, LLC | ProFrac Services, LLC | ADDRESS ON FILE | Frac | 30 Days Written Notice | N/A | 0.00 | X | | |
| 287 | MD America Energy, LLC | ProTechnics (Core Laboratories) | ADDRESS ON FILE | Science | 30 Days Written Notice | N/A | 0.00 | X | | |
| 288 | MD America Energy, LLC | Pruitt Tool & Supply | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 289 | MD America Energy, LLC | Purple Land Management | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 290 | MD America Energy, LLC | QES | ADDRESS ON FILE | Coil Tubing | 30 Days Written Notice | N/A | 0.00 | X | | |
| 291 | MD America Energy, LLC | Quadient | ADDRESS ON FILE | Post office services/ rented equipment | 50 months | N/A | 0.00 | X | | |
| 292 | MD America Energy, LLC | Quail Tools, LP | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 293 | MD America Energy, LLC | Quintana Energy Services | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 294 | MD America Energy, LLC | Qwik Pipe | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 295 | MD America Energy, LLC | R&W Rentals | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 296 | MD America Energy, LLC | R. V. McAFEE | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 297 | MD America Energy, LLC | R.M. Allen Family Practice DBA Hook Land M | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 298 | MD America Energy, LLC | RAM OPERATING | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 299 | MD America Energy, LLC | RANDOLPH K WILSON III | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 300 | MD America Energy, LLC | Randy or Terri White | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 301 | MD America Energy, LLC | R-Construction Co | ADDRESS ON FILE | Construction Contractor | 30 Days Written Notice | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 302 | MD America Energy, LLC | Red River Oilfield Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 303 | MD America Energy, LLC | RedZone Coil Tubing, LLC | ADDRESS ON FILE | Coil Tubing | 30 Days Written Notice | N/A | 0.00 | X | | |
| 304 | MD America Energy, LLC | Refinery Specialties, Inc | ADDRESS ON FILE | Well Chemicals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 305 | MD America Energy, LLC | Renegade Well Services, LLC | ADDRESS ON FILE | Wireline Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 306 | MD America Energy, LLC | RICHARD H VAN DEN BROEKE | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 307 | MD America Energy, LLC | RIDDELL EXPLORATION LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 308 | MD America Energy, LLC | RIG TOOLS, INC | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 309 | MD America Energy, LLC | ROBERT E. DANIEL | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 310 | MD America Energy, LLC | ROBERT S PEVETO JR | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 311 | MD America Energy, LLC | Rockstar Metalworks, LLC | ADDRESS ON FILE | Welder | 30 Days Written Notice | N/A | 0.00 | X | | |
| 312 | MD America Energy, LLC | ROCKWATER SOUTH TX LLC | ADDRESS ON FILE | Water Transfer | 30 Days Written Notice | N/A | 0.00 | X | | |
| 313 | MD America Energy, LLC | Rod and Tubing Services LLC | ADDRESS ON FILE | Tubular Supplier | 30 Days Written Notice | N/A | 0.00 | X | | |
| 314 | MD America Energy, LLC | Rodell Resources, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 315 | MD America Energy, LLC | RODNEY JONES | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 316 | MD America Energy, LLC | Rogers Wealth Group | ADDRESS ON FILE | 401k Plan Admin | active; can term with notice | N/A | 0.00 | X | | |
| 317 | MD America Energy, LLC | Roland Jeffery Keefer | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 318 | MD America Energy, LLC | Royalty Clearinghouse Partnership | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 319 | MD America Energy, LLC | SAM L. RASCO | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 320 | MD America Energy, LLC | Samaripa Oilfield Services, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 321 | MD America Energy, LLC | SANDIA MINERALS INC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 322 | MD America Energy, LLC | SANDIA MINERALS, INC. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 323 | MD America Energy, LLC | Sandra Conner | ADDRESS ON FILE | ROW | ong as, we are using the ROW | N/A | 0.00 | X | | |
| 324 | MD America Energy, LLC | Schlumberger | ADDRESS ON FILE | renting downhole tools | at any time | N/A | 0.00 | X | | |
| 325 | MD America Energy, LLC | S-Con Services Inc | ADDRESS ON FILE | Electric Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 326 | MD America Energy, LLC | Scott Environmental Services, Inc | ADDRESS ON FILE | Pit remediation | 30 Days Written Notice | N/A | 0.00 | X | | |
| 327 | MD America Energy, LLC | Shred-It | ADDRESS ON FILE | Confidential document storage and shredding | onth (30 day notice required) | N/A | 0.00 | X | | |
| 328 | MD America Energy, LLC | Silver Oak Energy Partners,LLC | ADDRESS ON FILE | PSA | Unknown | N/A | 0.00 | X | | |
| 329 | MD America Energy, LLC | Simons Petroleum, LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 330 | MD America Energy, LLC | Smart Oilfield Services Inc | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 331 | MD America Energy, LLC | Solaris Oilfield | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 332 | MD America Energy, LLC | Southern Flow Companies (Zedi Emerson) | ADDRESS ON FILE | Gas Measurement | 30 Days Written Notice | N/A | 0.00 | X | | |
| 333 | MD America Energy, LLC | Spencer Landreth | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 334 | MD America Energy, LLC | Spur Operating, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 335 | MD America Energy, LLC | SRG Lake | ADDRESS ON FILE | Water | Expires 8/31/2022 | N/A | 0.00 | X | | |
| 336 | MD America Energy, LLC | Stabil Drill Specialties LLC | ADDRESS ON FILE | Drilling Mud | 30 Days Written Notice | N/A | 0.00 | X | | |
| 337 | MD America Energy, LLC | Statewide Materials Transport, LTD | ADDRESS ON FILE | Trucking | 30 Days Written Notice | N/A | 0.00 | X | | |
| 338 | MD America Energy, LLC | Stellar Oilfield | ADDRESS ON FILE | renting trailers | at any time | N/A | 0.00 | X | | |
| 339 | MD America Energy, LLC | Stellar Oilfield Rentals, LLC | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 340 | MD America Energy, LLC | Stephen W. Schneider, Jr | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 341 | MD America Energy, LLC | Stephens Production Company | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 342 | MD America Energy, LLC | STEVEN M. COVEY | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 343 | MD America Energy, LLC | Stevens Tanker Division, LLC | ADDRESS ON FILE | Water Hauling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 344 | MD America Energy, LLC | Stockyards Land Services LLC | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 345 | MD America Energy, LLC | STONE MOUNTAIN PETROLEUM, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 346 | MD America Energy, LLC | STQ Exploration LLC | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 347 | MD America Energy, LLC | SULPHUR RIVER, LP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 348 | MD America Energy, LLC | Sun Coast Resources, Inc | ADDRESS ON FILE | Fuel | 30 Days Written Notice | N/A | 0.00 | X | | |
| 349 | MD America Energy, LLC | Sunbelt | ADDRESS ON FILE | renting generators | at any time | N/A | 0.00 | X | | |
| 350 | MD America Energy, LLC | Sunbelt Rentals, LLC | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 351 | MD America Energy, LLC | Supak Oilfield Service & Welding, LLC | ADDRESS ON FILE | Welder | 30 Days Written Notice | N/A | 0.00 | X | | |
| 352 | MD America Energy, LLC | T&J Torque & Testing, LLC | ADDRESS ON FILE | Testing Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 353 | MD America Energy, LLC | Team 3 Rentals and Service | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 354 | MD America Energy, LLC | Tetra Tech, INC | ADDRESS ON FILE | Flowback Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 355 | MD America Energy, LLC | Texas Document Solutions | ADDRESS ON FILE | renting printer/ scanner | Written notice | N/A | 0.00 | X | | |
| 356 | MD America Energy, LLC | Texas Fueling Services, INC | ADDRESS ON FILE | Fuel | 30 Days Written Notice | N/A | 0.00 | X | | |
| 357 | MD America Energy, LLC | Texas Hot Oilers, Inc | ADDRESS ON FILE | Hot Oil | 30 Days Written Notice | N/A | 0.00 | X | | |
| 358 | MD America Energy, LLC | TEXAS RAW OIL AND GAS, INC. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 359 | MD America Energy, LLC | Texas Specialty Sands, LLC | ADDRESS ON FILE | Sand | 30 Days Written Notice | N/A | 0.00 | X | | |
| 360 | MD America Energy, LLC | TEXICAN ENERGY CORPORATION | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 361 | MD America Energy, LLC | Thed Easley's, Inc | ADDRESS ON FILE | Crane | 30 Days Written Notice | N/A | 0.00 | X | | |
| 362 | MD America Energy, LLC | THOMAS S. RICHARDS | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 363 | MD America Energy, LLC | Titan Liner, Inc | ADDRESS ON FILE | Well equipment | 30 Days Written Notice | N/A | 0.00 | X | | |
| 364 | MD America Energy, LLC | Topline Rental, LLC | ADDRESS ON FILE | Well rentals | 30 Days Written Notice | N/A | 0.00 | X | | |
| 365 | MD America Energy, LLC | Topographic, LLC | ADDRESS ON FILE | Land Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 366 | MD America Energy, LLC | TOTAL SCREEN SOLUTIONS, LLC | ADDRESS ON FILE | Solids Control | 30 Days Written Notice | N/A | 0.00 | X | | |
| 367 | MD America Energy, LLC | TPG Sand - Pacesetter Proppants | ADDRESS ON FILE | Sand | 30 Days Written Notice | N/A | 0.00 | X | | |
| 368 | MD America Energy, LLC | Traverse Holding Corporation | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 369 | MD America Energy, LLC | TRICAN WELL SERVICE, L.P | ADDRESS ON FILE | Frac | 30 Days Written Notice | N/A | 0.00 | X | | |
| 370 | MD America Energy, LLC | Trinity Environmental Services | ADDRESS ON FILE | Waste Disposal | 30 Days Written Notice | N/A | 0.00 | X | | |
| 371 | MD America Energy, LLC | TRIUMPH DOWNHOLE TOOLS, LLC | ADDRESS ON FILE | Downhole Tools | 30 Days Written Notice | N/A | 0.00 | X | | |
| 372 | MD America Energy, LLC | TYLER INVESTMENT COMPANY | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 373 | MD America Energy, LLC | US Directional Drilling, Inc | ADDRESS ON FILE | Directional Drilling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 374 | MD America Energy, LLC | Vaughn Energy Services | ADDRESS ON FILE | Directional Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 375 | MD America Energy, LLC | VCP Energy Resources LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 376 | MD America Energy, LLC | VESS TEXAS PARTNERS II, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 377 | MD America Energy, LLC | VESS TEXAS PARTNERS IV, LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 378 | MD America Energy, LLC | VOC BRAZOS ENERGY PARTNERS, LP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 379 | MD America Energy, LLC | WALTER C. SULLIVAN | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 380 | MD America Energy, LLC | Weatherford | ADDRESS ON FILE | gas measurement services | 12/31/2020 | N/A | 0.00 | X | | |
| 381 | MD America Energy, LLC | WEATHERFORD ARTIFICIAL LIFT SYS., INC | ADDRESS ON FILE | Automation | 30 Days Written Notice | N/A | 0.00 | X | | |
| 382 | MD America Energy, LLC | WEATHERFORD US LP | ADDRESS ON FILE | Automation | 30 Days Written Notice | N/A | 0.00 | X | | |
| 383 | MD America Energy, LLC | Wellbenders Directional Services LLC | ADDRESS ON FILE | Directional Drilling | 30 Days Written Notice | N/A | 0.00 | X | | |
| 384 | MD America Energy, LLC | Whitley Penn | ADDRESS ON FILE | Prepares annual tax return | erred tax calc for Dec 31, 2020 | N/A | 0.00 | X | | |
| 385 | MD America Energy, LLC | WILL R. RASCO | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 386 | MD America Energy, LLC | WILLIS DRILLING CO., INC. | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 387 | MD America Energy, LLC | Wise Consultants LLC | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 388 | MD America Energy, LLC | Workover Solutions Inc | ADDRESS ON FILE | Well Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 389 | MD America Energy, LLC | WRATHER DEVELOPMENT CORP | ADDRESS ON FILE | Working interest owners | wn (until no longer producing) | N/A | 0.00 | X | | |
| 390 | MD America Energy, LLC | York Torc & Test LLC | ADDRESS ON FILE | Testing Services | 30 Days Written Notice | N/A | 0.00 | X | | |
| 391 | MD America Pipeline, | Crimson Exploration Operating Inc. | 717 TEXAS AVE SUITE 2900 | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 392 | MD America Pipeline, | CML EXPLORATION LLC | P O BOX 841738 | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 393 | MD America Pipeline, | Endeavor Natural Gas, L.P | 1201 Louisana St | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 394 | MD America Pipeline, | Southern Bay Operating, LLC | 110 Cypress Station DR | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 395 | MD America Pipeline, | ETC Texas Pipeline, LTD. | 800 E Sonterra Blvd | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 396 | MD America Pipeline, | SEI Energy, LLC | 2120 Northgate Park Lane | Gas & marketing agreement | wn (until no longer producing) | N/A | 0.00 | X | | |
| 397 | MD America Energy, LLC | J. W. MATHIS AND WIFE, MARY MATHIS | N/A | Lease | wn (until no longer producing) | TX-03-0049 | 0.00 | X | | |
| 398 | MD America Energy, LLC | GLENN F. MATHIS AND WIFE, LENA MATHIS | N/A | Lease | wn (until no longer producing) | TX-03-0007 | 0.00 | X | | |
| 399 | MD America Energy, LLC | GLENN F. MATHIS AND WIFE, LENA MATHIS | N/A | Lease | wn (until no longer producing) | TX-03-0048 | 0.00 | X | | |
| 400 | MD America Energy, LLC | E. WHITMIRE AND WIFE, ANNIE WHITMIRE | N/A | Lease | wn (until no longer producing) | TX-06-0045-000_A.HBP | 0.00 | X | | |
| 401 | MD America Energy, LLC | I. C. MOORE, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-06-0045-000_A.HBP | 0.00 | X | | |
| 402 | MD America Energy, LLC | J. W. FANNIN, AN UNMARRIED MAN | N/A | Lease | wn (until no longer producing) | TX-06-0053-001 | 0.00 | X | | |
| 403 | MD America Energy, LLC | LAWRENCE FITE AND WIFE, FLORENCE FITE | N/A | Lease | wn (until no longer producing) | TX-06-0054-001 | 0.00 | X | | |
| 404 | MD America Energy, LLC | LEE MADOLE AND WIFE, SADIE MADOLE; GRACE STANDLEY AND HUSBAND, SAM STANDLEY; F. W. MADOLE AND WIFE, HAZEL MADOLE; RUBY WHITE AND HUSBAND J. B. WHITE; VIVIAN FARRIS AND HUSBAND, JEFF FARRIS, JR.; JANIE STANDLEY AND HUSBAND, P. M. STANDLEY; MARGIE MADOLE PRESCOTT AND HUSBAND, MERLE PRESCOTT; IVY MAE PAYNE AND HUSBAND, R. M. PAYNE; M. T. MADOLE AND WIFE, ELIZABETH MADOLE, ACTING BY AND THROUGH OUR ATTORNEY-IN-FACT, BERTHA MADOLE, AND BERTHA MADOLE ACTING FOR HERSELF INDIVIDUALLY AND AS SURVIVOR IN COMMUNITY OF A. D. MADOLE, DECEASED. | N/A | Lease | Unknown (until no longer producing) | TX-06-0205-000 | | X | | |
| | | | | | | | 0.00 | | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 405 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0053-005 | 0.00 | X | | |
| 406 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0053-006 | 0.00 | X | | |
| 407 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0053-007 | 0.00 | X | | |
| 408 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0053-003 | 0.00 | X | | |
| 409 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0053-002 | 0.00 | X | | |
| 410 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0053-004 | 0.00 | X | | |
| 411 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0053-011 | 0.00 | X | | |
| 412 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0053-010_P.HBP | 0.00 | X | | |
| 413 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0053-012 | 0.00 | X | | |
| 414 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0054-003 | 0.00 | X | | |
| 415 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0054-004 | 0.00 | X | | |
| 416 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0054-002 | 0.00 | X | | |
| 417 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0043-003 | 0.00 | X | | |
| 418 | MD America Energy, LLC | FLAG OIL CORPORATION | N/A | Lease | wn (until no longer producing) | TX-06-0043-002 | 0.00 | X | | |
| 419 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0043-001 | 0.00 | X | | |
| 420 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0054-006 | 0.00 | X | | |
| 421 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0054-005 | 0.00 | X | | |
| 422 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0054-007 | 0.00 | X | | |
| 423 | MD America Energy, LLC | TEXAS OSAGE COOPERATIVE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0165-001 | 0.00 | X | | |
| 424 | MD America Energy, LLC | FLAG OIL CORPORATION OF DELAWARE, ACTING BY AND THROUTH ITS DULY AUTHORIZED PRESIDEENT, S. H. KING | N/A | Lease | wn (until no longer producing) | TX-06-0165-002 | 0.00 | X | | |
| 425 | MD America Energy, LLC | R. L. HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0165-003 | 0.00 | X | | |
| 426 | MD America Energy, LLC | LAWRENCE FITE, GUARDIAN OF THE ESTATES OF JAMES RICHARD FITE AND DAVID LAWRENCE FITE | N/A | Lease | wn (until no longer producing) | TX-06-0004-009 | 0.00 | X | | |
| 427 | MD America Energy, LLC | CURTIS GUNN AND WIFE, LILLIAN C. GUNN | N/A | Lease | wn (until no longer producing) | TX-06-0202-000 | 0.00 | X | | |
| 428 | MD America Energy, LLC | JAMES FUHLBERG, UNMARRIED | N/A | Lease | wn (until no longer producing) | TX-06-0203-000 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 429 | MD America Energy, LLC | W. H. SMITH, UNMARRIED; W. C. SMITH AND WIFE, ROSEMARY SMITH, AND JAMES E. SMITH AND WIFE, IVA SMITH | N/A | Lease | wn (until no longer producing) | TX-06-0209-000 | 0.00 | X | | |
| 430 | MD America Energy, LLC | LORENE WILSON, SURVIVING WIFE OF J. A. WILSON, DECEASED, A FEME SOLE, AND ONA FAY MCMAHAN JOINED BY HER HUSBAND, J. E. MCMAHAN | N/A | Lease | wn (until no longer producing) | TX-06-0204-001 | 0.00 | X | | |
| 431 | MD America Energy, LLC | J. E. HICKS AND WIFE, MARINTHA HICKS | N/A | Lease | wn (until no longer producing) | TX-06-0207-000 | 0.00 | X | | |
| 432 | MD America Energy, LLC | JOE ANNE WILSON, A FEME SOLE, ACTING UNDER AUTHORITY GRANTED BY THE DISTRICT COURT OF MADISON COUNTY, TEXAS, IN CAUSE NO. 1849, BY ORDER ENTERED ON JAN. 25, 1954, RECORDED IN VOL. L, P. 244, OF THE MINUTES OF SAID COURT, A CERTIFIED COPY OF WHICH WAS FILED FOR RECORD IN THE COUNTY CLERK'S OFFICE OF SAID COUNTY ON JAN. 26, 1954, UNDER CLERK'S FILE NO. 25943. | N/A | Lease | wn (until no longer producing) | TX-06-0204-003 | 0.00 | X | | |
| 433 | MD America Energy, LLC | MRS. LORENE WILSON, GUARDIAN OF THE ESTATE OF TOMMY CARROLL WILSON, A MINOR | N/A | Lease | wn (until no longer producing) | TX-06-0204-002 | 0.00 | X | | |
| 434 | MD America Energy, LLC | R. L. HOKE AND WIFE, GLADYS HOKE | N/A | Lease | wn (until no longer producing) | TX-06-0044-000_A.HBP | 0.00 | X | | |
| 435 | MD America Energy, LLC | LEE MADDLE AND WIFE, SADIE MADDLE; GRACE STANDLEY AND HUSBAND, SAM STANDLEY; F. W. MADDLE AND WIFE, HAZEL MADDLE; RUBY WHITE AND HUSBAND J. B. WHITE; VIVIAN FARRIS AND HUSBAND, JEFF FARRIS, JR.; JANIE STANDLEY AND HUSBAND, P. M. STANDLEY; MARGIE MADDLE PRESCOTT AND HUSBAND, MERLE PRESCOTT; IVY MAE PAYNE AND HUSBAND, R. M. PAYNE; M. T. MADDLE AND WIFE, ELIZABETH MADDLE, ACTING HEREIN BY AND THROUGH THEIR DULY CONSTITUTED ATTORNEY-IN-FACT, BERTHA MADDLE, AND BERTHA MADDLE, INDIVIDUALLY, AND AS SURVIVOR IN COMMUNITY OF A. D. MADDLE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-06-0210-000 | 0.00 | X | | |
| 436 | MD America Energy, LLC | J. H. WALTON, UNMARRIED, AND JEWELL W. GOREE JOINED BY HER HUSBAND, ELMO GOREE | N/A | Lease | wn (until no longer producing) | TX-06-0043-004 | 0.00 | X | | |
| 437 | MD America Energy, LLC | CHARLES D. WINGARD, GUARDIAN OF THE ESTATE OF R. N. WILSON, A PERSON OF UNSOUND MIND | N/A | Lease | wn (until no longer producing) | TX-06-0054-008 | 0.00 | X | | |
| 438 | MD America Energy, LLC | B. A. MORGAN AND WIFE, LULAN MORGAN | N/A | Lease | wn (until no longer producing) | TX-06-0046-000_A.HBP | 0.00 | X | | |
| 439 | MD America Energy, LLC | A. F. SETTLEMYER AND WIFE, ELNA SETTLEMYER | N/A | Lease | wn (until no longer producing) | TX-06-0060-000 | 0.00 | X | | |
| 440 | MD America Energy, LLC | HENRIETTA CANNON STONE, ACTING HEREIN WITHOUT THE JOINDER OF HER HUSBAND, ALLEN STONE, UNDER AND BY THE VIRTUE OF PERMISSION AND AUTHORITY GRANTED BY THE DISTRICT COURT, OF MADISON COUNTY, TEXAS ENTERED IN CAUSE #1802 STYLED EXPARTE: HENRIETTA CANNON STONE PETITIONER ON THE 4TH DAY OF FEBRUARY 1953 | N/A | Lease | wn (until no longer producing) | TX-06-0036-000 | 0.00 | X | | |
| 441 | MD America Energy, LLC | G. F. BOYD, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-06-0037-000_A.HBP | 0.00 | X | | |
| 442 | MD America Energy, LLC | D. C. CANNON, JR., A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-06-0038-000 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 443 | MD America Energy, LLC | J. H. WALTON, A SINGLE MAN, JEWELL W. GOREE AND HER HUSBAND | N/A | Lease | wn (until no longer producing) | TX-06-0040-000 | 0.00 | X | | |
| 444 | MD America Energy, LLC | JOE A. VENABLE, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-06-0063-002 | 0.00 | X | | |
| 445 | MD America Energy, LLC | M. D. HANSON AND WIFE, NATHALIE HANSON | N/A | Lease | wn (until no longer producing) | TX-06-0041-000 | 0.00 | X | | |
| 446 | MD America Energy, LLC | BERTHA MADOLE, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-06-0042-000_A.HBP | 0.00 | X | | |
| 447 | MD America Energy, LLC | E. H. MOSLEY AND WIFE, CORA MOSLEY | N/A | Lease | wn (until no longer producing) | TX-06-0208-000_A.HBP | 0.00 | X | | |
| 448 | MD America Energy, LLC | MARVIN F. ISGITT AND WIFE, ESTELLE ISGITT | N/A | Lease | wn (until no longer producing) | TX-06-0206-000 | 0.00 | X | | |
| 449 | MD America Energy, LLC | GEORGE L. POWERS, A SINGLE MAN, TILLIE E. COLEMAN, A FEME SOLE, O. L. MOORE AND WIFE, WILLIE BELL MOORE, J. M. POWERS AND WIFE, IRMA POWERS, G. N. POWERS AND WIFE, ELIZABETH POWERS, G. L. POWERS AND WIFE, EVELYN POWERS | N/A | Lease | wn (until no longer producing) | TX-06-0047-000 | 0.00 | X | | |
| 450 | MD America Energy, LLC | COTTONWOOD COMMUNITY CENTER | N/A | Lease | wn (until no longer producing) | TX-06-0048-000_A.HBP | 0.00 | X | | |
| 451 | MD America Energy, LLC | COTTONWOOD MISSIONARY BAPTIST CHURCH | N/A | Lease | wn (until no longer producing) | TX-06-0049-000 | 0.00 | X | | |
| 452 | MD America Energy, LLC | LEE MADDLE AND VIVIAN FARRIS, TRUSTEES OF THE OXFORD CEMETERY ASSOCIATION, THE LATTER JOINED PRO FORMA BY HER HUSBAND, JEFF FARRIS, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0200-000 | 0.00 | X | | |
| 453 | MD America Energy, LLC | IVA GLENN, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-7247 | 0.00 | X | | |
| 454 | MD America Energy, LLC | EVA MAE REEDER, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-06-7248 | 0.00 | X | | |
| 455 | MD America Energy, LLC | WINNIE CONAWAY, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07547_A.HBP | 0.00 | X | | |
| 456 | MD America Energy, LLC | ACEA MCNULTRY; GLOVER MCNULTRY; ZERLINE MCNULTRY CARTER AND HUSBAND, PERRY CARTER; QUARNOR MCNULTRY; AND THORNOR MCNULTRY | N/A | Lease | wn (until no longer producing) | TX-06-0050-000 | 0.00 | X | | |
| 457 | MD America Energy, LLC | D. F. BROWN AND WIFE, MILDRED BROWN; C. H. BROWN AND WIFE, WINNIE BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0051-000 | 0.00 | X | | |
| 458 | MD America Energy, LLC | GLENN F. MATHIS AND WIFE, LENA MATHIS | N/A | Lease | wn (until no longer producing) | TX-06-0052-004_P.HBP | 0.00 | X | | |
| 459 | MD America Energy, LLC | DAVID HALL AND WIFE, IMOGENE HALL | N/A | Lease | wn (until no longer producing) | TX-06-0075-000_A.HBP | 0.00 | X | | |
| 460 | MD America Energy, LLC | MRS. ADDIE N. DAMON | N/A | Lease | wn (until no longer producing) | TX-06-0052-001_P.HBP.HS | 0.00 | X | | |
| 461 | MD America Energy, LLC | J. W. MATHIS, JR. AND WIFE, CELESTE MATHIS | N/A | Lease | wn (until no longer producing) | TX-06-0227-002 | 0.00 | X | | |
| 462 | MD America Energy, LLC | J. W. MATHIS, JR., AND WIFE, CELESTE MATHIS | N/A | Lease | wn (until no longer producing) | TX-06-0055-001 | 0.00 | X | | |
| 463 | MD America Energy, LLC | CLYDE WALLACE, WIDOW OF ANGUS WALLACE (DECEASED) JAMES WALLACE AND IMOGENE WALLACE, HIS WIFE. | N/A | Lease | wn (until no longer producing) | TX-06-0056-005 | 0.00 | X | | |
| 464 | MD America Energy, LLC | ANNIE WALLACE JENNINGS AND HUSBAND, WM. B. JENNINGS | N/A | Lease | wn (until no longer producing) | TX-06-0056-003 | 0.00 | X | | |
| 465 | MD America Energy, LLC | LENA WALLACE DEAN, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0056-004 | 0.00 | X | | |
| 466 | MD America Energy, LLC | ONA S. PETTY, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-06-0052-002_P.HBP | 0.00 | X | | |
| 467 | MD America Energy, LLC | SIDNEY FANNIN AND WIFE, FREDDIE FANNIN | N/A | Lease | wn (until no longer producing) | TX-06-0053-009 | 0.00 | X | | |
| 468 | MD America Energy, LLC | W. H. FANNIN AND WIFE, EUNICE BLANCHE FANNIN | N/A | Lease | wn (until no longer producing) | TX-06-0053-008 | 0.00 | X | | |
| 469 | MD America Energy, LLC | TEXAS OSAGE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0055-002 | 0.00 | X | | |
| 470 | MD America Energy, LLC | R. L. HOUSE; AND C. G. HOUSE, TRUSTEE FOR ROSEMARY CLYDE HOUSE BREVARD AND ROBERTA LEE HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0055-003 | 0.00 | X | | |
| 471 | MD America Energy, LLC | R. L. HOUSE; C. G. HOUSE, TRUSTEE FOR ROSEMARY CLYDE HOUSE BREVARD AND ROBERTA LEE HOUSE | N/A | Lease | wn (until no longer producing) | TX-06-0056-001 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 472 | MD America Energy, LLC | TEXAS OSAGE ROYALTY POOL, INC., ACTING BY AND THROUGH ITS DULY AUTHORIZED PRESIDENT, D. N. CUSHING | N/A | Lease | wn (until no longer producing) | TX-06-0056-002 | 0.00 | X | | |
| 473 | MD America Energy, LLC | A. C. SCHILLER AND WIFE, LORENA SCHILLER | N/A | Lease | wn (until no longer producing) | TX-06-0057-005 | 0.00 | X | | |
| 474 | MD America Energy, LLC | J.V. ADAMS | N/A | Lease | wn (until no longer producing) | TX-06-0063-003 | 0.00 | X | | |
| 475 | MD America Energy, LLC | E. R. BROADWAY AND WIFE, ALMA BROADWAY | N/A | Lease | wn (until no longer producing) | TX-06-0057-002_P.HBP | 0.00 | X | | |
| 476 | MD America Energy, LLC | MRS. GEORGE HECK, EXECTURIX OF THE ESTATE OF GEORGE HECK, DECEASED | N/A | Lease | wn (until no longer producing) | TX-06-0057-004 | 0.00 | X | | |
| 477 | MD America Energy, LLC | AL MORTENSEN | N/A | Lease | wn (until no longer producing) | TX-06-0057-001 | 0.00 | X | | |
| 478 | MD America Energy, LLC | FIRST CITY NATIONAL BANK OF HOUSTON, TRUSTEE UNDER THE WILL OF R. B. WEATHERALL, JR., DECEASED | N/A | Lease | wn (until no longer producing) | TX-06-0057-003 | 0.00 | X | | |
| 479 | MD America Energy, LLC | S. A. MCADAMS AND HER HUSBAND, J. P. MCADAMS, AUDREY M. THEUS AND HER HUSBAND, W. C. THEUS | N/A | Lease | wn (until no longer producing) | TX-06-0058-001 | 0.00 | X | | |
| 480 | MD America Energy, LLC | RALPH A. JOHNSTON | N/A | Lease | wn (until no longer producing) | TX-06-0059-001 | 0.00 | X | | |
| 481 | MD America Energy, LLC | FERN Z. JACKSON, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0072-001_A.HBP | 0.00 | X | | |
| 482 | MD America Energy, LLC | GERTIE THOMAS WALTON & E. H. WALTON, HER HUSBAND, OUIDA SPIVEY AND HUSBAND, CECIL SPIVEY, FRED THOMAS AND ELAINE THOMAS, J. L. THOMAS AND WIFE, MARY ELLEN THOMAS, RETHA ASELTINE, A WIDOW, JOHNNIE RUTH WILLHITE &HUSBAND, HOWARD WILLHITE BETTIE CHOUINARD AND HUSBAND, BERNARD CHOUINARD | N/A | Lease | wn (until no longer producing) | TX-06-0071-001_A.HBP | 0.00 | X | | |
| 483 | MD America Energy, LLC | RALPH A. JOHNSTON, V. A. JOHNSTON, ORVILLE CURTIS ROGERS, EULA MAY JOHNSTON, FORT WORTH, TEXAS, TRUSTEE U/A WITH EULA MAY JOHNSTON | N/A | Lease | wn (until no longer producing) | TX-06-0061-000 | 0.00 | X | | |
| 484 | MD America Energy, LLC | W. A. BLACK AND MAUDIE BLACK, HIS WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0074-001_A.HBP | 0.00 | X | | |
| 485 | MD America Energy, LLC | CURTIS H. GUNN AND LILLIAN GUNN, HIS WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0070-001_A.HBP | 0.00 | X | | |
| 486 | MD America Energy, LLC | MRS. ERNEST E. LAMAR, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0063-001 | 0.00 | X | | |
| 487 | MD America Energy, LLC | D. F. BROWN, HARVEY CANNON AND ROLAND MIZE TRUSTEES FOR HIGH PRAIRIE CEMETERY ASSOCIATION | N/A | Lease | wn (until no longer producing) | TX-06-0062-000 | 0.00 | X | | |
| 488 | MD America Energy, LLC | J. E. CASEY AND WIFE, CARRIE BELL CASEY | N/A | Lease | wn (until no longer producing) | TX-06-0073-001_A.HBP | 0.00 | X | | |
| 489 | MD America Energy, LLC | O. B. SHANNON | N/A | Lease | wn (until no longer producing) | TX-06-0065-002 | 0.00 | X | | |
| 490 | MD America Energy, LLC | J. E. BLACK, AS HIS SEPERATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0066-000 | 0.00 | X | | |
| 491 | MD America Energy, LLC | PAULINE KEEFER JOINED PRO-FORMA BY HER HUSBAND T. C. KEEFER | N/A | Lease | wn (until no longer producing) | TX-06-0069-000 | 0.00 | X | | |
| 492 | MD America Energy, LLC | J. G. CAMPBELL | N/A | Lease | wn (until no longer producing) | TX-06-0064-001_A.HBP | 0.00 | X | | |
| 493 | MD America Energy, LLC | WALTER O. MOSLEY AND WIFE, MIDGET MOSLEY | N/A | Lease | wn (until no longer producing) | TX-06-0029-003_A.HBP | 0.00 | X | | |
| 494 | MD America Energy, LLC | JAMES E. CASEY AND WIFE, CARRIE CASEY | N/A | Lease | wn (until no longer producing) | TX-06-0065-001 | 0.00 | X | | |
| 495 | MD America Energy, LLC | A. L. LEE AND WIFE, MARY LOIS LEE | N/A | Lease | wn (until no longer producing) | TX-06-0067-000 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 496 | MD America Energy, LLC | JAMES LANG, AND THE OTHER UNDERSIGNED OWNERS OF INTERESTS IN THE LAND HEREINAFTER DESCRIBED (JAMES LANG AND WIFE, PEARL L. LANG; J. W. T. CHEATHAM; ETTIE SHEPPARD; NETTIE LAWLESS; JEWELL N. GOREE; ARTHUR FUHLBERG; E. L. CHEATHAM; JACK MCBRIDE; LUTHER R. MIDDLEBROOK AND WIFE, BESSIE MIDDLEBROOK; H. L. GENTRY AND WIFE, REBA MAE GENTRY; H. O. HARLESS AND WIFE, FRANCES HARLESS; G. O. BUCKHAULTS AND WIFE, ALMA H. BUCKHAULTS; R. MILTON DENMAN AND WIFE, CORA DENMAN; ROBERT V. MORRIS AND WIFE, LILLIAN MORRIS; J. M. FRYE AND WIFE, LIZZIE FRYE (AND MRS. EDGAR LENGWITNESS & CARL S. ??-NO ACKNOWLEGMENTS)) | N/A | Lease | wn (until no longer producing) | TX-06-0068-001 | 0.00 | X | | |
| 497 | MD America Energy, LLC | ROLLAN H. PARK AND OTHER UNDERSIGNED OWNERS OF INTERESTS IN THE LAND HEREINAFTER DESCRIBED (ROLLAN H. PARK AND NELLIE PARK, HUSBAND AND WIFE; P. M. CULBRETH AND WIFE, WINNIE CULBRETH; SHERMAN BULLARD AND WIFE, WILLIE BULLARD; CECIL MOORE AND WIFE, RUTH MOORE; RUBY FUHLBERG; MAMIE JEWEL MURPHY; JAMES E. FUHLBERG; AND ALICE F. LIGHT) | N/A | Lease | wn (until no longer producing) | TX-06-0068-002 | 0.00 | X | | |
| 498 | MD America Energy, LLC | MANUEL H. LANG | N/A | Lease | wn (until no longer producing) | TX-06-0068-003 | 0.00 | X | | |
| 499 | MD America Energy, LLC | LOUIS POSS | N/A | Lease | wn (until no longer producing) | TX-06-0068-004 | 0.00 | X | | |
| 500 | MD America Energy, LLC | A. L. CAMPBELL AND WIFE, ELAYNE CAMPBELL | N/A | Lease | wn (until no longer producing) | TX-06-0029-001_A.HBP | 0.00 | X | | |
| 501 | MD America Energy, LLC | GMA EMPLOYEES 1965 COMPANY (A TEXAS LIMITED PARTNERSHIP) | N/A | Lease | wn (until no longer producing) | TX-06-0058-002 | 0.00 | X | | |
| 502 | MD America Energy, LLC | JAMES FREDERICK MATHIS AND WIFE, JEANELLE MATHIS | N/A | Lease | wn (until no longer producing) | TX-06-0039-000_A.HBP.HS | 0.00 | X | | |
| 503 | MD America Energy, LLC | AARON WILLIS MCMAHAN; BILLIE MCMAHAN HORTON AND HUSBAND, WILLIAM HORTON; MARY LEE SUCHAN AND HUSBAND, JERRY SUCHAN | N/A | Lease | wn (until no longer producing) | TX-06-0076-001 | 0.00 | X | | |
| 504 | MD America Energy, LLC | GRACE STANDLEY, JOINED PRO-FORMA BY HER HUSBAND SAM STANDLEY; F. W. MADDLE | N/A | Lease | wn (until no longer producing) | TX-06-0077-000 | 0.00 | X | | |
| 505 | MD America Energy, LLC | ALPHA WALLER, WIDOW OF E. J. WALLER; WALLACE E. WALLER; WILLIAM M. WALLER; GUY A. WALLER; LLOYD WALLER AND FAY WALLER | N/A | Lease | wn (until no longer producing) | TX-06-0078-001 | 0.00 | X | | |
| 506 | MD America Energy, LLC | ALPHA WALLER, GUARDIAN OF THE ESTATE OF JOE F. WALLER, NON COMPOS MENTIS | N/A | Lease | wn (until no longer producing) | TX-06-0078-002 | 0.00 | X | | |
| 507 | MD America Energy, LLC | OLA GARNER LISENBY | N/A | Lease | wn (until no longer producing) | TX-06-0079-000_A.HBP | 0.00 | X | | |
| 508 | MD America Energy, LLC | FLAG-REDFERN OIL COMPANY (FORMERLY FLAG OIL CORPORATION OF DELAWARE) | N/A | Lease | wn (until no longer producing) | TX-06-0055-004 | 0.00 | X | | |
| 509 | MD America Energy, LLC | FLAG-REDFERN OIL COMPANY (FORMERLY FLAG OIL CORPORATION OF DELAWARE) | N/A | Lease | wn (until no longer producing) | TX-06-0056-006 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 510 | MD America Energy, LLC | A. L. CAMPBELL AND WIFE, ELAYNE CAMPBELL INDIVIDUALLY AND AS AGENTS FOR JAMES FREDRICK MATHIS ET UX AS GRANTED IN THE DEED DATED JANUARY 29, 1973 FROM JAMES FREDRICK MATHIS ET UX TO A. L. CAMPBELL ET UX AND RECORDED IN VOL. 195, PAGE 223 OF THE DEED RECORDS OF MADISON COUNTY, TEXAS. | N/A | Lease | wn (until no longer producing) | TX-06-0081-000_A.HBP.HS | 0.00 | X | | |
| 511 | MD America Energy, LLC | NELLIE BOOZER, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0082-000 | 0.00 | X | | |
| 512 | MD America Energy, LLC | JAMES E. CASEY, JR. AND CARRIE B. CASEY, WIDOW OF J. E. CASEY, SR. | N/A | Lease | wn (until no longer producing) | TX-06-0080-000_A.HBP | 0.00 | X | | |
| 513 | MD America Energy, LLC | A. L. LEE AND WIFE, LOIS CASEY LEE | N/A | Lease | wn (until no longer producing) | TX-06-0083-000_A.HBP | 0.00 | X | | |
| 514 | MD America Energy, LLC | GEORGE MITCHELL CROW AND WIFE, MATTIE JO CROW | N/A | Lease | wn (until no longer producing) | TX-06-0084-000 | 0.00 | X | | |
| 515 | MD America Energy, LLC | LOLA C. BLACK | N/A | Lease | wn (until no longer producing) | TX-06-0085-000 | 0.00 | X | | |
| 516 | MD America Energy, LLC | R. B. BAILEY, JR. AND WIFE, MILDRED C. BAILEY | N/A | Lease | wn (until no longer producing) | TX-06-0194-000 | 0.00 | X | | |
| 517 | MD America Energy, LLC | ALICE R. BURNEY, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-03-0084_A.HBP | 0.00 | X | | |
| 518 | MD America Energy, LLC | JAMES J. JOHNSTON, THE FIRST NATIONAL BANK, FORT WORTH, TEXAS, TRUSTEE FOR EULA MAY JOHNSTON, EULA MAY JOHNSTON, V. A. JOHNSTON FAMILY TRUST AND WILLIAM S. ROGERS | N/A | Lease | wn (until no longer producing) | TX-03-0082-001_P.HBP | 0.00 | X | | |
| 519 | MD America Energy, LLC | GEORGE L. CLAYTON AND HELEN R. CLAYTON, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0182-001_P.HBP.HS | 0.00 | X | | |
| 520 | MD America Energy, LLC | TEXAS OSAGE ROYALTY POOL, INC. | N/A | Lease | wn (until no longer producing) | TX-06-0183-001_P.HBP.VS | 0.00 | X | | |
| 521 | MD America Energy, LLC | M. A. PARKER AND OZELLE PARKER, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0186-001_P.HBP | 0.00 | X | | |
| 522 | MD America Energy, LLC | R. C. PARKER AND EMMA PARKER, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0180-001_A.HBP | 0.00 | X | | |
| 523 | MD America Energy, LLC | BOBBY D. FIFE AND PATSY J. FIFE, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0185-001_A.HBP.HS | 0.00 | X | | |
| 524 | MD America Energy, LLC | BELLE FANNIN, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0181-001_P.HBP | 0.00 | X | | |
| 525 | MD America Energy, LLC | WILLIE ALLPHIN, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0184-001_P.HBP | 0.00 | X | | |
| 526 | MD America Energy, LLC | AMADOR R. SOLIS AND CONSUELO SOLIS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0184-002_P.HBP | 0.00 | X | | |
| 527 | MD America Energy, LLC | H. DOYLE MAY, NOT JOINED BY MY WIFE BECAUSE THE HEREIN DESCRIBED PROPERTY CONSTITUTES NO PART OF MY HOMESTEAD | N/A | Lease | wn (until no longer producing) | TX-06-0178-002_P.HBP | 0.00 | X | | |
| 528 | MD America Energy, LLC | MILDRED MARTIN MAY, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0178-003_P.HBP | 0.00 | X | | |
| 529 | MD America Energy, LLC | JOHNNY CHARLES MAY | N/A | Lease | wn (until no longer producing) | TX-06-0178-004_P.HBP | 0.00 | X | | |
| 530 | MD America Energy, LLC | DONALD ALLEN MAY | N/A | Lease | wn (until no longer producing) | TX-06-0178-005_P.HBP | 0.00 | X | | |
| 531 | MD America Energy, LLC | PATRICIA ANN MAY | N/A | Lease | wn (until no longer producing) | TX-06-0178-001_P.HBP | 0.00 | X | | |
| 532 | MD America Energy, LLC | FLAG-REDFERN OIL COMPANY | N/A | Lease | wn (until no longer producing) | TX-06-0183-002_P.HBP | 0.00 | X | | |
| 533 | MD America Energy, LLC | GIBBS BROTHERS & COMPANY, A PARTNERSHIP FIRM OF WALKER COUNTY, TEXAS | N/A | Lease | wn (until no longer producing) | TX00009B_A.HBP | 0.00 | X | | |
| 534 | MD America Energy, LLC | A. Y. BENGE AND WIFE, CONNIE S. BENGE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0000-07544_A.HBP | 0.00 | X | | |
| 535 | MD America Energy, LLC | PEARL HANNAH TYLER, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-03-0101_A.HBP | 0.00 | X | | |
| 536 | MD America Energy, LLC | LUTHER BLEDSOE AND EULA BLEDSOE, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0177-001_P.HBP | 0.00 | X | | |
| 537 | MD America Energy, LLC | WILLIAM HERBST AND LORA HERBST, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0177-002_P.HBP | 0.00 | X | | |
| 538 | MD America Energy, LLC | D. E. HELMS AND JUDY HELMS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0176-002_P.HBP | 0.00 | X | | |
| 539 | MD America Energy, LLC | EARL MCWHORTER AND THEO MCWHORTER, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0176-005_P.HBP.HS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 540 | MD America Energy, LLC | AARON MUSGROVE AND AZEAL MUSGROVE, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0176-003_P.HBP | 0.00 | X | | |
| 541 | MD America Energy, LLC | MAYON THOMAS AND LEONA THOMAS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0176-004_P.HBP | 0.00 | X | | |
| 542 | MD America Energy, LLC | TRACY LEE BATSON AND JEWELL BATSON, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0176-001_P.HBP | 0.00 | X | | |
| 543 | MD America Energy, LLC | JAMES D. WILSON, INDIVIDUALLY AND AS INDEPENDENT EXECUTER AND TRUSTEE FOR JAMES D. WILSON, JR. AND FRANCES ELIZABETH WILSON, MINORS, UNDER THE WILL OF HAZEL HERRLING, DECEASED. | N/A | Lease | wn (until no longer producing) | TX00009C_A.HBP | 0.00 | X | | |
| 544 | MD America Energy, LLC | WALTER O. MOSLEY; MIDGET EULA SORRELLS; AND WALTER O. MOSLEY, JR. AND AARON A. MOSLEY, BOTH INDIVIDUALLY AND AS CO-INDEPENDENT EXECUTORS OF THE ESTATE OF MIDGET E. MOSLEY, DECEASED | N/A | Lease | wn (until no longer producing) | TX00212_P.HBP.HS | 0.00 | X | | |
| 545 | MD America Energy, LLC | RAYMOND B. BUCHANAN AND WIFE, MARY D. BUCHANAN | N/A | Lease | wn (until no longer producing) | TX00210 | 0.00 | X | | |
| 546 | MD America Energy, LLC | DIANE PETERS, EDGAR DUANE PETERS, PATRICIA KAY PETERS | N/A | Lease | wn (until no longer producing) | TX-06-0006-000 | 0.00 | X | | |
| 547 | MD America Energy, LLC | THE CITY NATIONAL BANK OF BRYAN, TEXAS AS TRUSTEE OF THE DIANE PETERS, EDGAR DUANE PETERS, PATRICIA KAY PETERS TRUST # 205 | N/A | Lease | wn (until no longer producing) | TX-06-0005-000 | 0.00 | X | | |
| 548 | MD America Energy, LLC | T. O. DUNMAN SR. AND WIFE, VIOLA E. DUNMAN | N/A | Lease | wn (until no longer producing) | TX00009A | 0.00 | X | | |
| 549 | MD America Energy, LLC | JOHN P. WATSON AND WIFE GLADYS A. WATSON | N/A | Lease | wn (until no longer producing) | TX00211 | 0.00 | X | | |
| 550 | MD America Energy, LLC | WILLIE D. HAYES AND PATRICIA HAYES, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX00137 | 0.00 | X | | |
| 551 | MD America Energy, LLC | EMMIE W. TAYLOR, A WIDOW, INDIVIDUALLY AND AS SOLE DEVISEE UNDER THE WILL OF JOHN L. TAYLOR, DECEASED | N/A | Lease | wn (until no longer producing) | TX00138 | 0.00 | X | | |
| 552 | MD America Energy, LLC | HENRY OSCAR TUCK, JR. AND JOAN LEE TUCK HEYDE | N/A | Lease | wn (until no longer producing) | TX00139 | 0.00 | X | | |
| 553 | MD America Energy, LLC | LENNIE MERVIS VICKERS; CARVEY T. NEVILL; MARY RUTH ROYER; AND JAMES COLLY NEVILL | N/A | Lease | wn (until no longer producing) | TX00140 | 0.00 | X | | |
| 554 | MD America Energy, LLC | CHARLES A. DRAKE AND WIFE, BONNIE | N/A | Lease | wn (until no longer producing) | TX-06-0003-000 | 0.00 | X | | |
| 555 | MD America Energy, LLC | LEMUEL A. DRAKE, JR ET UX PATRICIA LEE DRAKE | N/A | Lease | wn (until no longer producing) | TX-06-0001-001 | 0.00 | X | | |
| 556 | MD America Energy, LLC | MILDRED DRAKE KINDT, AND HUSBAND CHARLES KINDT | N/A | Lease | wn (until no longer producing) | TX-06-0002-000 | 0.00 | X | | |
| 557 | MD America Energy, LLC | ROBBIE M. DRAKE | N/A | Lease | wn (until no longer producing) | TX-06-0001-002 | 0.00 | X | | |
| 558 | MD America Energy, LLC | CLARENCE R. THEISS AND WIFE, DORIS THEISS; AND EARL A. THEISS AND WIFE, EDNA L. THEISS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0808-07612_A.HBP | 0.00 | X | | |
| 559 | MD America Energy, LLC | OLLIE TOM LENZ AND WIFE, EVELYN LENZ | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0808-07610_P.HBP | 0.00 | X | | |
| 560 | MD America Energy, LLC | ERVIN H. LENZ AND WIFE, FLORINE LENZ | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0808-07611_P.HBP | 0.00 | X | | |
| 561 | MD America Energy, LLC | EDGAR E. LENZ | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0808-07609_P.HBP | 0.00 | X | | |
| 562 | MD America Energy, LLC | FANNIE KEAS AND ISAAC F. KEAS, TRUSTEE UNDER THE WILL OF BUFORD KEAS, DECEASED | N/A | Lease | wn (until no longer producing) | TX07346_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 563 | MD America Energy, LLC | R. L. HOUSE; C. G. HOUSE, TRUSTEE FOR ROSEMARY HOUSE BREVARD AND C. G. HOUSE, TRUSTEE FOR ROBERTA HOUSE BENSON | N/A | Lease | wn (until no longer producing) | TX-06-0183-003_P.HBP | 0.00 | X | | |
| 564 | MD America Energy, LLC | PHIL DAVIS AND WIFE, JOYCE S. DAVIS | N/A | Lease | wn (until no longer producing) | TX-06-0008-000 | 0.00 | X | | |
| 565 | MD America Energy, LLC | MARTHA JANE WHITMORE AND HUSBAND HARRY E. WHITMORE | N/A | Lease | wn (until no longer producing) | TX-06-0086-001_P.HBP | 0.00 | X | | |
| 566 | MD America Energy, LLC | IRENE B. SAUNDERS AND MARY S.HALL | N/A | Lease | wn (until no longer producing) | TX-06-0086-010_P.HBP | 0.00 | X | | |
| 567 | MD America Energy, LLC | JEROME G. ZUBIK AND B. J. ZUBIK, EXECUTORS OF THE ESTATE OF FRANK J. ZUBIK, SR. DECEASED | N/A | Lease | wn (until no longer producing) | TX-06-0086-003 | 0.00 | X | | |
| 568 | MD America Energy, LLC | KATHERINE L. HIGGS, HELEN L. WINSTEIN, GAIL TIANO, LAURENE W. EDGE, SAM L. WILLIAMS | N/A | Lease | wn (until no longer producing) | TX-06-0086-011 | 0.00 | X | | |
| 569 | MD America Energy, LLC | RALPHANA SEARCY BUSHONG, MAULICE SEARCY OSWALT III, BETSY SEARCY MILLER | N/A | Lease | wn (until no longer producing) | TX-06-0086-009 | 0.00 | X | | |
| 570 | MD America Energy, LLC | J. W. BATTS, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0086-007 | 0.00 | X | | |
| 571 | MD America Energy, LLC | KATHLEEN WILSON | N/A | Lease | wn (until no longer producing) | TX-06-0086-004 | 0.00 | X | | |
| 572 | MD America Energy, LLC | ALICE SUE HUNTER AND DR. W. B. ROMAN, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0086-006 | 0.00 | X | | |
| 573 | MD America Energy, LLC | ETHEL GELBER, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF J. GELBER | N/A | Lease | wn (until no longer producing) | TX-06-0086-005 | 0.00 | X | | |
| 574 | MD America Energy, LLC | MARY G. ROHDE, WIDOW OF HENRY N. ROHDE DECEASE | N/A | Lease | wn (until no longer producing) | TX-06-0086-008 | 0.00 | X | | |
| 575 | MD America Energy, LLC | IRENE BOARD SAUNDERS | N/A | Lease | wn (until no longer producing) | TX-06-0086-002 | 0.00 | X | | |
| 576 | MD America Energy, LLC | JOHNNIE HABARTA, JR. AND WIFE, LILLIAN HABARTA | N/A | Lease | wn (until no longer producing) | TX00153 | 0.00 | X | | |
| 577 | MD America Energy, LLC | ELIZABETH WASHINGTON, WIDOW OF LUCIOS WASHINGTON (DECEASED) | N/A | Lease | wn (until no longer producing) | TX-06-0052-005_P.HBP | 0.00 | X | | |
| 578 | MD America Energy, LLC | OMA LEE GUESS, LULU TRIMBLE, H. D. MOTT, D. C. JOHNSON, JAMES JOHNSON, THOMAS JOHNSON AND LEE GLENDA THOMPSON | N/A | Lease | wn (until no longer producing) | TX-06-0093-001_P.HBP | 0.00 | X | | |
| 579 | MD America Energy, LLC | ORIE JOHNSON, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0303-08131_P.HBP | 0.00 | X | | |
| 580 | MD America Energy, LLC | MOSES JOHNSON | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0303-08134_P.HBP | 0.00 | X | | |
| 581 | MD America Energy, LLC | AUSTIN NATIONAL BANK, TRUSTEE OF THE DAMON ESTATE TRUST | N/A | Lease | wn (until no longer producing) | TX-06-0228-000_P.HBP | 0.00 | X | | |
| 582 | MD America Energy, LLC | JOE MITCHELL, JESSIE MCADAMS, ESSIA SANDLES, EURA M. SENIGAUR, BIRDIE HAYNES, LOVIE T. YANCEY AND WINFREY H. TAYLOR | N/A | Lease | wn (until no longer producing) | TX-06-0052-003 | 0.00 | X | | |
| 583 | MD America Energy, LLC | WILL JOHNSON BROOKS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0303-08135_P.HBP | 0.00 | X | | |
| 584 | MD America Energy, LLC | MCKINLEY JOHNSON, A SINGLE MAN, ALICE VISER, A WIDOW, CLORIA SANDELS, A WIDOW, EURA MAE SANDERS, A FEME SOLE, JESSIE FANT AND WIFE MARGARET FANT AND RUBY FANT TERRELL | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0303-08052_P.HBP | 0.00 | X | | |
| 585 | MD America Energy, LLC | ELIZABETH WASHINGTON, MYRTLE HAYNES AND LEMUEL JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-004_P.HBP | 0.00 | X | | |
| 586 | MD America Energy, LLC | GLENN F. MATHIS AND LENA MATHIS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0069 | 0.00 | X | | |
| 587 | MD America Energy, LLC | ONA LEE ALLEN AND CHESTER JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-003_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 588 | MD America Energy, LLC | ALBERTA SANDELS, ZOLLIE JOHNSON, ELZNA MARIE SHELTON, ALBERTA LEE SMITH, PEGGY J. MCGRUE, HIAWATHA WEBBER, J. T. WEBBER, JOE EDWARD SMITH, MELVIN ROY MCGRUE, MARGERIE DUNCAN, MILTON ROY MCGRUE, AREBA ERBY, LEE J. SMITH, SR., JUANITA BROWN, EDDIE B. SMITH, CLAUDINE MURRAY, WILSON SMITH, EUGENE SMITH | N/A | Lease | wn (until no longer producing) | TX-06-0052-007_P.HBP | 0.00 | X | | |
| 589 | MD America Energy, LLC | ALBERTA SANDELS, ZOLLIE JOHNSON, ELZNA MARIE SHELTON, ALBERTA LEE SMITH, PEGGY J. MCGRUE, HIAWATHA WEBBER, J. T. WEBBER, JOE EDWARD SMITH, MELVIN ROY MCGRUE, MARGERIE DUNCAN, MILTON ROY MCGRUE, AREBA ERBY, LEE J. SMITH SR., JUANITA BROWN, EDDIE B. SMITH, CLAUDINE MURRY, WILSON SMITH AND EUGENE SMITH, (JOHNNIE B GRIFFIN, MYRA FAYE GREEN, ROBERT SMITH, SAM A. SMITH, WILLIE MAE VAULT, T. N. SMITH) | N/A | Lease | wn (until no longer producing) | TX-06-0052-008_P.HBP | 0.00 | X | | |
| 590 | MD America Energy, LLC | SARA FABER BASDEN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0303-08133_P.HBP | 0.00 | X | | |
| 591 | MD America Energy, LLC | BEN DAVIS FABER, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF MRS. ERNEST FABER RIORDAN, DECEASED | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0303-08132_P.HBP | 0.00 | X | | |
| 592 | MD America Energy, LLC | HERMAN FANNIN AND WIFE GLADYS FANNIN | N/A | Lease | wn (until no longer producing) | TX-06-0092-001 | 0.00 | X | | |
| 593 | MD America Energy, LLC | BILLIE WAYNE KEY AND WIFE CHARLOTTE JEAN KEY | N/A | Lease | wn (until no longer producing) | TX-03-0094 | 0.00 | X | | |
| 594 | MD America Energy, LLC | JOHN ALLEN MONROE | N/A | Lease | wn (until no longer producing) | TX-06-0052-006_P.HBP | 0.00 | X | | |
| 595 | MD America Energy, LLC | MRS. MARIE ANDREWS AND HUSBAND, M. E. ANDREWS | N/A | Lease | wn (until no longer producing) | TX00199_A.HBP | 0.00 | X | | |
| 596 | MD America Energy, LLC | BILLY A. ANDREWS AND WIFE, GAIL ANDREWS | N/A | Lease | wn (until no longer producing) | TX00240 | 0.00 | X | | |
| 597 | MD America Energy, LLC | MRS. ADDIE ADAMS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX00142_A.HBP | 0.00 | X | | |
| 598 | MD America Energy, LLC | MINNIE BARLOW BAXTER | N/A | Lease | wn (until no longer producing) | TX00143_A.HBP | 0.00 | X | | |
| 599 | MD America Energy, LLC | FAYE ANDREWS | N/A | Lease | wn (until no longer producing) | TX00279 | 0.00 | X | | |
| 600 | MD America Energy, LLC | CLAYTON W. TODD AND JEAN M. TODD | N/A | Lease | wn (until no longer producing) | TX00285A_P.HBP | 0.00 | X | | |
| 601 | MD America Energy, LLC | KENNETH BEVERLY AND SHARON BEVERLY | N/A | Lease | wn (until no longer producing) | TX00286B_P.HBP.NTP(Kankey) | 0.00 | X | | |
| 602 | MD America Energy, LLC | M. C. HIBBETTS AND WIFE, EFFIE R. HIBBETTS | N/A | Lease | wn (until no longer producing) | TX00099_A.HBP.HS | 0.00 | X | | |
| 603 | MD America Energy, LLC | CHESTER JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-006_P.HBP | 0.00 | X | | |
| 604 | MD America Energy, LLC | HANNAH JOHNSON HAYWOOD | N/A | Lease | wn (until no longer producing) | TX-06-0094-005_P.HBP | 0.00 | X | | |
| 605 | MD America Energy, LLC | HENRY JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-002_P.HBP | 0.00 | X | | |
| 606 | MD America Energy, LLC | MARY E. WARD | N/A | Lease | wn (until no longer producing) | TX-06-0094-009_P.HBP | 0.00 | X | | |
| 607 | MD America Energy, LLC | EVELYN GENE LOTT | N/A | Lease | wn (until no longer producing) | TX-06-0094-010_P.HBP | 0.00 | X | | |
| 608 | MD America Energy, LLC | IRA JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-007_P.HBP | 0.00 | X | | |
| 609 | MD America Energy, LLC | LUELL H. S. JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-001_P.HBP | 0.00 | X | | |
| 610 | MD America Energy, LLC | T. L. HURRY ET UX MILDRED HURRY | N/A | Lease | wn (until no longer producing) | TX00126_A.HBP | 0.00 | X | | |
| 611 | MD America Energy, LLC | LEAH LOUISE JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-008_P.HBP | 0.00 | X | | |
| 612 | MD America Energy, LLC | WILLIS T. NEELY AND WIFE, GERTRUDE NEELY | N/A | Lease | wn (until no longer producing) | TX00278_A.HBP | 0.00 | X | | |
| 613 | MD America Energy, LLC | W. H. HENDERSON ET UX BETTY LOU HENDERSON | N/A | Lease | wn (until no longer producing) | TX00282_A.HBP | 0.00 | X | | |
| 614 | MD America Energy, LLC | GLADYS SIAS | N/A | Lease | wn (until no longer producing) | TX-06-0094-011 | 0.005 | X | | |
| 615 | MD America Energy, LLC | SALLY ZULCH, A WIDOW OF JACK ZULCH (DECEASED) | N/A | Lease | wn (until no longer producing) | TX00200_P.HBP | 0.00 | X | | |
| 616 | MD America Energy, LLC | MITTIE P. MAY | N/A | Lease | wn (until no longer producing) | TX00203_A.HBP.DL | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 617 | MD America Energy, LLC | JACK L. MAY AND WIFE, NANCY J. MAY | N/A | Lease | wn (until no longer producing) | TX00144_A.HBP.DL | 0.00 | X | | |
| 618 | MD America Energy, LLC | JOHN MILTON ANDREWS AND WIFE, BETTY ANN ANDREWS | N/A | Lease | wn (until no longer producing) | TX00145_A.HBP | 0.00 | X | | |
| 619 | MD America Energy, LLC | ETHELBERT M. BARLOW | N/A | Lease | wn (until no longer producing) | TX00281_A.HBP.DL.HS | 0.00 | X | | |
| 620 | MD America Energy, LLC | DONALD L. LEE AND WIFE, WANDA LEE | N/A | Lease | wn (until no longer producing) | TX00284 | 0.00 | X | | |
| 621 | MD America Energy, LLC | MRS. ADDIE ADAMS | N/A | Lease | wn (until no longer producing) | TX00131_A.HBP | 0.00 | X | | |
| 622 | MD America Energy, LLC | C. PEYTON WALLER AND WIFE, DAHLIS WALLER | N/A | Lease | wn (until no longer producing) | TX00205_A.HBP.VS | 0.00 | X | | |
| 623 | MD America Energy, LLC | BILL R. LEONARD AND WIFE LILLIE D. LEONARD | N/A | Lease | wn (until no longer producing) | TX00132_P.HBP | 0.00 | X | | |
| 624 | MD America Energy, LLC | JOE WAYNE KEEFER AND WIFE THELMA MAE KEEFER | N/A | Lease | wn (until no longer producing) | TX00127_A.HBP | 0.00 | X | | |
| 625 | MD America Energy, LLC | J. R. EVANS AND WIFE LONA EVANS | N/A | Lease | wn (until no longer producing) | TX00130 | 0.00 | X | | |
| 626 | MD America Energy, LLC | FRANCES LUCILLE EVANS, RHONDA S. DRAKE ET VIR FLOYD W. DRAKE | N/A | Lease | wn (until no longer producing) | TX00129 | 0.00 | X | | |
| 627 | MD America Energy, LLC | FRANCES LUCILLE EVANS, DONNA EVANS RICHIE | N/A | Lease | wn (until no longer producing) | TX00128_P.HBP | 0.00 | X | | |
| 628 | MD America Energy, LLC | H.R TURNER AND WIFE, VALERIA TURNER | N/A | Lease | wn (until no longer producing) | TX-06-7261 | 0.00 | X | | |
| 629 | MD America Energy, LLC | THOMAS I. BUCKNER AND WIFE, ANN BUCKNER | N/A | Lease | wn (until no longer producing) | TX00285B_P.HBP.NTP(Kanke v) | 0.00 | X | | |
| 630 | MD America Energy, LLC | MARY ALICE MCCOOK | N/A | Lease | wn (until no longer producing) | TX-06-0140-004 | 0.00 | X | | |
| 631 | MD America Energy, LLC | ELIZABETH LEATHERS NASH | N/A | Lease | wn (until no longer producing) | TX-06-0140-001 | 0.00 | X | | |
| 632 | MD America Energy, LLC | JACK GROCHOSKE AND MARY GROCHOSKE | N/A | Lease | wn (until no longer producing) | TX00286A | 0.00 | X | | |
| 633 | MD America Energy, LLC | JO FRANKIE HARRIS | N/A | Lease | wn (until no longer producing) | TX-06-0140-002 | 0.00 | X | | |
| 634 | MD America Energy, LLC | JOEL B. LEATHERS | N/A | Lease | wn (until no longer producing) | TX-06-0140-005 | 0.00 | X | | |
| 635 | MD America Energy, LLC | JACOB DUDLEY WILSON AND HIS WIFE, MERYAL WILSON; F. C. WILSON AND HIS WIFE, GLADYS WILSON; L. B. WILSON & HIS WIFE, GERALDINE WILSON | N/A | Lease | wn (until no longer producing) | TX-06-0137-001 | 0.00 | X | | |
| 636 | MD America Energy, LLC | MAE BELL LARGENT, INDIVIDUALLY, AND MAE BELL LARGENT, WILLIAM LARGENT, AND THOMAS CALFORD LARGENT AS CO-EXECUTORS OF THE ESTATE OF GEORGE C. LARGENT | N/A | Lease | wn (until no longer producing) | TX-06-0140-006 | 0.00 | X | | |
| 637 | MD America Energy, LLC | MARY MARGARET SYKES LEATHERS (AKA MRS. ROBERT B. LEATHERS) | N/A | Lease | wn (until no longer producing) | TX-06-0140-003 | 0.00 | X | | |
| 638 | MD America Energy, LLC | JAMES WALLACE, ALMA WALLACE, FRED WALLACE, AND WILLIE B. WALLACE | N/A | Lease | wn (until no longer producing) | TX-06-0138-001_P.HBP | 0.00 | X | | |
| 639 | MD America Energy, LLC | CLOYANCE S. WALLACE, JAMES WALLACE AS ATTORNEY IN FACT FOR JAMES W. WALLACE, FANNIE L. TUBBS, MAE ESTER WALLACE JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0139-001 | 0.00 | X | | |
| 640 | MD America Energy, LLC | CLOYANCE S. WALLACE AND JAMES WALLACE AS ATTORNEY IN FACT FOR JAMES W. WALLACE | N/A | Lease | wn (until no longer producing) | TX-06-0138-002 | 0.00 | X | | |
| 641 | MD America Energy, LLC | NAOMI ELIZABETH JANUARY, DURWOOD FLEMING AND LURLYN FLEMING, INDIVIDUALLY AND AS CO-TRUSTEES UNDER THE NAOMI ELIZABETH JANUARY TRUST | N/A | Lease | wn (until no longer producing) | TX00152 | 0.00 | X | | |
| 642 | MD America Energy, LLC | JOHN G. CAMPBELL | N/A | Lease | wn (until no longer producing) | TX-06-0193-000 | 0.00 | X | | |
| 643 | MD America Energy, LLC | KENNETH R. CASEY AND HIS WIFE, DEBBRA L. CASEY | N/A | Lease | wn (until no longer producing) | TX00102_A.HBP | 0.00 | X | | |
| 644 | MD America Energy, LLC | RUBY J. CASEY, A WIDOW | N/A | Lease | wn (until no longer producing) | TX00209_P.HBP | 0.00 | X | | |
| 645 | MD America Energy, LLC | CHARLENE C. CRAVEN, ANITA C. JAQUET, KENNETH R. CASEY AND DEAN CASEY, DEALING IN THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00136_P.HBP | 0.00 | X | | |
| 646 | MD America Energy, LLC | CAROL C. BYRD AND TENA C. VICE, DEALING IN THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00134_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 647 | MD America Energy, LLC | BARBARA C. VANDERBRINK, WIFE OF JACOB J. VANDERBRINK, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00135_P.HBP | 0.00 | X | | |
| 648 | MD America Energy, LLC | RUBY MAGNESS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0100-001 | 0.00 | X | | |
| 649 | MD America Energy, LLC | ROBBIE NICOL TATUM; ROBERT MORRIS TATUM, SR., AGENT AND ATTORNEY IN FACT FOR MAE NICOL MYERS | N/A | Lease | wn (until no longer producing) | TX-06-0086-026 | 0.00 | X | | |
| 650 | MD America Energy, LLC | ETHEL GELBER; LEONARD GELBER; MORRIS GELBER; JOE GELBER; CECIL GELBER REESE | N/A | Lease | wn (until no longer producing) | TX-06-0086-025 | 0.00 | X | | |
| 651 | MD America Energy, LLC | J.H. MALONEY | N/A | Lease | wn (until no longer producing) | TX-06-0086-016 | 0.00 | X | | |
| 652 | MD America Energy, LLC | DR. G.F. CAZELL AND GARGARET C. OWENS | N/A | Lease | wn (until no longer producing) | TX-06-0086-017 | 0.00 | X | | |
| 653 | MD America Energy, LLC | R.A. HARRIS | N/A | Lease | wn (until no longer producing) | TX-06-0086-021 | 0.00 | X | | |
| 654 | MD America Energy, LLC | ANGELA LUCKENBACH CONNER | N/A | Lease | wn (until no longer producing) | TX-06-0086-022 | 0.00 | X | | |
| 655 | MD America Energy, LLC | WILLIAM BIBLE AS INDEPENDENT EXECUTOR OF THE ALINE RHOUDES COLE ESTATE | N/A | Lease | wn (until no longer producing) | TX-06-0086-014 | 0.00 | X | | |
| 656 | MD America Energy, LLC | WILLIAM BIBLE | N/A | Lease | wn (until no longer producing) | TX-06-0086-015 | 0.00 | X | | |
| 657 | MD America Energy, LLC | BARBARA BIBLE MICHALKE | N/A | Lease | wn (until no longer producing) | TX-06-0086-018 | 0.00 | X | | |
| 658 | MD America Energy, LLC | SHIRLEY HOWARD | N/A | Lease | wn (until no longer producing) | TX-06-0086-013 | 0.00 | X | | |
| 659 | MD America Energy, LLC | NELLIE G. STEPHENSON | N/A | Lease | wn (until no longer producing) | TX-06-0086-012 | 0.00 | X | | |
| 660 | MD America Energy, LLC | DAISY MORRIS AND LYNN HARRIS | N/A | Lease | wn (until no longer producing) | TX-06-0086-023 | 0.00 | X | | |
| 661 | MD America Energy, LLC | ROBERT E. JORDAN AND HIS WIFE, ADA S. JORDAN | N/A | Lease | wn (until no longer producing) | TX00141_A.HBP.HS | 0.00 | X | | |
| 662 | MD America Energy, LLC | FRANK REAGAN HARRIS | N/A | Lease | wn (until no longer producing) | TX-06-0086-020 | 0.00 | X | | |
| 663 | MD America Energy, LLC | WILLIAM Y. GARRETT | N/A | Lease | wn (until no longer producing) | TX-06-0086-019 | 0.00 | X | | |
| 664 | MD America Energy, LLC | MARY ELIZABETH DUFFY SMITH, AS TRUSTEE FOR THE GEORGE WASHINGTON SMITH TRUST | N/A | Lease | wn (until no longer producing) | TX-06-0086-024 | 0.00 | X | | |
| 665 | MD America Energy, LLC | PEGGY MORGAN OSBORNE AND HUSBAND, WALLACE OSBORNE | N/A | Lease | wn (until no longer producing) | TX-06-0105-003_P.HBP | 0.00 | X | | |
| 666 | MD America Energy, LLC | JEFF OLEY BARNETT, II DEALING WITH HIS OWN SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00148 | 0.00 | X | | |
| 667 | MD America Energy, LLC | GLENDA SUE HOMER, DEALING WITH HER OWN SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00025_A.HBP | 0.00 | X | | |
| 668 | MD America Energy, LLC | JACQUELINE GERTRUDE HAMBRIC, DEALING HEREIN WITH HER OWN SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00058_A.HBP.HS | 0.00 | X | | |
| 669 | MD America Energy, LLC | J. W. MADDOX, VADA JARVIS, T. A. MADDOX AND LYDIA MADDOX | N/A | Lease | wn (until no longer producing) | TX00283_P.HBP.HS | 0.00 | X | | |
| 670 | MD America Energy, LLC | J. W. MADDOX AND VADA JARVIS | N/A | Lease | wn (until no longer producing) | TX00155_P.HBP.HS | 0.00 | X | | |
| 671 | MD America Energy, LLC | ROBERT L. ROWE (NOT HOMESTEAD) | N/A | Lease | wn (until no longer producing) | TX00151_P.HBP.HS | 0.00 | X | | |
| 672 | MD America Energy, LLC | OPAL JOHNSON, WIDOW OF H.S. JOHNSON, DORIS MIDDLETON, FRED A. JOHNSON, LUCIOUS W. JOHNSON, JOHNNIE SANDLES, RICHARD JOHNSON, VERNELL D. DAVENPORT, AND A.M. | N/A | Lease | wn (until no longer producing) | TX-06-0094-012_P.HBP | 0.00 | X | | |
| 673 | MD America Energy, LLC | WALLACE B. MORGAN AND WIFE, GEORGIA L. MORGAN | N/A | Lease | wn (until no longer producing) | TX-06-0104-000 | 0.00 | X | | |
| 674 | MD America Energy, LLC | AUTHULA NICKOLS AND HER HUSBAND, PHILIP NICKOLS | N/A | Lease | wn (until no longer producing) | TX-06-0105-002_P.HBP | 0.00 | X | | |
| 675 | MD America Energy, LLC | VIRGINIA BROWN AND HER HUSBAND, B. R. BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0105-001_P.HBP | 0.00 | X | | |
| 676 | MD America Energy, LLC | J.P. HAWKINS, ADMINISTRATOR OF THE ESTATE OF JAMES MONROE HARRISON, DECEASED | N/A | Lease | wn (until no longer producing) | TX-06-7260 | 0.00 | X | | |
| 677 | MD America Energy, LLC | STEVE JOHNSON JR., SON OF STEVE JOHNSON SR., (DECEASED) | N/A | Lease | wn (until no longer producing) | TX-06-0094-013_P.HBP | 0.00 | X | | |
| 678 | MD America Energy, LLC | ESTHER BRIDGES; JULIUS C. BRIDGES; BARRENTINE BRIDGES PRIOR; KATHERINE W. BRIDGES; HORATIO BRIDGES | N/A | Lease | wn (until no longer producing) | TX-06-0059-002 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 679 | MD America Energy, LLC | GEORGE W. JOHNSON, SR.; MAGNOLIA MICHEAUX ALLEN; NAPOLEON MICHEAUX; IOLA MICHEAUX MCCARTNEY; LONNIE MICHEAUX | N/A | Lease | wn (until no longer producing) | TX-06-0059-003 | 0.00 | X | | |
| 680 | MD America Energy, LLC | MARCELLAS BRIDGES; MARJORIE BRIDGES BURKS; VELMA BRIDGES JOENSEN; MILDRED BRIDGES; LANELL BRIDGES; HENRY S. BRIDGES; RUBEN BRIDGES, JR.; VIRA BRIDGES HALL; REV. MARVIN C. BRIDGES; RUBY RAYE BRIDGES CROSS; MARION BRIDGES, JR.; JANICE LEE BRIDGES; RAYMOND BRIDGES | N/A | Lease | wn (until no longer producing) | TX-06-0059-004 | 0.00 | X | | |
| 681 | MD America Energy, LLC | FORT WORTH AND DENVER RAILWAY COMPANY AND WILLIAM M. GIBBONS, TRUSTEE OF THE PROPERTY OF CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPAY, DEBTOR, AS TRUSTEE AND NOT AS AN INDIVIDUAL | N/A | Lease | wn (until no longer producing) | TX00204_A.HBP.HSVS | 0.00 | X | | |
| 682 | MD America Energy, LLC | TRUSTEES FOR THE HIGH PRARIE COLORED COMMUNITY, DORIS BYRD AND D. O. JOHNSON, ROSEVELT WEBBER | N/A | Lease | wn (until no longer producing) | TX-06-0108-000 | 0.00 | X | | |
| 683 | MD America Energy, LLC | CONCORD MASONIC LODGE, NO. 136 WINSTON SANDLES AND ROOSEVELT WEBBER (OFFICERS) | N/A | Lease | wn (until no longer producing) | TX-06-0109-000 | 0.00 | X | | |
| 684 | MD America Energy, LLC | TRUSTEES OF THE CHAPEL HILL COLORED CHURCH | N/A | Lease | wn (until no longer producing) | TX-06-0110-000 | 0.00 | X | | |
| 685 | MD America Energy, LLC | DR. HOWARD BURT, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0086-027 | 0.00 | X | | |
| 686 | MD America Energy, LLC | QUINCY TERRELL, ELECTRA BROWN AND WILLIE LEE BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0052-039_P.HBP | 0.00 | X | | |
| 687 | MD America Energy, LLC | MILTON BATSON, PERCY L. BROWN AND WIFE JEAN BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0113-000 | 0.00 | X | | |
| 688 | MD America Energy, LLC | FARRIS MOTT | N/A | Lease | wn (until no longer producing) | TX-06-0093-002_P.HBP | 0.00 | X | | |
| 689 | MD America Energy, LLC | ALLIE MOTT REED | N/A | Lease | wn (until no longer producing) | TX-06-0093-003_P.HBP | 0.00 | X | | |
| 690 | MD America Energy, LLC | MELANIE M. MOTT | N/A | Lease | wn (until no longer producing) | TX-06-0093-004_P.HBP | 0.00 | X | | |
| 691 | MD America Energy, LLC | VIVIAN E. ATERBERY; BERDIE JUSTICE; HENRY JUSTICE' AND LIAMOR DAIN JUSTICE; C/O BERDIE JUSTICE | N/A | Lease | wn (until no longer producing) | TX-06-0093-005_P.HBP | 0.00 | X | | |
| 692 | MD America Energy, LLC | MEDFORD D. STROUD ET UX, BETTY JO STROUD | N/A | Lease | wn (until no longer producing) | TX00206_A.HBP.HS | 0.00 | X | | |
| 693 | MD America Energy, LLC | ETHELBERT M. BARLOW | N/A | Lease | wn (until no longer producing) | TX00202_A.HBP.DL | 0.00 | X | | |
| 694 | MD America Energy, LLC | B. L. DISERENS AND WIFE, SARAH JO DISERENS | N/A | Lease | wn (until no longer producing) | TX00277_A.HBP | 0.00 | X | | |
| 695 | MD America Energy, LLC | JAMES F. MATHIS, SR., AND JEANELLE H. MATHIS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0192-000_A.HBP | 0.00 | X | | |
| 696 | MD America Energy, LLC | GLYNN E. NORWOOD AND WIFE, LUCILLE B. NORWOOD | N/A | Lease | wn (until no longer producing) | TX00150_P.HBP.HS | 0.00 | X | | |
| 697 | MD America Energy, LLC | FRANCES THOMPSON SHURE, AS HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00046C_P.HBP.HS | 0.00 | X | | |
| 698 | MD America Energy, LLC | KATHRYN THOMPSON CATHEY, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00046B_P.HBP.HS | 0.00 | X | | |
| 699 | MD America Energy, LLC | E. R. BROADWAY A/K/A EDGAR REED BROADWAY AND WIFE ALMA BROADWAY | N/A | Lease | wn (until no longer producing) | TX00110_P.HBP.HS | 0.00 | X | | |
| 700 | MD America Energy, LLC | T. A. MADDOX, A MARRIED MAN DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00149B_P.HBP.HS | 0.00 | X | | |
| 701 | MD America Energy, LLC | MELVIN A. REIMER JOINED BY HIS WIFE RUTH BROWN REIMER | N/A | Lease | wn (until no longer producing) | TX00149A_P.HBP.HS | 0.00 | X | | |
| 702 | MD America Energy, LLC | NAOMI ELIZABETH JANUARY, DURWOOD AND LURLYN FLEMING, INDIVIDUALLY AND AS CO-TRUSTEES UNDER THE NAOMI ELIZABETH JANUARY TRUST | N/A | Lease | | TX00149C | 0.00 | X | | |
| 703 | MD America Energy, LLC | CLIFFORD JOHNSON | N/A | Lease | wn (until no longer producing) | TX-06-0094-014 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 704 | MD America Energy, LLC | JAMES E. FUHLBERG; JEWELL GOREE; WINNIE CULBRETH; WILLIE BULLARD AND HUSBAND, SHERMAN BULLARD; NELLIE PARK; RUTH MOORE AND HUSBAND CECIL V. MOORE | N/A | Lease | wn (until no longer producing) | TX-06-0195-001 | 0.00 | X | | |
| 705 | MD America Energy, LLC | MARY ETTA CHEATHAM ERCANBRACK | N/A | Lease | wn (until no longer producing) | TX-06-0195-009 | 0.00 | X | | |
| 706 | MD America Energy, LLC | JAMES LANG; FRANCES HARLESS; REBA GENTRY AND HUSBAND, HERCHEL GENTRY; BESSIE MIDDLEBROOKS; FLORENCE MCWHORTER | N/A | Lease | wn (until no longer producing) | TX-06-0195-002 | 0.00 | X | | |
| 707 | MD America Energy, LLC | DURWARD B. RATLIFF | N/A | Lease | wn (until no longer producing) | TX-06-0195-007 | 0.00 | X | | |
| 708 | MD America Energy, LLC | JIM WOLF AND RUBY WOLF, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0195-003 | 0.00 | X | | |
| 709 | MD America Energy, LLC | MARY ANNETTE WILLARD | N/A | Lease | wn (until no longer producing) | TX-06-0195-004 | 0.00 | X | | |
| 710 | MD America Energy, LLC | MILTON LAWLESS | N/A | Lease | wn (until no longer producing) | TX-06-0195-015 | 0.00 | X | | |
| 711 | MD America Energy, LLC | MANUEL LANG | N/A | Lease | wn (until no longer producing) | TX-06-0195-005 | 0.00 | X | | |
| 712 | MD America Energy, LLC | E. L. CHEATHAM, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0195-006 | 0.00 | X | | |
| 713 | MD America Energy, LLC | JAMES W. MCBRIDE JOINED BY HIS WIFE, ORIAN MCBRIDE | N/A | Lease | wn (until no longer producing) | TX-06-0195-016 | 0.00 | X | | |
| 714 | MD America Energy, LLC | ALVA RAY MURPHY | N/A | Lease | wn (until no longer producing) | TX-06-0195-017 | 0.00 | X | | |
| 715 | MD America Energy, LLC | JULIUS CHEATHAM | N/A | Lease | wn (until no longer producing) | TX-06-0195-018 | 0.00 | X | | |
| 716 | MD America Energy, LLC | JENNIE MAE MCBRIDE AND DAVID MCBRIDE | N/A | Lease | wn (until no longer producing) | TX-06-0195-008 | 0.00 | X | | |
| 717 | MD America Energy, LLC | MARY A WILLARD, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0068-006 | 0.00 | X | | |
| 718 | MD America Energy, LLC | JAMES E FUHLBERG ET AL | N/A | Lease | wn (until no longer producing) | TX-06-0068-005 | 0.00 | X | | |
| 719 | MD America Energy, LLC | ALVA RAY MURPHY, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0068-007 | 0.00 | X | | |
| 720 | MD America Energy, LLC | GRAVES FRANCIS, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0068-008 | 0.00 | X | | |
| 721 | MD America Energy, LLC | R. R. STRINGFIELD | N/A | Lease | wn (until no longer producing) | TX-06-0195-024 | 0.00 | X | | |
| 722 | MD America Energy, LLC | R. R. STRINGFIELD | N/A | Lease | wn (until no longer producing) | TX-06-0195-023 | 0.00 | X | | |
| 723 | MD America Energy, LLC | LILLIAN POSS MORRS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0195-010 | 0.00 | X | | |
| 724 | MD America Energy, LLC | LOUIS POSS AND PAULINE M. POSS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-06-0195-011 | 0.00 | X | | |
| 725 | MD America Energy, LLC | WILLIE NADINE LANDS | N/A | Lease | wn (until no longer producing) | TX-06-0195-012 | 0.00 | X | | |
| 726 | MD America Energy, LLC | HUGH A. CLARK; JO A. CLARK; NEVA PRESCOTT | N/A | Lease | wn (until no longer producing) | TX-06-0195-022 | 0.00 | X | | |
| 727 | MD America Energy, LLC | J. E. BUCKAHAULTS | N/A | Lease | wn (until no longer producing) | TX-06-0195-013 | 0.00 | X | | |
| 728 | MD America Energy, LLC | ALMA BUCKAHAULTS DONAHO | N/A | Lease | wn (until no longer producing) | TX-06-0195-014 | 0.00 | X | | |
| 729 | MD America Energy, LLC | GEORGE O. BUCKHAULTS, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0195-019 | 0.00 | X | | |
| 730 | MD America Energy, LLC | BESSIE MAE OLEXY | N/A | Lease | wn (until no longer producing) | TX-06-0068-010 | 0.00 | X | | |
| 731 | MD America Energy, LLC | BILL OLEXY AND WIFE, BESSIE MAE OLEXY | N/A | Lease | wn (until no longer producing) | TX-06-0068-009 | 0.00 | X | | |
| 732 | MD America Energy, LLC | ALVA RAY MURPHY, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0068-011 | 0.00 | X | | |
| 733 | MD America Energy, LLC | SALLIE FRANCES MAGNESS | N/A | Lease | wn (until no longer producing) | TX-06-0116-000_A.HBP | 0.00 | X | | |
| 734 | MD America Energy, LLC | PAUL W. VAHLDIEK AND WIFE, TECKLA B. VAHLDIEK | N/A | Lease | wn (until no longer producing) | TX-06-0131-001 | 0.00 | X | | |
| 735 | MD America Energy, LLC | R. L. HENDERSON, JR. AND WIFE, ELEANOR I. HENDERSON | N/A | Lease | wn (until no longer producing) | TX-06-0130-001 | 0.00 | X | | |
| 736 | MD America Energy, LLC | LEONARD LORIA AND WIFE, DORIS LEE LORIA | N/A | Lease | wn (until no longer producing) | TX-06-0128-001 | 0.00 | X | | |
| 737 | MD America Energy, LLC | JOE HOGAN AND WIFE, LILLIE P. HOGAN | N/A | Lease | wn (until no longer producing) | TX-06-0129-001 | 0.00 | X | | |
| 738 | MD America Energy, LLC | LEE D. TURNER | N/A | Lease | wn (until no longer producing) | TX-06-0132-013 | 0.00 | X | | |
| 739 | MD America Energy, LLC | NELL MOSLEY HODGE, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-06-0132-010 | 0.00 | X | | |
| 740 | MD America Energy, LLC | ALTON J. SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-007 | 0.00 | X | | |
| 741 | MD America Energy, LLC | HELEN GRAY SMALL, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0132-005 | 0.00 | X | | |
| 742 | MD America Energy, LLC | ESTELLE GRIGGS SMALL, A WIDOW, MARTHA SMALL WILLIS DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-003 | 0.00 | X | | |
| 743 | MD America Energy, LLC | BERNICE HOUSTON WASHINGTON | N/A | Lease | wn (until no longer producing) | TX-06-0132-019 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 744 | MD America Energy, LLC | HELEN MOSLEY, A WIDOW, BARBARA MOSLEY, ARTHUR MOSLEY | N/A | Lease | wn (until no longer producing) | TX-06-0132-020 | 0.00 | X | | |
| 745 | MD America Energy, LLC | FLORENCE SMALL MURPHY | N/A | Lease | wn (until no longer producing) | TX-06-0132-021 | 0.00 | X | | |
| 746 | MD America Energy, LLC | FREDERICK SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-017 | 0.00 | X | | |
| 747 | MD America Energy, LLC | ALEXANDER SMALL, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0133-002 | 0.00 | X | | |
| 748 | MD America Energy, LLC | VIOLA TURNER DAVIS A WOMAN DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-002 | 0.00 | X | | |
| 749 | MD America Energy, LLC | EVA SMALL BAKER, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0132-001 | 0.00 | X | | |
| 750 | MD America Energy, LLC | THOMAS S. TURNER | N/A | Lease | wn (until no longer producing) | TX-06-0132-014 | 0.00 | X | | |
| 751 | MD America Energy, LLC | WILLIAM A. TURNER | N/A | Lease | wn (until no longer producing) | TX-06-0132-012 | 0.00 | X | | |
| 752 | MD America Energy, LLC | JERRY SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-024 | 0.00 | X | | |
| 753 | MD America Energy, LLC | WILLIE FRANK SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-023 | 0.00 | X | | |
| 754 | MD America Energy, LLC | PHILLIP MCKINLEY SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-022 | 0.00 | X | | |
| 755 | MD America Energy, LLC | HELEN MATLOCK | N/A | Lease | wn (until no longer producing) | TX-06-0132-009 | 0.00 | X | | |
| 756 | MD America Energy, LLC | RUTH STEWART | N/A | Lease | wn (until no longer producing) | TX-06-0132-015 | 0.00 | X | | |
| 757 | MD America Energy, LLC | ROBERT LEE HOUSTON | N/A | Lease | wn (until no longer producing) | TX-06-0132-008 | 0.00 | X | | |
| 758 | MD America Energy, LLC | WILLIAM SANDERS | N/A | Lease | wn (until no longer producing) | TX-06-0132-004 | 0.00 | X | | |
| 759 | MD America Energy, LLC | LINDALE SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-006 | 0.00 | X | | |
| 760 | MD America Energy, LLC | EDNA MAE SMALL CLARK | N/A | Lease | wn (until no longer producing) | TX-06-0132-034 | 0.00 | X | | |
| 761 | MD America Energy, LLC | DOROTHY MAE SMALL JACKSON | N/A | Lease | wn (until no longer producing) | TX-06-0143-001 | 0.00 | X | | |
| 762 | MD America Energy, LLC | BILLY D. MOSLEY DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0143-002 | 0.00 | X | | |
| 763 | MD America Energy, LLC | J. C. MOSLEY, DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0143-006 | 0.00 | X | | |
| 764 | MD America Energy, LLC | PEARLINE SMALL, A WIDOW, ALEXANDER SMALL, JR., JOE SMALL, VICKI SMALL KELLY, DIANA SMALL DAVIS | N/A | Lease | | TX-06-0132-016_P.HBP | 0.00 | X | | |
| 765 | MD America Energy, LLC | ESTER SMALL YARBOUGH | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07564_P.PRO | 0.00 | X | | |
| 766 | MD America Energy, LLC | JESSIE SMALL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07565_P.PRO | 0.00 | X | | |
| 767 | MD America Energy, LLC | MARY ANN HOUSTON CRUSE | N/A | Lease | wn (until no longer producing) | TX-06-0143-005 | 0.00 | X | | |
| 768 | MD America Energy, LLC | GLORIA NELL MOSLEY BURELL DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-026 | 0.00 | X | | |
| 769 | MD America Energy, LLC | KATHERINE MOSLEY RAMEY | N/A | Lease | wn (until no longer producing) | TX-06-0132-025 | 0.00 | X | | |
| 770 | MD America Energy, LLC | LURIA MOSLEY ECHOLS, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-06-0132-030 | 0.00 | X | | |
| 771 | MD America Energy, LLC | ANNIE DORIS MOSLEY HALL, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-032 | 0.00 | X | | |
| 772 | MD America Energy, LLC | WINSTON L. MOSLEY, DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-027 | 0.00 | X | | |
| 773 | MD America Energy, LLC | WILLIE JAMES MOSLEY DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-028 | 0.00 | X | | |
| 774 | MD America Energy, LLC | RACHEL MOSLEY WASHINGTON, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-031 | 0.00 | X | | |
| 775 | MD America Energy, LLC | DILLARD SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-029 | 0.00 | X | | |
| 776 | MD America Energy, LLC | CARL SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0143-003 | 0.00 | X | | |
| 777 | MD America Energy, LLC | EDGAR SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0132-033 | 0.00 | X | | |
| 778 | MD America Energy, LLC | BRUCE SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0143-004 | 0.00 | X | | |
| 779 | MD America Energy, LLC | CAROLYN JEAN SMALL HUCKABEY AND ROBBIE MAE SMALL TURNER BOTH DEALING IN THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0132-011_P.HBP | 0.00 | X | | |
| 780 | MD America Energy, LLC | RUTH SMALL SPIVEY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07567_P.PRO | 0.00 | X | | |
| 781 | MD America Energy, LLC | CHARLOTTE SMALL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07566_P.PRO | 0.00 | X | | |
| 782 | MD America Energy, LLC | WILLIE ED HOUSTON | N/A | Lease | wn (until no longer producing) | TX-06-0132-018 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 783 | MD America Energy, LLC | CONNIE B. BETTS, INDIVIDUALLY AND AS AGENT AND ATTORNEY-IN-FACT FOR LENA MAE THOMAS, BERTHA RANDALL, GERALDINE THOMAS, MELINDA WHEELER, ALLEN BETTS, JR., BETTY SUE DOMINGUES, TOMMY LEE BETTS, LESSOR | N/A | Lease | wn (until no longer producing) | TX-06-0136-017 | 0.00 | X | | |
| 784 | MD America Energy, LLC | NAPOLEON GOULD | N/A | Lease | wn (until no longer producing) | TX-06-0133-001 | 0.00 | X | | |
| 785 | MD America Energy, LLC | LENA BETTS THOMAS, GERALDINE BETTS THOMAS, LOUISE BETTS WHEELER, ALL DEALING WITH THEIR SEPARATE PROPERTY; CHRISTINE BETTS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0136-009 | 0.00 | X | | |
| 786 | MD America Energy, LLC | TOMMY BETTS, HEREIN DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-011 | 0.00 | X | | |
| 787 | MD America Energy, LLC | BETTY BETTS DOMINGO, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-010 | 0.00 | X | | |
| 788 | MD America Energy, LLC | BERTHA BETTS RANDALL, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0136-008 | 0.00 | X | | |
| 789 | MD America Energy, LLC | ALLEN BETTS, JR., HEREIN DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-006 | 0.00 | X | | |
| 790 | MD America Energy, LLC | EVIE SMALL BAKER | N/A | Lease | wn (until no longer producing) | TX-06-0141-001 | 0.00 | X | | |
| 791 | MD America Energy, LLC | LEE TURNER, HEREIN DEALING WITH HIS SEPARATE NON-HOMESTEAD PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-0757I_P.HBP | 0.00 | X | | |
| 792 | MD America Energy, LLC | VIOLA TURNER DAVIS, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-0570_P.HBP | 0.00 | X | | |
| 793 | MD America Energy, LLC | AUGUSTA TURNER, HEREIN DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-0756_P.HBP | 0.00 | X | | |
| 794 | MD America Energy, LLC | THOMAS TURNER, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-0568_P.HBP | 0.00 | X | | |
| 795 | MD America Energy, LLC | BERNICE WASHINGTON | N/A | Lease | wn (until no longer producing) | TX-06-0141-006 | 0.00 | X | | |
| 796 | MD America Energy, LLC | WILLIE EDD HOUSTON | N/A | Lease | wn (until no longer producing) | TX-06-0141-005 | 0.00 | X | | |
| 797 | MD America Energy, LLC | L. D. SMITH HEREIN DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-019 | 0.00 | X | | |
| 798 | MD America Energy, LLC | EDNA MAE SMALL CLARK | N/A | Lease | wn (until no longer producing) | TX-06-0141-002 | 0.00 | X | | |
| 799 | MD America Energy, LLC | DOROTHY MAE JACKSON | N/A | Lease | wn (until no longer producing) | TX-06-0141-003 | 0.00 | X | | |
| 800 | MD America Energy, LLC | LILLIE FAY SMITH | N/A | Lease | wn (until no longer producing) | TX-06-0141-004 | 0.00 | X | | |
| 801 | MD America Energy, LLC | JOSIE JOHNSON, HEREIN DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-018 | 0.00 | X | | |
| 802 | MD America Energy, LLC | JOHNNY BROADWAY JR. | N/A | Lease | wn (until no longer producing) | TX-06-0136-015 | 0.00 | X | | |
| 803 | MD America Energy, LLC | JESSIE LEO BROADWAY EDDIE LEE BROADWAY RICHARD BROADWAY | N/A | Lease | wn (until no longer producing) | TX-06-0136-016 | 0.00 | X | | |
| 804 | MD America Energy, LLC | J.C. MOSELEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-010 | 0.00 | X | | |
| 805 | MD America Energy, LLC | GLORIA NELL BURRELL | N/A | Lease | wn (until no longer producing) | TX-06-0141-007 | 0.00 | X | | |
| 806 | MD America Energy, LLC | CHARLES MOSELEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-011 | 0.00 | X | | |
| 807 | MD America Energy, LLC | WILLIE JAMES MOSELEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-012 | 0.00 | X | | |
| 808 | MD America Energy, LLC | CHARLOTTE SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0141-016 | 0.00 | X | | |
| 809 | MD America Energy, LLC | Billie Dean Moseley | N/A | Lease | wn (until no longer producing) | TX-06-0141-013 | 0.00 | X | | |
| 810 | MD America Energy, LLC | WINSTON MOSELEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-014 | 0.00 | X | | |
| 811 | MD America Energy, LLC | LURIA ECHOLS | N/A | Lease | wn (until no longer producing) | TX-06-0141-008 | 0.00 | X | | |
| 812 | MD America Energy, LLC | KATHERINE RAMEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-015 | 0.00 | X | | |
| 813 | MD America Energy, LLC | JESSIE SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0141-017 | 0.00 | X | | |
| 814 | MD America Energy, LLC | RUTH SMALL SPIVEY | N/A | Lease | wn (until no longer producing) | TX-06-0141-018 | 0.00 | X | | |
| 815 | MD America Energy, LLC | ESTER SMALL YARBOROUGH | N/A | Lease | wn (until no longer producing) | TX-06-0141-019 | 0.00 | X | | |
| 816 | MD America Energy, LLC | DILLARD SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0141-021 | 0.00 | X | | |
| 817 | MD America Energy, LLC | DORIS HALL | N/A | Lease | wn (until no longer producing) | TX-06-0141-009 | 0.00 | X | | |
| 818 | MD America Energy, LLC | RACHEL WASHINGTON | N/A | Lease | wn (until no longer producing) | TX-06-0141-020 | 0.00 | X | | |
| 819 | MD America Energy, LLC | CARL EARL SMALL, HEREIN DEALING WITH HIS SEPARATE PROPERTY #362074 | N/A | Lease | wn (until no longer producing) | TX-06-0142-001 | 0.00 | X | | |
| 820 | MD America Energy, LLC | BRUCE GERALD SMALL, HEREIN DEALING WITH HIS SEPARATE PROPERTY #3S2942 | N/A | Lease | wn (until no longer producing) | TX-06-0142-002 | 0.00 | X | | |
| 821 | MD America Energy, LLC | ERMA LEE BYRD FORD, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0136-007 | 0.00 | X | | |
| 822 | MD America Energy, LLC | JENNIE MAE GAMBLE, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-003 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 823 | MD America Energy, LLC | NANCY LEE PARKS, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-004 | 0.00 | X | | |
| 824 | MD America Energy, LLC | WILLIE LANDUS MOTLEY, HEREIN DEALING WITH HIS SEPARATE NON-HOMESTEAD PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-005 | 0.00 | X | | |
| 825 | MD America Energy, LLC | EUNICE BLACKNELL, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-002 | 0.00 | X | | |
| 826 | MD America Energy, LLC | MAGGIE PEARL THORNTON, HEREIN DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0136-001 | 0.00 | X | | |
| 827 | MD America Energy, LLC | CAIRO BAPTIST CHURCH, AN UNINCORPORATED NON PROFIT ORGANIZATION, BY NAPOLEAN GOULD AND ALEX LEROY SMALL, TRUSTEES AND DEACONS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07563_A.HBP | 0.00 | X | | |
| 828 | MD America Energy, LLC | TRUBY M. MASON, GRADY MADOLE, RAYMOND MADOLE, JIM HILL MADOLE, MAY CARMICHAEL, G. ROSS MADOLE, EDWINA WIEGHAT, DIANA MAY WELSH AND GERTRUDE HUBER FARAGO | N/A | Lease | wn (until no longer producing) | TX-06-0196-002 | 0.00 | X | | |
| 829 | MD America Energy, LLC | GEORGE E. JASTER AND WIFE, LAURA SALLY JASTER AND EDMUND A. JASTER AND WIFE, ELLEN M. JASTER | N/A | Lease | wn (until no longer producing) | TX-06-0196-001 | 0.00 | X | | |
| 830 | MD America Energy, LLC | BONNER D MURFF AND WIFE, LORENE MURFF | N/A | Lease | wn (until no longer producing) | TX-06-0135-001 | 0.00 | X | | |
| 831 | MD America Energy, LLC | THERESA FOSTER, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0134-001 | 0.00 | X | | |
| 832 | MD America Energy, LLC | LLOYD MURFF AND WIFE, ELSIE Y MURFF | N/A | Lease | wn (until no longer producing) | TX-06-0135-002 | 0.00 | X | | |
| 833 | MD America Energy, LLC | MANNING MARSHALL MOTT, II AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0093-006_P.HBP | 0.00 | X | | |
| 834 | MD America Energy, LLC | OVELL BROWN, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-030 | 0.00 | X | | |
| 835 | MD America Energy, LLC | DENNIS CAMPBELL, JR., AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-031 | 0.00 | X | | |
| 836 | MD America Energy, LLC | LIBBY NIXON BROWN, WIDOW OF MARSHALL BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0052-034 | 0.00 | X | | |
| 837 | MD America Energy, LLC | MARY MAGDALENE CAMPBELL, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-037 | 0.00 | X | | |
| 838 | MD America Energy, LLC | L. J. BROWN, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-036 | 0.00 | X | | |
| 839 | MD America Energy, LLC | ELNORA BROWN ASHLEY, MINNIE OLA JOHNSON AND WARREN BROWN, AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-009_P.HBP | 0.00 | X | | |
| 840 | MD America Energy, LLC | MINNIE MAE BROWN HARRISON, MARTHA ELLA BROWN AND MARY LOIS BROWN HARRISON, AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-010_P.HBP | 0.00 | X | | |
| 841 | MD America Energy, LLC | W. WALLACE MCDONALD, JR., A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-06-0052-011_P.HBP | 0.00 | X | | |
| 842 | MD America Energy, LLC | RUFUS WOOLEY, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-012_P.HBP | 0.00 | X | | |
| 843 | MD America Energy, LLC | LEON MORRIS, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-013_P.HBP | 0.00 | X | | |
| 844 | MD America Energy, LLC | LUTHER MAE CAMPBELL, WIDOW OF LYNNOY CAMPBELL | N/A | Lease | wn (until no longer producing) | TX-06-0052-014_P.HBP | 0.00 | X | | |
| 845 | MD America Energy, LLC | E. L. BROWN, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-015_P.HBP | 0.00 | X | | |
| 846 | MD America Energy, LLC | ULYSSES LANE CAMPBELL, PAULA K. CAMPBELL, LOIS ETTA CAMBELL PATRICIA ANN CAMPBELL, CURTIS AUTHOR CAMPBELL AND FLYNNOY CAMBELL, JR. AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-017_P.HBP | 0.00 | X | | |
| 847 | MD America Energy, LLC | DORIS BROWN JACKSON, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-024_P.HBP | 0.00 | X | | |
| 848 | MD America Energy, LLC | BARBARA JACKSON AND JOYCE JACKSON, AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-026_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 849 | MD America Energy, LLC | WILLIAM BROWN, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-027_P.HBP | 0.00 | X | | |
| 850 | MD America Energy, LLC | JAMES BROWN, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-028_P.HBP | 0.00 | X | | |
| 851 | MD America Energy, LLC | ED ALLEN BROWN AND CLIFFORD BROWN, AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-016_P.HBP | 0.00 | X | | |
| 852 | MD America Energy, LLC | MICHELLE BROWN, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-018_P.HBP | 0.00 | X | | |
| 853 | MD America Energy, LLC | GEORGE ROBERT CAMPBELL, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-019_P.HBP | 0.00 | X | | |
| 854 | MD America Energy, LLC | LINDA SUE CAMPBELL GRIFFIN, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-020_P.HBP | 0.00 | X | | |
| 855 | MD America Energy, LLC | FRANCES BROWN, WIDOW OF WALTER BROWN | N/A | Lease | wn (until no longer producing) | TX-06-0052-021_P.HBP | 0.00 | X | | |
| 856 | MD America Energy, LLC | CHARLIE JAMES CAMPBELL, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-022_P.HBP | 0.00 | X | | |
| 857 | MD America Energy, LLC | JOHN RICHARD CAMPBELL, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-023_P.HBP | 0.00 | X | | |
| 858 | MD America Energy, LLC | CAESAR ROMERO CAMPBELL, JANET CARLA CAMPBELL, JOYCE M. CAMPBELL BULLOCK, AND ESTHER DENICE CAMPBELL ROSS, AS THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-025_P.HBP | 0.00 | X | | |
| 859 | MD America Energy, LLC | SWEET BROWN HUEY, A/K/A ROSALIE HUEY, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-029_P.HBP | 0.00 | X | | |
| 860 | MD America Energy, LLC | ADELINE BROWN NASH, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-032_P.HBP | 0.00 | X | | |
| 861 | MD America Energy, LLC | IDA BROWN WRIGHT, AS HER SEPARATE PROPERTY A/K/A PINKLE WRIGHT | N/A | Lease | wn (until no longer producing) | TX-06-0052-033_P.HBP | 0.00 | X | | |
| 862 | MD America Energy, LLC | COREAN BROWN GEORGE, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-035_P.HBP | 0.00 | X | | |
| 863 | MD America Energy, LLC | JEWELL BROWN JOHNSON, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0052-038_P.HBP | 0.00 | X | | |
| 864 | MD America Energy, LLC | DONALD LACKEY AND WIFE, JOYCE LACKEY | N/A | Lease | wn (until no longer producing) | TX-06-0127-001 | 0.00 | X | | |
| 865 | MD America Energy, LLC | MABLE RASCO SMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280D | 0.00 | X | | |
| 866 | MD America Energy, LLC | MARY ALICE RASCO LAND, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280E | 0.00 | X | | |
| 867 | MD America Energy, LLC | PEARL RASCO MOSLEY, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280G | 0.00 | X | | |
| 868 | MD America Energy, LLC | JAMES T. RASCO, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280B | 0.00 | X | | |
| 869 | MD America Energy, LLC | JERRY DEAN KEEFER, AS HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280C | 0.00 | X | | |
| 870 | MD America Energy, LLC | PANSY RUTH FALCO, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00280F | 0.00 | X | | |
| 871 | MD America Energy, LLC | DEBORAH DOWNEY KEEFER, INDIVIDUALLY AND AS GUARDIAN OF THE PERSON AND ESTATE OF PAULA JO KEEFER, A MINOR | N/A | Lease | wn (until no longer producing) | TX00280A | 0.00 | X | | |
| 872 | MD America Energy, LLC | ELMER P. WARD ETUX, JEWEL WARD | N/A | Lease | wn (until no longer producing) | TX-06-0136-012 | 0.00 | X | | |
| 873 | MD America Energy, LLC | ERA JOHNSON MOSES, A/K/A ERA JOHNSON, AS HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0094-015 | 0.00 | X | | |
| 874 | MD America Energy, LLC | DAN MADOLE AND WIFE, CAROLYN MADOLE, HAZEL LOUISE MADOLE, KEVIN MADOLE, PAULA MADOLE & LAURA SUNDSTROM | N/A | Lease | | TX-06-0198-000 | 0.00 | X | | |
| 875 | MD America Energy, LLC | DAN MADOLE AND WIFE, CAROLYN AND GRACE M. STANDLEY | N/A | Lease | wn (until no longer producing) | TX-06-0197-000 | 0.00 | X | | |
| 876 | MD America Energy, LLC | HELEN LANG | N/A | Lease | wn (until no longer producing) | TX-06-0195-020 | 0.00 | X | | |
| 877 | MD America Energy, LLC | CLARENCE FRED LANG | N/A | Lease | wn (until no longer producing) | TX-06-0195-021 | 0.00 | X | | |
| 878 | MD America Energy, LLC | JOHNNY R. BYRD | N/A | Lease | wn (until no longer producing) | TX-06-0136-013 | 0.00 | X | | |
| 879 | MD America Energy, LLC | GLADYS DIXON | N/A | Lease | wn (until no longer producing) | TX-06-0136-014 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 880 | MD America Energy, LLC | LEO J. CHMIELOWIEC AND JOSEPHINE CHMIELOWIEC, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01617_P.HBP | 0.00 | X | | |
| 881 | MD America Energy, LLC | GASTON PARMER DONAHO AND BARBARA DONAHO, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01614_A.HBP | 0.00 | X | | |
| 882 | MD America Energy, LLC | WAYNE MURRY BLAND AND SHIRLEY J. BLAND, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01615_A.HBP | 0.00 | X | | |
| 883 | MD America Energy, LLC | LEONARD JAY PARKER, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01618_P.HBP | 0.00 | X | | |
| 884 | MD America Energy, LLC | ROBERT GENE PARKER, A MARRIED MAN DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01619_P.HBP | 0.00 | X | | |
| 885 | MD America Energy, LLC | GLENN ALAN PARKER, A MARRIED MAN DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01620_P.HBP | 0.00 | X | | |
| 886 | MD America Energy, LLC | DAVID A. MCCONKEY AND DONELLA B. MCCONKEY, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-01616_A.HBP | 0.00 | X | | |
| 887 | MD America Energy, LLC | JACOB DUDLEY WILSON AND WIFE MERYAL WILSON | N/A | Lease | wn (until no longer producing) | TX-06-0144-001 | 0.00 | X | | |
| 888 | MD America Energy, LLC | NAPOLEON GOULD AND ALEXANDER SMALL, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0004-001 | 0.00 | X | | |
| 889 | MD America Energy, LLC | JIMMY LOYD CALDWELL, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-06-0157-000 | 0.00 | X | | |
| 890 | MD America Energy, LLC | ROLLIE T. BURR AND WIFE, BEVERLY KAY BURR | N/A | Lease | wn (until no longer producing) | TX-06-0156-000 | 0.00 | X | | |
| 891 | MD America Energy, LLC | FRED M. WALSH AND WIFE, MARY LOU WALSH | N/A | Lease | wn (until no longer producing) | TX-06-0155-000 | 0.00 | X | | |
| 892 | MD America Energy, LLC | BETTY JO RICHARDS | N/A | Lease | wn (until no longer producing) | TX-06-0154-000 | 0.00 | X | | |
| 893 | MD America Energy, LLC | BOBBY G. PRESCOTT AND WIFE, NEVA C. PRESCOTT | N/A | Lease | wn (until no longer producing) | TX-06-0151-000 | 0.00 | X | | |
| 894 | MD America Energy, LLC | MELVIN E. PRESCOTT AND WIFE, LOIS E. PRESCOTT | N/A | Lease | wn (until no longer producing) | TX-06-0152-000 | 0.00 | X | | |
| 895 | MD America Energy, LLC | MARGIE M. PRESCOTT | N/A | Lease | wn (until no longer producing) | TX-06-0150-000 | 0.00 | X | | |
| 896 | MD America Energy, LLC | ERNEST J. KOMAREK | N/A | Lease | wn (until no longer producing) | TX-06-0153-000_A.HBP | 0.00 | X | | |
| 897 | MD America Energy, LLC | BETTY JOE KEEFER | N/A | Lease | wn (until no longer producing) | TX-06-0146-000 | 0.00 | X | | |
| 898 | MD America Energy, LLC | BILLY F. PHILLIPS AND WIFE, LANELLE PHILLIPS | N/A | Lease | wn (until no longer producing) | TX-06-0165-005 | 0.00 | X | | |
| 899 | MD America Energy, LLC | VELA MARIE ADAIR | N/A | Lease | wn (until no longer producing) | TX-06-0145-000 | 0.00 | X | | |
| 900 | MD America Energy, LLC | JOHN T. ASHABRANNER AND WIFE, MAVIS BLACK ASHABRANNER | N/A | Lease | wn (until no longer producing) | TX-06-0147-000 | 0.00 | X | | |
| 901 | MD America Energy, LLC | LENDON EMORY BLACK, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0149-000 | 0.00 | X | | |
| 902 | MD America Energy, LLC | CAROLYN BLACK CLARKSON | N/A | Lease | wn (until no longer producing) | TX-06-0148-000 | 0.00 | X | | |
| 903 | MD America Energy, LLC | BULAH MILLER WHITFIELD | N/A | Lease | wn (until no longer producing) | TX-06-0165-004 | 0.00 | X | | |
| 904 | MD America Energy, LLC | CECIL D. MUSGROVE AND BETTY R. MUSGROVE, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0047 | 0.00 | X | | |
| 905 | MD America Energy, LLC | MARY SADIE MELE | N/A | Lease | wn (until no longer producing) | TX-03-0085-003 | 0.00 | X | | |
| 906 | MD America Energy, LLC | JIMMIE L. ROBINSON | N/A | Lease | wn (until no longer producing) | TX-03-0085-002 | 0.00 | X | | |
| 907 | MD America Energy, LLC | MILDRED LURIE GAILLEY | N/A | Lease | wn (until no longer producing) | TX-03-0085-005 | 0.00 | X | | |
| 908 | MD America Energy, LLC | DORIS NELL KEEFER | N/A | Lease | wn (until no longer producing) | TX-03-0085-004 | 0.00 | X | | |
| 909 | MD America Energy, LLC | FLOYD KENNETH ROBINSON | N/A | Lease | wn (until no longer producing) | TX-03-0085-001 | 0.00 | X | | |
| 910 | MD America Energy, LLC | SAMUEL RAY EAVES | N/A | Lease | wn (until no longer producing) | TX-03-0080-001 | 0.00 | X | | |
| 911 | MD America Energy, LLC | SAMUEL RAY EAVES, JR., PATSY EAVES, AND SHEILA ANNETTE EAVES | N/A | Lease | wn (until no longer producing) | TX-03-0080-003 | 0.00 | X | | |
| 912 | MD America Energy, LLC | SHIRLEY ANN EAVES; THOMAS ALAN EAVES; AND BARRY GREGORY EAVES | N/A | Lease | wn (until no longer producing) | TX-03-0080-003 | 0.00 | X | | |
| 913 | MD America Energy, LLC | SAMUEL JAMES EAVES | N/A | Lease | wn (until no longer producing) | TX-03-0086-002 | 0.00 | X | | |
| 914 | MD America Energy, LLC | MELBA FROSSARD, A WIDOW, INDIVIDUALLY AND AS TRUSTEE OF THE J. H. FROSSARD TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0096-002 | 0.00 | X | | |
| 915 | MD America Energy, LLC | CECIL DOUGLAS MUSGROVE AND BETTY R. MUSGROVE, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0095 | 0.00 | X | | |
| 916 | MD America Energy, LLC | SARAH T. SMITH | N/A | Lease | wn (until no longer producing) | TX-03-0096-001 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 917 | MD America Energy, LLC | BILLY SETH POPE, ACTING HEREIN AS TRUSTEE, IN TRUST FOR USE AND BENEFIT OF ROBIN LEA POPE | N/A | Lease | wn (until no longer producing) | TX-03-0090-002 | 0.00 | X | | |
| 918 | MD America Energy, LLC | WALLACE E. POPE | N/A | Lease | wn (until no longer producing) | TX-03-0090-001 | 0.00 | X | | |
| 919 | MD America Energy, LLC | PHYLLIS POPE, WIDOW OF RAYMOND J. POPE, DECEASED, AND RYAN POPE | N/A | Lease | wn (until no longer producing) | TX-03-0090-005 | 0.00 | X | | |
| 920 | MD America Energy, LLC | OLEN C. POPE | N/A | Lease | wn (until no longer producing) | TX-03-0093-001 | 0.00 | X | | |
| 921 | MD America Energy, LLC | JENNIFER POPE, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-03-0090-004 | 0.00 | X | | |
| 922 | MD America Energy, LLC | ROBIN LEA POPE, A FEME SOLE | N/A | Lease | wn (until no longer producing) | TX-03-0090-003 | 0.00 | X | | |
| 923 | MD America Energy, LLC | CHARLES L. CROUCH | N/A | Lease | wn (until no longer producing) | TX-03-0081-001 | 0.00 | X | | |
| 924 | MD America Energy, LLC | WILLIAM L. CROUCH | N/A | Lease | wn (until no longer producing) | TX-03-0081-005 | 0.00 | X | | |
| 925 | MD America Energy, LLC | MARY ANN CROUCH DARBY | N/A | Lease | wn (until no longer producing) | TX-03-0081-003 | 0.00 | X | | |
| 926 | MD America Energy, LLC | ESTELLE CROUCH FANNIN | N/A | Lease | wn (until no longer producing) | TX-03-0081-004 | 0.00 | X | | |
| 927 | MD America Energy, LLC | CURTIS G. CROUCH | N/A | Lease | wn (until no longer producing) | TX-03-0081-002 | 0.00 | X | | |
| 928 | MD America Energy, LLC | JAMES R. LOY AND BONNA LEE LOY | N/A | Lease | wn (until no longer producing) | TX-03-0065-002 | 0.00 | X | | |
| 929 | MD America Energy, LLC | LOYCE TAYLOR; JOE ERWIN TAYLOR; AND JAMES LUTHER TAYLOR | N/A | Lease | wn (until no longer producing) | TX-03-0087 | 0.00 | X | | |
| 930 | MD America Energy, LLC | CAROL KAY LABAY, DEALING HEREIN WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0075 | 0.00 | X | | |
| 931 | MD America Energy, LLC | LOIS HERMAN BLEDSOE AND WIFE, GLADYS BLEDSOE | N/A | Lease | wn (until no longer producing) | TX-03-0089 | 0.00 | X | | |
| 932 | MD America Energy, LLC | J. L. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0088-002 | 0.00 | X | | |
| 933 | MD America Energy, LLC | JOHN F. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0088-001 | 0.00 | X | | |
| 934 | MD America Energy, LLC | MANUEL R. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0088-004 | 0.00 | X | | |
| 935 | MD America Energy, LLC | GRACIE SANDERS | N/A | Lease | wn (until no longer producing) | TX-03-0088-006 | 0.00 | X | | |
| 936 | MD America Energy, LLC | KENNETH R. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0088-003 | 0.00 | X | | |
| 937 | MD America Energy, LLC | NELVA PRATT | N/A | Lease | wn (until no longer producing) | TX-03-0088-007 | 0.00 | X | | |
| 938 | MD America Energy, LLC | MAVIS BOSWELL | N/A | Lease | wn (until no longer producing) | TX-03-0088-005 | 0.00 | X | | |
| 939 | MD America Energy, LLC | DAVID MCKEE FRAZIOR, JR. | N/A | Lease | wn (until no longer producing) | TX-03-0070 | 0.00 | X | | |
| 940 | MD America Energy, LLC | ADA F. MUSGROVE, A WIDOW; CECIL C. MUSGROVE; ELTON L. MUSGROVE; AND MILTON R. MUSGROVE | N/A | Lease | wn (until no longer producing) | TX-03-0062 | 0.00 | X | | |
| 941 | MD America Energy, LLC | MARY JACQUE CRAIG, WIDOW OF ROBERT MARSHALL CRAIG, DECEASED, AND ROBERT MARSHALL CRAIG | N/A | Lease | wn (until no longer producing) | TX-03-0077-002 | 0.00 | X | | |
| 942 | MD America Energy, LLC | REBA HICKS SAIN | N/A | Lease | wn (until no longer producing) | TX-03-0077-001 | 0.00 | X | | |
| 943 | MD America Energy, LLC | BOBBY D. FIFE AND WIFE, PATSY J. FIFE | N/A | Lease | wn (until no longer producing) | TX-03-0066 | 0.00 | X | | |
| 944 | MD America Energy, LLC | VERNON LEE WALTON AND LA VERN WALTON, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0099 | 0.00 | X | | |
| 945 | MD America Energy, LLC | JAMES H. POPE | N/A | Lease | wn (until no longer producing) | TX-03-0093-002 | 0.00 | X | | |
| 946 | MD America Energy, LLC | ROBERT V. HIBBETTS AND JANIE P. HIBBETTS, HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0065-001 | 0.00 | X | | |
| 947 | MD America Energy, LLC | JOHN R. MORRIS AND WIFE, CAROLE S. MORRIS | N/A | Lease | wn (until no longer producing) | TX-03-0091 | 0.00 | X | | |
| 948 | MD America Energy, LLC | LOUISE E. BARRETT, E. T. BARRETT, M. H. BARRETT, CAROLYN GUEDRY AND ARIEBETH BOTT | N/A | Lease | wn (until no longer producing) | TX-03-0083_A.HBP | 0.00 | X | | |
| 949 | MD America Energy, LLC | LEROY BOYD AND WIFE, BRENDA BOYD | N/A | Lease | wn (until no longer producing) | TX-03-0073 | 0.00 | X | | |
| 950 | MD America Energy, LLC | ROCK PRAIRIE BAPTIST CHURCH, REPRESENTED BY ITS BOARD OF DEACONS: ROBERT V. HIBBETTS, ALTON DISERENS, ERVIN CONRAD, CHARLES STARK, AND TERRY POPE | N/A | Lease | wn (until no longer producing) | TX-03-0060 | 0.00 | X | | |
| 951 | MD America Energy, LLC | J. L. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0078-002 | 0.00 | X | | |
| 952 | MD America Energy, LLC | JOHN F. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0078-001 | 0.00 | X | | |
| 953 | MD America Energy, LLC | MANUEL R. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0078-004 | 0.00 | X | | |
| 954 | MD America Energy, LLC | NELVA PRATT | N/A | Lease | wn (until no longer producing) | TX-03-0078-007 | 0.00 | X | | |
| 955 | MD America Energy, LLC | KENNETH R. COLE | N/A | Lease | wn (until no longer producing) | TX-03-0078-003 | 0.00 | X | | |
| 956 | MD America Energy, LLC | GRACIE SANDERS | N/A | Lease | wn (until no longer producing) | TX-03-0078-006 | 0.00 | X | | |
| 957 | MD America Energy, LLC | MAVIS BOSWELL | N/A | Lease | wn (until no longer producing) | TX-03-0078-005 | 0.00 | X | | |
| 958 | MD America Energy, LLC | BERNICE WAYNE EAVES, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-03-0086-003 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 959 | MD America Energy, LLC | JO LYNN LAGRAVIEW FREEMAN, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0158-001_P.HBP | 0.00 | X | | |
| 960 | MD America Energy, LLC | JIMMY L. CALDWELL, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0162-000 | 0.00 | X | | |
| 961 | MD America Energy, LLC | VIRGIL FOSTER AND WIFE, MARGARET ANN FOSTER | N/A | Lease | wn (until no longer producing) | TX-06-0161-000 | 0.00 | X | | |
| 962 | MD America Energy, LLC | FRANCIS C. RAWLS, AND WIFE BETTY L. RAWLS | N/A | Lease | wn (until no longer producing) | TX-06-0159-000_A.HBP | 0.00 | X | | |
| 963 | MD America Energy, LLC | NOVELLA BATSON KRANNING, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0160-001_P.HBP | 0.00 | X | | |
| 964 | MD America Energy, LLC | JAMES A. MORRISON, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0160-002_P.HBP | 0.00 | X | | |
| 965 | MD America Energy, LLC | ALLENE LAGRAVIER, A WIDOW; JIMMY F. LAGRAVIER AND EDWARD LAGRAVIER | N/A | Lease | wn (until no longer producing) | TX-06-0163-001 | 0.00 | X | | |
| 966 | MD America Energy, LLC | JIMMY LAGRAVIER | N/A | Lease | wn (until no longer producing) | TX-06-0164-000 | 0.00 | X | | |
| 967 | MD America Energy, LLC | TALMADGE WHITESIDE, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0167-000_A.HBP | 0.00 | X | | |
| 968 | MD America Energy, LLC | CHRISTINE FORD DAVIS, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0166-000 | 0.00 | X | | |
| 969 | MD America Energy, LLC | MAIBEL COLE, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-06-0168-003_P.HBP.HS | 0.00 | X | | |
| 970 | MD America Energy, LLC | RALPH E. COLE, A WIDOWER DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0168-001_P.HBP.HS | 0.00 | X | | |
| 971 | MD America Energy, LLC | KING COLE, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0168-002_P.HBP.HS | 0.00 | X | | |
| 972 | MD America Energy, LLC | JAMES JOHNSON AND PERRY JOHNSON, BOTH DEALING WITH THEIR SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0169-000_A.HBP | 0.00 | X | | |
| 973 | MD America Energy, LLC | FELIX HELTON, III, AS AGENT AND ATTORNEY-IN-FACT FOR LORAIN HELTON | N/A | Lease | wn (until no longer producing) | TX-06-0170-000_A.HBP.HS | 0.00 | X | | |
| 974 | MD America Energy, LLC | FELIX HELTON, III, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0171-000_A.HBP | 0.00 | X | | |
| 975 | MD America Energy, LLC | M. H. BARRETT AND WIFE, GAYLE R. BARRETT | N/A | Lease | wn (until no longer producing) | TX-06-0174-000 | 0.00 | X | | |
| 976 | MD America Energy, LLC | JAKE WILSON AND DIANNE WILSON | N/A | Lease | wn (until no longer producing) | TX-06-0173-001 | 0.00 | X | | |
| 977 | MD America Energy, LLC | JACOB DUDLEY WILSON AND WIFE, MERYAL WILSON; F. C. WILSON AND WIFE, GLADYS WILSON; L. B. WILSON AND WIFE, GERALDINE WILSONN | N/A | Lease | wn (until no longer producing) | TX-06-0172-001 | 0.00 | X | | |
| 978 | MD America Energy, LLC | JAMES J. JOHNSTON, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0175-001_P.HBP.VS | 0.00 | X | | |
| 979 | MD America Energy, LLC | V. A. JOHNSTON FAMILY TRUST BY KATHERINE PREWITT, TRUSTEE AND MARY FANCES CHESSER, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-06-0175-003_P.HBP.VS | 0.00 | X | | |
| 980 | MD America Energy, LLC | WILLIAM S. ROGERS, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0175-004_P.HBP.VS | 0.00 | X | | |
| 981 | MD America Energy, LLC | NCNB TEXAS NATIONAL BANK, TRUSTEE U/A FOR EULA MAY JOHNSTON TRUST #661 | N/A | Lease | wn (until no longer producing) | TX-06-0175-002_P.HBP.VS | 0.00 | X | | |
| 982 | MD America Energy, LLC | GLENN F. MATHIS AND WIFE, LENA MATHIS | N/A | Lease | wn (until no longer producing) | TX-06-0191-001_P.HBP | 0.00 | X | | |
| 983 | MD America Energy, LLC | JACOB DUDLEY WILSON AND WIFE, MERYAL WILSON; F. C. WILSON AND WIFE, GLADYS WILSON'L. B. WILSON AND WIFE, GERALDINE WILSON C/O JACOB DUDLEY WILSON | N/A | Lease | wn (until no longer producing) | TX-06-0189-001 | 0.00 | X | | |
| 984 | MD America Energy, LLC | CHARLIE MILLS, A WIDOWER | N/A | Lease | wn (until no longer producing) | TX-06-0190-001 | 0.00 | X | | |
| 985 | MD America Energy, LLC | BILLY H. SMITH, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0190-002 | 0.00 | X | | |
| 986 | MD America Energy, LLC | FRANCES SMITH PARK, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0190-003 | 0.00 | X | | |
| 987 | MD America Energy, LLC | THOMAS M. SMITH, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0190-005 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 988 | MD America Energy, LLC | THOMAS M. SMITH, DEALING WITH HIS SEPARATE | N/A | Lease | wn (until no longer producing) | TX-06-0190-004 | 0.00 | X | | |
| 989 | MD America Energy, LLC | THE RESERVE PETROLEUM COMPANY | N/A | Lease | wn (until no longer producing) | TX-06-0158-002_P.HBP.VS | 0.00 | X | | |
| 990 | MD America Energy, LLC | LOCHBUIE LIMITED PARTNERSHIP, AN OKLAHOMA LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-0158-003_P.HBP.VS | 0.00 | X | | |
| 991 | MD America Energy, LLC | SINGER BROS., A PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-0158-004_P.HBP | 0.00 | X | | |
| 992 | MD America Energy, LLC | ETOCO, INC. | N/A | Lease | wn (until no longer producing) | TX-06-0158-005_P.HBP | 0.00 | X | | |
| 993 | MD America Energy, LLC | LUCILLE VAUGHAN | N/A | Lease | wn (until no longer producing) | TX-06-0199-001 | 0.00 | X | | |
| 994 | MD America Energy, LLC | GARLAND R. MARSHALL AND LILLA MAE GRAY MARSHALL | N/A | Lease | wn (until no longer producing) | TX-06-0199-002 | 0.00 | X | | |
| 995 | MD America Energy, LLC | BARBARA WINSTEAD BILLINGS | N/A | Lease | wn (until no longer producing) | TX-06-0199-003 | 0.00 | X | | |
| 996 | MD America Energy, LLC | JEAN GIBBS SMITH BISHOP, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0190-006 | 0.00 | X | | |
| 997 | MD America Energy, LLC | HOLLY LAGRAVIER STROUD, ET VIR, KERRY STROUD | N/A | Lease | wn (until no longer producing) | TX-06-0163-002 | 0.00 | X | | |
| 998 | MD America Energy, LLC | WALDO BRIDGES, MOZETTA BRIDGES BOX, RODGERS BRIDGES, HORACE BRIDGES, GLADYS BRIDGES MAY, ROSIE MAE BRIDGES BROWN, MOSES BRIDGES, JR. | N/A | Lease | wn (until no longer producing) | TX-06-7345 | 0.00 | X | | |
| 999 | MD America Energy, LLC | WALDO BRIDGES, MOZETTA BRIDGES BOX, RODGERS BRIDGES, HORACE BRIDGES, ROSIE MAE BRIDGES BROWN, MOSES BRIDGES, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0059-005_P.HBP | 0.00 | X | | |
| 1000 | MD America Energy, LLC | MARK WAYNE LACKEY AND WIFE, DENISE B. LACKEY | N/A | Lease | wn (until no longer producing) | TX-06-0216-001 | 0.00 | X | | |
| 1001 | MD America Energy, LLC | GENE DOUGET, RECEIVER FOR GEORGE DUSTER AND THE UNKNOWN HEIRS OF GEORGE DUSTER | N/A | Lease | wn (until no longer producing) | TX-06-0217-001 | 0.00 | X | | |
| 1002 | MD America Energy, LLC | BARBARA ANN MANNING, INDIVIDUALLY AND AS CO-EXECUTRIX FOR THE ESTATE OF ELMER P. WARD | N/A | Lease | wn (until no longer producing) | TX-06-0219-001 | 0.00 | X | | |
| 1003 | MD America Energy, LLC | PEGGY CANNON, INDIVIDUALLY AND AS CO-EXECUTRIX FOR THE STATE OF ELMER P. WARD | N/A | Lease | wn (until no longer producing) | TX-06-0219-004 | 0.00 | X | | |
| 1004 | MD America Energy, LLC | MARIAN WARD, DEALING WITH HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-0219-002 | 0.00 | X | | |
| 1005 | MD America Energy, LLC | MARLICE WARD CLAYTON, INDIVIDUALLY AND AS CO-EXECUTRIX FOR THE ESTATE OF ELMER P. WARD | N/A | Lease | wn (until no longer producing) | TX-06-0219-003 | 0.00 | X | | |
| 1006 | MD America Energy, LLC | J. H. SCARES AND WIFE, DRUSCILLA SCATES | N/A | Lease | wn (until no longer producing) | TX-06-0218-001 | 0.00 | X | | |
| 1007 | MD America Energy, LLC | ELEANOR S. MORRISON | N/A | Lease | wn (until no longer producing) | TX-06-0221-001_P.HBP | 0.00 | X | | |
| 1008 | MD America Energy, LLC | GOODHUE W. SMITH, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0221-007_P.HBP | 0.00 | X | | |
| 1009 | MD America Energy, LLC | MARION T. COOLEY | N/A | Lease | wn (until no longer producing) | TX-06-0221-005_P.HBP | 0.00 | X | | |
| 1010 | MD America Energy, LLC | CITIZENS NATIONAL BANK OF MILAM COUNTY, AGENT FOR HILLIARD C. SMITH | N/A | Lease | wn (until no longer producing) | TX-06-0221-003_P.HBP | 0.00 | X | | |
| 1011 | MD America Energy, LLC | CITIZENS NATIONAL BANK OF MILAM COUNTY, AGENT FOR HILLIARD S. THOMAS ESTATE TRUST | N/A | Lease | wn (until no longer producing) | TX-06-0221-004_P.HBP | 0.00 | X | | |
| 1012 | MD America Energy, LLC | CITIZENS NATIONAL BANK OF MILAM COUNTY, AGENT FOR DEBORAH S. QUEBE | N/A | Lease | wn (until no longer producing) | TX-06-0221-002_P.HBP | 0.00 | X | | |
| 1013 | MD America Energy, LLC | VERNON MORROW | N/A | Lease | wn (until no longer producing) | TX-06-0221-009_P.HBP | 0.00 | X | | |
| 1014 | MD America Energy, LLC | WILLIAM K. MORROW | N/A | Lease | wn (until no longer producing) | TX-06-0221-010_P.HBP | 0.00 | X | | |
| 1015 | MD America Energy, LLC | GOODHUE W. SMITH III | N/A | Lease | wn (until no longer producing) | TX-06-0221-006_P.HBP | 0.00 | X | | |
| 1016 | MD America Energy, LLC | JAN M. SKAGGS | N/A | Lease | wn (until no longer producing) | TX-06-0221-008_P.HBP | 0.00 | X | | |
| 1017 | MD America Energy, LLC | GENE DOUGET, RECEIVER FOR GEORGE DUSTER AND THE UNKNOWN HEIRS OF GEORGE DUSTER (UNDER CAUSE NO. 0-00-63, 12TH DISTRICT COURT) | N/A | Lease | wn (until no longer producing) | TX-06-0219-005 | 0.00 | X | | |
| 1018 | MD America Energy, LLC | VINCENT B. MICHEL AND WIFE, MARLENE L. MICHEL | N/A | Lease | wn (until no longer producing) | TX-06-0223-001_P.HBP.VS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1019 | MD America Energy, LLC | GENE DOUGET, RECEIVER UNDER CAUSE NO. 0-00-117 OF THE 12TH DISTRICT COURT OF LEON COUNTY FOR HAYWOOD SMALL AND THE UNKNOWN HEIRS OF HAYWOOD SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0220-003 | 0.00 | X | | |
| 1020 | MD America Energy, LLC | GENE DOUGET, RECEIVER UNDER CAUSE NO. 0-00-117 OF THE 12TH DISTRICT COURT OF LEON COUNTY FOR HAYWOOD SMALL AND THE UNKNOWN HEIRS OF BILLIE HALL | N/A | Lease | wn (until no longer producing) | TX-06-0220-005 | 0.00 | X | | |
| 1021 | MD America Energy, LLC | GENE DOUGET, RECEIVER UNDER CAUSE NO. 0-00-117 OF THE 12TH DISTRICT COURT OF LEON COUNTY FOR GWINDOLYN MOSLEY AND THE UNKNOWN HEIRS OF GWINDOLYN MOSLEY | N/A | Lease | wn (until no longer producing) | TX-06-0220-001 | 0.00 | X | | |
| 1022 | MD America Energy, LLC | GENE DOUGET, RECEIVER UNDER CAUSE NO. 0-00-117 OF THE 12TH DISTRICT COURT OF LEON COUNTY FOR KENNETH SMALL AND THE UNKNOWN HEIRS OF KENNETH SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0220-004 | 0.00 | X | | |
| 1023 | MD America Energy, LLC | GENE DOUGET, RECEIVER UNDER CAUSE NO. 0-00-117 OF THE 12TH DISTRICT COURT OF LEON COUNTY FOR BILLY RAY SMALL AND THE UNKNOWN HEIRS OF BILL RAY SMALL | N/A | Lease | wn (until no longer producing) | TX-06-0220-002 | 0.00 | X | | |
| 1024 | MD America Energy, LLC | CARRIE L. WILSON, BY HER AGENT AND ATTORNEY-IN-FACT, JACK HAWKINS AND JACOB DUDLEY WILSON, TRUSTEE FOR THE NELSON WILSON TESTAMENTARY TRUST | N/A | Lease | wn (until no longer producing) | TX-06-0224-001 | 0.00 | X | | |
| 1025 | MD America Energy, LLC | PAUL R. VAHLDIEK, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0225-001 | 0.00 | X | | |
| 1026 | MD America Energy, LLC | JOHN P. WATSON AND GLADYS A. WATSON | N/A | Lease | wn (until no longer producing) | TX00147 | 0.00 | X | | |
| 1027 | MD America Energy, LLC | ROBERT W. CALDWELL, JR. AND WIFE, BEVERLY W. CALDWELL | N/A | Lease | wn (until no longer producing) | TX-03-0039 | 0.00 | X | | |
| 1028 | MD America Energy, LLC | H. K. ODOM, JR., INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF LINDA ODOM | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-07373 | 0.00 | X | | |
| 1029 | MD America Energy, LLC | BILLY M. PAYNE, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0052 | 0.00 | X | | |
| 1030 | MD America Energy, LLC | BILLY M. PAYNE, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0051 | 0.00 | X | | |
| 1031 | MD America Energy, LLC | MICHELE HARRIMAN | N/A | Lease | wn (until no longer producing) | TX-03-0008-007 | 0.00 | X | | |
| 1032 | MD America Energy, LLC | CHAP HARRIMAN | N/A | Lease | wn (until no longer producing) | TX-03-0008-006 | 0.00 | X | | |
| 1033 | MD America Energy, LLC | PHILLIP M. BLAIR AND YVONNE B. BLAIR, CO-TRUSTEES OF THE BLAIR FAMILY REVOCABLE LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0006-001 | 0.00 | X | | |
| 1034 | MD America Energy, LLC | JOHN E. BLAIR, III AND WIFE, DOROTHY J. BLAIR | N/A | Lease | wn (until no longer producing) | TX-03-0006-002 | 0.00 | X | | |
| 1035 | MD America Energy, LLC | KENNETH LEO ALLEN AND WIFE, NANCY ALLEN | N/A | Lease | wn (until no longer producing) | TX-03-0009 | 0.00 | X | | |
| 1036 | MD America Energy, LLC | LOUIS A. CHYTIL | N/A | Lease | wn (until no longer producing) | TX-03-0008-001_P.HBP | 0.00 | X | | |
| 1037 | MD America Energy, LLC | RONALD DEAN WARD, AGENT AND ATTORNEY-IN-FACT FOR LILLIAN WARD | N/A | Lease | wn (until no longer producing) | TX-03-0008-005_P.HBP | 0.00 | X | | |
| 1038 | MD America Energy, LLC | RONALD DEAN WARD A/K/A DEAN WARD | N/A | Lease | wn (until no longer producing) | TX-03-0010-002 | 0.00 | X | | |
| 1039 | MD America Energy, LLC | BARBARA H. OROSCO, INDIVIDUALLY, AND BARBARA H. OROSCO AND SALVADOR G. OROSCO, TRUSTEES OF THE OROSCO FAMILY TRUST DATED DECEMBER 7, 1988 | N/A | Lease | wn (until no longer producing) | TX-03-0010-001 | 0.00 | X | | |
| 1040 | MD America Energy, LLC | MARGARET THOMPSON AKA MARGUERITE C. THOMPSON | N/A | Lease | wn (until no longer producing) | TX-03-0008-004_P.HBP | 0.00 | X | | |
| 1041 | MD America Energy, LLC | CLARA JANE GRIFFIN | N/A | Lease | wn (until no longer producing) | TX-03-0008-003_P.HBP | 0.00 | X | | |
| 1042 | MD America Energy, LLC | DOROTHY DANIEL | N/A | Lease | wn (until no longer producing) | TX-03-0008-002_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1043 | MD America Energy, LLC | ROBERT D. DAVIDSON A/K/A ROBERT DUARD DAVIDSON AND WIFE JOY D. DAVIDSON | N/A | Lease | wn (until no longer producing) | TX-03-0023 | 0.00 | X | | |
| 1044 | MD America Energy, LLC | JEAN L. MOSES AND HUSBAND, DAYTON MOSES | N/A | Lease | wn (until no longer producing) | TX-03-0001-02 | 0.00 | X | | |
| 1045 | MD America Energy, LLC | JO ANN LOCKE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0001-01 | 0.00 | X | | |
| 1046 | MD America Energy, LLC | BRYAN W. SHAW A/K/A BRYAN WEBB SHAW AND WIFE, DANA L. SHAW A/K/A DANA LEE SHAW | N/A | Lease | wn (until no longer producing) | TX-03-0024-002 | 0.00 | X | | |
| 1047 | MD America Energy, LLC | MATTIE SUE WILSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0029-002_P.HBP.VS | 0.00 | X | | |
| 1048 | MD America Energy, LLC | MARY BETH ATKINSON JOINED BY HER HUSBAND DANIEL OLIN ATKINSON | N/A | Lease | wn (until no longer producing) | TX-03-0029-001_P.HBP.VS | 0.00 | X | | |
| 1049 | MD America Energy, LLC | RONNIE CRAIG, TEMPORARY ADMINISTRATOR OF THE ESTATE OF C.E. PAYNE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0024-003_P.HBP.VS | 0.00 | X | | |
| 1050 | MD America Energy, LLC | RONNIE CRAIG, TEMPORARY ADMINISTRATOR OF THE ESTATE OF C.E. PAYNE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0031-002 | 0.00 | X | | |
| 1051 | MD America Energy, LLC | RONNIE CRAIG, TEMPORARY ADMINISTRATOR OF THE ESTATE OF C. E. PAYNE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0027-002_P.HBP.VS | 0.00 | X | | |
| 1052 | MD America Energy, LLC | PEGGY PAYNE REED | N/A | Lease | wn (until no longer producing) | TX-03-0031-001 | 0.00 | X | | |
| 1053 | MD America Energy, LLC | PEGGY PAYNE REED | N/A | Lease | wn (until no longer producing) | TX-03-0027-001_P.HBP.VS | 0.00 | X | | |
| 1054 | MD America Energy, LLC | PEGGY PAYNE REED | N/A | Lease | wn (until no longer producing) | TX-03-0024-001_P.HBP.VS | 0.00 | X | | |
| 1055 | MD America Energy, LLC | PEGGY PAYNE REED | N/A | Lease | wn (until no longer producing) | TX-03-0025-001 | 0.00 | X | | |
| 1056 | MD America Energy, LLC | RONNIE CRAIG, TEMPORARY ADMINISTRATOR OF THE ESTATE OF C.E. PAYNE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0026-002 | 0.00 | X | | |
| 1057 | MD America Energy, LLC | RONNIE CRAIG, TEMPORARY ADMINISTRATOR OF THE ESTATE OF C.E. PAYNE, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0026-004 | 0.00 | X | | |
| 1058 | MD America Energy, LLC | PEGGY PAYNE REED | N/A | Lease | wn (until no longer producing) | TX-03-0026-001_P.HBP.VS | 0.00 | X | | |
| 1059 | MD America Energy, LLC | JARRET ROBISON, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-03-0017-006 | 0.00 | X | | |
| 1060 | MD America Energy, LLC | TAMARA ROBISON BURNETT, DEALING HEREIN WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0017-007 | 0.00 | X | | |
| 1061 | MD America Energy, LLC | WILLIAM HOEGEMERYER AND WIFE, JULIANNE S. HOEGEMEYER | N/A | Lease | wn (until no longer producing) | TX-03-0017-008 | 0.00 | X | | |
| 1062 | MD America Energy, LLC | KYLE W. HOEGEMEYER, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0017-004 | 0.00 | X | | |
| 1063 | MD America Energy, LLC | KYLE W. HOEGEMEYER, DEALING HEREIN WITH THIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0017-005 | 0.00 | X | | |
| 1064 | MD America Energy, LLC | T. HUGH THOMPSON AND WIFE, ELIZABETH THOMPSOM | N/A | Lease | wn (until no longer producing) | TX-03-0017-001 | 0.00 | X | | |
| 1065 | MD America Energy, LLC | MICHAEL L. GREER, JR. AND WIFE, SHARON GREER | N/A | Lease | wn (until no longer producing) | TX-03-0017-002 | 0.00 | X | | |
| 1066 | MD America Energy, LLC | BOB L. RYCHLIK AND WIFE, JEANETTE M. RYCHLIK | N/A | Lease | wn (until no longer producing) | TX-03-0017-003 | 0.00 | X | | |
| 1067 | MD America Energy, LLC | CHRIS H. HOEGEMEYER, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0017-009 | 0.00 | X | | |
| 1068 | MD America Energy, LLC | ANNA DELL SMITH AND ROSALIA CLEMENS | N/A | Lease | wn (until no longer producing) | TX-03-0038 | 0.00 | X | | |
| 1069 | MD America Energy, LLC | PHYLLIS BONIFAZI | N/A | Lease | wn (until no longer producing) | TX-03-0037 | 0.00 | X | | |
| 1070 | MD America Energy, LLC | OLIVER BISHOP, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0015 | 0.00 | X | | |
| 1071 | MD America Energy, LLC | WILLIAM L. STROMAN | N/A | Lease | wn (until no longer producing) | TX-03-0010-003 | 0.00 | X | | |
| 1072 | MD America Energy, LLC | HUGO J. ENDLER AND WIFE, ETHEL METZER ENDLER | N/A | Lease | wn (until no longer producing) | TX-03-0003 | 0.00 | X | | |
| 1073 | MD America Energy, LLC | STAN MALISKA AND LEISA MALISKA | N/A | Lease | wn (until no longer producing) | TX-03-0029-003_P.HBP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1074 | MD America Energy, LLC | TAUBER EXPLORATION & PRODUCTION COMPANY, A TEXAS CORPORATION | N/A | Lease | wn (until no longer producing) | TX-03-0028_P.HBP.VS | 0.00 | X | | |
| 1075 | MD America Energy, LLC | WINTHROP L. BENBOW AND MARK W. BENBOW, TRUSTEES OF THE ROBERT H. BENBOW IRREVOCABLE TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0025-003 | 0.00 | X | | |
| 1076 | MD America Energy, LLC | GLADYS MILDRED GANDY | N/A | Lease | wn (until no longer producing) | TX-03-0030-002_P.HBP.VS | 0.00 | X | | |
| 1077 | MD America Energy, LLC | DAVID E. MCWHORTER, SR. | N/A | Lease | wn (until no longer producing) | TX-03-0030-001_P.HBP.VS | 0.00 | X | | |
| 1078 | MD America Energy, LLC | AMY RUTH CASEY | N/A | Lease | wn (until no longer producing) | TX00239_P.HBP.HS | 0.00 | X | | |
| 1079 | MD America Energy, LLC | BILL J. COOLEY | N/A | Lease | wn (until no longer producing) | TX00014A_P.HBP | 0.00 | X | | |
| 1080 | MD America Energy, LLC | FRANCES BOSWELL COOLEY, A MARRIED WOMAN ACTING IN HER OWN RIGHT | N/A | Lease | wn (until no longer producing) | TX00014B_P.??? | 0.00 | X | | |
| 1081 | MD America Energy, LLC | ESTHER MAE MILLER | N/A | Lease | wn (until no longer producing) | TX00015_A.HBP | 0.00 | X | | |
| 1082 | MD America Energy, LLC | ELLOUISE COOK | N/A | Lease | wn (until no longer producing) | TX00013 | 0.00 | X | | |
| 1083 | MD America Energy, LLC | THE OLTMANN FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX00021B_P.HBP | 0.00 | X | | |
| 1084 | MD America Energy, LLC | CECIL SMITH | N/A | Lease | wn (until no longer producing) | TX00046A_P.HBP | 0.00 | X | | |
| 1085 | MD America Energy, LLC | J. W. MADDOX | N/A | Lease | wn (until no longer producing) | TX00010E_P.HBP | 0.00 | X | | |
| 1086 | MD America Energy, LLC | VADA C. JARVIS | N/A | Lease | wn (until no longer producing) | TX00010D_P.HBP | 0.00 | X | | |
| 1087 | MD America Energy, LLC | MELVIN A. REIMER | N/A | Lease | wn (until no longer producing) | TX00010A_P.HBP.HS | 0.00 | X | | |
| 1088 | MD America Energy, LLC | JACQUELINE GERTRUDE BARNETT HAMBRIC | N/A | Lease | wn (until no longer producing) | TX00012_A.HBP.HS | 0.00 | X | | |
| 1089 | MD America Energy, LLC | Q. JOSEPH MACHAC AND ELLA E. MACHAC, TRUSTEES OF THE Q. JOSEPH & ELLA E. MACHAC LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00010B_P.HBP | 0.00 | X | | |
| 1090 | MD America Energy, LLC | ELEANOR STEGER MADDOX | N/A | Lease | wn (until no longer producing) | TX00010C_P.HBP.HS | 0.00 | X | | |
| 1091 | MD America Energy, LLC | GARY LYNN COFFEY | N/A | Lease | wn (until no longer producing) | TX00047B_P.HBP | 0.00 | X | | |
| 1092 | MD America Energy, LLC | DEBRA ANN COFFEY | N/A | Lease | wn (until no longer producing) | TX00047A_P.HBP | 0.00 | X | | |
| 1093 | MD America Energy, LLC | LONNIE O. MILLS, SR. AND BRENITA MILLS | N/A | Lease | wn (until no longer producing) | TX00106_P.HBP | 0.00 | X | | |
| 1094 | MD America Energy, LLC | THURMAN CHARLES WALKER | N/A | Lease | wn (until no longer producing) | TX00031A_P.HBP | 0.00 | X | | |
| 1095 | MD America Energy, LLC | DON AND JEAN BRADSHAW REVOCABLE TRUST | N/A | Lease | wn (until no longer producing) | TX00030_A.HBP.VS | 0.00 | X | | |
| 1096 | MD America Energy, LLC | ROBERT C. HOMER AND WIFE, GLENDA SUE HOMER | N/A | Lease | wn (until no longer producing) | TX00016_A.HBP | 0.00 | X | | |
| 1097 | MD America Energy, LLC | PAULINE BENBOW WESTBROOK TRANT | N/A | Lease | wn (until no longer producing) | TX-03-0025-002 | 0.00 | X | | |
| 1098 | MD America Energy, LLC | LINDA JEAN UTECHT DAVIS | N/A | Lease | wn (until no longer producing) | TX00027F_A.HBP | 0.00 | X | | |
| 1099 | MD America Energy, LLC | THOMAS BRICE BATSON | N/A | Lease | wn (until no longer producing) | TX00032A_P.HBP | 0.00 | X | | |
| 1100 | MD America Energy, LLC | LOUISE BARNETT | N/A | Lease | wn (until no longer producing) | TX00024A_P.HBP | 0.00 | X | | |
| 1101 | MD America Energy, LLC | BRIAN ROY BAKER | N/A | Lease | wn (until no longer producing) | TX00027A_P.HBP | 0.00 | X | | |
| 1102 | MD America Energy, LLC | JOE EUGENE PETERSON | N/A | Lease | wn (until no longer producing) | TX00018 | 0.00 | X | | |
| 1103 | MD America Energy, LLC | SHIRLEY UTECHT TURLEY-HUEBNER | N/A | Lease | wn (until no longer producing) | TX00024D_P.HBP | 0.00 | X | | |
| 1104 | MD America Energy, LLC | BETH RUTH UTECHT STECKMAN | N/A | Lease | wn (until no longer producing) | TX00024B_P.HBP | 0.00 | X | | |
| 1105 | MD America Energy, LLC | ROBERT M. MCGILL, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX00034_A.HBP | 0.00 | X | | |
| 1106 | MD America Energy, LLC | WELDON SMITH & CARLEEN SMITH, TRUSTEES OF THE WELDON AND CARLEEN SMITH FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX00023_A.HBP | 0.00 | X | | |
| 1107 | MD America Energy, LLC | PEGGY UTECHT HOLLOMAN | N/A | Lease | wn (until no longer producing) | TX00024C_P.HBP | 0.00 | X | | |
| 1108 | MD America Energy, LLC | IMOGENE ISAAC WEATHERFORD | N/A | Lease | wn (until no longer producing) | TX00022B_P.HBP | 0.00 | X | | |
| 1109 | MD America Energy, LLC | KATHYRN THOMPSON CATHEY | N/A | Lease | wn (until no longer producing) | TX00046E_P.HBP.HS | 0.00 | X | | |
| 1110 | MD America Energy, LLC | FRANCES THOMPSON SHURE | N/A | Lease | wn (until no longer producing) | TX00046F_P.HBP.HS | 0.00 | X | | |
| 1111 | MD America Energy, LLC | SAM BEN HARRIS, AND WIFE, MYRA HARRIS | N/A | Lease | wn (until no longer producing) | TX00035_A.HBP | 0.00 | X | | |
| 1112 | MD America Energy, LLC | PATRICIA MANN EZZELL | N/A | Lease | wn (until no longer producing) | TX00048B_P.HBP | 0.00 | X | | |
| 1113 | MD America Energy, LLC | GREGORY S. WILLEMS | N/A | Lease | wn (until no longer producing) | TX00022A_P.HBP.HS | 0.00 | X | | |
| 1114 | MD America Energy, LLC | WILFRED DAINTY, II AND WIFE, LAURA DAINTY | N/A | Lease | wn (until no longer producing) | TX00017_A.HBP | 0.00 | X | | |
| 1115 | MD America Energy, LLC | DIANE FIELDS | N/A | Lease | wn (until no longer producing) | TX00048A_P.HBP | 0.00 | X | | |
| 1116 | MD America Energy, LLC | NORMA EVELYN MOSLEY BURKHARDT | N/A | Lease | wn (until no longer producing) | TX00043_A.HBP | 0.00 | X | | |
| 1117 | MD America Energy, LLC | GREGORY MCBEE | N/A | Lease | wn (until no longer producing) | TX00029M_P.HBP | 0.00 | X | | |
| 1118 | MD America Energy, LLC | DOROTHY I. DAVIS (AKA IMOGENE W. DAVIS) | N/A | Lease | wn (until no longer producing) | TX00029D_P.HBP.HS | 0.00 | X | | |
| 1119 | MD America Energy, LLC | OVA LEE HARRIS | N/A | Lease | wn (until no longer producing) | TX00029A_P.HBP | 0.00 | X | | |
| 1120 | MD America Energy, LLC | JANET SUE CASEY | N/A | Lease | wn (until no longer producing) | TX00029C_P.HBP.HS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1121 | MD America Energy, LLC | GEORGE G. MCBEE AND WIFE IDA JANE MCBEE | N/A | Lease | wn (until no longer producing) | TX-03-0018 | 0.00 | X | | |
| 1122 | MD America Energy, LLC | FREDRICK R. MILLER AND WIFE, CAROL MILLER | N/A | Lease | wn (until no longer producing) | TX-03-0019-002 | 0.00 | X | | |
| 1123 | MD America Energy, LLC | ORLAN WEATHERFORD AND WIFE, MARY DELL WEATHERFORD | N/A | Lease | wn (until no longer producing) | TX00038_A.HBP | 0.00 | X | | |
| 1124 | MD America Energy, LLC | ALLEN J. SEGAL, TRUSTEE OF THE SHEPHERD CREEK IRREVOCABLE TRUST | N/A | Lease | wn (until no longer producing) | TX00011A_P.HPB.VS | 0.00 | X | | |
| 1125 | MD America Energy, LLC | BRUCE WALLER | N/A | Lease | wn (until no longer producing) | TX00029E_P.HBP.HS | 0.00 | X | | |
| 1126 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE OF THE MARTHA ANN FLEMING CURTIS 1982 TRUST | N/A | Lease | wn (until no longer producing) | TX00011E_P.HBP.VS | 0.00 | X | | |
| 1127 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE OF THE NAOMI LURLYN FLEMING TRUST | N/A | Lease | wn (until no longer producing) | TX00011F_P.HBP.VS | 0.00 | X | | |
| 1128 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE OF FLEMING SHAMBLIN 1982 TRUST | N/A | Lease | wn (until no longer producing) | TX00011D_P.HBP.VS | 0.00 | X | | |
| 1129 | MD America Energy, LLC | PATSY WALLER JACK | N/A | Lease | wn (until no longer producing) | TX00029F_P.HBP.HS | 0.00 | X | | |
| 1130 | MD America Energy, LLC | PAMILA WALLER MARBLE | N/A | Lease | wn (until no longer producing) | TX00029B_P.HBP.HS | 0.00 | X | | |
| 1131 | MD America Energy, LLC | MR. EARL LEIGHMAN JOINED PRO FORMA BY HIS WIFE MARILYN R. LEIGHMAN | N/A | Lease | wn (until no longer producing) | TX-03-0033_A.HBP | 0.00 | X | | |
| 1132 | MD America Energy, LLC | H. DAVID POPE JR, AND WIFE CAROL C. POPE | N/A | Lease | wn (until no longer producing) | TX00029L_P.HBP | 0.00 | X | | |
| 1133 | MD America Energy, LLC | PATRICIA A. PAVELOCK | N/A | Lease | wn (until no longer producing) | TX00042_A.HBP.VS | 0.00 | X | | |
| 1134 | MD America Energy, LLC | SARA ADAMS JENNINGS JOINED PRO FORMA BY HUSBAND ADOLPHUS Y. JENNINGS | N/A | Lease | wn (until no longer producing) | TX-03-0032_A.HBP.VS | 0.00 | X | | |
| 1135 | MD America Energy, LLC | TODD A. AND LAURIE G. REGALADO | N/A | Lease | wn (until no longer producing) | TX00032C_P.HBP | 0.00 | X | | |
| 1136 | MD America Energy, LLC | HOMER HILDERBRANDT AND WIFE ROSA LEE HILDERBRANDT | N/A | Lease | wn (until no longer producing) | TX00029AI_P.HBP.VS | 0.00 | X | | |
| 1137 | MD America Energy, LLC | TERRY HILDEBRANDT | N/A | Lease | wn (until no longer producing) | TX00029AL_P.HBP.VS | 0.00 | X | | |
| 1138 | MD America Energy, LLC | MARILYN GEYER | N/A | Lease | wn (until no longer producing) | TX00029G_P.HBP | 0.00 | X | | |
| 1139 | MD America Energy, LLC | WEB/CON, INC. | N/A | Lease | wn (until no longer producing) | TX00010F | 0.00 | X | | |
| 1140 | MD America Energy, LLC | DIAMOND 7 LAND & CATTLE CO. | N/A | Lease | wn (until no longer producing) | TX00011B_P.HBP.VS | 0.00 | X | | |
| 1141 | MD America Energy, LLC | BERGFELD LAND & MINERALS GROUP, LLC | N/A | Lease | wn (until no longer producing) | TX-03-0019-001 | 0.00 | X | | |
| 1142 | MD America Energy, LLC | OLIVER BISHOP, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0016 | 0.00 | X | | |
| 1143 | MD America Energy, LLC | EMMA RUTH ANDREWS SPARKS | N/A | Lease | wn (until no longer producing) | TX00020_A.HBP | 0.00 | X | | |
| 1144 | MD America Energy, LLC | CAROL LYNN LOYD | N/A | Lease | wn (until no longer producing) | TX00019B_P.HBP | 0.00 | X | | |
| 1145 | MD America Energy, LLC | KATHRYN ELIZABETH CLARKE | N/A | Lease | wn (until no longer producing) | TX00019A_P.HBP | 0.00 | X | | |
| 1146 | MD America Energy, LLC | GARY E. SHERRILL AND WIFE, VIVIAN D. SHERRILL | N/A | Lease | wn (until no longer producing) | TX00040_A.HBP | 0.00 | X | | |
| 1147 | MD America Energy, LLC | VOLLIE G. GRIFFIN | N/A | Lease | wn (until no longer producing) | TX00039 | 0.00 | X | | |
| 1148 | MD America Energy, LLC | J. RAY ISGITT ET UX BRENDA ISGITT | N/A | Lease | wn (until no longer producing) | TX00052 | 0.00 | X | | |
| 1149 | MD America Energy, LLC | HARDY LYNN NEVILL | N/A | Lease | wn (until no longer producing) | TX00041 | 0.00 | X | | |
| 1150 | MD America Energy, LLC | JAMES HARDY NEVILL AND WIFE JOYCE M. NEVILL | N/A | Lease | wn (until no longer producing) | TX00044_A.HBP.VS | 0.00 | X | | |
| 1151 | MD America Energy, LLC | JOHN C. ADAMS, III, ET UX, NANCY ADAMS | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0303-01253_A.HBP.VS | 0.00 | X | | |
| 1152 | MD America Energy, LLC | OLEN L. WILLIAMSON | N/A | Lease | wn (until no longer producing) | TX00054 | 0.00 | X | | |
| 1153 | MD America Energy, LLC | HOMER HILDEBRANDT AND WIFE ROSA LEE HILDEBRANDT | N/A | Lease | wn (until no longer producing) | TX00049_A.HBP.VS | 0.00 | X | | |
| 1154 | MD America Energy, LLC | SHAWN DONALD HARMAN, INDIVIDUALLY AND AS INDEPENDENT OF ADMINISTRATOR OF THE ESTATE OF BILLYE BROADWAY HARMAN | N/A | Lease | | | TX00051 | 0.00 | X | | |
| 1155 | MD America Energy, LLC | JAMES ROY SCHUTT AND WIFE CATHY S. SCHUTT | N/A | Lease | wn (until no longer producing) | TX00029N_P.HBP | 0.00 | X | | |
| 1156 | MD America Energy, LLC | JOHN C. ADAMS III, ET UX, NANCY ADAMS | N/A | Lease | wn (until no longer producing) | TX-03-0035_P.HBP.VS | 0.00 | X | | |
| 1157 | MD America Energy, LLC | NICOLE INGRAM JOHNSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0036-002_P.HBP.VS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1158 | MD America Energy, LLC | G. HOLTON INGRAM, JR. AS ATTORNEY-IN-FACT FOR CHRISTOPHER INGRAM | N/A | Lease | wn (until no longer producing) | TX-03-0036-003_P.HBP.VS | 0.00 | X | | |
| 1159 | MD America Energy, LLC | MARY ELIZABETH ADAMS INGRAM IRREVOCABLE TRUST, FIRST NATIONAL BANK OF BRYAN, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0036-001_P.HBP.VS | 0.00 | X | | |
| 1160 | MD America Energy, LLC | DANNY CROCKER | N/A | Lease | wn (until no longer producing) | TX00056B | 0.00 | X | | |
| 1161 | MD America Energy, LLC | BETTY FRANCES CROCKER GRAY | N/A | Lease | wn (until no longer producing) | TX00056A | 0.00 | X | | |
| 1162 | MD America Energy, LLC | PAUL SMITH | N/A | Lease | wn (until no longer producing) | TX00056F | 0.00 | X | | |
| 1163 | MD America Energy, LLC | PEGGY VAN DUSSELDORP | N/A | Lease | wn (until no longer producing) | TX00057A | 0.00 | X | | |
| 1164 | MD America Energy, LLC | RONALD SMITH | N/A | Lease | wn (until no longer producing) | TX00056E | 0.00 | X | | |
| 1165 | MD America Energy, LLC | JOE DAN MCDOUGALD | N/A | Lease | wn (until no longer producing) | TX00050A | 0.00 | X | | |
| 1166 | MD America Energy, LLC | DONAL AND BETTY RUTH VERNON | N/A | Lease | wn (until no longer producing) | TX00056H | 0.00 | X | | |
| 1167 | MD America Energy, LLC | DANIEL E. VERNON JR. | N/A | Lease | wn (until no longer producing) | TX00056D_P.HBP | 0.00 | X | | |
| 1168 | MD America Energy, LLC | SANDRA DENMAN COLE | N/A | Lease | wn (until no longer producing) | TX00053A | 0.00 | X | | |
| 1169 | MD America Energy, LLC | BOBBY DENMAN AND JUDY DENMAN | N/A | Lease | wn (until no longer producing) | TX00053B | 0.00 | X | | |
| 1170 | MD America Energy, LLC | BOBBY DENMAN AND JUDY DENMAN | N/A | Lease | wn (until no longer producing) | TX00055 | 0.00 | X | | |
| 1171 | MD America Energy, LLC | MICHAEL ARLEN TILLER | N/A | Lease | wn (until no longer producing) | TX00036E_P.HBP | 0.00 | X | | |
| 1172 | MD America Energy, LLC | LESLIE VERNON JR. | N/A | Lease | wn (until no longer producing) | TX00056C | 0.00 | X | | |
| 1173 | MD America Energy, LLC | WALTER EARL ROGERS | N/A | Lease | wn (until no longer producing) | TX00050B | 0.00 | X | | |
| 1174 | MD America Energy, LLC | BONNIE ROGERS THOMPSON | N/A | Lease | wn (until no longer producing) | TX00050C | 0.00 | X | | |
| 1175 | MD America Energy, LLC | ARLENE MCMAHAN LOVING | N/A | Lease | wn (until no longer producing) | TX00059B_P.HBP | 0.00 | X | | |
| 1176 | MD America Energy, LLC | EDITH DENMAN AND JAMES OLEN DENMAN | N/A | Lease | wn (until no longer producing) | TX00060 | 0.00 | X | | |
| 1177 | MD America Energy, LLC | GERTRUDE CHANEY, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF DALE R. CHANEY, DECEASED | N/A | Lease | wn (until no longer producing) | TX00045B | 0.00 | X | | |
| 1178 | MD America Energy, LLC | CHARLES AND ANTIONETTE PATRONELLA | N/A | Lease | wn (until no longer producing) | TX00063_A.HBP | 0.00 | X | | |
| 1179 | MD America Energy, LLC | SARA ADAMS JENNINGS JOINED PRO FORMA BY HUSBAND ADOLPHUS Y. JENNINGS | N/A | Lease | wn (until no longer producing) | TX-03-0040-001_P.HBP.VS | 0.00 | X | | |
| 1180 | MD America Energy, LLC | MARY ELIZABETH ADAMS INGRAM IRREVOCABLE TRUST, FIRST NATIONAL BANK OF BRYAN, TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0040-002_P.HBP.VS | 0.00 | X | | |
| 1181 | MD America Energy, LLC | DUANE GEYER | N/A | Lease | wn (until no longer producing) | TX00029H_P.HBP.HS | 0.00 | X | | |
| 1182 | MD America Energy, LLC | THELMA AKERS, INDIVIDUALLY AND AS TRUSTEE OF THE THELMA AND J.D. AKERS REVOCABLE LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00037_A.HBP | 0.00 | X | | |
| 1183 | MD America Energy, LLC | WILLIAM S. ROGERS, DEALING WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0100-04_P.HBP.VS | 0.00 | X | | |
| 1184 | MD America Energy, LLC | MICHAEL A. CHESSER, CO-TRUSTEE OF THE V. A. JOHNSTON FAMILY TRUST AND DAVID A. PREWITT, CO-TRUSTEE OF THE V. A. JOHNSTON FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0100-03_P.HBP.VS | 0.00 | X | | |
| 1185 | MD America Energy, LLC | BETTY T. JOHNSTON, CO-TRUSTEE OF THE BETTY T. JOHNSTON MARITAL TRUST, PAUL M. HARDWICK, CO-TRUSTEE OF THE BETTY T. JOHNSTON MARITAL TRUST, AND LYLE E. CARBAUGH, CO-TRUSTEE OF THE BETTY T. JOHNSTON MARITAL TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0100-02_P.HBP.VS | 0.00 | X | | |
| 1186 | MD America Energy, LLC | JEFFREY GLEN BARNETT AND DAVID ALLEN BARNETT | N/A | Lease | wn (until no longer producing) | TX00101_P.HBP | 0.00 | X | | |
| 1187 | MD America Energy, LLC | EULA MAY JOHNSTON TRUST, BANK OF AMERICA, N.A., TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0100-01_P.HBP.HSVS | 0.00 | X | | |
| 1188 | MD America Energy, LLC | JIM C. WALL AND WIFE AMY B. WALL | N/A | Lease | wn (until no longer producing) | TX-03-0041_P.HBP.HSVS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1189 | MD America Energy, LLC | BLACK STONE MINERALS COMPANY, L.P., A DELAWARE LIMITED PARTNERSHIP, INDIVIDUALLY AND ON BEHALF OF THE GRANTEES (AND THEIR SUCCESSORS, IF APPLICABLE), UNDER THAT CERTAIN MINERAL AND ROYALTY DEED EFFECTIVE OCTOBER 1, 2003, RECORDED IN VOLUME 1088, PAGE 71, FILE NUMBER 193125 OF THE OFFICIAL PUBLIC RECORDS OF GRIMES COUNTY, TEXAS, AND IVORY ACQUISITIONS PARTNERS, L.P., A DELAWARE LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-07442_P.HBP | 0.00 | X | | |
| 1190 | MD America Energy, LLC | WILEY W. BRYANT | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-07459 | 0.00 | X | | |
| 1191 | MD America Energy, LLC | PAMELA K. BUCK | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-07434 | 0.00 | X | | |
| 1192 | MD America Energy, LLC | WENDELL MOSLEY AND WIFE, REGINA JAMIESON MOSLEY | N/A | Lease | wn (until no longer producing) | TX00007B_P.HBP.HS.VS | 0.00 | X | | |
| 1193 | MD America Energy, LLC | LOUIS B. HOLDER AND WIFE, SEWRETHA HOLDER | N/A | Lease | wn (until no longer producing) | TX00007A_P.HBP.HS.VS | 0.00 | X | | |
| 1194 | MD America Energy, LLC | ALBERT GONZALES AND WIFE, DONNA GONZALES | N/A | Lease | wn (until no longer producing) | TX00005_A.HBP.VS | 0.00 | X | | |
| 1195 | MD America Energy, LLC | LEOLA BOSWELL, A WIDOW, APPEARING HEREIN THROUGH HER AGENT AND ATTORNEY-IN-FACT, DORIS A. FREEMAN | N/A | Lease | wn (until no longer producing) | TX00006A_P.HBP.VS | 0.00 | X | | |
| 1196 | MD America Energy, LLC | WANDA S. PATRICK AND HUSBAND, GLENN W. PATRICK | N/A | Lease | wn (until no longer producing) | TX00006B_P.HBP.VS | 0.00 | X | | |
| 1197 | MD America Energy, LLC | JACKIE L. BENNETT, INDIVIDUALLY, AND AS AGENT AND ATTORNEY-IN-FACT FOR JEWEL A. CROCKER AND, DEANNA L. BENNETT | N/A | Lease | wn (until no longer producing) | TX00004_A.HBP.VS | 0.00 | X | | |
| 1198 | MD America Energy, LLC | DONNA J. VENABLE & DAVID G. GRIMMER, JTCWROS | N/A | Lease | wn (until no longer producing) | TX00002G_A.HBP.DL | 0.00 | X | | |
| 1199 | MD America Energy, LLC | JOYCE H. VENABLE, IND AS ATTORNEY IN FACT FOR BOBBIE JEAN VENABLE | N/A | Lease | wn (until no longer producing) | TX00002C_P.HBP.DL.HS | 0.00 | X | | |
| 1200 | MD America Energy, LLC | PEGGY A. CLUTE AND DONALD R. CLUTE | N/A | Lease | wn (until no longer producing) | TX00002D_P.HBP.DL.HS | 0.00 | X | | |
| 1201 | MD America Energy, LLC | PATRICIA HAYES AND WILLIE D. HAYES | N/A | Lease | wn (until no longer producing) | TX00002B_P.HBP.DL.HS | 0.00 | X | | |
| 1202 | MD America Energy, LLC | ISAAC E. SHIFLET AND WIFE, MARGARET L. SHIFLET | N/A | Lease | wn (until no longer producing) | TX00002A_P.HBP.DL | 0.00 | X | | |
| 1203 | MD America Energy, LLC | GEORGE A. RICHARDSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0042_A.HBP.VS | 0.00 | X | | |
| 1204 | MD America Energy, LLC | AARON M. PRUITT AND WIFE, ANNE E. PRUITT | N/A | Lease | wn (until no longer producing) | TX00002E_P.HBP.VS | 0.00 | X | | |
| 1205 | MD America Energy, LLC | WILLIE R. UTECHT | N/A | Lease | wn (until no longer producing) | TX00238B_P.HBP | 0.00 | X | | |
| 1206 | MD America Energy, LLC | GLENDA UTECHT STAPLES AND HUSBAND MARK STAPLES | N/A | Lease | wn (until no longer producing) | TX00238A_P.HBP | 0.00 | X | | |
| 1207 | MD America Energy, LLC | WILLIAM ROYCE HENSARLING, A MARRIED MAN DEALING HEREIN WITH HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-08238_A.HBP | 0.00 | X | | |
| 1208 | MD America Energy, LLC | WALLACE MEEKS, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029AJ_P.HBP.VS | 0.00 | X | | |
| 1209 | MD America Energy, LLC | CHRISTOPHER LEE CALVERY AND WIFE, DARLA ELAINE CALVERY | N/A | Lease | wn (until no longer producing) | TX00237_A.HBP.VS | 0.00 | X | | |
| 1210 | MD America Energy, LLC | KIRBY MINERALS, AN OKLAHOMA GENERAL PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX00001B_P.HBP.HS.VS | 0.00 | X | | |
| 1211 | MD America Energy, LLC | CHARLES F. UTZ AND WIFE, JEANETTE M. UTZ | N/A | Lease | wn (until no longer producing) | TX00061 | 0.00 | X | | |
| 1212 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE OF THE NAOMI LURLYN FLEMING TRUST | N/A | Lease | wn (until no longer producing) | TX00125 | 0.00 | X | | |
| 1213 | MD America Energy, LLC | CHERYL L. LINDBERG, AGENT OF THE SHEPARD CREEK IRREVOCABLE TRUST | N/A | Lease | wn (until no longer producing) | TX00125A | 0.00 | X | | |
| 1214 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE3 OF PAMELA FLEMING SHAMBLIN 1982 TRUST | N/A | Lease | wn (until no longer producing) | TX00125C | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1215 | MD America Energy, LLC | LURLYN JANUARY FLEMING, TRUSTEE OF THE MARTHA ANN FLEMING CURTIS 1982 TRUST | N/A | Lease | wn (until no longer producing) | TX00125B | 0.00 | X | | |
| 1216 | MD America Energy, LLC | MICHAEL J. PIESCHE AND WIFE, SHERRI R. PIESCHE | N/A | Lease | wn (until no longer producing) | TX00002F_P.HBP.VS | 0.00 | X | | |
| 1217 | MD America Energy, LLC | DANNY I. CROCKER AND WIFE, DELORES ANN CROCKER | N/A | Lease | wn (until no longer producing) | TX00003_A.HBP.DL | 0.00 | X | | |
| 1218 | MD America Energy, LLC | BELINDA COLWELL | N/A | Lease | wn (until no longer producing) | TX00081B_P.HBP | 0.00 | X | | |
| 1219 | MD America Energy, LLC | WACHOVIA BANK N A AS SUCCESSOR TRUSTEE OF THE JAMES C. STILLWAGON TRUST U/W FBO PAMELA A. FONTENOT (A.K.A PAMELA JO STILLWAGON) HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08149_P.HBP.VS | 0.00 | X | | |
| 1220 | MD America Energy, LLC | JAMES C. STILLWAGON, II, AS TRUSTEE OF THE JAMES C. STILLWAGON, II, FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX00103 | 0.00 | X | | |
| 1221 | MD America Energy, LLC | KAREN H. WILSON, TRUSTEE OF THE JAMES D. WILSON, JR. FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX00096 | 0.00 | X | | |
| 1222 | MD America Energy, LLC | BARBARA HIBBETTS WILSON, A SINGLE WOMAN; TRAVIS F. HIBBETTS, A MARRIED MAN HEREIN DEALING IN HIS SOLE AND SEPARATE PROPERTY; CARL R. HIBBETTS, A MARRIED MAN HEREIN DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00074A | 0.00 | X | | |
| 1223 | MD America Energy, LLC | JOHN P. WATSON AND WIFE, GLADYS A. WATSON | N/A | Lease | wn (until no longer producing) | TX00062A | 0.00 | X | | |
| 1224 | MD America Energy, LLC | CLAY MICHAEL ROTH TRUST UNDER THE WILL OF BARBARA CLAY RUTHERFORD CLAY MICHAEL ROTH TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0044-010 | 0.00 | X | | |
| 1225 | MD America Energy, LLC | RENEE CLAY FAGAN; TRUSTEE OF THE RENEE CLAY FAGAN TRUST UNDER THE LAST WILL AND TESTAMENT OF EUGENE J. CLAY; DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0044-009 | 0.00 | X | | |
| 1226 | MD America Energy, LLC | HARRY BELL AND WIFE VIRGINIA S. BELL | N/A | Lease | wn (until no longer producing) | TX00036B_P.HBP | 0.00 | X | | |
| 1227 | MD America Energy, LLC | JOE PAUL WRIGHT AND WIFE GINIA WRAY WRIGHT | N/A | Lease | wn (until no longer producing) | TX00036A_P.HBP | 0.00 | X | | |
| 1228 | MD America Energy, LLC | JOSEPH S. GUMINA, JR. AND WIFE TERRYE S. GUMINA | N/A | Lease | wn (until no longer producing) | TX00036C_P.HBP | 0.00 | X | | |
| 1229 | MD America Energy, LLC | JACK D. KEY AND WIFE KAREN KEY | N/A | Lease | wn (until no longer producing) | TX00036D_P.HBP | 0.00 | X | | |
| 1230 | MD America Energy, LLC | CELIA A CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-011 | 0.00 | X | | |
| 1231 | MD America Energy, LLC | KATHRYN CLAY MARTINE TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0044-008 | 0.00 | X | | |
| 1232 | MD America Energy, LLC | ANN ADAMS MELVIN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08187_A.HBP.HSVS | 0.00 | X | | |
| 1233 | MD America Energy, LLC | LAURA L CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-013 | 0.00 | X | | |
| 1234 | MD America Energy, LLC | ORLAN WEATHERFORD AND WIFE, MARY DELL WEATHERFORD | N/A | Lease | wn (until no longer producing) | TX00081A_P.HBP.HS | 0.00 | X | | |
| 1235 | MD America Energy, LLC | JAMES ROY SCHUTT AND WIFT, CATHY S. SCHUTT | N/A | Lease | wn (until no longer producing) | TX0029J | 0.00 | X | | |
| 1236 | MD America Energy, LLC | ANNETTE MEASELL AND HUSBAND, SCOTT MEASELL | N/A | Lease | wn (until no longer producing) | TX00097 | 0.00 | X | | |
| 1237 | MD America Energy, LLC | DENNIE WILSON AND WIFE, MARGARET ANN WILSON | N/A | Lease | wn (until no longer producing) | TX00064A | 0.00 | X | | |
| 1238 | MD America Energy, LLC | EMILY JANE LOTT | N/A | Lease | wn (until no longer producing) | TX00071C_P.HBP | 0.00 | X | | |
| 1239 | MD America Energy, LLC | MARY LOTT LEE | N/A | Lease | wn (until no longer producing) | TX00071B_P.HBP | 0.00 | X | | |
| 1240 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0000-00653_A.HBP.DL | 0.00 | X | | |
| 1241 | MD America Energy, LLC | TRAVIS GENE WINDHAM | N/A | Lease | wn (until no longer producing) | TX0069 | 0.00 | X | | |
| 1242 | MD America Energy, LLC | DANIEL DINGLEDINE AND CHARLOTTE DINGLEDINE | N/A | Lease | wn (until no longer producing) | TX00064B | 0.00 | X | | |
| 1243 | MD America Energy, LLC | JOHN DENNIS MAY AND VIRGINIA B. MAY | N/A | Lease | wn (until no longer producing) | TX0068 | 0.00 | X | | |
| 1244 | MD America Energy, LLC | JOHN DENNIS MAY | N/A | Lease | wn (until no longer producing) | TX0067 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1245 | MD America Energy, LLC | VALENTINE F. SHARE AND ELLEN M. SHARE | N/A | Lease | wn (until no longer producing) | TX00066A | 0.00 | X | | |
| 1246 | MD America Energy, LLC | ANTHONY COLWELL | N/A | Lease | wn (until no longer producing) | TX00081C_P.HBP.HS | 0.00 | X | | |
| 1247 | MD America Energy, LLC | ROSANNE CLAY OLIVER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0044-015_P.HBP.VS | 0.00 | X | | |
| 1248 | MD America Energy, LLC | THOMAS JOSEPH CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-012 | 0.00 | X | | |
| 1249 | MD America Energy, LLC | WILLIAM W. CROCKER, ALSO KNOWN AS BILLY WAYNE CROCKER | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-XXXX-07460 | 0.00 | X | | |
| 1250 | MD America Energy, LLC | RICHARD LOUIS CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-016 | 0.00 | X | | |
| 1251 | MD America Energy, LLC | MARY LOUISE CLAY CHARRIN | N/A | Lease | wn (until no longer producing) | TX-03-0044-018 | 0.00 | X | | |
| 1252 | MD America Energy, LLC | DAVID HENRY CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-002 | 0.00 | X | | |
| 1253 | MD America Energy, LLC | RALPH WALTER CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-003 | 0.00 | X | | |
| 1254 | MD America Energy, LLC | DARRELL R. HALL AND WIFE, SUE H. HALL | N/A | Lease | wn (until no longer producing) | TX00071A_P.HBP | 0.00 | X | | |
| 1255 | MD America Energy, LLC | DONALD EUGENE CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-001 | 0.00 | X | | |
| 1256 | MD America Energy, LLC | ELLWOOD T. BARRETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00033_A.HBP.DL | 0.00 | X | | |
| 1257 | MD America Energy, LLC | DIANE BERNICE CLAY SHANNAHAN | N/A | Lease | wn (until no longer producing) | TX-03-0044-004 | 0.00 | X | | |
| 1258 | MD America Energy, LLC | OLIN O. HAMMER AND WIFE, CAROL A. HAMMER | N/A | Lease | wn (until no longer producing) | TX00072A | 0.00 | X | | |
| 1259 | MD America Energy, LLC | JOYCE ANN DONAHO, JOINED BY HER HUSBAND, W. F. DONAHO | N/A | Lease | wn (until no longer producing) | TX-03-0044-014 | 0.00 | X | | |
| 1260 | MD America Energy, LLC | MARY K. BURKS, (FORMERLY MARY K. CANTRELL), DEALING IN HER SOLE & SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029Y_P.HBP.VS | 0.00 | X | | |
| 1261 | MD America Energy, LLC | JANE MARIE THATCHER, (FORMERLY JANE MARIE CANTRELL), DEALING IN HER SOLE & SEPARATE PROPERTY | N/A | Lease | | | TX00029AG_P.HBP.VS | 0.00 | X | | |
| 1262 | MD America Energy, LLC | GREGORY ALLEN PRUITT AND WIFE LINDA DIANNE PRUITT | N/A | Lease | wn (until no longer producing) | TX00029O_P.HBP.VS | 0.00 | X | | |
| 1263 | MD America Energy, LLC | PHYLLIS JANE HUGHES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029P_P.HBP.VS | 0.00 | X | | |
| 1264 | MD America Energy, LLC | DORROR KAY BEYER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029Q_P.HBP.VS | 0.00 | X | | |
| 1265 | MD America Energy, LLC | VIRGINIA LEE ESTES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029R_P.HBP.VS | 0.00 | X | | |
| 1266 | MD America Energy, LLC | GERALD L. MCDOUGALD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029T_P.HBP.VS | 0.00 | X | | |
| 1267 | MD America Energy, LLC | FAYE A. KRAUS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029U_P.HBP.VS | 0.00 | X | | |
| 1268 | MD America Energy, LLC | JESSICA MARIE MCDOUGALD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029V_P.HBP.VS | 0.00 | X | | |
| 1269 | MD America Energy, LLC | MARK CLIFTON WYSS, DEALING HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029W_P.HBP.VS | 0.00 | X | | |
| 1270 | MD America Energy, LLC | REBECCA DOREEN MATULA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029S_P.HBP.VS | 0.00 | X | | |
| 1271 | MD America Energy, LLC | GREGORY WAYNE WYSS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029X_P.HBP.VS | 0.00 | X | | |
| 1272 | MD America Energy, LLC | TARA LYN STANSBERRY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029AD_P.HBP.VS | 0.00 | X | | |
| 1273 | MD America Energy, LLC | KENNETH W. BEVERLY AND WIFE SHARON C. BEVERLY | N/A | Lease | wn (until no longer producing) | TX00029I_P.HBP.HS.VS | 0.00 | X | | |
| 1274 | MD America Energy, LLC | PEGGY ANN CLUTE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029AE_P.HBP | 0.00 | X | | |
| 1275 | MD America Energy, LLC | BARBARA PATRICIA HAYES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029AB_P.HBP | 0.00 | X | | |
| 1276 | MD America Energy, LLC | BOBBIE JEAN VENABLE, BY JOYCE VENABLE, ATTORNEY-IN-FACT | N/A | Lease | wn (until no longer producing) | TX00029AC_P.HBP | 0.00 | X | | |
| 1277 | MD America Energy, LLC | PATRICK WADE GEYER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029K_P.HBP.HS | 0.00 | X | | |
| 1278 | MD America Energy, LLC | DARRELL GLENN GEYER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029AH_P.HBP.HS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1279 | MD America Energy, LLC | WAYNE F. COLLINS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08203_P.HBP.HSVS | 0.00 | X | | |
| 1280 | MD America Energy, LLC | PHILIP JAMES MARKS, JR., AS OWNER OF A PARTIAL LIFE ESTATE, LEANN MARKS PLAGENS AND PHILIP JAMES MARKS, III, INDIVIDUALLY AND AS REMAINDERMEN OF PARTIAL LIFE ESTATE, AS HEIRS OF WILLA FRANKLIN MARKS, DECEASED | N/A | Lease | wn (until no longer producing) | TX-03-0045 | 0.00 | X | | |
| 1281 | MD America Energy, LLC | BILLY E. REYNOLDS AND WIFE LINDA S. REYNOLDS | N/A | Lease | wn (until no longer producing) | TX00029AA_P.HBP | 0.00 | X | | |
| 1282 | MD America Energy, LLC | JOHN HOWELL DAVISON | N/A | Lease | wn (until no longer producing) | TX00008 | 0.00 | X | | |
| 1283 | MD America Energy, LLC | FAYE B. ANDREWS | N/A | Lease | wn (until no longer producing) | TX00011C_P.HBP.VS | 0.00 | X | | |
| 1284 | MD America Energy, LLC | JOSEPH RAY AND FRANCES A. SIMMONS CHILDRENS TRUST | N/A | Lease | wn (until no longer producing) | TX00070B_P.HBP.VS | 0.00 | X | | |
| 1285 | MD America Energy, LLC | DONALD WAYNE BROCK AND WIFE ALICE JANE BROCK | N/A | Lease | wn (until no longer producing) | TX00070A_P.HBP.VS | 0.00 | X | | |
| 1286 | MD America Energy, LLC | LARRY T. MASON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX0045A | 0.00 | X | | |
| 1287 | MD America Energy, LLC | LLOYD WAYNE LONGER, EXECUTOR OF THE ESTATE OF FRANK LONGER | N/A | Lease | wn (until no longer producing) | TX00070C_P.HBP.VS | 0.00 | X | | |
| 1288 | MD America Energy, LLC | MARY J. ANDREWS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026A | 0.00 | X | | |
| 1289 | MD America Energy, LLC | CAROL LEE THEISS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00078 | 0.00 | X | | |
| 1290 | MD America Energy, LLC | PAMELA SUE MAYFIELD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026H | 0.00 | X | | |
| 1291 | MD America Energy, LLC | LAURA P. MITCHELL, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026B | 0.00 | X | | |
| 1292 | MD America Energy, LLC | ELIZABETH A. LANDER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026G | 0.00 | X | | |
| 1293 | MD America Energy, LLC | PAMALOU BEASLEY FULLER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026D | 0.00 | X | | |
| 1294 | MD America Energy, LLC | WILLIAM D. STEWART, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026E | 0.00 | X | | |
| 1295 | MD America Energy, LLC | MATT S. STEWART, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026C | 0.00 | X | | |
| 1296 | MD America Energy, LLC | MARIANNE STEWART, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026F | 0.00 | X | | |
| 1297 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-03-0098_A.HBP.DL | 0.00 | X | | |
| 1298 | MD America Energy, LLC | KEOWN CHARITABLE FOUNDATION | N/A | Lease | keown (until no longer producing) | TX00029AF_P.HBP.VS | 0.00 | X | | |
| 1299 | MD America Energy, LLC | TOM DENSON KITCHING, II, INDIVIDUALLY AND PAULINE DRIGGERS KITCHING, A WIDOW, BY AND THROUGH TOM DENSON KITCHING, II, HER AGENT AND ATTORNEY-IN-FACT | N/A | Lease | wn (until no longer producing) | TX00057B_P.HBP.HSVS | 0.00 | X | | |
| 1300 | MD America Energy, LLC | CHAP L. HARRIMAN | N/A | Lease | wn (until no longer producing) | TX-03-0058-001 | 0.00 | X | | |
| 1301 | MD America Energy, LLC | ROBERT NEAL LAWRY AND WIFE, AMY MARIE LAWRY | N/A | Lease | wn (until no longer producing) | TX00257 | 0.00 | X | | |
| 1302 | MD America Energy, LLC | CHARLES D. LAWRY AND WIFE, ANNA MARIE LAWRY | N/A | Lease | wn (until no longer producing) | TX00256 | 0.00 | X | | |
| 1303 | MD America Energy, LLC | CHARLES D. LAWRY AND WIFE, ANNA MARIE LAWRY | N/A | Lease | wn (until no longer producing) | TX00258 | 0.00 | X | | |
| 1304 | MD America Energy, LLC | JEAN H. HERRING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00029Z_P.HBP.VS | 0.00 | X | | |
| 1305 | MD America Energy, LLC | JOHN P. WATSON AND WIFE, GLADYS A. WATSON | N/A | Lease | wn (until no longer producing) | TX00083A | 0.00 | X | | |
| 1306 | MD America Energy, LLC | KENNETH RAY COLE AND WIFE BARBARA COLE | N/A | Lease | 5/20/2021 | TX-KR-LLS-9898-08108_P.HBP | 0.00 | X | | |
| 1307 | MD America Energy, LLC | DALTON M. CLOSS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0054_P.HBP.HS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1308 | MD America Energy, LLC | LYNDA KAY CAYARD, FORMERLY KNOWN AS LYNDA KAY LACEFIELD OLDHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00080 | 0.00 | X | | |
| 1309 | MD America Energy, LLC | IRMA E. POWERS | N/A | Lease | 6/2/2021 | TX-KR-LLS-9898-08117_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1310 | MD America Energy, LLC | BILLIE BOULDIN, A WIDOW | N/A | Lease | 6/3/2021 | TX-KR-LLS-9898-08114_P.ACT/HBP.HP | 0.00 | X | | |
| 1311 | MD America Energy, LLC | EFREN CONTRERAS AND WIFE CYNTHIA CONTRERAS | N/A | Lease | wn (until no longer producing) | TX00036F_P.HBP.VS | 0.00 | X | | |
| 1312 | MD America Energy, LLC | RONALD DEAN WARD | N/A | Lease | wn (until no longer producing) | TX-03-0058-003 | 0.00 | X | | |
| 1313 | MD America Energy, LLC | ROBERT E. BESS AND DIANNE L. BESS, ATTORNEYS IN FACT FOR O. B. BESS, A WIDOWER | N/A | Lease | wn (until no longer producing) | TX-01-0002 | 0.00 | X | | |
| 1314 | MD America Energy, LLC | PAUL D. COVINGTON AND WIFE, VIVIAN DOYLE COVINGTON | N/A | Lease | wn (until no longer producing) | TX-06-0014-000 | 0.00 | X | | |
| 1315 | MD America Energy, LLC | ROBERT DEAN CLEVELAND AND WIFE, KAY BAKER CLEVELAND | N/A | Lease | wn (until no longer producing) | TX-06-7264 | 0.00 | X | | |
| 1316 | MD America Energy, LLC | DONALD R. CLARK, JR. AND WIFE DEBORAH F. COWMAN | N/A | Lease | wn (until no longer producing) | TX00029AK_P.HBP.VS | 0.00 | X | | |
| 1317 | MD America Energy, LLC | KARL RADDE AND WIFE MELISSA RADDE | N/A | Lease | wn (until no longer producing) | TX00021A_P.HBP.VS | 0.00 | X | | |
| 1318 | MD America Energy, LLC | BARBARA H. OROSCO, INDIVIDUALLY, AND BARBARA H. OROSCO AND SALVADOR G. OROSCO, TRUSTEES OF THE OROSCO FAMILY TRUST DATED DECEMBER 7, 1988 | N/A | Lease | wn (until no longer producing) | TX-03-0058-004 | 0.00 | X | | |
| 1319 | MD America Energy, LLC | SUE ANTHONY DOTSON, A WIDOW | N/A | Lease | 7/9/2021 | TX-KR-LLS-9898-08116_P.HBP | 0.00 | X | | |
| 1320 | MD America Energy, LLC | ELLA M. BEASLEY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-06763_P.HBP.HS | 0.00 | X | | |
| 1321 | MD America Energy, LLC | JOE H. BARNES, II, ACTING BY AND THROUGH DOROTHY REA, HIS AGENT AND ATTORNEY-IN-FACT | N/A | Lease | 7/9/2021 | TX-KR-LLS-9898-08115_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1322 | MD America Energy, LLC | ANNETTE ADAMS PETERS, INDIVIDUALLY, AS HER SOLE AND SEPARATE PROPERTY, AND ANNETTE ADAMS PETERS AS TRUSTEE OF THE W. A. ADAMS 2008 TRUST, A TEXAS TRUST, AND LUCILLE YEAGER ADAMS, A WIDOW | N/A | Lease | wn (until no longer producing) | TX-01-0018-02 | 0.00 | X | | |
| 1323 | MD America Energy, LLC | DAVID H LLOYD TRUST ET AL | N/A | Lease | wn (until no longer producing) | TX-06-0024-003 | 0.00 | X | | |
| 1324 | MD America Energy, LLC | CHARLES ANN GUMINA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00036G_P.HBP.VS | 0.00 | X | | |
| 1325 | MD America Energy, LLC | PATRICK HUGH MCMAHAN AND WIFE, CAROL SUSAN HEUSSNER MCMAHAN | N/A | Lease | wn (until no longer producing) | TX00082_A.HBP | 0.00 | X | | |
| 1326 | MD America Energy, LLC | ROYALTY CLEARINGHOUSE PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX00032B_P.HBP.VS | 0.00 | X | | |
| 1327 | MD America Energy, LLC | WILLIAM LARRY HOGUE | N/A | Lease | wn (until no longer producing) | TX-06-0017-000_A.HBP | 0.00 | X | | |
| 1328 | MD America Energy, LLC | HARRY A. BELL AND WIFE, VIRGINIA BELL | N/A | Lease | wn (until no longer producing) | TX-06-0018-000_A.HBP | 0.00 | X | | |
| 1329 | MD America Energy, LLC | WILLIAM L. STROMAN, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-03-0058-002_P.HBP.VS | 0.00 | X | | |
| 1330 | MD America Energy, LLC | PAMELA SUE MAYFIELD, GAURDIAN FOR ROBERT MAXIM MAYFIELD, MINOR | N/A | Lease | wn (until no longer producing) | TX00026I | 0.00 | X | | |
| 1331 | MD America Energy, LLC | WALTER C. CLOPTON AND WIFE, NANCY CLOPTON | N/A | Lease | wn (until no longer producing) | TX-06-0024-002 | 0.00 | X | | |
| 1332 | MD America Energy, LLC | CHARLES E. HEATH, SR. AND WIFE, GLORIA JUNE HEATH | N/A | Lease | wn (until no longer producing) | TX-06-0024-001 | 0.00 | X | | |
| 1333 | MD America Energy, LLC | ROBERT MICHAEL BRYANT, SR., AND WIFE, GEORGIA KAY BRYANT | N/A | Lease | wn (until no longer producing) | TX-KR-0101-00872_P.ACT.HPVP | 0.00 | X | | |
| 1334 | MD America Energy, LLC | NETA JEAN CHESNEY | N/A | Lease | wn (until no longer producing) | TX-KR-0101-00882_P.ACT.HPVP | 0.00 | X | | |
| 1335 | MD America Energy, LLC | SAMUEL MARK BRYANT | N/A | Lease | wn (until no longer producing) | TX-KR-0101-00873_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1336 | MD America Energy, LLC | ROBERT MICHAEL BRYANT, JR. | N/A | Lease | wn (until no longer producing) | TX-KR-0101-00871_P.ACT.HPVP | 0.00 | X | | |
| 1337 | MD America Energy, LLC | SINGER BROS., A PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-0024-004 | 0.00 | X | | |
| 1338 | MD America Energy, LLC | KENNY DISERENS, TRUSTEE FOR THE PLEASANT GROVE BAPTIST CHURCH | N/A | Lease | wn (until no longer producing) | TX00085_A.HBP | 0.00 | X | | |
| 1339 | MD America Energy, LLC | TED L. REA AND WIFE DOROTHY B. REA | N/A | Lease | wn (until no longer producing) | TX-03-0057-002 | 0.00 | X | | |
| 1340 | MD America Energy, LLC | LOCHBUIE LIMITED PARTNERSHIP, AN OKLAHOMA LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-0024-009_P.HBP | 0.00 | X | | |
| 1341 | MD America Energy, LLC | THE RESERVE PETROLEUM COMPANY | N/A | Lease | wn (until no longer producing) | TX-06-0024-010_P.HBP | 0.00 | X | | |
| 1342 | MD America Energy, LLC | WOODROE MCMAHON AND WIFE, MERCEDES MCMAHON | N/A | Lease | wn (until no longer producing) | TX00086 | 0.00 | X | | |
| 1343 | MD America Energy, LLC | RICHARD L PEARSON AND NORMA R. PEARSON | N/A | Lease | wn (until no longer producing) | TX-04-0087 | 0.00 | X | | |
| 1344 | MD America Energy, LLC | BILLY FATE HUTTO AND WIFE, SHARRON ANN HUTTO | N/A | Lease | wn (until no longer producing) | TX00088B | 0.00 | X | | |
| 1345 | MD America Energy, LLC | SAMUEL D. SCHMIECH, JR. | N/A | Lease | wn (until no longer producing) | TX-04-0084 | 0.00 | X | | |
| 1346 | MD America Energy, LLC | TERRY G. PEARSON | N/A | Lease | wn (until no longer producing) | TX-04-0009 | 0.00 | X | | |
| 1347 | MD America Energy, LLC | BEVERLY KAY JONES | N/A | Lease | wn (until no longer producing) | TX-04-0112 | 0.00 | X | | |
| 1348 | MD America Energy, LLC | RICHARD MARK PEARSON | N/A | Lease | wn (until no longer producing) | TX-04-0011_A.HBP.VS | 0.00 | X | | |
| 1349 | MD America Energy, LLC | JAMES C. JENKINS | N/A | Lease | wn (until no longer producing) | TX-04-0109 | 0.00 | X | | |
| 1350 | MD America Energy, LLC | BURTIS RUTH BATES HENDERSON | N/A | Lease | wn (until no longer producing) | TX-04-0051 | 0.00 | X | | |
| 1351 | MD America Energy, LLC | PAULA LYNN MOSLEY, JOINED PRO FORMA BY HER HUSBAND MELVIN RAY MOSLEY | N/A | Lease | wn (until no longer producing) | TX-04-0010 | 0.00 | X | | |
| 1352 | MD America Energy, LLC | SUE CAROL GIBSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0045 | 0.00 | X | | |
| 1353 | MD America Energy, LLC | PEGGY JO STARK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0002 | 0.00 | X | | |
| 1354 | MD America Energy, LLC | JIMMY KEITH KETCHUM AND WIFE, HELEN R. DYER KETCHUM | N/A | Lease | wn (until no longer producing) | TX-04-0059 | 0.00 | X | | |
| 1355 | MD America Energy, LLC | ANNA MARIE KETCHUM, WIDOW OF ROBERT WYNDELL KETCHUM, DECEASED, ROBERT STANFORD KETCHUM; ANNA WYNDELL KETCHUM STRATTON | N/A | Lease | wn (until no longer producing) | TX-04-0058 | 0.00 | X | | |
| 1356 | MD America Energy, LLC | THE COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08186_A.HBP.VS | 0.00 | X | | |
| 1357 | MD America Energy, LLC | LUKE DILEO, JR. AND WIFE CARLA J. DILEO | N/A | Lease | wn (until no longer producing) | TX-03-0053 | 0.00 | X | | |
| 1358 | MD America Energy, LLC | ALAN F. CASEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00021C_P.HBP.VS | 0.00 | X | | |
| 1359 | MD America Energy, LLC | KELLY R. SHAW, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00021D_P.HBP.VS | 0.00 | X | | |
| 1360 | MD America Energy, LLC | KEVIN D. CASEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00021E_P.HBP.VS | 0.00 | X | | |
| 1361 | MD America Energy, LLC | BOBBY G. ADAMS, TRUSTEE FOR AMY ADRIANA GROOT | N/A | Lease | wn (until no longer producing) | TX00088A | 0.00 | X | | |
| 1362 | MD America Energy, LLC | JOSEPH MARK WILLIAMS, DEALING IN HIS SOLE & SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00088E | 0.00 | X | | |
| 1363 | MD America Energy, LLC | JAMES MICHAEL WILLIAMS, DEALING IN HIS SOLE & SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00088C | 0.00 | X | | |
| 1364 | MD America Energy, LLC | BOBBY G. ADAMS AND WIFE, MARJORIE A. ADAMS | N/A | Lease | wn (until no longer producing) | TX00087A | 0.00 | X | | |
| 1365 | MD America Energy, LLC | EMMA UTECHT ISBELL | N/A | Lease | wn (until no longer producing) | TX00028A_P.HBP.VS | 0.00 | X | | |
| 1366 | MD America Energy, LLC | MONA DELL STONE, THOMAS P. MCGINNIS ET UX REBECCA J. MCGINNIS | N/A | Lease | wn (until no longer producing) | TX00089 | 0.00 | X | | |
| 1367 | MD America Energy, LLC | JOY LOUISE GROOT, DEALING IN HER SOLE & SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00088D | 0.00 | X | | |
| 1368 | MD America Energy, LLC | WILLIAM GLUD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-05 | 0.00 | X | | |
| 1369 | MD America Energy, LLC | LINDA D. WATSON, AKA LINDA GLUD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-06 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1370 | MD America Energy, LLC | NORTH ZULCH INDEPENDENT SCHOOL DISTRICT | N/A | Lease | wn (until no longer producing) | TX00087B | 0.00 | X | | |
| 1371 | MD America Energy, LLC | BRENDA SUE PLEMONS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0006-02_P.HBP (SOWELL) | 0.00 | X | | |
| 1372 | MD America Energy, LLC | LINDA LOU WILSON HERRMANN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0007-03 | 0.00 | X | | |
| 1373 | MD America Energy, LLC | JAMES MICHAEL WILSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0006-01 | 0.00 | X | | |
| 1374 | MD America Energy, LLC | GLORIA P. DICKEY, DEALING IN HER SOLE & SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX0090 | 0.00 | X | | |
| 1375 | MD America Energy, LLC | PATRICIA L. HARRIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00026J | 0.00 | X | | |
| 1376 | MD America Energy, LLC | GREGORY BRYAN CARGLE, DEALING HEREIN IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-02 | 0.00 | X | | |
| 1377 | MD America Energy, LLC | PAULA GAY CARGLE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-04 | 0.00 | X | | |
| 1378 | MD America Energy, LLC | HOWARD STANDLEY CARGLE, DEALING HEREIN IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-03 | 0.00 | X | | |
| 1379 | MD America Energy, LLC | RODNEY CARGLE, DEALING HEREIN IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0021-01 | 0.00 | X | | |
| 1380 | MD America Energy, LLC | GLENN D. HART AND WIFE, LAUREN L. HART | N/A | Lease | wn (until no longer producing) | TX-03-0055 | 0.00 | X | | |
| 1381 | MD America Energy, LLC | GLENN D. HART AND WIFE, LAUREN L. HART | N/A | Lease | wn (until no longer producing) | TX-03-0056 | 0.00 | X | | |
| 1382 | MD America Energy, LLC | OLAN E. WEAVER, DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00048C_P.HBP | 0.00 | X | | |
| 1383 | MD America Energy, LLC | FRED A. HENSON AND WIFE, ELIZABETH C. HENSON | N/A | Lease | wn (until no longer producing) | TX-04-0001-09_P.HBP.VS(SI90) | 0.00 | X | | |
| 1384 | MD America Energy, LLC | RONALD BAILEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0020-02_P.HBP.VS(SI90) | 0.00 | X | | |
| 1385 | MD America Energy, LLC | JOE WAYNE SOWELL AND WIFE, PATRICIA ANN SOWELL | N/A | Lease | wn (until no longer producing) | TX-04-0073 | 0.00 | X | | |
| 1386 | MD America Energy, LLC | VIRGINIA SOWELL GILBERT | N/A | Lease | wn (until no longer producing) | TX-04-0046 | 0.00 | X | | |
| 1387 | MD America Energy, LLC | DORA COMPIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0020-03_P.HBP.VS(SI90) | 0.00 | X | | |
| 1388 | MD America Energy, LLC | LAURA BAILEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0020-01_P.HBP.VS(SI90) | 0.00 | X | | |
| 1389 | MD America Energy, LLC | SAMUEL J. CATALENA AND WIFE, CAROLYN CATALENA | N/A | Lease | wn (until no longer producing) | TX-03-0057-001 | 0.00 | X | | |
| 1390 | MD America Energy, LLC | MAURINE WILSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-11_P.HBP.VS(SI90) | 0.00 | X | | |
| 1391 | MD America Energy, LLC | DUANE TAYLOR STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-04_P.HBP.VS(SI90) | 0.00 | X | | |
| 1392 | MD America Energy, LLC | DOUGLAS STANDLEY BAUGH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-01_P.HBP.VS(SI90) | 0.00 | X | | |
| 1393 | MD America Energy, LLC | ANN STANDLEY POE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-07_P.HBP.VS(SI90) | 0.00 | X | | |
| 1394 | MD America Energy, LLC | JAMES LEE STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-05_P.HBP.VS(SI90) | 0.00 | X | | |
| 1395 | MD America Energy, LLC | KRISTI LYNN STANDLEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-02_P.HBP.VS(SI90) | 0.00 | X | | |
| 1396 | MD America Energy, LLC | SAMMIE JO LEWIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-10_P.HBP.VS(SI90) | 0.00 | X | | |
| 1397 | MD America Energy, LLC | SAM GARRETT STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-03_P.HBP.VS(SI90) | 0.00 | X | | |
| 1398 | MD America Energy, LLC | BELYNDA GALE BAUGH WILSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0001-06_P.HBP.VS(SI90) | 0.00 | X | | |
| 1399 | MD America Energy, LLC | MARTIN E. WAMPLER II, SOLE TRUSTEE OF THE WAMPLER LIVING TRUST DATED MAY 7, 2003 | N/A | Lease | wn (until no longer producing) | TX-04-0075_A.HBP.VS(SI90) | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1400 | MD America Energy, LLC | MARVIN GLENN BAILEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0018-01_P.HBP.VS(SI*90) | 0.00 | X | | |
| 1401 | MD America Energy, LLC | WENDELL WAYNE BAILEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0018-02_P.HBP.VS(SI*90) | 0.00 | X | | |
| 1402 | MD America Energy, LLC | BRENDA LAFAYE PEARSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0081 | 0.00 | X | | |
| 1403 | MD America Energy, LLC | ROBINE ILENE PEARSON | N/A | Lease | wn (until no longer producing) | TX-04-0085 | 0.00 | X | | |
| 1404 | MD America Energy, LLC | EDNA DARLENE UPCHURCH | N/A | Lease | wn (until no longer producing) | TX-04-0083 | 0.00 | X | | |
| 1405 | MD America Energy, LLC | BARBARA GENE PEARSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0082 | 0.00 | X | | |
| 1406 | MD America Energy, LLC | CHARLES LARRY PEARSON | N/A | Lease | wn (until no longer producing) | TX-04-0113 | 0.00 | X | | |
| 1407 | MD America Energy, LLC | FRANK B. ROSS, CO-TRUSTEE, ACTING INDEPENDENTLY, ON BEHALF OF THE ROSS FAMILY TRUST, AND SHARON ROSS ESSARY, INDEPENDENT EXECUTRIX OF THE ESTATE OF ALICE B. ROSS, DECEASED | N/A | Lease | wn (until no longer producing) | TX-04-0001-08_P.HBP.HSVS(SI90) | 0.00 | X | | |
| 1408 | MD America Energy, LLC | GEORGE DONALD RASCO, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00091A | 0.00 | X | | |
| 1409 | MD America Energy, LLC | WILLIAM RANDALL DOWELL | N/A | Lease | wn (until no longer producing) | TX-06-0028-006 | 0.00 | X | | |
| 1410 | MD America Energy, LLC | RENEE SONYA BRUNE | N/A | Lease | wn (until no longer producing) | TX-06-0028-005 | 0.00 | X | | |
| 1411 | MD America Energy, LLC | KENNY SIMONS, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00091D | 0.00 | X | | |
| 1412 | MD America Energy, LLC | GEARL RAYMOND RASCO, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00091C | 0.00 | X | | |
| 1413 | MD America Energy, LLC | CHARLES R. DOWELL | N/A | Lease | wn (until no longer producing) | TX-06-0028-002_P.HBP.VS | 0.00 | X | | |
| 1414 | MD America Energy, LLC | MARIAN DOWELL | N/A | Lease | wn (until no longer producing) | TX-06-0028-003 | 0.00 | X | | |
| 1415 | MD America Energy, LLC | ALTA FEATHERSTONE, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00091E | 0.00 | X | | |
| 1416 | MD America Energy, LLC | DEBORAH MCFADIN, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00091B | 0.00 | X | | |
| 1417 | MD America Energy, LLC | RONALD BAILEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0104-01_P.HBP.VS(SI90) | 0.00 | X | | |
| 1418 | MD America Energy, LLC | JOE F. JAMES, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0104-04_P.HBP.VS(SI90) | 0.00 | X | | |
| 1419 | MD America Energy, LLC | LAURA BAILEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0104-02_P.HBP.VS(SI90) | 0.00 | X | | |
| 1420 | MD America Energy, LLC | DORA COMPIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0104-03_P.HBP.VS(SI90) | 0.00 | X | | |
| 1421 | MD America Energy, LLC | LARRY D CLANCY AND WIFE, REBECCA S CLANCY | N/A | Lease | wn (until no longer producing) | TX-06-0028-004_P.HBP.VS | 0.00 | X | | |
| 1422 | MD America Energy, LLC | JANIS LYNNE WILLIAMS | N/A | Lease | wn (until no longer producing) | TX00276 | 0.00 | X | | |
| 1423 | MD America Energy, LLC | CENTERPOINT ENEGERY HOUSTON ELECTRIC, LLC | N/A | Lease | wn (until no longer producing) | TX00094 | 0.00 | X | | |
| 1424 | MD America Energy, LLC | WENDELL MOSLEY AND WIFE, REGINA LYN JAMIESON- MOSLEY | N/A | Lease | wn (until no longer producing) | TX00092A | 0.00 | X | | |
| 1425 | MD America Energy, LLC | EULA MAY JOHNSTON TRUST, BANK OF AMERICA, N.A., TRUSTEE | N/A | Lease | wn (until no longer producing) | TX-03-0100-05_P.HBP.HSVS | 0.00 | X | | |
| 1426 | MD America Energy, LLC | PATRICK MCCAFFERTY | N/A | Lease | wn (until no longer producing) | TX00095H | 0.00 | X | | |
| 1427 | MD America Energy, LLC | JOHN MCCAFFERTY | N/A | Lease | wn (until no longer producing) | TX00095C | 0.00 | X | | |
| 1428 | MD America Energy, LLC | WILLIAM MCCAFFERTY | N/A | Lease | wn (until no longer producing) | TX00095D | 0.00 | X | | |
| 1429 | MD America Energy, LLC | SUE MCCAFFERTY | N/A | Lease | wn (until no longer producing) | TX00095I | 0.00 | X | | |
| 1430 | MD America Energy, LLC | PETER MCCAFFERTY | N/A | Lease | wn (until no longer producing) | TX00095G | 0.00 | X | | |
| 1431 | MD America Energy, LLC | UNION PACIFIC RAILROAD COMPANY | N/A | Lease | wn (until no longer producing) | TX00108_A.HBP.HS.VS | 0.00 | X | | |
| 1432 | MD America Energy, LLC | DAVID P. VINSON | N/A | Lease | wn (until no longer producing) | TX00095F | 0.00 | X | | |
| 1433 | MD America Energy, LLC | PEC MINERALS LP | N/A | Lease | wn (until no longer producing) | TX00095A | 0.00 | X | | |
| 1434 | MD America Energy, LLC | NANCY DYKES | N/A | Lease | wn (until no longer producing) | TX00095J | 0.00 | X | | |
| 1435 | MD America Energy, LLC | AMY DYKES MEWES | N/A | Lease | wn (until no longer producing) | TX00095E | 0.00 | X | | |
| 1436 | MD America Energy, LLC | MARY CAROLYN HARVARD HAMLYN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08198_P.HBP.HSVS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1437 | MD America Energy, LLC | FAYE BARTLETT WILLIAMS, CHARLES LINDBERG WILLIAMS, ANNIE DEAN WILLIAMS AND KANDI LASHAE POOLE, EACH DEALING IN HIS/HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0106-03 | 0.00 | X | | |
| 1438 | MD America Energy, LLC | RUTHIE ANNETTE FORD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-01 | 0.00 | X | | |
| 1439 | MD America Energy, LLC | FAYE BARTLETT WILLIAMS, CHARLES LINDBERG WILLIAMS, ANNIE DEAN WILLIAMS, KANDI LASHAE POOLE, EACH DEALING IN HIS/HER SOLE AND SEPARATE PROPERTY, AND CHARLES EDWARD JONES, EXECUTOR OF THE ESTATE OF COQUEZE WILLIAMS MCGARRITY | N/A | Lease | wn (until no longer producing) | TX-04-0107-04 | 0.00 | X | | |
| 1440 | MD America Energy, LLC | CHARLES EDWARD JONES, EXECUTOR OF THE ESTATE OF COQUEZE WILLIAMS MCGARRITY | N/A | Lease | wn (until no longer producing) | TX-04-0110-03 | 0.00 | X | | |
| 1441 | MD America Energy, LLC | JESSE WILLIAMS, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0110-06 | 0.00 | X | | |
| 1442 | MD America Energy, LLC | BETTY JEAN PARKS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-03 | 0.00 | X | | |
| 1443 | MD America Energy, LLC | BETTY JEAN PARKS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0110-04 | 0.00 | X | | |
| 1444 | MD America Energy, LLC | JESSE WILLIAMS, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-07 | 0.00 | X | | |
| 1445 | MD America Energy, LLC | HERBERT G. WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-06 | 0.00 | X | | |
| 1446 | MD America Energy, LLC | HERBERT G. WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0106-04 | 0.00 | X | | |
| 1447 | MD America Energy, LLC | LOLA WILLIAMS, INDIVIDUALLY AND AS GUARDIAN OF RAYNESHA WILLIAMS, A MINOR CHILD | N/A | Lease | wn (until no longer producing) | TX-04-0107-08 | 0.00 | X | | |
| 1448 | MD America Energy, LLC | LOLA WILLIAMS, INDIVIDUALLY AND AS GUARDIAN OF RAYNESHA WILLIAMS, A MINOR CHILD | N/A | Lease | wn (until no longer producing) | TX-04-0110-07 | 0.00 | X | | |
| 1449 | MD America Energy, LLC | DERRICK LAMAR HENSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-02 | 0.00 | X | | |
| 1450 | MD America Energy, LLC | DERRICK LAMAR HENSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0110-02 | 0.00 | X | | |
| 1451 | MD America Energy, LLC | JAMES LAMONTE SMITH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0106-02 | 0.00 | X | | |
| 1452 | MD America Energy, LLC | JAMES LAMONTE SMITH | N/A | Lease | wn (until no longer producing) | TX-04-0826 | 0.00 | X | | |
| 1453 | MD America Energy, LLC | BARBARA ANN WILLIAMS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0110-05 | 0.00 | X | | |
| 1454 | MD America Energy, LLC | BARBARA ANN WILLIAMS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0107-05 | 0.00 | X | | |
| 1455 | MD America Energy, LLC | RUTHIE ANNETTE FORD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0106-01 | 0.00 | X | | |
| 1456 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00100_A.HBP | 0.00 | X | | |
| 1457 | MD America Energy, LLC | MARTHA A. HARVARD | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08192_P.HBP.HSVS | 0.00 | X | | |
| 1458 | MD America Energy, LLC | HENRY E. HARVARD | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08191_P.HBP.HSVS | 0.00 | X | | |
| 1459 | MD America Energy, LLC | PAULINE ELIZABETH BENBOW WESTBROOK TRANT | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08194_P.HBP.HSVS | 0.00 | X | | |
| 1460 | MD America Energy, LLC | WINTHOP L. BENBOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08195_P.HBP.HSVS | 0.00 | X | | |
| 1461 | MD America Energy, LLC | WILLIAM GREENOUGH | N/A | Lease | wn (until no longer producing) | TX00095B | 0.00 | X | | |
| 1462 | MD America Energy, LLC | DELORES BIRCHUM | N/A | Lease | wn (until no longer producing) | TX00121D | 0.00 | X | | |
| 1463 | MD America Energy, LLC | ELLA MAE MAY | N/A | Lease | wn (until no longer producing) | TX00122 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1464 | MD America Energy, LLC | HIRAM DAVIDSON | N/A | Lease | wn (until no longer producing) | TX00124 | 0.00 | X | | |
| 1465 | MD America Energy, LLC | TERRY L. MAY | N/A | Lease | wn (until no longer producing) | TX00123 | 0.00 | X | | |
| 1466 | MD America Energy, LLC | LINDA SUE PRESLEY | N/A | Lease | wn (until no longer producing) | TX00121H | 0.00 | X | | |
| 1467 | MD America Energy, LLC | BETTY J. WADE | N/A | Lease | wn (until no longer producing) | TX00121C | 0.00 | X | | |
| 1468 | MD America Energy, LLC | JAMES E. MAY | N/A | Lease | wn (until no longer producing) | TX00121B | 0.00 | X | | |
| 1469 | MD America Energy, LLC | TERRY L. MAY | N/A | Lease | wn (until no longer producing) | TX00121A | 0.00 | X | | |
| 1470 | MD America Energy, LLC | ELLA MAE MAY | N/A | Lease | wn (until no longer producing) | TX00121 | 0.00 | X | | |
| 1471 | MD America Energy, LLC | ROBERT H. MAY | N/A | Lease | wn (until no longer producing) | TX00121F | 0.00 | X | | |
| 1472 | MD America Energy, LLC | LANELLE GAFFORD | N/A | Lease | wn (until no longer producing) | TX00121E | 0.00 | X | | |
| 1473 | MD America Energy, LLC | DONALD R. MAY | N/A | Lease | wn (until no longer producing) | TX00121G | 0.00 | X | | |
| 1474 | MD America Energy, LLC | CHARLES WAYNE BENBOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08188_P.HBP.HSVS | 0.00 | X | | |
| 1475 | MD America Energy, LLC | EVAN T. BENBOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08189_P.HBP.HSVS | 0.00 | X | | |
| 1476 | MD America Energy, LLC | CAROLYN CLITHEROE JENSEN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08193_P.HBP.HSVS | 0.00 | X | | |
| 1477 | MD America Energy, LLC | PAMELA CLITHEROE HILLIARD | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08197_P.HBP.HSVS | 0.00 | X | | |
| 1478 | MD America Energy, LLC | MARION ELIZABETH BENBOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08190_P.HBP.HSVS | 0.00 | X | | |
| 1479 | MD America Energy, LLC | DOROTHY CLITHEROE MCDONALD | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08201_P.HBP.HSVS | 0.00 | X | | |
| 1480 | MD America Energy, LLC | MARGARET B. BOONE ACTING BY AND THROUGH HER AGENT AND ATTORNEY-IN-FACT HOMER S. BOONE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08199_P.HBP.HSVS | 0.00 | X | | |
| 1481 | MD America Energy, LLC | SHARI COLLINS CARROLL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08200_P.HBP.HSVS | 0.00 | X | | |
| 1482 | MD America Energy, LLC | MARK W. BENBOW | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08196_P.HBP.HSVS | 0.00 | X | | |
| 1483 | MD America Energy, LLC | GUADALUPE STONE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0018-03_P.HBP.VS(SI*90) | 0.00 | X | | |
| 1484 | MD America Energy, LLC | JAMES MICHAEL HAHN | N/A | Lease | wn (until no longer producing) | TX00107 | 0.00 | X | | |
| 1485 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-00485_A.HBP.VS | 0.00 | X | | |
| 1486 | MD America Energy, LLC | RON BRAWDY, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-00276_P.HBP | 0.00 | X | | |
| 1487 | MD America Energy, LLC | SHARON BRAWDY BAILEY, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-00495_P.HBP | 0.00 | X | | |
| 1488 | MD America Energy, LLC | BILLY BRAWDY, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-00492_P.HBP | 0.00 | X | | |
| 1489 | MD America Energy, LLC | JOHNNY W. GIERISCH, JR. | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08107_P.HBP.VS | 0.00 | X | | |
| 1490 | MD America Energy, LLC | MARTHA NELL DEAN | N/A | Lease | wn (until no longer producing) | TX-04-0200_A.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1491 | MD America Energy, LLC | GLB HOLDINGS, LP, THOUGH ITS GENERAL PARTNER GLB, LLC, BY GEORGE LEE BOENIGK, MANAGER | N/A | Lease | wn (until no longer producing) | TX00073B | 0.00 | X | | |
| 1492 | MD America Energy, LLC | GEORGE RANDALL BOENIGK FAMILY LIMIITED PARTNERSHIP LP, THROUGH ITS GENERAL PARTNER GEORGE RANDALL BOENIGK, LLC, BY GEORGE RANDALL BOENIGK, MANAGER | N/A | Lease | wn (until no longer producing) | TX00073A | 0.00 | X | | |
| 1493 | MD America Energy, LLC | KMT FAMILY HOLDINGS LP, THROUGH ITS GENERAL PARTNER KMT HOLDINGS, LLC, BY CLARISSA KATHLEEN ZINCHE, MANAGER | N/A | Lease | wn (until no longer producing) | TX00073C | 0.00 | X | | |
| 1494 | MD America Energy, LLC | HOCHHEIM HOLDINGS LP, THROUGH IT GENERAL PARTNER HOCHHEIM HOLDINGS, LLC, BY BOBBY ALAN BOENIGK, MANAGER | N/A | Lease | wn (until no longer producing) | TX00073D | 0.00 | X | | |
| 1495 | MD America Energy, LLC | CITY OF MADISONVILLE, TEXAS | N/A | Lease | wn (until no longer producing) | TX-04-0592_P.HBP(FM;SI90) | 0.00 | X | | |
| 1496 | MD America Energy, LLC | DRC PETROLEUM LTD. | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-08202_P.HBP.HSVS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1497 | MD America Energy, LLC | SOUTHWEST PETROLEUM COMPANY, L.P. | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-9898-08204_P.HBP.HSVS | 0.00 | X | | |
| 1498 | MD America Energy, LLC | DAVID H. MURDOCK DBA INTERNATIONAL MINING COMPANY | N/A | Lease | wn (until no longer producing) | TX00001A_P.HBP.HS.VS | 0.00 | X | | |
| 1499 | MD America Energy, LLC | LISA L. DIVIN (A/K/A LISA L. DIVIAN), A SINGLE WOMAN | N/A | Lease | wn (until no longer producing) | TX00259 | 0.00 | X | | |
| 1500 | MD America Energy, LLC | LINDA D. GAYLE, A SINGLE WOMAN | N/A | Lease | wn (until no longer producing) | TX00260 | 0.00 | X | | |
| 1501 | MD America Energy, LLC | CARLA KLUGE, A MARRIED WOMAN DEALING IN HER SEPARATE PROPERTY AND ESTATE | N/A | Lease | wn (until no longer producing) | TX00261 | 0.00 | X | | |
| 1502 | MD America Energy, LLC | LANE LANCASTER, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX00262 | 0.00 | X | | |
| 1503 | MD America Energy, LLC | KATHY WALKER STOVER, A MARRIED WOMAN DEALING IN HER SEPARATE PROPERTY AND ESTATE | N/A | Lease | | TX00263 | 0.00 | X | | |
| 1504 | MD America Energy, LLC | JEREMY B. WALKER, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX00266 | 0.00 | X | | |
| 1505 | MD America Energy, LLC | RAYBERN E. WALKER, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX00264 | 0.00 | X | | |
| 1506 | MD America Energy, LLC | LACEY HARDY GLENNON, SPOUSE OF THOMAS KELLEY GLENNON, DEALING WITH SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0329-01_P.HBP(FM;SI90) | 0.00 | X | | |
| 1507 | MD America Energy, LLC | JOEL MORGAN HARDY, SPOUSE OF PATRICIA OROZCO HARDY, DEALING WITH SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0329-02_P.HBP(FM;SI90) | 0.00 | X | | |
| 1508 | MD America Energy, LLC | JOHN R. HARDY AND WIFE, TONI HARDY | N/A | Lease | wn (until no longer producing) | TX-04-0329-03_P.HBP(FM;SI90) | 0.00 | X | | |
| 1509 | MD America Energy, LLC | JOHN RAYFORD HARDY, JR., AKA JAY HARDY, SPOUSE OF MARIA DOLORES HARDY, DEALING WITH SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0329-04_P.HBP(FM;SI90) | 0.00 | X | | |
| 1510 | MD America Energy, LLC | DEBRA JAYNE HAMILTON, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00098_A.HBP | 0.00 | X | | |
| 1511 | MD America Energy, LLC | DONALD BURR, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0326-01 | 0.00 | X | | |
| 1512 | MD America Energy, LLC | NANCY MCDONALD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0326-04 | 0.00 | X | | |
| 1513 | MD America Energy, LLC | DWIGHT M. BURR, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0326-02 | 0.00 | X | | |
| 1514 | MD America Energy, LLC | ALMERA BURR MCCOSLIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0326-05_P.HBP | 0.00 | X | | |
| 1515 | MD America Energy, LLC | JIMMY BURR, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0326-03 | 0.00 | X | | |
| 1516 | MD America Energy, LLC | CYNTHIA STRETZ, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0326-06_P.HBP | 0.00 | X | | |
| 1517 | MD America Energy, LLC | GREGORY A. MORGAN AND WIFE, RHONDA GAINEY MORGAN | N/A | Lease | wn (until no longer producing) | TX-04-0286 | 0.00 | X | | |
| 1518 | MD America Energy, LLC | WERNER WELTON STEWART, III, AND WIFE, MARY CATHERINE STEWART | N/A | Lease | wn (until no longer producing) | TX-04-0246 | 0.00 | X | | |
| 1519 | MD America Energy, LLC | STEVEN E. CUBSTEAD, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00215D | 0.00 | X | | |
| 1520 | MD America Energy, LLC | MIKE R. CUBSTEAD, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00215C | 0.00 | X | | |
| 1521 | MD America Energy, LLC | ANTHONY G. CUBSTEAD, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00215A | 0.00 | X | | |
| 1522 | MD America Energy, LLC | DONNA L. BRINSON, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00215E | 0.00 | X | | |
| 1523 | MD America Energy, LLC | DENA CUBSTEAD PAUL, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX00215B | 0.00 | X | | |
| 1524 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-9898-08205_P.HBP.VS | 0.00 | X | | |
| 1525 | MD America Energy, LLC | JAMES E. BLAIR, III AND WIFE, REBECCA L. BLAIR | N/A | Lease | wn (until no longer producing) | TX-04-0340_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1526 | MD America Energy, LLC | TEXAS OSAGE ROYALTY POOL, INC. | N/A | Lease | wn (until no longer producing) | TX-06-7252 | 0.00 | X | | |
| 1527 | MD America Energy, LLC | JOAN CONE | N/A | Lease | wn (until no longer producing) | TX-01-0050-12_P.HBP.HS | 0.00 | X | | |
| 1528 | MD America Energy, LLC | MARK HENRY DYKES | N/A | Lease | wn (until no longer producing) | TX-06-0028-012 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1529 | MD America Energy, LLC | R.E. SAMUEL, JR. AND WIFE, MARCELLA P. SAMUEL | N/A | Lease | wn (until no longer producing) | TX-04-0431_A.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1530 | MD America Energy, LLC | BARBARA LEWIS WILLITS | N/A | Lease | wn (until no longer producing) | TX00274 | 0.00 | X | | |
| 1531 | MD America Energy, LLC | NEIL MATHIS | N/A | Lease | wn (until no longer producing) | TX-04-0204-15 | 0.00 | X | | |
| 1532 | MD America Energy, LLC | BOBBIE JACK MCVEY ARMSTRONG | N/A | Lease | wn (until no longer producing) | TX-04-0204-02 | 0.00 | X | | |
| 1533 | MD America Energy, LLC | MARY JO MCVEY | N/A | Lease | wn (until no longer producing) | TX-04-0204-16 | 0.00 | X | | |
| 1534 | MD America Energy, LLC | JOHNNY WALKER | N/A | Lease | wn (until no longer producing) | TX-04-0204-24 | 0.00 | X | | |
| 1535 | MD America Energy, LLC | SHARON ANN ANDERSON | N/A | Lease | wn (until no longer producing) | TX-04-0204-01_P.HBP | 0.00 | X | | |
| 1536 | MD America Energy, LLC | BETTY ANN MCVEY DEFORE | N/A | Lease | wn (until no longer producing) | TX-04-0204-04_P.HBP | 0.00 | X | | |
| 1537 | MD America Energy, LLC | BILLY EASTERLING | N/A | Lease | wn (until no longer producing) | TX-04-0204-05_P.HBP | 0.00 | X | | |
| 1538 | MD America Energy, LLC | REBECCA SCARMARDO | N/A | Lease | wn (until no longer producing) | TX-04-0204-23_P.HBP | 0.00 | X | | |
| 1539 | MD America Energy, LLC | SOHNNE SOWELL HILL, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0825_A.HBP.VS | 0.00 | X | | |
| 1540 | MD America Energy, LLC | DANA LYNN WEBB MANDELL, PEGGY M. OSBORNE, INDIVIDUALLY AND AS TRUSTEE OF THE OSBORNE FAMILY TRUST, RICHARD CLARK OSBORNE AND CAROLYN LYNN OSBORNE ISBELL | N/A | Lease | wn (until no longer producing) | TX-04-0901_P.HBP.HSVS(SI*90) | 0.00 | X | | |
| 1541 | MD America Energy, LLC | ROBERT PREJEAN | N/A | Lease | wn (until no longer producing) | TX-04-0204-19_P.HBP | 0.00 | X | | |
| 1542 | MD America Energy, LLC | FLORA LUCILLE DAVIS | N/A | Lease | wn (until no longer producing) | TX00267 | 0.00 | X | | |
| 1543 | MD America Energy, LLC | AMY ELIZABETH JOHNSON | N/A | Lease | wn (until no longer producing) | TX-04-0824_P.HBP | 0.00 | X | | |
| 1544 | MD America Energy, LLC | TIMOTHY WAYNE BURR | N/A | Lease | wn (until no longer producing) | TX-04-0511_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1545 | MD America Energy, LLC | DIANNE CAREY | N/A | Lease | wn (until no longer producing) | TX-04-0510_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1546 | MD America Energy, LLC | CAROL GOLMON | N/A | Lease | wn (until no longer producing) | TX-04-0204-07_P.HBP | 0.00 | X | | |
| 1547 | MD America Energy, LLC | SUZANNE HIPPLER | N/A | Lease | wn (until no longer producing) | TX-04-0204-08_P.HBP | 0.00 | X | | |
| 1548 | MD America Energy, LLC | STEVEN HURST | N/A | Lease | wn (until no longer producing) | TX-04-0204-10_P.HBP | 0.00 | X | | |
| 1549 | MD America Energy, LLC | SAMMIE RUBY KELLEY | N/A | Lease | wn (until no longer producing) | TX-04-0204-11_P.HBP | 0.00 | X | | |
| 1550 | MD America Energy, LLC | JOHN LEWIS | N/A | Lease | wn (until no longer producing) | TX00268 | 0.00 | X | | |
| 1551 | MD America Energy, LLC | JOHN D. BATSON | N/A | Lease | wn (until no longer producing) | TX-04-0204-03_P.HBP | 0.00 | X | | |
| 1552 | MD America Energy, LLC | PATSY NELL KEPKA | N/A | Lease | wn (until no longer producing) | TX-04-0204-12_P.HBP | 0.00 | X | | |
| 1553 | MD America Energy, LLC | HELEN J. COLE, INDIVIDUALLY AND AS ATTORNEY-IN-FACT FOR ARNOLD J. COLE | N/A | Lease | wn (until no longer producing) | TX-04-0337_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1554 | MD America Energy, LLC | LORETTA HOLEMAN | N/A | Lease | wn (until no longer producing) | TX-04-0204-09_P.HBP | 0.00 | X | | |
| 1555 | MD America Energy, LLC | DALE KEYWORTH A/K/A DALE BOLEN MANESS | N/A | Lease | wn (until no longer producing) | TX-04-0204-13_P.HBP | 0.00 | X | | |
| 1556 | MD America Energy, LLC | MATTIE FLORENCE MANESS | N/A | Lease | wn (until no longer producing) | TX-04-0204-14_P.HBP | 0.00 | X | | |
| 1557 | MD America Energy, LLC | CHRISTOPHER MEGASON | N/A | Lease | wn (until no longer producing) | TX-04-0204-17_P.HBP | 0.00 | X | | |
| 1558 | MD America Energy, LLC | OPAL ARTHULA ODOM, A/K/A ARTHULA MANESS HAYES | N/A | Lease | wn (until no longer producing) | TX-04-0204-18_P.HBP | 0.00 | X | | |
| 1559 | MD America Energy, LLC | KATHLEEN B. MATHEWS | N/A | Lease | wn (until no longer producing) | TX00045C | 0.00 | X | | |
| 1560 | MD America Energy, LLC | MARY M. MUELLER | N/A | Lease | wn (until no longer producing) | TX00272 | 0.00 | X | | |
| 1561 | MD America Energy, LLC | CHARLES RAY PRESLEY, JR. | N/A | Lease | wn (until no longer producing) | TX-04-0204-20_P.HBP | 0.00 | X | | |
| 1562 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00112_A.HBP.NTP(J.M.AndrewsGU) | 0.00 | X | | |
| 1563 | MD America Energy, LLC | LLOYD MASON, GLINDA MASON, AND LOIS MARIE MASON WILLIAMS | N/A | Lease | wn (until no longer producing) | TX-04-0540_A.HBP(FM;SI90) | 0.00 | X | | |
| 1564 | MD America Energy, LLC | CHRISTOPHER DAVID REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00982_P.HBP.HSVS | 0.00 | X | | |
| 1565 | MD America Energy, LLC | ELIZABETH PAMELA REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00984_P.HBP.HSVS | 0.00 | X | | |
| 1566 | MD America Energy, LLC | LEAH REDMON PRINCE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00979_P.HBP.HSVS | 0.00 | X | | |
| 1567 | MD America Energy, LLC | BRIAN EDWARD REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00981_P.HBP.HSVS | 0.00 | X | | |
| 1568 | MD America Energy, LLC | CLARK EDWARD REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00983_P.HBP.HSVS | 0.00 | X | | |
| 1569 | MD America Energy, LLC | MARK EDWARD REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00985_P.HBP.HSVS | 0.00 | X | | |
| 1570 | MD America Energy, LLC | THOMAS EDWARD REDMON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-00986_P.HBP.HSVS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1571 | MD America Energy, LLC | FLORENCE MCDANIEL | N/A | Lease | wn (until no longer producing) | TX00271 | 0.00 | X | | |
| 1572 | MD America Energy, LLC | CLARK C. MCDANIEL | N/A | Lease | wn (until no longer producing) | TX00270 | 0.00 | X | | |
| 1573 | MD America Energy, LLC | STEVEN D. MCDANIEL | N/A | Lease | wn (until no longer producing) | TX00269 | 0.00 | X | | |
| 1574 | MD America Energy, LLC | TERRY L. MAY | N/A | Lease | wn (until no longer producing) | TX00122E | 0.00 | X | | |
| 1575 | MD America Energy, LLC | DOANALD RAY MAY | N/A | Lease | wn (until no longer producing) | TX00122D | 0.00 | X | | |
| 1576 | MD America Energy, LLC | ROBERT HENRY MAY | N/A | Lease | wn (until no longer producing) | TX00122A | 0.00 | X | | |
| 1577 | MD America Energy, LLC | JAMES EDWARD MAY | N/A | Lease | wn (until no longer producing) | TX00122B | 0.00 | X | | |
| 1578 | MD America Energy, LLC | DELORES MAY BIRCHUM | N/A | Lease | wn (until no longer producing) | TX00122F | 0.00 | X | | |
| 1579 | MD America Energy, LLC | LANELL GAFFORD | N/A | Lease | wn (until no longer producing) | TX00122G | 0.00 | X | | |
| 1580 | MD America Energy, LLC | LINDA SUE PRESLEY | N/A | Lease | wn (until no longer producing) | TX00122H | 0.00 | X | | |
| 1581 | MD America Energy, LLC | BETTY J. WADE | N/A | Lease | wn (until no longer producing) | TX00122C | 0.00 | X | | |
| 1582 | MD America Energy, LLC | LAURA ALLISON PRESLEY ANDERSON | N/A | Lease | wn (until no longer producing) | TX-04-0204-25 | 0.00 | X | | |
| 1583 | MD America Energy, LLC | MATTHEW AARON PRESLEY | N/A | Lease | wn (until no longer producing) | TX-04-0204-22_P.HBP | 0.00 | X | | |
| 1584 | MD America Energy, LLC | DAVID ARTHUR WEICK | N/A | Lease | wn (until no longer producing) | TX00273 | 0.00 | X | | |
| 1585 | MD America Energy, LLC | ROBERT HAROLDE PEEL | N/A | Lease | wn (until no longer producing) | TX-04-0459-02_P.HBP(FM;SI90) | 0.00 | X | | |
| 1586 | MD America Energy, LLC | GARY DAVID MABRY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0587_P.HBP(FM;SI90) | 0.00 | X | | |
| 1587 | MD America Energy, LLC | LAURA BAILEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0447-01_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1588 | MD America Energy, LLC | RONALD BAILEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0447-02_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1589 | MD America Energy, LLC | DORA COMPIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0448_P.HBP(FM;SI90) | 0.00 | X | | |
| 1590 | MD America Energy, LLC | DENNISE MARIE PEEL EDWARDS | N/A | Lease | wn (until no longer producing) | TX-04-0459-01_A.HBP(FM;SI90) | 0.00 | X | | |
| 1591 | MD America Energy, LLC | TRAVIS M. MABRY | N/A | Lease | wn (until no longer producing) | TX-04-0627_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1592 | MD America Energy, LLC | SYBLE MARIE LITTLE BY HER AGENT AND ATTORNEY-IN-FACT, THOMAS M. LITTLE | N/A | Lease | wn (until no longer producing) | TX-04-0621_P.HBP(FM;SI90) | 0.00 | X | | |
| 1593 | MD America Energy, LLC | JOHN MABRY | N/A | Lease | wn (until no longer producing) | TX-04-0622_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1594 | MD America Energy, LLC | MILAM MABRY | N/A | Lease | wn (until no longer producing) | TX-04-0623_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1595 | MD America Energy, LLC | SARAH MABRY | N/A | Lease | wn (until no longer producing) | TX-04-0625_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1596 | MD America Energy, LLC | LANCE L HAYS AND WIFE FRANCINE ANNE HAYS | N/A | Lease | wn (until no longer producing) | TX-04-0591_P.HBP(FM;SI90) | 0.00 | X | | |
| 1597 | MD America Energy, LLC | GEORGE E. JASTER AND WIFE, LAURA S. JASTER | N/A | Lease | wn (until no longer producing) | TX-04-0589_P.HBP(FM;SI90) | 0.00 | X | | |
| 1598 | MD America Energy, LLC | THE ESTATE OF T.O. DUNMAN, JR. | N/A | Lease | wn (until no longer producing) | TX00231_A.HBP | 0.00 | X | | |
| 1599 | MD America Energy, LLC | TERRY M JONES ET UX | N/A | Lease | wn (until no longer producing) | TX-03-0044-020 | 0.00 | X | | |
| 1600 | MD America Energy, LLC | MARK B LINDSAY HUSBAND OF/AND PATRICIA HILL LINDSAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-007 | 0.00 | X | | |
| 1601 | MD America Energy, LLC | DEBORAH ANN PEEL BROSCH | N/A | Lease | wn (until no longer producing) | TX-04-0610_P.HBP(FM;SI90) | 0.00 | X | | |
| 1602 | MD America Energy, LLC | GERALD J. CREIGHTON, JR. | N/A | Lease | wn (until no longer producing) | TX-04-0612_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1603 | MD America Energy, LLC | THOMAS HAROLD LEE | N/A | Lease | wn (until no longer producing) | TX-04-0620_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1604 | MD America Energy, LLC | MIDHILL, A PARTNERSHIP, TRUSTEE F/B/O SUSAN E. HEISS SEP IRA | N/A | Lease | wn (until no longer producing) | TX-04-0628_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1605 | MD America Energy, LLC | MARY ELIZABETH FIELDS, A/K/A MARY ELIZABETH LEE | N/A | Lease | wn (until no longer producing) | TX-04-0614_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1606 | MD America Energy, LLC | MARY ELIZABETH LEE FINDLEY, A/K/A MARY BETH LEE | N/A | Lease | wn (until no longer producing) | TX-04-0615_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1607 | MD America Energy, LLC | JOSEPH M. RIDDELL, III, INDEPENDENT EXECUTOR OF THE ESTATE OF PATRICIA SUE HENGY RIDDELL, DECEASED, SAID ESTATE CURRENTLY IN PROBATE UNDER CAUSE NO. 2010-PR01977-1, PROBATE COURT NO. 1, TARRANT COUNTY, TEXAS | N/A | Lease | wn (until no longer producing) | TX-04-0578_P.HBP.VS(FM;SI90) | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1608 | MD America Energy, LLC | JAY C COLEMAN AND JOYCE M. COLEMAN HUSBAND AND WIFE | N/A | Lease | wn (until no longer producing) | TX-03-0044-006 | 0.00 | X | | |
| 1609 | MD America Energy, LLC | XENIA HENGY TILLERY | N/A | Lease | wn (until no longer producing) | TX-04-0586_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1610 | MD America Energy, LLC | HAROLD WILDER, D/B/A K & W RESOURCES, LTD. | N/A | Lease | wn (until no longer producing) | TX-04-0588_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1611 | MD America Energy, LLC | PEGGY T. FOWLER | N/A | Lease | wn (until no longer producing) | TX-04-0463_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1612 | MD America Energy, LLC | CHERRIE LANE WATSON | N/A | Lease | wn (until no longer producing) | TX-04-0630_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1613 | MD America Energy, LLC | ELLINGTON L. DARDEN | N/A | Lease | wn (until no longer producing) | TX-04-0613_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1614 | MD America Energy, LLC | KRONZER FAMILY LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-04-0619_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1615 | MD America Energy, LLC | SHERRIDAN PEEL BRIGGS AND CURTIS BRIGGS | N/A | Lease | wn (until no longer producing) | TX-04-0609_P.HSVS(FM;SI90) | 0.00 | X | | |
| 1616 | MD America Energy, LLC | RENEE PEEL BUTLER, A/K/A RENEE LISA PEEL | N/A | Lease | wn (until no longer producing) | TX-04-0611_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1617 | MD America Energy, LLC | WATKINS FAMILY INVESTMENTS, LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-04-0617_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1618 | MD America Energy, LLC | FRANK T. ABRAHAM FAMILY TRUST, BY NANCY GREEN ABRAHAM & HOUSTON TRUST CO., CO-TRUSTEES | N/A | Lease | wn (until no longer producing) | TX-04-0618_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1619 | MD America Energy, LLC | NANCY GREEN ABRHAM | N/A | Lease | wn (until no longer producing) | TX-04-0608_P.HBP.HSVS(FM;SI90) | 0.00 | X | | |
| 1620 | MD America Energy, LLC | DOUGLAS G. YULE OR TRUSTEE OF THE WILLIAM H. YULE TRUST | N/A | Lease | wn (until no longer producing) | TX00222 | 0.00 | X | | |
| 1621 | MD America Energy, LLC | JERRY STEPHENS | N/A | Lease | wn (until no longer producing) | TX00201 | 0.00 | X | | |
| 1622 | MD America Energy, LLC | JANIS JEAN METCALF | N/A | Lease | wn (until no longer producing) | TX-03-0059 | 0.00 | X | | |
| 1623 | MD America Energy, LLC | FRANK D. CARTER, A SINGLE MAN AND LIFE TENANT | N/A | Lease | wn (until no longer producing) | TX00265 | 0.00 | X | | |
| 1624 | MD America Energy, LLC | SHELLEY HEWITT SIMRIN | N/A | Lease | wn (until no longer producing) | TX-01-0050-04_P.HBP.HS | 0.00 | X | | |
| 1625 | MD America Energy, LLC | KENT J. HEWITT | N/A | Lease | wn (until no longer producing) | TX-01-0050-05_P.HBP.HS | 0.00 | X | | |
| 1626 | MD America Energy, LLC | ELIZABETH ANNE AYDAM | N/A | Lease | wn (until no longer producing) | TX-01-0050-03_P.HBP.HS | 0.00 | X | | |
| 1627 | MD America Energy, LLC | ALICE C. BERTUCCI | N/A | Lease | wn (until no longer producing) | TX-01-0050-02_P.HBP.HS | 0.00 | X | | |
| 1628 | MD America Energy, LLC | ALINE REESE CROMPTON | N/A | Lease | wn (until no longer producing) | TX-01-0050-01_P.HBP.HS | 0.00 | X | | |
| 1629 | MD America Energy, LLC | BARBARA JEFFREY O'NEAL CLAY | N/A | Lease | wn (until no longer producing) | TX-03-0044-019 | 0.00 | X | | |
| 1630 | MD America Energy, LLC | ORLAN WEATHERFORD AND WIFE, MARY DELL WEATHERFORD | N/A | Lease | wn (until no longer producing) | TX00198A_P.HBP.VS | 0.00 | X | | |
| 1631 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00227_A.HBP.DL | 0.00 | X | | |
| 1632 | MD America Energy, LLC | JOHN P. WATSON AND WIFE, GLADYS A. WATSON | N/A | Lease | wn (until no longer producing) | TX00216 | 0.00 | X | | |
| 1633 | MD America Energy, LLC | ANTHONY COLWELL | N/A | Lease | wn (until no longer producing) | TX00198C_P.HBP.VS | 0.00 | X | | |
| 1634 | MD America Energy, LLC | DEWAYNE SPRINGER AIF EDITH SPRINGER DENMAN | N/A | Lease | wn (until no longer producing) | TX00208 | 0.00 | X | | |
| 1635 | MD America Energy, LLC | DOROTHY L. CONNER, ADMINISTRATRIX OF THE ESTATE OF EDITH M. DENMAN, DECEASED | N/A | Lease | wn (until no longer producing) | TX00207 | 0.00 | X | | |
| 1636 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0303-07576_A.HBP.DL | 0.00 | X | | |
| 1637 | MD America Energy, LLC | JAMES HENRY REIMER | N/A | Lease | wn (until no longer producing) | TX00217B_P.HBP | 0.00 | X | | |
| 1638 | MD America Energy, LLC | DOROTHY LEA WINKLES | N/A | Lease | wn (until no longer producing) | TX00217D_P.HBP | 0.00 | X | | |
| 1639 | MD America Energy, LLC | GARY PAUL REIMER | N/A | Lease | wn (until no longer producing) | TX00217C_P.HBP | 0.00 | X | | |
| 1640 | MD America Energy, LLC | DAVID LLOYD REIMER | N/A | Lease | wn (until no longer producing) | TX00217F_P.HBP | 0.00 | X | | |
| 1641 | MD America Energy, LLC | ELIZABETH ANN MYERS | N/A | Lease | wn (until no longer producing) | TX00217E_P.HBP | 0.00 | X | | |
| 1642 | MD America Energy, LLC | Q. JOSEPH AND ELLA E. MACHAC TRUSTEES OF THE Q. JOSEPH AND ELLA E. MACHAC LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00217A_P.HBP | 0.00 | X | | |
| 1643 | MD America Energy, LLC | PAUL BAILEY, JOINED HEREIN PRO FORMA BY HIS WIFE, CAROLYN BAILEY | N/A | Lease | wn (until no longer producing) | TX-04-0528_A.HBP(FM;SI90) | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1644 | MD America Energy, LLC | JAMES EDWARD STONE AND WIFE, GUADALUPE STONE | N/A | Lease | wn (until no longer producing) | TX-04-0642_P.HBP.VS(SI*90) | 0.00 | X | | |
| 1645 | MD America Energy, LLC | ROLAND JEFFERY KEEFER | N/A | Lease | wn (until no longer producing) | TX00091G | 0.00 | X | | |
| 1646 | MD America Energy, LLC | JOHN WAYNE KEEFER | N/A | Lease | wn (until no longer producing) | TX00091F | 0.00 | X | | |
| 1647 | MD America Energy, LLC | JULIA ANN EDWARDS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0844_P.HBP(FM;SI90) | 0.00 | X | | |
| 1648 | MD America Energy, LLC | DONALD SCOTT EDWARDS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0841-01_P.HBP(FM;SI90) | 0.00 | X | | |
| 1649 | MD America Energy, LLC | ALBERT BONIFAZI, IND., AS DEVISEE AND AS IND. EXEC. OF THE ESTATE OF ANGELA BONIFAZI, DECEASED, ET AL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07621_P.HBP | 0.00 | X | | |
| 1650 | MD America Energy, LLC | ALBERT BONIFAZI, IND., AS DEVISEE AND AS IND. EXEC. OF THE ESTATE OF ANGELA BONIFAZI, DECEASED, ET AL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07633_P.HBP | 0.00 | X | | |
| 1651 | MD America Energy, LLC | JAMES D. PARKER, JR., AND PAMELA YOCHAM PARKER | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07629_P.HBP | 0.00 | X | | |
| 1652 | MD America Energy, LLC | DOUGLAS D. DANIELL, AND WIFE, MARGARET KITCHENS DANIELL | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07628 | 0.00 | X | | |
| 1653 | MD America Energy, LLC | PHYLLIS BONIFAZI | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07622 | 0.00 | X | | |
| 1654 | MD America Energy, LLC | ELIZABETH GRIFFIN BETTIS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07630_P.HBP | 0.00 | X | | |
| 1655 | MD America Energy, LLC | ABIGAIL CHANCE THOMASON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07632_P.HBP | 0.00 | X | | |
| 1656 | MD America Energy, LLC | RAGAN CREEK, LTD., A TEXAS LIMITED PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-7266 | 0.00 | X | | |
| 1657 | MD America Energy, LLC | ROBERTA J. BLOCH | N/A | Lease | wn (until no longer producing) | TX-01-0050-07_P.HBP.HS | 0.00 | X | | |
| 1658 | MD America Energy, LLC | JAMES KEET LEWIS III | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07625_P.HBP | 0.00 | X | | |
| 1659 | MD America Energy, LLC | ROBERT RISHER LEWIS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07626_P.HBP | 0.00 | X | | |
| 1660 | MD America Energy, LLC | LAURA LEWIS JONES | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07627_P.HBP | 0.00 | X | | |
| 1661 | MD America Energy, LLC | ARTHUR M. HENSON, COUNTY JUDGE OF MADISON COUNTY, TEXAS, ACTING IN HIS CAPACITY AS RECEIVER FOR MINERAL INTERESTS UNDER APPOINTMENT BY THE 278TH JUDICIAL DISTRICT COURT OF MADISON COUNTY, TEXAS, IN CAUSE NO. 13-13337-278-10, FOR LEWIS S. WEST, AND HIS HEIRS, DEVISEES, SUCCESSORS AND/OR ASSIGNS, KNOWN OR UNKNOWN, IF ANY OF THEM SHOULD BE DECEASED | N/A | Lease | wn (until no longer producing) | TX00066B_P.HBP | 0.00 | X | | |
| 1662 | MD America Energy, LLC | MARSHAL A. HARRELL AND WIFE, B. SHELTON HARRELL | N/A | Lease | wn (until no longer producing) | TX-06-7265 | 0.00 | X | | |
| 1663 | MD America Energy, LLC | BERTRAND C. KLEIN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-01-0050-13_P.HBP.HS | 0.00 | X | | |
| 1664 | MD America Energy, LLC | GLYNA BROWN AND KATHERINE MATHIS GUSTAVUS, INDEPENDENT CO-EXECUTORS OF THE ESTATE OF LENA CAMPBELL MATHIS, DECEASED AND KATHERINE MATHIS GUSTAVUS, TRUSTEE OF THE GLENN FOREST MATHIS RESIDUARY TRUST | N/A | Lease | wn (until no longer producing) | TX-03-0071_A.HBP.HSVS | 0.00 | X | | |
| 1665 | MD America Energy, LLC | BARBARA HIBBETTS WILSON, A SINGLE WOMAN; TRAVIS F. HIBBETTS, A MARRIED MAN DEALING IN HIS SOLE AND SEPARATE PROPERTY; JANE K. HIBBETTS, INDIVIDUALLY AND AS TRUSTEE OF THE CARL ROBERT HIBBETTS FAMILY TRUST | N/A | Lease | wn (until no longer producing) | TX00236 | 0.00 | X | | |
| 1666 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-00616_A.HBP.DL | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1667 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00229_A.HBP.DL.NTP(ThomasonA1H) | 0.00 | X | | |
| 1668 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00230 | 0.00 | X | | |
| 1669 | MD America Energy, LLC | BELYNDA GALE WILSON, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0907-02 | 0.00 | X | | |
| 1670 | MD America Energy, LLC | MAURINE WILSON, REPRESENTED HEREIN BY HER ATTORNEY IN FACT, CONNIE PASHO | N/A | Lease | wn (until no longer producing) | TX-04-0907-01 | 0.00 | X | | |
| 1671 | MD America Energy, LLC | JAMES LEE STANDLEY, DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0908 | 0.00 | X | | |
| 1672 | MD America Energy, LLC | SAM GARRETT STANDLEY, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-04-0906 | 0.00 | X | | |
| 1673 | MD America Energy, LLC | DOUGLAS STANDLEY BAUGH, A SINGLE MAN | N/A | Lease | wn (until no longer producing) | TX-04-0904 | 0.00 | X | | |
| 1674 | MD America Energy, LLC | ANN STANDLEY POE, DEALING IN HER SOLE SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0909 | 0.00 | X | | |
| 1675 | MD America Energy, LLC | KRISTI LYN STANDLEY, A SINGLE WOMAN | N/A | Lease | wn (until no longer producing) | TX-04-0903_P.HBP.VS(FM;SI90) | 0.00 | X | | |
| 1676 | MD America Energy, LLC | DUANE TAYLOR STANDLEY, DEALING IN HIS SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0905 | 0.00 | X | | |
| 1677 | MD America Energy, LLC | SAMMIE JO LEWIS, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-04-0902 | 0.00 | X | | |
| 1678 | MD America Energy, LLC | SAMUEL SIMONS | N/A | Lease | wn (until no longer producing) | TX00091K | 0.00 | X | | |
| 1679 | MD America Energy, LLC | TERRANCE SIMONS | N/A | Lease | wn (until no longer producing) | TX00091L | 0.00 | X | | |
| 1680 | MD America Energy, LLC | KENNETH WYATT SIMONS | N/A | Lease | wn (until no longer producing) | TX00091M | 0.00 | X | | |
| 1681 | MD America Energy, LLC | JUDY MAY RASCO MARTIN, AS TRUSTEE OF THE WILL RASCO FAMILY LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00091J | 0.00 | X | | |
| 1682 | MD America Energy, LLC | THOMAS G. SANDERS | N/A | Lease | wn (until no longer producing) | TX-06-0012-027 | 0.00 | X | | |
| 1683 | MD America Energy, LLC | VIVIAN MYRLE MALLETT MCDOUGALD | N/A | Lease | wn (until no longer producing) | TX-06-0012-029 | 0.00 | X | | |
| 1684 | MD America Energy, LLC | ANDREW HAWKINS, TRUSTEE FOR THE 2012 VERA F. WYATT REVOCABLE TRUST DATED AUGUST 30, 2012 | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07631_P.HBP | 0.00 | X | | |
| 1685 | MD America Energy, LLC | CHIMNEY HILL RESOURCES, LLC | N/A | Lease | wn (until no longer producing) | TX00046D_P.HBP | 0.00 | X | | |
| 1686 | MD America Energy, LLC | NORMA RUTH SANDERS ADUDDELL | N/A | Lease | wn (until no longer producing) | TX-06-0012-008 | 0.00 | X | | |
| 1687 | MD America Energy, LLC | PHILIP CHARLES BRASHIER | N/A | Lease | wn (until no longer producing) | TX-06-0012-025 | 0.00 | X | | |
| 1688 | MD America Energy, LLC | ELIZABETH PEARSON REAVES, F/K/A ELIZABETH PEARSON LOFTIN | N/A | Lease | wn (until no longer producing) | TX-06-0012-028 | 0.00 | X | | |
| 1689 | MD America Energy, LLC | LESLIE A. COOK | N/A | Lease | wn (until no longer producing) | TX-06-0012-024 | 0.00 | X | | |
| 1690 | MD America Energy, LLC | TAD EDWARD COOK | N/A | Lease | wn (until no longer producing) | TX-06-0012-023 | 0.00 | X | | |
| 1691 | MD America Energy, LLC | KATHY JORGENSEN | N/A | Lease | wn (until no longer producing) | TX-06-0012-022 | 0.00 | X | | |
| 1692 | MD America Energy, LLC | DEBORAH J. COOK | N/A | Lease | wn (until no longer producing) | TX-06-0012-026 | 0.00 | X | | |
| 1693 | MD America Energy, LLC | ARTHUR R. KEETON, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0012-020 | 0.00 | X | | |
| 1694 | MD America Energy, LLC | BOB LOFTIN ROYALL | N/A | Lease | wn (until no longer producing) | TX-06-0012-018 | 0.00 | X | | |
| 1695 | MD America Energy, LLC | PAMELA JEAN WILCOX | N/A | Lease | wn (until no longer producing) | TX-06-0012-019 | 0.00 | X | | |
| 1696 | MD America Energy, LLC | THOMAS E. COOK | N/A | Lease | wn (until no longer producing) | TX-06-0012-007 | 0.00 | X | | |
| 1697 | MD America Energy, LLC | SEAN SAMUEL BRASHIER-DAVIS | N/A | Lease | wn (until no longer producing) | TX-06-0012-014 | 0.00 | X | | |
| 1698 | MD America Energy, LLC | MADELAINE FRANCIS DAVIS AFRIDI | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07545_P.HBP | 0.00 | X | | |
| 1699 | MD America Energy, LLC | ADRIANA BRASHIER-DAVIS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0606-07546_P.HBP | 0.00 | X | | |
| 1700 | MD America Energy, LLC | HAZEL HOLT SLYTER | N/A | Lease | wn (until no longer producing) | TX-06-0012-030 | 0.00 | X | | |
| 1701 | MD America Energy, LLC | SUSAN HOLT KIDDER | N/A | Lease | wn (until no longer producing) | TX-06-0012-013 | 0.00 | X | | |
| 1702 | MD America Energy, LLC | PAUL ROBERT COOKSEY | N/A | Lease | wn (until no longer producing) | TX-06-0012-010 | 0.00 | X | | |
| 1703 | MD America Energy, LLC | MARGARET WREN COOKSEY ANDERSON | N/A | Lease | wn (until no longer producing) | TX-06-0012-009 | 0.00 | X | | |
| 1704 | MD America Energy, LLC | DAVID LOFTIN COOKSEY | N/A | Lease | wn (until no longer producing) | TX-06-0012-017 | 0.00 | X | | |
| 1705 | MD America Energy, LLC | ARTHUR R. KEETON, JR. | N/A | Lease | wn (until no longer producing) | TX-06-0012-021 | 0.00 | X | | |
| 1706 | MD America Energy, LLC | RUTH EVEONNE KAISER SANDERS, INDIVIDUALLY AND AS LIFE ESTATE, AND JEFFREY WAYNE SANDERS, INDIVUALLY AND AS REMAINDERMAN, AND DANIEL WAYNE SANDERS, INDIVIDUALLY AND AS REMAINDERMAN | N/A | Lease | wn (until no longer producing) | TX-06-0012-012 | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1707 | MD America Energy, LLC | DOROTHY MAXINE W. GOODSON, FRANCES WOGENSTAHL, BY DOROTHY MAXINE W.E GOODSON, ATTORNEY-IN-FACT FOR FRANCES WOGENSTAHL, AND ARTHUR BRYAN WOGENSTAHL | N/A | Lease | wn (until no longer producing) | TX-06-0012-011_P.HBP.VS | 0.00 | X | | |
| 1708 | MD America Energy, LLC | ESTATE OF ERIN ELNORA CORBIN, BY WILLIAM ZACK CORBIN, INDEPENDENT EXECUTOR | N/A | Lease | wn (until no longer producing) | TX-06-0012-031 | 0.00 | X | | |
| 1709 | MD America Energy, LLC | KENNETH WREN WILCOX | N/A | Lease | wn (until no longer producing) | TX-06-0012-032 | 0.00 | X | | |
| 1710 | MD America Energy, LLC | CHAYSE ANDREW FARMER | N/A | Lease | wn (until no longer producing) | TX-06-0012-033_P.HBP | 0.00 | X | | |
| 1711 | MD America Energy, LLC | SALLY JON KANKEY AND TRAVIS KANKEY | N/A | Lease | wn (until no longer producing) | TX00223 | 0.00 | X | | |
| 1712 | MD America Energy, LLC | KIMBERLY KANKEY LOWRY | N/A | Lease | wn (until no longer producing) | TX00223A | 0.00 | X | | |
| 1713 | MD America Energy, LLC | WILLIAM R. HENSARLING | N/A | Lease | wn (until no longer producing) | TX-01-0043-26_P.HBP.HSVP | 0.00 | X | | |
| 1714 | MD America Energy, LLC | GEORGIA RUTH KEEFER LEBEL | N/A | Lease | wn (until no longer producing) | TX00091I | 0.00 | X | | |
| 1715 | MD America Energy, LLC | MICHAEL V. PEER | N/A | Lease | wn (until no longer producing) | TX-01-0050-06_P.HBP.HS | 0.00 | X | | |
| 1716 | MD America Energy, LLC | JACQUELINE GERTRUDE BARNETT HAMBRIC ESTATE | N/A | Lease | wn (until no longer producing) | TX00221_A.HBP | 0.00 | X | | |
| 1717 | MD America Energy, LLC | ELSA LAURA JUAREZ AND HUSBAND, JOSE HINOJOSA | N/A | Lease | wn (until no longer producing) | TX-04-0835_P.HBP(FM;SI90) | 0.00 | X | | |
| 1718 | MD America Energy, LLC | GARY PAUL REIMER | N/A | Lease | wn (until no longer producing) | TX00220C_P.HBP | 0.00 | X | | |
| 1719 | MD America Energy, LLC | ELIZABETH ANN MYERS | N/A | Lease | wn (until no longer producing) | TX00220B_P.HBP | 0.00 | X | | |
| 1720 | MD America Energy, LLC | DOROTHY LEA WINKLES | N/A | Lease | wn (until no longer producing) | TX00220D_P.HBP | 0.00 | X | | |
| 1721 | MD America Energy, LLC | JAMES HENRY REIMER | N/A | Lease | wn (until no longer producing) | TX00220E_P.HPB | 0.00 | X | | |
| 1722 | MD America Energy, LLC | DAVID LLOYD REIMER | N/A | Lease | wn (until no longer producing) | TX00220F_P.HBP | 0.00 | X | | |
| 1723 | MD America Energy, LLC | ELEANOR STEGER MADDOX LIFE ESTATE | N/A | Lease | wn (until no longer producing) | TX00220A_P.HBP | 0.00 | X | | |
| 1724 | MD America Energy, LLC | PATRICIA LYNN BREWER | N/A | Lease | wn (until no longer producing) | TX00091H | 0.00 | X | | |
| 1725 | MD America Energy, LLC | Q. JOSEPH MACHAC AND WIFE, ELLA E. MACHAC TRUSTEES OF THE Q JOSEPH & ELLA E. MACHAC LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00220_P.HBP | 0.00 | X | | |
| 1726 | MD America Energy, LLC | CAL FARLEY'S BOYS RANCH | N/A | Lease | wn (until no longer producing) | TX-01-0050-23 | 0.00 | X | | |
| 1727 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00232_A.HBP.DL | 0.00 | X | | |
| 1728 | MD America Energy, LLC | STAR-TELEGRAM CHARITIES, INC. | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0606-01114_P.HBP.HS | 0.00 | X | | |
| 1729 | MD America Energy, LLC | AMERICAN HEART ASSOCIATION, INC. | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0606-01115_P.HBP.HS | 0.00 | X | | |
| 1730 | MD America Energy, LLC | UNITED WAY OF TARRANT COUNTY | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-0106-01113_P.HBP.HS | 0.00 | X | | |
| 1731 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-9999-01560_A.HBP.DL | 0.00 | X | | |
| 1732 | MD America Energy, LLC | B'NAI B'RITH INTERNATIONAL | N/A | Lease | wn (until no longer producing) | TX-01-0050-11 | 0.00 | X | | |
| 1733 | MD America Energy, LLC | FEDERATED COUNCIL OF ISRAEL INSTITUTIONS | N/A | Lease | wn (until no longer producing) | TX-01-0050-18 | 0.00 | X | | |
| 1734 | MD America Energy, LLC | CHERYL L. FLEMING, TRUSTEE OF THE FOX HOLLOW IRREVOCABLE TRUST | N/A | Lease | wn (until no longer producing) | TX00224B_P.HBP.VS | 0.00 | X | | |
| 1735 | MD America Energy, LLC | MARTHA ANN FLEMING CURTIS, TRUSTEE OF THE RICHARD STEPHEN AND MARTHA ANN FLEMING CURTIS LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00224_P.HBP.VS | 0.00 | X | | |
| 1736 | MD America Energy, LLC | PAMELA SHAMBLIN, TRUSTEE OF THE LYN-MARR LIVING TRUST | N/A | Lease | wn (until no longer producing) | TX00224A_P.HBP.VS | 0.00 | X | | |
| 1737 | MD America Energy, LLC | MONCRIEF CANCER FOUNDATION | N/A | Lease | wn (until no longer producing) | TX-01-0050-17.P.HBP | 0.00 | X | | |
| 1738 | MD America Energy, LLC | TEXAS HEALTH RESOURCES FOUNDATION | N/A | Lease | wn (until no longer producing) | TX-01-0050-20.HBP | 0.00 | X | | |
| 1739 | MD America Energy, LLC | DALLAS HOME FOR JEWISH AGED, INC. | N/A | Lease | wn (until no longer producing) | TX-01-0050-19.HBP | 0.00 | X | | |
| 1740 | MD America Energy, LLC | NATIONAL JEWISH HEALTH | N/A | Lease | wn (until no longer producing) | TX-01-0050-15.HBP | 0.00 | X | | |
| 1741 | MD America Energy, LLC | RAYMOND K. PREJEAN AND WIFE, LISA D. PREJEAN | N/A | Lease | wn (until no longer producing) | TX-XR-LLS-9898-07619_P.HBP.VP | 0.00 | X | | |
| 1742 | MD America Energy, LLC | HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC. ("HADASSAH") | N/A | Lease | wn (until no longer producing) | TX-01-0050-14.HBP | 0.00 | X | | |
| 1743 | MD America Energy, LLC | ALL SAINTS HEALTH FOUNDATION | N/A | Lease | wn (until no longer producing) | TX-01-0050-16.HBP | 0.00 | X | | |
| 1744 | MD America Energy, LLC | JANET SUE CASEY | N/A | Lease | wn (until no longer producing) | TX00234_P.HBP.VS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1745 | MD America Energy, LLC | DOROTHY I. DAVIS AKA IMOGENE W. DAVIS | N/A | Lease | wn (until no longer producing) | TX00234A_P.HBP.VS | 0.00 | X | | |
| 1746 | MD America Energy, LLC | CHARLES DUANE GEYER | N/A | Lease | wn (until no longer producing) | TX00234B_P.HBP.VS | 0.00 | X | | |
| 1747 | MD America Energy, LLC | DARRELL GLENN GEYER | N/A | Lease | wn (until no longer producing) | TX00234C_P.HBP.VS | 0.00 | X | | |
| 1748 | MD America Energy, LLC | MARILYN PALMOS GEYER | N/A | Lease | wn (until no longer producing) | TX00234D_P.HBP.VS | 0.00 | X | | |
| 1749 | MD America Energy, LLC | PATRICK WADE GEYER | N/A | Lease | wn (until no longer producing) | TX00234E_P.HBP.VS | 0.00 | X | | |
| 1750 | MD America Energy, LLC | PATSY WALLER JACK | N/A | Lease | wn (until no longer producing) | TX00234F_P.HBP.VS | 0.00 | X | | |
| 1751 | MD America Energy, LLC | PAMLA WALLER MARBLE | N/A | Lease | wn (until no longer producing) | TX00234G_P.HBP.VS | 0.00 | X | | |
| 1752 | MD America Energy, LLC | BRUCE WAYNE WALLER | N/A | Lease | wn (until no longer producing) | TX00234H_P.HBP.VS | 0.00 | X | | |
| 1753 | MD America Energy, LLC | IMOGENE ISAAC WEATHERFORD | N/A | Lease | wn (until no longer producing) | TX00233B_P.HBP.VS | 0.00 | X | | |
| 1754 | MD America Energy, LLC | JASON RAY SEYMOUR | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07623_P.HBP | 0.00 | X | | |
| 1755 | MD America Energy, LLC | JOHN FLOYD MOORE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07620_P.HBP | 0.00 | X | | |
| 1756 | MD America Energy, LLC | GRAND ROYAL ARCH CHAPTER OF TEXAS FOR ITS HOME FOR AGED MASONS, A TEXAS NON PROFIT CORPORATION | N/A | Lease | wn (until no longer producing) | TX-01-0050-21_P.HBP | 0.00 | X | | |
| 1757 | MD America Energy, LLC | JEWISH FEDERATION OF FORT WORTH | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-0106-01127_P.HBP.HS | 0.00 | X | | |
| 1758 | MD America Energy, LLC | BILL J. COOLEY AND WIFE, FRANCES BOSWELL COOLEY | N/A | Lease | wn (until no longer producing) | TX00214_A.HBP | 0.00 | X | | |
| 1759 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-03-0103 | 0.00 | X | | |
| 1760 | MD America Energy, LLC | GREGORY S. WILLEMS | N/A | Lease | wn (until no longer producing) | TX00233A_P.HBP.VS | 0.00 | X | | |
| 1761 | MD America Energy, LLC | COMMISIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX00242 | 0.00 | X | | |
| 1762 | MD America Energy, LLC | CASANDRA COOK JONES | N/A | Lease | wn (until no longer producing) | TX00146B | 0.00 | X | | |
| 1763 | MD America Energy, LLC | CASANDRA COOK JONES | N/A | Lease | wn (until no longer producing) | TX00146A_P.HBP | 0.00 | X | | |
| 1764 | MD America Energy, LLC | ASPEN GROVE ROYALTY COMPANY, LLC | N/A | Lease | wn (until no longer producing) | TX-03-0044-021-P.HBP.VS | 0.00 | X | | |
| 1765 | MD America Energy, LLC | KENNETH W. BEVERLY AND WIFE, SHARON C. BEVERLY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01491_P.HBP.NTP(Reynolds) | 0.00 | X | | |
| 1766 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-03-0104_A.HBP.DL | 0.00 | X | | |
| 1767 | MD America Energy, LLC | KENNETH ANDREW, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0841-03_P.HBP(FM;SI90) | 0.00 | X | | |
| 1768 | MD America Energy, LLC | JOE HAROLD ANDREW, INDIVIDUALLY | N/A | Lease | wn (until no longer producing) | TX-04-0841-02_P.HBP(FM;SI90) | 0.00 | X | | |
| 1769 | MD America Energy, LLC | UNION PACIFIC RAILROAD COMPANY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07489_A.HBP.VS | 0.00 | X | | |
| 1770 | MD America Energy, LLC | ROBERT E. BARNES AND JOHNNIE RUTH BARNES | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07624_P.HBP | 0.00 | X | | |
| 1771 | MD America Energy, LLC | WANDA PLOTTS, INDIVIDUALLY, AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF PETER B. PLOTTS, DECEASED | N/A | Lease | 4/22/2021 | TX-KR-LLS-9898-07931_P.HBP | 0.00 | X | | |
| 1772 | MD America Energy, LLC | ANNETTE PLOTTS STAFFORD AND HUSBAND, MIKE STAFFORD | N/A | Lease | 4/22/2021 | TX-KR-LLS-9898-07927_P.HBP | 0.00 | X | | |
| 1773 | MD America Energy, LLC | LEW V. PLOTTS, JR. AND WIFE, BEVERLY ANN PLOTTS | N/A | Lease | 4/22/2021 | TX-KR-LLS-9898-07929_P.HBP | 0.00 | X | | |
| 1774 | MD America Energy, LLC | JEFF D. PLOTTS AND WIFE, AMY L. PLOTTS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9898-07928_P.HBP.VP (04/22/2021) | 0.00 | X | | |
| 1775 | MD America Energy, LLC | PAULA JEAN MILLER, FORMERLY KNOWN AS PAULA JEAN DOTY | N/A | Lease | 5/19/2021 | TX-KR-LLS-9898-08113_P.HBP | 0.00 | X | | |
| 1776 | MD America Energy, LLC | DAVID MCWHORTER, ALSO KNOWN AS BUEL DAVID MCWHORTER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01590_P.HBP.VS | 0.00 | X | | |
| 1777 | MD America Energy, LLC | THOMAS DORMAN MCWHORTER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01591_P.HBP.VS | 0.00 | X | | |
| 1778 | MD America Energy, LLC | OPAL A. FERGUSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01477_P.HBP.VS | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1779 | MD America Energy, LLC | DAVID MCWHORTER, ALSO KNOWN AS BUEL DAVID MCWHORTER AND WIFE, DIANE MCWHORTER | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01476_P.HBP.VS | 0.00 | X | | |
| 1780 | MD America Energy, LLC | BOBBIE M. SOUTHER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01519_P.HBP.VS | 0.00 | X | | |
| 1781 | MD America Energy, LLC | DAN WILLIAM LEWIS, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01467_P.HBP.VS | 0.00 | X | | |
| 1782 | MD America Energy, LLC | DONALD J. LEWIS, II, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01475_P.HBP.VS | 0.00 | X | | |
| 1783 | MD America Energy, LLC | DARRELL SCOTT LEWIS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01473_P.HBP.VS | 0.00 | X | | |
| 1784 | MD America Energy, LLC | GERRELDENE HOPPE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01592_P.HBP.VS | 0.00 | X | | |
| 1785 | MD America Energy, LLC | COUNTY OF MADISON TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01673_A.ACT.HPVP | 0.00 | X | | |
| 1786 | MD America Energy, LLC | JIM PATRICK MCCULLOCH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01678_P.ACT.HPVP | 0.00 | X | | |
| 1787 | MD America Energy, LLC | LINDA BOSSE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-03982_A.ACT.HPVP | 0.00 | X | | |
| 1788 | MD America Energy, LLC | CHARLES E. HEATH, SR. AND WIFE, GLORIA JUNE HEATH | N/A | Lease | wn (until no longer producing) | TX-06-7254 | 0.00 | X | | |
| 1789 | MD America Energy, LLC | NANCY CLOPTON, DEALING IN HER SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-06-7253 | 0.00 | X | | |
| 1790 | MD America Energy, LLC | ETOCO, INC. | N/A | Lease | wn (until no longer producing) | TX-06-7255 | 0.00 | X | | |
| 1791 | MD America Energy, LLC | PROSPERITY BANK AS AGENT & ATTY-IN-FACT FOR DAVID LLOYD | N/A | Lease | wn (until no longer producing) | TX-06-7258 | 0.00 | X | | |
| 1792 | MD America Energy, LLC | LOCHBUIE, LLC | N/A | Lease | wn (until no longer producing) | TX-06-7257 | 0.00 | X | | |
| 1793 | MD America Energy, LLC | THE RESERVE PETROLEUM COMPANY | N/A | Lease | wn (until no longer producing) | TX-06-7256 | 0.00 | X | | |
| 1794 | MD America Energy, LLC | SINGER BROS, A PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-06-7259 | 0.00 | X | | |
| 1795 | MD America Energy, LLC | BETTIE JO STROUD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01626_A.ACT.HPVP | 0.00 | X | | |
| 1796 | MD America Energy, LLC | KIRBY MINERALS, AN OKLAHOMA GENERAL PARTNERSHIP | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01672_P.HBP.VS | 0.00 | X | | |
| 1797 | MD America Energy, LLC | UNIVERSAL ROYALTY COMPANY, LTD. | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01700_P.ACT.HPVP | 0.00 | X | | |
| 1798 | MD America Energy, LLC | ANN CARTER LANG AND JON RAY ROLLO, SUCCESSOR CO-TRUSTEES OF LANG TRUST | N/A | Lease | 11/9/2020 | TX-KR-LLS-9999-01502_P.ACT.HPVP | 0.00 | X | | |
| 1799 | MD America Energy, LLC | DAVID H. MUROCK DBA INTERNATIONAL MINING COMPANY, A SOLE PROPRIETORSHIP | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01720_P.HBP.HSVS | 0.00 | X | | |
| 1800 | MD America Energy, LLC | JEAN M. THIERHEIMER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/14/2020 | TX-KR-LLS-9999-01613_P.ACT.HP | 0.00 | X | | |
| 1801 | MD America Energy, LLC | OLIVER WILLIAM LAWLESS, JR, DEALING IN HIS SOLE AND SEPARATE PROPERY | N/A | Lease | 11/17/2020 | TX-KR-LLS-9999-01498_P.ACT.HPVP | 0.00 | X | | |
| 1802 | MD America Energy, LLC | MATTHEW G. VOGES, INDIVIDUALLY AND AS REMAINDERMAN OF THE SHARON A. VOGES LIFE ESTATE | N/A | Lease | 11/30/2020 | TX-KR-LLS-9999-01530_P.ACT.HPVP | 0.00 | X | | |
| 1803 | MD America Energy, LLC | SHARON A. VOGES, LIFE TENANT | N/A | Lease | 11/30/2020 | TX-KR-LLS-9999-01531_P.ACT.HPVP | 0.00 | X | | |
| 1804 | MD America Energy, LLC | BEVERLY RENEE AUSTIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/30/2020 | TX-KR-LLS-9999-01576_P.ACT.HPVP | 0.00 | X | | |
| 1805 | MD America Energy, LLC | DEREK P. VOGES, INDIVIDUALLY AND AS REMAINDERMAN OF THE SHARON A. VOGES LIFE ESTATE | N/A | Lease | 11/30/2020 | TX-KR-LLS-9999-01600_P.ACT.HPVP | 0.00 | X | | |
| 1806 | MD America Energy, LLC | DOROTHY FRYE O'CONNELL, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/30/2020 | TX-KR-LLS-9999-01679_P.ACT.HPVP | 0.00 | X | | |
| 1807 | MD America Energy, LLC | LEONARD SHAW BLAND, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/2/2020 | TX-KR-LLS-9999-01497_P.ACT.HPVP | 0.00 | X | | |
| 1808 | MD America Energy, LLC | LINDA LOUISE LAWLESS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/2/2020 | TX-KR-LLS-9999-01577_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1809 | MD America Energy, LLC | JOHN MILTON DONAHO, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/9/2020 | TX-KR-LLS-9999-01504_P.ACT.HPVP | 0.00 | X | | |
| 1810 | MD America Energy, LLC | THOMAS D. MCWHORTER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01540_P.ACT.HPVP | 0.00 | X | | |
| 1811 | MD America Energy, LLC | OPAL A. FERGUSON, DEALING IN HER SOLE AND SPEARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01537_P.ACT.HPVP | 0.00 | X | | |
| 1812 | MD America Energy, LLC | DAVID MCWHORTER, ALSO KNOWN AS BUEL DAVID MCWHORTER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01539_P.ACT.HPVP | 0.00 | X | | |
| 1813 | MD America Energy, LLC | DAVID, AKA BUEL DAVID MCWHORTER AND WIFE, DIANE MCWHORTER | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01538_P.ACT.HPVP | 0.00 | X | | |
| 1814 | MD America Energy, LLC | BOBBIE M. SOUTHER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01478_P.ACT.HPVP | 0.00 | X | | |
| 1815 | MD America Energy, LLC | DAN WILLIAM LEWIS, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01481_P.ACT.HPVP | 0.00 | X | | |
| 1816 | MD America Energy, LLC | DONALD J. LEWIS, II, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01479_P.ACT.HPVP | 0.00 | X | | |
| 1817 | MD America Energy, LLC | DARRELL SCOTT LEWIS | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01480_P.ACT.HPVP | 0.00 | X | | |
| 1818 | MD America Energy, LLC | GERRELDENE HOPPE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01542_P.ACT.HPVP | 0.00 | X | | |
| 1819 | MD America Energy, LLC | CHARLES D. LAWRY AND WIFE, ANNA MARIE LAWRY | N/A | Lease | 12/10/2020 | TX-KR-LLS-9999-01692_A.ACT | 0.00 | X | | |
| 1820 | MD America Energy, LLC | JAMES W. MCBRIDE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/14/2020 | TX-KR-LLS-9999-01581_P.ACT.HPVP | 0.00 | X | | |
| 1821 | MD America Energy, LLC | BOBBIE DEAN MURPHY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/16/2020 | TX-KR-LLS-9999-01506_P.ACT | 0.00 | X | | |
| 1822 | MD America Energy, LLC | F. G. MIDDLEBROOK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/16/2020 | TX-KR-LLS-9999-01506_P.ACT | 0.00 | X | | |
| 1823 | MD America Energy, LLC | ROBERT F. CHESNIK AND WIFE, ELEANOR M. CHESNIK | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01674_A.HBP.HPVP | 0.00 | X | | |
| 1824 | MD America Energy, LLC | PEGGY BALDWIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/11/2021 | TX-KR-LLS-9999-01675_P.ACT.HPVP | 0.00 | X | | |
| 1825 | MD America Energy, LLC | ANN PLATT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/15/2021 | TX-KR-LLS-9999-06980_P.ACT.HPVP | 0.00 | X | | |
| 1826 | MD America Energy, LLC | TIMOTHY CHEATHAM, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/19/2021 | TX-KR-LLS-9999-01740_P.ACT.HPVP | 0.00 | X | | |
| 1827 | MD America Energy, LLC | ROANE LEE JAMISON DUBOSE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/26/2021 | TX-KR-LLS-9999-01710_P.ACT.HPVP | 0.00 | X | | |
| 1828 | MD America Energy, LLC | JEAN CATES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/1/2021 | TX-KR-LLS-9999-01711_P.ACT.HPVP | 0.00 | X | | |
| 1829 | MD America Energy, LLC | JODI LEIGH NORRIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/1/2021 | TX-KR-LLS-9999-01741_P.ACT.HPVP | 0.00 | X | | |
| 1830 | MD America Energy, LLC | PAMELA KAY VON SCHEELE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/12/2021 | TX-KR-LLS-9999-01737_P.ACT.HPVP | 0.00 | X | | |
| 1831 | MD America Energy, LLC | DONNA FAY MCCULLOCH COLE | N/A | Lease | 2/12/2021 | TX-KR-LLS-9999-01734_P.ACT.HPVP | 0.00 | X | | |
| 1832 | MD America Energy, LLC | JOHN LUDWIG JASTER | N/A | Lease | 2/12/2021 | TX-KR-LLS-9999-01735_P.ACT.HPVP | 0.00 | X | | |
| 1833 | MD America Energy, LLC | KAREN JUNE DAVIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/14/2021 | TX-KR-LLS-9999-01722_P.ACT.VP | 0.00 | X | | |
| 1834 | MD America Energy, LLC | JUDITH EARLENE PHILIPS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/14/2021 | TX-KR-LLS-9999-01732_P.ACT.VP | 0.00 | X | | |
| 1835 | MD America Energy, LLC | LELA CAROL HOLZHAUSER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/14/2021 | TX-KR-LLS-9999-01736_P.ACT.VP | 0.00 | X | | |
| 1836 | MD America Energy, LLC | MARILYN PALMOS GEYER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-01747_P.HBP.VS | 0.00 | X | | |
| 1837 | MD America Energy, LLC | REGINA G. POSS, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/14/2021 | TX-KR-LLS-9999-07059_P.ACT.HPVP | 0.00 | X | | |
| 1838 | MD America Energy, LLC | BEN DAVID WINS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/7/2021 | TX-KR-LLS-9999-01744_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1839 | MD America Energy, LLC | COUNTY OF MADISON, TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-05055_A.HBP | 0.00 | X | | |
| 1840 | MD America Energy, LLC | ROANE LEE JAMISON DUBOSE | N/A | Lease | 4/2/2021 | TX-KR-LLS-9999-01708_P.ACT.HPVP | 0.00 | X | | |
| 1841 | MD America Energy, LLC | BETTYE GRAYSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-05052_P.HBP | 0.00 | X | | |
| 1842 | MD America Energy, LLC | JUDITH GAIL BELL, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-05051_P.HBP | 0.00 | X | | |
| 1843 | MD America Energy, LLC | MARIE MCMAHON TIGHE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-03986_P.HBP | 0.00 | X | | |
| 1844 | MD America Energy, LLC | WOODROE MCMAHON, DEALING IN HIS SOLE AND SEPARATE PROPERTY, BY AND THROUGH HIS AGENT AND ATTORNEY-IN-FACT, KENNETH JERRY MCMAHON | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-05053_P.HBP | 0.00 | X | | |
| 1845 | MD America Energy, LLC | MARK MCMAHON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-05060_P.HBP | 0.00 | X | | |
| 1846 | MD America Energy, LLC | JEAN CATES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/13/2021 | TX-KR-LLS-9999-01709_P.ACT.HPVP | 0.00 | X | | |
| 1847 | MD America Energy, LLC | BEN DAVID WIMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/13/2021 | TX-KR-LLS-9999-01743_P.ACT.HPVP | 0.00 | X | | |
| 1848 | MD America Energy, LLC | LINDA BOSSE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/13/2021 | TX-KR-LLS-9999-05056_P.ACT.HPVP | 0.00 | X | | |
| 1849 | MD America Energy, LLC | GEORGE E. JASTER AND WIFE, LAURA S. JASTER | N/A | Lease | 4/26/2021 | TX-KR-LLS-9999-05047_P.ACT | 0.00 | X | | |
| 1850 | MD America Energy, LLC | JESSIE LEE CONAWAY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/26/2021 | TX-KR-LLS-9999-05048_P.ACT.HPVP | 0.00 | X | | |
| 1851 | MD America Energy, LLC | HAYDEN LEE HOLLIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/9/2021 | TX-KR-LLS-9999-05184_P.ACT.HPVP | 0.00 | X | | |
| 1852 | MD America Energy, LLC | JAMES ROBERTSON HOLLIS, JR., DEALING IN HIS SOLE & SEPARATE PROPERTY | N/A | Lease | 5/9/2021 | TX-KR-LLS-9999-06997_P.ACTHPVP | 0.00 | X | | |
| 1853 | MD America Energy, LLC | MICHELLE LANG HAYES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/17/2021 | TX-KR-LLS-9999-01727_P.ACT.HPVP | 0.00 | X | | |
| 1854 | MD America Energy, LLC | TIMOTHY CHEATHAM, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/17/2021 | TX-KR-LLS-9999-01739_P.ACT.HPVP | 0.00 | X | | |
| 1855 | MD America Energy, LLC | REGINA G. POSS, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/17/2021 | TX-KR-LLS-9999-07060_P.ACT.HPVP | 0.00 | X | | |
| 1856 | MD America Energy, LLC | BNSF RAILWAY COMPANY, A DELAWARE CORPORATION | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-06979_P.HBP.VP(2YRS).HS | 0.00 | X | | |
| 1857 | MD America Energy, LLC | JO BETH BATSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-05177_P.ACT | 0.00 | X | | |
| 1858 | MD America Energy, LLC | GLYDE SUE BATSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/6/2021 | TX-KR-LLS-9999-05178_P.ACT | 0.00 | X | | |
| 1859 | MD America Energy, LLC | JOE D. SHADDIX, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/6/2021 | TX-KR-LLS-9999-05176_P.ACT | 0.00 | X | | |
| 1860 | MD America Energy, LLC | JIM ED BATSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/7/2021 | TX-KR-LLS-9999-06995_P.ACT | 0.00 | X | | |
| 1861 | MD America Energy, LLC | HERMAN BATSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/7/2021 | TX-KR-LLS-9999-06994_P.ACT | 0.00 | X | | |
| 1862 | MD America Energy, LLC | MARY CATHERINE SIMMONS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/7/2021 | TX-KR-LLS-9999-06988_P.ACT.HPVP | 0.00 | X | | |
| 1863 | MD America Energy, LLC | DONALD WAYNE BATSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/8/2021 | TX-KR-LLS-9999-07030_P.ACT | 0.00 | X | | |
| 1864 | MD America Energy, LLC | JOHN DALE PULLEN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-06986_P.HBP | 0.00 | X | | |
| 1865 | MD America Energy, LLC | HENRY DESALVO, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07079_P.ACT | 0.00 | X | | |
| 1866 | MD America Energy, LLC | GERALD CROUCH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07052_P.ACT | 0.00 | X | | |
| 1867 | MD America Energy, LLC | STEWART CROUCH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07054_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1868 | MD America Energy, LLC | ERIN A. CONNALLY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/14/2021 | TX-KR-LLS-9999-07091_P.ACT | 0.00 | X | | |
| 1869 | MD America Energy, LLC | VANESSA ARMSTRONG YOUNG, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/14/2021 | TX-KR-LLS-9999-07083_P.ACT.HPVP | 0.00 | X | | |
| 1870 | MD America Energy, LLC | MARY ANN BRYANT, AS TRUSTEE OF THE MARY ANN BRYANT GST TRUST | N/A | Lease | 7/18/2021 | TX-KR-LLS-9999-07087_P.ACT | 0.00 | X | | |
| 1871 | MD America Energy, LLC | COLLEEN A. JENNINGS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/18/2021 | TX-KR-LLS-9999-07137_P.ACT | 0.00 | X | | |
| 1872 | MD America Energy, LLC | COLLEEN A. JENNINGS, AS TRUSTEE OF THE COLLEEN A. JENNINGS FAMILY TRUST | N/A | Lease | 7/18/2021 | TX-KR-LLS-9999-07140_P.ACT | 0.00 | X | | |
| 1873 | MD America Energy, LLC | EDWIN T. HUBBARD, AS TRUSTEE OF THE HUBBARD LIVING TRUST | N/A | Lease | 7/22/2021 | TX-KR-LLS-9999-07073_P.ACT | 0.00 | X | | |
| 1874 | MD America Energy, LLC | SARA HUBBARD NOURSE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/22/2021 | TX-KR-LLS-9999-07081_P.ACT | 0.00 | X | | |
| 1875 | MD America Energy, LLC | MARILYN HUBBARD POLLARD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/22/2021 | TX-KR-LLS-9999-07086_P.ACT | 0.00 | X | | |
| 1876 | MD America Energy, LLC | JEAN LOUSIE MORRIS FRANKLIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07064_P.ACT.HPVP | 0.00 | X | | |
| 1877 | MD America Energy, LLC | KATIE ANDERSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07070_P.ACT.HPVP | 0.00 | X | | |
| 1878 | MD America Energy, LLC | LOWELL MORRIS THOMAS AND SHIRLEY ANN THOMAS, CO-TRUSTEES OF THE LOWELL MORRIS THOMAS AND SHIRLEY ANN THOMAS REVOCABLE TRUST | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07084_P.ACT.HPVP | 0.00 | X | | |
| 1879 | MD America Energy, LLC | DIANNE GOGGAN, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/26/2021 | TX-KR-LLS-9999-07066_P.ACT | 0.00 | X | | |
| 1880 | MD America Energy, LLC | ZOE B. FRANCIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/26/2021 | TX-KR-LLS-9999-07104_P.ACT.HPVP | 0.00 | X | | |
| 1881 | MD America Energy, LLC | LOUISE TOOPS HOMEIER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/1/2021 | TX-KR-LLS-9999-07088_P.ACT | 0.00 | X | | |
| 1882 | MD America Energy, LLC | IRON CREEK RANCH, LLC. A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 8/1/2021 | TX-KR-LLS-9999-07098_P.ACT.DL | 0.00 | X | | |
| 1883 | MD America Energy, LLC | GEORGE R. MORGAN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/1/2021 | TX-KR-LLS-9999-07099_P.ACT | 0.00 | X | | |
| 1884 | MD America Energy, LLC | FRANCES GRIFFIN GORDAN ALLINSMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/2/2021 | TX-KR-LLS-9999-07092_P.ACT | 0.00 | X | | |
| 1885 | MD America Energy, LLC | ERIN FERGUSON WARD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/2/2021 | TX-KR-LLS-9999-07115_P.ACT | 0.00 | X | | |
| 1886 | MD America Energy, LLC | SUSAN A. RYMAN, LIFE TENANT | N/A | Lease | 8/10/2021 | TX-KR-LLS-9999-07100_P.ACT.HPVP | 0.00 | X | | |
| 1887 | MD America Energy, LLC | BARTON RYMAN, INDIVIDUALLY AND AS REMAINDERMAN OF THE MARK H. RYMAN LIFE ESTATE | N/A | Lease | 8/10/2021 | TX-KR-LLS-9999-07085_P.ACT.HPVP | 0.00 | X | | |
| 1888 | MD America Energy, LLC | JANICE LOU RYMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/10/2021 | TX-KR-LLS-9999-07221_P.ACT.HPVP | 0.00 | X | | |
| 1889 | MD America Energy, LLC | BRIAN RYMAN, INDIVIDUALLY AND AS REMAINDERMAN OF THE SUSAN A. RYMAN LIFE ESTATE | N/A | Lease | 8/10/2021 | TX-KR-LLS-9999-07278_P.ACT.HPVP | 0.00 | X | | |
| 1890 | MD America Energy, LLC | ERIN SCHARBOR, INDIVIDUALLY AND AS REMAINDERMAN OF THE SUSAN A. RYMAN LIFE ESTATE | N/A | Lease | 8/10/2021 | TX-KR-LLS-9999-07279_P.ACT.HPVP | 0.00 | X | | |
| 1891 | MD America Energy, LLC | CHARLES J. FUHRMANN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/31/2021 | TX-KR-LLS-9999-07166_P.ACT | 0.00 | X | | |
| 1892 | MD America Energy, LLC | RICHARD FUHRMANN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/31/2021 | TX-KR-LLS-9999-07167_P.ACT | 0.00 | X | | |
| 1893 | MD America Energy, LLC | RONALD LEON SCHOLZ, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07183_P.ACT.VP | 0.00 | X | | |
| 1894 | MD America Energy, LLC | ROBERT WAYNE SCHOLZ, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07182_P.ACT.VP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1895 | MD America Energy, LLC | JOYCE LYNN SCHOLZ MARSHBURN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07181_P.ACT.VP | 0.00 | X | | |
| 1896 | MD America Energy, LLC | BARBARA ANNETTE SCHOLZ KIMICH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07178_P.ACT.VP | 0.00 | X | | |
| 1897 | MD America Energy, LLC | CHERYL ANN BUSA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07175_P.ACT.VP | 0.00 | X | | |
| 1898 | MD America Energy, LLC | BRENDA KAY SCHOLZ KURTEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/8/2021 | TX-KR-LLS-9999-07180_P.ACT.VP | 0.00 | X | | |
| 1899 | MD America Energy, LLC | NANCY P. WIGLEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07208_P.HBP.VS | 0.00 | X | | |
| 1900 | MD America Energy, LLC | MULTICULTURAL ALLIANCE FKA THE NATIONAL CONFERENCE OF CHRISTIANS AND JEWS, A TEXAS NON-PROFIT CORPORATION | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07112_P.HBP.VS | 0.00 | X | | |
| 1901 | MD America Energy, LLC | COMMISSIONER OF THE GENERAL LAND OFFICE OF THE STATE OF TEXAS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07950_A.HBP | 0.00 | X | | |
| 1902 | MD America Energy, LLC | JAMES MICHAEL SALLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/19/2021 | TX-KR-LLS-9999-07047_P.ACT.HPVP | 0.00 | X | | |
| 1903 | MD America Energy, LLC | BARBARA JEAN HUBBARD, DEALING IN HER SOLE SEPARATE PROPERTY | N/A | Lease | 9/27/2021 | TX-KR-LLS-9999-07177_P.ACT | 0.00 | X | | |
| 1904 | MD America Energy, LLC | DEBRA G. FUHRMANN, FORMERLY KNOWN AS DEBRA G. NEWMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/28/2021 | TX-KR-LLS-9999-07271_P.ACT | 0.00 | X | | |
| 1905 | MD America Energy, LLC | KENNETH, L. VICKERS, INDEPENDENT EXECUTOR OF THE ESTATE OF JUANITA B. VICKERS, DECEASED | N/A | Lease | 9/30/2021 | TX-KR-LLS-9999-07269_P.ACT | 0.00 | X | | |
| 1906 | MD America Energy, LLC | FINCH RANCH, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 2/20/2022 | TX-KR-LLS-9999-07383_P.ACT.HPVP | 0.00 | X | | |
| 1907 | MD America Energy, LLC | RITA KAYE PAVLICEK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/24/2022 | TX-KR-LLS-9999-07386_P.ACT.HPVP | 0.00 | X | | |
| 1908 | MD America Energy, LLC | MARILYN PALMOS GEYER, INDIVIDUALLY AND AS LIFE TENANT, AND; PATRICK WADE GEYER, INDIVIDUALLY AND AS REMAINDERMAN OF THE MARILYN PALMOS GEYER LIFE ESTATE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07443_P.HBP.VS | 0.00 | X | | |
| 1909 | MD America Energy, LLC | BILLY MIKE HARRIS, SR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07445_P.HBP.VS | 0.00 | X | | |
| 1910 | MD America Energy, LLC | PATSY WALLER JACK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07444_P.HBP.VS | 0.00 | X | | |
| 1911 | MD America Energy, LLC | IMOGENE ISAAC WEATHERFORD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07441_P.HBP.VS | 0.00 | X | | |
| 1912 | MD America Energy, LLC | DOROTHY I. DAVIS, ALSO KNOWN AS IMOGENE W. DAVIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07472_P.HBP.VS | 0.00 | X | | |
| 1913 | MD America Energy, LLC | JANET SUE CASEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07471_P.HBP.VS | 0.00 | X | | |
| 1914 | MD America Energy, LLC | PAMILA WALLER MARBLE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07473_P.HBP.VS | 0.00 | X | | |
| 1915 | MD America Energy, LLC | DEAN WHIPPLE AND WIFE, PATTI WHIPPLE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07581_P.HBP.VS | 0.00 | X | | |
| 1916 | MD America Energy, LLC | BRUCE WAYNE WALLER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07490_P.HBP.VS | 0.00 | X | | |
| 1917 | MD America Energy, LLC | DOUGLAS MCDOUGALD, DEALING IN HIS SOLE AND SEPARATE PROPERTY, BY AND THROUGH HIS AGENT AND ATTORNEY-IN-FACT, SERENA A. WHITLEY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07510_P.ACT.HPVP | 0.00 | X | | |
| 1918 | MD America Energy, LLC | SERENA A. WHITLEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07511_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1919 | MD America Energy, LLC | LEOLA H. BOSWELL, DEALING IN HER SOLE AND SEPARATE PROPERTY, BY AND THROUGH HER AGENT AND ATTORNEY-IN-FACT, DORIS A. FREEMAN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07476_P.ACT.HPVP | 0.00 | X | | |
| 1920 | MD America Energy, LLC | DEBRA I. COURT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07495_P.ACT.HPVP | 0.00 | X | | |
| 1921 | MD America Energy, LLC | JOHN R. ISGITT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07514_P.ACT.HPVP | 0.00 | X | | |
| 1922 | MD America Energy, LLC | SARA ISGITT HAMBLIN, INDIVIDUALLY AND AS CUSTODIAN FOR SADIE ELYSE HAMBLIN | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07513_P.ACT.HPVP | 0.00 | X | | |
| 1923 | MD America Energy, LLC | MICHAEL J. PIESCHE AND WIFE, SHERRI R. PIESCHE | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07501_P.ACT.HPVP | 0.00 | X | | |
| 1924 | MD America Energy, LLC | BILLY FATE HUTTO AND WIFE, SHARRON ANN HUTTO | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07499_P.ACT.HPVP | 0.00 | X | | |
| 1925 | MD America Energy, LLC | MARIANNE STEWART, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07525_P.ACT.HPVP | 0.00 | X | | |
| 1926 | MD America Energy, LLC | JAMES HARDY LANDER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07524_P.ACT.HPVP | 0.00 | X | | |
| 1927 | MD America Energy, LLC | FAYE B. ANDREWS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07556_P.HBP.VP | 0.00 | X | | |
| 1928 | MD America Energy, LLC | WILLIAM D. STEWART, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07583_P.ACT.HPVP | 0.00 | X | | |
| 1929 | MD America Energy, LLC | CHARLES F. UTZ AND WIFE, JEANETTE MARIE UTZ | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07577_A.ACT.HPVP | 0.00 | X | | |
| 1930 | MD America Energy, LLC | KENNETH W. BEVERLY AND WIFE, SHARON BEVERLY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07500_P.ACT.HPVP | 0.00 | X | | |
| 1931 | MD America Energy, LLC | LEONARD GENE LONGER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07530_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1932 | MD America Energy, LLC | MARY KATHERINE CANNON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07529_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1933 | MD America Energy, LLC | THOMAS EDWARD LONGER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07531_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1934 | MD America Energy, LLC | ALAN F. CASEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07519_P.ACT.HPVP | 0.00 | X | | |
| 1935 | MD America Energy, LLC | JOSEPH RAY SIMMONS, TRUSTEE OF THE JOSEPH RAY AND FRANCES A. SIMMONS CHILDREN TRUST | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07552_P.ACT/HBP.HPVP | 0.00 | X | | |
| 1936 | MD America Energy, LLC | KENNETH JERRY MCMAHON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07548_P.ACT.HPVP | 0.00 | X | | |
| 1937 | MD America Energy, LLC | MATT S. STEWART, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07526_P.ACT.HPVP | 0.00 | X | | |
| 1938 | MD America Energy, LLC | KELLY R. SHAW, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07520_P.ACT.HPVP | 0.00 | X | | |
| 1939 | MD America Energy, LLC | PAMALOU BEASLEY FULLER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07523_P.ACT.HPVP | 0.00 | X | | |
| 1940 | MD America Energy, LLC | LAURA P. MITCHELL, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07553_P.ACT.HPVP | 0.00 | X | | |
| 1941 | MD America Energy, LLC | ALTA FEATHERSTONE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07517_P.ACT.HPVP | 0.00 | X | | |
| 1942 | MD America Energy, LLC | DEBORAH MCFADIN, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07549_P.ACT.HPVP | 0.00 | X | | |
| 1943 | MD America Energy, LLC | GEARL RAYMOND RASCO, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07578_P.ACT.HPVP | 0.00 | X | | |
| 1944 | MD America Energy, LLC | THOMAS P. MCGINNIS AND WIFE, REBECCA J. MCGINNIS | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07515_A.ACT.HPVP | 0.00 | X | | |
| 1945 | MD America Energy, LLC | JAMES MICHAEL WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07518_P.ACT.HPVP | 0.00 | X | | |
| 1946 | MD America Energy, LLC | JAMES MICHAEL WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07516_P.ACT.HPVP | 0.00 | X | | |
| 1947 | MD America Energy, LLC | CHARLES ANN GUMINA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07502_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1948 | MD America Energy, LLC | DONALD R. BRADSHAW, TRUSTEE OF THE DONALD R. BRADSHAW TRUST U/T/A DATED AUGUST 8, 2001 | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07584_P.ACT/HBP.HPVP.NTP(Cattleman) | 0.00 | X | | |
| 1949 | MD America Energy, LLC | DONALD R. BRADSHAW, TRUSTEE OF THE GLORIA JEAN BRADSHAW FAMILY TRUST U/T/A DATED AUGUST 8, 2001 | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07585_P.ACT/HBP.HPVP.NTP(Cattleman) | 0.00 | X | | |
| 1950 | MD America Energy, LLC | TRIPLE CROWN ACQUISITIONS, LLC | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07521_P.ACT.HPVP | 0.00 | X | | |
| 1951 | MD America Energy, LLC | STEPHEN W. CRAWFORD AND WIFE, MICHELLE LOUISE CORSON CRAWFORD, ALSO KNOWN AS MICHELLE L. CRAWFORD | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07554_P.ACT.HPVP | 0.00 | X | | |
| 1952 | MD America Energy, LLC | SHELLY RANSOM VINSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07528_P.ACT.HPVP | 0.00 | X | | |
| 1953 | MD America Energy, LLC | WALLACE LEE MEEKS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07522_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1954 | MD America Energy, LLC | FAYE ARLENE KRAUS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07561_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1955 | MD America Energy, LLC | JEAN H. HERRING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07559_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1956 | MD America Energy, LLC | PHYLLIS JANE HUGHES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07560_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1957 | MD America Energy, LLC | REBECCA DOREEN MATULA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07562_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1958 | MD America Energy, LLC | VIRGINIA LEE ESTES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07558_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1959 | MD America Energy, LLC | DORROR K. BEYER, TRUSTEE OF THE JERRY L. AND DORROR K. BEYER TRUST | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07557_P.ACT.HPVP.P.HPVP | 0.00 | X | | |
| 1960 | MD America Energy, LLC | KERRCO INC., A DELAWARE CORPORATION | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07639_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1961 | MD America Energy, LLC | LLOYD WAYNE LONGER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07551_P.ACT.HPVP.NTP | 0.00 | X | | |
| 1962 | MD America Energy, LLC | MARY K. BURKS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/6/2020 | TX-KR-LLS-9999-07579_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1963 | MD America Energy, LLC | JANE MARIE THATCHER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/6/2020 | TX-KR-LLS-9999-07580_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1964 | MD America Energy, LLC | GREGORY S. WILLEMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/6/2020 | TX-KR-LLS-9999-07586_P.ACT/HBP.HPVP.NTP(Freeman) | 0.00 | X | | |
| 1965 | MD America Energy, LLC | DANIEL LONGER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/11/2020 | TX-KR-LLS-9999-07550_P.ACT.HPVP.NTP(McGill) | 0.00 | X | | |
| 1966 | MD America Energy, LLC | GOC MADISON, LLC | N/A | Lease | 11/29/2020 | TX-KR-LLS-9999-07574_P.ACT.HPVP | 0.00 | X | | |
| 1967 | MD America Energy, LLC | WABR, LLC | N/A | Lease | 11/29/2020 | TX-KR-LLS-9999-07575_P.ACT.HPVP | 0.00 | X | | |
| 1968 | MD America Energy, LLC | ASHTAN ROYALTIES, LLC | N/A | Lease | 11/29/2020 | TX-KR-LLS-9999-07573_P.ACT.HPVP | 0.00 | X | | |
| 1969 | MD America Energy, LLC | KENT J. HEWITT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/4/2020 | TX-KR-LLS-9999-07555_P.ACT.HPVP | 0.00 | X | | |
| 1970 | MD America Energy, LLC | SHELLEY HEWITT SIMRIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07572_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1971 | MD America Energy, LLC | ROBERT CHARLES JANNISE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/7/2020 | TX-KR-LLS-9999-07589_P.ACT.HPVP | 0.00 | X | | |
| 1972 | MD America Energy, LLC | DEBORAH ADAMS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/7/2020 | TX-KR-LLS-9999-07588_P.ACT.HPVP | 0.00 | X | | |
| 1973 | MD America Energy, LLC | ANOIL COMPANY, A TEXAS CORPORATION | N/A | Lease | 12/12/2020 | TX-KR-LLS-9999-07597_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 1974 | MD America Energy, LLC | ELLIOT CAGE KELLY, TRUSTEE OF THE CAGE MINERAL TRUST DATED JUNE 2, 2003 | N/A | Lease | 1/5/2021 | TX-KR-LLS-9999-07582_P.HBP | 0.00 | X | | |
| 1975 | MD America Energy, LLC | MARY J. ANDREWS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/5/2021 | TX-KR-LLS-9999-07587_P.ACT | 0.00 | X | | |
| 1976 | MD America Energy, LLC | JOHNEBELLE LINE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/8/2021 | TX-KR-LLS-9999-07600_P.ACT | 0.00 | X | | |
| 1977 | MD America Energy, LLC | DONALD R. CLARK, JR. AND DEBORAH COWMAN | N/A | Lease | 1/13/2021 | TX-KR-LLS-9999-07595_P.ACT/HBP.HPVP.NTP | 0.00 | X | | |
| 1978 | MD America Energy, LLC | KEVIN D. CASEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/23/2021 | TX-KR-LLS-9999-07594_P.ACT.DR | 0.00 | X | | |
| 1979 | MD America Energy, LLC | DONAHO RANCH, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 1/31/2021 | TX-KR-LLS-9999-07599_P.ACT.HP | 0.00 | X | | |
| 1980 | MD America Energy, LLC | EFREN CONTRERAS AND WIFE, CYNTHIA CONTRERAS | N/A | Lease | 2/1/2021 | TX-KR-LLS-9999-07596_P.ACT.VP | 0.00 | X | | |
| 1981 | MD America Energy, LLC | FRANK MARTIN SMITH, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/6/2021 | TX-KR-LLS-9999-07604_P.ACT | 0.00 | X | | |
| 1982 | MD America Energy, LLC | GAYLA LYNN HUFF, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/6/2021 | TX-KR-LLS-9999-07603_P.ACT | 0.00 | X | | |
| 1983 | MD America Energy, LLC | DONNA L. SMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/6/2021 | TX-KR-LLS-9999-07653_P.ACT | 0.00 | X | | |
| 1984 | MD America Energy, LLC | JOY LOUISE GROOT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/7/2021 | TX-KR-LLS-9999-07590_P.ACT | 0.00 | X | | |
| 1985 | MD America Energy, LLC | JOY LOUISE GROOT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/7/2021 | TX-KR-LLS-9999-07593_P.ACT.DR | 0.00 | X | | |
| 1986 | MD America Energy, LLC | CORONADO RESOURCES, L.P., A TEXAS LIMITED PARTNERSHIP | N/A | Lease | 2/7/2021 | TX-KR-LLS-9999-07591_P.ACT.DR | 0.00 | X | | |
| 1987 | MD America Energy, LLC | CORONADO RESOURCES 2013, LP, A DELAWARE LIMITED PARTNERSHIP | N/A | Lease | 2/7/2021 | TX-KR-LLS-9999-07592_P.ACT.DR | 0.00 | X | | |
| 1988 | MD America Energy, LLC | PAUL D. SMITH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/14/2021 | TX-KR-LLS-9999-07598_P.ACT.HP.DR | 0.00 | X | | |
| 1989 | MD America Energy, LLC | WANDA WILSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/27/2021 | TX-KR-LLS-9999-07642_P.ACT.HPVP | 0.00 | X | | |
| 1990 | MD America Energy, LLC | GLYNN R. WILSON AND WIFE, SUE WILSON | N/A | Lease | 2/27/2021 | TX-KR-LLS-9999-07641_P.ACT.HPVP | 0.00 | X | | |
| 1991 | MD America Energy, LLC | ELLWOOD T. BARRETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/1/2021 | TX-KR-LLS-9999-08004_A.ACT/HBP.DL.HP | 0.00 | X | | |
| 1992 | MD America Energy, LLC | CHARLES PARK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/12/2021 | TX-KR-LLS-9999-07606_P.ACT.HP | 0.00 | X | | |
| 1993 | MD America Energy, LLC | WILLIAM RANDALL DOWELL, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/19/2021 | TX-KR-LLS-9999-07601_P.ACT.HPVP | 0.00 | X | | |
| 1994 | MD America Energy, LLC | RENEE SONYA DOWELL NIEBLING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/19/2021 | TX-KR-LLS-9999-07602_P.ACT.HPVP | 0.00 | X | | |
| 1995 | MD America Energy, LLC | IRA BETTS, CO-TRUSTEE; LAVERNE KLENK, CO-TRUSTEE; MITCHELL KOOP, CO-TRUSTEE; CHARLES WENDT, CO-TRUSTEE AND WELLS FARGO BANK, N.A., CO-TRUSTEE OF THE KEOWN CHARITABLE FOUNDATION | N/A | Lease | 3/20/2021 | TX-KR-LLS-9999-07941_P.ACT.DR.HPVP | 0.00 | X | | |
| 1996 | MD America Energy, LLC | GREGORY A. PRUITT OR L. DIANNE PRUITT, TRUSTEE OF THE GREGORY A. PRUITT AND L. DIANNE PRUITT REVOCABLE LIVING TRUST DATED JUNE 10, 2016 | N/A | Lease | 3/30/2021 | TX-KR-LLS-9999-07640_P.ACT.VP.NTP(Reynolds) | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | MD America Energy, LLC | T. C. CRAIGHEAD & COMPANY, LLC, AN OKLAHOMA LIMITED LIABILITY COMPANY | N/A | Lease | 4/8/2021 | TX-KR-LLS-9999-0760B_P.ACT.HPVP | 0.00 | X | | |
| 1998 | MD America Energy, LLC | SHIRLEY MAXINE CANNON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/20/2021 | TX-KR-LLS-9999-0761B_A.ACT.VP | 0.00 | X | | |
| 1999 | MD America Energy, LLC | HOPE ELLEN POHORELSKY AND HUSBAND, DAVID POHORELSKY | N/A | Lease | 4/20/2021 | TX-KR-LLS-9999-07613_A.ACT.VP | 0.00 | X | | |
| 2000 | MD America Energy, LLC | G&P INVESTMENTS, INC., A TEXAS CORPORATION | N/A | Lease | 4/23/2021 | TX-KR-LLS-9999-0763B_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 2001 | MD America Energy, LLC | CADDO MINERALS, INC., A TEXAS CORPORATION | N/A | Lease | 4/23/2021 | TX-KR-LLS-9999-07940_P.ACT.DR.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 2002 | MD America Energy, LLC | STRATA TRUST COMPANY, F/B/O WILLIAM DUDLEY FOWLER ACCOUNT 201418604 | N/A | Lease | 4/23/2021 | TX-KR-LLS-9999-07943_P.ACT.DR.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 2003 | MD America Energy, LLC | KENT PORTER BETTS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/28/2021 | TX-KR-LLS-9999-07605_A.ACT | 0.00 | X | | |
| 2004 | MD America Energy, LLC | TANYA JO EMBRY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/28/2021 | TX-KR-LLS-9999-07932_P.ACT | 0.00 | X | | |
| 2005 | MD America Energy, LLC | SUE JANE ASHMORE JOHNSON, INDEPENDENT EXECUTOR OF THE ESTATE OF RANDEE BUICE JOHNSON, DECEASED | N/A | Lease | 5/8/2021 | TX-KR-LLS-9999-07987_P.ACT | 0.00 | X | | |
| 2006 | MD America Energy, LLC | EDDIE LEE ANDERSON | N/A | Lease | 5/9/2021 | TX-KR-LLS-9898-08112_P.ACT/HBP.HPVP | 0.00 | X | | |
| 2007 | MD America Energy, LLC | MICHAEL LLOYD ANDERSON, SR | N/A | Lease | 5/9/2021 | TX-KR-LLS-9898-08111_P.ACT/HBP.HPVP | 0.00 | X | | |
| 2008 | MD America Energy, LLC | RICHARD D. GEORGE, SR. AND WIFE, MARGARET ANDERSON GEORGE | N/A | Lease | 5/9/2021 | TX-KR-LLS-9898-08109_P.ACT/HBP.HPVP | 0.00 | X | | |
| 2009 | MD America Energy, LLC | BRENDA REA BOYD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/11/2021 | TX-KR-LLS-9999-07971_P.ACT | 0.00 | X | | |
| 2010 | MD America Energy, LLC | KARL RADDE AND WIFE, MELISSA RADDE | N/A | Lease | 5/13/2021 | TX-KR-LLS-9999-07616_P.ACT.VP | 0.00 | X | | |
| 2011 | MD America Energy, LLC | JANET SUE CASEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/15/2021 | TX-KR-LLS-9999-07654_P.ACT.HPVP | 0.00 | X | | |
| 2012 | MD America Energy, LLC | NORMAN EUGENE HERRICK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/15/2021 | TX-KR-LLS-9999-07937_A.ACT.HP | 0.00 | X | | |
| 2013 | MD America Energy, LLC | BILLY MIKE HARRIS, SR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/15/2021 | TX-KR-LLS-9999-07933_P.ACT.HPVP | 0.00 | X | | |
| 2014 | MD America Energy, LLC | ALBERT GONZALES AND WIFE, DONNA GONZALES | N/A | Lease | 5/21/2021 | TX-KR-LLS-9999-07944_A.ACT.DR.VP | 0.00 | X | | |
| 2015 | MD America Energy, LLC | LORNE THEISS, EXECUTOR OF THE ESTATE OF CAROL LEE THEISS, DECEASED | N/A | Lease | 5/22/2021 | TX-KR-LLS-9999-07946_A.ACT.DR.HPVP | 0.00 | X | | |
| 2016 | MD America Energy, LLC | KENDELL W. LEWIS, AS AGENT AND ATTORNEY-IN-FACT, AND AS TRUSTEE OF THE NORMA MOSLEY BURKHARDT TRUST | N/A | Lease | 5/24/2021 | TX-KR-LLS-9999-07945_A.ACT | 0.00 | X | | |
| 2017 | MD America Energy, LLC | CHARLES DUANE GEYER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2021 | TX-KR-LLS-9999-07939_P.ACT/HBP.HPVP.NTP(Freeman) | 0.00 | X | | |
| 2018 | MD America Energy, LLC | THOMAS G. PETERS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2021 | TX-KR-LLS-9999-07963_A.ACT | 0.00 | X | | |
| 2019 | MD America Energy, LLC | PEGGY COLE, TRUSTEE OF THE JACK LEON COLE FAMILY TRUST | N/A | Lease | 5/24/2021 | TX-KR-LLS-9999-07965_A.ACT | 0.00 | X | | |
| 2020 | MD America Energy, LLC | DELORES ANN SWEARINGEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2021 | TX-KR-LLS-9999-07964_A.ACT.HPVP | 0.00 | X | | |
| 2021 | MD America Energy, LLC | JANICE KATHERINE ROBERTS THOMPSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/28/2021 | TX-KR-LLS-9999-07936_P.ACT | 0.00 | X | | |
| 2022 | MD America Energy, LLC | JIMMIE A. ROBERTS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/28/2021 | TX-KR-LLS-9999-07935_P.ACT | 0.00 | X | | |
| 2023 | MD America Energy, LLC | ANN CAROLYN ROBERTS EVANS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/28/2021 | TX-KR-LLS-9999-07934_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2024 | MD America Energy, LLC | TARA LYN STANSBERRY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/8/2021 | TX-KR-LLS-9999-07942_P.ACT.HPVP.NTP(Reynolds) | 0.00 | X | | |
| 2025 | MD America Energy, LLC | LIGHTHOUSE ROYALTIES, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 6/13/2021 | TX-KR-LLS-9999-07980_P.ACT.NTP(Reynolds) | 0.00 | X | | |
| 2026 | MD America Energy, LLC | CHRISTOPHER ALAN DEAR, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/24/2021 | TX-KR-LLS-9999-07961_A.ACT | 0.00 | X | | |
| 2027 | MD America Energy, LLC | BOBBY G. ADAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/24/2021 | TX-KR-LLS-9999-07960_P.ACT.DR | 0.00 | X | | |
| 2028 | MD America Energy, LLC | AN OIL COMPANY, A TEXAS CORPORATION | N/A | Lease | 6/30/2021 | TX-KR-LLS-9999-07966_P.ACT.HPVP | 0.00 | X | | |
| 2029 | MD America Energy, LLC | KERRCO, INC., A DELAWARE CORPORATION | N/A | Lease | 6/30/2021 | TX-KR-LLS-9999-07994_P.ACT.HPVP | 0.00 | X | | |
| 2030 | MD America Energy, LLC | LIGHTHOUSE ROYALTIES, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 6/30/2021 | TX-KR-LLS-9999-08021_P.ACT | 0.00 | X | | |
| 2031 | MD America Energy, LLC | JOYCE GAIDO AND HUSBAND, JOE GAIDO | N/A | Lease | 7/3/2021 | TX-KR-LLS-9999-07614_A.ACT | 0.00 | X | | |
| 2032 | MD America Energy, LLC | JEFFREY S. CORNELIUS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-07948_P.HBP | 0.00 | X | | |
| 2033 | MD America Energy, LLC | AARON M. PRUITT AND WIFE, ANNE E. PRUITT | N/A | Lease | 7/5/2021 | TX-KR-LLS-9999-07967_P.ACT.DR.VP | 0.00 | X | | |
| 2034 | MD America Energy, LLC | CHRISTOPHER LEE CALVERY AND WIFE, DARLA ELAINE CALVERY | N/A | Lease | 7/9/2021 | TX-KR-LLS-9999-07988_A.ACT.DL.HPVP | 0.00 | X | | |
| 2035 | MD America Energy, LLC | DENNIS HAY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/10/2021 | TX-KR-LLS-9999-07637_P.ACT | 0.00 | X | | |
| 2036 | MD America Energy, LLC | SHELTON WAYNE COOK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/10/2021 | TX-KR-LLS-9999-07636_P.ACT | 0.00 | X | | |
| 2037 | MD America Energy, LLC | DONNA SUE COOK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/10/2021 | TX-KR-LLS-9999-07635_P.ACT | 0.00 | X | | |
| 2038 | MD America Energy, LLC | THOMAS RICHARD COOK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/10/2021 | TX-KR-LLS-9999-07938_P.ACT | 0.00 | X | | |
| 2039 | MD America Energy, LLC | DESERT PARTNERS III, L. P., A TEXAS LIMITED PARTNERSHIP | N/A | Lease | 7/11/2021 | TX-KR-LLS-9999-07968_P.ACT | 0.00 | X | | |
| 2040 | MD America Energy, LLC | LAZY S MINERALS, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07970_P.ACT.DR.HPVP | 0.00 | X | | |
| 2041 | MD America Energy, LLC | EFP INVESTMENTS, LTD, TEXAS LIMITED PARTNERSHIP | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07969_P.ACT.DR.HPVP | 0.00 | X | | |
| 2042 | MD America Energy, LLC | TWIN ENERGY, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07982_P.ACT.DR.HPVP | 0.00 | X | | |
| 2043 | MD America Energy, LLC | TOWERS ROYALTY, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 7/13/2021 | TX-KR-LLS-9999-07981_P.ACT.DR.HPVP | 0.00 | X | | |
| 2044 | MD America Energy, LLC | LEONARD W. BLACKLEDGE | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07617_P.ACT | 0.00 | X | | |
| 2045 | MD America Energy, LLC | ROBERT MAXIM MAYFIELD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07979_P.ACT.DR.HPVP | 0.00 | X | | |
| 2046 | MD America Energy, LLC | PAMELA SUE MAYFIELD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/25/2021 | TX-KR-LLS-9999-07978_P.ACT.DR.HPVP | 0.00 | X | | |
| 2047 | MD America Energy, LLC | DAN S. KELLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/29/2021 | TX-KR-LLS-9999-07634_P.ACT | 0.00 | X | | |
| 2048 | MD America Energy, LLC | SARA JENNINGS ADAMS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/3/2021 | TX-KR-LLS-9999-07972_P.ACT.HPVP | 0.00 | X | | |
| 2049 | MD America Energy, LLC | J. H. STEPHENS, ALSO KNOWN AS JERRY H. STEPHENS, DEALING IN HIS SOLE AND SEPARATE PROPERTY, BY AND THROUGH HIS AGENT AND ATTORNEY-IN-FACT, WARREN EVERETT STEPEHENS | N/A | Lease | 8/3/2021 | TX-KR-LLS-9999-07989_P.ACT.DR.HPVP | 0.00 | X | | |
| 2050 | MD America Energy, LLC | PATRICIA ANNE COX HARDEE AND HUSBAND, DUDLEY HARDEE | N/A | Lease | 8/9/2021 | TX-KR-LLS-9898-08110_P.ACT/HBP.HP | 0.00 | X | | |
| 2051 | MD America Energy, LLC | GEORGE MORETTI, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/9/2021 | TX-KR-LLS-9999-07984_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2052 | MD America Energy, LLC | LESLIE ODOM HERRMANN, JOSEPH A. BRANDESKY FAMILY LLC, KELLIE ODOM O'CONNELL, AND SUZANNE M. SIRGO | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08015_P.ACT/HBP.DL.HPVP-02.09.2021 | 0.00 | X | | |
| 2053 | MD America Energy, LLC | CYNTHIA CLARK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/18/2021 | TX-KR-LLS-9999-07974_P.ACT.HP | 0.00 | X | | |
| 2054 | MD America Energy, LLC | CANDICE CLARK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/18/2021 | TX-KR-LLS-9999-07973_P.ACT.HP | 0.00 | X | | |
| 2055 | MD America Energy, LLC | DAVID POHORELSKY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/24/2021 | TX-KR-LLS-9999-07983_A.ACT | 0.00 | X | | |
| 2056 | MD America Energy, LLC | ELAYNE W. CAMPBELL, A WIDOW, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 9/4/2021 | TX-KR-LLS-9999-07977_A.ACT.HPVP | 0.00 | X | | |
| 2057 | MD America Energy, LLC | DENNIS A. BLAGRAVE AND WIFE, TAMELA D. BLAGRAVE | N/A | Lease | 10/1/2021 | TX-KR-LLS-9999-07975_P.ACT.HPVP | 0.00 | X | | |
| 2058 | MD America Energy, LLC | LAVERNE Z. HALL, DEALING IN HER SOLE AND SEPARATE PROPERTY, BY AND THROUGH HER AGENT AND ATTORNEY-IN-FACT, CHRISTOPHER A. HALL | N/A | Lease | 10/4/2021 | TX-KR-LLS-9999-07992_P.ACT.HP | 0.00 | X | | |
| 2059 | MD America Energy, LLC | KEMPER PHOEBE GIBSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/4/2021 | TX-KR-LLS-9999-07993_P.ACT | 0.00 | X | | |
| 2060 | MD America Energy, LLC | MARY KOENNING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08005_P.ACT | 0.00 | X | | |
| 2061 | MD America Energy, LLC | CHESTER MAURICE D'OLIVE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08011_P.ACT | 0.00 | X | | |
| 2062 | MD America Energy, LLC | PAMELA SCHUBERT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08012_P.ACT | 0.00 | X | | |
| 2063 | MD America Energy, LLC | JAMES LESLIE ANDERS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08010_P.ACT | 0.00 | X | | |
| 2064 | MD America Energy, LLC | CATHY LU LABOSKI, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08020_P.ACT | 0.00 | X | | |
| 2065 | MD America Energy, LLC | MARCENA O'MALLEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/11/2021 | TX-KR-LLS-9999-08036_P.ACT | 0.00 | X | | |
| 2066 | MD America Energy, LLC | RONALD SMITH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/14/2021 | TX-KR-LLS-9999-08013_P.ACT.DR.HP | 0.00 | X | | |
| 2067 | MD America Energy, LLC | JIMMY LEE BARRON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 10/22/2021 | TX-KR-LLS-9999-08008_P.ACT | 0.00 | X | | |
| 2068 | MD America Energy, LLC | ARMOUR PIPE LINE COMPANY, A DELAWARE CORPORATION | N/A | Lease | 10/30/2021 | TX-KR-LLS-9999-08014_P.ACT.HPVP | 0.00 | X | | |
| 2069 | MD America Energy, LLC | G. NEAL PROPERTIES NO. 2, L.P., A TEXAS LIMITED PARTNERSHIP BY GENE NEAL, INC., GENERAL PARTNER | N/A | Lease | 11/4/2021 | TX-KR-LLS-9999-07990_P.ACT.HPVP | 0.00 | X | | |
| 2070 | MD America Energy, LLC | CATHY LU LABOSKI, TRUSTEE OF THE TESTAMENTARY TRUST CREATED UNDER THE WILL OF DAVID LYNN ANDERS DATED 10/31/2002 FOR THE BENEFIT OF CABLE RYAN ANDERS | N/A | Lease | 11/11/2021 | TX-KR-LLS-9999-08018_P.ACT | 0.00 | X | | |
| 2071 | MD America Energy, LLC | MELISSA LANE D'OLIVE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/11/2021 | TX-KR-LLS-9999-08019_P.ACT | 0.00 | X | | |
| 2072 | MD America Energy, LLC | CLAYTON LEWIS LISENBY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/12/2021 | TX-KR-LLS-9999-08017_P.ACT | 0.00 | X | | |
| 2073 | MD America Energy, LLC | THE UNDERSIGNED: ENK3 MINERALS, LP, A TEXAS LIMITED PARTNERSHIP, INDIVIDUALLY, AS SUCCESSOR TO THE SUE MCCAFFERTY LIFE STATE, AND AS REMAINDERMAN OF THE SUE MCCAFFERTY LIFE ESTATE, AS SUCCESSOR, TO PETER MCCAFFERTY, ET AL | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08022_P.ACT | 0.00 | X | | |
| 2074 | MD America Energy, LLC | BUCKHEAD ENERGY, LLC | N/A | Lease | 11/25/2021 | TX-KR-LLS-9999-07995_P.ACT | 0.00 | X | | |
| 2075 | MD America Energy, LLC | LAZY S MINERALS, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 11/25/2021 | TX-KR-LLS-9999-07996_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2076 | MD America Energy, LLC | CAPROCK ENERGY, LLC, A NEVADA LIMITED LIABILITY COMPANY (SUCCESSOR INTEREST OF VICKI CURRY) | N/A | Lease | 11/25/2021 | TX-KR-LLS-9999-08023_P.ACT.HPVP | 0.00 | X | | |
| 2077 | MD America Energy, LLC | GLEN LOUS LISENBY ANDRESS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/26/2021 | TX-KR-LLS-9999-08016_P.ACT | 0.00 | X | | |
| 2078 | MD America Energy, LLC | ANDREW ISAAC FREEMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/28/2021 | TX-KR-LLS-9999-08026_P.ACT.HPVP | 0.00 | X | | |
| 2079 | MD America Energy, LLC | BOBBY L. FREEMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/28/2021 | TX-KR-LLS-9999-08027_P.ACT.HPVP | 0.00 | X | | |
| 2080 | MD America Energy, LLC | CYNTHIA I. FREEMAN LOTT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/28/2021 | TX-KR-LLS-9999-08031_P.ACT.HPVP | 0.00 | X | | |
| 2081 | MD America Energy, LLC | NORTH ZULCH INDEPENDENT SCHOOL DISTRICT | N/A | Lease | 12/1/2021 | TX-KR-LLS-9999-08030_P.ACT | 0.00 | X | | |
| 2082 | MD America Energy, LLC | JOHN SULLIVAN BLACK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2021 | TX-KR-LLS-9999-07999_P.ACT | 0.00 | X | | |
| 2083 | MD America Energy, LLC | JANICE B. BURGESS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2021 | TX-KR-LLS-9999-08000_P.ACT | 0.00 | X | | |
| 2084 | MD America Energy, LLC | SANDRA B. COX, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2021 | TX-KR-LLS-9999-08001_P.ACT | 0.00 | X | | |
| 2085 | MD America Energy, LLC | JOSEPHINE S. PETTY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2021 | TX-KR-LLS-9999-08003_P.ACT | 0.00 | X | | |
| 2086 | MD America Energy, LLC | SUZAN B. PORTER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/10/2021 | TX-KR-LLS-9999-07991_P.ACT | 0.00 | X | | |
| 2087 | MD America Energy, LLC | MELISSA BASS HINTON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/18/2021 | TX-KR-LLS-9999-08002_P.ACT | 0.00 | X | | |
| 2088 | MD America Energy, LLC | JAMES A. BASS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/18/2021 | TX-KR-LLS-9999-07998_P.ACT | 0.00 | X | | |
| 2089 | MD America Energy, LLC | KENNETH L. BASS, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/18/2021 | TX-KR-LLS-9999-07997_P.ACT | 0.00 | X | | |
| 2090 | MD America Energy, LLC | FANELLA KATHRYN SMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/30/2021 | TX-KR-LLS-9999-08028_P.ACT | 0.00 | X | | |
| 2091 | MD America Energy, LLC | PAMELA HOOD KAUFMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/1/2021 | TX-KR-LLS-9999-08007_P.ACT.HPVP | 0.00 | X | | |
| 2092 | MD America Energy, LLC | PETER ERIC HOOD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/1/2021 | TX-KR-LLS-9999-08006_P.ACT.HPVP | 0.00 | X | | |
| 2093 | MD America Energy, LLC | LOCHBUIE LLC | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08024_P.HBP.DR.VS | 0.00 | X | | |
| 2094 | MD America Energy, LLC | THE RESERVE PETROLEUM COMPANY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08025_P.HBP.DR.VS | 0.00 | X | | |
| 2095 | MD America Energy, LLC | JOHN CHRISTOPHER TOBIAS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/8/2022 | TX-KR-LLS-9999-08055_P.ACT | 0.00 | X | | |
| 2096 | MD America Energy, LLC | JAMES C. COLE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/11/2022 | TX-KR-LLS-9999-08033_P.ACT.HP | 0.00 | X | | |
| 2097 | MD America Energy, LLC | WENDELL MOSLEY AND WIFE, REGINA LYN JAMIESON-MOSLEY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08038_P.HBP.VS | 0.00 | X | | |
| 2098 | MD America Energy, LLC | GLORIA P. DICKEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/22/2022 | TX-KR-LLS-9999-08034_P.ACT.HPVP | 0.00 | X | | |
| 2099 | MD America Energy, LLC | SAUNDRA ANGELINA FRYER AND HUSBAND, JUSTIN TRAVIS FRYER | N/A | Lease | 1/29/2022 | TX-KR-LLS-9999-08035_P.ACT.HPVP | 0.00 | X | | |
| 2100 | MD America Energy, LLC | JIMMY EARL GILBERT AND WIFE, BETTY JO GILBERT | N/A | Lease | 1/29/2022 | TX-KR-LLS-9999-08032_P.ACT.HPVP | 0.00 | X | | |
| 2101 | MD America Energy, LLC | EDWARD LEONARD LAGRAVIER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/5/2022 | TX-KR-LLS-9999-08047_A.ACT | 0.00 | X | | |
| 2102 | MD America Energy, LLC | KERRY D. STROUD AND WIFE, HOLLY M. STROUD | N/A | Lease | 3/5/2022 | TX-KR-LLS-9999-08063_P.ACT | 0.00 | X | | |
| 2103 | MD America Energy, LLC | BURTIS D. FEWOX, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/6/2022 | TX-KR-LLS-9999-08039_P.ACT | 0.00 | X | | |
| 2104 | MD America Energy, LLC | ALTON R. DISERENS AND WIFE, CYNTHIA K. DISERENS, AND CYNTHIA K. DISERENS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/7/2022 | TX-KR-LLS-9999-08040_A.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2105 | MD America Energy, LLC | KENNETH DISERENS AND WIFE, JERI L. DISERENS | N/A | Lease | 3/7/2022 | TX-KR-LLS-9999-08042_A.ACT | 0.00 | X | | |
| 2106 | MD America Energy, LLC | BARBARA B. SMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/12/2022 | TX-KR-LLS-9999-08060_A.ACT | 0.00 | X | | |
| 2107 | MD America Energy, LLC | SCOTT ELLIS WINDHAM, A MARRIED MAN DEALING IN HIS SOLE AND SEPARATE PROPERTY & LAURA BEATRICE WINDHAM PILATIN, A MARRIED WOMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/29/2022 | TX-KR-LLS-9999-08061_P.ACT | 0.00 | X | | |
| 2108 | MD America Energy, LLC | PAT J. TOBIAS AND WIFE, MARA L. TOBIAS | N/A | Lease | 4/9/2022 | TX-KR-LLS-9999-08062_P.ACT | 0.00 | X | | |
| 2109 | MD America Energy, LLC | PROSPERITY BANK, AS TRUSTEE OF THE DAVID VINCENCIA LLOYD REVOCABLE TRUST | N/A | Lease | 4/19/2022 | TX-KR-LLS-9999-08054_P.ACT.HPVP | 0.00 | X | | |
| 2110 | MD America Energy, LLC | MARTHA JANE BENNETT KOPETSKY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08044_P.ACT.HPVP | 0.00 | X | | |
| 2111 | MD America Energy, LLC | WILLIAM C. BENNETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08051_P.ACT.HPVP | 0.00 | X | | |
| 2112 | MD America Energy, LLC | RACHEL MAE ROBINSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08049_P.ACT.HPVP | 0.00 | X | | |
| 2113 | MD America Energy, LLC | ROBERT BURROUGHS BENNETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08057_P.ACT.HPVP | 0.00 | X | | |
| 2114 | MD America Energy, LLC | MAC L. BENNETT, III, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08045_P.ACT.HPVP | 0.00 | X | | |
| 2115 | MD America Energy, LLC | RHEA NANETTE COLLUM, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/3/2021 | TX-KR-LLS-9999-08059_P.ACT.HPVP | 0.00 | X | | |
| 2116 | MD America Energy, LLC | CHEROKEE LAND & MINERALS, INC., A TEXAS CORPORATION | N/A | Lease | 5/6/2022 | TX-KR-LLS-9999-08076_P.ACT.HPVP | 0.00 | X | | |
| 2117 | MD America Energy, LLC | PEC MINERALS LP, BY PEC MINERALS GP, LLC, SOLE GENERAL PARTNER | N/A | Lease | 5/13/2021 | TX-KR-LLS-9999-08068_P.ACT.HPVP | 0.00 | X | | |
| 2118 | MD America Energy, LLC | PATRICIA HILBURN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/17/2022 | TX-KR-LLS-9999-08099_P.ACT.HPVP | 0.00 | X | | |
| 2119 | MD America Energy, LLC | LORNE R. THEISS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/17/2022 | TX-KR-LLS-9999-08093_P.ACT.HPVP | 0.00 | X | | |
| 2120 | MD America Energy, LLC | PROSPERITY BANK, AS TRUSTEE OF THE DAVID VINCENCIA LLOYD REVOCABLE TRUST | N/A | Lease | 5/21/2022 | TX-KR-LLS-9999-08067_P.ACT.HPVP | 0.00 | X | | |
| 2121 | MD America Energy, LLC | ROGER KNIGHT, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/22/2022 | TX-KR-LLS-9999-08081_A.ACT | 0.00 | X | | |
| 2122 | MD America Energy, LLC | KEVIN R. KNIGHT, TRUSTEE OF THE RK, JR./ADK FAMILY TRUST | N/A | Lease | 5/22/2022 | TX-KR-LLS-9999-08079_P.ACT | 0.00 | X | | |
| 2123 | MD America Energy, LLC | GAIL STILLWELL,TRUSTEE OF THE ROGER KNIGHT, JR., FAMILY IRREVOCABLE TRUST | N/A | Lease | 5/22/2022 | TX-KR-LLS-9999-08080_P.ACT | 0.00 | X | | |
| 2124 | MD America Energy, LLC | RUSSELL LEE HARRISON, III, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2022 | TX-KR-LLS-9999-08086_P.ACT | 0.00 | X | | |
| 2125 | MD America Energy, LLC | JEFFREY L. HOLLAND, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2022 | TX-KR-LLS-9999-08090_P.ACT | 0.00 | X | | |
| 2126 | MD America Energy, LLC | JOY BONIN BRADBURY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2022 | TX-KR-LLS-9999-08091_P.ACT | 0.00 | X | | |
| 2127 | MD America Energy, LLC | CARISA RUDD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/24/2022 | TX-KR-LLS-9999-08123_P.ACT | 0.00 | X | | |
| 2128 | MD America Energy, LLC | BILL BUSBY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/29/2022 | TX-KR-LLS-9999-08078_P.ACT.HPVP | 0.00 | X | | |
| 2129 | MD America Energy, LLC | JUSTIN MUNSEY AND WIFE, SYNTHIA MUNSEY | N/A | Lease | 5/29/2022 | TX-KR-LLS-9999-08095_P.ACT.HPVP | 0.00 | X | | |
| 2130 | MD America Energy, LLC | WAYLAND GREGG DOAN AND WIFE, KAREN DOAN | N/A | Lease | 5/29/2022 | TX-KR-LLS-9999-08096_P.ACT.HPVP | 0.00 | X | | |
| 2131 | MD America Energy, LLC | SCOTT ALLEN COLE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08087_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2132 | MD America Energy, LLC | GRACIE SANDERS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08084_A.ACT.HPVP | 0.00 | X | | |
| 2133 | MD America Energy, LLC | RONALD LYNN COLE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08075_P.ACT.HPVP | 0.00 | X | | |
| 2134 | MD America Energy, LLC | NANCY BOWELL NUCHE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08083_A.ACT.HPVP | 0.00 | X | | |
| 2135 | MD America Energy, LLC | KENNETH SPIKES, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08089_A.ACT.HPVP | 0.00 | X | | |
| 2136 | MD America Energy, LLC | GRACIE SANDERS, ALSO KNOWN AS GRACIE MAE SANDER, LIFE TENANT AND GREGG DOAN, AND KAREN DOAN, REMAINDERMEN OF THE GRACIE SANDERS LIFE ESTATE | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08082_P.ACT.HPVP | 0.00 | X | | |
| 2137 | MD America Energy, LLC | NELVA COLE PRATT, LIFE TENANT AND GREGG DOAN, AND KAREN DOAN, REMAINDERMEN OF THE NELVA COLE PRATT LIFE ESTATE | N/A | Lease | 5/31/2022 | TX-KR-LLS-9999-08085_P.ACT.HPVP | 0.00 | X | | |
| 2138 | MD America Energy, LLC | CHARLSIE NICOLE CURRIE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-08077_P.ACT | 0.00 | X | | |
| 2139 | MD America Energy, LLC | MARTHA JANE BENNETT KOPETSKY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-08043_P.ACT.HPVP | 0.00 | X | | |
| 2140 | MD America Energy, LLC | WILLIAM C. BENNETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-08050_P.ACT.HPVP | 0.00 | X | | |
| 2141 | MD America Energy, LLC | RACHEL MAE ROBINSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-08048_P.ACT.HPVP | 0.00 | X | | |
| 2142 | MD America Energy, LLC | ROBERT BURROUGHS BENNETT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2022 | TX-KR-LLS-9999-08056_P.ACT.HPVP | 0.00 | X | | |
| 2143 | MD America Energy, LLC | MAC L. BENNETT, III, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-08046_P.ACT.HPVP | 0.00 | X | | |
| 2144 | MD America Energy, LLC | RHEA NANETTE COLLUM, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2021 | TX-KR-LLS-9999-08058_P.ACT.HPVP | 0.00 | X | | |
| 2145 | MD America Energy, LLC | W. R. HENSARLING, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/3/2022 | TX-KR-LLS-9999-08074_A.ACT.HPVP | 0.00 | X | | |
| 2146 | MD America Energy, LLC | DOUGLAS STANDLEY BAUGH, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/5/2022 | TX-KR-LLS-9999-08070_P.ACT | 0.00 | X | | |
| 2147 | MD America Energy, LLC | CHARLES BENNETT LANDERS AND WIFE, JEWELL IMOGENE LANDERS | N/A | Lease | 6/6/2022 | TX-KR-LLS-9999-08092_P.ACT.HPVP | 0.00 | X | | |
| 2148 | MD America Energy, LLC | HAROLD L. RANKING, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/7/2022 | TX-KR-LLS-9999-08094_A.ACT | 0.00 | X | | |
| 2149 | MD America Energy, LLC | ETOCO, L.P., A TEXAS LIMITED PARTNERSHIP | N/A | Lease | 6/14/2022 | TX-KR-LLS-9999-08098_P.ACT.HPVP | 0.00 | X | | |
| 2150 | MD America Energy, LLC | SAMMIE JO LEWIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08069_P.ACT | 0.00 | X | | |
| 2151 | MD America Energy, LLC | ANN STANDLEY POE, DEALING WITH HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08072_P.ACT | 0.00 | X | | |
| 2152 | MD America Energy, LLC | DUANE TAYLOR STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08071_P.ACT | 0.00 | X | | |
| 2153 | MD America Energy, LLC | BELYNDA GALE BAUGH WILSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08066_P.ACT | 0.00 | X | | |
| 2154 | MD America Energy, LLC | KRISTI LYN STANDLEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08065_P.ACT | 0.00 | X | | |
| 2155 | MD America Energy, LLC | SAM GARRETT STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08064_P.ACT | 0.00 | X | | |
| 2156 | MD America Energy, LLC | CONNIE PASHO, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08073_P.ACT | 0.00 | X | | |
| 2157 | MD America Energy, LLC | JAMES LEE STANDLEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/15/2022 | TX-KR-LLS-9999-08088_P.ACT | 0.00 | X | | |
| 2158 | MD America Energy, LLC | WESLEY BLOOMFIELD AND WIFE, ANNA I. BLOOMFIELD | N/A | Lease | 6/18/2022 | TX-KR-LLS-9999-08102_A.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2159 | MD America Energy, LLC | HUGH THOMPSON AND WIFE, ELIZABETH THOMPSON | N/A | Lease | 6/18/2022 | TX-KR-LLS-9999-08105_P.ACT | 0.00 | X | | |
| 2160 | MD America Energy, LLC | SETH L. THOMASSON AND WIFE, BARBARA Y. THOMASSON | N/A | Lease | 6/20/2022 | TX-KR-LLS-9999-08097_P.ACT.HPVP | 0.00 | X | | |
| 2161 | MD America Energy, LLC | JOYCE F. DYER, ALSO KNOWN AS JOYCE FAYE DYER, LIFE TENANT AND TERRILYN DYER WREN, REMAINDERMAN OF THE JOYCE F. DYER, ALSO KNOWN AS JOYCE FAYE DYER, LIFE ESTATE | N/A | Lease | 6/20/2022 | TX-KR-LLS-9999-08100_P.ACT.HPVP | 0.00 | X | | |
| 2162 | MD America Energy, LLC | ANN MARIE BROWNING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/25/2022 | TX-KR-LLS-9999-08121_P.ACT | 0.00 | X | | |
| 2163 | MD America Energy, LLC | JONATHAN L. HODGES, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/25/2022 | TX-KR-LLS-9999-08127_A.ACT | 0.00 | X | | |
| 2164 | MD America Energy, LLC | MATTHEW HODGES AND WIFE, AMBER HODGES | N/A | Lease | 6/25/2022 | TX-KR-LLS-9999-08119_A.ACT | 0.00 | X | | |
| 2165 | MD America Energy, LLC | BRUCE A. MARTIN AND ALVIN LLOYD MARTIN, CO-TRUSTEES OF THE L. C. MARTIN FAMILY MINERAL TRUST DATED OCTOBER 22, 2015 | N/A | Lease | 6/27/2022 | TX-KR-LLS-9999-08101_P.ACT | 0.00 | X | | |
| 2166 | MD America Energy, LLC | JANNA COLE GREEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08104_P.ACT | 0.00 | X | | |
| 2167 | MD America Energy, LLC | PAUL R. HICKS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08103_P.ACT | 0.00 | X | | |
| 2168 | MD America Energy, LLC | PATRICIA L. DALEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08129_P.ACT | 0.00 | X | | |
| 2169 | MD America Energy, LLC | DANIEL A. FEUHS AND WIFE, CARYN M. FEUHS | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08122_P.ACT | 0.00 | X | | |
| 2170 | MD America Energy, LLC | DANIEL A. FEUHS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08126_P.ACT | 0.00 | X | | |
| 2171 | MD America Energy, LLC | GWENDOLYN DOLORES BRACKETT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/2/2022 | TX-KR-LLS-9999-08128_P.ACT | 0.00 | X | | |
| 2172 | MD America Energy, LLC | WANDA PHILLIPS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/6/2022 | TX-KR-LLS-9999-08150_P.ACT | 0.00 | X | | |
| 2173 | MD America Energy, LLC | ALYCE RAC, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/6/2022 | TX-KR-LLS-9999-08155_P.ACT | 0.00 | X | | |
| 2174 | MD America Energy, LLC | DORIS A. MOSES WARREN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/16/2022 | TX-KR-LLS-9999-08106_P.ACT.HPVP | 0.00 | X | | |
| 2175 | MD America Energy, LLC | KYLE WALTON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/16/2022 | TX-KR-LLS-9999-08148_A.ACT | 0.00 | X | | |
| 2176 | MD America Energy, LLC | NANCY CLOPTON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 7/17/2022 | TX-KR-LLS-9999-08118_P.ACT | 0.00 | X | | |
| 2177 | MD America Energy, LLC | TAMMY ALLPHIN GILBERT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/1/2022 | TX-KR-LLS-9999-08143_P.ACT.HPVP | 0.00 | X | | |
| 2178 | MD America Energy, LLC | BENNY LEE ALLPHIN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/1/2022 | TX-KR-LLS-9999-08142_P.ACT.HPVP | 0.00 | X | | |
| 2179 | MD America Energy, LLC | JANNA COLE GREEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/7/2022 | TX-KR-LLS-9999-08130_A.ACT | 0.00 | X | | |
| 2180 | MD America Energy, LLC | CHARLES E. HEATH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/7/2022 | TX-KR-LLS-9999-08120_P.ACT.HP | 0.00 | X | | |
| 2181 | MD America Energy, LLC | TERRI LYNN O'NEIL WALDRIP, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/9/2022 | TX-KR-LLS-9999-08146_P.ACT | 0.00 | X | | |
| 2182 | MD America Energy, LLC | KELLEY MARIE HORTON MOORE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/9/2022 | TX-KR-LLS-9999-08145_P.ACT | 0.00 | X | | |
| 2183 | MD America Energy, LLC | CRYSTAL MROZ, FORMERLY KNOWN AS CRYSTAL HENNING, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/16/2022 | TX-KR-LLS-9999-08141_P.ACT.HPVP | 0.00 | X | | |
| 2184 | MD America Energy, LLC | JESSICA GUSTAVUS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/16/2022 | TX-KR-LLS-9999-08140_P.ACT.HPVP | 0.00 | X | | |
| 2185 | MD America Energy, LLC | MONICA ALI, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/16/2022 | TX-KR-LLS-9999-08139_P.ACT.HPVP | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2186 | MD America Energy, LLC | DENA WEISINGER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/17/2022 | TX-KR-LLS-9999-08125_P.ACT | 0.00 | X | | |
| 2187 | MD America Energy, LLC | MARK K. MANGRUM, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/17/2022 | TX-KR-LLS-9999-08124_P.ACT.HPVP | 0.00 | X | | |
| 2188 | MD America Energy, LLC | VIDA JEAN STOVER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/21/2022 | TX-KR-LLS-9999-08136_P.ACT | 0.00 | X | | |
| 2189 | MD America Energy, LLC | KAY W. MARTIN, A WIDOW, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/21/2022 | TX-KR-LLS-9999-08154_P.ACT | 0.00 | X | | |
| 2190 | MD America Energy, LLC | MARY ANNE HICKS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/26/2022 | TX-KR-LLS-9999-08137_P.ACT | 0.00 | X | | |
| 2191 | MD America Energy, LLC | PHILLIP A. HICKS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 8/26/2022 | TX-KR-LLS-9999-08138_P.ACT | 0.00 | X | | |
| 2192 | MD America Energy, LLC | JODI DARLENE HORTON HOFFMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/9/2021 | TX-KR-LLS-9999-08147_P.ACT,HPVP | 0.00 | X | | |
| 2193 | MD America Energy, LLC | JERI LEEANN HORTON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/9/2021 | TX-KR-LLS-9999-08144_P.ACT.HPVP | 0.00 | X | | |
| 2194 | MD America Energy, LLC | DEBORAH LEE O'NEIL GOODWIN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/9/2021 | TX-KR-LLS-9999-08153_P.ACT | 0.00 | X | | |
| 2195 | MD America Energy, LLC | HURLENE HALES SAVAGE, LIFE TENANT WITH BRUCE A. MARTIN AND ALVIN LLOYD MARTIN, CO-TRUSTEES OF THE L. C. MARTIN MINERAL TRUST DATED OCTOBER 22, 2015 AS REMAINDERMAN, | N/A | Lease | 9/10/2022 | TX-KR-LLS-9999-08151_P.ACT | 0.00 | X | | |
| 2196 | MD America Energy, LLC | BRUCE A. MARTIN AND ALVIN LLOYD MARTIN, CO-TRUSTEES OF THE L. C. MARTIN FAMILY MINERAL TRUST DATED OCTOBER 22, 2015 | N/A | Lease | 9/10/2022 | TX-KR-LLS-9999-08152_P.ACT | 0.00 | X | | |
| 2197 | MD America Energy, LLC | LYNDA I. DEFENBAUGH, INDIVIDUALLY AND AS SUCCESSOR TRUSTEE OF THE OLAN M. RISINGER AND AUDREY P. RISINGER REVOCABLE LIVING TRUST | N/A | Lease | 9/16/2022 | TX-KR-LLS-9999-08231_P.ACT | 0.00 | X | | |
| 2198 | MD America Energy, LLC | THE RESERVE PETROLEUM COMPANY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08157_P.ACT.HPVP | 0.00 | X | | |
| 2199 | MD America Energy, LLC | LOCHBUIE LLC | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08156_P.ACT.HPVP | 0.00 | X | | |
| 2200 | MD America Energy, LLC | SAM W. ROBINSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/7/2021 | TX-KR-LLS-9999-08161_P.ACT.VP | 0.00 | X | | |
| 2201 | MD America Energy, LLC | NETTIE RAE ROBINSON HARRIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/7/2021 | TX-KR-LLS-9999-08169_P.ACT | 0.00 | X | | |
| 2202 | MD America Energy, LLC | SHERRY L. FINCH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/8/2021 | TX-KR-LLS-9999-08163_P.ACT | 0.00 | X | | |
| 2203 | MD America Energy, LLC | PATRICIA SUE HINDS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/8/2021 | TX-KR-LLS-9999-08162_P.ACT | 0.00 | X | | |
| 2204 | MD America Energy, LLC | ANDREA NELL ROBINSON JACOBY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/8/2021 | TX-KR-LLS-9999-08165_P.ACT.VP | 0.00 | X | | |
| 2205 | MD America Energy, LLC | F AND G INVESTMENTS, A LIMITED LIABILITY PARTNERSHIP | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08159_P.ACT.VP | 0.00 | X | | |
| 2206 | MD America Energy, LLC | RIBBLE INVESTMENT, LLC | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08160_P.ACT.VP | 0.00 | X | | |
| 2207 | MD America Energy, LLC | MYRTLE ANN LINDLEY KAPELLA, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08182_P.ACT | 0.00 | X | | |
| 2208 | MD America Energy, LLC | CAROL JEAN LINDLEY GESSNER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08164_P.ACT | 0.00 | X | | |
| 2209 | MD America Energy, LLC | KENT F. WHITTEN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08184_P.ACT | 0.00 | X | | |
| 2210 | MD America Energy, LLC | NATIONAL COUNCIL OF JEWISH WOMEN, GREATER DALLAS SECTION, INC. | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08215_P.ACT | 0.00 | X | | |
| 2211 | MD America Energy, LLC | MONTERREY MINERALS, LLC, A TEXAS LIMITED LIABILITY COMPANY | N/A | Lease | 11/13/2021 | TX-KR-LLS-9999-08214_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2212 | MD America Energy, LLC | WILLIAM CRUTCHFIELD WILLIAMS, II AND WIFE, MARTHA LYNN WILLIAMS | N/A | Lease | 11/18/2021 | TX-KR-LLS-9999-08167_P.ACT | 0.00 | X | | |
| 2213 | MD America Energy, LLC | W. R. HENSARLING, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/20/2021 | TX-KR-LLS-9999-08229_A.ACT.HPVP | 0.00 | X | | |
| 2214 | MD America Energy, LLC | JOAN F. KALUZA GLASS, A WIDOW | N/A | Lease | 11/21/2021 | TX-KR-LLS-9999-08168_P.ACT | 0.00 | X | | |
| 2215 | MD America Energy, LLC | LINDA BATTLES HERRON, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/21/2021 | TX-KR-LLS-9999-08170_P.ACT | 0.00 | X | | |
| 2216 | MD America Energy, LLC | MELISSA SHARP, A MARRIED WOMAN | N/A | Lease | 1/21/2021 | TX-KR-LLS-9999-08176_P.ACT | 0.00 | X | | |
| 2217 | MD America Energy, LLC | CLAUDE WAYNE GLASS, JR., A MARRIED MAN | N/A | Lease | 11/21/2021 | TX-KR-LLS-9999-08228_P.ACT | 0.00 | X | | |
| 2218 | MD America Energy, LLC | D. GREGORY HINDS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 11/22/2021 | TX-KR-LLS-9999-08166_P.ACT | 0.00 | X | | |
| 2219 | MD America Energy, LLC | CLARK JOHN WHITTEN, DEALING WITH HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/3/2021 | TX-KR-LLS-9999-08171_P.ACT | 0.00 | X | | |
| 2220 | MD America Energy, LLC | DANIEL LANE LARGENT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/4/2021 | TX-KR-LLS-9999-08177_P.ACT | 0.00 | X | | |
| 2221 | MD America Energy, LLC | JIMMIE THOMPSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/5/2021 | TX-KR-LLS-9999-08181_P.ACT | 0.00 | X | | |
| 2222 | MD America Energy, LLC | JOHN W. DENMAN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/6/2021 | TX-KR-LLS-9999-08185_P.ACT | 0.00 | X | | |
| 2223 | MD America Energy, LLC | LANEY CLARE FUHRMANN, INDEPENDENT EXECUTOR OF THE ESTATE OF CARL I. FUHRMANN, JR., DECEASED | N/A | Lease | 12/6/2021 | TX-KR-LLS-9999-08213_P.ACT | 0.00 | X | | |
| 2224 | MD America Energy, LLC | JENNIFER BAILEY BURNS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/6/2021 | TX-KR-LLS-9999-08221_P.ACT | 0.00 | X | | |
| 2225 | MD America Energy, LLC | MARY BAILEY VASQUEZ, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/6/2021 | TX-KR-LLS-9999-08220_P.ACT | 0.00 | X | | |
| 2226 | MD America Energy, LLC | KELLEY BRISTER UNDERWOOD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/9/2021 | TX-KR-LLS-9999-08173_P.ACT.VP | 0.00 | X | | |
| 2227 | MD America Energy, LLC | DABNEY BRISTER KOWIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/9/2021 | TX-KR-LLS-9999-08172_P.ACT.VP | 0.00 | X | | |
| 2228 | MD America Energy, LLC | LAZY S MINERALS, LLC, A DELAWARE LIMITED LIABILITY COMPANY | N/A | Lease | 12/16/2021 | TX-KR-LLS-9999-08180_P.ACT.HPVP | 0.00 | X | | |
| 2229 | MD America Energy, LLC | MARILYN M. WHITTEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/18/2021 | TX-KR-LLS-9999-08219_P.ACT | 0.00 | X | | |
| 2230 | MD America Energy, LLC | KATHLEEN M. DAVIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/18/2021 | TX-KR-LLS-9999-08179_P.ACT | 0.00 | X | | |
| 2231 | MD America Energy, LLC | MICHAEL A. CONWAY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/19/2021 | TX-KR-LLS-9999-08212_P.ACT.HPVP | 0.00 | X | | |
| 2232 | MD America Energy, LLC | MICHAEL A. CONWAY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 12/19/2021 | TX-KR-LLS-9999-08211_P.ACT.HPVP | 0.00 | X | | |
| 2233 | MD America Energy, LLC | TIMOTHY WAYNE BURR, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/2/2022 | TX-KR-LLS-9999-08230_P.ACT | 0.00 | X | | |
| 2234 | MD America Energy, LLC | JOHN CALVIN FRYE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/2/2022 | TX-KR-LLS-9999-08183_P.ACT | 0.00 | X | | |
| 2235 | MD America Energy, LLC | DAVID M. BAILEY, INDEPENDENT EXECUTOR OF THE ESTATE OF ELIZABETH G. BAILEY, DECEASED | N/A | Lease | 1/2/2022 | TX-KR-LLS-9999-08227_P.ACT.HP | 0.00 | X | | |
| 2236 | MD America Energy, LLC | HARMON L. LOWMAN, III, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/2/2022 | TX-KR-LLS-9999-08254_P.ACT | 0.00 | X | | |
| 2237 | MD America Energy, LLC | LINDA BOWDEN LINDLEY WALICEK, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/3/2022 | TX-KR-LLS-9999-08218_P.ACT | 0.00 | X | | |
| 2238 | MD America Energy, LLC | VERNON JOE JOHNSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/10/2022 | TX-KR-LLS-9999-08175_P.ACT | 0.00 | X | | |
| 2239 | MD America Energy, LLC | RUSSELL ARRON DENMAN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/10/2022 | TX-KR-LLS-9999-08216_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2240 | MD America Energy, LLC | LINDLEY DOUGLAS MCBRIDE, DEALING IN HIS SOLE AND SEPARATE PROPERTY, BY AND THROUGH HIS AGENT AND ATTORNEY-IN-FACT, KIMBERLY MCBRIDE | N/A | Lease | 1/16/2022 | TX-KR-LLS-9999-08178_P.ACT | 0.00 | X | | |
| 2241 | MD America Energy, LLC | CRYSTAL PULLEN, FORMERLY KNOWN AS CRYSTAL DAVIS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/16/2022 | TX-KR-LLS-9999-08209_P.ACT | 0.00 | X | | |
| 2242 | MD America Energy, LLC | JONOTHAN HANSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/16/2022 | TX-KR-LLS-9999-08208_P.ACT | 0.00 | X | | |
| 2243 | MD America Energy, LLC | STEVEN M. MAGNESS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | wn (until no longer producing) | TX-KR-LLS-9999-08237_P.ACT | 0.00 | X | | |
| 2244 | MD America Energy, LLC | VERONICA SIMES, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/16/2022 | TX-KR-LLS-9999-08174_P.ACT | 0.00 | X | | |
| 2245 | MD America Energy, LLC | ALLEN J. SANFORD, TRUSTEE OF THE COLE GREAT-GRANDCHILDREN'S TRUST | N/A | Lease | 1/17/2021 | TX-KR-LLS-9999-08158_A.ACT.HPVP | 0.00 | X | | |
| 2246 | MD America Energy, LLC | LEAH DRURY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/20/2023 | TX-KR-LLS-9999-08223_P.ACT.HPVP | 0.00 | X | | |
| 2247 | MD America Energy, LLC | KAREN SUE HEWITT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/22/2022 | TX-KR-LLS-9999-08225_P.ACT.HPVP | 0.00 | X | | |
| 2248 | MD America Energy, LLC | RONDA K. KUHLMANN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/22/2022 | TX-KR-LLS-9999-08224_P.ACT.HPVP | 0.00 | X | | |
| 2249 | MD America Energy, LLC | MARTHA J. BAKER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 1/22/2022 | TX-KR-LLS-9999-08226_P.ACT.HPVP | 0.00 | X | | |
| 2250 | MD America Energy, LLC | SHARRON KINNARD SADLER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/3/2022 | TX-KR-LLS-9999-08210_P.ACT | 0.00 | X | | |
| 2251 | MD America Energy, LLC | MARK ANDREW CASON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/3/2022 | TX-KR-LLS-9999-08217_P.ACT | 0.00 | X | | |
| 2252 | MD America Energy, LLC | MORRIS ROGERS CASEY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 2/7/2023 | TX-KR-LLS-9999-08222_P.ACT.HPVP | 0.00 | X | | |
| 2253 | MD America Energy, LLC | LOLA WINGATE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 3/2/2022 | TX-KR-LLS-9999-08247_P.ACT | 0.00 | X | | |
| 2254 | MD America Energy, LLC | JERRY B. NELSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/1/2022 | TX-KR-LLS-9999-08234_P.ACT | 0.00 | X | | |
| 2255 | MD America Energy, LLC | MELANIE LYNNE HINTON PITTMAN, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/1/2022 | TX-KR-LLS-9999-08235_P.ACT | 0.00 | X | | |
| 2256 | MD America Energy, LLC | BARBARA DILLENBACK GANT, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/1/2022 | TX-KR-LLS-9999-08232_P.ACT | 0.00 | X | | |
| 2257 | MD America Energy, LLC | SHANNON LYNN WILLIAMS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/1/2022 | TX-KR-LLS-9999-08233_P.ACT | 0.00 | X | | |
| 2258 | MD America Energy, LLC | MEARL MCDONALD, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/1/2022 | TX-KR-LLS-9999-08239_P.TEMP.HPVP | 0.00 | X | | |
| 2259 | MD America Energy, LLC | PAUL LEE HINTON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 4/6/2022 | TX-KR-LLS-9999-08236_P.ACT | 0.00 | X | | |
| 2260 | MD America Energy, LLC | DONALD M. SHANNON AND WIFE, ANDREA MARIE SHANNON | N/A | Lease | 4/24/2022 | TX-KR-LLS-9999-08250_P.ACT | 0.00 | X | | |
| 2261 | MD America Energy, LLC | DONALD M. SHANNON AND WIFE, ANDREA MARIE SHANNON | N/A | Lease | 4/24/2022 | TX-KR-LLS-9999-08249_P.ACT | 0.00 | X | | |
| 2262 | MD America Energy, LLC | DONALD M. SHANNON AND WIFE, ANDREA MARIE SHANNON | N/A | Lease | 4/24/2022 | TX-KR-LLS-9999-08248_P.ACT | 0.00 | X | | |
| 2263 | MD America Energy, LLC | CARRIE MCDOUGALD ROBERTS, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-08240_P.ACT | 0.00 | X | | |
| 2264 | MD America Energy, LLC | MONICA L. GRAY, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-08242_P.ACT | 0.00 | X | | |
| 2265 | MD America Energy, LLC | CURTIS NEAL MCDOUGALD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-08244_P.ACT | 0.00 | X | | |
| 2266 | MD America Energy, LLC | NELSON A. SMITH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-08253_P.ACT | 0.00 | X | | |
| 2267 | MD America Energy, LLC | CRAIG DUNCAN MCDOUGALD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-08252_P.ACT | 0.00 | X | | |

| Count | Debtor Name | Contract Counterparty | Address1 | Contract Description | Remaining Term | Contract # | Cure Amount | Assume Contract | Reject Contract | Renegotiate Contract |
|---|---|---|---|---|---|---|---|---|---|---|
| 2268 | MD America Energy, LLC | WAYNE DALE WOOD, JR., DEALING IN HIS SOLE AND SEPARATE PROPERTY | N/A | Lease | 5/1/2022 | TX-KR-LLS-9999-07829_P.ACT | 0.00 | X | | |
| 2269 | MD America Energy, LLC | JAMES EDWARD STONE, INDIVIDUALLY AND AS A BENEFICIARY OF THE ESTATE OF GUADALUPE STONE | N/A | Lease | 5/14/2022 | TX-KR-LLS-9999-08241_P.ACT | 0.00 | X | | |
| 2270 | MD America Energy, LLC | ROUTE 66 MINERALS, L.P., A TEXAS LIMITED PARTNERSHIP | N/A | Lease | 5/29/2022 | TX-KR-LLS-9999-08243_P.ACT.VP | 0.00 | X | | |
| 2271 | MD America Energy, LLC | JOAN CONE, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-08251_P.ACT | 0.00 | X | | |
| 2272 | MD America Energy, LLC | SHARRON KINNARD SADLER, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-07920_P.ACT | 0.00 | X | | |
| 2273 | MD America Energy, LLC | JANICE PIERPER SMITH, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-08246_P.ACT | 0.00 | X | | |
| 2274 | MD America Energy, LLC | CYNTHIA SMITH FURROW, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-07922_P.ACT | 0.00 | X | | |
| 2275 | MD America Energy, LLC | THOMAS C. HOWARD, III, TRUSTEE, OF THE THOMAS C. HOWARD, III REVOCABLE TRUST U/A/D 9/23/99 | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-08245_P.ACT | 0.00 | X | | |
| 2276 | MD America Energy, LLC | FREDNA H. GRIMLAND, DEALING IN HER SOLE AND SEPARATE PROPERTY | N/A | Lease | 6/1/2022 | TX-KR-LLS-9999-08053_P.ACT | 0.00 | X | | |

## EXHIBIT E

### Schedule of Retained Causes of Action

Article IV.K of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; *provided*, *however*, that the Reorganized Debtors have determined not to (and shall not) commence or prosecute Avoidance Actions against the Holders of Trade Claims, subject in all respects to the Reorganized Debtors' rights to use such Causes of Action and the underlying facts to defend against any Claims or Causes of Action asserted against the Debtors or Reorganized Debtors. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. A schedule of the Causes of Action known by the Debtors to be retained by the Reorganized Debtors is included as part of the Plan Supplement. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including, without limitation, pursuant to Article VIII hereof, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.L include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court. The Reorganized Debtors specifically reserve and preserve any Cause of Action that a Debtor may hold against the MeiDu Parties and C. Eric Waller.

Notwithstanding and without limiting the generality of Article IV.K of the Plan, the following Exhibit E(i) through Exhibit E(iii) (each of which is attached hereto) include specific

10786406

types of Causes of Actions expressly preserved by the Debtors or the Reorganized Debtors including:

> Exhibit E(i): Claims Related to Insurance Policies;

> Exhibit E(ii): Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation; and

> Exhibit E(iii): Claims Related to Accounts Receivable and Accounts Payable.

For the avoidance of doubt, subject to the applicable consent rights contained in the Plan, the Debtors reserve all rights to amend, revise, or supplement the list of retained Causes of Action at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

**<u>EXHIBIT E(i)</u>**

**Claims Related to Insurance Policies**

<u>Exhibit E(i)</u> includes the Debtors' insurance brokers. Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is included on <u>Exhibit E(i)</u>, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Additionally, on October 26, 2020, each of the Debtors filed its *Schedules of Assets and Liabilities*, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records (collectively and as amended, the "<u>Schedules</u>"). The Debtors expressly reserve all claims and Causes of Action related to the insurance contracts and policies listed on Schedule A/B and Schedule G for each of the Debtors to the extent the Debtors or Reorganized Debtors may have claims and Causes of Action against such insurance contracts and policies now or in the future.

## Claims Related to Insurance Policies

| Line of Coverage | Carrier | Policy Number | Policy Period |
|---|---|---|---|
| Oil and Gas Commercial General Liability | St. Paul Fire & Marine Insurance Company | ZLP81M4772919N4 | 12/07/2019 to 12/07/2020 |
| Automobile Liability | St. Paul Fire & Marine Insurance Company | ZLP81M4772919N4 | 12/07/2019 to 12/07/2020 |
| Umbrella and Excess Liability | St. Paul Fire & Marine Insurance Company | ZLP81M4772919N4 | 12/07/2019 to 12/07/2020 |
| Workers Compensation and Employers' Liability | Travelers Casualty and Surety Company | 8L741410UB | 12/07/2019 to 12/07/2020 |
| Well Control Insurance | Travelers Property Casualty Company of America | 91N22741 | 12/07/2019 to 12/07/2020 |
| Oil Lease Property and Equipment | St. Paul Fire & Marine Insurance Company | ZIM16N0640319N4 | 12/07/2019 to 12/07/2020 |
| Care, Custody & Control Coverage | Travelers Property Casualty Company of America | 91N22741 | 12/07/2019 to 12/07/2020 |
| Environmental Legal Liability | Aspen Specialty Insurance Company | ERAHHXP19 | 12/07/2019 to 12/07/2020 |
| Excess Liability | Evanston Insurance Company | MKLV3EFX100441 | 12/07/2019 to 12/07/2020 |

| | | | |
|---|---|---|---|
| Side A - Directors and Officers Liability | XL Specialty Insurance Company | ELU168597-20 | 6/26/2020 to 6/26/2022 |
| Employment Practices Liability | Continental Casualty Company | 652267868 | 9/21/2020 to 9/21/2020 |
| Fiduciary Duty Liability | Continental Casualty Company | 652267868 | 9/21/2020 to 9/21/2020 |
| Commercial Crime Insurance | Continental Casualty Company | 652267868 | 9/21/2020 to 9/21/2020 |

| Bond Number(s) | Principal Name(s) | Obligee | Issuer | Term |
|---|---|---|---|---|
| 800015714 | MD America Pipeline, LLC | Texas Railroad Commission | One Beacon Surety Company | 8/1/2020-8/1/2021 |
| 800015715 | MD America Energy, LLC | Texas Railroad Commission | One Beacon Surety Company | 8/1/2020-8/1/2021 |
| 800015716 | MD America Energy, LLC | Texas Railroad Commission | One Beacon Surety Company | 8/1/2020-8/1/2021 |

10786406

**EXHIBIT E(ii)**

**Claims, Defenses, Cross-Claims, and Counter-Claims**
**Related to Litigation and Possible Litigation**

Exhibit E(ii) includes Entities that are party to or that the Debtors believe may become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such Entity is included on Exhibit E(ii).

In addition, Exhibit E(ii) includes claims and Causes of Action the Debtors expressly retain based in whole or in part upon any and all contracts and leases to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever. Notwithstanding the foregoing, the Debtors retain all such claims and Causes of Action regardless of whether such contract or lease is included on Exhibit E(ii). The claims and Causes of Actions reserved include, without limitation, Causes of Action against vendors, suppliers of goods or services, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors; (d) for payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) for any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counter-claims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims. Additionally, on October 26, 2020, each of the Debtors filed its Schedules, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records, and its *Statement of Financial Affairs*, which details certain information regarding each Debtor's property (collectively and as amended, the "SoFAs"). Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all claims and Causes of Action against any Entity listed on (a) the Schedules, Schedule A/B, Schedule D, Schedule E, Schedule F, Schedule G and Schedule H of each Debtor and (b) the SoFA of each Debtor, in each case to the extent such Entities owe or may in the future owe money to the Debtor or Reorganized Debtor.

**Claims, Defenses, Cross-Claims, and Counter-Claims
Related to Litigation and Possible Litigation**

| **Name of Party** | **Nature of Claim** |
|---|---|
| C. Eric Waller | Claims related to Claims, Defenses, Cross-Claims, and Counter-Claims related to Litigation and Possible Litigation |
| MeiDu Energy Corporation (f/k/a MeiDu Holding Co., Ltd.) | Claims related to Claims, Defenses, Cross-Claims, and Counter-Claims related to Litigation and Possible Litigation |
| MeiDu America, Inc. | Claims related to Claims, Defenses, Cross-Claims, and Counter-Claims related to Litigation and Possible Litigation |
| Any shareholders or affiliates of MeiDu Energy Corporation or MeiDu America Inc. (other than any of the Debtors or the Debtors' subsidiaries) | Claims related to Claims, Defenses, Cross-Claims, and Counter-Claims related to Litigation and Possible Litigation |
| Jimmy Shao | Claims related to Claims, Defenses, Cross-Claims, and Counter-Claims related to Litigation and Possible Litigation |

10786406

**EXHIBIT E(iii)**

**Claims Related to Accounts Receivable and Accounts Payable**

Exhibit E(iii) includes Entities that have recently or that currently owe money to the Debtors. Unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors regardless of whether such Entity is included on Exhibit E(iii). Additionally, on October 26, 2020, each of the Debtors filed its Schedules, which included, among other things, claims and Causes of Action each of the Debtors had reflected as a liability on its books and records. The Debtors expressly reserve all claims and Causes of Action against any Entity listed on Schedule A/B, Schedule D, and Schedule E/F of each Debtor to the extent such Entities owe or may in the future owe money to the Debtors or Reorganized Debtors. Furthermore, unless otherwise released under Article VIII of the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe money to them.

**Claims Related to Accounts Receivable and Accounts Payable**

| Count | Owner Name | Net Amount |
|---|---|---|
| 1 | ABCO/ALFORD GROUP | $ (1,105.09) |
| 2 | Allison Lynn Coffey | $ (305.77) |
| 3 | Anthony Colwell | $ (254.41) |
| 4 | ARTHUR E. MENVILLE | $ (24.47) |
| 5 | Bluegrass Energy Enhancement Fund, LLC | $ (13.56) |
| 6 | CALVIN BENNETT JR | $ (55.92) |
| 7 | CAROLE WESTMORELAND MARTIN | $ (55.92) |
| 8 | CONTINENT LAND & TRUST | $ (98,829.82) |
| 9 | Darrell Glenn Geyer | $ (73.93) |
| 10 | Debra Ann Coffey | $ (1,223.50) |
| 11 | DONNA TARDY | $ (27.58) |
| 12 | EDDIE H. CAMP | $ (1,223.50) |
| 13 | Energy Royalties LLC | $ (1.81) |
| 14 | GEORGE DONALD RASCO | $ (7,717.90) |
| 15 | Georgia Ruth Keefer Lebel | $ (267.43) |
| 16 | Goldking Energy Partners 1, LP | $ (38.10) |
| 17 | Hayley O. Johnson | $ (3.37) |
| 18 | Hurley-Texas Royalty Partnership | $ (258.49) |
| 19 | J & A Wheat Investments Inc | $ (1,316.62) |
| 20 | JAMES R. MCCAFFERTY TRUST | $ (37.53) |
| 21 | JANET CARLA CAMPBELL | $ (2.33) |
| 22 | Jimmie Landreth | $ (6.75) |
| 23 | John Heinsius | $ (4.15) |
| 24 | JOHN R. ISGITT | $ (57,162.82) |
| 25 | John Wayne Keefer | $ (4,149.70) |
| 26 | KARA BELINDA COLWELL | $ (254.41) |
| 27 | Kathryn Elizabeth Coffey | $ (305.77) |
| 28 | Lyn-Marr Living Trust | $ (472.07) |
| 29 | Mark Edward Kuder | $ (1,209.70) |
| 30 | Michael Van Bodin | $ (3,161.43) |
| 31 | Patricia Lynn Keefer Brewer | $ (344.74) |
| 32 | Randy or Terri White | $ (6.75) |
| 33 | Rock Resources, LTD | $ (1,118.84) |
| 34 | Rod Sterling Clanton | $ (194.53) |
| 35 | Roland Jeffery Keefer | $ (4,119.79) |
| 36 | Spencer Landreth | $ (6.75) |
| 37 | Traverse Holding Corporation | $ (3.37) |
| 38 | WILLIAM CALVIN BENNETT | $ (51.91) |
| | **Total:** | **$ (185,410.53)** |

**<u>EXHIBIT F</u>**

**Identity of New Boards and Senior Management**

## <u>EXHIBIT F</u>

### Identity of New Boards and Senior Management

Article IV.I of the Plan provides that as of the Effective Date, the term of the current members of the board of directors, members or managers of each of the Debtors shall expire automatically, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with this Plan, the New Organizational Documents, and other constituent documents of each Reorganized Debtor.

Mike Dye will be Chief Executive Officer, Brooklyn George will be Chief Financial Officer and Tim Bozeman will be Chief Operating Officer.

The initial New Parent Board shall consist of Bryan Walker, Jonathan Tunis, Christopher Halloran, and Greg White.

10786406

## **EXHIBIT G**

**Schedule of Trade Claims**

[None]

# **EXHIBIT H**

## **Schedule of Non-Released Entities**

[None]

**<u>EXHIBIT I</u>**

**Valuation Analysis**

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION SHOULD NOT BE USED OR RELIED UPON FOR THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY FTI CONSULTING, INC. ("FTI") REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH FTI'S VALUATION ANALYSIS.

Solely for the purposes of the Plan and the Disclosure Statement, FTI, as financial advisor to the Debtors, has estimated the total enterprise value ("Total Enterprise Value") and implied equity value (the "Equity Value") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Debtors, FTI met with the Debtors' senior management team to discuss the Debtors' assets, operations, and future prospects; reviewed the Debtors' historical financial information; reviewed certain internal financial and operating data, including the Debtors' reserve report; reviewed the Debtors' financial projections for the Reorganized Debtors provided in Exhibit D to the Disclosure Statement (the "Projections"); reviewed publicly available third-party information; and conducted such other studies, analysis, and inquiries FTI deemed appropriate.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the businesses and assets of the Debtors, after giving effect to the Plan, based on the application of standard valuation techniques. The estimated values set forth in this Exhibit I: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an opinion on the terms and provisions or fairness from a financial point of view of any Holder of the consideration to be received by such Holder under the Plan; (c) do not

constitute a recommendation to any Holder of Claims or Interests as to how such Holder should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, FTI has relied upon the accuracy, completeness, and fairness of financial, reserve, and other information furnished by the Debtors. FTI did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Projections in all material respects. FTI has relied on the Debtors' representation and warranty that the Projections: (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. FTI does not offer an opinion as to the attainability of the Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and FTI, and consequently are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the Petition Date. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, FTI has assumed no material changes that would affect the value will occur between the Petition Date and the assumed Effective Date.

FTI did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, FTI believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The following is a summary of analyses performed by FTI to arrive at its recommended range of estimated Total Enterprise Value for the Reorganized Debtors:

A.  Net Asset Value

The net asset value analysis estimated the value of the Debtors' oil and gas reserves by risk-adjusting the projected discounted cash flows of the company's reserves. The cash flows from the reserves are derived from wells currently producing hydrocarbons as well as wells to be drilled in the future. Under this methodology, future cash flows are discounted using various discount rates depending on the reserve category. The Total Enterprise Value for the Company is then calculated by adjusting the reserve value for the aggregate discounted cash flows for future general and administrative expenses, plugging and abandonment liabilities, and additional production and processing taxes not included in the cash flows from the reserves.

B.  Discounted Cash Flow

The discounted cash flow analysis estimates the value of the Debtors' business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted using mid-year convention by a range of discounts rates above and below the Debtors' estimated weighted average cost of capital. The Total Enterprise Value of the Reorganized Debtors is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows over the course of the projection period plus an estimate for the value of the Reorganized Debtors beyond the projection period, known as the terminal value. The terminal values are calculated using a range of EBITDA (as defined below) multiples based on public company trading and a range of perpetuity growth rates.

C.  Precedent Transaction Analysis

The precedent transaction analysis estimates the value of a company by examining public and private transactions on both a corporate and asset-level basis. Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics, such as earnings before interest, taxes, depreciation, and amortization ("EBITDA") and production. The section of asset-level transactions for this purpose was based upon the commodity weighting, reserve life, asset type, commodity price environment, developmental level, relative size, geographic location, and other characteristics that were deemed relevant. The Total Enterprise Value in this case is calculated by multiplying the implied EBITDA, production, or reserves multiple by MD America's forecasted or current operating metric.

D.  Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding either the aggregate amount or market value of outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, such as EBITDA, production, and reserves. The selection of public comparable companies for this purpose was based upon the geographic location, scale, quantum of reserves, and percentage of reserves represented by oil and natural gas liquids relative to natural gas, as well as other characteristics that were deemed relevant.

E.  Total Enterprise Value and Implied Equity Value

The assumed range of reorganization value, as of an assumed Effective Date of November 30, 2020, reflects work performed by FTI on the basis of information with respect to the business and assets of the Debtors available to FTI as of the date of this Disclosure Statement. It should be understood that, although subsequent developments may affect FTI's conclusions, FTI does not have an obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, FTI estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $59 million to $92 million, with a midpoint of $75 million as of the assumed Effective Date of November 30, 2020. Based on the assumed pro forma net debt of $60 million as of the Emergence Date, the Total Enterprise Value implies and Equity Value midpoint of $15 million. This estimate incorporates, among other factors, each of the aforementioned valuation methodologies described herein as well as the Company's forecasted unrestricted cash balance on the Effective Date. FTI has relied upon the Company's forecasted unrestricted cash balance in estimated the Total Enterprise Value and Implied Equity Value.

The estimate of Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

FTI's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Claims as to how such Holder should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any Holder of the consideration to be received by such Holder under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, FTI, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

FTI is acting as financial advisor to the Debtors and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal, or other specialist advice.